UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MIRIAM FULD, individually, as personal representative : 
and administrator of the Estate of Ari Yoel Fuld, deceased, : 
and as natural guardian of plaintiff Natan Shai Fuld, :
NATAN SHAI FULD, minor, by his next friend and :   Case No.: 20-cv-3374
guardian Miriam Fuld, NAOMI FULD, TAMAR GILA :
FULD, and ELIEZER YAKIR FULD, :
  :
            Plaintiffs, :
  :
  :
      vs.   :   **<u>AMENDED COMPLAINT</u>**
  :   **<u>WITH JURY DEMAND</u>**
THE PALESTINE LIBERATION ORGANIZATION and :
THE PALESTINIAN AUTHORITY (a/k/a "The :
Palestinian Interim Self-Government Authority," and/or :
"The Palestinian Council," and/or "The Palestinian :
National Authority"), :
  :
            Defendants. :
  :
  :
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# **<u>INTRODUCTION</u>**

1.     This is a civil action pursuant to the Antiterrorism Act, 18 U.S.C. §2331 *et. seq.*,

the Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L. No. 116-94,

div. J, tit. IX, §903, 133 Stat. 3082 (PSJVTA), and supplemental causes of action, brought by

United States citizens, family members, and the personal representative of the estate of a United

States citizen, who were injured and killed in a terrorist attack assisted and encouraged by

defendants on September 16, 2018, in Gush Etzion, Israel.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this matter and over defendants pursuant to 18

U.S.C. §§2333, and 2334 and the rules of supplemental jurisdiction, as this is an action by

United States nationals who have been injured "in [their] person, property or business by reason

of an act of international terrorism."  Subject matter jurisdiction is also conferred by 28 U.S.C.

§§ 1331 and 1332, as this involves a federal question, and the matter in controversy is between

citizens of a State and citizens of a foreign state, and exceeds the sum or value of $75,000.

3.     The Southern District of New York is the proper venue for this action pursuant to

18 U.S.C. §2334(a), since defendants Palestinian Authority and Palestine Liberation

Organization maintain an office and agent in this district and are residents in this district.

Moreover, defendants Palestinian Authority and Palestine Liberation Organization are "deemed

to have consented to personal jurisdiction," pursuant to 18 U.S.C. §2334(e)(1)(A), the Promoting

Security and Justice for Victims of Terrorism Act of 2019, (the "PSJVTA"), which provides that

a defendant "shall be deemed to have consented to personal jurisdiction," in ATA cases if, after

April 18, 2020, a defendant has made any payment "to *any* payee designated by *any* individual

who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of

terrorism that injured or killed a national of the United States, if such payment is made by reason

of such imprisonment; or (ii) to *any* family member of *any* individual, following such

individual's death while committing an act of terrorism that injured or killed a national of the

United States, if such payment is made by reason of the death of such individual."  18 U.S.C.

§2334(e)(1)(A)(i)(ii) (emphasis added).  In addition, Defendants have consented to jurisdiction

under 18 U.S.C. §2334(e)(1)(B)(iii), which provides that a defendant "shall be deemed to have

consented to personal jurisdiction" in ATA cases if, after January 4, 2020, the defendant

"conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority," subject to specified exceptions.  18 U.S.C. §2334(e)(1)(B)(iii).  Furthermore, Defendants have consented to jurisdiction under 18 U.S.C. §2334(e)(1)(B)(i), which provides that a defendant has consented to jurisdiction if, after January 4, 2020, it "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States," unless "used exclusively for the purpose of conducting official business of the United Nations."  18 U.S.C. §2334(e)(1)(B)(i).

## PARTIES

4.     Plaintiff MIRIAM FULD was severely harmed by the terrorist attack encouraged, incentivized, and assisted by defendants on September 16, 2018 in Gush Etzion, Israel, ("the September 16, 2018 Terrorist Attack"), and is, and at all times relevant hereto was, an American citizen.  Plaintiff MIRIAM FULD is the wife of American citizen Ari Yoel Fuld, who was murdered in the September 16, 2018 Terrorist Attack, and brings this action individually, as the personal representative and administrator of the Estate of Ari Yoel Fuld, and as a natural guardian of her minor child, plaintiff NATAN SHAI FULD.

5.     Plaintiff NATAN SHAI FULD was severely harmed by the September 16, 2018 Terrorist Attack, and is, and at all times relevant hereto was, an American citizen and the minor son of plaintiff MIRIAM FULD, and decedent Ari Yoel Fuld, who was murdered in the September 16, 2018 Terrorist Attack.

6.     Plaintiff NAOMI FULD was severely harmed by the September 16, 2018 Terrorist Attack, and is, and at all times relevant hereto was, an American citizen and the

daughter of plaintiff MIRIAM FULD and decedent Ari Yoel Fuld, who was murdered in the September 16, 2018 Terrorist Attack.

7.      Plaintiff TAMAR GILA FULD was severely harmed by the September 16, 2018 Terrorist Attack, and is, and at all times relevant hereto was, an American citizen and the daughter of plaintiff MIRIAM FULD and decedent Ari Yoel Fuld, who was murdered in the September 16, 2018 Terrorist Attack.

8.      Plaintiff ELIEZER YAKIR FULD was severely harmed by the September 16, 2018 Terrorist Attack, and is, and at all times relevant hereto was, an American citizen and the son of plaintiff MIRIAM FULD and decedent Ari Yoel Fuld, who was murdered in the September 16, 2018 Terrorist Attack.

9.      Defendant THE PALESTINE LIBERATION ORGANIZATION, (hereinafter "PLO"), is, and at all times relevant hereto was, a legal person as defined by 18 U.S.C. §2331(3). Defendant PLO is a public body within the meaning of N.Y. C.P.L.R. §1023.

10.     Defendant THE PALESTINIAN AUTHORITY, also known as The Palestinian Interim Self-Government Authority, and/or The Palestinian National Authority, and/or The Palestinian Council, (hereinafter "PA"), is, and at all times relevant hereto was, a legal person as defined by 18 U.S.C. §2331(3).  Defendant PA is a public body within the meaning of N.Y. C.P.L.R. §1023.

## STATEMENT OF FACTS

11.     The PLO was formed in 1964.  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 1, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

12.     Since its establishment in 1964, and through the present day, defendant PLO has funded, planned, and carried out thousands of terrorist bombings, shootings, and other attacks, resulting in the deaths of hundreds of innocent civilians and the wounding of thousands more. Dozens of United States citizens have been murdered, and scores more wounded, by terrorist attacks carried out and encouraged by defendant PLO.  Congress has explicitly found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad . . . [and] the PLO covenant specifically states that armed struggle is the only way to liberate Palestine, thus it is an overall strategy, not merely a tactical phase . . . .  Congress determines that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States . . . ."  22 U.S.C. §5201.  At all times relevant hereto, the PLO has funded, encouraged, carried out, and utilized terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals.

13.     In 1974, the PLO was invited by the United Nations General Assembly to "participate in the sessions and the work of the General Assembly in the capacity of observer." Observer status for the Palestine Liberation Organization, G.A. Res. 3237, 29 U.N. GAOR Supp. (No. 31) at 4, U.N. Doc. A/9631 (1974).

14.     In 1980, the PLO's Permanent Observer, acting in his official capacity, purchased a townhouse located at 115 East 65th Street in the City and County of New York.  Deed, reproduced at App. to Supp. Mem. in Support of Mot. to Recall Mandate, pp. 270-272, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-5 (2d Cir. Filed Mar. 25, 2019).

15.     In 1993, the PLO and the State of Israel signed a "Declaration of Principles," (the "DOP"), which followed the signatories' mutual recognition.  The DOP anticipated Palestinian self-rule in Gaza and Jericho, (Art. V), the transfer of power and responsibilities to Palestinians

in the West Bank, (Art. VI), and an agreement on self-government and the election of a Palestinian council, (Art. III).  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 5, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

16.     Following further negotiations, the PLO and the State of Israel entered into a series of bilateral agreements. These agreements included, inter alia, the "Gaza-Jericho Agreement," signed in Cairo in 1994; the "Agreement on Preparatory Transfer of Powers and Responsibilities," also signed in 1994; and the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, (the "Interim Agreement"), signed in 1995.  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 6, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

17.     Following the 1995 execution of the Interim Agreement, the PLO created the PA. Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 9, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

18.     The PA's "ultimate authority is the PLO," and the PA is "accountable to the PLO Executive Committee."  Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (Request for an Advisory Opinion), Written Statement Submitted by Palestine at ¶¶ 118–119 (S.D.N.Y. filed Jan. 30, 2004), https://www.icj-cij.org/files/caserelated/131/1555.pdf.

19.     The PA "cannot assume roles or functions not delegated to it by the PLO." PA Ministry of Foreign Affairs Website, translated and reproduced at App. to Supp. Mem. in

Support of Mot. to Recall Mandate, pp. 249-54, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-5 (2d Cir. Filed Mar. 25, 2019).

20.     In the Interim Agreement, the PLO and the State of Israel assigned certain governmental duties in the West Bank and Gaza to the PA.  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 7, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

21.     Since its creation by the PLO, the PA has provided many government services, including local policing and civil authority over traditional matters such as agriculture, banking, employment, environmental protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, water and sewage, and the PA has a police force and levies taxes. Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 9, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

22.     Following its establishment in 1995, and through the present day, defendant PA, as the governing body of the PLO, has funded, encouraged, planned, and carried out hundreds of terrorist bombings, shootings, and other terrorist attacks, resulting in the deaths of hundreds of civilians and the wounding of thousands more.  Dozens of United States citizens have been murdered, and many more wounded, by terrorist attacks carried out and encouraged by defendant PA.

23.     Congress has explicitly found, "Textbooks used by the Palestinian Authority . . . in the West Bank and Gaza demonize Israel, encourage war, and teach children that Palestinian statehood can be achieved through violence. . . .  It is the sense of Congress that the Palestinian

Authority and UNRWA have not sufficiently worked to eliminate all content and passages encouraging violence or intolerance toward other nations or ethnic groups from the curriculum used in their respective schools."  Peace and Tolerance in Palestinian Education Act.  At all times relevant hereto, the PA has funded, encouraged, carried out, and utilized terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals.

24.     Article 9.5 of the Interim Agreement provides that the PA "will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions."  Interim Agreement Art. 9.5(a), available at: https://peacemaker.un.org/sites/peacemaker.un.org/files/IL%20PS_950928_ InterimAgreementWestBankGazaStrip%28OsloII%29.pdf.

25.     The PLO states that it has delegated to the PA a role in the PLO's conduct of foreign activities, including its activities at the UN Mission in New York.  In 2005, the PA adopted "The Diplomatic Corps Law No. 13-2005."  According to this law, the PA's Ministry of Foreign Affairs is charged with "[o]verseeing all missions politically, administratively and financially," (§ 3); and all staff with the rank of "Ambassador" are appointed by the PA's President, (§§ 7, 9).  The Diplomatic Corps Law No. 13-2005, translated and reproduced at App. to Supp. Mem. in Support of Motion to Recall Mandate, pp. 214-24, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-4 (2d Cir. Filed Mar. 25, 2019).

26.     In accordance with this law, PA President Abbas appointed Riyad Mansour to head the Palestinian UN Mission on September 10, 2005, with the civil service rank of "ambassador" within the PA's Foreign Ministry, serving as the PLO's Permanent Observer to the

United Nations.  Palestinian Gazette, Decision No. 122 of 2005, translated and reproduced at

App. to Supp. Mem. in Support of Motion to Recall Mandate, pp. 234-40, *Waldman v. Palestine*

*Liberation Org.*, No. 15-3135, ECF Doc. 305-4 (2d Cir. Filed Mar. 25, 2019).

27.     Upon information and belief, Dr. Mansour continued in this position after January

4, 2020.

28.     According to testimony of Salam Fayyad, "after the PA came into being, the

PLO . . . ceased to have its own independent sources of funding largely. . . .  [F]unding for its

own operations did come from the PA." Deposition of Salam Fayyad, p. 76:2-7, *Saperstein v.

Palestinian Auth.*, No. 04-20225-CIV (S.D. Fl. given Mar. 9, 2010).  Dr. Fayyad was the PA's

Finance Minister from June 2002 to November 2005, and from March 2007 to May 2012, and he

was the PA's Prime Minister between June 2007 and June 2013.

29.     Upon information and belief, the PLO has received all or substantially all its

funding from the PA at all relevant times, including after January 4, 2020.

30.     As described in detail below, Defendants have made payments to the designees of

prisoners imprisoned for committing terror attacks and to the families of suicide terrorists by

reason of the terror attacks.  The entities through which Defendants have channeled these

payments have been moved repeatedly back and forth between the PLO to the PA at the

discretion of Chairman/President Abbas.

**First Basis of Consent to Jurisdiction: Defendants' Pay-For-Slay Practices**

31.     Defendants have consented to jurisdiction under the PSJVTA, Section

2334(e)(1)(A), which provides that a defendant "shall be deemed to have consented to personal

jurisdiction" in ATA cases if, after April 18, 2020, it "makes *any* payment, directly or

indirectly—(i) to *any* payee designated by *any* individual who, after being fairly tried or pleading

guilty, has been imprisoned for committing any act of terrorism that injured or killed a national

of the United States, if such payment is made by reason of such imprisonment; or (ii) to *any*

family member of *any* individual, following such individual's death while committing an act of

terrorism that injured or killed a national of the United States, if such payment is made by reason

of the death of such individual."  18 U.S.C. § 2334(e)(1)(A)(i)(ii) (emphasis added).

Accordingly, it is not necessary that payment be made to a specific terrorist or his family, but

rather to any payee within the above parameters.

### *Defendants' Prisoner and "Martyr" Payments*

32.    Defendants have a longstanding practice pursuant to which they provide monthly

payments to designees of Palestinians imprisoned for murdering or injuring civilians and to the

families of suicide terrorists.  According to the Congressional Research Service, "The Palestinian

practice of compensating families who lost a member (combatant or civilian) in connection with

Israeli-Palestinian violence reportedly dates back to the 1960s.  Palestinian payments on behalf

of prisoners or decedents in their current form apparently 'became standardized during the

second intifada [uprising] of 2000 to 2005.'  Various PA laws and decrees since 2004 have

established parameters for payments."  Jim Zanotti, Congressional Research Service: "U.S.

Foreign Aid to the Palestinians," at 12 (Dec. 12, 2018) (footnotes omitted), available at:

https://crsreports.congress.gov/product/pdf/RS/RS22967/59.

33.    In 2004, Defendants enacted a law providing that the designee of any individual

imprisoned for committing any offense while "participating in the struggle against the

occupation"—*i.e.*, against Israelis and Jews in Israel—is eligible for such payments.  This law

codified prior practice. It was described in detail in January 2015 in documents and testimony at

trial in *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD) (S.D.N.Y.), *e.g.*, Trial Exs. 512 (ECF Doc. 909), 1143 (ECF Doc. 910); Trial Tr. 494-505, 568-91 (ECF Doc. 837, 839).

34.     Individuals charged with terrorism are classified under Israeli law as "security prisoners." *See* Criminal Procedure (Arrest of a Security Offense Suspect) (Temporary Provision) Law, 5766-2006.

35.     There are thousands of Palestinian security prisoners serving sentences in Israel. For example, in 2015, counsel for the PLO and PA elicited testimony in open court that there were approximately 4,000 security prisoners in Israel.  Trial Transcript in *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD) (S.D.N.Y.), ECF Doc. 830, pp. 602-03, 909-10 (filed Mar. 4, 2015).

36.     Defendants have a long-standing practice pursuant to which they provide monthly payments to families of Palestinian or pro-Palestinian individuals who were injured or killed in the context of the Palestinian-Israeli conflict.  Such individuals include suicide terrorists.  This practice was described in detail in January 2015 in documents and testimony at trial in *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD) (S.D.N.Y.), *e.g.*, Trial Tr. 593-94, 603-04.

37.     Defendants call these payments "martyr" payments. According to the Washington Post, the PA's "Foundation for the Care of the Families of Martyrs, has an annual budget of $173 million and operates within the Palestinian Authority's Ministry of Social Affairs. The foundation gives support to any individual 'wounded, killed, or otherwise affected as a result of their joining the revolution or the presence of the revolution . . . .'"  David Makovsky, Ghaith al-Omari and Lia Weiner, *If Palestinians are Serious about Peace, 'Martyr' Violence Should Not*

*Pay,* Wash. Post (April 6, 2017), available at: https://www.washingtonpost.com/news/global-opinions/wp/2017/04/06/if-palestinians-are-serious-about-peace-martyr-violence-should-not-pay.

38.     Hundreds of Palestinians have died while committing terror attacks against civilians in Israel.

39.     In 2018, the *Washington Post*'s "Fact Checker" column reported that approximately "13,000 Palestinian men and women are beneficiaries of the prisoner payments, which totaled about $160 million," and approximately "33,700 families (19,700 in the Palestinian territories) shared in about $183 million in martyr payments." Glenn Kessler, *Does the Palestinian Authority pay $350 million a year to 'terrorists and their families?'* Wash. Post (March 14, 2018), available at: https://www.washingtonpost.com/news/fact-checker/wp/2018/03/14/does-the-palestinian-authority-pay-350-million-a-year-to-terrorists-and-their-families.

40.     The entity that Defendants have used to make payments to security prisoners has changed over time. In May 2020, the *Jerusalem Post* reported: "In 2014, the PA closed the PA Ministry of Prisoners' Affairs, and in 2015 it created the PLO Commission of Prisoners' Affairs. In 2018, it reopened the PA Ministry of Prisoners' Affairs and in 2019 it changed its name to the Commission for Detainees' Affairs. Now in 2020, it is trying to hide its payments by moving them once again from the PA to the PLO." Donna Rachel Edmunds, *PA Hiding Terrorist Salaries from Donor Countries in Financial Reports*, Jerusalem Post (May 6, 2020), available at https://www.jpost.com/arab-israeli-conflict/pa-hiding-terrorist-salaries-from-donor-countries-in-financial-reports-627111.

41.     With regard to the payments described above, the PLO and PA act in coordination and/or common control with one another.  According to a witness called by Defendants at trial in *Sokolow v. PLO*, both the Martyr's Foundation and the Ministry for Prisoners and Ex-Prisoners have been "moved" between the PLO and the PA, and that the decision to move these institutions is made by Mahmoud Abbas, President of the PA and Chairman of the PLO.  Trial Transcript (Feb. 10, 2015) at 3132-33 in *Sokolow v. PLO*, No. 04 Civ. 397 (GBD), ECF Doc. 878 (Testimony of Hanan Ashrawi) (S.D.N.Y. filed Mar. 4, 2015).

42.     Upon information and belief, the PA has provided funds to the PLO with the knowledge and/or intent that the PLO would make the payments described above.

43.     At all times relevant hereto, defendants PLO and PA have encouraged and incentivized terrorism with the egregious practice of providing these generous financial payments to families of Palestinians who engage in acts of terrorism and to individuals incarcerated in Israeli prisons.  Wall Street Journal, *Ending Aid to Terrorists, Palestinian Law Rewards Those Who Kill Jews, Including Americans*, November 13, 2016; Bloomberg Opinion, *The Palestinian Incentive Program for Killing Jews*, July 1, 2016; Wall Street Journal, *Pay for Slay in Palestine, U.S. Aid Becomes a Transfer Payment for Terrorists*, March 27, 2017; Jerusalem Post, *How to End the Palestinian Authority's 'pay-for-slay' laws*, March 6, 2017; The Tower Magazine, *Abbas Defends Payments to Terrorists After Meeting With U.S. Envoys*, June 22, 2017.  Moreover, defendants PA and PLO refer to Palestinians who commit terror attacks in Israel and otherwise as "heroes" and to those Palestinians who are killed while carrying out terror attacks as "martyrs," which serves to not only legitimize, but extol all acts against Israel, including violent acts such as murder.  The Washington Post, *If Palestinians Are Serious About Peace, 'Martyr' Violence Should Not Pay*, April 6, 2017.  In 2009, PA President Mahmoud

Abbas stated that payments would continue to be made for prisoners belonging to the PLO. Palestine News Network, *Stipends for PLO-member political prisoners*, March 4, 2009.

44.     As depicted above, the PA spends approximately $300 million per year, which is roughly 7 percent of its total budget, supporting two foundations: one established for the purpose of assisting families of "martyrs," The Foundation for the Care of the Families of Martyrs, and the second for Palestinians who are incarcerated in Israeli prisons, a program codified in 2004 Palestinian Law No. 14, the Aid for Prisoners in Israeli Prisons. *Id*. The law provides for monthly salaries to prisoners, along with an entire compensation package and reward upon the prisoner's release from prison, including various economic preferential treatments. *Id*. In 2014, in the face of international pressure on PA to cease payments, PA President Mahmoud Abbas transferred the Ministry of Prisoners' Affairs from PA to PLO, which Abbas also chairs. *Id*.; Forward, *Does Aid to Palestinians Subsidize the Families of Terrorists?*, August 23, 2016. In fact, defendants PA and PLO fund one another. *See id*. In June of 2016, PA's budget report listed a transfer of $137.45 million to PLO in support of PLO's program to protect its prisoners and their families. *Id*.

*Defendants Gave Up Hundreds of Millions of Dollars in Aid to Continue Pay-For-Slay Practice*

45.     On December 26, 2018, PA Prime Minister Rami Hamdallah informed Secretary of State Mike Pompeo that the PA would reject United States financial support as of January 31, 2019, because it did not want to be subject to personal jurisdiction in the United States pursuant to the proposed Anti-Terrorism Clarification Act of 2018, thus clearly indicating the PA's intention to continue to encourage and commit terrorist attacks in Israel without having to subject itself to trial in the United States for committing such acts against United States citizens in Israel. *See* Letter from PA Prime Minister Rami Hamdallah to Secretary of State Mike Pompeo

(December 26, 2018).   "The Government of Palestine respectfully informs the United States

Government that, as of January 31st, 2019, it fully disclaims and no longer wishes to accept any

form of assistance referenced in ATCA. . . .   The Government of Palestine unambiguously makes

the choice not to accept such assistance."  *Id*.  Implicit in Hamdallah's statement is the fact that

the PA was willing to choose terrorism over foreign aid.

46.     Prior to 2018, the United States provided billions of dollars in financial assistance

to the PLO and the PA.  Jim Zanotti, Congressional Research Service: "U.S. Foreign Aid to the

Palestinians," at 1 (Dec. 12, 2018), available at: https://crsreports.congress.gov/product/pdf/RS/

RS22967/59.

47.     In 2018, Congress enacted the Taylor Force Act, which mandated that specified

foreign assistance to the PA was forbidden, unless the Secretary of State certified that the PLO

and PA "(A) are taking credible steps to end acts of violence against Israeli citizens and United

States citizens that are perpetrated *or* materially assisted by individuals under their jurisdictional

control, such as the March 2016 attack that killed former United States Army officer Taylor

Force, a veteran of the wars in Iraq and Afghanistan; (B) have terminated payments for acts of

terrorism against Israeli citizens and United States citizens to any individual, after being fairly

tried, who has been imprisoned for such acts of terrorism and to any individual who died

committing such acts of terrorism, including to a family member of such individuals . . . ."

Taylor Force Act, Pub. L. 115-141, Title X, § 1004(1)(A)(B)) (codified at 22 U.S.C. § 2378c–

1(a)(1)(B)) (emphasis added).

48.     In enacting the Taylor Force Act, Congress found that "[t]he Palestinian

Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the

families of deceased terrorists, is an incentive to commit acts of terror."  *Id.*, §1002(1).

15

49.     The Taylor Force Act, Section 1003, "(1) calls on the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations to stop payments for acts of terrorism by individuals who are imprisoned after being fairly tried and convicted for acts of terrorism and by individuals who died committing acts of terrorism and to repeal the laws authorizing such payments; (2) calls on all donor countries providing budgetary assistance to the Palestinian Authority to cease direct budgetary support until the Palestinian Authority stops all payments incentivizing terror; (3) urges the Palestinian Authority to develop programs to provide essential public services and support to any individual in need within its jurisdictional control, rather than to provide payments contingent on perpetrating acts of violence . . . ." *Id.*, §1003(1)(2)(3).

50.     Congress specified limitation of foreign aid to the West Bank and Gaza and enacted the Taylor Force Act specifically to combat the PA's incentivization of acts of terror through its pay-for-slay laws.

51.     Based on Sections 1004(a)(1)(A)(B), Congress found that the pay-for-slay laws incentivize and are the proximate cause of acts of terror to such an extent, that even if the acts of terror are perpetrated by individuals who are merely under the jurisdictional control of the PA and PLO, that by itself is sufficient to render the PA and PLO ineligible for American funds.

52.     Nevertheless, after Congress passed the Taylor Force Act in March 2018, notwithstanding the threatened substantial loss in funding, Mahmoud Abbas, PLO Chairman and PA President, announced in a public speech, "We will not accept a cut or cancellation of salaries to the families of martyrs and prisoners . . . .  Even if we have only a penny left, we will give it to the martyrs, the prisoners and their families. . . .  We view the prisoners and the martyrs as planets and stars in the skies of the Palestinian struggle, and they have priority in everything."

*See*, *e.g.*, The Times of Israel*, Abbas Vows to Continue Stipends to Terrorists, even with PA's 'last penny,'"* July 24, 2018; The Jerusalem Post, *Abbas: We Won't Stop Payments to Martyrs and Prisoners*, July 24, 2018.  PA President Abbas added that the PA "will not allow anyone to interfere with the money that Israel is against us paying to the families of martyrs and prisoners." *Id*.  The PA and PLO chose terrorism over foreign aid.  The stipends amount to approximately $300 million, roughly 7 percent of the PA's $5 billion budget for 2018.  *Id*; The Washington Post, *If Palestinians Are Serious About Peace, 'Martyr' Violence Should Not Pay*, April 6, 2017.

53.     Beginning in 2018, the United States has withheld hundreds of millions of dollars per year in foreign assistance from the PA pursuant to the Taylor Force Act.  Jim Zanotti, Congressional Research Service, *U.S. Foreign Aid to the Palestinians* at 1 (Dec. 12, 2018), available at: https://crsreports.congress.gov/product/pdf/RS/RS22967/59.

54.     Notwithstanding the substantial loss in funding, Defendants have confirmed numerous times that the payments described above will continue and have continued. For example,

    a.  On September 20, 2018, the Palestinian Prisoner Affairs Commission spokesman, Hassan Abd Rabbo, stated, "We are not bashful or secretive about our support for our prisoners.  The [Jabarin] family would be eligible to receive a monthly salary of NIS 1,400, ($390), if their son is not freed by Israel and it completes all the necessary documents."  Times of Israel, U.S. Envoy: Abbas Pay to Family of Terrorist Who Killed Ari Fuld is Unconscionable, September 20, 2018.  Abd Rabbo added that the sum would increase if Jabarin would remain in prison for several years.  *Id.*  Former PA Prisoners' Affairs Minister Ashraf al-Ajrami confirmed Abd Rabbo's statements, as well.  *Id.*

b. On September 26, 2019, Chairman Abbas stated in a speech to the United Nations General Assembly: "Even if we only have one penny left, we will give it to the martyrs, the prisoners and their families. . . .  We view the prisoners and the martyrs as planets and stars in the skies of the Palestinian struggle, and they have priority in everything."  *See*, *e.g.*, The Times of Israel, *Abbas Vows to Continue Stipends to Terrorists, even with PA's 'last penny,'"* July 24, 2018; The Jerusalem Post, *Abbas: We Won't Stop Payments to Martyrs and Prisoners*, July 24, 2018.

c. On March 29, 2020, the PA's Prime Minister Mohammed Shtayyeh declared that "we will pay full salaries this month over several days to prevent the public from crowding in front of banks . . . [t]he third day for prisoners and martyrs," as announced by WAFA, the official PA news agency.  https://english.wafa.ps.

d. On April 16, 2020, PA President Mahmoud Abbas declared "[t]he issue of the prisoners will remain our first priority despite all the difficulties we are facing. This is to preserve the just, inalienable rights of our people," as announced by WAFA, the official PA news agency.  *Id.*

e. On July 5, 2020, Qadri Abu Bakr, the head of Defendants' Ministry of Prisoners and Ex-Prisoners, "stated that the Finance Ministry had transferred all of the prisoners' allowances into their bank accounts, along with the date the allowances were to be paid," as announced by WAFA.  *Id.*  WAFA also reported that Minister "Abu Bakr demanded that all banks commit to paying the prisoners' allowances and refrain from closing any of the accounts, or cancelling any of the ATM cards, considering that failing to pay the prisoners' allowances would

violate the directives of the [Palestine] Monetary Authority and the government, and that it would violate the agreement that had previously been concluded." *Id.*

f.   On July 9, 2020, Qadri Abu Bakr, the head of Defendants' Ministry of Prisoners and Ex-Prisoners, was interviewed on official Palestinian Television. When asked about the prisoner payments, he stated: "Regarding the salaries, everything was 100% on Wednesday [July 8, 2020], obviously, after contact, of course, with a number of the banks that had stopped the payments.  And nearly all the prisoners- we did not receive a single call from any prisoner.  They went to the banks and it was paid to them."  Official PA TV, Giants of Endurance, July 9, 2020.

g.   On August 4, 2020, in his declaration in the underlying case, Tareq Mustafa, Director General of the Budget Department at the Palestinian Authority's Ministry of Finance, admitted that "one payment, in the amount of 1,400 NIS (approximately $400 USD), was transferred to the mother of Jabarin in October 2019."  Mustafa Dec., dated August 4, 2020, ¶ 6.

*Pay-for-Slay Payments Include Payments to Terrorists Who Killed or Injured U.S. Nationals*

55.   Hundreds of nationals of the United States have been killed or injured in terror attacks in Israel.  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 317 (2d Cir. 2018).

56.   There are more than two hundred Palestinian "security prisoners," who have been imprisoned after being fairly tried or pleading guilty for committing acts of terrorism that killed or injured one or more nationals of the United States.

57.     As of December 4, 2014, the following individuals were imprisoned after being fairly tried or pleading guilty for committing acts of terrorism that injured or killed one or more nationals of the United States:

h.  Abdullah, Mohamed Sami

i.  Aweis, Abdel Karim

j.  Aweis, Nasser

k.  Barghouti, Abdullah

l.  Barghouti, Ahmed

m.  Ghanem, Faras

n.  Haliel, Ali

o.  Hamash, Hilmi

p.  Hamed, Ibrahim

q.  Ma'ali, Mohammed

r.  Al-Masri, Majid

s.  Maqdad, Abdel Rahman

t.  Mousleh, Mohamed

u.  Noor, Munzar

v.  Sa'ad, Ahmed

w.  Salah, Ahmed

    x.  Sa'adi, Kahira

    y.  Shawish, Nasser

    z.  Shehadeh, Sana'a

Letter from Kent A. Yalowitz to Hon. George B. Daniels (Dec. 4, 2014) with Exhibits, *Sokolow v. Palestine Liberation Org.*, No. 03 Civ. 397 (GBD) (S.D.N.Y.), ECF Doc. 660.

58.    At least through January 2015, Defendants made monthly payments to the designees of the individuals identified in paragraph 57, pursuant to the practices described in paragraphs 32 through 44.  Payment records showing monthly payments for each of these individuals were admitted as evidence at trial in *Sokolow v. Palestine Liberation Org.* as Trial Exhibits, and the PLO and PA stipulated on October 31, 2014, that "the Palestinian Authority's practices concerning the promotions of prisoners, payments to prisoners' families, and payments to martyrs' families have not materially changed" since the close of fact discovery in 2012. Stipulation in *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 632-1 (S.D.N.Y. Oct. 31, 2014); *see* Trial Exhibits 2, 3, 7, 10, 25, 48, 49, 58, 104, 105, 106, 108, 109, 112, 116, 118, 123, 127, 128, 1120, 1121 (variously filed as exhibits to ECF Docs. 547, 909, and 927).

59.    More than sixty Palestinian individuals have died while committing acts of terrorism that killed or injured one or more nationals of the United States.

60.    The following individuals died committing acts of terrorism that injured or killed one or more nationals of the United States:

    a.  Awada, Sa'id

  b. Ramadan, Said Ibrahim Said

  c. Hashaika, Mohammed

  d. Ja'ara, Ali

  e. Idris, Wafa Ali Kaliel

61. At least through January 2015, Defendants made monthly payments to the families of individuals identified in paragraph 60(a) through (e) pursuant to the practices described in paragraphs 32 through 44.  Payment records showing monthly payments for each of these individuals were admitted as evidence at trial in *Sokolow v. Palestine Liberation Org.* as Trial Exhibits, and the PLO and PA stipulated on October 31, 2014, that "the Palestinian Authority's practices concerning the promotions of prisoners, payments to prisoners' families, and payments to martyrs' families have not materially changed" since the close of fact discovery in 2012.  Stipulation in *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 632-1 (S.D.N.Y. Oct. 31, 2014); see Trial Exhibits 8, 9, 62, 88, 89, 123 (ECF Doc. 927).

62. Upon information and belief, Defendants' practices concerning payments described above have not materially changed since January 2015.

63. Upon information and belief, after April 18, 2020, Defendants made monthly payments to the designees or families of individuals identified in paragraphs 55 and 58.

64. Defendants have also made at least one payment to the family of Kahlil Yousef Ali Jabarin, who murdered Ari Yoel Fuld in an act of terror on September 16, 2018.  Mustafa Dec., dated August 4, 2020, ¶ 6 ("[O]ne payment, in the amount of 1,400 NIS (approximately $400 USD), was transferred to the mother of Jabarin in October 2019.").

65.     On July 9, 2020, Qadri Abu Bakr, the head of Defendants' Ministry of Prisoners and Ex-Prisoners, was interviewed on official Palestinian Television. When asked about prisoner payments, he stated: "Regarding the salaries, everything was 100% on Wednesday [July 8, 2020], obviously, after contact, of course, with a number of the banks that had stopped the payments.  And nearly all the prisoners-we did not receive a single call from any prisoner.  They went to the banks and it was paid to them."  Official PA TV, Giants of Endurance, July 9, 2020.

66.     After April 18, 2020, Defendants have, directly or indirectly, made payments to more than two hundred payees designated by individuals who, after being fairly tried or pleading guilty, have been imprisoned for committing acts of terrorism that injured or killed nationals of the United States, and such payments were made by reason of such imprisonment.  *See* 18 U.S.C. § 2334(e)(1)(A)(i).

67.     After April 18, 2020, Defendants have, directly or indirectly, made payments to family members of more than sixty individuals, following such individuals' deaths while committing acts of terrorism that injured or killed nationals of the United States, and such payments were made by reason of the deaths of such individuals.  *See* 18 U.S.C. § 2334(e)(1)(A)(ii).

**Second Basis of Consent to Jurisdiction: Defendants' U.S. Activities**

68.     Defendants have consented to jurisdiction under 18 U.S. C. §2334(e)(1)(B)(iii), which provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after January 4, 2020, the defendant "conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority," subject to specified exceptions.  18 U.S. C. §2334(e)(1)(B)(iii).

69.     For many years, Defendants have provided "consular services," such as the authentication of birth and death certificates, and other forms, through agents located in the United States, including Ahmad Alahmad, Samir Farhat, and Awni Abu Hdba.  For example, in 2019, Defendants' agent Awni Abu Hdba participated in the authentication of a document while located in New Jersey.  These activities were described in detail in the Declaration of David Russell filed in the Second Circuit in *Sokolow v. Palestine Liberation Org.*, No. 15-3135 (DE 305-5) at pp. A278-82.

70.     Upon information and belief, after January 4, 2020, one or more agents described in paragraph 65 have participated in the authentication and/or consideration of documents for authentication on behalf of the PA and PLO while physically located in the United States, including by transmitting documents for authentication to employees of the PA's Ministry of Foreign Affairs.

71.     The PA's Ministry of Foreign Affairs acts as the PLO's agent.  According to Defendants, the PA's "ultimate authority is the PLO," and the PA "was made accountable to the PLO Executive Committee."  *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (Request for an Advisory Opinion)*, Written Statement Submitted by Palestine at ¶¶ 118–119 (Jan. 30, 2004), https://www.icj-cij.org/files/case-related/131/1555.pdf.

72.     The PA's Ministry of Foreign Affairs website acknowledges that the PA "cannot assume roles or functions not delegated to it by the PLO."  App. to Supp. Mem. in Support of Plaintiffs-Appellants' Motion to Recall the Mandate, *Sokolow v. Palestine Liberation Org.*, No. 15-3135 (DE 305-5), at p. A249, A252.

73.     The PLO has delegated to the PA a role in the PLO's conduct of activities at the UN Mission in New York.  In 2005, the PA adopted "The Diplomatic Corps Law No. 13-2005." According to this law, the PA's Ministry of Foreign Affairs is charged with "[o]verseeing all missions politically, administratively and financially," (§ 3); and all staff with the rank of "Ambassador" are appointed by the PA's President, (§§ 7, 9).

74.     In accordance with this law, PA President Abbas appointed Riyad Mansour to head the Palestinian UN Mission, on September 10, 2005, with the civil service rank of "ambassador" within the PA's Foreign Ministry, serving as the PLO's Permanent Observer to the United Nations.  Dr. Mansour continues to head the Mission today, and other PA officials also staff the office.

*Political Propaganda Activities and Proselytizing*

75.     Subsequent to January 4, 2020, while physically in the United States, Defendants have conducted press conferences and created and distributed informational materials.

76.     Defendants' communications made while physically in the United States were adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect U.S. foreign policy.

77.     On February 11, 2020, Mahmoud Abbas, Chairman of the PLO and President of the PA, held a press conference with a retired Israeli politician in New York City, during which Chairman Abbas criticized the U.S. anticipated Israel–Palestine Peace Plan.  Chairman Abbas said: "A few days ago, the so-called deal of the century was introduced by America and totally went against international law and does not make way for a two-state solution. This cannot be a basis for any future negotiations as it will not make way for a joint peace."

78.     The PLO maintains an office in the United States.

77.     The PLO holds itself out to be, and carries out conduct in the name of, the State of Palestine, in connection with official business of the United Nations.

79.     The PA's Ministry of Foreign Affairs acts as the PLO's agent in connection with activities in the United States. For example, Dr. Mansour holds an appointment as an officer of the PA.

80.     Dr. Mansour holds himself out as "Ambassador, Permanent Observer of the State of Palestine to the United Nations."

81.     The PA holds itself out to be, and carries out conduct in the name of, the State of Palestine in connection with official business of the United Nations.

82.     After January 4, 2020, Defendants have maintained and updated a website and Twitter and Facebook accounts in the name of the State of Palestine, through which they publish communications in English adapted to or intended to influence the public within the United States.

83.     Facebook and Twitter are United States-based social media companies.

84.     Upon information and belief, Defendants' website is maintained by a service provider physically located in the United States.

85.     Upon information and belief, Defendants have updated their website and/or their United States-based social-media accounts while physically inside the United States.

26

86.     After January 4, 2020, Defendants have used their website to publish communications in English adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect U.S. foreign policy.

Such communications included the following examples:

a.   January 13, 2020: Defendants published a letter on their website asserting that Israel is carrying out a "frenzied, illegal colonization campaign." https://english.wafa.ps.

b.   February 14, 2020: Defendants published a letter on their website asserting that Israel was engaging in "relentless crimes, provocation, incitement and inflammatory rhetoric." *Id.*

c.   February 20, 2020: Defendants published a letter on their website asserting that Israel was engaged in "continuing illegal settlement activities, land grab and annexation schemes." *Id.*

d.   February 26, 2020: Defendants published a letter on their website asserting that Israel "persists in rabid pursuit of its illegal colonization schemes." *Id.*

e.   March 13, 2020: Defendants published a letter on their website asserting that Israel "escalates the pace of its illegal annexation and colonization schemes and its aggressions and inflammatory rhetoric against the Palestinian people." *Id.*

f.   April 2, 2020: Defendants published a letter on their website asserting that Israel "has not for a minute ceased its illegal policies and practices." *Id.*

g.  April 15, 2020: Defendants published a letter on their website asserting that
    "Israel continues to cynically exploit the international community's focus on the
    life and death circumstances imposed by the COVID-19 pandemic, to entrench its
    illegal occupation, advance annexation, and escalate its repression of
    Palestinians." *Id.*

h.  April 29, 2020: Defendants published a letter on their website asserting that
    Israel's accusations of antisemitism are used to "taint legitimate criticism" by
    those who "dare to denounce Israel's violations of the Palestinian people's rights
    and its colonization of their land." *Id.*

i.  May 13, 2020: Defendants published a letter on their website asserting that "not a
    day has passed where Israel has not cynically exploited the COVID-19 crisis,
    globally and locally, to forge ahead with its annexationist plans and in full
    coordination with the current US administration." *Id.*

j.  June 4, 2020: Defendants published a letter on their website asserting that Israel
    "continues its depraved dehumanization of the Palestinian people and
    colonization of Palestinian land." *Id.*

k.  July 24, 2020: Defendants published a letter on their website asserting that Israel
    "forges ahead with its expansionist policies in the West Bank, cementing its
    illegal occupation and escalating its aggression against the Palestinian people,
    their land and their rights." *Id.*

l.  August 6, 2020: Defendants published a letter on their website asserting that there were "continuing and escalating illegal policies and practices of Israel, the occupying Power, and its extremist military and settler forces." *Id.*

m.  August 17, 2020: Defendants published a letter on their website asserting that "Israel carries on with its illegal colonization and annexation measures in our land and with its repression of the Palestinian people through measures of collective punishment, dispossession, displacement and other violations of their rights." *Id.*

87.  After January 4, 2020, Defendants also published on their website English translations of numerous speeches given by Palestinian representatives at the United Nations. These translations were adapted to and/or intended to influence the public within the United States in furtherance of defendants' political interests and/or to affect U.S. foreign policy.

Such publications included the following examples:

n.  February 11, 2020: Defendants assert that the proposed U.S. peace plan "contains diktats, consecrates occupation and annexation by military force, and would lead to an Apartheid system, an anachronistic reality being implemented today in Palestine. It rewards occupation instead of holding it accountable for the crimes it has committed for decades against our people and land." *Id.*

o.  April 23, 2020: Defendants assert that Israel should "stop its colonization and de facto annexation of Palestinian land; end its immoral blockade on the Gaza Strip; and release the thousands of Palestinians, including children, that it has imprisoned…. Israel carries on with its illegal policies and practices, business as usual." *Id.*

p.   May 27, 2020: Defendants assert, "Israel has demonstrated time and time again its contempt for the rule of international law and for Palestinian rights and lives." *Id.*

q.   June 24, 2020: Defendants assert that Israel is "drunk on power, propelled by infinite impunity, motivated by one single thought that it has been under the influence of for decades: grabbing maximum Palestinian land with minimum Palestinians." *Id.*

r.   July 21, 2020: Defendants assert that the Palestinian people has been "dispossessed, exiled, occupied, colonized, annexed and deprived of their fundamental human rights." *Id.*

88.   Since January 4, 2020, Defendants have updated their Twitter account more than 200 times and their Facebook account more than 125 times.  Upon information and belief, some or all of these updates were done by persons and/or on computers that were physically present in the United States.

89.   Defendants' Twitter and Facebook updates have included communications in English adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect U.S. foreign policy. For example:

s.   February 4, 2020: Defendants published the "official Palestinian position" concerning the U.S. peace plan, entitled "Palestine Liberation Organization Position Paper Regarding the Trump Administration's so-called Plan."

t.   February 11, 2020: Defendants stated, "They (#Israelis) are strengthening the #apartheid regime…this plan is a plan to put an end to the Question of #Palestine…" (ellipses in original).

u.  March 17, 2020: Defendants stated, "US lawmakers call on their administration to oppose demolition of Palestinian homes."

v.  March 30, 2020: Defendants stated, "With resilience and strength, we will defeat [COVID-19] despite the continued Israeli violations against the land and people of Palestine."

w.  April 10, 2020: Defendants stated, "Infographic: Summary of Israeli violations since the State of #Palestine declared a state of emergency over the outbreak of #COVID19."

x.  April 12, 2020: Defendants stated, "While the world works on saving lives, US and Israel working on killing prospects of peace through annexation."

y.  April 17, 2020: Defendants stated, "Palestinian prisoners are hostages to Israel's gratuitous cruelty and must be released."

z.  April 20, 2020: Defendants stated, "#Palestinian leadership will confront Israel's united agenda of permanent aggression and #annexation."

aa. April 23, 2020: Defendants stated, "We reiterate: the #US plan will not bring peace. This plan—and #Israels decision to proceed w/ #annexation—will destroy the two-State solution & entrench Israel's military control over the #Palestinian ppl and land."

bb. April 28, 2020: Defendants stated, "Ever since Trump took office in 2016, Israel has built more illegal settlements on Palestinian land and displaced more families than in previous years."

cc. May 15, 2020: Defendants published an article entitled, "Nakba is a continuum of injustice that must end."  The article begins: "Seventy-two years ago, the Nakba (Catastrophe) that was forced upon the Palestinian people began with a systematic campaign of ethnic cleansing, expulsion, mass murder, theft, and destruction by Zionist militias that later formed the Israeli army."  The article contains no mention of any proceedings in the United Nations.

dd. May 18, 2020: Defendants announced that "the Palestinian Govt. will meet to discuss how we will move forward in response to Israel's announcement on the looming #annexation plan scheduled to take place this July."

ee. May 19, 2020: Defendants republish a declaration by the Organization of Islamic Cooperation opposing the annexation plan.

ff. May 21, 2020: Defendants republish a press release to "mobilize efforts to combat Israel's unlawful annexation plans."

gg. May 22, 2020: Defendants republished portions of a letter written by eighteen US. Senators expressing "grave concern regarding unilateral annexation of Palestinian Territory."

hh. June 7 to 11, 2020: Defendants published a series of videos entitled "one voice against Israel's annexation."

ii. June 11, 2020: Defendants published an "open letter to the Israeli Government concerning Annexation" by legal scholars.

jj. June 12, 2020: Defendants published a statement from the President of Sinn Féin that "[t]he global community must stand w/the Palestinian people at this time."

kk. June 16, 2020: Defendants publish a statement denouncing "the threat annexation: Israel's acquisition of lands belonging to the State of #Palestine by Force."

ll. June 25, 2020: Defendants published a letter from European lawmakers "contemning Israel's latest plan to illegally #annex #Palestinian territory in the occupied #Westbank."

mm.     June 26, 2020: Defendants published a statement from Churches for Middle East Peace arguing that "Annexing any (part) of the West Bank will entrench inequalities and abuses of Palestinian human rights."

nn. June 26, 2020: Defendants published a letter stating that Israel is engaged in "institutionalized violence, terror and racism."

oo. July 1, 2020: Defendants published a "call for immediate targeted sanctions to stop Israel's #Annexation and Apartheid" and a position paper for "all those interested to know more about the illegality of Israel's annexation and its impact on the lives of the people of #Palestine."

pp. July 2, 2020: Defendants published a "call by international women leaders against Israeli annexation."

qq. July 3, 2020: Defendants published a statement by retired politicians urging European politicians "to maintain their resolve against #Israel's plans to annex swathes of the #WestBank."

rr.  July 29, 2020: Defendants published a video captioned: "The reality of occupation and #annexation in #Jerusalem summed up. Ethnic cleansing, land theft, oppression, persecution and other #IsraeliCrimes continue in the absence of #accountability."

ss.  August 31, 2020: Defendants retweeted an assertion that "Israel must immediately allow entry of fuel and other essential items into #Gaza.

90.     In summary, since January 4, 2020, Defendants conducted activities while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority.  *See* 18 U.S.C. § 2334(e)(1)(B)(iii).

**Third Basis for Consent to Jurisdiction: Maintenance of a U.S. Office or Other Facility**

91.     Defendants have consented to jurisdiction under 18 U.S.C. §2334(e)(1)(B)(i), which provides that a defendant has consented to jurisdiction if, after January 4, 2020, it "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States," unless "used exclusively for the purpose of conducting official business of the United Nations."

92.     Defendants own and maintain an office, premises, or other facility located in a townhouse at 115 East 65th Street in New York City.  Defendants own the building in which the facility is located in the name of the "Permanent Observer Mission of Palestine to the United Nations."  Deed to 115 East 65th Street, reproduced at App. to Supp. Mem. in Support of Mot. to Recall Mandate, pp. 275-76, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-5 (2d Cir. Filed Mar. 25, 2019).

93.     Agents, officers, and/or employees of the PLO have used the East 65th Street facility since January 4, 2020.  Such activities have been conducted in the name of the State of Palestine.

94.     Agents, officers, and/or employees of the PA have used the East 65th Street facility since January 4, 2020.  Such activities have been conducted in the name of the State of Palestine.

95.     Each Defendant employs one or more employees in the United States who have used the East 65th Street Facility to publish one or more communications described above.

**Defendants' Incitement and Incentivization of the Murder of Ari Yoel Fuld**

96.     In July 2018, PA President Mahmoud Abbas announced, "We will not accept a cut or cancellation of salaries to the families of martyrs and prisoners . . . .  Even if we have only a penny left, we will give it to the martyrs, the prisoners and their families. . . .  We view the prisoners and the martyrs as planets and stars in the skies of the Palestinian struggle, and they have priority in everything."  *See*, *e.g.*, The Times of Israel*, Abbas Vows to Continue Stipends to Terrorists, even with PA's 'last penny,'"* July 24, 2018; The Jerusalem Post, *Abbas: We Won't Stop Payments to Martyrs and Prisoners*, July 24, 2018.  PA President Abbas added that the PA "will not allow anyone to interfere with the money that Israel is against us paying to the families of martyrs and prisoners."  *Id*.

97.     Subsequently, on September 15, 2018, in a speech before the PLO Executive Committee in Ramallah, PA President Mahmoud Abbas falsely alleged that Israel was planning to establish special Jewish prayer zones inside the Al-Aqsa Mosque, and that Palestinians, together with Jordan, would be bringing the issue before the International Criminal Court and the

International Court of Justice.  *Mahmoud Abbas: Fresh American Blood on His Hand, Abbas's Responsibility for Murder*, Bassam Tawil, September 17, 2018, https://gatestoneinsititute.org/13001/abbas-ari-fuld-murder.  Abbas' false allegation was then picked up by several media outlets in the West Bank and Gaza.  *Id.*

98.     The aforementioned statements by PA President Abbas, reiterating Defendant PA's firm position that it will continue to fund and reward terrorism, and alleging that Israel was planning to establish Jewish prayer zones inside the Al-Aqsa Mosque, were incentives and catalysts that directly and proximately caused Khalil Yousef Ali Jabarin, ("Jabarin"), to commit his terrorist attack and murder Ari Yoel Fuld on September 16, 2018, (the "September 16, 2018 Terrorist Attack"), hours after reports of Abbas' allegation were published.  *See id.* (PA President and PLO Chairman Abbas' "latest fabrication [on September 15, 2018], is directly responsible for the murder of Ari Fuld, stabbed to death by a terrorist who actually believed Abbas's lies about a purported Israeli scheme to split the Al-Aqsa Mosque between Muslims and Jews," and was not the first statement Abbas made with the intention to incite a terrorist attack. In 2015, Abbas incited the wave of stabbing and vehicular terrorist attacks known as the "Jerusalem Intifada," or the "Knife Intifada," by stating: "'The Al-Aqsa is ours, the Church of the Holy Sepulchre is ours, and they have no right to defile them with their filthy feet.  We will not allow them to, and we will do everything in our power to protect Jerusalem. . . . We welcome every drop of blood spilled in Jerusalem.  This is pure blood, clean blood, blood on its way to Allah.  With the help of Allah, every shaheed (martyr) will be in heaven, and every wounded will get his reward.'"); *Did Mahmoud Abbas Incite Murder of Ari Fuld?*, https://honestreporting.com/idns-09-17-2018-ari-fuld (tweet from Mark Halawa on September 16, 2018: "Attention!! Palestinian President Mahmoud Abbas repeated an old libel, on Saturday,

saying: 'Israel plans to establish Jewish prayer inside the Aqsa mosque, in the same fashion done in Hebron.' -All pro-Hamas twitter accounts are calling for violence citing Abbas' remarks.").

99.    The Palestinian Islamic Jihad terrorist group noted that Jabarin's murder of Ari Fuld was a "'natural response to Zionist terrorism committed by aggression and crimes against our people, our lands and our holy sites.'" *Mahmoud Abbas: Fresh American Blood on His Hand, Abbas's Responsibility for Murder*, Bassam Tawil, September 17, 2018, https://gatestoneinsititute.org/13001/abbas-ari-fuld-murder.  In addition, Hamas senior official Husam Badran, commenting on Ari Yoel Fuld's murder, stated, "'We welcome this heroic attack and affirm that harming Al-Aqsa Mosque is a red line.  This operation is in response to what Israel is planning to do in Al-Aqsa Mosque.'"  *Id.*  Hamas and Palestinian Islamic Jihad confirmed the direct link between Abbas' false charge against Israel and the murder of Ari Yoel Fuld.  *Id.*

100.    Jabarin decided to murder a Jew because he had an incentive reward of payment to commit an act of terror, and President and Chairman Abbas announced that Israel was planning to create special Jewish prayer areas inside the Al-Aqsa Mosque, thereby inciting Jabarin to commit an act of terror in retaliation for Israel's "crime."  *See id.*

101.    Upon information and belief, Jabarin decided to become a "shahid," a "martyr," and kill Jews by carrying out a stabbing attack with a knife that was twenty-one centimeters long, a knife that his family used to slaughter animals.

102.    Upon information and belief, on Sunday, September 16, 2018, in the early hours of the morning, intent on becoming a shahid and murder Jews to receive a reward of a payment for an act of terror, and in response to Abbas' allegation of Israel's "violation" against Al-Aqsa

Mosque, Jabarin left his house in Yatta, near the city of Hebron, with a bag that held the twenty-one centimeter knife that was used to slaughter animals.

103.     Upon information and belief, Jabarin went to the Zif Junction, with the intent to carry out a stabbing attack against Israeli Defense Force soldiers, but proceeded to his next destination when he was unable to locate and target soldiers in the Zif Junction.

104.     Upon information and belief, Jabarin then hailed a taxi from the Zif Junction and traveled to the Cave of the Patriarchs in Hebron to commit a stabbing attack at that site. However, when he arrived at the Cave of the Patriarchs, Jabarin was informed that the entrance was closed, so he decided to travel in a taxi to a different destination to carry out the stabbing attack.

105.     Upon information and belief, upon arriving at a security crossing near Bethlehem with the intent to commit a stabbing attack on Jews, Jabarin noticed that there were Palestinian residents who were being checked by Israeli Defense Force soldiers, and because he didn't want to harm Palestinian residents in the crossing, Jabarin decided not to carry out his stabbing attack there.

106.     Subsequently, Jabarin went to the commercial compound mall near the Gush Etzion Junction, and planned to carry out his stabbing attack outside the Rami Levi supermarket. Jabarin spoke to a street cleaner, then entered the mall, went into the bathroom area, took the knife out of his bag, and hid it inside the coat he was wearing.  Jabarin went out of the mall into the parking lot, leaving his bag behind, and bought a sandwich at the falafel stand outside the mall.  Upon information and belief, Jabarin asked the person who sold the falafel whether she

was an American.  Jabarin then sat outside the Rami Levi supermarket, and began eating his sandwich while observing the passersby.

107.    Ari Yoel Fuld, ("Ari"), a 45-year-old New York native and father of four, drove into the parking lot, waited for a parking spot for approximately seven minutes, and then parked in a spot and stayed in his car for another three minutes.  Ari then got out of his car, walked past Jabarin, and went into the mall to a cell phone store.  Jabarin noticed that Ari had been wearing a skullcap with bold English lettering on it, and deduced that Ari was a Jew and an American. Upon information and belief, Ari was targeted because he was a Jewish American.

108.    Jabarin continued to sit outside the supermarket as numerous other people passed by, apparently waiting for Ari to reappear.  Approximately fifteen minutes later, when Ari came out of the mall, Ari passed Jabarin again.  Ari walked toward Rami Levi supermarket, and Jabarin stood up and started to follow Ari, pausing and hiding amongst the cars so as not to be noticed when Ari stopped to look at his phone.  An older man then walked between Jabarin and Ari.  Jabarin decided to carry out the planned attack, and as soon as the older man passed by, at approximately 11:05 a.m., Jabarin approached Ari from behind while holding the handle of the knife in his pocket.  When he was about one- and one-half feet away from Ari, Jabarin pulled his knife out from his pocket, aimed it at the back of Ari's neck, and stabbed Ari on the upper part of his back near his neck, inserting the blade in full, while saying in Arabic, "Basem Allah," ("In the name of the lord"), and, "Allah Akhbar," ("Allah is great").

109.    Ari turned toward Jabarin and tried to push him away.  Jabarin pulled the knife out of Ari's body and started running with the knife in his hand away from Ari and toward the falafel stand.  Ari yelled, "Terrorist!"  Then, Ari and a bystander pursued Jabarin and shot him,

causing Jabarin to fall.  The knife fell out of Jabarin's hand while he fell to the ground.  After his

fall, Jabarin reached out to grab the knife again, but it was removed by another bystander.

110.    Ari then collapsed to the ground, saying, "I've been hurt."  Shortly thereafter, Ari

was transferred to Shaarei Zedek Hospital.  His condition was unstable.  Motivated to become a

"martyr," Jabarin's act of stabbing Ari with the intent to kill him, by using his twenty-one

centimeter knife, caused a stab wound in Ari's back, and caused wounds to Ari's main artery and

right lung, which resulted in Ari's death.  After numerous attempts to resuscitate him failed, Ari

Yoel Fuld was pronounced dead.

111.    The September 16, 2018 Terrorist Attack was incentivized, incited, encouraged,

and proximately caused by Defendants PA and PLO.  *See Mahmoud Abbas: Fresh American*

*Blood on His Hand, Abbas's Responsibility for Murder*, Bassam Tawil, September 17, 2018,

https://gatestoneinsititute.org/13001/abbas-ari-fuld-murder (PA President and PLO Chairman

Abbas' "latest fabrication [on September 15, 2018], is directly responsible for the murder of Ari

Fuld, stabbed to death by a terrorist who actually believed Abbas's lies about a purported Israeli

scheme to split the Al-Aqsa Mosque between Muslims and Jews," and was not the first statement

Abbas made with the intention to incite a terrorist attack.  In 2015, Abbas incited the wave of

stabbing and vehicular terrorist attacks known as the "Jerusalem Intifada," or the "Knife

Intifada," by stating: "The Al-Aqsa is ours, the Church of the Holy Sepulchre is ours, and they

have no right to defile them with their filthy feet.  We will not allow them to, and we will do

everything in our power to protect Jerusalem. . . . We welcome every drop of blood spilled in

Jerusalem.  This is pure blood, clean blood, blood on its way to Allah.  With the help of Allah,

every shaheed (martyr) will be in heaven, and every wounded will get his reward."); *Did*

*Mahmoud Abbas Incite Murder of Ari Fuld?*, https://honestreporting.com/idns-09-17-2018-ari-

fuld (quoting a tweet from Mark Halawa: "Attention!! Palestinian President Mahmoud Abbas repeated an old libel, on Saturday, saying: 'Israel plans to establish Jewish prayer inside the Aqsa mosque, in the same fashion done in Hebron.' -All pro-Hamas twitter accounts are calling for violence citing Abbas' remarks.").  The September 16, 2018 Terrorist Attack was a natural by-product of and was caused by Defendants' egregious practice of providing generous financial payments to families of Palestinians who engage in acts of terrorism and to individuals incarcerated in Israeli prisons, and Defendants' statements inciting acts of terror while incentivizing such acts of terror with reward.  *Id.*

112.    Following the September 16, 2018 Terrorist Attack, Jabarin was taken into Israeli police custody, and the Palestinian Prisoner Affairs Commission spokesman, Hassan Abd Rabbo, stated, "We are not bashful or secretive about our support for our prisoners.  The [Jabarin] family would be eligible to receive a monthly salary of NIS 1,400, ($390), if their son is not freed by Israel and it completes all the necessary documents."  Times of Israel, *U.S. Envoy: Abbas Pay to Family of Terrorist Who Killed Ari Fuld is Unconscionable*, September 20, 2018.  Abd Rabbo added that the sum would increase if Jabarin would remain in prison for several years.  *Id*. Former PA Prisoners' Affairs Minister Ashraf al-Ajrami confirmed Abd Rabbo's statements, as well.  *Id*.

113.    Defendants have made at least one payment to the family of Kahlil Yousef Ali Jabarin, who murdered Ari Yoel Fuld in the September 16, 2018 Terror Attack.  Mustafa Dec., dated August 4, 2020, ¶ 6 ("[O]ne payment, in the amount of 1,400 NIS (approximately $400 USD), was transferred to the mother of Jabarin in October 2019.").

114.    After April 18, 2020, Defendants have, directly or indirectly, made payments to more than two hundred payees designated by individuals who, after being fairly tried or pleading

guilty, have been imprisoned for committing acts of terrorism that injured or killed nationals of the United States, and such payments were made by reason of such imprisonment. *See* 18 U.S.C. § 2334(e)(1)(A)(i).

115.    After April 18, 2020, Defendants have, directly or indirectly, made payments to family members of more than sixty individuals, following such individuals' deaths while committing acts of terrorism that injured or killed nationals of the United States, and such payments were made by reason of the deaths of such individuals. *See* 18 U.S.C. § 2334(e)(1)(A)(ii).

**FIRST COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,**
**INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. §2333**

116.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

117.    Defendants' acts constitute a violation of the criminal laws of the United States and of the several States, or would constitute criminal violations if committed within the jurisdiction of the United States and of the several States.  The actions of Defendants violate, or if committed within U.S. jurisdiction would violate literally scores of federal and state criminal statutes prohibiting, inter alia and without limitation: homicide, battery, assault, as well as the criminal prohibitions against aiding and abetting, attempting, serving as an accessory to, solicitation of and conspiracy to commit these and other such felonies.  Among other things, Defendants have committed criminal solicitation, which is a crime under 18 U.S.C. 373 and under New York State Law, including N.Y. Penal L. 100.08, 125.25.

118.    The acts of Defendants described herein were performed pursuant to and as implementation of an established policy of utilizing terrorist attacks in order to achieve their

goals.  Specifically, the acts of Defendants described herein were intended to terrorize, intimidate, and coerce the civilian population in Israel into acquiescing to Defendants' political goals and demands, and to influence the policy of the United States and Israeli governments in favor of accepting defendants' political goals and demands.  Moreover, Defendants, themselves and through their respective officials, representatives, spokesmen, communications media and other agents; (a) repeatedly admitted to committing acts of terrorism and violence against the civilian population in Israel and the West Bank and expressly stated that these acts were intended both to intimidate and coerce that civilian population into acquiescing to defendants' political goals and demands and to influence the policy of the United States and Israeli governments in favor of Defendants' political goals and demands, and (b) expressly threatened the further occurrence of such terrorist acts if their political goals and demands were not achieved.  The acts of Defendants described herein therefore appear to be and were in fact intended to intimidate and coerce a civilian population, and to influence the policy of a government by intimidation or coercion, within the meaning of 18 U.S.C. §2331.

119.    Defendants' acts were dangerous to human life, by their nature and as evidenced by their consequences.

120.    Defendants' acts occurred outside the territorial jurisdiction of the United States.

121.    The acts of Defendants are therefore, "acts of international terrorism," as defined under 18 U.S.C. §§2331 and 2333.  The behavior of Defendants also constitutes aiding and abetting acts of international terrorism, and conspiracy to commit acts of international terrorism.

122.    As a direct and proximate result of the acts of international terrorism committed by Defendants, including the statements made by President of the PA and Chairman of the PLO,

Mahmoud Abbas, and other representatives of Defendants, and which Defendants aided and abetted and/or conspired to commit, Plaintiffs were caused severe injury, including: death, pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

123.     Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

124.     Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

<u>**SECOND COUNT**</u>
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,**
<u>**WRONGFUL DEATH**</u>

125.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

126.     Defendants, personally and/or through their agents and/or employees and/or co-conspirators, willfully and deliberately encouraged, authorized, aided, abetted, induced, and conspired to commit the September 16, 2018 Terrorist Attack described above.

127.     Defendants' behavior constituted a breach of legal duties to desist from committing, or aiding, abetting, authorizing, encouraging or conspiring to commit acts of international terrorism and extrajudicial killing, and to refrain from intentionally, wantonly, and/or negligently authorizing or causing the infliction of death, physical injuries, harm to persons such as the plaintiffs herein.

128.     Defendants' actions were willful, malicious, intentional, wrongful, unlawful, negligent, and/or reckless, and were the proximate cause of the September 16, 2018 Terrorist Attack and the death of Ari Yoel Fuld.

129.     At the time of his death, decedent Ari Yoel Fuld enjoyed good health, was industrious, and in possession of all of his faculties.

130.     The murder of Ari Yoel Fuld caused decedent, his estate, and plaintiffs MIRIAM FULD, NATAN SHAI FULD, NAOMI FULD, TAMAR GILA FULD, and ELIEZER YAKIR FULD severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship, and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

131.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

132.     Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public, warranting an award of punitive damages.

### THIRD COUNT
### AGAINST DEFENDANTS ON BEHALF OF PLAINTIFF
### THE ESTATE OF ARI YOEL FULD,
### PAIN AND SUFFERING

133.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

134.     As a result of the September 16, 2018 Terrorist Attack caused by Defendants' actions described herein, decedent Ari Yoel Fuld, prior to his death, sustained great, severe, and permanent injuries to his body, head, and limbs, became sick, sore, lame and disabled.  From the

time of the stabbing until his death, decedent Ari Yoel Fuld suffered great conscious pain, shock, and physical and mental anguish.

135.    Defendants are therefore jointly and severally liable to the estates of decedent Ari Yoel Fuld for the full amount of decedent's damages, in such sums as may hereinafter be determined.

136.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**FOURTH COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,**
**LOSS OF CONSORTIUM AND SOLATIUM**

137.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

138.    As a result and by reason of the death of Ari Yoel Fuld, which was caused by the actions of Defendants described herein, plaintiff MIRIAM FULD has been deprived of the services, society, consortium, and solatium of her deceased husband, and has suffered and will continue to suffer severe mental anguish, bereavement and grief, and injury to her feelings.

139.    As a result and by reason of the death of Ari Yoel Fuld, which was caused by the actions of Defendants described herein, plaintiffs NATAN SHAI FULD, NAOMI FULD, TAMAR GILA FULD, and ELIEZER YAKIR FULD have been deprived of the services, society, consortium, and solatium of their deceased father, and have suffered and will continue to suffer severe mental anguish, bereavement and grief, and injury to their feelings.

140.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

141.     Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

## FIFTH COUNT
## AGAINST DEFENDANTS
## ON BEHALF OF ALL PLAINTIFFS,
## NEGLIGENCE

142.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

143.     Defendants, personally and/or through their agents and/or employees and /or co-conspirators, willfully and deliberately and/or wantonly and/or negligently authorized, encouraged, and assisted in the September 16, 2018 Terrorist Attack that harmed Plaintiffs.

144.     Defendants had legal duties under local and other applicable law to desist from engaging in, or authorizing and encouraging, acts of violence, and to refrain from deliberately and/or wantonly, and/or negligently authorizing or causing the infliction of injuries to persons such as the plaintiffs herein.

145.     Defendants' behavior constituted a breach of these legal duties.

146.     Defendants foresaw, or should have reasonably foreseen, that their breach of these legal duties would create unreasonable risk of injuries such as those suffered by the Plaintiffs to persons such as the Plaintiffs.

147.     But for Defendants' wrongful and/or unlawful and/or negligent acts, Plaintiffs would not have suffered severe injury, including: death; pain and suffering; pecuniary loss and loss of income; loss of guidance, society and companionship; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

148.     Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

149.     Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

### SIXTH COUNT
### AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

150.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

151.     Defendants' conduct was willful, outrageous and/or grossly negligent, and was dangerous to human life, and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency.

152.     Defendants' conduct caused the Plaintiffs egregious emotional distress.

153.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

154.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

### SEVENTH COUNT
### AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,
### CIVIL CONSPIRACY

155.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

156.    Defendants knowingly and willingly conspired, agreed and acted in concert with each other, in a common plan and design to facilitate and cause acts of terrorism, including, without limitation, by agreeing, pursuant to their Pay for Slay laws, to pay those who commit acts of terror, such as the one in which Plaintiffs were harmed.

157.    As a result of the September 16, 2018 Terrorist Attack caused, resulting from, and facilitated by Defendants' conspiracy, Plaintiffs suffered the damages enumerated herein.

158.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

159.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

### EIGHTH COUNT
### AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,
### AIDING AND ABETTING

160.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

161.     Defendants provided one another, and their organs, agencies, instrumentalities, officials, agents and employees, and their other co-conspirators with material support and resources and other substantial aid and assistance, in order to aid, abet, facilitate, and cause the commission of acts of terrorism, including the September 16, 2018 Terrorist Attack in which plaintiffs were harmed.

162.     As a result of the September 16, 2018 Terrorist Attack, which was caused, resulted from, and was facilitated by Defendants' provision of material support and resources and other acts of aiding and abetting, including, without limitation, Defendants' practice of paying monthly stipends to those who commit acts of terror pursuant to their Pay for Slay laws, Plaintiffs suffered the damages enumerated herein.

163.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

164.     Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

### NINTH COUNT
### AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS, VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

165.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

166.     At all relevant times, defendants PLO and PA engaged in the actions described herein within the scope of their agency, office, and employment, and in furtherance of the interests of defendants PLO and PA.

167.     Defendants PLO and PA authorized or ratified, and condoned, encouraged, incentivized, and incited the actions described herein of Khalil Yousef Ali Jabarin.

168.     Therefore, defendants PLO and PA are vicariously liable for the acts of Khalil Yousef Ali Jabarin.

169.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

170.     Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

<u>**TENTH COUNT**</u>
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
<u>**INDUCEMENT**</u>

171.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

172.     Defendants PLO and PA offered and provided their own and each other's officials, agents, and employees with substantial material and pecuniary inducements and incentives to plan, organize, and execute acts on international terrorism, including the September 16, 2018 Terrorist Attack in which Plaintiffs were harmed.  Defendants PLO and PA did so, knowing that the acts for which they provided inducements and incentives were illegal and/or tortious, and that they would had been directly liable had they performed those acts themselves.

173.     As a result of the September 16, 2018 Terrorist Attack, which was caused, resulted from, and was facilitated by the substantial material and pecuniary inducements and

incentives offered and provided by Defendants PLO and PA, Plaintiffs suffered the damages enumerated herein.

174.   Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants jointly and severally, as to each of the above counts and causes of action, as follows:

A.   Compensatory damages against all defendants, jointly and severally, in the amount of $200,000,000.00 (TWO HUNDRED MILLION DOLLARS);

B.   Treble damages, costs and attorney's fees as provided in 18 U.S.C. §2333;

C.   Punitive Damages;

D.   Reasonable costs and expenses;

E.   Reasonable attorneys' fees; and

F.   Such further relief as the Court finds just and equitable.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: September 18, 2020
       New York, New York

LAW OFFICE OF JEFFREY FLEISCHMANN PC
By: /s/ Jeffrey Fleischmann
Jeffrey Fleischmann, Esq.
*Attorneys for Plaintiffs*
150 Broadway, Suite 900
New York, N.Y. 10038
Tel.: (646) 657-9623
Fax: (646) 351-0694

Email: jf@lawjf.com

-and-

Samuel Silverman, Esq.
The Silverman Law Firm
16 Squadron Blvd.
New City, NY 10956
(845) 517-0351
silvermans@silvermanlaw.net