# EXHIBIT E

**[ORAL ARGUMENT HELD DECEMBER 13, 2018]**

**No. 15-7034**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ESTER OF ESTHER KLIEMAN, et al.,

Plaintiffs-Appellants,

v.

PALESTINIAN AUTHORITY, et al.

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR UNITED STATES AS AMICUS CURIAE**

JOSEPH H. HUNT
  *Assistant Attorney General*

JESSIE K. LIU
  *United States Attorney*

SHARON SWINGLE
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7243*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-8189*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY ................................................................. 1

STATEMENT OF THE CASE ......................................................................... 2

    A.   Background ............................................................................ 2

    B.   Prior Proceedings ................................................................. 6

ARGUMENT ................................................................................................ 8

    I.   Section 4's Factual Predicates Are Not Satisfied ..................... 8

    II.   Section 4 Applies to Pre-Enactment Lawsuits ....................... 8

    III.   Section 4 is Constitutional .................................................. 9

        A. Congress May Treat the Palestinian Authority's or Palestine Liberation Organization's Consent as a Lawful Basis for Exercising Personal Jurisdiction Under Section 4 ........................................ 9

        B. Section 4 Does Not Impose an Unconstitutional Condition ......................................................... 16

CONCLUSION ........................................................................................... 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .................................................................................... 17, 19

*Bank Markazi v. Peterson*,
136 S. Ct. 1310 (2016) ....................................................................................... 12

*Brown v. Lockheed Martin Corp.*,
814 F.3d 619 (2d Cir. 2016) .............................................................................. 16

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .............................................................................. 10, 11, 14

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ................................................................................ 7, 11, 14

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) ..................................................................................... 17, 18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ..................................................................................... 14, 16

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ............................................................................................... 16

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites*,
456 U.S. 694 (1982) ................................................................................. 1, 9, 10

*J. McIntyre Machinery, Ltd. v. Nicastro*,
564 U.S. 873 (2011) ........................................................................................... 15

*Klieman v. Palestinian Auth.*,
82 F. Supp. 3d 237 (D.D.C. 2015) ................................................................. 6, 7

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro*,
937 F.2d 44 (2d Cir. 1991) .................................................................................. 4

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ..................................................................................8, 9

*Livnat v. Palestinian Authority*,
  851 F.3d 45 (D.C. Cir. 2017) ............................................................... 9

*National Black Police Ass'n v. District of Columbia*,
  108 F.3d 346 (D.C. Cir. 1997) ............................................................. 8

*National Equip. Rental, Ltd. v. Szukhent*,
  375 U.S. 311 (1964) ........................................................................... 10

*Nollan v. California Coastal Comm'n*,
  483 U.S. 825 (1987) ........................................................................... 17

*Northwest Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ............................................................................. 8

*Pennsylvania Fire Ins. Co. of Phila. v. Gold Issue Mining & Milling Co.*,
  243 U.S. 93 (1917) ............................................................................. 14

*United States v. PLO*,
  695 F. Supp. 1456 (S.D.N.Y. 1988) ..................................................... 4

*Wellness Int'l Network v. Sharif*,
  135 S. Ct. 1932 (2015) ...................................................................... 10

**Statutes:**

Anti-Terrorism Act of 1987,
  Pub. L. No. 100-204 (codified at 22 U.S.C. § 5201 *et seq.*) .............................. 2

Anti-Terrorism Clarification Act of 2018,
  Pub. L. No. 115-253 (codified at 18 U.S.C. § 2334(e)) ................................. 1, 6

Department of State, Foreign Operations, and
  Related Programs Appropriations Act, 2018,
  Division K, Pub. L. No. 115-141, § 7041(m)(2)(B) ...................................... 18

Department of State, Foreign Operations, and
  Related Programs Appropriations Act, 2019,
  div. F, Pub. L. No. 116-6, § 7041(k)(2)(B)(i), 133 Stat. 14....................................3, 5, 19

Foreign Assistance Act:
  22 U.S.C. § 2291 ....................................................................................5
  22 U.S.C. § 2346 ....................................................................................5

Middle East Peace Facilitation Act of 1993,
  Pub. L. No. 103-125, § 3(b)(2), (d)(2), 107 Stat. 1309 .................................3, 13

Middle East Peace Facilitation Act of 1994,
  Pub. L. No. 103-236, § 583, 108 Stat. 488 ..........................................18

Middle East Peace Facilitation Act of 1996,
  Pub. L. No. 104-107, § 604, (b), 110 Stat. 755 ....................................18

Taylor Force Act, tit. X, div. S,
  Pub. L. No. 115-141 ............................................................................5, 13

Pub. L. No. 102-572, § 1003(a),
  106 Stat. 4506 (1992) ...........................................................................6

18 U.S.C. § 2333(d)(2) .........................................................................6

18 U.S.C. § 2334(e) ..........................................................................1, 6, 10

18 U.S.C. § 2334(e)(1) .........................................................................9

22 U.S.C. § 2378b ...............................................................................5

22 U.S.C. § 5201(b) ...........................................................................2, 18

22 U.S.C. § 5202 ...............................................................................2, 18

## Legislative Materials:

164 Cong. Rec. S5103 (daily ed. July 19, 2018)....................................9

H.R. Rep. No. 102-1040 (1992).........................................................6, 12

H.R. Rep. No. 115-858 (2018) ........................................................................ 9, 12, 13

Statement on Signing the Foreign Relations Authorization Act,
    Fiscal Years 1988 and 1989, 2 Pub. Papers 1541 (Dec. 22, 1987) .............................. 3

Jim Zanotti, *The Palestinians: Background and U.S. Relations*,
    Cong. Research Serv. Rep. RL34074 (Nov. 21, 2018) .................................................. 3

**Other Authorities:**

Lifting Restrictions on U.S. Relations with the Palestine
    Liberation Organization, Presidential Determination
    No. 94-13 (Jan. 14, 1994) 59 Fed. Reg. 4777 (Feb. 1, 1994) ......................................... 4

U.S. Dep't of State, *Closure of the PLO Office in Washington*,
    https://www.state.gov/r/pa/prs/ps/2018/09/285812.htm
    (Sept. 10, 2018) .................................................................................................................. 4

## GLOSSARY

| | |
|---|---|
| ATA of 1987 | Anti-Terrorism Act of 1987 |
| ATA of 1992 | Anti-Terrorism Act of 1992 |
| ATCA | Anti-Terrorism Clarification Act |
| PLO | Palestine Liberation Organization |

## INTRODUCTION AND SUMMARY

The United States respectfully submits this brief in response to the Court's order of December 19, 2018, inviting the United States to address the constitutionality of the Anti-Terrorism Clarification Act of 2018 (ATCA), Pub. L. No. 115-253 (codified at 18 U.S.C. § 2334(e)).  In the government's view, this Court should not reach that question because the statute's factual predicates are not satisfied.  As the government previously notified the Court, defendants have declined to "accept" the foreign assistance specified in the ATCA and do not currently "benefit" from a waiver of section 1003 of the Anti-Terrorism Act of 1987.  *See* United States' Response to Feb. 6, 2019 Order (filed Feb. 15, 2019) [hereinafter, "U.S. Resp."].

In any event, the ATCA is constitutional.  The ATCA expressly sets forth the actions that, if taken after 120 days after the enactment of the statute, will be deemed consent to personal jurisdiction in a narrow and specified set of cases: civil cases under the Anti-Terrorism Act of 1992.  The Supreme Court has long recognized consent as a basis for personal jurisdiction, and has held that there are a variety of "legal arrangements" through which a defendant may consent to personal jurisdiction. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites*, 456 U.S. 694, 702 (1982).  And Congress has particular authority to enact such a statute with respect to the Palestinian Authority and the Palestine Liberation Organization—*sui generis* foreign non-sovereign entities that exercise governmental power—that have a unique

relationship with the United States government premised on those entities'
renouncement of terrorism and commitment to peace in the Middle East.

## STATEMENT OF THE CASE

### A.    Background

**1.**  The Palestine Liberation Organization has been recognized by the United
Nations as the representative of the Palestinian people; the Palestinian Authority was
created pursuant to the Oslo Accords to exercise interim governance authority for the
Palestinian people in Gaza and the West Bank.  The United States does not recognize
either the Palestinian Authority or the Palestine Liberation Organization as a
sovereign government.  As a matter of historical practice, Congress and the Executive
Branch have worked together closely to determine our country's policies with respect
to those entities.

**a.** In the Anti-Terrorism Act  of 1987 (ATA of 1987), Pub. L. No. 100-204
(codified at 22 U.S.C. § 5201 *et seq.*), Congress "determine[d] that the PLO and its
affiliates are a terrorist organization and a threat to the interests of the United States,
its allies, and to international law and should not benefit from operating in the United
States."  22 U.S.C. § 5201(b).  In section 1003 of that act, Congress made it unlawful
for the Palestine Liberation Organization "or any of its constituent groups" to
"establish or maintain an office, headquarters, premises, or other facilities or
establishments within the jurisdiction of the United States."  *Id.* § 5202.

The Executive Branch has authority to waive this prohibition, both constitutionally and statutorily. In his statement on signing the ATA of 1987, President Reagan acknowledged the validity of the prohibition so long as he did not exercise his constitutional prerogative to engage with the Palestine Liberation Organization diplomatically. *See* Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, 2 Pub. Papers 1541, 1542 (Dec. 22, 1987). Congress has also regularly authorized waivers of the statutory prohibition under certain conditions. *See, e.g.*, Middle East Peace Facilitation Act of 1993, Pub. L. No. 103-125, § 3(b)(2), (d)(2), 107 Stat. 1309, 1310 (authorizing temporary waiver if the President certifies that "it is in the national interest of the United States" and "the Palestine Liberation Organization continues to abide by" its Oslo Accords commitments); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2019, div. F, Pub. L. No. 116-6, § 7041(k)(2)(B)(i), 133 Stat. 14, 341 (2019 Appropriations Act) (authorizing temporary waiver if President determines the Palestinians have not obtained United Nations membership status as a state and have not "actively supported an [International Criminal Court] investigation against Israeli nationals for alleged crimes against Palestinians").[1] Beginning in 1994, following the Oslo Accords in which the Palestine Liberation Organization renounced terrorism and recognized Israel's right to exist, the Executive Branch has periodically

---

[1] *See also* Jim Zanotti, *The Palestinians: Background and U.S. Relations*, Cong. Research Serv. Rep. RL34074, at 4 (Nov. 21, 2018) (describing history of waivers).

issued waivers of section 1003 to permit the Palestine Liberation Organization to maintain an office of the General Delegation in Washington, DC.  *See, e.g.*, Lifting Restrictions on U.S. Relations with the Palestine Liberation Organization, Presidential Determination No. 94-13 (Jan. 14, 1994), 59 Fed. Reg. 4777 (Feb. 1, 1994).

In 2018, prior to the enactment of the statute at issue here, the State Department announced that it was closing the office of the General Delegation because "the PLO has not taken steps to advance the start of direct and meaningful negotiations with Israel," and has "refused to engage with the U.S. government with respect to peace efforts and otherwise."[2]  No waiver of section 1003 currently is in effect, and the Palestine Liberation Organization's Washington office closed as of October 10, 2018.  *See* Ex. 5, U.S. Resp., Sept. 10, 2018 Letter from U.S. Dep't of State to Chief Representative, General Delegation of the PLO.

The Palestine Liberation Organization continues to maintain its United Nations Observer Mission in New York.  Since the enactment of section 1003, courts have held that its prohibitions "do[] not apply . . . to the PLO's Mission in New York."  *See, e.g.*, *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro*, 937 F.2d 44, 46 (2d Cir. 1991); *United States v. PLO*, 695 F. Supp. 1456, 1464–71 (S.D.N.Y. 1988).  The Executive Branch does not issue waivers of section 1003 to permit the Palestine Liberation Organization to maintain its Observer Mission.

---

[2] *See* U.S. Dep't of State, *Closure of the PLO Office in Washington*, https://www.state.gov/r/pa/prs/ps/2018/09/285812.htm (Sept. 10, 2018).

**b.** The United States has historically provided foreign assistance to the Palestinian Authority under the Foreign Assistance Act, 22 U.S.C. §§ 2291, 2346, and related statutes. This foreign assistance has long been subject to statutory conditions. *See, e.g.*, 22 U.S.C. § 2378b ("Limitations on Assistance to the Palestinian Authority"); 2019 Appropriations Act, div. F, Pub. L. No. 116-6, §§ 7036–7040, 7041(k), 133 Stat. 14, 331–42. For example, the Taylor Force Act, tit. X, div. S, Pub. L. No. 115-141, provides that economic assistance that directly benefits the Palestinian Authority may be provided only if the Secretary of State certifies that the Palestinian Authority has taken certain actions with respect to terrorism. Under the annual appropriations act, the Secretary of State is also obligated to "take all appropriate steps to ensure" that financial assistance to the West Bank and Gaza "is not provided to or through any individual, private or government entity . . . that the Secretary knows or has reason to believe advocates, plans, sponsors, engages in, or has engaged in, terrorist activity," and must "terminate assistance to any individual" or entity "determined to be involved in or advocating terrorist activity." 2019 Appropriations Act, div. F, Pub. L. No. 116-6, § 7039(b).

The United States does not provide foreign assistance to the Palestine Liberation Organization.

**2.** In 1992, in order "to develop a comprehensive legal response to international terrorism," Congress created a civil damages remedy for United States nationals harmed by an act of international terrorism committed by a foreign terrorist

organization.  H.R. Rep. No. 102-1040, at 5 (1992) (1992 House Report); *see* Pub. L. No. 102-572, § 1003(a), 106 Stat. 4506, 4521–24 (1992) (adding 18 U.S.C. § 2231, 233–38 (Anti-Terrorism Act of 1992 or ATA of 1992)).  The ATA of 1992 allows a United States national to sue "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).

On October 3, 2018, Congress enacted the ATCA.  Section 4 of the ATCA provides that "for purposes of any civil action" under the ATA of 1992, "a defendant shall be deemed to have consented to personal jurisdiction in such civil action if, regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed, the defendant," "after the date that is 120 days after the date of enactment [*i.e.*, January 31, 2019]," either accepts specified forms of foreign assistance or, "in the case of a defendant benefiting from a waiver or suspension" of the ATA of 1987, establishes or "continues to maintain any office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States."  Pub. L. No. 115-253, § 4, 132 Stat. 3183, 3184 (adding 18 U.S.C. § 2334(e)).

### B.    Prior Proceedings

Plaintiffs are family members of a United States citizen who was killed when she was shot by terrorists while riding on a public bus in the West Bank.  *See Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237 (D.D.C. 2015).  Plaintiffs brought suit against the

Palestinian Authority and Palestine Liberation Organization, as well as several other individuals and groups, under the ATA's civil liability provision, alleging in relevant part that the Palestinian Authority and Palestine Liberation Organization had "provide[d] weapons, funding, and other support to the organizations and individuals responsible for the attack." *Id.* at 240–41. The Palestinian Authority and Palestine Liberation Organization sought dismissal on personal jurisdictional grounds.

The district court initially held that it had general personal jurisdiction, relying on the Palestinian Authority's and Palestine Liberation Organization's "continuous and systematic" contacts with the United States, including speechmaking and other public appearances here by those entities' officials. *See Klieman*, 82 F. Supp. 3d at 239. Following the Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), the defendants renewed their objection to personal jurisdiction. The district court agreed, and dismissed the case. *See Klieman*, 82 F. Supp. 3d at 243–47.

While the case was on appeal to this Court, Congress enacted the ATCA. Plaintiffs filed a supplemental brief contending that the ATCA will "resolve[]" the personal jurisdiction issue in this case because the ATCA's conditions for consent to personal jurisdiction "will be met" on February 1, 2019. *See* Pls.' Supp. Br. at 2–3. Defendants opposed, contending that the ATCA's factual predicates will not be satisfied, and that the ATCA violates the due process clause and imposes an unconstitutional condition. *See* Defs.' Supp. Resp. at 5–20.

On December 19, 2018, the Court invited the United States to file an amicus brief addressing defendants' arguments regarding the constitutionality of Section 4 of the ATCA. The Court instructed the United States to "assume that the 'accepts' and/or 'continues to maintain' provisions of Section 4 will be satisfied 'after the date that is 120 days after the date of enactment of'" the ATCA.

## ARGUMENT

### I.   Section 4's Factual Predicates Are Not Satisfied

As the United States previously informed the Court, as of February 1, 2019 and since that date, neither the "accepts" nor the "continues to maintain" provision has been met. Accordingly, there is no need for a remand to the district court. This Court can determine that the ATCA's statutory predicates are not satisfied, and need not address the constitutionality of Section 4. *See Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 353 (D.C. Cir. 1997). It is particularly appropriate for the Court to avoid unnecessarily addressing the constitutional issue here, as it arises in the context of the conduct of foreign relations.

### II.   Section 4 Applies to Pre-Enactment Lawsuits

This litigation also implicates the question whether Section 4 may apply "in a case arising from conduct antedating [its] enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994). Section 4's plain language makes clear that it does: the provision applies "regardless of the date of the occurrence of the act of international terrorism

upon which such civil action was filed." 18 U.S.C. § 2334(e)(1). By "expressly prescrib[ing]" that Section 4 is to apply in cases arising from pre-enactment *conduct*, *Landgraf*, 511 U.S. at 280, Congress made clear its intention for Section 4 to apply in lawsuits filed before its enactment, such as this one. Section 4's legislative history confirms this point. *See, e.g.*, H.R. Rep. No. 115-858, at 10 (2018) (2018 House Report) (explaining that Section 4 will "apply in cases (including cases that are pending in the courts of the United States on the date of enactment)"); *see also* 164 Cong. Rec. S5103 (daily ed. July 19, 2018) (statement of Sen. Grassley). Because Congress was clear as to Section 4's "proper reach," there is "no need to resort to judicial default rules" such as *Landgraf*'s presumption against retroactivity. *Landgraf*, 511 U.S. at 280. The Court need only apply the statute as prescribed.

## III.   Section 4 is Constitutional

### A.   Congress May Treat the Palestinian Authority's or Palestine Liberation Organization's Consent as a Lawful Basis for Exercising Personal Jurisdiction Under Section 4

This Court held in *Livnat v. Palestinian Authority*, 851 F.3d 45, 55 (D.C. Cir. 2017), that the Palestinian Authority has due process rights, and that a federal court must establish personal jurisdiction over it consistent with the Fifth Amendment. The United States assumes for purposes of this brief that the Palestine Liberation Organization also has due process rights. The Supreme Court has long recognized, however, that "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Bauxites*, 456 U.S. at 703.

9

There are a "variety of legal arrangements" through which a defendant may consent to a court's exercise of jurisdiction in the absence of minimum contacts. *Id.*; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). A defendant may consent by, for example, entering a contract and "agree[ing] in advance to submit to the jurisdiction of a given court," *National Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964), or through "the voluntary use of certain state procedures," *Bauxites*, 456 U.S. at 704. As long as a defendant's consent is "knowing and voluntary," the court's exercise of jurisdiction is consistent with due process. *See Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1948 (2015); *Burger King*, 471 U.S. at 472 n.14.

**1.** Section 4 is one such "legal arrangement[]" through which a defendant can consent to personal jurisdiction. *See Bauxites*, 456 U.S. at 703. Section 4 sets out expressly what actions will cause a defendant to be "deemed to have consented" to personal jurisdiction in civil cases under the ATA of 1992 if those actions are taken after 120 days after the enactment of Section 4. 18 U.S.C. § 2334(e). Since the ATCA's enactment, the Palestinian Authority and Palestine Liberation Organization have "know[n]" what actions will be deemed consent, and have had the opportunity to "voluntarily" choose whether or not to continue such actions and thereby consent to jurisdiction in the courts of the United States for civil actions under the ATA of 1992. *See Wellness Int'l Network*, 135 S. Ct. at 1948.

Section 4 thus operates similarly to other legal arrangements through which a defendant may validly consent to personal jurisdiction. *See Bauxites*, 456 U.S. at 703.

For example, a defendant that consents by contract to suit in a particular forum is aware in advance of the forum in which it may be subject to suit, and the causes of action for which it may be sued: those arising out of the contract. The defendant can "structure [its] primary conduct with some minimum assurance as to where that conduct will and will not render [it] liable to suit," consistent with the Due Process Clause. *Daimler*, 571 U.S. at 139 (quoting *Burger King*, 471 U.S. at 472); *see also id.* at 137 (discussing predictability and personal-jurisdiction rules). Similarly, Section 4 sets out expressly what actions will be deemed consent to personal jurisdiction in the courts of the United States, and it specifies the cause of action for which the defendant will be deemed to have consented to personal jurisdiction: civil cases under the ATA of 1992. The 120-day implementation period also gives defendants fair warning that particular conduct will subject them to personal jurisdiction, and a reasonable period of time to structure their conduct accordingly.[3]

**2.** Furthermore, "Congress passed, and the President signed, [the ATCA] in furtherance of their stance on a matter of foreign policy," a "realm [that] warrants

---

[3] Factual questions could arise in a particular case whether a defendant has "accepted" the assistance specified in the ATCA, or whether a defendant has known in advance whether certain actions or certain sources of funding would constitute acceptance of qualifying foreign assistance. Those questions are not presented here, however. As discussed above, defendants have explicitly disavowed any receipt of the specified forms of foreign assistance under the specified authorities, and the United States confirmed that it would cease providing foreign assistance under the specified authorities by January 31, 2019. *See* Exs. 1 & 2, U.S. Resp.

respectful review by courts." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016).

Specifically, Congress enacted, and the President signed, Section 4 to provide a

meaningful response to international terrorism, and the political branches acted

against an extensive backdrop of statutes relating to the terms under which the

Palestine Liberation Organization may operate in the United States and the Palestinian

Authority may receive foreign assistance.

The civil-liability provision of the ATA of 1992 is intended "to develop a

comprehensive legal response to international terrorism."  1992 House Report at 5.

Congress found in the ATCA, however, that because courts had determined that the

Palestinian Authority and Palestine Liberation Organization were not subject to

general personal jurisdiction in the United States, the goals of the ATA of 1992 were

not being realized.  *See* H.R. Rep. No. 115-858, at 6.  Congress thus determined that it

was necessary to enact Section 4 so that the ATA of 1992's civil-liability provision

could function effectively to "halt, deter, and disrupt international terrorism."  *Id.* at

7–8; *see also id.* at 2–3.

The actions Congress selected in Section 4 to "deem[]" consent to personal

jurisdiction are consistent with this legislative purpose.  Defendants are *sui generis*

foreign entities that exercise governmental power but have not been recognized as a

sovereign government by the Executive.  Their right to operate within the United

States and their receipt of foreign assistance is dependent on the coordinated

judgments of the political branches.  As a matter of historical practice, the political

branches have long imposed conditions on these benefits based on the same concerns that motivated enactment of this statute, namely concerns about support for acts of terrorism by the Palestinian Authority and Palestine Liberation Organization. *See supra* pp. 2–5 (discussing constitutional and statutory conditions under which the Executive Branch may waive section 1003 of the ATA of 1987 to permit the Palestine Liberation Organization to operate in the United States, and the statutory findings necessary for foreign assistance to be provided to the Palestinian Authority); *see also, e.g.*, Middle East Peace Facilitation Act of 1993, Pub. L. No. 103-125, § 3(b)(2), (d)(2), 107 Stat. 1309, 1310 (authorizing waiver of section 1003 if the President certifies "it is in the national interest of the United States," and the Palestine Liberation Organization is offering its Oslo Accords commitments); Taylor Force Act, tit. X, div. S, Pub. L. No. 115-141 (providing that economic assistance that directly benefits the Palestinian Authority may be provided only if the Secretary of State certifies that the Palestinian Authority has taken certain actions with respect to terrorism).

In this context, it was reasonable and consistent with the Fifth Amendment for Congress and the Executive to determine that the Palestine Liberation Organization's maintenance of an office in this country after a waiver of section 1003, or the Palestinian Authority's continued receipt of certain foreign assistance, should be "deemed" consent to personal jurisdiction in civil cases under the ATA of 1992, the purpose for which is to deter terrorism. *See* 2018 House Report at 7 (explaining that "Congress has repeatedly tied the[ Palestinian Authority and Palestine Liberation

Organization's] continued receipt of these privileges to their adherence to their commitment to renounce terrorism," and that it is appropriate to deem the continued acceptance of these benefits to be "consent to jurisdiction in cases in which a person's terrorist acts injure or kill U.S. nationals").

**3.** Defendants' contrary arguments are not persuasive. Defendants insist that they are not "at home" in the United States. *See* Defs.' Supp. Br. at 21. But the "at home" test for general jurisdiction is relevant only in the absence of consent. *See Daimler*, 571 U.S. at 129; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927–28 (2011). A forum's ability to exercise jurisdiction by consent is separate and apart from the forum's ability to exercise general or "specific jurisdiction over an out-of-state defendant who has not consented to suit there." *Burger King*, 471 U.S. at 472.

Defendants also contend that any consent to jurisdiction under the ATCA cannot be "'voluntary.'" *See* Defs.' Supp. Br. at 20–21. But the ATCA explicitly sets out which actions will be "deemed" consent, and it provides advanced notice to defendants so that they can choose whether or not to continue those actions. Once a defendant is on notice, the defendant's choice to continue receiving foreign assistance under the specified authorities, or choice to continue to maintain an office pursuant to an Executive Branch waiver of section 1003, is the "voluntary act" that manifests consent to jurisdiction. *Cf. Pennsylvania Fire Ins. Co. of Phila. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95–96 (1917) (finding defendant's appointment of agent for service of process constitutionally subjected defendant to suit in state for cases

growing out of defendant's activities because the governing statute "ha[d] been held
to go to that length" and the execution of the document "was the defendant's
voluntary act").

**4.**  The United States takes no position on whether a State may enact a statute
deeming certain conduct, such as registering to do business in the State, to be consent
to jurisdiction, and this Court need not address that question to decide the
constitutionality of Section 4, which arises in a unique foreign affairs context.  *See, e.g.*,
Pls.' Supp. Br. at 15; Defs.' Supp. Br. at 20–21.  As discussed above, this case involves
jurisdiction in a limited set of anti-terrorism cases against *sui generis* foreign non-
sovereign entities that have no right to operate in the United States.  The United
States does not recognize a Palestinian state, and yet the Palestine Liberation
Organization wishes to operate an office here to conduct public diplomacy and public
advocacy on behalf of an entity that holds itself out as a foreign government.  In this
foreign affairs context, in contrast to the limited and mutually exclusive sovereignty of
the several states, Congress may deem certain actions of defendants like the
Palestinian Authority and the Palestine Liberation Organization to be consent to
personal jurisdiction in the United States, even if a State cannot enact similar
legislation.  *See J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality
op.) (explaining that "personal jurisdiction requires a forum-by-forum, or sovereign-
by-sovereign, analysis").

Section 4 also differs meaningfully from a state statute deeming registration or other processes to be consent to jurisdiction.  A state registration-by-consent statute could make a defendant "amenable to suit" in the forum, "on any claim for relief," simply by virtue of doing business in the forum.  *See Goodyear*, 564 U.S. at 929; *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 636–38, 640 (2d Cir. 2016).  Section 4, by contrast, grants jurisdiction over specified civil actions under a single federal statute, and only if the defendant performs specified actions under the ATCA.  Those civil actions also have a nexus to conduct by the Palestinian Authority and the Palestine Liberation Organization that has historically been the basis for restrictions on assistance (in the case of the Palestinian Authority) or operating in the United States (in the case of the Palestine Liberation Organization): engaging in or providing support for terrorist activity.  Section 4 is thus substantially narrower than State consent-by-registration statutes, and poses less risk of unfair surprise.  Moreover, in light of this foreign affairs and national security context, Section 4 is entitled to deference in a way that state consent-by-registration statutes are not.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 35–36 (2010) (discussing deference owed to political branches when "sensitive interests in national security and foreign affairs [are] at stake").  This Court need not, and should not, address state consent-by-registration statutes in order to find Section 4 constitutional.

### B. Section 4 Does Not Impose an Unconstitutional Condition

The Court's order inviting the United States to file an amicus brief also directed the United States to address "defendants' argument that Section 4 of the Act violates the unconstitutional conditions doctrine." Neither this Court nor the Supreme Court has applied an unconstitutional conditions doctrine to a statute that deems certain actions taken by a defendant to be consent to personal jurisdiction for purposes of the Fifth Amendment's Due Process Clause. And no case has addressed such a statute with respect to these *sui generis* defendants. Assuming that some form of unconstitutional conditions doctrine applies in this context, however, it is satisfied here.

In applying the unconstitutional conditions doctrine in the context of the Takings Clause, the Supreme Court has held that a condition on the grant of a land use permit or other permission that would constitute an outright taking if imposed directly is permissible if it furthers the end advanced as the justification for the prohibition. *See Dolan v. City of Tigard*, 512 U.S. 374, 385–86, 391 (1994) (determining whether the state interest has a "nexus" and "rough proportionality" to the imposed condition); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837–38 (1987) (same). And in the First Amendment context, in reviewing government funding conditions applied to domestic entities with constitutional rights, Congress is permitted to impose "conditions that define the limits of [a] government spending program" and thereby "specify the activities Congress wants to subsidize." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). "[I]f a party objects" to the

17

conditions, its "recourse is to decline the funds." *Id.* A condition becomes
unconstitutional only where it "seek[s] to leverage funding" to burden First
Amendment-protected activity "outside the contours of the program itself." *Id.* at
214–15.

Regardless of the analytical framework, if any, that applies in this context,
Section 4 does not impose an unconstitutional condition. The Palestine Liberation
Organization is presumptively prohibited from establishing or maintaining an office in
the United States based on Congress's determination that it is "a terrorist organization
and a threat to the interests of the United States, its allies, and to international law."
22 U.S.C. §§ 5201(b), 5202. Waiver of this prohibition has historically been
contingent on the Executive Branch's determination that certain conditions are met,
including that the Palestine Liberation Organization have renounced terrorism and
committed to peace in the Middle East. *See, e.g.*, Middle East Peace Facilitation Act of
1994, Pub. L. No. 103-236, § 583, 108 Stat. 488, 488–89; Middle East Peace
Facilitation Act of 1996, Pub. L. No. 104-107, § 604, (b), 110 Stat. 755, 756–57;
Department of State, Foreign Operations, and Related Programs Appropriations Act,
2018, div. K, Pub. L. No. 115-141, § 7041(m)(2)(B). To the extent the Executive
Branch permits the Palestine Liberation Organization to operate in the United States
for the purposes of advancing United States efforts to promote peace between Israel
and the Palestinians, it is reasonable and proportional for the United States to
condition the Palestine Liberation Organization's exercise of the waiver on its consent

to personal jurisdiction in cases that allege they have provided material support for terrorist attacks injuring U.S. persons.  *See Dolan*, 512 U.S. at 391.

Similarly, the Palestinian Authority's receipt of foreign assistance is subject to restrictions related to international terrorism, and dependent on the judgments of the political branches with respect to the Palestinian Authority's actions, including prior judgments that such assistance was not being used to support terrorism.  *See, e.g.*, 2019 Appropriations Act, div. F, Pub. L. No. 116-6, § 7039(b) (requiring Secretary of State to ensure that "assistance is not provided to or through any individual, private or government entity that the Secretary knows or has reason to believe advocates, plans, sponsors, engages in, or has engaged in, terrorist activity"); *id.* § 7040(a), (b) (prohibiting funds to the Palestinian Authority unless the President certifies that it is "important to the national security interest of the United States"); *id.* § 7041(k)(1) (requiring Secretary of State, before providing assistance to the West Bank and Gaza, to certify the assistance is for specified purposes, including to "advance Middle East peace" or "improve security in the region").  The assistance provided under the authorities in Section 4 likewise has historically served counterterrorism purposes, including by improving the capacity of Palestinian Authority security forces and police to combat terrorism.  If the Executive Branch has made the required determinations and provided assistance to the Palestinian Authority under the specified authorities, it is within "the contours" of the programs for Congress to also require that, if the Palestinian Authority knowingly accepts that assistance, it must also consent to

personal jurisdiction in cases alleging it has provided material support for terrorism. *Cf. Alliance for Open Society Int'l*, 570 U.S. at 214–15; *see also* 2018 House Report at 7.

In sum, to the extent Section 4 imposes conditions on defendants for purposes of an unconstitutional conditions doctrine, those conditions are constitutional because they relate to the terms under which the Palestinian Authority and Palestine Liberation Organization may receive foreign assistance or operate in the United States—benefits that have long been subject to conditions set by the political branches in relation to those entities' renouncement of terrorism.  Congress may appropriately impose such conditions in the foreign affairs context with respect to entities such as defendants here, even assuming Congress could not set the same conditions with respect to domestic entities.  In this particular statutory context, it is not an unconstitutional condition for Congress to determine that the Palestinian Authority's acceptance of foreign assistance from the United States, or the Palestine Liberation Organization's establishment or maintenance of an office in the United States pursuant to a waiver of the ATA of 1987, should be deemed consent to personal jurisdiction in civil cases under the ATA of 1992, the purpose of which is to meaningfully combat terrorism.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Respectfully submitted,

JOSEPH H. HUNT
   *Assistant Attorney General*

JESSIE K. LIU
   *United States Attorney*

SHARON SWINGLE

 *s/ Courtney L. Dixon*
COURTNEY L. DIXON
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7243*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-8189*
   *courtney.l.dixon@usdoj.gov*

March 2019

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,132 words.  This brief also

complies with the typeface and type-style requirements of Federal Rule of Appellate

Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in

Garamond 14-point font, a proportionally spaced typeface.


*s/ Courtney L. Dixon*
Courtney L. Dixon

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2019, I electronically filed the foregoing brief

with the Clerk of the Court for the United States Court of Appeals for the District of

Columbia Circuit by using the appellate CM/ECF system.  Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.


*s/ Courtney L. Dixon*
Courtney L. Dixon

**ADDENDUM**

## TABLE OF CONTENTS

18 U.S.C. § 2333(a)........................................................................................A1

18 U.S.C. § 2334(e)........................................................................................A2

22 U.S.C. § 5202 ...........................................................................................A3

**18 U.S.C. 2333(a)**

**§ 2333. Civil Remedies**

(a) **Action and Jurisdiction**—Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

**18 U.S.C. § 2334(e)**

**§ 2334. Jurisdiction and Venue**

. . .

(e) Consent of certain parties to personal jurisdiction—

(1) In general—Except as provided in paragraph (2), for purposes of any civil action under section 2333 of this title, a defendant shall be deemed to have consented to personal jurisdiction in such civil action if, regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed, the defendant—

(A) After the date that is 120 days after the enactment of this subsection, accepts—

(i) Any form of assistance, however provided, under chapter 4 of part II of the Foreign Assistance Act of 1971 (22 U.S.C. 2346 et seq.);

(ii) Any form of assistance, however provided, under section 481 of the Foreign Assistance Act of 1961 (22 U.S.C. 2291) for international narcotics control and law enforcement; or

(iii) Any form of assistance, however provided, under chapter 9 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 9349bb et seq.); or

(B) In the case of a defendant benefitting from a waiver or suspension of section 1003 of the Anti-Terrorism Act of 1987 (22 U.S.C. 5202) after the date that is 120 days after the date of enactment of thus subsection—

(i) Continues to maintain any office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States; or

(ii) Establishes or procures any office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States.

(2) Applicability—Paragraph (1) shall not apply to any defendant who ceases to engage in the conduct described in paragraphs (1)(A) and (1)(B) for 5 consecutive calendar years.

A2

22 U.S.C. § 5202

## § 5202. Prohibitions regarding PLO

It shall be unlawful, if the purpose be to further the interests of the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof, on or after the effective date of this chapter—

> (3) . . . to establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof.

A3