# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, et al.,

                Plaintiffs,

-against-

PALESTINE LIBERATION
ORGANIZATION, et al.,

                Defendants.

Case No. 04 Civ. 397 (GBD)

---

## **DEFENDANTS' BRIEF CONCERNING APPLICATION OF THE PSJVTA**

**SQUIRE PATTON BOGGS (US) LLP**
Gassan A. Baloul
Mitchell R. Berger
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants Palestine Liberation
Organization and Palestinian Authority*

January 8, 2021

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

PROCEDURAL BACKGROUND ...................................................................... 6

    A.    The Second Circuit held that the exercise of personal jurisdiction over the PA and PLO in this case does not satisfy due process. ........... 6

    B.    The Second Circuit declined to recall its mandate after Congress passed the ATCA and Plaintiffs filed a new case on the same facts ................................................................................................... 7

    C.    The Supreme Court issued a GVR order so the Second Circuit could consider the PSJVTA .................................................................. 8

    D.    The Second Circuit remanded to this Court to determine the applicability and constitutionality of the PSJVTA before deciding whether to recall its 2016 mandate ........................................ 9

ARGUMENT ..................................................................................................... 10

I.    Defendants' activities "in the United States" do not satisfy the factual predicates for statutory jurisdiction under the plain language of the PSJVTA ....................................................................................................... 10

II.    The PSJVTA violates the Due Process Clause if applied to create jurisdiction over the PA and PLO in this case ................................................. 20

    A.    This Court has no general or specific jurisdiction over the PA and PLO under binding precedent ...................................................... 23

    B.    The PSJVTA does not attempt to satisfy the Due Process Clause, but relies instead on jurisdictional theories that have been rejected by the Supreme Court .................................................... 27

        1.    The PSJVTA does not purport to create a causal connection between its factual prerequisites and Plaintiffs' claims. ........................................................................ 27

        2.    Plaintiffs' arguments regarding the PSJVTA rely on jurisdictional theories that have been rejected by the Supreme Court ......................................................................... 30

    C.    Neither of the due process "tests" relied upon by Plaintiffs resolves the constitutional problems with the PSJVTA. ..................... 35

III.    Application of the PSJVTA to this case violates separation of powers .......... 37

## **TABLE OF CONTENTS**
### (continued)

**Page**

A.     Congress cannot use the PSJVTA to legislatively override the Supreme Court's due process rulings ...................................................... 38

B.     Under separation of powers principles, Congress cannot reopen a closed case or reinstate a voided judgment ....................................... 42

IV.     The PSJVTA's "deemed consent" provision violates due process as applied in this case .......................................................................... 45

A.     The Constitution forbids Congress from coercing "consent" to personal jurisdiction .............................................................. 46

B.     Implied consent cannot be applied retroactively to salvage Plaintiffs' claims in this case ................................................ 51

V.     Congress cannot condition the exercise of constitutional rights on Defendants' agreement to be regulated by Congress. ................................... 56

CONCLUSION ...................................................................................... 59

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**          **Page**

*Adams Dairy v. Nat'l Dairy Prods. Corp.*,
  293 F. Supp. 1135 (W.D. Mo. 1968) ...................................................... 55

*Am. Surgical Assistants, Inc. v. United Healthcare of Tex.*,
  2010 U.S. Dist. LEXIS 30878 (S.D.N.Y. Mar. 30, 2010) ....................... 9

*In re Aphria Sec. Litig.*,
  2020 U.S. Dist. LEXIS 181054 (S.D.N.Y. Sep. 30, 2020) ..................... 28

*Armstrong v. D.C. Pub. Library*,
  154 F. Supp. 2d 67 (D.D.C. 2001) ......................................................... 19

*Avelar v. J. Cotoia Constr., Inc.*,
  No. 11-2172, 2011 U.S. Dist. LEXIS 126487 (E.D.N.Y. Nov. 2, 2011) ............... 43

*Bank Markazi v. Peterson*,
  136 S. Ct. 1310 (2016) ...................................................................... 4, 39

*Bartlett v. Bowen*,
  816 F.2d 695 (D.C. Cir. 1987) .............................................................. 41

*Berry v. Webloyalty.com, Inc.*,
  2011 U.S. Dist. LEXIS 39581 (S.D. Cal. Apr. 11, 2011) ....................... 29

*Bertuglia v. City of New York*,
  839 F. Supp. 2d 703 (S.D.N.Y. 2012) ..................................................5-6

*Bristol-Myers Squibb Co. v. Superior Court*,
  137 S. Ct. 1773 (2017) .................................................23-24, 31-32, 51

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016) ....................................................45-46, 48

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ....................................................... 21, 26, 28, 34, 51

*Burnham v. Superior Court of Cal.*,
  495 U.S. 604 (1990) ....................................................................... 42, 52

*Carvette v. Marion Power Shovel Co.*,
  249 A.2d 58 (Conn. 1968) ..................................................................... 54

*Chufen Chen v. Dunkin' Brands, Inc.*,
  954 F.3d 492 (2d Cir. 2020)................................................................... 55

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ........................................................................... 38-40

*Comm. on the Judiciary v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................ 37

*Covington Indus. v. Resintex A.G.,*
    629 F.2d 730 (2d Cir. 1980) .................................................................. 42

*CRI Liquidating REIT v. A.F. Evans Co.,*
    730 A.2d 1244 (Del. Ch. 1997) ....................................................... 53-54

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ................................................................... *passim*

*Deerfield v. FCC,*
    992 F.2d 420 (2d Cir. 1993) .................................................................. 41

*Diamond Crystal Salt Co. v. P.J. Ritter Co.,*
    419 F.2d 147 (1st Cir. 1969) ................................................................ 55

*Dickerson v. United States,*
    530 U.S. 428 (2000) ............................................................... 37, 38, 39

*Dudnikov v. Chalk & Vermilion Fine Arts,*
    514 F.3d 1063 (10th Cir. 2008) ............................................................ 26

*Duncan v. Walker,*
    533 U.S. 167 (2001) .............................................................................. 18

*EEOC v. Arabian Am. Oil Co.,*
    499 U.S. 244 (1991) ............................................................................. 12

*Ehrenfeld v. Mahfouz,*
    489 F.3d 542 (2d Cir. 2007) .................................................................. 34

*FCC v. Fox TV Stations, Inc.,*
    567 U.S. 239 (2012) .............................................................................. 19

*Fed. Election Com. v. Cent. Long Island Tax Reform Immediately*
    *Comm.,*
    616 F.2d 45 (2d Cir. 1980).............................................................. 10, 43

*Foremost-McKesson, Inc. v. Iran,*
    905 F.2d 438 (D.C. Cir. 1990) ............................................................. 36

*Frost & Frost Trucking Co. v. R.R. Comm'n of State of Cal.,*
    271 U.S. 583 (1926) ........................................................................... 58-59

*G.L. v. D.L.,*
    2017 Haw. App. Lexis 468 (Nov. 22, 2017) ......................................... 43

*Genuine Parts Co. v. Cepec,*
    137 A.3d 123 (Del. 2016) ...................................................................... 49

*Godinez v. Moran,*
    509 U.S. 389 (1993) .............................................................................. 46

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) .............................................................................. 59

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    564 U.S. 915 (2011) .......................................................................*passim*

*GTE New Media Servs. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000)............................................................. 34

*Gulf Coast Bank & Trust v. Designed Conveyor Sys.,*
    No. 16-412, 2017 U.S. Dist. LEXIS 4711 (M.D. La. Jan. 12, 2015)..................... 48

*Hess v. Pawloski,*
    274 U.S. 352 (1927) .............................................................................. 52

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinea,*
    456 U.S. 694 (1982) .............................................................................. 45

*Internatl. Shoe Co. v. Washington,*
    326 U.S. 310 (1945) .......................................................................*passim*

*J. McIntyre Mach., Ltd. v. Nicastro,*
    564 U.S. 873 (2011) .............................................................. 49-50, 53

*Kagan v. United Vacuum Appliance Corp.,*
    260 N.E.2d 208 (Mass. 1970) ............................................................. 54

*Estate of Klieman v. Palestinian Auth.,*
    923 F.3d 1115 (D.C. Cir. 2019) .......................................................*passim*

*Klinghoffer v. SNC Achille Lauro,*
    937 F.2d 44 (2d Cir. 1991)........................................................... 11, 15

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013) ............................................................... 5, 46, 56, 58

*Krueger v. Rheem Mfg. Co.*,
   149 N.W.2d 142 (Iowa 1967) .............................................................. 54, 55

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) ........................................................................... 43, 56

*Lanham v. BNSF Ry. Co.*,
   939 N.W.2d 363 (Neb. 2020) ................................................................... 48

*Lelchook v. Islamic Republic of Iran*,
   No. 16-7078, 2020 U.S. Dist. LEXIS 221606 (E.D.N.Y. Nov. 23,
   2020).................................................................................................... 28

*Leonard v. USA Petroleum Corp.*,
   829 F. Supp. 882 (S.D. Tex. 1993) .......................................................... 45

*Linan v. Carnival Corp.*,
   2010 U.S. Dist. LEXIS 47735 (S.D. Fla. Apr. 21, 2010)........................... 29

*Livnat v. Palestinian Auth.*
   139 S. Ct. 373 (2018) ............................................................................... 7

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) .........................................................*passim*

*Mallory v. Norfolk S. Railway*,
   No. 1961, 2018 WL 3025283 (Pa. Com. Pl. May 30, 2018) ..................... 49

*Marbury v. Madison*,
   5 U.S. 137 (1803) ....................................................................... 4, 39, 40

*McGee v. Int'l Life Ins. Co.*,
   355 U.S. 220 (1957) ................................................................... 51, 52, 54

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ...................................................................... 28

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ..................................................................... 34

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ................................................................................ 58

*Nelson v. Miller*,
    143 N.E.2d 673 (Ill. 1957) ........................................................................... 54

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*,
    377 U.S. 58 (1964) ...................................................................................... 18

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) .................................................................................. 20

*Opati v. Republic of Sudan*,
    140 S. Ct. 1601 (2020) ........................................................................... 43-44

*Pennoyer v. Neff*,
    95 U.S. 714 (1877) ........................................................................... 32, 33, 52

*Pennsylvania Fire Ins. v. Gold Issue Mining & Milling Co.*,
    243 U.S. 93 (1917) ...................................................................................... 52

*Perry v. Sindermann*,
    408 U.S. 593 (1972) .................................................................................... 56

*Plaut v. Spendthrift Farm*,
    514 U.S. 211 (1995) ................................................................................ 39-40

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ...................................................................... 20

*Qualley v. Clo-Tex Int'l, Inc.*,
    212 F.3d 1123 (8th Cir. 2000) ..................................................................... 29

*Quill Corp. v. N. Dakota*,
    504 U.S. 298 (1992) .................................................................................... 21

*R.S.W.W., Inc. v. Keego Harbor*,
    397 F.3d 427 (6th Cir. 2005) ........................................................................ 5

*Reynolds v. Turning Point Holding Co.*,
    No. 19-1935, 2020 U.S. Dist. LEXIS 33163 (E.D. Pa. Feb. 26, 2020) .................. 48

*Reynolds-Naughton v. Norwegian Cruise Line Ltd.*,
    386 F.3d 1 (1st Cir. 2004) ........................................................................... 18

*Roman Cath. Archdiocese of San Juan v. Feliciano*,
    140 S. Ct. 696 (2020) ............................................................................. 42-43

*Ruhrgas A.G. v. Marathon Oil Co.*,
526 U.S. 574 (1999) ................................................................ 42

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*,
989 F.2d 572 (2d Cir. 1993).................................................. 4, 20-21

*Seldon v. Magedson*,
No. 11-6218, 2012 U.S. Dist. LEXIS 141616 (S.D.N.Y. July 10, 2012)............................................................................................ 32

*Shaffer v. Heitner*,
433 U.S. 186 (1977) ........................................................... 21, 52-53

*Shatsky v. PLO*,
2017 U.S. Dist. LEXIS 94946 (D.D.C. June 20, 2017) ...................... 5-56

*Shatsky v. PLO*,
955 F.3d 1016 (D.C. Cir. 2020) ...................................................*passim*

*Siemer v. Learjet Acquisition Corp.*,
966 F.2d 179 (5th Cir. 1992) .......................................................... 47

*Sokolow v. PLO*,
138 S. Ct. 1438 (2018) .................................................................. 7

*South Carolina v. Moore*,
447 F.2d 1067 (4th Cir. 1971) ........................................................ 43

*South Dakota v. Dole*,
483 U.S. 203 (1987) ...................................................................... 47

*Southern Pac. Co. v. Denton*,
146 U.S. 202 (1892) ...................................................................... 58

*Steel v. United States*,
813 F.3d 1545 (9th Cir. 1987) ........................................................ 36

*Sullivan v. A.W. Chesterton, Inc.*,
384 F. Supp. 3d 532 (E.D. Pa. 2019)............................................ 48, 58

*Texas Trading & Milling Corp. v. Nigeria*,
647 F.2d 300 (2d Cir. 1981)........................................................... 44

*The Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) ........................................................................ 47

*United States v. Klein,*
    80 U.S. 128 (1872) .................................................................................. 39

*United States v. PLO,*
    695 F. Supp. 1456 (S.D.N.Y. 1988) ........................................... 12, 57

*United States v. Sioux Nation,*
    448 U.S. 371 (1980) ............................................................................. 41

*United States v. Van Waeyenberghe,*
    481 F.3d 951 (7th Cir. 2007) .......................................................... 46

*Waite v. All Acquisition Corp.,*
    901 F.3d 1307 (11th Cir. 2018) ................................................... 48

*Walden v. Fiore,*
    571 U.S. 277 (2014) ..................................................................*passim*

*Waldman v. PLO,*
    835 F.3d 317 (2d Cir. 2016)....................................................*passim*

*Waldman v. PLO,*
    925 F.3d 570 (2d Cir. 2019) ................................................. 8, 24-25

*Waldman v. PLO,*
    140 S. Ct. 2714 (Apr. 27, 2020) ...................................................... 9

*Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivanos,*
    712 F. Supp. 383 (S.D.N.Y. 1989) ............................................... 44

*Wellness Int'l Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015) ........................................................................... 47

*Wis. Dep't of Revenue v. William Wrigley, Jr., Co.,*
    505 U.S. 214 (1992) ........................................................................... 16

## Statutes, Treaties, and Legislative History

Anti-Terrorism Act, 18 U.S.C. § 2333.......................................................passim

Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253, 132
    Stat. 3184 (Oct. 3, 2018) .........................................................passim

Covention on the Privileges and Immunities of the United Nations, §
    12, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 16 (entered into force
    Apr. 29, 1970) ................................................................................. 12

Recording of Executive Business Meeting, Committee on the Judiciary
(Oct. 17, 2019), *available at*:
https://www.judiciary.senate.gov/meetings/10/17/2019 /executive-
business-meeting ............................................................................... 17

Md. Code, Courts & Jud. Pro. § 6-103 (b)(1)-(3) ......................................... 33

Oslo I Accord (*Declaration of Principles on Interim Self-Government
Arrangements*), 32 I.L.M. 1525 (Sept. 13, 1993)..................................... 57

Oslo II Accord (*Israeli-Palestinian Interim Agreement on the West Bank
and Gaza Strip*), Art. XVII, 36 I.L.M. 55 (Sept. 28, 1995))..................... 57

Presidential Statement on Signing S.1569 (1992), 28 Weekly Comp.
Pres. Doc. 2212 (Oct. 29, 1992 .............................................................. 28

Promoting Security and Justice for Victims of Terrorism Act, 18 U.S.C.
§ 2334 (2019).................................................................................*passim*

Signatories of the Vienna Convention on Diplomatic Relations (Apr.
18, 1961), 500 U.N.T.S. 241, *at*:
https://treaties.un.org/pages/viewdetails.aspx?src=
treaty&mtdsg_no=iii-3&chapter=3 ....................................................... 15

Statement of Sen. Leahy, Cong. Rec.—Sen., S267 (Jan. 28, 2020)..................... 17, 18

Statement of Rep. Goodlatte, 164 Cong. Rec. H. 6616, 6617 (July 23,
2018)..................................................................................................... 28

UN Headquarters Agreement, 61 Stat. 3416, TIAS 1676, 554 UNTS
308 (1947) ..................................................................................... 11-12, 57

U.S. Congress, HR 1865, Roll Call votes, *available at*:
https://www.congress.gov/bill/116th-congress/house-bill/1865/text ................... 18

**UN Documents and Statements**

2/14/20 PLO UN Mission letter to UN,
https://digitallibrary.un.org/record/3854048 ....................................... 13

3/13/20 PLO UN Mission letter to UN,
https://digitallibrary.un.org/record/3856540 ....................................... 13

4/2/20 PLO UN Mission letter to UN,
https://digitallibrary.un.org/record/3856541 ....................................... 13

UN G.A. Res. 52/250, UN GAOR, 52d Sess., Supp. No. 49, *Participation of Palestine in the work of the United Nations*, A/52/250 (July 13, 1998), available at: https://undocs.org/en/A/RES/52/250. .................................... 15

General Assembly Resolution A/RES/ES-10/2, *Illegal Israeli actions in occupied East Jerusalem and the rest of the Occupied Palestinian Territory* ................................................................................................. 14

President Abbas' February 11, 2020, statement regarding his UN Security Council speech, at: https://www.youtube.com/watch?v=s4IYqLL5N4U ............................... 14

President Abbas' February 11, 2020, UN Security Council speech, at: https://www.c-span.org/video/?469283-1/un-security-council-meeting-middle-east-peace-plan ........................................................... 14

UN Press Release, *State of Palestine to Gain Enhanced Rights, Privileges in General Assembly Work, Sessions When It Assumes 2019 Group of 77 Chairmanship*, at: https://www.un.org/press/en/2018/ga12078.doc.htm ........................... 15

UN Doc. A/RES/67/19 (11/29/12), at: https://undocs.org/en/A/RES/67/19 ................ 15

UN Documentation, United Nations Dag Hammarskjöld Library, at: https://research.un.org/en/docs/find/letters ........................................... 13

UN News, Israel-Palestine, *at*: https://news.un.org/en/tags/israel-palestine........................................................................................................ 15

UN Security Council, Agenda Item S/2020/10-23, *The Situation in the Middle East, including the Palestinian question* ................................. 14

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................................................. 16

CENTER FOR NEW AMERICAN SECURITY, *A New U.S. Strategy for the Israeli-Palestinian Conflict* (December 2020)....................................... 30

Charles W. Rhodes, *Clarifying General Jurisdiction*, 34 Seton Hall L. Rev. 807, 900 (2004) ....................................................................... 50

Congressional Research Service, RS22967, *U.S. Foreign Aid to the Palestinians* (Dec. 12, 2018) ................................................................... 30

Consular Services, Department of Vanuatu Immigration and Passport
    Services, https://immigration.gov.vu/index.php/department-of-
    immigration-and-passport-service/consular-services ........................................... 20

Facebook:  Holy See Mission to the UN, facebook.com/Holy-See-UN-
    1485490781744692 .................................................................................................. 14

Facebook:  U.K. Mission to the UN, facebook.com/UKMisUN .................................. 14

Facebook:  U.S. Mission to the UN, facebook.com/USattheUN .............................. 14

Holy See Mission to the UN, holyseemission.org ....................................................... 14

Oxford English Dictionary (Online ed., 2020) ....................................................... 16-17

Twitter:  Holy See Mission to the UN (@HolySeeUN................................................... 13

Twitter: U.K. Mission to the UN (@UKUN_NewYork) ............................................. 13

Twitter:  U.S. Mission to the UN (@USUN) .............................................................. 13

U.S. Brief, *Klieman v. Palestinian Auth.*,
    No. 15-7034 (D.C. Cir. Feb. 15 & Mar. 13, 2019) ............................................... 8, 11

U.S. Br. as Amicus Curiae, *Sokolow v. PLO*, No. 16-1071 (Sup. Ct. Feb.
    22, 2018) ..................................................................................................................... 7

U.S. Relations With Vanuatu, U.S. State Department,
    https://www.state.gov/u-s-relations-with-vanuatu/ ............................................... 20

United States Mission to the United Nations, Public Affairs Section, *at:*
    https://usun.usmission.gov/mission/press-and-public-diplomacy-
    section/ ...................................................................................................................... 17

Website: U.K. Mission to UN, www.gov.uk/world/uk-mission-to-the-
    united-nations-new-york ....................................................................................... 14

Website: U.S. Mission to the UN, https://usun.usmission.gov/ ................................. 14

Webster's Third New International Dictionary, Unabridged (2002) ......................... 16

Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012) ........................................ 16

## INTRODUCTION

The PSJVTA cannot constitutionally move the jurisdictional goal-posts after this Court voided the *Sokolow* judgment for lack of jurisdiction over Defendants. *See* Doc. 996 & 1003. Congress could not constitutionally have legislated that Defendants must pay the voided *Sokolow* judgment after the Second Circuit held that the judgment was a nullity for lack of jurisdiction over Defendants. Equally, the PSJVTA cannot constitutionally achieve the same result by waving a legislative magic wand of "deemed consent" to supply the jurisdiction that the Second Circuit found constitutionally unavailable. Importantly, in remanding to this Court, the Second Circuit expressly left intact its 2016 decision voiding the *Sokolow* judgment on due process grounds, *Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016) ("*Waldman I*"). *See* Remand Order, Doc. 1006, p. 3. The PSJVTA, however, purports to define the constitutional boundaries of jurisdictional due process differently than the Second Circuit in *Waldman I*, the D.C. Circuit in look-alike cases, and the Supreme Court. Federal courts in this and other cases have held that exercising personal jurisdiction based on the actions alleged by Plaintiffs – including activities in the United States, and the "random" and "fortuitous" attacks implicating longstanding payment programs in Palestine – violated the Due Process Clause.

Attempting to elide those decisions, the PSJVTA purports to create "deemed consent" jurisdiction over Defendants based on their activities outside Palestine in two different ways. First, it legislates "consent" to jurisdiction (1) if Defendants have an "office" or other physical facility in the United States; or (2) if either Defendant "conducts any activity while physically present in the United States." 18 U.S.C. §

2334(e)(1)(B). The statute, however, contains a number of exceptions for activities that do *not* trigger jurisdiction, including: (a) any office used, or activity conducted, in the United States "exclusively for the purpose of conducting official business of the United Nations"; (b) any "activity undertaken exclusively for the purpose of meetings with officials of the United States or other foreign governments"; and (c) any "personal or official activities" that are conducted "ancillary" to the UN and governmental meeting exceptions. § 2334(e)(3).

As a matter of statutory construction, none of the activities by PLO UN Mission personnel, as alleged by Plaintiffs, triggers jurisdiction under the plain language of these PSJVTA provisions. This Court accordingly need not reach constitutional questions concerning that prong of the PSJVTA.

Second, as to the PSJVTA's payments prong (18 U.S.C. § 2334(e)(1)(A); *see infra* at 9),[1] the PSJVTA cannot constitutionally be applied to Defendants, for multiple reasons. The payments-prong of the PSJVTA: **(i)** violates the Due Process Clause by authorizing jurisdiction over Defendants where the constitutional minimum contacts test is not satisfied, because Congress cannot bypass the "constitutional due process principles" discussed in *Waldman I*; **(ii)** violates

---

[1] To facilitate this Court's resolution of the statutory-construction and constitutional questions, the Court can assume, without deciding, that Defendants have made at least one payment implicating the PSJVTA's payments provision. As a result, this Court need not resolve any of the complex factual questions raised by Plaintiffs regarding the payments – including whether convictions obtained in Israeli military trials satisfy the PSJVTA's "fairly tried" requirement (18 U.S.C. § 2334(e)(1)(A)(i)) – nor sidetrack these remand proceedings with lengthy discovery that will not inform resolution of the statutory-construction or constitutional issues.

separation of powers by attempting to re-define the contours of constitutionally appropriate jurisdiction as established by the Judicial Branch in this case; **(iii)** violates due process as applied to Defendants by attempting to statutorily impose jurisdiction based on fictional, "deemed" consent, in the absence of true, voluntary consent, if Defendants simply continue with their pre-PSJVTA conduct; and **(iv)** imposes an unconstitutional condition as applied here by legislating away Defendants' due process rights if Defendants engage in certain non-UN-related activities and do not alter domestic Palestinian law.  These arguments would apply equally to application of the U.S. activities-prong of the PSJVTA, if the Court were to hold that actions of PLO UN Mission personnel fall within the ambit of the PSJVTA.

First, the PSJVTA violates Defendants' due process rights by seeking to statutorily impose jurisdiction over Defendants in a way forbidden by the Constitution.  In *Waldman I*, 835 F.3d at 327, the Second Circuit explained that personal jurisdiction has three requirements:  (1) proper "service of process," (2) "a statutory basis for personal jurisdiction that renders such service of process effective," and (3) "the exercise of personal jurisdiction must comport with constitutional due process principles" (citation omitted).  Regardless of whether the first two requirements are satisfied, the Second Circuit in *Waldman I* already decided the third requirement—in this very case—in a manner that precludes the exercise of personal jurisdiction over the PA and PLO.  Because any legislatively-created personal jurisdiction must still comply with due process, the enactment of the PSJVTA does not bypass the constitutional due process problems identified in

*Waldman I.* Plaintiffs have failed to meet their burden to prove that this Court can exercise jurisdiction over Defendants under the Due Process Clause.

Second, the PSJVTA violates separation of powers as applied here by legislatively redefining the constitutional boundaries of jurisdictional due process to undermine earlier rulings of the Judicial Branch. Congress cannot supersede the role of the courts in interpreting the Constitution. *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) (a statute "cannot create personal jurisdiction where the Constitution forbids it") (citation omitted). *Waldman I* unequivocally held that Defendants' activities in the United States do not create jurisdiction because they are not connected to the attacks in this case, and Defendants' alleged activities in Palestine do not create jurisdiction because they are not aimed at the United States. Congress cannot instruct the courts to rule otherwise. *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1315 (2016) ("Article III of the Constitution establishes an independent Judiciary with the 'province and duty ... to say what the law is' in particular cases and controversies.") (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

Third, the PSJVTA further circumvents due process by imposing fictional and coercive "deemed consent" to jurisdiction, rather than "free and voluntary" consent that is required under established precedent. Modern Supreme Court jurisprudence confirms that consent to personal jurisdiction under the Due Process Clause must be free and voluntary, and cannot be coerced. Inserting the words "deemed consent" into a jurisdictional statute does not satisfy constitutional limitations because the Due

Process Clause requires that courts look past the form of a statute to its substance. After so many years challenging personal jurisdiction in this case, it blinks reality to suggest that Defendants voluntarily consented to jurisdiction by processing overseas payments or holding a press conference in 2020—activity that, even as alleged by Plaintiffs, was not qualitatively different than Defendants' pre-PSJVTA activity.

Fourth, the PSJVTA imposes an unconstitutional condition here by legislating away Defendants' due process rights if Defendants engage in previously authorized or accepted U.S. activities, or continue to carry out Palestinian domestic laws. The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). The doctrine applies "to prohibit the government from conditioning benefits on [an] ... agreement to surrender due process rights." *R.S.W.W., Inc. v. Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005).

These four substantial constitutional challenges are raised by the court of appeals' remand. That court remanded to determine the "applicability of the PSJVTA to this case," which explicitly included "any issues regarding its application to this case including its constitutionality." Remand Order, Doc. 1006, p. 3. Plaintiffs' brief myopically dwells on the PSJVTA's factual predicates, but makes only limited arguments concerning the interpretation and constitutionality of the PSJVTA. Given the Second Circuit's mandate to address *all* PSJVTA issues, "including its constitutionality," this failure or refusal by Plaintiffs to fully brief those issues reflects a lack of fidelity to the appellate mandate. *Id.*; *see also Bertuglia v. City of*

*New York*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012) ("arguments raised for the first time in reply should not be considered because the [other party] had no opportunity to respond to those new arguments").

## PROCEDURAL BACKGROUND

### A. The Second Circuit held that the exercise of personal jurisdiction over the PA and PLO in this case does not satisfy due process.

Plaintiffs alleged violations of the Anti-Terrorism Act ("ATA") for attacks committed in Israel by nonparties who Plaintiffs asserted were assisted by Defendants. *Waldman I*, 835 F.3d at 324. Although a jury found for Plaintiffs at trial in 2015, Plaintiffs failed to prove that the attackers targeted Americans. *Id.* at 337-38. Instead, Plaintiffs' experts opined that the "killing was indeed random." *Id.*

The Second Circuit reversed and directed dismissal for lack of personal jurisdiction. *Waldman I*, 835 F.3d at 330, 332-344. It held that Defendants were persons under the Fifth Amendment entitled to due process. *Id.* Defendants were not subject to general jurisdiction under *Daimler AG v. Bauman*, 571 U.S. 117, 127-28 (2014), because they were not "essentially at home" in the United States. *Id.* Nor was there specific jurisdiction under *Walden v. Fiore*, 571 U.S. 277, 284 (2014), because there was no evidence Defendants took actions in the United States relevant to the attacks, and the attacks "were not expressly aimed at the United States." *Waldman I*, 835 F.3d at 337. The fact that Americans were injured was "'random [and] fortuitous.'" *Id.* The Second Circuit issued its mandate on November 28, 2016.

Soon afterward, the D.C. Circuit reached the same conclusion, holding that the plaintiffs in three look-alike cases "failed to carry their burden of demonstrating that

personal jurisdiction over the Palestinian Authority in this case would meet the requirements of the Fifth Amendment's Due Process Clause." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 58 (D.C. Cir. 2017); *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1127 (D.C. Cir. 2019) (same); *Shatsky v. PLO*, 955 F.3d 1016, 1038 (D.C. Cir. 2020) (vacating grant of summary judgment on the merits to Defendants because the court lacked personal jurisdiction).

Plaintiffs in this case sought *certiorari* on the application of the Due Process Clause to Defendants, and the Solicitor General recommended that the Supreme Court deny Plaintiffs' petition because *Waldman I* did not "implicate any conflict among the courts of appeals, or otherwise warrant [the Supreme] Court's intervention." Br. of U.S. as Amicus Curiae at 1, *Sokolow v. PLO*, No. 16-1071 (Feb. 22, 2018). The Supreme Court denied *certiorari* in this case, *Sokolow v. PLO*, 138 S. Ct. 1438 (2018), and in a parallel case from the D.C. Circuit, *see Livnat v. Palestinian Auth.* 139 S. Ct. 373 (2018).

### B. The Second Circuit declined to recall its mandate after Congress passed the ATCA and Plaintiffs filed a new case.

Plaintiffs moved to recall the mandate in the court of appeals after the passage of the Anti-Terrorism Clarification Act, Pub. L. No. 115-253, 132 Stat. 3184 (Oct. 3, 2018) ("ATCA"), which purported to create personal jurisdiction if Defendants accepted certain U.S. aid or maintained an office "within the jurisdiction of the United States" pursuant to Executive Branch waiver. Plaintiffs also refiled their claims in a new action. *See Sokolow v. PLO*, No. 18-12213 (S.D.N.Y. 2018).

In a parallel case before the D.C. Circuit, the United States filed two amicus briefs stating that the factual prerequisites for jurisdiction under the ATCA had not been met. U.S. Briefs, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Feb. 15 & Mar. 13, 2019). The United States noted that it was uncontested that Defendants had disclaimed all U.S. aid, and it argued that the PLO's UN Mission does not "fall within the terms of the ATCA" because it is not within U.S. jurisdiction. *Id.*

The Second Circuit denied Plaintiffs' motion to recall its mandate, finding that "[t]he plaintiffs have not shown that either factual predicate of Section 4 of the ATCA has been satisfied." *Waldman v. PLO*, 925 F.3d 570, 574-76 (2d Cir. 2019) ("*Waldman II*"). It also held that the "[c]ourt's interest in finality ... weighs against recalling the mandate," explaining that "[r]ecalling the mandate now would offend 'the need to preserve finality in judicial proceedings.'" *Id.* (citation omitted). The circuit court noted that the ATCA "does not suggest that courts should reopen cases that are no longer pending." *Id.* As Plaintiffs had already filed a new case to take advantage of new jurisdictional facts, the court further held that "[t]o the extent that there are any developments in the activities of the PA or the PLO that may subject them to personal jurisdiction under the ATCA, they can be raised in that case." *Id.* at 576 n.2.

## C. The Supreme Court issued a GVR order so the Second Circuit could consider the PSJVTA.

Plaintiffs petitioned for *certiorari* from the Second Circuit's refusal to recall the mandate. While the petition was pending, Congress passed the PSJVTA, which states that Defendants are "deemed" to consent to personal jurisdiction if they (1) make payments after April 18, 2020, to persons (after having been "fairly tried" or

- 8 -

"pleading guilty") imprisoned for (or to families of those who died while committing) "any act of terrorism" resulting in the death or injury of a U.S. national; or (2) undertake certain activities while "physically present in the United States," after January 4, 2020. § 2334(e). But the physical presence provision exempts (1) any physical office or activities that are "exclusively for the purpose of conducting official business of the United Nations"; (2) activities "exclusively" for meeting with U.S. or foreign officials, or as approved by the Secretary of State, and (3) legal representation. § 2334(e)(3)(A)-(E). Importantly, the PSJVTA also exempts "any personal or official activities conducted ancillary to" those allowed activities. *Id.*, § 2334(e)(3)(F).

The Supreme Court issued a GVR order, stating: "The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded … for further consideration in light of the [PSJVTA]." *Waldman v. PLO*, 140 S. Ct. 2714 (Apr. 27, 2020). The Court also issued a GVR with identical language in *Klieman*, a direct-appeal case against Defendants from the D.C. Circuit. *Id.*

### D. The Second Circuit remanded to this Court to determine the applicability and constitutionality of the PSJVTA before deciding whether to recall its 2016 mandate.

Rather than decide those issues in the first instance, the Second Circuit remanded for this Court to determine the "applicability of the PSJVTA to this case." Remand Order, Doc. 1006, p. 3. The scope of the remand order expressly includes "any issues regarding its application to this case including its constitutionality." *Id.* at 3. Once this Court resolves those issues, "the case will be returned" to the court of appeals. *Id.* at 4. The Second Circuit did not reconsider its decision that the Due

- 9 -

Process Clause of the Fifth Amendment precludes jurisdiction over Defendants. The court of appeals ruled that Plaintiffs' motion "to recall the mandate, issued on November 28, 2016, will be held in ABEYANCE." *Id.* (emphasis in original).

## ARGUMENT

### I. Defendants' activities "in the United States" do not satisfy the factual predicates for statutory jurisdiction under the plain language of the PSJVTA.

The PSJVTA purports to create "deemed consent" jurisdiction over Defendants' activities outside Palestine in two different ways. It creates "consent" if either Defendant (1) has an "office" or other physical facility in the United States; or (2) "conducts any activity while physically present in the United States." 18 U.S.C. § 2334(e)(1)(B). The statute, however, contains a number of exceptions for activities that do *not* trigger jurisdiction, including: (a) any office used, or activity conducted, in the United States "exclusively for the purpose of conducting official business of the United Nations"; (b) any "activity undertaken exclusively for the purpose of meetings with officials of the United States or other foreign governments"; and (c) any "personal or official activities" that are conducted "ancillary" to either of the UN and governmental meeting exceptions. *Id.*, § 2334(e)(3).

None of the activities alleged by Plaintiffs regarding these physical presence prongs triggers jurisdiction under the plain language of the PSJVTA:[2]

---

[2] This Court, furthermore, is obligated to adopt a reasonable construction of the PSJVTA that avoids the constitutional questions raised below. *See Fed. Election Com. v. Cent. Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 52 (2d Cir. 1980) ("If a court can decide a case on non-constitutional grounds, it should not stray into the field of constitutional analysis.").

1.  *The UN Mission is not in the United States.*  First, the PLO's UN Mission is not within "the United States" as a matter of law, which makes nearly all of the Plaintiffs' factual allegations irrelevant.  The Second Circuit has explained that the PLO's UN Mission is not in the United States:

> [T]he Headquarters Agreement effectively removes control over the UN Headquarters and related areas from the jurisdiction of the United States.  In other words, the PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control.

*Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991).  In an amicus brief, the United States recently agreed that the "Observer Mission in New York" did not "fall within the terms of the [ATCA]," notwithstanding that ATCA applied to all offices "in the jurisdiction of the United States."  U.S. Brief, *Klieman v. Palestinian Auth.*, No. 15-7034, at 6 (D.C. Cir. Feb. 15, 2019).  This Court need not decide whether there is a difference between ATCA's "within the jurisdiction of the United States" and the PSJVTA's "in the United States"—because the UN Mission is not considered to be within either as a matter of law.

Plaintiffs argue that § 2334(e)(4) of the PSJVTA supersedes *Klinghoffer* and the UN Headquarters Agreement, but the provision says no such thing.  The PSJVTA is limited to a physical office "within the territory of the United States," and Congress already knew the PLO's UN Mission was not considered to be in the United States.  Had Congress wanted this provision to cover the UN Mission, it could have said so directly, or expressly abrogated the Headquarters Agreement, but Congress chose not to do so.  The Headquarters Agreement is not mentioned in the PSJVTA's text or

legislative history. Because the statute does not "clearly and unequivocally" rescind the Headquarters Agreement, "this [C]ourt is under a duty to interpret statutes in a manner consonant with existing treaty obligations." *United States v. PLO*, 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 264-65 (1991) ("an act of congress ought never to be construed to violate the law of nations if any other possible construction remains") (citation omitted).

2. *The "official business of the United Nations" includes all of the regular activities of the PLO's UN Mission.* Because Congress did not define what constitutes "official" business, this Court should look to the UN's own description of what constitutes official UN business. The Office of the Legal Adviser to the United Nations takes a broad view of official business, which includes anything "directly related" to a "mission or project," such as travel to an airport for vacation in an official vehicle. UNITED NATIONS JURIDICAL YEARBOOK, at 154-55 (1985). The scope of "official" UN business therefore includes all activities regularly undertaken in support of the Member's mission to the United Nations. *See id*. The Secretary-General, of course, makes the ultimate determination of what constitutes an "official" act. *Id*. In addition, the Convention on the Privileges and Immunities of the United Nations states that UN representatives have "complete freedom of speech and independence in this discharge of their duties … *in respect of words spoken or written*." Convention on the Privileges and Immunities of the United Nations, § 12, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 16 (ratified Apr. 29, 1970) (emphasis added).

The written communications of the PLO's UN Mission *quoted in Plaintiffs' brief* plainly fall within the UN's definition of "official" business, as they are official UN communications *archived on the UN's website with official UN designations*.[3] Such letters "are used to formally inform the UN community of events and the outcome of non-UN meetings, to transmit reports or communications, and for a variety of other purposes."[4]  In other words, the UN considers the communications of the PLO's UN Mission to be official UN documents.  Similarly, the other activities alleged by Plaintiffs – such as giving speeches on matters of concern to UN-member nations, written communications on such events, and similar postings on social media – are the official activities of every UN Mission and therefore the "official business" of the United Nations.  The official UN business of the PLO's UN mission—convincing other UN members to support the Palestinian people—is, by definition, communicative in nature.  Though Plaintiffs claim that updating "a website and Twitter and Facebook accounts" is non-UN activity, almost every UN Mission has a website and social media.[5]  The content of the PLO UN Mission website and social

---

[3] For example, *compare* Yalowitz Decl. ¶213(b) (2/14/20 letter), *with* 2/14/20 PLO UN Mission letter to UN, https://digitallibrary.un.org/record/3854048 (designated as official UN correspondence concerning illegal Israeli actions in occupied East Jerusalem and the rest of the occupied territory, among other designations); c*ompare* Yalowitz Decl. ¶213(e) (3/13/20 letter), *with* 3/13/20 PLO UN Mission letter to UN, https://digitallibrary.un.org/record/3856540 (same); and *compare* Yalowitz Decl. ¶213(f) (4/2/20 letter), *with* 4/2/20 PLO UN Mission letter to UN, https://digitallibrary.un.org/record/3856541 (same).

[4] *UN Documentation, How to Find UN Documents*, United Nations Dag Hammarskjöld Library, at: https://research.un.org/en/docs/find/letters (last visited Jan 4, 2021).

[5] *See, e.g.,* <u>Twitter</u>: U.K. Mission to the UN (@UKUN_NewYork); U.S. Mission to the UN (@USUN); Holy See Mission to the UN (@HolySeeUN).  <u>Facebook</u>: U.K. Mission

media accounts also falls squarely within ongoing, official UN General Assembly and Security Council matters.[6]

Plaintiffs argue that President Abbas' appearance at a February 11, 2020 conference triggers the PSJVTA (*see* Pl. Br. at 18), but they fail to mention that the conference was explicitly held to discuss that morning's Security Council meeting and President Trump's proposed peace plan, alongside former Israeli Prime Minister Olmert. Indeed, the first thing President Abbas said was "I delivered a speech this morning at the [UN] Security Council…"[7] This was an official announcement about the UN Mission's participation in a Security Council meeting regarding an American President's peace plan, together with a former Israeli head of state. This plainly qualifies as both "official" UN business and meetings with "other foreign governments" under the PSJVTA. *See* PSJVTA, § 2334(c)(3)(B) & (D).

---

to the UN, facebook.com/UKMisUN; U.S. Mission to the UN, facebook.com/USattheUN; Holy See Mission to the UN, facebook.com/Holy-See-UN-1485490781744692. Websites: U.K. Mission to UN, www.gov.uk/world/uk-mission-to-the-united-nations-new-york; U.S. Mission to the UN, https://usun.usmission.gov/; Holy See Mission to the UN, holyseemission.org.

[6] Plaintiffs claim that the UN Mission discusses the U.S. peace plan for Israel and Palestine; Israeli apartheid; demolition of Palestinian homes; Israeli human rights violations; and the annexation of Palestinian lands by Israel. Yalowitz Decl. ¶¶ 213(a)-(m); 215(a)-(aa). These issues plainly fall under official UN matters, including General Assembly Resolution A/RES/ES-10/2, *Illegal Israeli actions in occupied East Jerusalem and the rest of the Occupied Palestinian Territory,* and UN Security Council, Agenda Item S/2020/10-23, *The Situation in the Middle East, including the Palestinian question.*

[7] *See* President Abbas' February 11, 2020, UN Security Council speech, available at: https://www.c-span.org/video/?469283-1/un-security-council-meeting-middle-east-peace-plan; Ruptly, Abbas and Olmert give joint press conference in New York, YouTube (February 11, 2020), https://www.youtube.com/watch?v=s4IYqLL5N4U.

Contrary to Plaintiffs' claims (Pl. Br. at 20), Defendants' communications are easily distinguished from those addressed in *Klinghoffer* in 1991. In that case, the court concluded that media appearances "taken together" with "proselytizing and fund-raising activities" were not sufficiently "in furtherance" of Palestine's "observer" status to avoid personal jurisdiction. In this case, Plaintiffs cite nothing that could be understood as "proselytizing" or "fund-raising" activities as discussed in *Klinghoffer*. More importantly, the status of the PLO's UN Mission has evolved significantly since *Klinghoffer*. The UN enhanced the PLO's observer status in 1998, granting it the right to participate in General Assembly debate,[8] and even, now, to directly address the Security Council. In November 2012, the UN granted Palestine "Non-member Observer State" status.[9] This new status allowed the PA to accede to the Vienna Convention on Diplomatic Relations, among other treaties.[10] It also allowed Palestine to take a more active part in the UN. For example, Palestine was the 2019 chair for the Group of 77, a coalition of developing countries at the UN.[11] The "question of Palestine" is an official issue that the UN, its members, and the PLO's UN Mission frequently address.[12]

---

[8] UN G.A. Res. 52/250, *Participation of Palestine in the work of the United Nations*, A/52/250 (July 13, 1998), *available at*: https://undocs.org/en/A/RES/52/250.

[9] UN G.A. Res 67/19, *State of Palestine in the United Nations*, A/RES/67/19 (Nov. 29, 2012), *available at*: https://undocs.org/en/A/RES/67/19.

[10] *See* Signatories of the Vienna Convention on Diplomatic Relations (Apr. 18, 1961), 500 U.N.T.S. 241, *available at*: https://treaties.un.org/pages/viewdetails.aspx?src=treaty&mtdsg_no=iii-3&chapter=3.

[11] UN Press Release, *State of Palestine to Gain Enhanced Rights, Privileges in General Assembly Work, Sessions When It Assumes 2019 Group of 77 Chairmanship* (Oct. 16, 2018) *at*: https://www.un.org/press/en/2018/ga12078.doc.htm.

[12] *See* Israel-Palestine, UN News, *at*: https://news.un.org/en/tags/israel-palestine.

3. *The PSJVTA also allows for "ancillary" activities.*  The PSJVTA has a relief valve to ensure that any non-official, normal-course activities of the UN Mission are exempt from jurisdictional consideration.  Section 2334(e)(3)(F) clarifies that the exceptions for "official" activities also apply to "any *personal* or *official* activities conducted ancillary to activities listed under this paragraph" (emphasis added).  Ancillary means "supplementary," Black's Law Dictionary (11th ed. 2019), "incidental or peripheral," The Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012), or "subordinate, subsidiary," Webster's Third New International Dictionary, Unabridged (2002); *see also Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 228-34 (1992) (distinguishing activities that are "essential" to an activity from those that are "ancillary" because they have a "connection" to an activity).  Under any reasonable interpretation, media appearances following a Security Council speech or to discuss a proposed peace plan qualify as activities that are "ancillary" to official UN business and meetings with government officials.

Plaintiffs attempt to flip the ordinary meaning of "ancillary" on its head, asserting that "ancillary" means only "essential."  Pl. Br. at 21.  In doing so, Plaintiffs rely on the Oxford English Dictionary's third definition of "ancillary," which refers "esp[ecially]" to "non-medical staff and services at hospitals."  *See* Oxford English Dictionary (Online ed., 2020).  Plaintiffs overlook the first definition in the same dictionary, which defines ancillary as "subservient, subordinate," and includes an example, "[i]t will be rather ancillary than essential."  *Id*.  Moreover, the examples provided for Plaintiffs' preferred third definition directly undermine their argument.

Oxford lists "hotels," "road vehicles," and "canals" as examples of ancillary services for a "railway," even though such services are more "supplementary" than "essential." *Id.* Media appearances and updates posted to social media are no less "essential" to official UN business than a hotel might be to a railway. For example, the United States Mission to the UN has both a "Public Affairs" and "Press" department, "which manages a comprehensive suite of social media platforms for the Mission."[13]

Defendants' common-sense interpretation of "ancillary" draws further support from the legislative history. As Senator Leahy explained, the PSJVTA allows Defendants to "meet with advocates regarding relevant issues, make public statements, and otherwise engage in public advocacy and civil society activities that are ancillary to the conduct of official business without consenting to personal jurisdiction." Statement of Sen. Leahy, Cong. Rec.—Sen., S267, 116th Cong. (Jan. 28, 2020). Senator Leahy voted against the original version of the bill in committee, fearing that it would drive Defendants out of the UN. *See* Markup – Senate Judiciary Committee, 116th Cong. (Oct. 17, 2019).[14] But he then formed a "bipartisan" group for a "negotiation that resulted in" the ancillary activities exception, which included "Senators of both parties [that] understand that it is in our national interest to permit certain activities related to the official representation of the PA and PLO." Cong. Rec.—Sen., S267 (Jan. 28, 2020). Senator Leahy then voted for the final bill. Having

---

[13] United States Mission to the United Nations, Public Affairs Section, *at*: https://usun.usmission.gov/mission/press-and-public-diplomacy-section/.
[14] Recording of Executive Business Meeting, Committee on the Judiciary (Oct. 17, 2019), *at*: https://www.judiciary.senate.gov/meetings/10/17/2019/executive-business-meeting (Senator Leahy's comments are at 53:15 to 55:17 of the video).

voted for the bill *and* negotiated the language at issue, his views deserve "special weight." *Reynolds-Naughton v. Norwegian Cruise Line*, 386 F.3d 1, 5 (1st Cir. 2004) ("the sponsors of the *language* [at issue] ... would ordinarily get special weight").

Plaintiffs rely primarily on the statements of Senator Lankford, who they claim was a "proponent" of the bill. But Senator Lankford did not support the *amended* version of the PSJVTA that passed into law with the "ancillary" provision. In fact, he *voted against the bill containing the final PSJVTA*.[15] *See, e.g.*, *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964) (discounting statements by a bill's opponents). The statements by Senator Lankford prominently quoted by Plaintiffs were made at the last minute, after the "ancillary" provision was finalized, and just moments before he voted *against* the final bill. *See* S7182, 116th Cong. (Dec. 19, 2019). Senator Leahy's comments were a necessary response to Senator Lankford's last-minute attempt to water down the "ancillary" provision after Senator Lankford's views did not prevail in the final version of the bill. Plaintiffs misstate the record when they paint Senator Lankford as a proponent of the version of the PSJVTA that *actually* passed into law.

Plaintiffs' arguments for an excessively narrow construction of the "ancillary" provision are based on their assertion that the "principal purpose" of the PSJVTA was to cut off the PLO's UN mission from the media and even its own web page—*i.e.*, a wholly ineffective UN mission that could not lead the Group of 77 or effectively

---

[15]  *See* HR 1865, 116th Cong., Roll Call votes, *available at*: https://www.congress.gov/bill/116-congress/house-bill/1865/text.

lobby the Security Council.  Pl. Br. at 20-23.  But their idea that the ancillary provision fails to cover the alleged activities finds no support in the statute's actual language. Senator Leahy's bipartisan negotiated compromise with the "ancillary" language had the purpose and effect of allowing the PLO to continue the normal activities of its UN mission.  *See also Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are thus 'reluctant to treat statutory terms as surplusage' in any setting.") (citation omitted).

If common-place activities like media appearances are not at least ancillary to a mission's official UN activities, then Plaintiffs' interpretation of the PSJVTA leaves the statute entirely unclear where the line that triggers jurisdiction is drawn— creating a separate, constitutional fair notice problem.  *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (The Fifth Amendment requires that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 81 (D.D.C. 2001).

The "ancillary" provision also necessarily applies to both the "office" and "activities" prongs of § 2334(e)(1)(B).  The "office" prong requires examination of how office personnel "use[]" the office, because each "use," "conduct," and "business" of the office necessarily requires *activity* by such personnel.  If the office prong focused solely on the nominal purpose of the office (rather than the activities carried out by office personnel), then the UN Mission would facially qualify as an office used exclusively for official UN business without other analysis.  The jurisdictional exemption for ancillary activities applies generally to activities listed "under this paragraph," which

- 19 -

necessarily includes how an "office" is used. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 938-39 (2017) (interpreting according to Congress' "hierarchical" drafting scheme, which include "section[s], subsection[s], paragraph[s], and on down the line").

In the end, this Court does not need to consider the "ancillary" exception because Plaintiffs *do not allege any activities that are outside of the standard (and therefore "official") business of a typical UN Mission*. Indeed, even the pre-PSJVTA "consular" activities that Plaintiffs assert would easily be considered "incidental" or "supplemental," even though they comfortably fit within "official" UN business.[16] In sum, Plaintiffs have failed to carry their burden of showing activities in the United States after the passage of the PSJVTA that could create jurisdiction under that statute. *See Waldman*, 835 F.3d at 334 (Plaintiffs bear burden of proving personal jurisdiction over Defendants).

## II. The PSJVTA violates the Due Process Clause if applied to create jurisdiction over the PA and PLO in this case.

The PSJVTA cannot circumvent the constitutional limits on personal jurisdiction: "it is well-settled that 'a statute cannot grant personal jurisdiction where the Constitution forbids it.'" *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (citation omitted); *Seetransport Wiking*

---

[16] For example, Vanuatu conducts consular services out of its UN Mission office. Consular Services, Department of Vanuatu Immigration and Passport Services, https://immigration.gov.vu/index.php/department-of-immigration-and-passport-service/consular-services. As the State Department acknowledges, "Vanuatu does not have an embassy in Washington, DC, but has a mission to the United Nations in New York." U.S. Relations With Vanuatu, U.S. State Department, https://www.state.gov/u-s-relations-with-vanuatu/.

*Trader*, 989 F.2d at 580 (a statute "cannot create personal jurisdiction where the Constitution forbids it") (citation omitted).  The Due Process Clause "sets the outer boundaries of a state tribunal's authority to proceed against a defendant," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011), and "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations,'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (citation omitted).  *See Shaffer v. Heitner*, 433 U.S. 186, 212 & n.23 (1977) ("all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny").  Congress does not "have the power to authorize violations of the Due Process Clause" where the courts conclude that constitutional requirements have not been met.  *Quill Corp. v. N. Dakota*, 504 U.S. 298, 305 (1992).

Just as states cannot enforce long-arm statutes that exceed "the limits imposed by federal due process," *Daimler*, 571 U.S. at 125, the federal courts have repeatedly held that Congress cannot create personal jurisdiction that exceeds the boundaries of the Fifth Amendment's Due Process Clause.  Personal jurisdiction requires "procedurally proper" service, "a statutory basis for personal jurisdiction that renders such service of process effective," and "the exercise of personal jurisdiction must comport with constitutional due process principles."  *Waldman I*, 835 F.3d at 327 (citation omitted).  The latter analysis applies even where the statutory basis for personal jurisdiction has been met.  As the Second Circuit held, "due process analysis—considerations of minimum contacts and reasonableness—applies even

when federal service-of-process statutes are satisfied. Simply put, the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman I*, 835 F.3d at 343 (citation omitted).

For that reason, whether the PSJVTA provides a *statutory* basis for personal jurisdiction, any legislatively-created personal jurisdiction *must also comply with the Fifth Amendment's Due Process Clause*. This issue has been litigated in cases involving the PA and PLO again and again—and the constitutional limits of due process have been vindicated every time. No matter what jurisdiction a statute may purport to create, "Congress cannot wish away a constitutional provision." *Livnat*, 851 F.3d at 53.

The PSJVTA provides for personal jurisdiction over Defendants in connection with all ATA claims regardless of whether Defendants' forum or forum-directed activities substantially relate to Plaintiffs' claims—in other words, it purports to impose general jurisdiction. It professes to create statutory jurisdiction if Defendants (1) make overseas payments to any individual (or his family) in relation to any "act of terrorism" that resulted in harm to a U.S. national, or (2) maintain an office or undertake any activity in the United States that does not fall under the statute's exceptions. But as previously held by the Second Circuit in this case, and by the D.C. Circuit in multiple other cases against the PA and PLO, the unchanged activities of Defendants – which necessarily include those specified in the PSJVTA and claimed by Plaintiffs in both their brief and in their previous briefs to the appellate courts – are insufficient to create jurisdiction under the Due Process Clause.

- 22 -

### A.    This Court has no general or specific jurisdiction over the PA and PLO under binding precedent.

The PSJVTA's jurisdiction-creating conduct provisions cannot be squared with the constitutional standards for personal jurisdiction recognized by the Supreme Court. The Court recognizes two forms of personal jurisdiction: "case-specific and all-purpose (general) jurisdiction." *Goodyear*, 564 U.S. at 927. Federal courts have repeatedly held that subjecting Defendants to either type of jurisdiction would violate the Fifth Amendment's Due Process Clause because they neither are "at home" in, nor have they engaged in suit-connected conduct in or directed at, the United States.

Both the Second and D.C. Circuits have concluded that Defendants are "'at home' in Palestine, where they govern," not in the United States. *Waldman I*, 835 F.3d at 332; *accord Livnat*, 851 F.3d at 56 ("The appellants do not argue that the Palestinian Authority may be 'fairly regarded as at home' in the United States, and for good reason… [T]he Palestinian Authority is … not subject to general jurisdiction in the United States."). Plaintiffs make no attempt to claim that the PA or PLO are "at home" in the United States, nor could the PSJVTA establish the factual prerequisites required for general jurisdiction under *Daimler*, 571 U.S. at 122.

The PSJVTA also fails to meet the constitutional standards for specific jurisdiction, which is determined by "the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 284 (citation omitted). "In order for a … court to exercise specific jurisdiction, the suit must aris[e] out of or relate to the defendant's contacts with the forum" such that there is "an affiliation between the forum and the underlying controversy." *Bristol-Myers Squibb Co. v. Superior Court*,

137 S. Ct. 1773, 1780 (2017) (citation omitted). Under specific jurisdiction, "the defendant's *suit-related conduct* must create a substantial connection with the forum state." *Walden*, 571 U.S. at 283 (emphasis added). That substantial connection "must arise out of contacts that the defendant *himself* creates with the forum State." *Id.* (citation omitted; emphasis in original).

Rather than look at suit-specific conduct, the PSJVTA uses the same factual predicates for jurisdiction over Defendants in every ATA suit—meaning that jurisdiction under the PSJVTA necessarily is a species of general jurisdiction. *See* 18 U.S.C. § 2334(a) & (e)(1). Nor could the PSJVTA legislate some form of specific jurisdiction in any case, given the holdings of both the Second and D.C. Circuits that random attacks in Israel or Palestine (which attacks, in turn, may lead to payments pursuant to Palestinian social programs regardless of the nationality of any victim) do not create specific jurisdiction under Supreme Court precedent.

Defendants' activities outside Palestine likewise do not create jurisdiction under the Due Process Clause. As an initial matter, the Second Circuit held that the PLO's UN Mission in New York was not in the United States for purposes of personal jurisdiction. *Waldman II*, 925 F.3d at 575 ("The Observer Mission is not considered to be within the jurisdiction of the United States."). The circuit court further held that Defendants' political and lobbying activities in New York and Washington were "not connected to the wrongs for which the plaintiffs … seek redress." *Waldman I*, 835 F.3d at 342. The D.C. Circuit agreed that claims about "the Palestinian Authority's general political and financial activities in the United States, such as its

lobbying contracts and U.S. investments" were not sufficiently connected to the terrorist attack in Palestine to support jurisdiction. *Livnat*, 851 F.3d at 57. These decisions rebuffed plaintiffs' arguments in their appellate briefs that Defendants' U.S.-based activities create jurisdiction in connection with attacks in Israel or Palestine. *See, e.g., Livnat*, No. 15-7024, Pl. Br. at 42-43 (D.C. Cir. July 13, 2015) (arguing that personal jurisdiction exists based on U.S. "private fundraising activities," "lobbyists," and "more than 500 speaking engagements in the United States to further its causes"); *Klieman*, No. 15-7034, Pl. Br. at 43 (D.C. Cir. July 31, 2018) (arguing that ambassador's statements in U.S media created jurisdiction).

Similarly, payments to Palestinians detained in Israeli prisons or Palestinian families without regard to the nationality of those harmed in random overseas attacks do not create jurisdiction. Both appellate courts reviewed plaintiffs' extensive claims that Defendants made payments to prisoners (or their families) after such attacks, but still concluded that jurisdiction was inappropriate under due process. *See Waldman*, No. 15-3135, Pls. Br., Doc. 96, p. 29, 35-39, 81-84, 87-88 (2d Cir. Dec. 11, 2015) (plaintiffs' extensive discussion on the payments in their appellate brief); *Shatsky*, 955 F.3d at 1022 (noting the "martyr" payments); *see also Klieman*, 923 F.3d at 1119 (noting allegations that the PA funded terrorists and terrorist organizations). Courts have also rejected all claims that the payments were causally connected to the attacks. *See Shatsky*, No. 02-2280, 2017 U.S. Dist. LEXIS 94946, *31-32 (D.D.C. June 20, 2017) ("without more, these after-the-fact payments are not sufficient for a reasonable jury to conclude that defendants proximately caused the … bombing"),

*vacated for want of jurisdiction by Shatsky*, 955 F.3d at 1022-23 (noting plaintiffs' argument that martyr payments showed that Defendants "facilitated the bombing by providing financial support to the Popular Front").

Those holdings that after-the-fact welfare payments cannot form the basis for personal jurisdiction were mandated by Supreme Court precedent. Personal jurisdiction looks at the "consequences" of forum-directed activities, and asks whether the lawsuits "arise proximately from such activities." *Burger King*, 471 U.S. at 474. Specific jurisdiction requires some form of "causal connection" between the defendants' conduct aimed at the forum and the plaintiff's injury. *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1078-79 (10th Cir. 2008). Congress cannot legislate an adjudicative fact that payment programs of general applicability to all Palestinian prisoners are causally-connected to specific attacks (*see infra* at 29-30), when courts consistently have rejected allegations that there is any such connection.

As explained by the D.C. Circuit, "absent intentional targeting" of the United States, "the fact that an American died in a terrorist incident abroad" does not show "'intentional conduct by the defendant that creates the necessary contacts with the forum.'" *Klieman*, 923 F.3d at 1126 (quoting *Walden*, 571 U.S. at 286). As the Second Circuit explained, jurisdiction cannot be premised on "the mere knowledge that United States citizens might be wronged in a foreign country" because doing so violates "the jurisdictional limits set forth in *Walden*." *Waldman I*, 835 F.3d at 338. Under *Walden*, overseas torts do not create personal jurisdiction without evidence the attacks were purposefully directed at harming the United States. *Id.* at 338 ("a

- 26 -

defendant's mere knowledge that a plaintiff resides in a specific jurisdiction would be insufficient to subject a defendant to specific jurisdiction in that jurisdiction if the defendant does nothing in connection with the tort in that jurisdiction"). The minimum contacts test requires "contacts with the forum State *itself* … not … contacts with persons who reside there." *Walden,* 571 U.S. at 285 (emphasis added).

Under this binding precedent, exercising jurisdiction over the PA and PLO here based on conduct already raised by the plaintiffs in those cases would violate the Fifth Amendment's Due Process Clause.

**B.     The PSJVTA does not attempt to satisfy the Due Process Clause, but relies instead on jurisdictional theories that have been rejected by the Supreme Court.**

The PSJVTA does not (and cannot) change the due process rationale underlying the Second Circuit and D.C. Circuit's prior decisions on personal jurisdiction. It expresses the same congressional interests as those in its predecessor statutes—interests that have already been considered by the appellate courts. Plaintiffs instead claim that the PSJVTA bypasses the binding precedent on personal jurisdiction over Defendants by requiring courts to *assume* that the statute's factual prerequisites are sufficient to create general jurisdiction under the ATA for any plaintiff. But that claimed bypass depends on theories that have been roundly rejected by the Supreme Court.

**1.     The PSJVTA does not purport to create a causal connection between its factual predicates and Plaintiffs' claims.**

Plaintiffs rely heavily on Congress' purpose in enacting the PSJVTA, but the statute expresses the identical interest in allowing redress to injured Americans as did its predecessor statutes, the ATA and the ATCA.[17]  The circuit courts have already acknowledged that "congressional interests *may* be relevant to whether personal jurisdiction comports with due-process standards," but held that such interests "*cannot change the standards themselves.*"  *Livnat*, 851 F.3d at 56 (emphasis added).  Public policy is only considered in connection with the reasonableness inquiry, which only occurs if minimum contacts exist.  *In re Aphria Sec. Litig.*, No. 18-11376, 2020 U.S. Dist. LEXIS 181054, *17 (S.D.N.Y. Sep. 30, 2020) ("If the court determines that a defendant lacks the requisite contacts, it need not consider the second prong of the due process test to determine whether the exercise of jurisdiction is reasonable under the particular circumstances of the case.") (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568-69 (2d Cir. 1996)).  Public policy is irrelevant where, as here, a defendant has insufficient forum contacts.  *Burger King*, 471 U.S. at 476.

---

[17] *See Lelchook v. Islamic Republic of Iran*, No. 16-7078, 2020 U.S. Dist. LEXIS 221606, *18-19 (E.D.N.Y. Nov. 23, 2020) (ATA was meant to provide "a remedy … for Americans injured abroad") (emphasis omitted) (quoting Presidential Statement on Signing S.1569 (1992), 28 Weekly Comp. Pres. Doc. 2212 (Oct. 29, 1992)); Anti-Terrorism Clarification Act of 2018, 164 Cong. Rec. H. 6616, 6617 (daily ed. July 23, 2018) (statement of Rep. Goodlatte) (explaining ATCA "makes … improvements in order to better ensure that victims of international terrorism can obtain justice in U.S. courts against terrorists and their supporters"), *id.* (statement of Rep. Nadler) (ATCA was intended to "make it easier for American victims of international terrorism to have their day in court").

In addition, the PSJVTA does not contain legislative findings (it could not contain findings that supplant required adjudicative findings in any event) that the conduct giving rise to "deemed" jurisdictional consent is causally connected to the actions for which the plaintiffs seek to hold the defendants liable. Even if it did, courts only rely on such findings when considering "material wholly unrelated to the activities of the parties." *Qualley v. Clo-Tex Int'l, Inc.,* 212 F.3d 1123, 1128 (8th Cir. 2000) (citation omitted); *Am. Surgical Assistants, Inc. v. United Healthcare of Tex.,* No. 09-0774, 2010 U.S. Dist. LEXIS 30878, *18 (S.D.N.Y. Mar. 30, 2010) (refusing "to take notice of the contents of [Senate reports] that pass on the very questions at play in this litigation."); *Berry v. Webloyalty.com, Inc.*, No. 10-1358, 2011 U.S. Dist. LEXIS 39581, *40-41 (S.D. Cal. Apr. 11, 2011) (refusing to take judicial notice of the contents of Senate reports "as the statements are disputed"); *Linan v. Carnival Corp.*, No. 09-22849, 2010 U.S. Dist. LEXIS 47735, *4 (S.D. Fla. Apr. 21, 2010) (it is inappropriate "to treat facts contained in the legislative history as conclusively proven by taking judicial notice of same"). Nor are Defendants aware of any court taking judicial notice of legislative findings that *contradicted its own precedents* regarding those facts.

The precedent here – *Waldman*, *Livnat*, *Klieman*, and *Shatsky* – relied upon the same general jurisdictional "facts" (activities in the United States and indiscriminate attacks implicating payments in Palestine made without regard to the nationality of any individual who may have been harmed) that are detailed in Plaintiffs' brief. It was not enough then, and it is not enough now. Each court held that even proof of material support for terrorist attacks in Israel would be insufficient

to establish personal jurisdiction **unless** the conduct was targeted at the United States. *Waldman I*, 835 F.3d at 339-41 (finding no jurisdiction because "there is no evidence the attacks specifically targeted United States citizens"). The post-attack payments, provided pursuant to generally applicable government policies in connection with random attacks not directed at Americans,[18] did not target the United States and therefore cannot support specific jurisdiction under the Due Process Clause. *Walden*, 571 U.S. at 284 ("[f]or a State to exercise jurisdiction consistent with due process, the defendant's *suit-related conduct* must create a substantial connection with the forum State") (emphasis added).

> ### 2. Plaintiffs' arguments regarding the PSJVTA rely on jurisdictional theories that have been rejected by the Supreme Court.

Plaintiffs argue that the PSJVTA bypasses both *Waldman I* and all other precedent regarding personal jurisdiction and the Due Process Clause, by requiring

---

[18] *Shatsky v. PLO*, No. 02-2280, ECF 333-2 (D.D.C. Mar. 2, 2016) (deposition transcript of Mr. Amawi stating that the PA does "not get involved in whether it was a shooting or throwing a stone. What we care for is the document from the Red Cross. And regardless of the violation, the amount received is the same."); *Sokolow v. PLO*, No. 04-0397, Trial Tr. (S.D.N.Y Feb 11, 2015), at 3229:25-3231:20 (witness describing the crimes categorized as security prisoners, which include non-violent crimes; Goldenberg *et al*, *A New U.S. Strategy for the Israeli-Palestinian Conflict* CENTER FOR NEW AMERICAN SECURITY, at 37 (Dec. 2020) ("those who have been killed whose families receive stipends range from innocent bystanders to non-violent protesters to murderers"); Zanotti, CONG. RESEARCH SERV., RS22967, *U.S. Foreign Aid to the Palestinians* (Dec. 12, 2018) (noting that while "some payments go to people who make 'heinous attacks' or their families," "Palestinians may be jailed by Israel as security threats for acts that some—or many—Americans might consider civil disobedience") (citing *Washington Post* article); *see also* Pl. Br. at 10-11 (quoting Palestinian law that requires payments be made to "**every**" security prisoner, which includes "approximately 4,000" Palestinians) (emphasis added).

- 30 -

courts to ***assume*** that the statute's factual prerequisites are sufficient to create general jurisdiction over Defendants in "any civil action" under the ATA (PSJVTA, § 2334(b)) based on the statute's unique approach to the "minimum contacts" test. This is the same argument that they made regarding the ATA in their original appeal, which was rejected in *Waldman I. Waldman v. PLO*, No. 15-3135, Pls. Br., Doc. 96, p. 50 (2d Cir. Dec. 11, 2015) (arguing that the ATA creates personal jurisdiction" because it "invokes a traditional basis for jurisdiction—continuous presence … consistent with traditional notions of fair play and substantial justice"). But the jurisdictional theories underlying that "bypass" approach to personal jurisdiction have been soundly rejected by the Supreme Court.

The plaintiff in *Bristol-Myers*, 137 S. Ct. at 1781, argued that "the strength of the requisite connection between the forum and the specific claims at issue is relaxed if the defendant has … forum contacts that are unrelated to those claims." In other words, the plaintiff argued that the strictures of general jurisdiction are not as strong – and a defendant could be deemed essentially at home – if it engaged in sufficient unrelated forum activities. *Id*. The PSJVTA embraces that same approach, providing for a relaxed jurisdictional test that can be satisfied by statutorily enumerated activities that fall short of the constitutionally-required standard.

In *Bristol-Myers*, the Supreme Court emphatically rejected the creation of a "loose and spurious form of general jurisdiction" that would be available when a defendant had insufficient "general connections with the forum." *Id*. at 1781. Just as the *Bristol-Myers* plaintiffs did not "claim to have suffered harm in th[e] State"

and "all the conduct giving rise to the … claims occurred elsewhere," *id.* at 1782, Plaintiffs in this case were not harmed in the United States and all conduct giving rise to the harm occurred overseas. Because "the plaintiffs' claims did not arise from any activity by the defendants in this forum" *Waldman I*, 835 F.3d at 343, relaxed **general** jurisdiction under the PSJVTA is not permitted under *Bristol-Myers*.

*Bristol-Myers* similarly forbids a "relaxed" approach to **specific** jurisdiction. The Court held that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers*, 137 S. Ct. at 1780 (citation omitted); *see also Seldon v. Magedson*, No. 11-6218, 2012 U.S. Dist. LEXIS 141616, *18 (S.D.N.Y. July 10, 2012) ("[q]uestions of specific jurisdiction are always tied to the particular claims asserted … specific jurisdiction is generally analyzed on a claim-by-claim basis") (citation omitted). Thus in *Goodyear*, the Supreme Court rejected an argument that jurisdiction could be predicated on the fact that Goodyear sold similar tires in the forum, because "[e]ven regularly occurring [activity] in a State do[es] not justify the exercise of jurisdiction over a claim unrelated to those sales." *Goodyear*, 564 U.S. at 930 n.6.

Plaintiffs also argue in favor of another outdated approach to personal jurisdiction by stating that any unsanctioned activity "in the United States" creates ATA jurisdiction. Such arguments reflect the strict "territorial approach" to personal jurisdiction exemplified by *Pennoyer v. Neff*, 95 U.S. 714 (1878). That view was overturned by *International Shoe* in favor of the prevailing test that requires "minimum contacts" and "fairness." *Daimler*, 571 U.S. at 126-28. Under

*International Shoe*, "'the relationship among the defendant, the forum, and the litigation … became the central concern of the inquiry into personal jurisdiction.'" *Id.* (citation omitted). *Daimler* confirmed that cases "following *Pennoyer's* territorial thinking … should not attract heavy reliance today." *Id.* at 138 n.18. The PSJVTA's territorial approach does not comply with modern due process jurisprudence.

The Second Circuit has also rejected Plaintiffs' claim that the due process standards should be relaxed for federal statutes. They previously argued that a more relaxed standard applies under the Fifth Amendment "when the political branches conclude that personal jurisdiction over a defendant for extraterritorial conduct is in the national interest." *Waldman I*, 835 F.3d at 330. But the Second Circuit rejected that argument because "the minimum contacts and fairness analysis is the same under the Fifth Amendment and the Fourteenth Amendment." *Id.* at 331. The D.C. Circuit similarly held that courts apply "Fourteenth Amendment personal-jurisdiction standards in Fifth Amendment cases." *Livnat*, 851 F.3d at 149.

At base, the PSJVTA is little different from other statutes that purport to create personal jurisdiction based on legislatively defined actions. Many long-arm statutes (Maryland's, in this example) would be essentially unchanged in their effects if modified to add "deemed consent" language, as shown here with additions in italics and deletions in strikethrough:  "A court may *deem that any person consents to* ~~exercise~~ personal jurisdiction ~~over a person~~, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State; (2) Contracts

to supply goods, food, services, or manufactured products in the State; (3) Causes tortious injury in the State…" Md. Code, Courts & Jud. Pro. § 6-103 (b)(1)-(3).

Even if likened to a specific-jurisdiction long-arm statute, the PSJVTA still must satisfy the minimum contacts test. In *Burger King*, 471 U.S. at 469, Florida's long-arm statute applied to the defendant's failure to render performance under a Florida contract. With that predicate met, the Supreme Court inquired whether "the assertion of personal jurisdiction … did not offend due process." *Id*. at 478. Courts routinely make this analysis. *See Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007) ("even if … personal jurisdiction is proper under … the New York long-arm statute, this Court must make the ultimate determination whether this jurisdiction satisfies constitutional due process"); *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) ("Even when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause.").

In the end, Defendants have limited contacts with the United States. The payments in Palestine implicated by the PSJVTA are made pursuant to generally applicable policies regardless of the nationality of anyone killed or injured. And Defendants' Mission to the United Nations is no way connected to the overseas third-party attacks here. Because the question "whether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process," this lack of contacts precludes personal jurisdiction. *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005).

### C. Neither of the due process "tests" relied upon by Plaintiffs resolves the constitutional problems with the PSJVTA.

Rather than addressing the due process principles applied by *Waldman I* in this case, Plaintiffs ask this Court to evaluate the constitutionality of the PSJVTA "under two potentially relevant due process standards": (1) that a statute must provide "fair warning" of activities that may subject persons to jurisdiction; and (2) that the government may not exercise power "without any reasonable justification in the service of a legitimate governmental objective." Pls. Br. at 25-26. Neither of these "potentially relevant" standards is *actually* relevant to determining whether the Due Process Clause prohibits the Court from exercising jurisdiction over Defendants.

Although "fair warning" is part of due process, Plaintiffs wrongly assert it is alone sufficient to satisfy *every* due process requirement. In fact, in addition to requiring "fair warning that a particular activity may subject [defendants] to the jurisdiction of a foreign sovereign," the Due Process Clause also "protects defendants from being subject to the binding judgments of a forum with which they have established no meaningful contacts, ties, or relations." *Livnat*, 851 F.3d at 48 (citation omitted). As the Second Circuit held, exercising jurisdiction over Defendants violates due process because the activities relied upon by Plaintiffs (public relations events and payments in Palestine) cannot support general or specific jurisdiction. *Waldman I*, 835 F.3d at 331-35. Because Defendants are not "at home" in the United States, jurisdiction must be based on **the forum-directed conduct**

*that* creates *ATA liability*.  *Id.* at 343 ("The plaintiffs' claims did not arise from the defendants' purposeful contacts with the forum.").  As the D.C. Circuit explained, "[t]he *statutory* requirements for personal jurisdiction do not affect the constitutional *in personam* jurisdiction requirement that, pursuant to the Due Process Clause of the Fifth Amendment, certain 'minimum contacts' must exist between the person and the jurisdiction." *Foremost-McKesson, Inc. v. Iran*, 905 F.2d 438, 442 n.10 (D.C. Cir. 1990) (emphasis in original).

Moreover, constitutional "fair warning" regarding a defendant's primary conduct must occur **before** the conduct that gives rise to liability.  *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("When a court is exercising specific jurisdiction over a defendant … the fair warning that due process requires arises not at the time of the suit, but when the events that gave rise to the suit occurred."); *Metropolitan Life Ins. Co.. v. Robertson Ceco Corp.*, 84 F.3d 560, 569-70 (2d Cir. 1996) ("In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period … up to and including the date the suit was filed— to assess whether they satisfy the 'continuous and systematic' standard.").  Plaintiffs rely on payments made long after the conduct at issue in this case.

Plaintiffs' "reasonable justification" test also fails to satisfy due process. Clearing the low hurdle of rationality does not satisfy other constitutional requirements.  Merely meeting statutory requirements does not ensure compliance with minimum contacts, the reasonableness test, or separation of powers.  *Id.*; *Livnat*, 851 F.3d at 56 ("[A]lthough congressional interests may be relevant to whether

personal jurisdiction comports with due-process standards, they cannot change the standards themselves."). This Court should reject Plaintiffs' attempts to run around the constitutional hurdles preventing the application of the PSJVTA in this case.

## III. Application of the PSJVTA to this case violates separation of powers.

The PSJVTA is unconstitutional as applied here because it dictates personal jurisdiction in direct opposition to the decisions in *Waldman*, *Livnat*, *Klieman* and *Shatsky*, which were based on due process limitations. Congress cannot retroactively change the jurisdictional calculus in a way that contradicts settled judicial interpretations and applications of the Due Process Clause. The PSJVTA also redefines the constitutional boundaries of free and voluntary consent under Supreme Court precedent by creating an impermissible fiction that preemptively dictates that courts will "deem" certain actions by the PA and PLO to constitute "consent" to jurisdiction for causes of action that predate such deemed consent by almost 20 years.

The PSJVTA cannot reverse the Judiciary's prior constitutional rulings by mandating the circumstances under which the courts must exercise personal jurisdiction over Defendants. To do so would violate well-settled separation of powers principles. *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 88 (D.D.C. 2008) ("It is the judiciary, rather than Congress, that is traditionally regarded as the arbiter of constitutional rights and it is self-evident why courts do not look to congressional intent when construing the Constitution. ... [W]e presume that justiciable constitutional rights are to be enforced through the courts.") (citation omitted). For

the same reasons, Congress cannot reopen a closed case or reinstate decisions, as both are improper intrusions upon the province of the Judiciary.

### A. Congress cannot use the PSJVTA to legislatively override the Supreme Court's due process rulings.

The Supreme Court has consistently held that Congress cannot "legislatively supersede" the federal courts' decisions "interpreting and applying the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). Congress cannot compel federal courts to ignore their own prior decisions that uniformly hold that exercising personal jurisdiction over Defendants would violate due process. *See Waldman I*, 835 F.3d at 338 ("the plaintiffs point us to no evidence that these indiscriminate terrorist attacks were specifically targeted against United States citizens, and the mere knowledge that United States citizens might be wronged in a foreign country goes beyond the jurisdictional limit set forth in [*Walden*]"); *Livnat*, 851 F.3d at 58 (plaintiffs "failed to carry their burden of demonstrating that personal jurisdiction over the Palestinian Authority in this case would meet the requirements of the Fifth Amendment's Due Process Clause"); *Klieman*, 923 F.3d at 1127 ("We conclude that plaintiffs' prima facie case for specific jurisdiction does not meet the Constitution's requirements."); *Shatsky*, 955 F.3d at 1038 ("Because the district court lacked personal jurisdiction over the defendants, its judgment on the merits [which granted summary judgment to Defendants] cannot stand.").

This dispute is no different from other instances in which Congress has (unsuccessfully) tried to circumvent the Judiciary's constitutional pronouncements. In *City of Boerne v. Flores*, 521 U.S. 507, 523-24 (1997)*,* for example, Congress passed

a statute in response to a constitutional decision it disliked, seeking to create a different standard.  The Court invalidated the statute, holding:

> When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed.

*Id*. at 536; *see also Marbury*, 5 U.S. at 177 (a contrary holding would place the Constitution "on a level with ordinary legislative acts, ... alterable when the legislature shall please to alter it").

Similarly, in *Dickerson*, 530 U.S. at 436, the Supreme Court invalidated a federal statute designed to overrule *Miranda v. Arizona* by altering the considerations a trial court makes when determining the voluntariness of a confession.  Because it found that *Miranda*'s analysis was based on the Constitution, the Court concluded that "*Miranda* announced a constitutional rule that Congress may not supersede legislatively."  *Id*. at 444; *see also Bank Markazi*, 136 S. Ct. at 1324 n.19 ("commentators have rightly read *Klein* to have at least this contemporary significance: **Congress 'may not exercise [its authority, including its power to regulate federal jurisdiction,] in a way that requires a federal court to act unconstitutionally.'**") (citation omitted, emphasis added, alteration in original); *United States v. Klein*, 80 U.S. 128, 147-48 (1872) (Congress violated separation of powers by trying to redefine the Executive's pardon power).

In the prior litigation against Defendants, the Judiciary exercised its Article III authority to determine that the ATA could not legislatively alter Defendants' due

process "liberty" interest as a protected "person." *Waldman I*, 835 F.3d at 330-31, 338-42. Separation of powers prevents Congress from "requir[ing] federal courts to exercise the judicial power in a manner that," as here, they have already held the Constitution forbids. *Plaut v. Spendthrift Farm*, 514 U.S. 211, 218, 238-39 (1995) ("The nub of that infringement consists ... of the Legislature's nullifying prior, authoritative judicial action. It makes no difference whatever to that separation-of-powers violation that it is in gross rather than particularized (e.g., 'we hereby set aside *all* hitherto entered judicial orders'), or that it is not accompanied by an 'almost' violation of the Bill of Attainder Clause, or an 'almost' violation of any other constitutional provision.") (emphasis in original).

Congress cannot redefine the constitutional protections of jurisdictional due process by statute. Just like the statutes at issue in *Boerne* and *Dickerson*, the PSJVTA "attempt[s] a substantive change in constitutional protections." *Boerne*, 521 U.S. at 532. The PSJVTA, like the statute in *Boerne*, "was designed to control cases and controversies." *Id*. In this case the "provisions of the federal statute here invoked are beyond Congressional authority" because they violate the Fifth Amendment, and it is the courts' "precedent, not [the PSJVTA], which must control." *Id*. Congress cannot alter courts' interpretation of the Constitution by legislating that the same type of actions judicially-found not to create personal jurisdiction now confer personal jurisdiction by fictional consent. Nor can the PSJVTA compel the courts to close their eyes and exercise personal jurisdiction without regard to the PA and PLO's constitutional due-process rights. *Marbury*, 5 U.S. at 178.

- 40 -

Here, the federal courts previously held that exercising jurisdiction violated due process while recognizing the facts about Defendants' UN Mission activities and the prisoner payments. *Klieman*, 923 F.3d at 1119 (detailing allegations that the PA funded terrorists and terrorist organizations); *see also Shatsky*, 955 F.3d at 1022-23, 1037-38 (dismissing for lack of jurisdiction despite the plaintiffs' discussion about the payments and finding PSJVTA claims not yet ripe). If exercising personal jurisdiction over Defendants due to those activities violated the Due Process Clause in 2016, how can Congress tell the federal courts to "deem" that exercising jurisdiction over identical activities in 2020 does not violate it? Plainly, it cannot.

Yet the PSJVTA effectively compels reversal of the federal courts' due process holdings, "prescrib[ing] a rule for decision that [leaves] the court no adjudicatory function to perform." *United States v. Sioux Nation*, 448 U.S. 371, 392 (1980). Plaintiffs' arguments that the PSJVTA simply allows Defendants to "*elect*" to waive personal jurisdiction unless they consent to regulation of their internal and UN affairs (Pl. Br. at 34-35) ignores the statute's wholesale revision of what conduct suffices to create jurisdiction under the Constitution. Similar to other statutes that have been held to be unconstitutional as applied, the PSJVTA purports to allow Congress to override federal court decisions about what constitutes consent to personal jurisdiction. *See Deerfield v. FCC*, 992 F.2d 420, 428 (2d Cir. 1993) (affirming that "Congress cannot prescribe a rule for the decision of a cause in a particular way" and concluding that a statute could not provide for review of a judgment by the executive branch) (citation omitted); *Bartlett v. Bowen*, 816 F.2d 695,

706 (D.C. Cir. 1987) ("We think it obvious that a statute that would have the effect of precluding any sort of review in an independent judicial forum… would be flatly inconsistent with the doctrine of separation of powers implicit in our constitutional scheme.").

### B. Under separation of powers principles, Congress cannot reopen a closed case or reinstate a voided judgment.

Application of the PSJVTA to resurrect the prior judgment in this closed case would also be a legislative transgression on the Judiciary's power to have the final word on the case-specific application of jurisdictional due process. "Personal jurisdiction" is "'an essential element of the jurisdiction' … without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas A.G. v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (citation omitted). Separation-of-powers principles prevent the PSJVTA from reinstating the original judgment in this case after the Judiciary declared that judgment void *ab initio* for lack of jurisdiction.

Federal courts have long held that all prior judgments in a case are void when made without personal jurisdiction: "A judgment entered against parties not subject to the personal jurisdiction of the rendering court is a nullity." *Covington Indus. v. Resintex A.G.*, 629 F.2d 730, 732 (2d Cir. 1980). As explained in *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 608-09 (1990), the limited nature of the judicial power provided to the federal courts under the Constitution means that "the judgment of a court lacking jurisdiction is void."

The Supreme Court recently strengthened this constitutional doctrine to state that even if a court later acquires jurisdiction *in the same case*, its prior merits

decisions made without jurisdiction remain "absolutely void" and may not be recognized. *Roman Cath. Archdiocese of San Juan v. Feliciano*, 140 S. Ct. 696, 700 (2020) (citation omitted). Many other courts have applied these principles to hold that decisions made without jurisdiction are void. *See South Carolina v. Moore*, 447 F.2d 1067, 1073 (4th Cir. 1971) (decisions were void "despite subsequent determination that the removal petition was ineffective"); *G.L. v. D.L.*, 2017 Haw. App. Lexis 468, *13-14 (Nov. 22, 2017) (void judgment was not "resurrected or reinstated" by post-judgment waiver of personal jurisdiction).

*De facto* recognition of a void judgment by operation of legislative enactment presents the same concerns. Because "[a] judgment entered against parties not subject to the personal jurisdiction of the rendering court is a nullity," *Resintex A.G.*, 629 F.2d at 732, the PSJVTA cannot be applied to resurrect or reinstate any of this Court's earlier decisions—including the result of the prior jury trial. *See, e.g., Avelar v. J. Cotoia Constr.*, No. 11-2172, 2011 U.S. Dist. LEXIS 126487, *15 (E.D.N.Y. Nov. 2, 2011) (vacating prior state court judgment, including judgment liens and attachments, and dismissing for lack of personal jurisdiction).

This Court should interpret the PSJVTA as not applying to this closed case, and not resurrecting prior judgments, which would avoid these constitutional questions. *See Cent. Long Island Tax Reform Immediately Comm.*, 616 F.2d at 52 ("If a court can decide a case on non-constitutional grounds, it should not stray into the field of constitutional analysis."). That construction is also necessary to avoid an improper Congressional effort to "retroactively" single out "unpopular" foreign

defendants for "retribution" long after the primary conduct at issue. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267 (1994); *see also Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1607 (2020) ("If legislative majorities could too easily make new laws with retroactive application, disfavored groups could become easy targets for discrimination, with their past actions visible and unalterable."). As such, there is no reason to interpret the PSJVTA as having any applicability to the original judgment in this case.

Plaintiffs' interpretation of the PSJVTA would allow Congress to effectively compel judicial action through a wink and a nod. If Congress is able to require courts to "deem" that a foreign defendant consents to jurisdiction unless it complies with Congressional mandates, even in the absence of voluntary consent, then the Judiciary effectively is divested of its independent authority to evaluate jurisdiction under a case-specific application of due process requirements. *See Texas Trading & Milling Corp. v. Nigeria*, 647 F.2d 300, 307 (2d Cir. 1981) (legislation linking personal jurisdiction to subject matter jurisdiction is limited by the Due Process Clause); *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivanos*, 712 F. Supp. 383, 390 (S.D.N.Y. 1989) (Congress cannot "override the constitutional due process constraints underlying personal jurisdiction").

The Second and D.C. Circuits have repeatedly and unambiguously held that personal jurisdiction could not be exercised ***constitutionally*** over the PA/PLO for the attacks at issue in these cases, which were insufficiently connected with the

United States. *Waldman I*, 835 F.3d at 344; *Livnat*, 851 F.3d at 58. Congress is without authority to alter these conclusions after the fact.

## IV. The PSJVTA's "deemed consent" provision violates due process as applied in this case.

The PSJVTA tries to sidestep the Due Process Clause by instructing courts to "deem" that Defendants have consented to personal jurisdiction. But modern jurisprudence has confirmed that *voluntariness* is the hallmark of due process for consent to personal jurisdiction. *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640-41 (2d Cir. 2016). Because consent "requires a voluntary, reasoned act," concepts like '[e]xtorted actual consent' and 'equally unwilling implied consent' are not the stuff of due process." *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 886, 889 (S.D. Tex. 1993) (quoting Cound, *et al.*, Civil Procedure, Ch. 2, p. 71 (3d Ed. 1981)).

The Supreme Court has recognized certain specific ways that parties may consent to personal jurisdiction, including: submitting to the jurisdiction of a court "by appearance" or "a stipulation," signing a contract "in advance to submit to the jurisdiction of a given court" or through "agreements to arbitrate," agreement by "constructive consent" through "the voluntary use of certain state procedures," waiver of a jurisdictional defense "if not timely raised," and failure "to comply with a pretrial discovery order." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinea*, 456 U.S. 694, 703-05 (1982) (citations and marks omitted).[19] Each example represents actions

---

[19] *Insurance Corp.*, 456 U.S. at 705-06, itself held that "the application of the Rule 37 sanction" to apply personal jurisdiction for failure to keep an agreement to produce

that express or imply *voluntary* consent to a specific dispute. *Id*. There is no modern Supreme Court case upholding a statutory decision to create personal jurisdiction through involuntary "consent," as the PSJVTA purports to do.

The PSJVTA's "deemed consent" provision is unconstitutional as applied here because consent to personal jurisdiction under the Due Process Clause must be free and voluntary, and cannot be coerced. Simply adding the words "deemed consent" to a jurisdictional statute does not satisfy constitutional limitations because the Due Process Clause looks past the form of a statute to its substance. *Koontz*, 570 U.S. at 607 (noting long refusal to "attach significance to the distinction between conditions precedent and conditions subsequent").

## A. The Constitution forbids Congress from coercing "consent" to personal jurisdiction.

The Due Process Clause prevents any statute from coercing consent to personal jurisdiction from any defendant. Indeed, the Second Circuit has recognized that legislatively coerced consent threatens to "rob [*Daimler*] of meaning by a back-door thief." *Brown*, 814 F.3d at 640. The reach of the legislature's "coercive power, even when exercised pursuant to a corporation's consent, may be limited by the Due Process clause." *Id*. at 641. If consent is to mean anything in this context, the choice must be "free and voluntary." *Id*.

This follows from the longstanding principle that "a trial court must satisfy itself" that the "waiver" of a defendant's "constitutional rights is knowing and

---

jurisdictional discovery was essentially a "finding of a constructive waiver" by the defendant's actions in that case.

voluntary." *Godinez v. Moran*, 509 U.S. 389, 400 (1993); *United States v. Van Waeyenberghe*, 481 F.3d 951, 957 (7th Cir. 2007) ("Waivers of constitutional rights must be knowing and voluntary."); *see also* Pls. Br. at 26 (admitting that conduct must be "voluntary"). This rule applies to any jurisdictional constitutional right. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948 (2015) (asking "whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case'") (citation omitted). Decisions to give up constitutional rights must be voluntary "not merely in theory but in fact." *South Dakota v. Dole*, 483 U.S. 203, 211-12 (1987).

Recent decisions have applied these principles to hold that statutes cannot create jurisdiction based on a defendant's actions that are insufficient for jurisdiction under the Due Process Clause. Thus, "the relationship among the defendant, the forum, and the litigation" is "the central concern of the inquiry into personal jurisdiction." *Daimler*, 571 U.S. at 126 (citation omitted). Personal jurisdiction results from an active change in position (or a choice) by Defendants that submits them to the jurisdiction of the court in the first instance, or contacts that are "continuous and systematic as to render them essentially at home in the forum state," *Goodyear*, 571 U.S. at 127 (citations omitted). Because statutes seeking to unilaterally create jurisdiction via artificial consent do not involve real choice, "a foreign corporation that properly complies with the [statute] only consents to personal jurisdiction where such jurisdiction is constitutionally permissible." *Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183-84 (5th Cir. 1992); *see The Bremen v. Zapata Off-*

*Shore Co.*, 407 U.S. 1, 12-13 (1972) (contract-based personal jurisdiction is subject to traditional voluntariness inquiries such as "overweening bargaining power").

Federal courts around the country increasingly recognize that even a "mandatory statutory regime purporting to confer consent to general jurisdiction in exchange for the ability to legally do business in a state is contrary to the rule in *Daimler*, and therefore, can no longer stand." *Sullivan v. A.W. Chesterton, Inc.*, 384 F. Supp. 3d 532, 540-41 (E.D. Pa. 2019). "After *Daimler*, there is 'little room' to argue that compliance with a state's 'bureaucratic measures' render a corporation at home in a state." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1318 (11th Cir. 2018) (citation omitted); *accord Reynolds v. Turning Point Holding Co.*, No. 19-1935, 2020 U.S. Dist. LEXIS 33163, *14 (E.D. Pa. Feb. 26, 2020) (following *Chesterton* finding that Pennsylvania's business registration statute unconstitutional as it required consent to general personal jurisdiction in exchange for registering to do business). Those courts explain that "[i]t is axiomatic … that consent is only valid if it is given knowingly and voluntarily." *Chesterton*, 384 F. Supp. 3d at 538; *Gulf Coast Bank & Trust v. Designed Conveyor Sys.*, No. 16-412, 2017 U.S. Dist. LEXIS 4711, *13-14 (M.D. La. Jan. 12, 2015) (compliance with the registration statute did not constitute consent to general jurisdiction); *c.f. Brown*, 814 F.3d at 640 (recognizing potential conflict with *Daimler* if a registration statute purports to create general jurisdiction).

That same analysis animates recent state-court decisions holding that statutes purporting to create artificial consent to jurisdiction do not survive *Daimler*. *Lanham v. BNSF Ry.*, 939 N.W.2d 363, 372 (Neb. 2020) (concluding that treating registration

to do business as "implied consent to personal jurisdiction would exceed the due process limits" and highlighting the Second Circuit's observation that implied consent in such a circumstance would rob *Daimler* of meaning "by a back-door thief") (quoting *Brown*, 814 F.3d at 640); *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 139-42 (Del. 2016) ("*Daimler* makes plain that it is inconsistent with principles of due process to exercise general jurisdiction over a foreign corporation that is not 'essentially at home' in a state for claims having no rational connection to the state.") (citation omitted). *See also Mallory v. Norfolk S. Railway*, No. 1961, 2018 WL 3025283 (Pa. Com. Pl. May 30, 2018) (general jurisdiction cannot be predicated on registration statute: "[f]aced with this Hobson's choice, a foreign corporation's consent to general jurisdiction in Pennsylvania can be hardly characterized as voluntary"), appeal transf. to Pa. Supreme Ct., Order, No. 802 EDA 2018 (Pa. Superior Ct. Oct. 30, 2020).

In this case, the PA and PLO have continued the same behavior in which they engaged before the PSJVTA. They have taken no actions that could be understood as "free and voluntary" consent under the Supreme Court's interpretation of the Due Process Clause in *Daimler*, *Walden*, *International Shoe*—or any other case. *See Brown*, 814 F.3d at 640 (describing constitutional consent). Defendants did not sign a contract agreeing to jurisdiction, accept funding from Congress in exchange for personal jurisdiction, or otherwise voluntarily agree to litigate Plaintiffs' claims in this forum. Rather, they have challenged personal jurisdiction at every stage of this case, including this one. And, as explained above, their challenges have been vindicated because the PA and PLO lack the requisite "minimum contacts."

Exercising jurisdiction over Defendants in this case would therefore violate due process. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011) (plurality) ("[T]hose who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter.").

The factual predicates for "deemed consent" under the PSJVTA do not change this analysis, because that conduct is insufficient to confer jurisdiction under the Due Process Clause. Statutorily-created consent is meaningless unless the actual actions of the defendants satisfy due process—whether by signing a forum selection clause, by a party's primary conduct, or by failing to raise jurisdiction in a motion to dismiss. Accepting Plaintiffs' interpretation of the PSJVTA would mean that Congress (or a State) could subject any entity to personal jurisdiction by "deeming" constitutionally-insignificant conduct as "consent" to jurisdiction. Congress could declare, for example, that a foreign manufacturer is "deemed to consent" to personal jurisdiction in the U.S. if it conducts financial transactions in dollars, uses software licensed by a company in the U.S., or interacts with customers on Facebook or Twitter. *See Daimler*, 571 U.S. at 140-41 (warning of the dangers of an "expansive view" of personal jurisdiction); Charles W. Rhodes, *Clarifying General Jurisdiction*, 34 SETON HALL L. REV. 807, 900 (2004) ("applying the American conception of general jurisdiction" "to disputes without any relationship to the United States" often "is viewed with [abhorrence] by many other nations"). Such a statute would represent an unconstitutional override of the Due Process Clause's limitations on this Court's exercise of personal jurisdiction.

For example, *Bristol-Meyers*, 137 S. Ct. 1773, held that a California court could not exercise personal jurisdiction over a non-California pharmaceutical company with respect to the claims of non-California residents who did not purchase or consume its drugs in California, even though the court had personal jurisdiction over the company for California residents' claims. If the PSJVTA were constitutional as applied here, California (or Congress) could pass a statute saying that within 120 days after enactment, if a company continues to sell a product in a state, then it is "deemed" to consent to personal jurisdiction for claims related to that product, even if the plaintiff is not a California resident, was not injured in the state, and bought the product years before the enactment—robbing *Bristol-Myers* of all meaning. Without the limitations supplied by due process, defendants could not "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Daimler*, 571 U.S. at 139 (quoting *Burger King*, 471 U.S. at 472).

### B. Implied consent cannot be applied retroactively to salvage Plaintiffs' claims in this case.

Applying the PSJVTA's "deemed consent" provision would be particularly unfair in this case, given the Second Circuit's decision vacating the judgment for lack of personal jurisdiction in 2016 – three years before passage of the Act. Although statutes conferring jurisdiction generally may apply retroactively, that default rule assumes that basic constitutional requirements (such as "minimum contacts") are otherwise satisfied. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223-24 (1957) (holding California long-arm statute could be applied retroactively because "[i]t did nothing more than to provide petitioner with a California forum" to enforce a contract "which

had substantial connection with that State").  As explained below, courts addressing "implied consent" provisions similar to the PSJVTA have held for decades that such statutes are not consistent with due process, ***especially*** where applied retroactively.

The PSJVTA's reliance on the outdated notion of "deemed consent" betrays its lack of fidelity to modern due process, as the Supreme Court abandoned fictional consent as the governing standard nearly 80 years ago.  "In a continuing process of evolution," the Supreme Court "accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of … judicial power over [foreign] corporations." *McGee*, 355 U.S. at 222.  In *International Shoe*, the Court expressly disclaimed continued reliance on "consent" when it was a "legal fiction," because the true basis for personal jurisdiction is the "quality and nature" of the defendant's contacts with the forum.  *Int'l Shoe*, 326 U.S. at 318-19; *see also McGee*, 355 U.S. at 225-26.  "[The Due Process Clause] does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations."  *Int'l Shoe*, 326 U.S. at 319.

As explained above, artificial consent statutes like the PSJVTA are a relic of the *Pennoyer*-era cases that were once upheld by the Supreme Court.  For example, cases like *Hess v. Pawloski*, 274 U.S. 352, 356 (1927), and *Pennsylvania Fire Ins. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 94 (1917), upheld statutorily-created jurisdiction based on "consent and presence" that "were purely fictional." *Burnham*, 495 U.S. at 617-18 (plurality opinion).  But in the modern era, the Supreme Court's "opinion in *International Shoe* cast those fictions aside."  *Id*. at 618.  As such,

jurisdictional statutes "must be evaluated according to the standards set forth in *International Shoe* and its progeny" and "[t]o the extent that prior decisions are inconsistent with this standard, they are overruled." *Shaffer*, 433 U.S. at 212 & n.39.

As Justice Ginsburg explained, legal fictions are not sufficient to support the exercise of personal jurisdiction under modern standards:

> *International Shoe* itself, and decisions thereafter, made plain that legal fictions, notably 'presence' and 'implied consent,' should be discarded, for they conceal the actual bases on which jurisdiction rests. 'The relationship among the defendant, the forum, and the litigation' determines whether due process permits the exercise of personal jurisdiction over a defendant, and 'fictions of implied consent' or 'corporate presence' do not advance the proper inquiry.

*Nicastro*, 564 U.S. at 900 (Ginsburg, J., dissenting); *see also id.* at 901 ("a forum can exercise jurisdiction when its contacts with the controversy are sufficient; invocation of a fictitious consent, the Court has repeatedly said, is unnecessary and unhelpful").

The PSJTVA is not the first statute to rely on outdated theories of "consent" to confer jurisdiction. Even after *International Shoe*, the long-arm statutes of several states continued to incorporate traditional fictional "consent." As states began amending their long-arm statutes to reflect the minimum contacts analysis set forth in *International Shoe*, the question naturally arose whether these statutes could be applied retroactively to exert jurisdiction over defendants that were not "present" or "doing business" in the forum state when suit was filed—but who nonetheless had engaged in "certain minimum contacts" there.

The answer to the retroactivity question hinged on the jurisdictional provision. Where the statute relied on the nature and quality of the defendant's purposeful contacts with the state (so-called "single-act" statutes), courts held that the statutes

could apply retroactively to causes of action that accrued prior to enactment. *See, e.g., Carvette v. Marion Power Shovel Co.*, 249 A.2d 58, 60 (Conn. 1968) (long-arm statute that hinged on defendant's contacts with the forum applied retroactively because it was "in essence a procedural statute" that simply "permit[ted] the plaintiff to obtain an effective in personam judgment against the defendant in Connecticut instead of having to go to [another state] for the institution of this suit"); *Kagan v. United Vacuum Appliance Corp.*, 260 N.E.2d 208, 210-11 (Mass. 1970) (long-arm statute applied retroactively because it "[was] not based on implied consent," but rather "[made] the doing of certain acts the basis of jurisdiction over a non-resident"); *Nelson v. Miller*, 143 N.E.2d 673, 676-79 (Ill. 1957) (same). The results in "single-act" states were consistent with the Supreme Court's decision in *McGee*, which held that California's long-arm statute applied retroactively because it relied on defendant's "substantial connection" with the state. *McGee*, 355 U.S. at 224.

But where long-arm jurisdiction hinged on "the fiction of implied consent," courts "almost invariably" reached the opposite conclusion (decades before *Daimler, Goodyear,* or *Walden*) holding that such statutes "operate prospectively only." *Krueger v. Rheem Mfg.*, 149 N.W.2d 142, 145-48 (Iowa 1967). Because implied-consent statutes focused on some pretended agreement rather than the defendant's state contacts, they were not "procedural," but affected the substantive rights of the defendant. *Id.*; *see also Carvette*, 249 A.2d at 61 (distinguishing long-arm statutes based on minimum contacts from statutes deeming "the performance of certain acts" as "implied consent," and explaining that such statutes "are often held prospective in

operation under the theory that it is impossible retroactively to imply consent"); *CRI Liquidating REIT v. A.F. Evans Co.*, 730 A.2d 1244, 1247-48 (Del. Ch. 1997) (explaining the "critical" distinction between "implied consent" and "single act" statutes, holding that implied consent statutes "are not retroactively applied because the consent is constructive, not actual," and thus affects the defendant's substantive rights); *Adams Dairy v. Nat'l Dairy Prods. Corp.*, 293 F. Supp. 1135, 1147-49 (W.D. Mo. 1968) (noting that "'implied consent statutes have generally been held not to operate retroactively" because "neither as a matter of statutory construction nor as a matter of constitutional law is it possible to imply consent retroactively") (citation omitted); *Diamond Crystal Salt Co. v. P.J. Ritter Co.*, 419 F.2d 147, 148 (1st Cir. 1969) (noting that "statutes which predicated jurisdiction upon fictionalized 'consent'" are not given "retrospective construction"). Jurisdictional provisions relying on implied "consent" cannot be applied retroactively to causes of action that accrued before the effective date of the statute. *Krueger*, 149 N.W.2d at 145.

Congress' attempt to manufacture jurisdiction via "deemed consent" under the PSJTVA illustrates this difference. As the Second Circuit has already held in this very case, the nature and quality of Defendants' contacts with the United States are insufficient to confer personal jurisdiction under the Due Process Clause. A federal statute properly focused on the defendants' contacts with the forum therefore could not possibly confer jurisdiction over defendants, regardless of its retroactive effect. *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 499 (2d Cir. 2020) ("a foreign corporation does not consent to general personal jurisdiction in New York by merely

registering to do business in the state … this conclusion is consistent with the U.S. Constitution and the evolving law surrounding general personal jurisdiction").

Perhaps for that very reason, Congress improperly attempted to manufacture retroactive jurisdiction by declaring in the PSJVTA that *constitutionally-insufficient* contacts are "deemed consent" to personal jurisdiction. That attempt runs directly counter to the well-established authority, described above, that implied-consent provisions unconstitutionally affect substantive rights, and therefore cannot be given retroactive effect. Indeed, "the presumption against retroactive legislation is deeply rooted in our jurisprudence," and reflects "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Landgraf*, 511 U.S. at 265, 270. Plaintiffs' attempt to use the PSJTVA's implied-consent to resuscitate a defunct judgment does not implicate a procedural rule, but instead upsets fundamental interests in finality, repose, and settled expectations. *Id.* at 265-68 & n.29.

## V. Congress cannot condition the exercise of constitutional rights on Defendants' agreement to be regulated by Congress.

The unconstitutional conditions doctrine further demonstrates the due process problems created by applying the PSJVTA to Defendants. The "predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person to do what it attempted to pressure the person into doing." *Koontz*, 570 U.S. at 612. In other words, the government cannot deny a benefit on a prohibited basis because doing so "would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citation omitted).

- 56 -

The federal courts have held that Defendants are "persons" entitled to due process rights against the imposition of personal jurisdiction. *Waldman I*, 835 F.3d at 328-30. Yet the PSJVTA requires Defendants to give up those rights unless they yield to Congressional regulation of the activities of their UN delegation and Palestinian laws of internal applicability. These are not activities that Congress can otherwise regulate. *See United States v. PLO*, 695 F. Supp. at 1466 ("After the United Nations invited the PLO to participate…, the Department of State took the position that it was required to provide access to the UN for the PLO. The State Department at no time disputed the notion that the rights of entry, access and residence guaranteed to invitees include the right to maintain offices") (citation omitted).

The United States has endorsed and supported the Oslo Accords, which guarantee internal self-government to Defendants within the West Bank and the Gaza Strip. Oslo I Accord (*Declaration of Principles on Interim Self-Government Arrangements*), 32 I.L.M. 1525 (Sept. 13, 1993); Oslo II Accord (*Israeli-Palestinian Interim Agreement on the West Bank and Gaza Strip*), 36 I.L.M. 55 (Sept. 28, 1995). The United States also guarantees UN delegations freedom to pursue their UN business through the UN Headquarters Agreement, 61 Stat. 3416 (22 U.S.C. § 287 note), TIAS 1676, 12 UNTS 1947 (June 26, 1947). If Plaintiffs' reading of the PSJVTA were correct, then the statute would condition Defendants' ability to enjoy the benefit of those agreements on forfeiting their constitutional rights to due process.

Whether analyzed as a violation of due process or an unconstitutional condition, Congress cannot threaten to take away constitutional rights as a way of

forcing consent to regulation. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-81 (2012) (Congress could not require States to accept a Medicaid expansion or lose all Medicaid funding, which was "pas[t] the point at which pressure turns into compulsion" and amounted to "a gun to the head."). For example, in *Frost & Frost Trucking Co. v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 599 (1926), the Supreme Court rejected a statute conditioning a company's continued operation on agreeing to become a common carrier. It explained that "constitutional guaranties, so carefully safeguarded against direct assault, are open to destruction by the indirect but no less effective process of requiring a surrender, which, though in form voluntary, in fact lacks none of the elements of compulsion." *Id.* at 593; *see Koontz*, 570 U.S. at 607 (citing *Frost* for its analysis of extortionate demands).

Another district court recently refused to apply Pennsylvania's registration statute on similar grounds, holding that the statute "conditions the benefit of certain privileges of doing business … upon the surrender of the constitutional right, recognized in *Daimler*, to be subject to general personal jurisdiction only where the corporation is 'at home.'" *Chesterton*, 384 F. Supp. 3d at 541. In *Chesterton*, foreign corporations doing business in Pennsylvania had no choice but to register—but the court refused to allow the state to create a concession to general jurisdiction in exchange for the privilege of doing business, because the concession was effectively coerced. *Id.*; *see Southern Pac. Co. v. Denton*, 146 U.S. 202, 206-07 (1892) (invalidating a Texas law stating that a foreign company could not, as a condition of doing business in Texas, remove a suit filed in state court to federal court).

Any contrary holding would "sanction the achievement" of an infringement of individual due process rights "so long as it was cloaked in the garb" of the deemed consent provision in the PSJVTA. *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960). "It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Id.* (quoting *Frost*, 271 U.S. at 594).

In the end, Congress cannot coerce Defendants to concede to jurisdiction in ATA cases if they do not accede to the United States' demands to manage Palestinian government decisions about its own internal operations, such as payment programs that apply to all Palestinians, or its diplomatic speech at or ancillary to its UN presence, including website posts or messages on Twitter. None of those activities can possibly constitute voluntary consent to general jurisdiction, and none of Plaintiffs' claims arises from those activities for purposes of specific jurisdiction. The application of the PSJVTA to this case is unconstitutional whether this Court views it through the lens of separation of powers, the Due Process Clause, or the unconstitutional conditions doctrine.

## **CONCLUSION**

This Court should find that the PSJVTA does not provide jurisdiction over Defendants in this case.

Dated: January 8, 2021                    Respectfully submitted,

                                          **SQUIRE PATTON BOGGS (US) LLP**

                                          /s/ *Gassan A. Baloul*
                                          Gassan A. Baloul (GB-4473)
                                          gassan.baloul@squirepb.com
                                          Mitchell R. Berger (MB-4112)
                                          mitchell.berger@squirepb.com
                                          2550 M Street, N.W.
                                          Washington, D.C. 20037
                                          Telephone: (202) 457-6000
                                          Facsimile:  (202) 457-6315

                                          *Attorneys for Defendants Palestine
                                          Liberation Organization and Palestinian
                                          Authority*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2021, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

*/s/ Gassan A. Baloul*
Gassan A. Baloul (GB-4473)