# LAW OFFICE OF
# JEFFREY FLEISCHMANN, P.C.

150 Broadway, Suite 900
New York, N.Y. 10038

JEFFREY FLEISCHMANN

Telephone: (646) 657-9623
Facsimile: (646) 351-0694

---

February 12, 2021

<u>Via ECF:</u>
Hon. Jesse M. Furman
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

     Re: <u>1:20-cv-03374-JMF Miriam Fuld et al. v. The Palestine Liberation Organization et al.</u>

Dear Judge Furman:

I represent plaintiffs Miriam Fuld, individually, as personal representative and administrator of the Estate of Ari Yoel Fuld, deceased, and as natural guardian of plaintiff Natan Shai Fuld, Natan Shai Fuld, minor, by his next friend and guardian Miriam Fuld, Naomi Fuld, Tamar Gila Fuld, and Eliezer Yakir Fuld in the above-referenced matter.  In connection with the current motion to dismiss the amended complaint, both Parties have quoted extensively from the briefing in the Sokolow case.  Attached hereto as Exhibit A is a copy of the Reply brief submitted in Sokolow, which addresses many of the issues in the pending motion to dismiss.

     Respectfully Submitted,

          LAW OFFICE OF JEFFREY FLEISCHMANN PC
          *Attorneys for Plaintiffs*

          By: <u>/s/ Jeffrey Fleischmann</u>
             Jeffrey Fleischmann

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,

                                    *Plaintiffs*,

        v.                                                          Case No. 04 Civ. 397 (GBD)

PALESTINE LIBERATION ORGANIZATION,
et al.,

                                    *Defendants*.


# PLAINTIFFS' REPLY MEMORANDUM
## CONCERNING APPLICATION AND CONSTITUTIONALITY OF THE
## PROMOTING SECURITY AND JUSTICE FOR VICTIMS OF TERRORISM ACT


ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
T: (212) 836–8000
F: (212) 836–8689

*Attorneys for Plaintiffs*

February 9, 2021

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.      Defendants' Post-Enactment Pay-For-Slay Payments Satisfy § 2334(e)(1)(A) ................ 2

II.     Defendants' Post-Enactment U.S.-Based Office And Activities Satisfy
        § 2334(e)(1)(B) ........................................................................................................ 3

        A.      Defendants Maintained An Office And Conducted Activities In The United
                States .......................................................................................................... 3

        B.      No Statutory Exception Applies ...................................................................... 6

        C.      Alternatively, The Court Should Allow Discovery ............................................ 16

III.    The PSJVTA Does Not Violate the Due Process Clause ................................................. 16

        A.      Consent Jurisdiction Does Not Require Minimum Contacts ............................... 17

                1.      Consent Jurisdiction Remains Valid ...................................................... 18

                2.      The PSJVTA Meets The Due-Process Requirements Identified in
                        *Brown v. Lockheed Martin* ................................................................. 19

        B.      Defendants' Fallback Arguments Are Meritless ............................................... 24

                1.      Defendants' "Coercion" Argument Fails ................................................ 24

                2.      Defendants' "Unconstitutional Conditions" Argument Fails ..................... 26

                3.      Defendants' "Retroactivity" Argument Fails .......................................... 28

IV.     The PSJVTA Does Not Invade The Judicial Power ...................................................... 31

        A.      Congress Did Not "Legislatively Supersede" A Constitutional Rule ................... 31

        B.      The PSJVTA Does Not Require The Judiciary to Reopen A Closed Case or
                Reinstate A Supposedly "Voided Judgment" Theory ....................................... 33

CONCLUSION ................................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**                                                                                    Page(s)

*A.I. Trade Fin., Inc. v. Petra Bank*,
   989 F.2d 76 (2d Cir. 1993)..................................................................................3

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
   817 F.3d 755 (Fed. Cir. 2016).......................................................................18, 25

*Agrashell, Inc. v. Bernard Sirotta Co.*,
   344 F.2d 583 (2d Cir. 1965)................................................................................29

*Am. Dairy Queen Corp. v. W.B. Mason Co.*,
   No. 18-cv-693, 2019 WL 135699 (D. Minn. Jan. 8, 2019) ...................................25

*In re Asbestos Prods. Liab. Litig.*,
   384 F. Supp. 3d 532 (E.D. Pa. 2019) ..................................................................25

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
   902 F.2d 194 (2d Cir. 1990)..................................................................................3

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016)........................................................................................33

*Birchfield v. North Dakota*,
   136 S. Ct. 2160 (2016)..................................................................................19, 28

*Biton v. Palestinian Interim Self-Gov't Auth.*,
   310 F. Supp. 2d 172 (D.D.C. 2004) .....................................................................30

*Bors v. Johnson & Johnson*,
   208 F. Supp. 3d 648 (E.D. Pa. 2016) ..................................................................25

*Bostock v. Clayton Cty.*,
   140 S. Ct. 1731 (2020)........................................................................................15

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
   137 S. Ct. 1773 (2017)........................................................................................23

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)......................................................................20, 21, 22

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)............................................................................................19

*Butler v. Daimler Trucks N. Am.*,
   433 F. Supp. 3d 1216 (D. Kan. 2020) ..................................................................25

*Capitol Recs., LLC v. Vimeo, LLC,*
826 F.3d 78 (2d Cir. 2016) ........................................................................14

*Carnival Cruise Lines, Inc. v. Shute,*
499 U.S. 585 (1991) ...................................................................................19

*Chen v. Dunkin' Brands, Inc.,*
954 F.3d 492 (2d Cir. 2020) ......................................................................20

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ...................................................................................32

*Clark v. Martinez,*
543 U.S. 371 (2005) ..............................................................................15, 16

*Daimler v. A.G. Bauman,*
571 U.S. 117 (2014) ...............................................................20, 22, 23, 24

*Danziger & De Llano, LLP v. Morgan Verkamp LLC,*
948 F.3d 124 (3d Cir. 2020) ......................................................................16

*Dickerson v. United States,*
530 U.S. 428 (2000) ...................................................................................32

*Dolan v. City of Tigard,*
512 U.S. 374 (1994) ...................................................................................27

*Eagle Force Holdings, LLC v. Campbell,*
187 A.3d 1209 (Del. 2018) ........................................................................19

*Eastern Enterprises v. Apfel,*
54 U.S. 498 (1998) .....................................................................................29

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC,*
844 F.3d 79 (2d Cir. 2016) ..........................................................................3

*Foxworth v. Permanent Mission of Rep. of Uganda to United Nations,*
796 F. Supp. 761 (S.D.N.Y. 1992) ..............................................................5

*Gas Sensing Tech. Corp. v. Ashton,*
353 F. Supp. 3d 1192 (D. Wyo. 2018),
*aff'd,* 795 F. App'x 1010 (10th Cir. 2020) ................................................18

*Genuine Parts Co. v. Cepec,*
137 A.3d 123 (Del. 2016) ..........................................................................20

*Gorton v. Air & Liquid Sys. Corp.,*
303 F. Supp. 3d 278 (M.D. Pa. 2018) ........................................................25

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006)...............................................................................................31

*Harrison v. Matthews*,
  235 Ark. 915 (1962)............................................................................................29

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
  935 F.3d 211 (4th Cir. 2019) ................................................................................17

*In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 &
  50 U.S.C. § 1705*,
  381 F. Supp. 3d 37 (D.D.C.),
  *aff'd sub. nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019).........................18

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982)...............................................................................18, 19, 22

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
  655 F.3d 136 (2d Cir. 2011)..................................................................................24

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011)..............................................................................................24

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995)......................................................................................9

*Khudeish v. The Minister of Citizenship and Immigration*,
  [2020] F.C. 1124 (Can.).........................................................................................3

*Klieman v. Palestinian Auth.*,
  923 F.3d 1115 (D.C. Cir. 2019), *vacated*, 140 S. Ct. 2713 (2020)...................29, 33

*Klieman v. Palestinian Auth.*,
  No. 15–7034 (D.C. Cir. Feb. 15, 2019) ................................................................16

*Klinghoffer v. S.N.C. Achille Lauro*,
  816 F. Supp. 930 (S.D.N.Y. 1993) ......................................................................26

*Klinghoffer v. S.N.C. Achille Lauro*,
  937 F.2d 44 (2d Cir. 1991)......................................................................... *passim*

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013)........................................................................................26, 27

*Krueger v. Rheem Mfg. Co.*,
  149 N.W. 2d 142 (Iowa 1967) ..............................................................................29

*Landgraf v. USI Film Prod.*,
511 U.S. 244 (1994)...................................................................................................31

*Lanham v. BNSF Ry.*,
939 N.W.2d 363 (Neb. 2020)....................................................................................20

*McGee v. International Life Ins. Co.*,
355 U.S. 220 (1957)...................................................................................................31

*Meese v. Keene*,
481 U.S. 465 (1987).....................................................................................................8

*Miller v. Angliker*,
848 F.2d 1312 (2d Cir. 1988)....................................................................................24

*Mitchell v. Eli Lilly & Co.*,
159 F. Supp. 3d (E.D. Mo. 2016)............................................................................25

*Mullaney v. Anderson*,
342 U.S. 415 (1952)...................................................................................................34

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826 (1989).............................................................................................34, 35

*Oppel v. Empire Mut. Ins. Co.*,
92 F.R.D. 494 (S.D.N.Y. 1981) ................................................................................19

*Palestine Information Office v. Shultz*,
853 F.2d 932 (D.C. Cir. 1988)..................................................................................25

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
467 U.S. 717 (1984)...................................................................................................30

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995).............................................................................................33, 34

*Replica Auto Body Panels & Auto Sales Inc. v. inTech Trailers Inc.*,
454 F. Supp. 3d 458 (M.D. Pa. 2020) ......................................................................25

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004)...................................................................................................31

*Rising v. Brown*,
313 F. Supp. 824 (C.D. Cal. 1970) ........................................................8, 20, 21, 22

*Rockefeller Tech. Invs. (Asia) VII v. Changzhou SinoType Tech. Co.*,
9 Cal. 5th 125 (2020) ................................................................................................18

*Rodriguez v. Ford Motor Co.*,
    458 P.3d 569 (N.M. Ct. App. 2019) ................................................................25

*Roman Catholic Archdiocese of San Juan v. Feliciano*,
    140 S. Ct. 696 (2020) ......................................................................................35

*In re Sealed Case*,
    932 F.3d 915 (D.C. Cir. 2019) ....................................................................18, 23

*Shatsky v. Palestine Liberation Org.*,
    955 F.3d 1016 (D.C. Cir. 2020) ........................................................................35

*Simonson v. Int'l Bank*,
    14 N.Y.2d 281 (1964) .......................................................................................29

*Estates of Ungar ex rel. Srachman v. Palestinian Auth.*,
    228 F. Supp. 2d 40 (D.R.I. 2002) ....................................................................10

*Stone v. INS*,
    514 U.S. 386 (1995) ...........................................................................................4

*In re Terrorist Attacks on Sept. 11, 2001*,
    298 F. Supp. 3d 631 (S.D.N.Y. 2018) ..........................................................34, 35

*Ungar v. Palestinian Auth.*,
    153 F. Supp. 2d 76 (D.R.I. 2001) .....................................................................30

*United Republic Insurance Co. v. Chase Manhattan Bank*,
    315 F.3d 168 (2d Cir. 2003) .............................................................................35

*United States v. Aguilar*,
    515 U.S. 593 (1995) .........................................................................................14

*United States v. Alabama*,
    362 U.S. 602 (1960) .........................................................................................35

*United States v. Balde*,
    943 F.3d 73 (2d Cir. 2019) .................................................................................4

*United States v. Palestine Liberation Org.*,
    695 F. Supp. 1456 (S.D.N.Y. 1988) ....................................................5, 12, 26, 27

*United States v. Sioux Nation*,
    448 U.S. 371 (1980) .........................................................................................33

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976) .............................................................................................29

*W. & S. Life Ins. Co. v. State Bd. of Equalization of California,*
    451 U.S. 648 (1981)............................................................................................27

*Waite v. All Acquisition Corp.,*
    901 F.3d 1307 (11th Cir. 2018) ....................................................................17, 20

*Waldman v. Palestine Liberation Org.,*
    835 F.3d 317 (2d Cir. 2016)...............................................................................31

*Waldman v. Palestine Liberation Org.,*
    925 F.3d 570 (2d Cir. 2019), *vacated,* 140 S. Ct. 2714 (2020) .........................4

*Wellness Int'l Network, Ltd. v. Sharif,*
    135 S. Ct. 1932 (2015).......................................................................................18

*Wisconsin Department of Revenue v. William Wrigley, Jr., Co.,*
    505 U.S. 214 (1992)...........................................................................12, 13, 14

*Zinermon v. Burch,*
    494 U.S. 113 (1990)...........................................................................................19

**STATUTES**

15 U.S.C.
    § 381....................................................................................................................12

18 U.S.C.
    § 2333..............................................................................................................7, 14
    § 2334(e)(1)(A)...................................................................................................28
    § 2334(e)(1)(A)(i)..................................................................................................3
    § 2334(e)(1)(A)(ii)................................................................................................3
    § 2334(e)(1)(B)...................................................................................................28
    § 2334(e)(1)(B)(i).........................................................................................4, 11
    § 2334(e)(1)(B)(iii)...............................................................................................5
    § 2334(e)(3)(A).....................................................................................................7
    § 2334(e)(3)(B)...................................................................................................10
    § 2334(e)(3)(F)...................................................................................................11
    § 2334(e)(4) ..........................................................................................................5

22 U.S.C.
    § 2778(a)(1).........................................................................................................23
    § 2778(c)..............................................................................................................23
    § 2778(d).............................................................................................................23
    § 2778(e).............................................................................................................23
    § 4305(b)(3)........................................................................................................27
    § 4309A(b)(1).....................................................................................................27
    § 4309a(e)..............................................................................................................5
    § 5202...........................................................................................................25, 27

31 U.S.C.
  § 5318(k)(3) ....................................................................................................23

50 U.S.C.
  § 4801(9)(B)....................................................................................................23
  § 4812(a)(1) ....................................................................................................23

Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L.
  116-94, div. J, tit. IX, § 903(d)(1)(A) (2019) .................................................7, 14

Pub. L. 99–399, § 1202 (Aug. 27, 1986) ...........................................................30

Pub. L. 102–572, title X, § 1003 (Oct. 29, 1992) ..............................................30

Pub. L. 116–283, § 6308(a) (Jan. 1, 2021) .........................................................23

Taylor Force Act, 22 U.S.C. § 2378c-1 ..............................................................27

## REGULATIONS

15 C.F.R.
  § 734.14(b)......................................................................................................23
  § 736.2(b)(2) ...................................................................................................23

22 C.F.R.
  § 120.19...........................................................................................................23
  § 123.9.............................................................................................................23
  § 127.10...........................................................................................................23

## TREATIES

Convention on Privileges and Immunities of the United Nations, June 9, 1970,
  21 U.S.T. 1418 .............................................................................................8, 9

Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999,
  2179 U.N.T.S. 197 ...........................................................................................30

Convention for Suppression of Terrorist Bombings, Dec. 15, 1997,
  2149 U.N.T.S. 258 ...........................................................................................30

UN Headquarters Agreement, June 26–Nov. 21, 1947, 61 Stat. 754 .............4

## LEGISLATIVE MATERIALS

165 Cong. Rec. S7182 (daily ed. Dec. 19, 2019)...........................................14

Executive Business Meeting, Comm. on the Judiciary (Oct. 17, 2019),
  https://www.judiciary.senate.gov/meetings/10/17/2019/executive-business-
  meeting............................................................................................................15

**OTHER AUTHORITIES**

Ancillary, *Oxford English Dictionary* (online ed.),
  https://www.oed.com/view/Entry/7258 ...................................................................12

Ancillary, *Fowler's Dictionary of Modern English Usage* (4th ed. 2015) ....................................12

Ancillary, *Webster's Third New International Dictionary* (2002) ................................................12

16 Moore's Federal Practice—Civil § 108.53 (2020) ....................................................................17

4 Wright & Miller's Fed. Prac. & Proc. § 1067.3 (4th ed. 2008) ..................................................17

*The Constitution of the United States of America: Analysis and Interpretation*, S.
  Doc. No. 112–9 (2012 & Supp. 2017)....................................................................................17

1968 U.N. Jurid. Y.B. 194, U.N. Doc. ST/LEG/SER.C/6 ..............................................................8

1977 U.N. Jurid. Y.B. 247, U.N. Doc. ST/LEG/SER.C/15 .......................................................8, 13

1979 U.N. Jurid. Y.B. 170, U.N. Doc. ST/LEG/SER.C/17 .............................................................9

1985 U.N. Jurid. Y.B. 154, U.N. Doc. ST/LEG/SER.C/23 .............................................................8

## INTRODUCTION

The Second Circuit remanded for this Court to determine the applicability of the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA) and, if it applies, to address its constitutionality. Defendants admit that their conduct meets the PSJVTA's pay-for-slay provision. They deny that their conduct meets the U.S. office and activities provision, but their arguments—that the Upper East Side of Manhattan is not "in the United States," and that appearing at university seminars and notarizing birth certificates is "official business of the United Nations"—cannot be taken seriously.

Defendants focus their main effort on trying to have the statute declared unconstitutional, but their principal argument is frivolous: They say that Congress may not specify conditions under which a defendant can manifest its consent to the exercise of personal jurisdiction unless that defendant *already* has "minimum contacts" with the United States. That argument is contrary to black-letter law and improperly conflates consent jurisdiction with specific jurisdiction.

Defendants' fallback arguments are even weaker, boiling down to the theory that they have an absolute due-process right to be free of U.S. regulation, period. But that is not the law. Due process requires fair warning and a reasonable fit between the statute and a legitimate governmental objective, and the PSJVTA easily meets those requirements. Indeed, Defendants concede that "[n]either of these" standards "is actually relevant" to their arguments. Def. Br. 35 (emphasis omitted). As for separation of powers, Defendants have abandoned the meritless argument they pressed in the Supreme Court and the Second Circuit, that Congress "required" the judiciary to reopen a final judgment on the merits; their work-around arguments are make-weights.

The Court should also be mindful of the extraordinary nature of Defendants' position here. Congress, exercising its constitutional duty to make laws concerning foreign affairs, enacted a

1

statute focused on the conduct of a foreign government in order to promote U.S. interests and U.S. policy. Now, that same foreign government—unwilling to cooperate with the U.S. foreign policy goals of compensating terror victims and ending institutionalized payments for terrorists—asks this Court to hold that the political branches exceeded their constitutional powers. Defendants do not cite any case holding a federal statute unconstitutional at the behest of a foreign government, and we have been unable to find one. Defendants would have this Court be the first to do so, in order to provide them with immunity for their involvement in terror attacks that left Americans murdered and maimed, by crafting a new constitutional rule that departs from well-established standards—and without even complying with their notice obligation to the Attorney General as required by Fed. R. Civ. P. 5.1. The Court should decline the invitation.

## ARGUMENT

## I.   Defendants' Post-Enactment Pay-For-Slay Payments Satisfy § 2334(e)(1)(A)

Defendants do not contest Plaintiffs' factual showings that they each engaged in the conduct set out in 18 U.S.C. § 2334(e)(1)(A) by making qualifying payments—after April 18, 2020, and with full notice of the PSJVTA—to the designees or family members of at least 178 terrorists who killed or injured Americans. The evidence is overwhelming. *See* Pl. Mem. Ex. A; Yalowitz Decl. ¶¶ 4–201 & Exs. 1–26; Spitzen Decl. ¶¶ 12, 17, 42–45 & Ex. 13; Kaufman Decl. ¶¶ 7–8, 10; Yalowitz Supp. Decl. ¶ 2 & Ex. A.

Defendants relegate to a footnote their admission that the statute applies to them based on their post-enactment conduct, stating that "the Court can assume, without deciding, that Defendants have made at least one payment implicating the PSJVTA's payments provision." Def. Br. 2 n.1. But the Second Circuit charged this Court with "determining the applicability of the PSJVTA to this case," Mandate (Sept. 8, 2020) (D.E. 1006), a fact-based inquiry that turns on whether

Defendants engaged in specified conduct after specified dates following the law's enactment. This mandate contemplates findings, not assumptions. A plaintiff may carry its burden to establish personal jurisdiction "by a preponderance of the evidence," *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993), if it puts forward "undisputed facts" that jurisdiction exists, *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). And a defendant's failure to challenge the jurisdictional evidence means that there are no genuine factual disputes concerning jurisdiction. *Id.*; *see EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016). This Court should find that the jurisdictional facts presented by Plaintiffs have been established and that Plaintiffs have met their burden by a preponderance of the evidence.[1]

## II.    Defendants' Post-Enactment U.S.-Based Office And Activities Satisfy § 2334(e)(1)(B)

Defendants are subject to suit by operation of § 2334(e)(1)(B). We demonstrate below that (A) Defendants maintained an office and conducted activities in the United States; (B) their U.S. office and U.S. activities do not qualify for any statutory exception in the PSJVTA; and (C) if this Court determines that the current record does not support jurisdiction on the basis of Defendants' U.S. presence, discovery is warranted.

### A.    Defendants Maintained An Office And Conducted Activities In The United States

1.    ***Defendants' Office.***—Defendants do not deny that they own and maintain

---

[1]    Defendants call pay-for-slay a "social program[]" providing "welfare payments," Def. Br. 24, 26, but the statute does not turn on the *purpose* of the payments, other than requiring that they must be made "by reason of" the terrorist's incarceration or death, 18 U.S.C. § 2334(e)(1)(A)(i)–(ii), and Defendants do not dispute that their payments meet those terms. Nonetheless, the Court should not countenance Defendants' mendacity. These are not welfare payments; they are the product of an institutionalized reward system for terrorists, one that law-abiding individuals—and even street criminals—are ineligible for. Spitzen Decl. ¶ 12. As a court recently found, "the Palestine Martyrs' Families Foundation was created by the PLO to fulfill the criminal purpose of incentivising acts of terrorism against Israelis." *Khudeish v. The Minister of Citizenship and Immigration*, [2020] F.C. 1124, para. 28 (Can.).

an office located in a townhouse at 115 East 65th Street in Manhattan. Yalowitz Decl. ¶¶ 216–18. The PSJVTA covers a defendant that "continues to maintain any office, headquarters, premises, or other facilities or establishments *in the United States*" after January 4, 2020. 18 U.S.C. § 2334(e)(1)(B)(i) (emphasis added). The unambiguous meaning of "in the United States" is "present within its geographic borders," *United States v. Balde*, 943 F.3d 73, 81 (2d Cir. 2019), and the Upper East Side is within the geographic borders of the United States.

Nevertheless, Defendants claim that their townhouse is not "in the United States." Def. Br. 11. They base that remarkable proposition on a statement in *Klinghoffer* that a treaty "effectively removes control over the UN Headquarters and related areas from *the jurisdiction of* the United States," *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (emphasis added) (discussing UN Headquarters Agreement, June 26–Nov. 21, 1947, 61 Stat. 754, 756), and a pleading in which the United States read a pre-PSJVTA statutory reference to "within *the jurisdiction of* the United States" as inapplicable to the PLO's Observer Mission in New York, U.S. Resp. to Order at 5–6, *Klieman v. Palestinian Auth.*, No. 15–7034 (D.C. Cir. Feb. 15, 2019) (emphasis added). But Congress deleted the phrase "the jurisdiction of" after the Second Circuit held earlier in this case that a prior version of § 2334(e) did not reach any activities at the Upper East Side townhouse because it was not "within the jurisdiction of the United States." *Waldman v. Palestine Liberation Org.*, 925 F.3d 570, 575 (2d Cir. 2019), *vacated*, 140 S. Ct. 2714 (2020). Defendants contend that Congress achieved nothing by changing the phrase "within the jurisdiction of the United States" to "in the United States." Def. Br. 11. But courts must presume the opposite—that Congress "intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

Defendants also rely on a statement in *Klinghoffer* reading the UN Headquarters

4

Agreement to create a "legal fiction that the *UN Headquarters* is not really United States territory at all, but is rather neutral ground over which the United States has ceded control." 937 F.2d at 51 (emphasis added). But the UN *Headquarters* is different from UN *missions*, *see* 22 U.S.C. § 4309a(e), which enjoy no immunity "from being haled into court to answer for [] tortious conduct." *Foxworth v. Permanent Mission of Rep. of Uganda to United Nations*, 796 F. Supp. 761, 764 (S.D.N.Y. 1992). In any event, Congress removed any potential doubt about the plain-language meaning of "in the United States" by adding a separate rule of construction:

> Notwithstanding any other law (including any treaty), any office, headquarters, premises, or other facility or establishment within the territory of the United States that is not specifically exempted by paragraph (3)(A) shall be considered to be in the United States for purposes of paragraph (1)(B).

18 U.S.C. § 2334(e)(4). So even if the UN Headquarters Agreement somehow removed Defendants' townhouse from being "in the United States,"[2] Congress expressly abrogated the Headquarters Agreement by using the phrase "[n]otwithstanding any other law (including any treaty)." Such language is "the textual expression of intent to supersede treaty obligations" identified as dispositive in *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1469 (S.D.N.Y. 1988). Defendants say that paragraph (e)(4) is ineffective because it does not *specifically* reference the Headquarters Agreement, Def. Br. 11–12, but if that were true, then the reference to "any treaty" in paragraph (e)(4) would be meaningless.

      **2.**    *Defendants' Activities.*—A defendant also consents to personal jurisdiction in ATA cases if it "conducts any activity while physically present in the United States on behalf

---

[2]    *Compare* Def. Br. 11 *with* UN Headquarters Agreement § 7(c) ("Except as otherwise provided in this agreement or in the General Convention, the federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws").

of the Palestine Liberation Organization or the Palestinian Authority" after January 4, 2020. 18 U.S.C. § 2334(e)(1)(B)(iii). Defendants engaged in at least three distinct forms of activity after that date while physically present in the United States.

*First*, Defendants offered so-called "consular" services—such as notarizing birth certificates and other documents—through agents located in various cities around the United States such as Anaheim, California. Yalowitz Decl. ¶ 207 & Ex. 34; Yalowitz Supp. Decl. Ex. B. Plaintiffs challenged Defendants to come forward with evidence that they terminated such activities, Pl. Mem. 18, 24–25, and Defendants did not. Instead, they stated that "the PA and PLO have continued the same behavior in which they engaged before the PSJVTA." Def. Br. 49.

*Second*, Defendants made public appearances, including a press conference by Chairman Abbas on February 11, 2020, and (more recently) local appearances by Defendants' top official in the United States, Riyad Mansour, at an undergraduate seminar hosted by Seton Hall University on November 19, 2020, and a "webinar" hosted by the American-Arab Anti-Discrimination Committee on October 22, 2020. Yalowitz Decl. ¶ 208; Yalowitz Supp. Decl. ¶¶ 4–5 & Exs. C–D.

*Third*, Defendants maintained and regularly updated a website and social media accounts in English to influence the U.S. public and U.S. policymakers. Yalowitz Decl. ¶¶ 209–15 & Exs. 33, 35–58. Plaintiffs provided evidence that these communications were made at least in part by employees and agents physically in the United States and hosted on computers physically in the United States. *Id.* ¶¶ 210–11 & Ex. 37. Defendants did not contest this showing.

## B. No Statutory Exception Applies

Rather than contest the evidence of their post-enactment conduct within the United States, Defendants argue that their office and activities should be excluded as falling within one or another of three limited exceptions. But none of those exceptions applies here, and Defendants' attempt to

limit the statute's reach cannot be squared with Congress's instruction to construe the statute "liberally" in order "to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA, Pub. L. 116-94, div. J, tit. IX, § 903(d)(1)(A) (2019); 18 U.S.C. § 2333.

      **1.**     ***Exception (A).***— Subparagraph (3)(A) contains an exception for "any office, headquarters, premises, or other facility or establishment used *exclusively* for the purpose of conducting *official business* of the United Nations." 18 U.S.C. § 2334(e)(3)(A) (emphasis added). Defendants contend that their Upper East Side townhouse falls within subparagraph (A) on the theory that "all of the regular activities" taking place there were "official business of the United Nations." Def. Br. 12. But the record does not support that assertion.

      Defendants do not contest the evidence that their "Director of Public Relations" used the office to send out numerous tweets and Facebook posts. Yalowitz Decl. ¶ 212 & Exs. 33, 38. These propaganda statements cannot possibly have been "official business of the United Nations." Many made no mention of UN proceedings or UN activities of any kind. Indeed, some appear *specifically* directed toward influencing U.S. policy, such as Defendants' March 17 statement that "US lawmakers [had] call[ed] on their administration to oppose demolition of Palestinian homes," and their May 22 republication of selective portions of a letter signed by eighteen U.S. senators expressing "concern regarding unilateral annexation of Palestinian Territory." Yalowitz Dec. ¶ 215(c), (o). Defendants also used Twitter and Facebook to air political grievances for public relations purposes, in communications making absolutely no reference to UN proceedings or UN activities, but instead asserting (for example) that: "Seventy-two years ago, the Nakba (Catastrophe) that was forced upon the Palestinian people began with a systematic campaign of ethnic cleansing, expulsion, mass murder, theft, and destruction by Zionist militias that later formed the Israeli army," and that Israel is engaged in "institutionalized violence, terror and racism." *Id.* ¶ 215(k), (v).

Defendants even doubled down on their commitment to the terror salaries: "Palestinian prisoners are hostages to Israel's gratuitous cruelty and must be released." *Id.* ¶ 215(g).

Defendants do not attempt to justify these particular tweets and Facebook posts as "official business of the Untied Nations." Nor could they. They are propaganda—*i.e.*, "political material intended to influence the foreign policies of the United States," *Meese v. Keene*, 481 U.S. 465, 470 (1987). Under Second Circuit precedent, Defendants' "media" appearances and "other proselytizing" "may properly be considered as a basis for jurisdiction" precisely because such activities simply are "*not* conducted in furtherance of the PLO's [UN] observer status." *Klinghoffer*, 937 F.2d at 51–52 (emphasis added). In an analogous context, courts have held that mass mailings for the purpose of political influence is not "official business" of Congress. *E.g.*, *Rising v. Brown*, 313 F. Supp. 824, 827 (C.D. Cal. 1970) ("Appeals for political support … and reference to campaign opponents as such are all matters beyond the official business concept." (citation omitted)).

In support of their assertion that mass distribution of propaganda is "official business of the United Nations," Defendants invoke an opinion of the UN Office of Legal Affairs involving a traffic accident. Def. Br. 12. But that and other UN legal opinions make clear that the Office of Legal Affairs deems "official business of the United Nations" to be the "performance of official duties on behalf of the United Nations," 1968 U.N. Jurid. Y.B. 194–95, U.N. Doc. ST/LEG/SER.C/6, such as attending to "the business of the Organization" or undertaking "an official act," 1985 U.N. Jurid. Y.B. 148, U.N. Doc. ST/LEG/SER.C/23.[3] Mass-media distribution of propaganda that does not even mention the UN plainly does not fall into that category.

---

[3]     Contrary to Defendants' brief (at 12), the "traffic accident" case did not concern UN employees going on "vacation." It concerned a UN employee "driving to and from a project site." 1985 U.N. Jurid. Y.B. at 154; *see also* 1977 U.N. Jurid. Y.B. 247, U.N. Doc. ST/LEG/SER.C/15 ("travel between home and office is not in itself considered to be an official act").

Defendants also selectively quote (Br. p. 12) Section 12 of the Convention on Privileges and Immunities of the United Nations, July 9, 1070, 21 U.S.T. 1418, 1427–29, but the protections of that Convention extend only to "representatives of *members*" of the UN, *id.* (emphasis added), not to non-member observers or invitees—just like the Headquarters Agreement. *See Klinghoffer*, 937 F.2d at 48; *Kadic v. Karadzic*, 70 F.3d 232, 247–48 (2d Cir. 1995). The UN's Office of Legal Affairs has specifically told Defendants' own counsel that the PLO is "not entitled to diplomatic privileges or immunities under the Headquarters Agreement between the United Nations and the United States or under other statutory provisions applicable in the host State," and that its presence in New York beyond access to the UN itself reflects "merely gestures of courtesy by the United States authorities." 1979 U.N. Jurid. Y.B. 170, U.N. Doc. ST/LEG/SER.C/17.

Even if Defendants were UN Members (they are not), Section 12 applies only to words spoken or written by representatives of Members in the course of "discharging their duties." 21 U.S.T. at 1428. Defendants' "words" and "acts" in any capacity other than "discharging their duties" would not be protected by the Convention, even if it otherwise applied to them. For example, an employee of the Iranian Mission to the United Nations is currently under indictment for making media appearances and publishing articles intended to influence U.S. policy and U.S. public opinion without registering under the Foreign Agents Registration Act. *See* Indictment, *United States v. Afrasiabi*, No. 21-cr-0046 (ERK) (E.D.N.Y. Jan. 25, 2021).

Finally, Defendants contend that their change from "observer" to so-called "Non-member Observer State" renders *Klinghoffer* obsolete. Def. Br. 15. But being a "*non*-member State" plainly leaves them outside the protection of treaties that apply "only to representatives of members of the UN, not to observers such as the PLO." *Klinghoffer*, 937 F.2d at 48. "The fact that neither the PA nor the PLO is a Member of the United Nations bears enormous significance. … The PA

9

defendants' assertion that the PA is closer to full membership than it has been in the past does not make it a Member. Close is simply not good enough." *Ungar v. Palestinian Auth.*, 228 F. Supp. 2d 40, 49 (D.R.I. 2002). Nothing about non-member status gives Defendants a special diplomatic need to use their Upper East Side townhouse to issue tweets to thousands of followers accusing their political opponents of "ethnic cleansing, expulsion, mass murder" and "institutionalized violence, terror and racism," or calling incarcerated terrorists on their own payroll "hostages to Israel's gratuitous cruelty." Yalowitz Decl. ¶ 215(g), (k), (v).

> **2.      *Exception (B).*—** Subparagraph (3)(B) contains an exception for "any activity undertaken *exclusively* for the purpose of conducting official business of the United Nations." 18 U.S.C. § 2334(e)(3)(B) (emphasis added). Defendants do not dispute the evidence that they conducted extensive activities beyond their New York offices and do not explain how these activities could have been undertaken "exclusively" for "official business of the United Nations."

*First*, Defendants' nationwide network of agents acting as notaries and providing services such as certifying Palestinian birth certificates for use in the U.S., Yalowitz Supp. Decl. Ex. B, have nothing to do with the official business of the United Nations—maintaining "international peace and security," taking "appropriate measures to strengthen universal peace," solving "international problems" of universal concern, and functioning as "a centre for harmonizing the actions of nations in the attainment of these common ends." UN Charter art. 1. Notarizing a birth certificate in Anaheim, California, is not attending to the "official business" of the United Nations. Defendants point out that the Pacific-Island nation of Vanuatu has a single office in New York where *both* UN business *and* consular business are conducted, Def. Br. 20 n.16, but Vanuatu's administrative practice of combining UN and non-UN business at a single address plainly does not mean that run-of-the-mill notarization services are official UN business.

*Second*, for the reasons discussed above, Defendants' public appearances and media re-leases aiming to influence the U.S. public and U.S. policymakers were not "exclusively" for the purpose of conducting "official business" of the United Nations. Defendants have no special UN-based need to appear at college seminars, hold press conferences, and fire off grievance-laced tweets. As the Second Circuit held in *Klinghoffer*, such activities are "not conducted in furtherance of the PLO's [UN] observer status." 937 F.2d at 51.

     **3.**    ***Exception (F).***—Subparagraph (3)(F) contains an exception for "any per-sonal or official activities conducted ancillary to activities listed under this paragraph." 18 U.S.C. § 2334(e)(3)(F). Defendants contend that *all* their U.S. activities are "ancillary" to official UN business. This is incorrect for several reasons.

     *First*, subparagraph (3)(F) does not apply at all to Defendants' "office, headquarters, prem-ises, or other facilities or establishments in the United States." *Id.* § 2334(e)(1)(B)(i). As its title indicates, paragraph (3) distinguishes between "*locations*" and "*activities*." The paragraph treats *locations* in subparagraph (A). It treats *activities* in subparagraphs (B) through (F). Since subpar-agraph (F) concerns *activities*—not locations—it does not apply to the New York office—a loca-tion, not an activity. Consistent with the distinction in paragraph (3) between locations and activ-ities, paragraph (4) contains a "[r]ule of construction" concerning locations: any office or other facility within the territory of the United States "shall be considered to be in the United States for purposes of paragraph (1)(B)" unless it is "specifically exempted by Paragraph (3)(A)"—the ex-ception for locations. Defendants contend that the "use" of an office is an activity, Def. Br. 19–20, but that argument ignores the distinction in paragraph (3) between "locations" and "activities" and the instruction in paragraph (e)(4). Congress was within its rights to decide that an office must be used *exclusively* for the purpose of official business of the United Nations in order to benefit from

the statutory exemption. *See United States v. Palestine Liberation Org.*, 695 F. Supp. at 1470–71.

*Second*, the Court may reject out of hand Defendants' contention that notarizing birth certificates and the like is "ancillary" to the official business of the United Nations. Defendants never explain how notarizing a birth certificate in Anaheim is even tangentially related in any way to official UN business. It is not.

*Third*, Defendants' public appearances and media statements also are not "ancillary" to official UN business. "Ancillary" is defined as follows, according to one leading dictionary:

> 1. Subservient, subordinate, ministering (to)
>
> 2. *lit.* (after Latin.) Of or pertaining to maid-servants. …
>
> 3. Designating activities and services that provide essential support to the functioning of a central service or industry; also, of staff employed in these supporting roles. Now used esp. of non-medical staff and services in hospitals. …

*Oxford English Dictionary* (online ed.), https://www.oed.com/view/Entry/7258 (last visited Feb. 5, 2021). Defendants criticize Plaintiffs' reliance on the third sense, but providing essential support is hardly different from providing subservient, subordinate ministrations. The word's "main modern meaning" is thus "providing necessary support to the essential operations of a central organization." *Fowler's Dictionary of Modern English Usage* at 48 (4th ed. 2015); *see Webster's Third New International Dictionary* at 80 (2002) ("subordinate or auxiliary to a primary or principal legal document, proceeding, office, or officer").

The Supreme Court's decision in *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214 (1992), on which Defendants rely (Def. Br. 16), illustrates the correct usage of the word "ancillary." That case concerned the reach of the term "solicitation of orders" in 15 U.S.C. § 381, which the Court read as covering not only "actual requests for purchases," but also "activities that are *entirely ancillary* to requests for purchases." 505 U.S. at 226, 228 (emphasis by

the Court). The Court explained that an activity is "ancillary" to the main activity if "the only reason to do it is to facilitate" the main activity—which is to say, only if it "serve[s] no purpose apart from [its] role in facilitating" the main activity. *Id.* at 229, 234. Thus, "ancillary" activities were those serving "no independent business function apart from their connection to the soliciting of orders." *Id.* at 228–29. In contrast, "activities that the company would have reason to engage in anyway" were *not* "ancillary." *Id.* at 229. The Court then applied its holding to the activity of sales representatives replacing stale chewing gum at stores. The Court acknowledged that replacing the stale gum facilitated the solicitation of orders by encouraging consumers to buy gum; but the activity was not "ancillary" because it *also* resulted in sales, "thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting consumers." *Id.* at 233–34.

Here, Defendants' various activities are "ancillary" to official UN business *only* if they serve "no independent purpose" other than to facilitate UN business. For example, taking a cab to the UN Headquarters in order to deliver a speech is not "official business of the United Nations," *see* 1977 U.N. Jurid. Y.B. at 247, but it serves no independent purpose and therefore is "ancillary" to the conduct of official UN business. In contrast, tweeting out accusations that Israel engages in racism, ethnic cleansing, terror, and gratuitous cruelty and retweeting statements from U.S. politicians about the Defendants' relationship with Israel have an obvious independent purpose: to influence U.S. government policymakers and the U.S. public on matters of interest to the Defendants. Such activities are therefore *not* "ancillary" to the conduct of official UN business.

Defendants observe that *some* of their media releases were the retransmission of letters sent to the UN Secretary General "archived on the UN's website," and one of their public appearances was supposedly "held to discuss" UN proceedings. Def. Br. 13, 14 (emphasis omitted). These public-relations activities were not ancillary to official UN business. Defendants' propaganda may

have been *composed of* communications *originally* delivered to the UN, but the additional and separate act of retransmitting those communications to tens of thousands of "followers" on Facebook and Twitter served an additional and independent purpose—and therefore takes the activity outside the meaning of the word "ancillary," as in *William Wrigley*.

Even if there were some ambiguity over the meaning of the word "ancillary" in Exception (F), Congress itself has told the courts how to construe the statute: "liberally" in order "to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA, § 903(d)(1)(A); 18 U.S.C. § 2333. Defendants have nothing to say about this statutory text—they do not even cite it. Defendants also have nothing to say about the rule that courts assume that "the legislature did not intend [an] exception to be so broad as to leave nothing of the general principle," *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 91 (2d Cir. 2016), requiring courts to "place metes and bounds on [even] very broad language of [a] catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995).

The PSJVTA's legislative history also supports applying the main modern meaning of "ancillary," as explained by the bill's lead sponsor: "the exception in the language for 'ancillary' activities is intended to permit only essential support or services that are absolutely necessary to facilitate the conduct of diplomatic activities expressly exempted in the bill." 165 Cong. Rec. S7182 (daily ed. Dec. 19, 2019) (statement of Sen. Lankford). Defendants urge the Court to disregard the lead sponsor's views because he voted against the spending bill to which the PSJVTA was attached, but Senator Lankford was no opponent of his own bill—he contemporaneously explained that he viewed enactment of the PSJVTA as a "legislative success" even though he could not bring himself to vote in favor of adding "half-a-trillion dollars in new debt spending beyond the agreed-upon amounts." Yalowitz Supp. Decl. ¶¶ 6–7 & Exs. E–F. Consistent with Senator

Lankford's views, Senator Leahy (who voted against the bill in committee) also said he would support the bill on the floor and "get recourse for victims" if changes to the bill were made to protect the opportunity for "quiet discussions" at the UN.[4] Senator Leahy said nothing before the vote suggesting a desire to immunize inflammatory tweets. After the statute passed, Defendants' counsel lobbied the staff of Senator Leahy, Yalowitz Decl. Ex. 60, who then created a piece of "subsequent legislative history" on which Defendants rely. But Defendants have no response to the rule that courts do not credit "subsequent legislative history," *see Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1747 (2020), let alone subsequent legislative history with a tainted provenance.

Finally, in a footnote, Def. Br. 10 n.2, Defendants assert that the Court "is obligated" to adopt their construction of the statute to "avoid[] the constitutional questions" they raise. That is wrong as a matter of logic and law. Since Defendants concede that their pay-for-slay payments meet the terms of paragraph (1)(A), no constitutional question could be avoided by adopting their statutory-construction arguments about other provisions of the law. Moreover, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Here, Defendants' construction of the U.S.-presence provisions is implausible under rules of "ordinary textual analysis," making the canon of constitutional avoidance irrelevant. Moreover, the canon applies only to "*serious* constitutional doubts." *Id.* at 381 (emphasis added). As we discuss below, the constitutional issues in this case are not close.

---

[4]   "I want to be able to … try to get recourse for victims. I don't want to do something that may selectively close doors to the UN, where, as you know as well as I, many times it's the quiet discussions held between the United States and others at the UN that solve a lot of problems." Executive Business Meeting, Comm. on the Judiciary, at 1:02:37–1:03:07 (Oct. 17, 2019), https://www.judiciary.senate.gov/meetings/10/17/2019/executive-business-meeting.

15

### C. Alternatively, The Court Should Allow Discovery

If the Court concludes that notarizing routine documents, holding press conferences, and sending out propaganda to tens of thousands of followers for the obvious purpose of influencing U.S. policy are done "exclusively for the purpose of conducting official business of the United Nations," then it should permit discovery about Defendants' other U.S.-based activities.

In Plaintiffs' opening memorandum, Plaintiffs showed that Defendants are likely engaged in additional undisclosed activities in the United States, such as meetings "with advocates" and "civil society activities." Yalowitz Decl. ¶ 222 & Exs. 60–61. Defendants do not deny that they engaged in such activities. Instead, they carefully assert that their "*regular* activities" were "official business of the United Nations," Def. Br. 12 (emphasis added)—but the statutory text does not limit the jurisdictional trigger to "regular" activities (whatever that means). Nor do Defendants make any argument against discovery in their lengthy brief in this Court. In two other cases against Defendants, District Judges are currently supervising jurisdictional discovery concerning whether the PSJVTA has been met. Yalowitz Supp. Decl. Exs. G–H. If this Court has any doubt that Defendants have engaged in non-UN activities within the United States, discovery would be appropriate here as well.

### III. The PSJVTA Does Not Violate the Due Process Clause

A defendant is amenable to suit in any jurisdiction where it is at home (general jurisdiction); where its suit-related conduct creates a substantial connection with the forum (specific jurisdiction); or where it agrees to be sued (consent jurisdiction). *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). Defendants' principal argument for unconstitutionality (Def. Br. 20–37) is that any statute or rule providing for *consent jurisdiction* is automatically unconstitutional unless it also meets the test for *specific jurisdiction*. That argument

is frivolous; it improperly conflates two distinct bases for personal jurisdiction. It is black-letter law that a defendant may consent to personal jurisdiction even without minimum contacts. In such cases, due process requires fair warning and reasonableness—standards that the PSJVTA meets.

Defendants' fallback arguments are weaker still. They say that they were "effectively coerced," but they come nowhere close to demonstrating any form of coercion. They say that the PSJVTA imposes an "unconstitutional condition" on their enjoyment of benefits from the U.S. government, but they fail to identify any benefit they were receiving from the government pre-PSJVTA; and even if they did, the statute meets the relevant constitutional standard—reasonableness. And they say that the PSJVTA is unconstitutionally "retroactive," but the law's applicability depends on post-enactment conduct, and it easily satisfies the reasonableness standard.

## A. Consent Jurisdiction Does Not Require Minimum Contacts

"Consent is a traditional basis of jurisdiction that may be upheld even in the absence of minimum contacts between the defendant and the forum state." 16 Moore's Federal Practice—Civil § 108.53 (2020) (citation omitted); *see* 4 Wright & Miller's Fed. Prac. & Proc. § 1067.3 (4th ed. 2008); *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 112–9, at 1999 (2012 & Supp. 2017); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) ("unless the party consents to jurisdiction, there must be … minimum contacts") (citation omitted); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents."); *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 769 (Fed. Cir. 2016) (O'Malley, J., concurring) ("consent to jurisdiction is an alternative to the minimum contacts analysis"); *Rockefeller Tech. Invs. (Asia) VII v. Changzhou SinoType Tech. Co.*, 9 Cal. 5th 125, 140 (2020) ("even

one who has no minimum contacts with this state, may consent to jurisdiction in a particular case" (citation omitted)); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 50–51 (D.D.C.) ("Bank One argues that consent to the 'jurisdiction of the federal courts of the United States' does not mean what it says, but rather means 'consent to the jurisdiction of *some* federal court (e.g., a federal court having a connection to the matter at issue) though not necessarily *any and every* federal court.' The limitation that Bank One tries to read into the consent does not exist." (emphasis in original) (footnote and citation omitted)), *aff'd sub nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019); *Gas Sensing Tech. Corp. v. Ashton*, 353 F. Supp. 3d 1192, 1206 (D. Wyo. 2018) ("if there is no specific or general jurisdiction, personal jurisdiction will nevertheless exist if the defendant consents to jurisdiction"), *aff'd*, 795 F. App'x 1010 (10th Cir. 2020).

### 1. Consent Jurisdiction Remains Valid

Defendants cite snippets of cases to argue that the Supreme Court "abandoned fictional consent as the governing standard nearly 80 years ago." Def. Br. 52–53. But the casting aside of "legal fictions" has not done away with the exercise of jurisdiction on the basis of implied consent, which the Supreme Court has repeatedly upheld in the modern era. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948 (2015) (adopting an "implied consent" rule for submission to jurisdiction of bankruptcy court, so long as the implied consent was "knowing and voluntary"); *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court."); *see also Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185–86 (2016) (Fourth Amendment does not bar statutes providing that motorists are "deemed to have consented" to blood and breath alcohol tests, since the statutes are "reasonable" and have a "nexus"

to the privilege of driving, explaining "this standard does not differ in substance from the standard" under "Fifth Amendment jurisprudence").

If Defendants' argument was correct, then Rule 12(h)(1) would be unconstitutional, because a defendant could never consent to personal jurisdiction unless the court would have specific jurisdiction anyway. Yet a Rule 12(h) waiver presents no due process problem. *See Bauxites*, 456 U.S. at 708–09; *Oppel v. Empire Mut. Ins. Co.*, 92 F.R.D. 494, 497 n.11 (S.D.N.Y. 1981) (Weinfeld, J.). Similarly, forum selection clauses would not be enforceable in the absence of minimum contacts, but that is not true either. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589 (1991) ("Because we find the forum-selection clause to be dispositive of this question, we need not consider petitioner's [minimum contacts] constitutional argument as to personal jurisdiction."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) ("Where a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required") (footnote omitted).

As explained in Plaintiffs' opening memorandum, due process requires "fair warning that a particular activity may subject [defendants] to the jurisdiction of a foreign sovereign," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (alterations and quotation marks omitted), and bars "certain arbitrary, wrongful government actions," *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Defendants concede that "[n]either of these" standards "is actually relevant" to their arguments. Def. Br. 35 (emphasis omitted).

### 2. The PSJVTA Meets The Due-Process Requirements Identified in *Brown v. Lockheed Martin*

Relying principally on *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), Defendants assert that *Daimler v. A.G. Bauman*, 571 U.S. 117 (2014), requires the Court to

19

invalidate the PSJVTA. Def. Br. 46–50. In *Brown*, the court construed Connecticut's ambiguous registration-to-do-business statute as not providing consent to general jurisdiction, because "constitutional concerns" about such a statute should be "avoided absent a clearer statement by the state legislature or the Connecticut Supreme Court." 814 F.3d at 623. Defendants also cite *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492 (2d Cir. 2020), which followed *Brown* by similarly construing the New York registration-to-do-business statute so that registration "does not constitute consent" to general jurisdiction, in order to avoid a constitutional question about a statute whose interpretation involved "uncertainty [and] ambiguity." *Id.* at 499 (quotation marks omitted).[5]

Nothing in either case is inconsistent with the PSJVTA. To the contrary, *Brown* expressly recognized the rule that "a defendant may consent to personal jurisdiction *without regard* to what a due process analysis *of its contacts* would yield." 814 F.3d at 641 (emphasis added). And, rather than focusing on "minimum contacts," *Brown* described the relevant due-process concerns in terms of fair warning and arbitrary government action—standards that the PSJVTA easily meets.

With regard to fair warning, *Brown* observed that the statute at issue contained no "express language alerting the potential registrant that by complying with the statute and appointing an agent it would be agreeing to submit to the general jurisdiction of the state courts," *id.* at 636, and expressed concern about construing the statute to create jurisdiction based "on a slender inference of consent pulled from routine bureaucratic measures that were largely designed for another purpose entirely." *Id.* at 639. *Brown* also expressed concern about whether the statue "permit[ted] a court to adjudicate any cause of action against the corporate defendant, wherever arising, and

---

[5] Defendants also cite other cases that follow *Brown*. *E.g., Waite v. All Acquisition Corp.*, 901 F.3d at 1318; *Lanham v. BNSF Ry.*, 939 N.W.2d 363, 372 (Neb. 2020); *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 139–42 (Del. 2016).

whoever the plaintiff," *id.* at 624, even where the defendant had provided only "perhaps unwitting" consent, *id.* at 637. In contrast, the PSJVTA focuses expressly on personal jurisdiction and describes in advance *exactly* which defendants are subject to its terms (these defendants) and *exactly* what conduct will be deemed consent to personal jurisdiction in the courts of the United States. The PSJVTA also specifies a limited set of claims for which a defendant will be deemed to have consented to personal jurisdiction (civil cases under the ATA), and it limits the class of eligible plaintiffs (U.S. nationals and their estates, survivors, and heirs).

With regard to arbitrary government action, *Brown* expressed concern about permitting "the exercise of general jurisdiction over a corporation in a state in which the corporation had done *no business at all*," which would no doubt reach "circumstances where the state's interests seem limited," *Id.* at 637. In contrast, the interests of the United States here are extremely robust. As we explained in our opening memorandum, the ATA and PSJVTA advance the United States' interests in: (1) combating terrorism by imposing civil liability on the PLO and PA in cases when they or their employees or agents engage in or provide material support for terrorism; (2) protecting U.S. citizens wherever in the world they travel; (3) supporting fair compensation for American victims of terrorism from those responsible for their losses; and (4) achieving a Middle East peace agreement without disruption by grave acts of violence committed by terrorists. As the United States has explained with regard to the PSJVTA's predecessor, this statute "arises in a unique foreign affairs context," involving "a limited set of anti-terrorism cases against *sui generis* foreign non-sovereign entities that have no right to operate in the United States." U.S. Br. at 15, *Klieman v. Palestinian Auth.*, No. 15–7034 (D.C. Cir. March 13, 2019). "In this foreign affairs context, in contrast to the limited and mutually exclusive sovereignty of the several states, Congress may deem certain actions of defendants like the Palestinian Authority and the Palestine Liberation

Organization to be consent to personal jurisdiction in the United States, even if a State cannot enact similar legislation." *Id.*; *accord* U.S. Br. at 32, *Ford Motor Co. v. Montana Eighth Judicial Circuit Court*, No. 19–368 (U.S. Mar. 6, 2020) ("the United States' constitutional powers and special competence in matters of foreign affairs and international commerce, in contrast to the limited and geographically cabined sovereignty of each of the several States, would permit the exercise of federal judicial power in ways that have no analogue at the state level").

Finally, *Brown* identified an additional potential concern, saying that a state's consent-to-general-jurisdiction-by-registration statute would present a "difficult constitutional question about the validity of such consent after *Daimler*," given "*Daimler*'s strong admonition against the expansive exercise of general jurisdiction." 814 F.3d at 640. In this regard, the Second Circuit's analysis about whether *Daimler* would be extended was tentative and limited. The court identified "potential" and "unresolved constitutional issues." *Id.* at 638. And in light of cases allowing consent jurisdiction (including the Supreme Court's *Bauxites* decision), *Brown* explained that "a carefully drawn state statute that expressly required consent to general jurisdiction as a condition on a foreign corporation's doing business in the state, at least in cases brought by state residents, might well be constitutional." *Id.* at 641 (quotation marks omitted). *Brown*'s tentative analysis thus focused on the interest of a defendant in avoiding "the coercive power of a State that may have little legitimate interest in the claims in question." *See Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017).

Defendants do not explain why they think *Daimler* should be extended to limit the power of Congress in the consent context without similarly focusing on the United States' interest in the dispute. They simply assert, without analysis, that Congress may never provide for jurisdiction over a foreign person who, say, "conducts financial transactions in dollars" or "uses [U.S.-origin

22

software] licensed by a company in the U.S." without also showing that their "primary conduct" satisfies the "minimum contacts" required for specific jurisdiction. Def. Mem. 49–50. Tellingly, Congress has actually enacted statutes much like those in Defendants' hypothetical—permitting civil jurisdiction over foreign persons who use U.S. currency and U.S.-origin software.[6] No court has invalidated these statutes, which protect national security and implement foreign policy. Doing so on the basis of decisions regarding state-court jurisdiction would make no sense in light of the very different federal interests at stake, because "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis," *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality), and because the structural limits on the power of individual States by our system of federalism "may be decisive," *Bristol-Myers Squibb*, 137 S. Ct. at 1780. As the United States explained in *Daimler* itself, when it comes to federal statutes, "the political Branches are well positioned to determine when the exercise of personal jurisdiction will, on balance, further the United States' interests," and the courts should give "proper regard" to "Congress's judgment concerning relevant contacts with a forum for jurisdictional purposes." U.S. Br. at 3, *Daimler*, No. 11–965 (U.S. July 6, 2013).

---

[6]     For example, Congress recently authorized subpoenas to "any foreign bank that maintains a correspondent account in the United States" (without which U.S.-dollar transactions are impossible) for "any records relating to the correspondent account *or any account* at the foreign bank" in civil and criminal investigations. Pub. L. 116–283, § 6308(a) (Jan. 1, 2021) (amending 31 USC 5318(k)(3)) (emphasis added). Congress passed this statute in support of extraterritorial laws designed to deny rogue actors "access to American markets *and currency.*" *See In re Sealed Case*, 932 F.3d 915, 919 (D.C. Cir. 2019) (emphasis added). Similarly, the Arms Export Control Act and the Export Control Reform Act authorize the President to impose civil and criminal penalties on *any* person who transfers specified U.S.-origin technology (including software)—even if the transfer takes place *outside* the United States between two foreign persons. *See* 22 U.S.C. § 2778(a)(1), (c)–(e); 50 U.S.C. §§ 4801(9)(B), 4812(a)(1); 15 C.F.R. §§ 734.14(b), 736.2(b)(2); 22 C.F.R. §§ 120.19, 123.9, 127.10.

## B.     Defendants' Fallback Arguments Are Meritless

Defendants offer three fallback arguments under the Due Process Clause—"coercion," "unconstitutional conditions," and "retroactivity." We address each in turn.

### 1.     Defendants' "Coercion" Argument Fails

Relying on criminal and civil cases, Defendants assert that their consent was not "free and voluntary," on the theory that they were "coerced." Def. Br. 46–51. That assertion is absurd. Coercion is "the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh [] options rationally." *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988); *see Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) ("economic duress" requires "(1) a wrongful threat that (2) precluded the exercise of [] free will").

There are no facts in the record supporting a finding that comes anywhere close to coercion. Defendants admit that they have "continued the same behavior in which they engaged before the PSJVTA." Def. Br. 49. That is a misleadingly passive way to acknowledge that Defendants have *chosen* to continue paying financial rewards to terrorists and their designees, and have *chosen* to continue conducting non-UN activities within the United States. The PSJVTA did not overwhelm their free will—whether by force, threat, or otherwise. In fact, *before* the PSJVTA's April 18 trigger date, Defendants insisted that whether, "sometime in the future, the factual predicates of the PSJVTA might come to pass" was nothing but "speculation." Br. in Opp. 3, *Sokolow v. Palestine Liberation Org.*, No. 19–764 (U.S. Mar. 13, 2020). Then, after April 18, Defendants made repeated, defiant statements insisting that they would maintain their pay-for-slay programs come what may, which—combined with the breathtaking scope of those programs—leave no doubt that Defendants' conduct was voluntary.

24

With regard to their U.S. activities, Defendants point to cases stating that "the option of refraining from doing business in a state is not really a viable one for most corporations." *In re Asbestos Prods. Liab. Litig.*, 384 F. Supp. 3d 532, 542 (E.D. Pa. 2019) (quotation marks and internal alterations omitted). Defendants' cases are in the minority,[7] but the constitutionality of state business-registration statutes is simply not at issue here, because Defendants are decidedly *unlike* business organizations with constitutionally protected rights to do business in interstate commerce. The PLO and its affiliates, in contrast to business organizations, are presumptively *prohibited* from expending any funds or establishing or maintaining any office in the United States, 22 U.S.C. § 5202, including even an "information office." *Palestine Information Office v. Shultz*, 853 F.2d 932, 934 (D.C. Cir. 1988). Nothing in the Constitution gives them a right to enter the United States or operate here—much less to engage in non-UN activities. *United States v. Palestine Liberation Org.*, 695 F. Supp. at 1471. Indeed, Defendants appear to have refrained from non-UN activities from 1988 until 1993. *See Klinghoffer v. S.N.C. Achille Lauro*, 816 F. Supp. 930, 932 (S.D.N.Y. 1993) ("[T]his court found that the PLO was doing sufficient non-United Nations-related business within the state to make it 'present' for purposes of New York long-arm jurisdiction when the cases brought before 1988 were filed, but those filed thereafter made no such showing and were

---

[7]     *See, e.g., Acorda Therapeutics*, 817 F.3d at 767 (O'Malley, J., concurring) ("*Daimler* did not overrule the line of Supreme Court authority establishing that a corporation may consent to jurisdiction over its person by choosing to comply with a state's registration statute"); *Replica Auto Body Panels & Auto Sales Inc. v. inTech Trailers Inc.*, 454 F. Supp. 3d 458, 463 (M.D. Pa. 2020) ("the vast majority of cases have concluded that consent is an alternative basis for general jurisdiction not addressed by, and therefore not abrogated by, *Daimler*"); *Butler v. Daimler Trucks N. Am.*, 433 F. Supp. 3d 1216, 1238 (D. Kan. 2020) (Kansas consent-by-registration statute comports with due process); *Rodriguez v. Ford Motor Co.*, 458 P.3d 569, 578 (N.M. Ct. App. 2019) (New Mexico); *Am. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-cv-693, 2019 WL 135699, at *3 (D. Minn. Jan. 8, 2019) (collecting cases); *Gorton v. Air & Liquid Sys. Corp.*, 303 F. Supp. 3d 278, 298 (M.D. Pa. 2018); *Bors v. Johnson & Johnson*, 208 F. Supp. 3d 648, 655 (E.D. Pa. 2016); *Mitchell v. Eli Lilly & Co.*, 159 F. Supp. 3d at 967, 977 (E.D. Mo. 2016).

dismissed.").

Defendants had a "viable" choice to refrain from paying terrorists a monthly salary and to limit their activities to those necessary to conduct official UN business; comparing themselves to a corporation being forced to "refrain from doing business in a state" is beyond the pale.

### 2. Defendants' "Unconstitutional Conditions" Argument Fails

Defendants invoke the unconstitutional conditions doctrine. Def. Br. 56–59. The doctrine does not apply here; and if it did, it would be easily satisfied.

The unconstitutional-conditions doctrine has been applied to limit when the government may condition the receipt of a government benefit on the relinquishment of a constitutional right. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013). It applies *only* if the government is denying a "benefit" to a person who decides to exercise a constitutional right. *Id.* at 604. And it allows the government to impose conditions on the receipt of benefits, "so long as there is a 'nexus' and 'rough proportionality'" between the condition and the "social costs" imposed by private conduct. *Id.* at 605–06.

Here, although Defendants identify a constitutional right they have relinquished—the right to object to personal jurisdiction—they fail to identify a "benefit" they are receiving from the government. Defendants assert that freedom to operate their pay-for-slay programs is a "benefit" they receive from the Oslo Accords, but the United States is not a party to that agreement.[8] Defendants also claim that they are benefiting from a supposed right to operate in the United States free of "Congressional regulation of the activities of their UN delegation," Def. Br. 57, but that is incorrect. Under the Foreign Missions Act, "[t]he conduct of any activities, or the acquisition of

---

[8]    It is difficult to understand how Defendants think that United States approves of their pay-for-slay program anyway, as it has enacted statutes designed to halt such payments. *See* Pl. Mem. 33 & n.13 (discussing Taylor Force Act, 22 U.S.C. § 2378c-1).

any benefits … outside the United Nations Headquarters District by any individual … may be permitted or denied or subject to reasonable regulation, as determined to be in the best interests of the United States." 22 U.S.C. § 4309A(b)(1). Defendants are also subject to 22 U.S.C. § 5202, "a wide gauged restriction of PLO activity within the United States," that may be enforced to "effectively curtail *any* PLO activities in the United States, aside from the Mission to the United Nations." *United States v. Palestine Liberation Org.*, 695 F. Supp. at 1471 (emphasis added). Even Defendants' East 65th Street townhouse is owned as a matter of the grace, not entitlement, subject to forced sale if "necessary to protect the interests of the United States." 22 U.S.C. § 4305(b)(3).

Finally, the unconstitutional conditions doctrine would be easily satisfied here even if it applied. Government conditions on the receipt of a benefit will be sustained if they serve a "legitimate purpose" and it is "reasonable" to conclude that the conditions "would promote that purpose." *W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 668 (1981). The doctrine thus restrains government action only where the condition "has little or no relationship" to the government's interest. *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994); *see Koontz*, 570 U.S. at 605–06 (conditions upheld if there is a "'nexus' and 'rough proportionality'").

Defendants concede that the PSJVTA clears "the low hurdle of rationality." Def. Br. 36. They argue that the government may *never* condition the receipt of a benefit on the relinquishment of a constitutional right, no matter what the governmental interests at stake. Def. Br. 57–58 ("Congress cannot threaten to take away constitutional rights as a way of forcing consent to regulation."). That is not the law. For example, "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood alcohol content] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." *Birchfield*, 136 S. Ct. at 2169 (quotation marks omitted). These laws have been upheld because

the condition on drivers' constitutional rights is "needed for the promotion of legitimate governmental interests." *Id.* at 2176 (quotation marks omitted).

### 3. Defendants' "Retroactivity" Argument Fails

Defendants assert that the PSJVTA "cannot be applied retroactively" under the Due Process Clause. Def. Br. 51–56. Defendants' argument is misleading and incorrect. Congress precisely defined which aspects of the PSJVTA apply *prospectively* and which apply *retrospectively*: (a) the law applies *only if* Defendants engage in specified *post-enactment* conduct; and (b) if such post-enactment conduct occurs, the law provides a forum in specified cases regardless of the date of the underlying conduct. There is nothing unconstitutional about either aspect of the statute.

### a. Only Post-Enactment Conduct Triggers The PSJVTA

The PSJVTA is purely prospective in defining when the jurisdictionally relevant conduct must occur: "after the date that is 120 days after the date of the enactment of the Promoting Security and Justice for Victims of Terrorism Act of 2019" in the case of pay-for-slay payments, 18 U.S.C. § 2334(e)(1)(A); and "after 15 days after the date of enactment of the Promoting Security and Justice for Victims of Terrorism Act of 2019" in the case of U.S. presence, *id.* § 2334(e)(1)(B).

Defendants' brief ignores this obvious feature of the statute. Defendants do not cite a single case identifying a retroactivity problem where the conduct-manifesting consent occurs after the enactment of the jurisdictional statute, as here. To the contrary, the main case on which they rely *approved* of a statute that "gave the nonresident … a choice," because "the nonresident was free to avoid the risk of litigation" by modifying its conduct. *Krueger v. Rheem Mfg. Co.*, 149 N.W. 2d 142, 146 (Iowa 1967). The court explained it would be unjust to infer consent *solely* from pre-enactment conduct, "for such a retrospective construction would have deprived [the nonresident] of any choice in the matter." *Id.* (quoting *Harrison v. Matthews*, 235 Ark. 915, 918 (1962)); *see*

*Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583, 586 (2d Cir. 1965) (no due process violation in applying jurisdictional statute to cause of action arising before enactment unless "the acts serving as the predicate for jurisdiction under the new section are shown to have been carried out in justifiable reliance on the prior law") (quoting *Simonson v. Int'l Bank*, 14 N.Y.2d 281, 290 (1964)). Here, Defendants' "clear choice" is starkly illustrated by the difference in their conduct now as compared to their conduct in response to the Anti-Terrorism Clarification Act of 2018, when they stopped accepting U.S. assistance in response to a statutory change. *See Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1128 (D.C. Cir. 2019), *vacated*, 140 S. Ct. 2713 (2020).

### b.    The PSJVTA Violates No Anti-Retroactivity Rule

In challenging retroactive legislation under the Due Process clause, "'the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.'" *Eastern Enterprises v. Apfel*, 54 U.S. 498, 524 (1998) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–18 (1976)). Retroactive statutes "may be invalidated on due process grounds only under the most egregious of circumstances." *Id.* at 550 (Kennedy, J., concurring). Even legislation with a retroactive effect will satisfy due process if the "retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730 (1984).

Defendants do not argue that Congress acted irrationally. Instead, they assert that the PSJVTA "upsets fundamental interests in finality, repose, and settled expectations." Def. Br. 56. But a statute that applies only after the regulated party makes an informed, voluntary choice to engage in post-enactment conduct plainly does no such thing.

Even on its own terms, Defendants' assertion is stunningly misleading. Defendants certainly had no "settled expectations" with regard to their liability-creating conduct. Their conduct

occurred in the years 2002 to 2004—many years after it was criminalized under U.S. law, Pub. L. 99–399, § 1202 (Aug. 27, 1986); many years after Congress created a private right of action for U.S. citizens, Pub. L. 102–572, title X, § 1003 (Oct. 29, 1992); and even after international conventions outlawed it around the globe.[9] Moreover, at the time of Defendants' conduct in this case, they had been uniformly held subject to personal jurisdiction in U.S. courts for committing acts of terror outside the United States, so they had no expectation of immunity from U.S. jurisdiction. *See Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 179 (D.D.C. 2004); *Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Klinghoffer*, 795 F. Supp. at 114. The Second Circuit's 2016 jurisdictional ruling came as an eleventh-hour reprieve, due to a sea change in the law of personal jurisdiction. In the PSJVTA, Congress *vindicated* the parties' expectations circa 2002–2004 by providing a U.S. forum for U.S. terror victims, if the Defendants elected to engage in conduct specified in the PSJVTA—which they did.

Finally, Defendants assert that the Due Process Clause somehow engrafts a "minimum contacts" prerequisite to the rule that "statutes conferring jurisdiction generally may apply retroactively." Def. Br. 51. Defendants simply misread the cases. Defendants rely on *McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957), but there the Court treated retroactivity *separately* from the minimum-contacts analysis and nowhere said that minimum contacts are even remotely relevant on the issue of retroactivity, merely holding that:

> The statute was remedial, in the purest sense of that term, and neither enlarged nor impaired respondent's substantive rights or obligations under the contract. It did nothing more than to provide petitioner with a California forum to enforce whatever substantive rights she might have against respondent.

---

[9]    Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2179 U.N.T.S. 197; Convention for Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 258.

*Id.* at 224. Since *McGee*, the Supreme Court has repeatedly "sanctioned the application to all pending and future cases of intervening statutes that merely confer or oust jurisdiction." *Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004) (alterations and quotation marks omitted); *see Landgraf v. USI Film Prod.*, 511 U.S. 244, 274 (1994) ("We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed."). With a straight jurisdiction-conferring statute like the PSJVTA, "no retroactivity problem arises because the change in the law does not 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Hamdan v. Rumsfeld*, 548 U.S. 557, 577 (2006) (quoting *Landgraf*, 511 U.S. at 280). No reading of these cases supports the assertion that this straightforward rule applies only where the minimum-contacts test is *also* met.

## IV. The PSJVTA Does Not Invade The Judicial Power

Defendants press two separation-of-powers theories: (a) that the PSJVTA impermissibly attempts to alter a constitutional standard announced by the Judiciary; and (b) that the PSJVTA is a legislative transgression on the Judiciary's power to have the final word. They are wrong.

### A. Congress Did Not "Legislatively Supersede" A Constitutional Rule

Contrary to Defendants' assertion, Congress did not "legislatively supersede" a constitutional rule. Def. Br. 38 (quoting *Dickerson v. United States*, 530 U.S. 428, 437 (2000)). The Second Circuit held in this case that this Court "could not constitutionally exercise either general or specific personal jurisdiction over the defendants in this case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 344 (2d Cir. 2016). The PSJVTA does not purport to alter that holding. Instead, it created a new statutory basis under which Defendants may consent to personal jurisdiction in ATA suits through certain post-enactment conduct. The questions here—whether Defendants have

31

consented to personal jurisdiction under the PSJVTA by engaging in such conduct, and whether the PSJVTA *itself* is constitutional—have not been addressed by the Second Circuit.

Defendants also assert (at 40) that "Congress cannot redefine the constitutional protections of jurisdiction due process by statute." But that is not at all what Congress did with the PSJVTA. The PSJVTA does not "redefine" any constitutional standard; it simply provides a new legal ground on which specified post-enactment conduct will be deemed to manifest consent to personal jurisdiction for a specific class of cases. As explained above, *supra* Section II.A, this consent pro-vision fully satisfies due process because it gives Defendants fair warning and because it has a reasonable relationship with the government's legitimate interests. Nothing in the statute purports to change the due-process standards that apply.

The cases Defendants cite (at 38–39) illustrate this point. In both *City of Boerne v. Flores*, 521 U.S. 507 (1997), and *Dickerson*, 530 U.S. at 438, the Supreme Court held that Congress could not legislatively alter constitutional standards articulated by the Supreme Court and replace them with conflicting standards devised by the legislature. The PSJVTA does not purport to do that.

Nor does the PSJVTA "*effectively* compel[] reversal of the federal courts' due process holdings." Def. Br. 41 (emphasis added). The Second Circuit's holdings concerning general juris-diction and specific jurisdiction are law of the case. The Second Circuit and Supreme Court reo-pened the case because Defendants chose not to alter their conduct in response to the PSJVTA—in contrast to their decision in 2019 to stop accepting U.S. assistance in order to avoid application of the Anti-Terrorism Clarification Act, *Klieman*, 923 F.3d at 1128. The fact that Defendants chose to continue the conduct specified in the PSJVTA does nothing to undermine, reverse, or overrule the Second Circuit's holdings regarding general and specific jurisdiction.

Almost as a throw-away, Defendants also say that the PSJVTA leaves "'the court no

adjudicatory function to perform.'" Def. Br. 41 (quoting *United States v. Sioux Nation*, 448 U.S. 371, 392 (1980)). Wrong again. This Court is currently engaged in precisely such an "adjudicatory function" to determine whether the factual predicates of the PSJVTA have been satisfied. To be sure, Congress may not enact a law that says, "in *Smith v. Jones*, Smith wins," because such a law "compels findings or results under old law" and "fails to supply any new legal standard effectuating the lawmakers' reasonable policy judgment." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1326 (2016) (alterations and quotation marks omitted). That is not at all what the PSJVTA did. It set up a *new* legal standard for consent, with a focus exclusively on *post-enactment* conduct.

### B. The PSJVTA Does Not Require The Judiciary to Reopen A Closed Case or Reinstate A Supposedly "Voided Judgment" Theory

A statute violates the separation of powers if it *requires* federal courts to reopen final judgments on the merits. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 215 (1995); *United States v. Sioux Nation*, 448 U.S. at 406–07. Defendants no longer argue that the PSJVTA requires the reopening of a final judgment on the merits. Now they say only that applying the statute to reopen the judgment in this case "would [unconstitutionally] allow Congress to effectively compel judicial action through a wink and a nod." Def. Br. 44. That is nonsense. If this Court's original judgment is reinstated, it will be because the *Judicial Branch* exercised its own discretion. In the words of *Plaut*, the PSJVTA "does not impose any legislative mandate to reopen upon the courts, but merely reflects and confirms the courts' own inherent and discretionary power … to set aside a judgment." 514 U.S. at 233–34. *Plaut* does not apply where "the Second Circuit—*not Congress*—directed that the judgments … be reopened." *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 661 (S.D.N.Y. 2018) (emphasis in original).

Defendants also assert that the Second Circuit is powerless "to resurrect or reinstate any of

this Court's earlier decisions—including the result of the prior jury trial," on the theory that judgments entered without jurisdiction are "void." Def. Br. 42–43. Defendants do not explain what this has to do with the separation of powers or the constitutionality of the PSJVTA. Even if Defendants were correct about what should happen to the jury verdict once this case is reopened—though they are not—that has no bearing on the issues committed to this Court by the Second Circuit's remand order. In any event, Defendants are obviously wrong in asserting that appellate courts are inherently powerless to cure jurisdictional defects in district court judgments. The Supreme Court and Second Circuit have repeatedly exercised judicial discretion to do just that.

For example, in *Mullaney v. Anderson*, the Supreme Court exercised discretion to add parties in order to cure the plaintiff's lack of standing, explaining: "To dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration." 342 U.S. 415, 417 (1952). In *Newman-Green, Inc. v. Alfonzo-Larrain*, the Supreme Court salvaged jurisdiction by dismissing a non-diverse party that had been in the case at the time of judgment in the district court. 490 U.S. 826, 838 (1989). The Court explained it was exercising a "deeply rooted understanding of appellate power," *Id.* at 836, and focused on the practicality that "requiring dismissal after years of litigation would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention," where the plaintiff could "simply refile in the District Court." *Id.* at 837. And in *United Republic Insurance Co. v. Chase Manhattan Bank*, 315 F.3d 168 (2d Cir. 2003), the Second Circuit recalled its mandate after learning that subject-matter jurisdiction may have been lacking at the time the district court entered judgment. But the Circuit did not vacate the district-court judgment as "void"; it remanded to the district court to determine whether jurisdiction could be salvaged by dismissing a non-diverse party, explaining: "Once a district court has proceeded to final judgment,

considerations of finality, efficiency, and economy become overwhelming, and federal courts must salvage jurisdiction where possible." *Id.* at 170 (quotation marks omitted).

Other examples abound. Personal jurisdiction may be established on appeal by a defendants' conduct during appellate proceedings, even where the district court lacked such jurisdiction at the time of judgment. *See Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1029 (D.C. Cir. 2020) ("a defendant may consent to personal jurisdiction "at any stage of a proceeding, including … on appeal"). Indeed, the very notion that a party can consent to jurisdiction on appeal *presupposes* that personal jurisdiction did not exist at the time of judgment; but such consent *still* suffices to establish personal jurisdiction. And when Congress makes an intervening change in controlling law, a court's jurisdiction may appear for the first time on appeal, *United States v. Alabama*, 362 U.S. 602, 604 (1960), or even on remand after the mandate has been recalled, *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 661.

As a counter-example, Defendants rely on *Roman Catholic Archdiocese of San Juan v. Feliciano*, 140 S. Ct. 696, 700 (2020), and a similar case. Def. Br. 42–43. But those cases concerned orders of courts divested of subject-matter jurisdiction by removal to federal court. Such cases are not instructive because the jurisdictional defect could not be cured by an appellate court.[10]

## CONCLUSION

For the foregoing reasons, and the reasons stated in Plaintiffs' opening memorandum, the Court should find that Defendants have consented to jurisdiction under the PSJVTA and hold that the PSJVTA is constitutional.

---

[10]    Defendants' reliance on a non-precedential case from a Hawaiian state court is also misplaced. That case held that the defendant did not waive invalid service by failing to raise the defense in a motion to vacate the judgment. *See G.L. v. D.L.*, No. CAAP-15-485 (Haw. Ct. App. Nov. 22, 2017).

Dated: February 9, 2021
New York, New York

Respectfully submitted,

ARNOLD & PORTER
    KAYE SCHOLER LLP

By: _____

    Kent A. Yalowitz
    *Kent.Yalowitz@arnoldporter.com*
    David Russell
    *David.Russell@arnoldporter.com*
    250 West 55th Street
    New York, NY 10019
    T: (212) 836–8344

    Dirk C. Phillips
    *Dirk.Phillips@arnoldporter.com*
    Stephen K. Wirth
    *Stephen.Wirth@arnoldporter.com*
    601 Massachusetts Ave. NW
    Washington, DC 20001
    T: (202) 942–6739