# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                                            )
MIRIAM FULD, *et al.*,                      )
                                            )
                        Plaintiffs,         )          Case No. 20-cv-3374 (JMF)
                                            )
        v.                                  )
                                            )
THE PALESTINE LIBERATION                    )
ORGANIZATION and                            )
THE PALESTINIAN AUTHORITY,                  )
                                            )
                        Defendants.         )
_____   )


## **DEFENDANTS' SUPPLEMENTAL BRIEF ON THE PSJVTA**

**SQUIRE PATTON BOGGS (US) LLP**

Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Joseph S. Alonzo (JA-1378)
joseph.alonzo@squirepb.com
1211 Avenue of the Americas
26th Floor
New York, NY 10036
Telephone: (212) 872-9800
Facsimile: (212) 872-9815

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................... 1

Legal Standard .......................................................................................................... 3

Argument ................................................................................................................... 3

    I.    Exercising Personal Jurisdiction over Defendants Would Violate Due
Process ........................................................................................................... 3

        A.    Defendants Lack Sufficient Contacts with the United States to
Support the Exercise of Personal Jurisdiction under the Due
Process Clause ................................................................................... 3

        B.    Defendants Have Not "Consented" to Personal Jurisdiction ................... 5

            1.    Consent to Jurisdiction Must Be Free and Voluntary ................... 5

            2.    Implied Consent Statutes Must Offer A Benefit That The
Defendant May Accept to Demonstrate Consent To
Jurisdiction ................................................................................... 8

            3.    Defendants Have Not Impliedly Agreed to Personal
Jurisdiction ................................................................................. 11

        C.    Applying the PSJVTA's "Deemed Consent" Provision to
Defendants in this Case Would Be Unconstitutional ........................... 14

            1.    The Fiction of "Deemed Consent" Cannot Displace the
Requirements of the Due Process Clause ................................... 14

            2.    Allowing Congress to Dictate that Defendants Shall Be
"Deemed" to Have Consented to Personal Jurisdiction in
this Case Would Violate Separation of Powers .......................... 19

    II.    This Court Does Not Need to Consider the PSJVTA's U.S.-Conduct
Prong, Which Has Not Been Met in Any Case .................................................. 21

        A.    Palestine's UN Mission Is Not "In the United States" and Is
Specifically Exempted under the PSJVTA ............................................. 21

        B.    The Alleged Activities Do Not Create Jurisdiction under the
PSJVTA ............................................................................................ 22

Conclusion ............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Dairy Queen Corp. v. W.B. Mason Co.*,
   No. 18-cv-693, 2019 U.S. Dist. LEXIS 3314 (D. Minn. Jan. 8, 2019).....................................7

*Armstrong v. Pomerance*,
   423 A.2d 174 (Del. 1980) ........................................................................................................9

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016)...........................................................................................................20

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)...................................................................................1, 5, 9, 14, 20

*Carnival Cruise Lines v. Shute*,
   499 U.S. 585 (1991)................................................................................................................18

*Chen v. Dunkin' Brands, Inc.*,
   954 F.3d 492 (2d Cir. 2020)................................................................................................9, 14

*City of Boerne v. Flores*,
   521 U.S. 507 (1997)................................................................................................................20

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986)................................................................................................................21

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014).......................................................................................................4, 10, 17

*Dickerson v. United States*,
   530 U.S. 428 (2000)..........................................................................................................19, 20

*Estate of Klieman v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019) ..............................................3, 4, 5, 10, 11, 13, 20

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. __, 141 S. Ct. 1017 (2021)..................................................................................4, 11

*Frost & Frost Trucking Co. v. R.R. Comm'n*,
   271 U.S. 583 (1926)................................................................................................................16

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*,
   636 F.2d 1300 (D.C. Cir. 1980) ............................................................................................16

*Genuine Parts Co. v. Cepec*,
    137 A.3d 123 (Del. 2016) ...................................................................................10

*Gilson v. Republic of Ir.*,
    682 F.2d 1022 (D.C. Cir. 1982) ..........................................................................18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) .....................................................................................10, 18

*Hess v. Pawloski*,
    274 U.S. 352 (1927) ................................................................................7, 8, 10

*In re Mid-Atl. Toyota Antitrust Litig.*,
    525 F. Supp. 1265 (D. Md. 1981) ....................................................................7, 9

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) .......................................................................................6, 18

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ...........................................................................................16

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) .......................................................................5, 13, 21

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ...........................................................................................14

*Laker Airways Ltd. v. Sabena*,
    731 F.2d 909 (D.C. Cir. 1984) ..........................................................................15

*Lanham v. BNSF Ry. Co.*,
    939 N.W.2d 363 (Neb. 2020) .............................................................................10

*Leonard v. USA Petroleum Corp.*,
    829 F. Supp. 882 (S.D. Tex. 1993) .................................................................7, 14

*Litecubes, LLC v. N. Light Prods.*,
    523 F.3d 1353 (Fed. Cir. 2008) .........................................................................15

*Livnat v. Palestinian Auth.*,
    851 F.3d 45 (D.C. Cir. 2017) ...................................................................4, 18, 20

*Lugones v. Pete & Gerry's Organic*,
    440 F. Supp. 3d 226 (S.D.N.Y. 2020) .................................................................3

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .......................................................................19, 20

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988)......................................................................13

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) .............................................................................18

*R.S.W.W., Inc. v. City of Keego Harbor*,
   397 F.3d 427 (6th Cir. 2005) .............................................................................14

*Reynolds-Naughton v. Norwegian Cruise Line*,
   386 F.3d 1 (1st Cir. 2004)..................................................................................25

*Roell v. Withrow*,
   538 U.S. 580 (2003)............................................................................................6

*Seetransport Wiking Trader Schiffarhtsgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993)...............................................................................19

*Shaffer v. Heitner*,
   433 U.S. 186 (1977)...........................................................................................17

*Shatsky v. PLO*,
   955 F.3d 1016 (D.C. Cir. 2020) ....................................................................3, 4, 5

*Siemer v. Learjet Acquisition Corp.*,
   966 F.2d 179 (5th Cir. 1992) .............................................................................19

*Sullivan v. A.W. Chesterton, Inc.*,
   384 F. Supp. 3d 532 (E.D. Pa. 2019) .............................................................10, 14

*United States v. PLO*,
   695 F. Supp. 1456 (S.D.N.Y. 1988)............................................................12, 13, 22

*Walden v. Fiore*,
   571 U.S. 277 (2014)............................................................................................4

*Waldman v. PLO*,
   835 F.3d 317 (2d Cir. 2016)............................................3, 4, 5, 14, 15, 18, 20

*Waldman v. PLO*,
   925 F.3d 570 (2d Cir. 2018)..........................................................................11, 13

*Wellness Int'l Network, Ltd. v. Sharif*,
   135 S. Ct. 1932 (2015).................................................................................5, 21

*WorldCare Ltd. Corp. v. World Ins. Co.*,
   767 F. Supp. 2d 341 (D. Conn. 2011) ...............................................................19

*Wuchter v. Pizzutti*,
276 U.S. 13 (1928)........................................................................................8

**Statutes, Treaties, and Legislative History**

166 Cong. Rec. S627 (daily ed. Jan. 28, 2020) (statement of Sen. Patrick Leahy).......................25

22 U.S.C. § 5201(b)........................................................................................13

22 U.S.C. § 5202............................................................................................12

22 U.S.C. § 5203............................................................................................12

Anti-Terrorism Clarification Act of 2018, 18 U.S.C. §§ 2334(e).............................................3, 10

Promoting Security and Justice for Victims of Terrorism Act, 18 U.S.C. § 2334
(2019)........................................................................................................ passim

Taylor Force Act, 22 U.S.C. § 2378c-1 ....................................................................12

**UN Documents and Statements**

CEIRRP Report, CEIRPP, UN Doc. A/75/35, at:
https://www.un.org/ga/search/view_doc.asp?symbol=A/75/35 ...............................................24

General Assembly Resolution A/RES/ES-10/2, *Illegal Israeli actions in occupied
East Jerusalem and the rest of the Occupied Palestinian Territory,*......................................25

Letters from the Permanent Observer of the State of Palestine to the United
Nations, available at: https://digitallibrary.un.org/record/3854048?ln=en. ...........................23

*Programme of Work for 2020*, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7,
2020), at: https://www.un.org/unispal/document/palestinian-rights-committee-
programme-of-work-for-2020-a-ac-183-2020-1/. ........................................................24

Remarks by Ambassador Linda Thomas-Greenfield at the J Street National
Conference (April 19, 2021), at: https://usun.usmission.gov/remarks-by-
ambassador-linda-thomas-greenfield-at-the-j-street-national-conference/...............................24

UN Committee on the Exercise of the Inalienable Rights of the Palestinian People
("CEIRPP") Report, CEIRPP, UN Doc. A/75/35...........................................................24

UN Documentation, How to Find UN Documents, United Nations Dag
Hammarskjöld Library, at: https://research.un.org/en/docs/find/letters (last
visited Jan 4, 2021). ....................................................................................23

UN Humanitarian Affairs Office – Occupied Palestinian Territory, *Another 52
Palestinians were injured by Israeli forces across the West Bank*, at
https://www.ochaopt.org/poc/30-march-12-april-2021. ...............................................25

v

UN Juridical Yearbook (1985)................................................................................24

UN Juridical Yearbook (2000) ..............................................................................22

UN Security Council, Agenda Item S/2020/10-23, *The Situation in the Middle
     East, including the Palestinian question*...................................................25

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)..............................................................25

Richard A. Epstein, "Consent, Not Power, as the Basis of Jurisdiction," *Univ. of
     Chicago Legal Forum*: Vol. 2001: Issue 1, Art. 2, at 3. ...........................8

U. S. Brief, *Klieman v. Palestinian Auth.*,
     No. 15-7034 (D.C. Cir. Mar. 13, 2019) .................................................10, 11, 22

Oxford English Dictionary (Online ed., 2020) ..................................................25

Depositions, *Shatsky v. PLO*,
     955 F.3d 1016 (D.C. Cir. 2020)......................................................3, 4, 5, 12

State Dept., Notarial and Authentication Services, at:
     https://travel.state.gov/content/travel/en/records-and-
     authentications/authenticate-your-document/Notarial-Authentication-Services-
     Consular.html......................................................................................................23

Twitter:  CEIRPP Twitter post, *Special Rapporteurs Warn of Rising Levels of
     Israeli Settler Violence in a Climate of Impunity*, at:
     https://twitter.com/UNISPAL/status/1382718800144048132................................25

WAFA New Agency Website, avalable at: https://english.wafa.ps/ ............................23

Pls.' Brief, *Waldman v. PLO*,
     No. 15-3135 (2d Cir. Dec. 11, 2015) .................................................................15

Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012) ..........................................25

Defendants the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") previously moved to dismiss Plaintiffs' Amended Complaint (ECF 21) for lack of personal jurisdiction and for failure to state a claim, under Fed. R. Civ. P. 12(b)(2) and (6). (ECF 25.) Plaintiffs filed a response (ECF 29) and Defendants replied (ECF 31). The Court then ordered supplemental briefing on "the application and constitutionality of" the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), codified at 18 U.S.C. § 2334(e). (ECF 34.) For the following reasons, this Court should dismiss Plaintiffs' Amended Complaint because the PSJVTA does not confer personal jurisdiction over the Defendants.

## Introduction

Time and again, courts evaluating the same conduct asserted by Plaintiffs in this case have held that personal jurisdiction cannot be exercised over Defendants without violating the Due Process Clause. That judicial application of constitutional principles has been subject to repeated legislative attack, of which the PSJVTA is just the latest example. But Congress cannot legislate around the Due Process Clause, nor can it supplant Defendants' due process rights by "deem[ing]" that they "consent" to jurisdiction (18 U.S.C. § 2334(e)(1)) when it is clear that they do not.

"Consent" jurisdiction is a very narrow doctrine, and Due Process requires that any such "consent" be "free and voluntary." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640–41 (2d Cir. 2016). As explained by the U.S. government in defending the PSJVTA's predecessor statute, "deemed" consent to jurisdiction cannot be squared with Due Process unless there is reciprocity— that is, an express or implied exchange by which a defendant impliedly agrees to jurisdiction in return for a benefit conferred by the forum. The PSJVTA provides no such reciprocity, but instead purports to base jurisdiction on Defendants' continuation of conduct—making payments in Palestine, and maintaining facilities, or conducting activity, that is not "official" United Nations business or "any personal or official activities conducted ancillary" thereto. 18 U.S.C. § 2334(e).

While Congress may legislate liability or restrictions for a broad range of activity, it cannot constitutionally remove Defendants' due process protections against personal jurisdiction as a direct or "deemed" consequence of engaging in such activity.  That is because Fifth Amendment due process imposes supervening requirements for exercising personal jurisdiction over any defendant that engages in legislatively proscribed activities.  Due process requires that the defendant's proscribed activities either must have "minimum contacts" with the forum and give rise to Plaintiffs' claims, or reflect the receipt of a benefit from the forum that creates the "reciprocal obligation" of consent to jurisdiction.

The PSJVTA fails both due process tests.  The activities identified in the statute already have been held not to establish "minimum contacts."  Those activities likewise do not depend on any benefit or authorization from the forum (the United States).  Pre-existing U.S. law already prohibits, or purports to impose liability or other restrictions for, each type of activity on which PSJVTA "deemed" jurisdiction is based, and the PSJVTA does not offer to waive such prohibitions or liability.  In the absence of a benefit offered to Defendants in the PSJVTA, there is nothing for them to have accepted or rejected through their conduct, and thus no implied agreement to consent to jurisdiction.

Accordingly, the PSJVTA does not fit within the narrow window of "consent" jurisdiction, but instead improperly attempts to bypass constitutional due-process requirements that prohibit the exercise of personal jurisdiction over Defendants in precisely the circumstances presented in this case.  The courts have already determined that Defendants' alleged activities are constitutionally inadequate to give rise to personal jurisdiction in the United States.  Allowing Congress to transform those same activities into "consent" would undermine the Supreme Court's modern personal-jurisdiction jurisprudence. This Court should therefore conclude that Plaintiffs have not

established valid "consent" by Defendants to personal jurisdiction and should reaffirm that exercising personal jurisdiction over Defendants would violate due process.

## Legal Standard

Even when a plaintiff invokes "a statutory basis for personal jurisdiction" like the PSJVTA, "the exercise of personal jurisdiction [still] must comport with constitutional due process principles." *Lugones v. Pete & Gerry's Organic, LLC,* 440 F. Supp. 3d 226, 234 (S.D.N.Y. 2020) (quoting *Waldman v. PLO*, 835 F.3d 317, 327 (2d Cir. 2016)).   The PSJVTA purports to create "deemed consent" jurisdiction if Defendants make payments, after April 18, 2020, to persons who were "fairly tried" or "ple[d] guilty" and were imprisoned for (or to families of those who died committing) "any act of terrorism" that injured or killed a U.S. national.   18 U.S.C. § 2334(e)(1)(B).   The PSJVTA also "deems" "consent" to jurisdiction if, after January 4, 2020, Defendants maintain "any office" or other facility "in the United States," or engage in "any activity while physically present in the United States," not expressly exempted. *Id.* § 2334(e)(1)(B), (e)(3).

## Argument

**I.     Exercising Personal Jurisdiction over Defendants Would Violate Due Process.**

**A.     Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction under the Due Process Clause.**

Both this Circuit and the D.C. Circuit have repeatedly held that exercising personal jurisdiction over the PA and the PLO for their alleged involvement in terrorist attacks in Israel would violate the Fifth Amendment's Due Process Clause. *See Waldman*, 835 F.3d at 344 (holding personal jurisdiction over Defendants would exceed "the limits prescribed by the due process clause"); *Shatsky v. PLO*, 955 F.3d 1016, 1036–38 (D.C. Cir. 2020) (holding the PA and the PLO "are not now and were not at the time they were served subject to the district court's personal jurisdiction"); *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1118 (D.C. Cir. 2019)

(holding Fifth Amendment "barred U.S. courts from exercising jurisdiction" over "the PA/PLO");
*Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–58 (D.C. Cir. 2017) (same).

 As those courts consistently recognize, Defendants are not subject to <u>general</u> jurisdiction
in the United States because they are not "fairly regarded as 'at home'" here.  *Shatsky*, 955 F.3d at
1036; *see also Waldman*, 835 F.3d at 332 (holding Defendants are fairly regarded as "'at home' in
Palestine, where they govern"); *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (describing the
due process limitations on general jurisdiction).  Defendants also are not subject to <u>specific</u>
jurisdiction in the United States because their "suit-related conduct"—namely, their alleged
involvement in terrorist attacks overseas (which Defendants dispute)—is "not sufficiently
connected to the United States."  *Waldman*, 835 F.3d at 335–44; *see also Ford Motor Co. v. Mont.
Eighth Jud. Dist. Ct.*, 592 U.S. __, 141 S. Ct. 1017 (2021) (describing the necessary "connection"
between plaintiffs' claims and defendant's forum activity); *Walden v. Fiore*, 571 U.S. 277, 284
(2014) ("defendant's suit-related conduct must create a substantial connection" with the forum).

 Plaintiffs do not challenge these holdings.  Nor do Plaintiffs allege that Defendants'
contacts with the United States satisfy the requirements for general or specific jurisdiction under
the Due Process Clause.  In this case, Defendants engage in only limited UN-related activities in
the United States, and those activities are unrelated to the alleged conduct that gave rise to
Plaintiffs' claims—which occurred in the West Bank and did not target the United States.

 Instead, Plaintiffs assert that this Court may exercise personal jurisdiction over Defendants
under the "deemed consent" provisions of the PSJVTA.  *See* ECF 21, Am. Compl., ¶ 3 (alleging
personal jurisdiction solely under the PSJVTA).  Despite Defendants' lack of any substantial
contacts with the United States (and their express objection), Plaintiffs allege that Defendants
should be "deemed to have consented to personal jurisdiction" in the United States because they:

(1) made certain payments to individuals in Palestine; (2) maintained an office—Palestine's Mission to the UN—in New York; and (3) engaged in certain activities (press statements, social media posts, and alleged "consular services") in the United States.  *See id.* ¶¶ 3, 31–95.

The courts already have ruled that the same or similar activities cannot support personal jurisdiction over Defendants consistent with the Due Process minimum contacts test.  *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (holding Palestine's UN Mission cannot "properly be considered as a basis of jurisdiction"); *Shatsky*, 955 F.3d at 1022–23, 1037 (holding allegations that Defendants "provid[ed] what the Families call 'martyr payments'" and conducted "a public relations campaign designed to influence the United States' policy toward Israel" were insufficient for personal jurisdiction); *Waldman*, 835 F.3d at 335–44 (same with respect to alleged "lobbying activities"); *Klieman*, 923 F.3d at 1123–26 (same with respect to allegations that Defendants "supported acts of terrorism … in part with the goal of advancing their 'campaign in the United States to influence or affect United States foreign policy'").

The question before this Court is whether Plaintiffs can rely upon those same, constitutionally-inadequate activities to force "consent" to jurisdiction under the PSJVTA.  As explained below, the answer to that question is plainly "no."  The constitutional protections afforded to litigants by the Due Process Clause are not so easily evaded.

**B.      Defendants Have Not "Consented" to Personal Jurisdiction.**

**1.      Consent to Jurisdiction Must Be Free and Voluntary.**

Where the legislature attempts to force consent, due process requires courts to analyze whether consent is "free and voluntary."  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016); *see Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932, 1948 (2015) ("It bears emphasizing … consent—whether express or implied—must still be knowing and voluntary.").

Absent express consent, the defendant's consent may be "inferred from [its] conduct." *Roell v. Withrow*, 538 U.S. 580, 582, 589 (2003) (explaining a party may "signal[] consent … through actions rather than words").  For implied consent, the nature of the defendant's activity must evince the defendant's agreement to the forum's exercise of jurisdiction. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee* ("*Bauxites*"), 456 U.S. 694, 705–09 (1982) (holding that "due process is violated … if behavior of the defendant will not support" the application of a legal presumption to the issue of personal jurisdiction).

In some cases, determining whether a defendant knowingly and voluntarily consented to personal jurisdiction is straightforward.  A party may expressly agree—through a forum-selection clause, for example—to submit to the jurisdiction of a particular forum. *Id.* at 703–04.  Courts may also infer jurisdiction based on actions a party takes within the litigation itself demonstrating it has agreed to submit to the court's jurisdiction. *Id.* (explaining that a party may consent to jurisdiction by invoking certain state judicial procedures, stipulating to jurisdiction, or appearing in court without objecting to jurisdiction).  But these canonical forms of consent are not at issue, because Plaintiffs do not claim that Defendants have expressly consented or taken any action in the litigation itself to submit to the jurisdiction of the court.  To the contrary, Defendants have twice moved to dismiss Plaintiffs' claims for lack of personal jurisdiction. *See* ECF 17, Mot. to Dismiss, at 4–8; ECF 25, Mot. to Dismiss, at 4–10.

When the legislature attempts to "deem" consent by statute, as here, the due process requirement of reciprocity protects defendants from unilateral, legislatively imposed jurisdiction. As discussed below, courts have recognized a narrow category of "implied consent" statutes under which a party freely and voluntarily agrees to personal jurisdiction by accepting a benefit conferred by the forum. *See Hess v. Pawloski*, 274 U.S. 352, 354–57 (1927) (holding that "acceptance by a

non-resident of the rights and privileges [to drive on public roads]" constituted "signification of his agreement" to consent to jurisdiction under non-resident motorist statute); *Am. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-cv-693, 2019 U.S. Dist. LEXIS 3314, *7 (D. Minn. Jan. 8, 2019) ("Consent to personal jurisdiction may be established in a number of ways, including as a condition of performing some activity in the state.").  When the defendant chooses to take advantage of a forum's offerings (e.g., driving on public roadways, doing business in the state), courts properly assume that the defendant has freely and voluntarily accepted the conditions (including consent to personal jurisdiction) that the state places on such activity.  By accepting the benefit of engaging in the regulated activity, the defendant enters a "'bargain' with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct that the state could otherwise prohibit.  *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993); *see also In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (explaining "consent is part of a bargain").  Put another way, reciprocity or exchange of benefits is the test for true, voluntary *agreement* to personal jurisdiction, as distinguished from unilateral imposition of jurisdiction by the forum.

This implied consent framework improperly becomes a disguised form of imposed jurisdiction if the statute does not offer the defendant any corresponding benefit to "accept" in exchange for its consent.  When the defendant does not avail itself of some benefit offered by the forum, "there is no bargain—no social compact."  *Leonard*, 829 F. Supp. at 889 ("Without a received benefit, there is no bargain, and without a bargain, there is no due process."); *see also In re Mid-Atl.*, 525 F. Supp. at 1278 (holding, in business-registration context, that "[i]f the corporation conducts no business in the forum, it has not availed itself of 'benefits and protections of the laws' of the forum and there is no bargain between the corporation and the forum state").  "The term

consent is inextricably linked to the idea of agreement and is, thus, implicated by the proposition that persons who consent to certain obligations are bound because they agreed to be bound … Parties who consent regard themselves as better off on net because they believe what they receive is worth more to them than what they surrender."  Richard A. Epstein, "Consent, Not Power, as the Basis of Jurisdiction," *Univ. of Chicago Legal Forum*: Vol. 2001: Issue 1, Art. 2, at 3.

Thus, when the purported "consent" is <u>*not*</u> accompanied by a corresponding benefit—offered by the forum and accepted by the defendant—a defendant's conduct does *not* evince an agreement to consent to personal jurisdiction.  If the activity purportedly giving rise to "consent" to jurisdiction did <u>*not*</u> require authorization from the state, the defendant's choice to engage in the activity does not reflect any agreement to jurisdiction because it gained nothing by way of exchange; the defendant's ability to engage in the activity did not depend on any "benefit" conferred by the forum in the first instance.

### 2. Implied Consent Statutes Must Offer A Benefit That The Defendant May Accept to Demonstrate Consent To Jurisdiction.

This reciprocal exchange underpins other deemed-consent statutes, such as when States deem consent to jurisdiction in return for a specific benefit.  Many states, for example, have enacted statutes conditioning the benefit of driving on public roads on consent to personal jurisdiction in the state for suits arising from their use of the roads.   Because the state has authority "to regulate the use of its highways" and to "exclude" non-residents, the Supreme Court has held the state could require non-resident drivers to consent to personal jurisdiction.  *Hess*, 274 U.S. at 356–57.  By accepting the privilege of driving on public roads, a non-resident motorist in turn demonstrates his implicit agreement to personal jurisdiction. *Id.*; *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a non-resident in using the highways … may properly be declared to be an agreement to accept service of summons in a suit growing out of the use of the highway ….").

Many courts have similarly held that a foreign defendant may impliedly consent to personal jurisdiction by registering to do business in the state.  In exchange for the privilege of doing business, registration statutes require foreign corporations to consent to service of process.  *See Brown*, 814 F.3d at 632–33 (tracing the history of such statutes and describing implied consent as "a promise, fairly extracted, to appear in state court" in exchange for the right to do business in the state); *In re Mid-Atl.*, 525 F. Supp. at 1278 ("When a corporation, as part of its registration to do business in a state, consents to jurisdiction, that consent is part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state."). State corporate director "deemed consent" statutes are subject to a similar analysis.  *See Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (holding that by accepting the "benefits" of a corporate directorship created by state law (such as the opportunity to receive interest-free, unsecured loans), defendants implicitly consented to personal jurisdiction in state court).

Importantly, implied jurisdictional consent cannot pass constitutional muster merely by providing advance notice of jurisdictional consequences absent this type of proffered exchange. Rather, due process requires that the defendant's consent to jurisdiction be "free and voluntary." *Brown*, 814 F.3d at 640.  Free and voluntary consent cannot be established, for example, even when a statute provides advance notice of jurisdictional consequences if deemed consent clashes with due process limits on jurisdiction.  *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 499 (2d Cir. 2020) (holding that New York's business registration statute, historically construed as conditioning registration to do business on consent to general jurisdiction, could no longer be read to imply consent consistent with U.S. Constitution under *Daimler*).[1]

---

[1] As the Second Circuit's decision in *Brown* illustrates, the continued vitality of business registration statutes as a valid grounds for consent to personal jurisdiction is very much in question following *Daimler*.  *See Brown*, 814 F.3d at 637–40.  Post-*Daimler*, several courts have concluded that mere registration to do business is not a sufficient basis to warrant the exercise of personal jurisdiction.  *See, e.g.*, *Sullivan v. A.W. Chesterton, Inc.*, 384 F. Supp. 3d 532, 540–

When courts uphold such implied "consent" jurisdiction, it is because the foreign defendant's decision to accept a benefit conferred by the forum signals its implicit agreement to consent to the state court's jurisdiction. The defendant could not engage in the specified activity (e.g., driving on public highways or doing business in the state) without accepting the conditions placed on the activity by the government. The defendant's decision to accept the benefit of engaging in such activity thus demonstrates its implicit agreement to consent to personal jurisdiction. *See, e.g.*, *Hess*, 274 U.S. at 356–57 (defendant's acceptance of privilege of driving on public roadways serves as "equivalent" of agreeing to consent to jurisdiction).

The United States emphasized that reciprocity was central to the constitutionality of the PSJVTA's predecessor, the Anti-Terrorism Clarification Act of 2018 ("ATCA"), 18 U.S.C. §§ 2334(e)(1)(A), (B) (2018) (superseded by the PSJVTA). In *Klieman*, the Justice Department focused on the two benefits at issue under the ATCA: U.S. financial aid or a Presidential waiver of the 1987 ATA's prohibition on any non-UN PLO office in the United States. The ATCA provided for "deemed consent" jurisdiction over Defendants if they accepted either benefit. *Id.* The Government argued that because "[t]he political branches have long imposed **conditions on these benefits**," it was therefore "reasonable and consistent with the Fifth Amendment for Congress and the Executive to determine that the [PLO's] maintenance of an office in this country … or the Palestinian Authority's continued receipt of certain foreign assistance, should be 'deemed' consent to personal jurisdiction in civil cases under the ATA of 1992." U.S. Brief, *Klieman v. Palestinian*

---

41 (E.D. Pa. 2019) (holding that "a mandatory statutory regime purporting to confer consent to general jurisdiction in exchange for the ability to legally do business in a state is contrary to the rule in *Daimler* and, therefore, can no longer stand"); *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 126, 145 (Del. 2016) (holding that "after *Daimler*, it is not tenable to read Delaware's registration statutes" as conferring personal jurisdiction based on implied consent; *Lanham v. BNSF Ry. Co.*, 939 N.W.2d 363, 371 (Neb. 2020) ("Since *Daimler AG* was decided, the vast majority of state and federal courts have rejected consent by registration as being irreconcilable with [*Goodyear*] and [*Daimler*]."). As these cases hold, a legislative end-run around the constitutional standards announced in *Daimler* violates due process. Applying the PSJVTA to Defendants would violate due process for the same reasons.

*Auth.*, No. 15-7034, at 12-13 (D.C. Cir. Mar. 13, 2019) (emphasis added).

Both the Second and D.C. Circuits thereafter held that the ATCA did not supply jurisdiction over Defendants because they had not accepted either type of U.S. government benefit. *Klieman*, 923 F.3d at 1128–31 (holding plaintiffs failed to establish factual predicates for consent under the ATCA because Defendants "unambiguously ma[de] the choice not to accept such assistance" from the U.S. government); *Waldman v. PLO* ("*Waldman II*"), 925 F.3d 570, 574–75 (2d Cir. 2018) (holding that neither "factual predicate of [the ATCA] has been satisfied" because "neither the PLO nor the PA accept United States assistance," and "plaintiffs have not established that the defendants benefit from an express waiver or suspension [of the ATA]").

The Supreme Court in *Ford* also recently explained that this type of exchange of "reciprocal obligations" between the defendant and the forum make the exercise of personal jurisdiction fair. *Ford Motor Co.*, 141 S. Ct. at 1030. Because Ford enjoyed "the benefits and protections" of the forum's laws by doing business in the forum, the Court held that "allowing jurisdiction in these cases treats Ford fairly." *Id.* By the same token, when there is no exchange between the defendant and the forum, it is unfair to infer free and voluntary consent by the defendant to submit to jurisdiction.

### 3.    Defendants Have Not Impliedly Agreed to Personal Jurisdiction.

Unlike the implied consent statutes described above, the PSJVTA does not confer any benefit on Defendants, or offer to waive pre-existing laws penalizing or prohibiting the activities listed in the statute. Instead, the PSJVTA declares that Defendants shall be "deemed" to have consented to jurisdiction if they continue to engage in precisely the same activities—payments in Palestine and activities by Palestine's UN Mission personnel—they conducted before enactment of the PSJVTA. Accordingly, Defendants' decision to continue engaging in such conduct does

not reflect an acceptance of any benefit conferred by the United States, and therefore does not reflect any implied agreement to jurisdiction in U.S. courts.

The first type of conduct identified by the PSJVTA—payments in Palestine to prisoners or families—occurs entirely outside the United States.  While Congress has legislated that such payments potentially may support Anti-Terrorism Act *liability*, the courts have already held that such legislation standing alone cannot provide *jurisdiction* over Defendants because such payments are not connected to the United States or the plaintiffs' claims.  *See Shatsky*, 955 F.3d at 1022–23, 1037 (holding alleged "martyr payments" did not confer specific jurisdiction over Defendants).  Congress also has legislated that Defendants' continuation of such payments will foreclose any U.S. aid to Palestine.  *See, e.g.*, Taylor Force Act, 22 U.S.C. § 2378c-1.  But Defendants' payments in Palestine do not depend on U.S. government authorization, and Defendants thus do not avail themselves of any U.S. government benefit when they make such payments.  Absent such a benefit, there is no exchange that might signal free and voluntary consent to jurisdiction.

The same is also true of the second type of conduct relied upon by Plaintiffs: the operation of Palestine's UN Mission, and activities such as social-media posts in furtherance of the Mission's work.  Since long before the PSJVTA, the Anti-Terrorism Act of 1987 has expressly denied Defendants the "benefit" of engaging in any activity in the United States.  *See* 22 U.S.C. § 5202; *United States v. PLO*, 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988).[2]  As the courts have recognized, the 1987 Act is a "wide gauged restriction of PLO activity within the United States," *id.*, that

---

[2] The ATA of 1987 prohibits the PLO from operating in the United States by making it unlawful to (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO.  *See* 22 U.S.C. § 5202.  The Attorney General is authorized to enforce these provisions by proceedings in district court.  22 U.S.C. § 5203.

Congress enacted for the express purpose of "deny[ing] the PLO the benefits of operating in the United States." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) (emphasis added) ("The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefit of operating in the [United States]"); *see* 22 U.S.C. § 5201(b) (declaring Congress's intent to deny the PLO the "benefit" of operating in the United States).

Long before the PSJVTA, judicial interpretation of the UN Headquarters Agreement ("UNHQA") already confined the reach of the 1987 ATA so that the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission to the United States." *PLO*, 695 F. Supp. at 1471.  Pursuant to the UNHQA, Defendants may maintain the "continuity" of operations at their UN Mission, and are guaranteed "entry, access, and residence" to the UN.  *Id.* at 1465–68; *see also Klinghoffer*, 937 F.2d at 51 (holding UNHQA entitles Defendants to operate their UN Mission by "effectively remov[ing] control over the UN Headquarters and related areas from [U.S.] jurisdiction"); *see also infra* at 21–25 (describing scope of Palestine Mission's protected UN activities).  The PSJVTA does not offer to waive any restriction imposed by the 1987 ATA, and no such waiver could be implied because the courts have held that any such waiver must be express.  *Waldman II*, 925 F.3d at 574-75; *Klieman*, 923 F.3d at 1130-31.  The PSJVTA therefore offers Defendants no protection from the 1987 ATA, or any other benefit whose acceptance might signal free and voluntary consent to jurisdiction in the United States.

The PSJVTA thus stands in stark contrast to its predecessor statute, the ATCA.  Under the ATCA, a defendant was deemed to "consent" to jurisdiction if it accepted U.S. financial aid or the "benefit" of a formal "waiver or suspension" of the prohibitions on defendants' activities under the 1987 Act.  *See* 18 U.S.C. §§ 2334(e)(1)(A), (B) (2018) (superseded by PSJVTA).  In other words, the ATCA permitted Defendants to exchange submission to U.S. jurisdiction in return for

foreign aid or an express waiver of the 1987 ATA.[3]

The PSJVTA, by contrast, does not confer any benefit on Defendants in exchange for their purported "consent."  The PSJVTA does not authorize Defendants to engage in activities in the United States prohibited by the ATA, nor does it extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction.  Accordingly, "there is no bargain—no social compact" between the parties that could evince Defendants' implied agreement to submit to jurisdiction in the United States.  *Leonard*, 829 F. Supp. at 889.

### C. Applying the PSJVTA's "Deemed Consent" Provision to Defendants in this Case Would Be Unconstitutional.

#### 1. The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause.

The Second Circuit recognized in *Brown* and *Chen* that due process serves as a supervening check on legislatively imposed "consent" to jurisdiction.  The Second Circuit reiterated its "constitutional concerns" that, if legislative notice of "consent" jurisdiction were alone enough to satisfy due process, "'*Daimler*'s ruling would be robbed of meaning by a back-door thief.'"  *Chen*, 954 F.3d at 499 (quoting *Brown*, 814 F.3d at 640).  *Waldman I* reinforces this point, with its rejection of Plaintiffs' argument that "the defendants consented to personal jurisdiction under the ATA" by appointing an agent and accepting service of process.  835 F.3d at 337.  Plaintiffs argued that Defendants were "on notice" that acceptance of service conferred personal jurisdiction as a

---

[3] This is not to say that the ATCA itself, or an implied consent statute structured like the ATCA, would be free of constitutional defects.  *See supra* n.1.  Under the unconstitutional-conditions doctrine, the government cannot condition the receipt of a government benefit on the surrender of constitutional rights.  *See Koontz v. St. Johns Riv. Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005).  Courts have applied this principle in the business-registration context to invalidate statutes conditioning the right to do business in the state (a government benefit) on the forfeiture of constitutional defenses to personal jurisdiction.  *See, e.g.*, *Sullivan*, 384 F. Supp. 3d at 540–42.  To the extent Plaintiffs assert the PSJVTA confers some "benefit" on Defendants, the same rule would apply: the government cannot condition the receipt of any such government benefit on Defendants' "consent" to forego jurisdictional defenses under the Due Process Clause.  The Court need not reach that issue, however, because the PSJVTA does not confer any benefit on Defendants.

"condition" of entry.  Pls.' Br., *Waldman v. PLO*, No. 15-3135 (2d Cir. Dec. 11, 2015).  Although it was clear that the "ATA permitted service of process on the representative of PLO and PA in Washington," the Second Circuit held that "the statute does not answer the constitutional question of whether due process is satisfied."  835 F.3d at 343 (citing 18 U.S.C. § 2334(a)).

If due process did not require more than fair notice of legislatively-imposed jurisdictional consequences, then nothing could stop Congress from decreeing that henceforth a foreign defendant shall be "deemed" to have "consented" to personal jurisdiction by engaging in *any* activity *anywhere* in the world, even absent "minimum contacts" or "free and voluntary" consent.  But, as the *Waldman I* rejection of Plaintiffs' "consent" argument contemplates, while Congress can prohibit conduct "beyond the territorial boundaries of the United States," that legislative jurisdiction *cannot provide personal jurisdiction* over foreign defendants unless the constitutional requirements are satisfied.  *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008).

The personal jurisdiction requirement serves as "an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is <u>independent of the extraterritorial reach of a federal statute</u>."  *Id.* (emphasis added).  As such, Congress's "prescriptive jurisdiction"—its authority to make federal law applicable to parties and their activities—"is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'" *Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984).  This distinction between "prescriptive" and "adjudicative" jurisdiction ensures that foreign defendants cannot be dragged into federal court based solely on Congressional fiat.

Where there is no free and voluntary consent as demonstrated by a reciprocal exchange, Congress cannot simply attach the penalty of personal jurisdiction to a defendant's conduct and call it "deemed consent."  It is undisputed that Congress has broad authority to outlaw extraterritorial

conduct that harms its citizens, including acts of terrorism.  But whether U.S. courts have jurisdiction over the person is subject to a different analysis governed by the Due Process Clause, which as discussed below, precludes Congress from simply imposing jurisdiction.  *See FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1318–19 (D.C. Cir. 1980) (distinguishing adjudicatory from prescriptive jurisdiction and explaining that "a court may not exercise its adjudicatory authority over an individual unless it has power to reach him, as circumscribed by the due process clause of the Constitution").  Congress cannot evade these constitutional restrictions by masking imposed jurisdiction as deemed consent.  *See Frost & Frost Trucking Co. v. R.R. Comm'n*, 271 U.S. 583, 593 (1926) ("[C]onstitutional guarantees, so carefully safeguarded against direct assault, [should not be] open to destruction by the indirect but no less effective process of requiring a surrender which, though in form voluntary, in fact lacks none of the elements of compulsion.").

In the absence of free and voluntary consent to personal jurisdiction by Defendants, the PSJVTA's "deemed consent" provision is no different than the "fictions" of "implied consent" and "presence" discarded in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  As the Supreme Court explained, prior decisions asserting personal jurisdiction over foreign defendants had often "resort[ed] to the legal fiction that [the defendant] has given its consent to service and suit, consent being implied from its presence in the state through the acts of its authorized agents."  *Id.* at 318. "But more realistically it may be said that those authorized acts were of such a nature as to justify the fiction," meaning that the "nature and quality" of the defendant's activities in the forum were "sufficient to render [the defendant] liable to suit."  *Id*.  "Implied consent," in other words, was an obscure (and unhelpful) way of saying that the defendant's forum contacts were sufficient to warrant jurisdiction under the Due Process Clause.  *See Shaffer v. Heitner*, 433 U.S. 186, 202–03

16

(1977) (explaining that courts analyzing "implied consent" "were in fact attempting to ascertain 'what dealings make it just to subject a foreign corporation to local suit'").

Plaintiffs' reliance on "deemed consent" is no different. Stripped of the "legal fiction" of "consent," Plaintiffs assert this Court can exercise jurisdiction over Defendants based on payments made outside the United States and the activities of Palestine's UN Mission. (*See* ECF 21, Am. Compl., ¶¶31–95.) Yet federal courts have uniformly held that the nature and quality of those same activities are insufficient to warrant the imposition of personal jurisdiction under the Due Process Clause. *See supra* at 3–5. Merely calling the same conduct grounds for "deemed consent" to jurisdiction does not alter that conclusion.

Accepting Plaintiffs' assertion that incanting the words "deemed consent" allows Congress to transform constitutionally-inadequate imposed jurisdiction into "consent" jurisdiction would swallow the "minimum contacts" test. In *Daimler*, for example, the Supreme Court held that the Due Process Clause prohibited a California court from exercising general jurisdiction over a car manufacturer and its US subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere. *See* 571 U.S. at 139. Despite achieving "sizable" sales in the state, the Court held that defendants' activities were insufficient for general jurisdiction because they were not "essentially at home" in the forum. *Id.*

Under Plaintiffs' novel interpretation of due process, California could circumvent that holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state. If constitutionally-inadequate activities in a forum can serve as a valid basis for consent to personal jurisdiction divorced from any accompanying benefit provided by the forum, there is no end to the types of activities that could serve as the basis for "deemed consent" to jurisdiction.

Courts, however, have consistently rejected attempts to extend legislatively-imposed jurisdiction beyond constitutional limits. *See, e.g.*, *Gilson v. Republic of Ir.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982) ("a statute cannot grant personal jurisdiction where the Constitution forbids it"); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (same). As the D.C. Circuit recognized in *Livnat*, "due-process protections" must be applied "to limit personal jurisdiction in Antiterrorism Act cases" even when doing so might "thwart Congress's intent to provide redress," because "Congress cannot wish away a constitutional provision." 851 F.3d at 53. The Due Process Clause "sets the outer boundaries of [a court's] authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 923 (2011). Exercising personal jurisdiction over Defendants on the fiction that they "consent" to jurisdiction simply by continuing activity that fails the minimum contacts test, when the forum offers no benefit in exchange, would transgress those constitutional boundaries. *See Livnat*, 851 F.3d at 56 ("[A]lthough congressional interests may be relevant to whether personal jurisdiction comports with due-process standards, they cannot change the standards themselves.").

Whatever the source of personal jurisdiction, the Court has also emphasized that the exercise of jurisdiction must "not offend 'traditional notions of fair play and substantial justice.'" *Bauxites*, 456 U.S. at 702–03; *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991) (holding forum-selection clauses are still "subject to judicial scrutiny for fundamental fairness"); *Waldman*, 835 F.3d at 343 (holding "due process analysis—considerations of minimum contacts and reasonableness—applies even when federal service-of-process statutes are satisfied").

Exercising jurisdiction over Defendants in this case would violate traditional notions of fair play and substantial justice, given Defendants' "paltry" contacts with the forum, the lack of any suit-related conduct in (or targeting) the United States, and the prior holdings of both the

Second and D.C. Circuits that Defendants lack sufficient contacts to support jurisdiction.  *See Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183–84 (5th Cir. 1992) (holding defendant can only impliedly "consent" to jurisdiction "where such jurisdiction is constitutionally permissible"); *WorldCare Ltd. Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 361, 364 (D. Conn. 2011) (holding foreign defendant's "paltry" forum contacts failed the "reasonableness test").  "Expansive, non-explicit consent to being haled into court on any claim whatsoever in a [forum] in which one lacks minimum contacts goes against the longstanding notion that personal jurisdiction is primarily concerned with fairness."  *Id.* at 355.  "Deeming" consent to jurisdiction would be doubly unfair in this case, since any such ruling would retroactively undo the courts' prior uniform rulings based on conduct that took place long after the conduct giving rise to suit.

> **2.    Allowing Congress to Dictate that Defendants Shall Be "Deemed" to Have Consented to Personal Jurisdiction in this Case Would Violate Separation of Powers.**

Allowing Congress through the PSJVTA to override the courts' application of constitutional due process requirements would also violate separation of powers.  It is well-settled that "Congress may not legislatively supersede" the decisions of the federal courts "interpreting and applying the Constitution."   *Dickerson v. United States*, 530 U.S. 428, 437 (2000); *Seetransport Wiking Trader Schiffarhtsgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) (a statute "cannot create personal jurisdiction where the Constitution forbids it") (citation omitted).  Placing legislative acts "on a level with" the Constitution would require the courts to "close their eyes on the constitution," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and make the Constitution, "like other acts, … alterable when the legislature shall please to alter it."  *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997).  The result would give Congress "practical and real omnipotence," *Marbury*, 5 U.S. at 178, and would permit "[s]hifting legislative

majorities [to] change the Constitution and effectively circumvent the difficult and detailed amendment process contained in Article V."  *Boerne*, 521 U.S. at 529.

The Supreme Court consistently enforces these separation-of-powers principles by invalidating Congressional efforts to make "substantive change[s] in constitutional protections" by legislation.  *Id.* at 532 (invaliding federal statute passed to change constitutional protections); *see Dickerson*, 530 U.S. at 437 (invaliding statute designed to overrule constitutional rule in *Miranda v. Arizona* by altering considerations for determining the voluntariness of a confession). In *Boerne*, the Court held that the judiciary must adhere to its prior constitutional rulings in the face of "contrary expectations" from the "political branches" when they "act against the background of a judicial interpretation of the Constitution already issued."  521 U.S. at 536.  In such circumstances, "it is this Court's precedent, not [the statute], which must control."  *Id.*

The PSJVTA violates separation of powers as applied here by legislatively redefining the constitutional boundaries of personal jurisdiction to undermine the rulings of the Judicial Branch in *Shatsky I*, *Waldman*, *Livnat*, and *Klieman*, all of which held that Defendants' activities are insufficient to create jurisdiction under the Due Process Clause.  Congress cannot change these courts' interpretation and application of constitutional rules, *Bank Markazi v. Peterson,* 136 S. Ct. 1310, 1315 (2016) ("Article III of the Constitution establishes an independent Judiciary with the 'province and duty ... to say what the law is' in particular cases and controversies."), nor can Congress "exercise its authority, including its power to regulate federal jurisdiction, in a way that requires a federal court to act unconstitutionally," *id.* at 1324 n.19 (cleaned up).  Applying the PSJVTA to Defendants in this case would dictate personal jurisdiction in direct opposition to the Judicial Branch and is therefore impermissible.  *See Brown*, 814 F.3d at 640 (noting that *Daimler's* constitutional holding cannot be robbed of meaning by a legislative "back-door thief").

Finally, a party cannot waive or consent to a separation-of-powers violation. "To the extent that [a] structural principle is implicated in a given case . . . the parties cannot by consent cure the constitutional difficulty." *Wellness Int'l*, 135 S. Ct. at 1943 (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986)). "When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." *Schor*, 478 U.S. at 850–51. Artificially-manufactured "consent" cannot be used to usurp the judicial role.

## II.    This Court Does Not Need to Consider the PSJVTA's U.S.-Conduct Prong, Which Has Not Been Met in Any Case.

Because personal jurisdiction based on *either* PSJVTA prong would violate due process, there is no need for the Court to determine whether Plaintiffs can satisfy the disjunctive "U.S. conduct" PSJVTA prong, 18 U.S.C. § 2334(e)(1)(B), in addition to the "payment" prong, 18 U.S.C. § 2334(e)(1)(A). Nonetheless, while it would not change the outcome of the due process analysis, Plaintiffs' allegations do not meet the U.S. conduct prong, which Plaintiffs allege is triggered by the physical office of Palestine's UN Mission (ECF 21, ¶¶ 91–95), and by certain activities, including "consular services," a Palestinian news website, and posts by the UN Mission's website (palestineun.org), Twitter account (@Palestine_UN), and Facebook page (@Palestine.at.UN) (*see id.* ¶¶ 69–90). None of these acts supports jurisdiction under the PSJVTA.

### A.    Palestine's UN Mission Is Not "In the United States" and Is Specifically Exempted under the PSJVTA.

Plaintiffs allege that the presence of Palestine's UN Mission in New York is enough to create jurisdiction as an office "in the United States" under 18 U.S.C. § 2334(e)(1)(B)(i). (ECF 21, Am. Compl., ¶¶ 91–95.) But under longstanding judicial interpretation, the UN Mission is not "in the United States" under the UNHQA, which "effectively removes control over the UN

Headquarters and related areas from the jurisdiction of the United States."  *Klinghoffer*, 937 F.2d at 51 ("the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control").  The United States agrees that Palestine's UN Mission is not "in the jurisdiction of the United States" under the UNHQA.  U.S. Brief, *Klieman v. Palestinian Auth.*, No. 15-7034, at 6 (D.C. Cir. March 13, 2019).  Any interference with the Mission's "ability to discharge its official functions" would "contravene" the UN Charter, the UNHQA, and "various General Assembly resolutions."  UN JURIDICAL YEARBOOK, Ch. V, § A(13) (2000); *see also PLO*, 695 F. Supp. at 1471 ("The PLO Mission to the United Nations is an invitee of the United Nations under the Headquarters Agreement and its status is protected by that agreement.").  Indeed, the PSJVTA incorporates this law into its provisions, specifically exempting Palestine's UN Mission as an office used "exclusively for the purpose of conducting official business of the United Nations."  18 U.S.C. § 2334(e)(3)(A).

**B.    The Alleged Activities Do Not Create Jurisdiction under the PSJVTA.**

None of the activities alleged by Plaintiff satisfies §2334(e)(1)(B)(iii):

1.    *Consular services*.  Third-party depositions in another case show that the "consular services" alleged by Plaintiffs (ECF 21, Am. Compl., ¶¶ 69–74) were nothing more than U.S. notaries (who happen to be Palestinian) acting for private clients.  The notaries denied any authority to act on Defendants' behalf, did not take any actions on behalf of or receive any remuneration from Defendants, and denied any professional contacts with Palestine's UN Mission.[4]  The depositions showed that the U.S. notaries sent notarized documents on behalf of their private clients to the PLO's Canadian or Mexican consulates for authentication, and that the

---

[4] *See* Awni Abu Hba Depo. (attached as Ex. A) at 92-93, 119, 149, 155; Fuad Ateyeh Depo. (attached as Ex. B) at 22-24, 43, 69.  These depositions were taken in *Shatsky v. PLO*, No. 18-12355 (S.D.N.Y.).

Palestinian Land Department answers emails about real estate in Palestine.[5]  The notaries are not Defendants' agents, and Defendants' responses to their inquiries (from consulates or the Land Department) did not take place "while physically present" in the United States.  These activities thus do not constitute grounds for "deemed consent" under the PSJVTA "while physically present" in the United States.  *See* 18 U.S.C. § 2334(e)(1)(B)(iii).

2. *Internet activities*.  Even though the PSVJTA applies only to those "physically present" in the United States, Plaintiffs rely heavily on internet and social-media posts.  Plaintiffs first cite the news website of the state-supported Palestinian news organization, WAFA, https://english.wafa.ps/.[6]  (ECF 21, Am. Compl., ¶¶ 86a–86m.)  It is unclear why Plaintiffs believe a Palestinian website triggers the PSVJTA, except perhaps that the content was originally created by Palestine's UN Mission.  Everything Plaintiffs quote from WAFA is either an official UN communication *archived on the UN's website* (*id.* ¶¶ 86a–86m) or a speech "given by Palestinian representatives at the United Nations" (*id.* ¶¶ 87n-87r).  For example, ¶ 86a and ¶ 86b quote letters from Palestine's Mission to various UN bodies that were archived as relevant to four UN agenda items, including "Illegal Israeli actions" and "Palestine Question."[7]  Such letters "formally inform the UN community of events and the outcome of non-UN meetings."[8]  Plaintiffs also quote the Mission's official Twitter and Facebook pages (*id.* ¶¶ 89s–89ss), discussing the same subjects.

---

[5] *See* Hbda Depo. at 91-102; Ateyeh Depo. at 46-56, 68.  Authenticating documents in Canada and Mexico does not somehow make the U.S. notaries "agents" of the PLO.  Indeed, the State Department encourages citizens to send "a document notarized by a local foreign notary" to a U.S. consulate for authentication. *See, e.g.*, State Dept., Notarial and Authentication Servs., available at: https://travel.state.gov/content/travel/en/records-and-authentications/authenticate-your-document/Notarial-Authentication-Services-Consular.html.

[6] *See* About Us, WAFA, at https://english.wafa.ps/Home/AboutUs (WAFA is an "independent body" supported by the PLO to "serve as an independent platform to report events from the official Palestinian perspective").

[7] The letters and UN agenda information are available at: https://digitallibrary.un.org/record/3847785?ln=en; https://digitallibrary.un.org/record/3854048?ln=en.

[8] *UN Documentation, How to Find UN Documents*, United Nations Dag Hammarskjöld Library, available at: https://research.un.org/en/docs/find/letters (last visited Jan. 4, 2021).

Plaintiffs claim that any advocacy by Palestine's UN Mission's for the two-state solution, the end of annexation and demolitions, and the end of the occupation triggers the PSJVTA. But not only is Palestine's UN Mission not "in the United States," all the communications alleged in the complaint are official UN business under § 2334(e)(3). *See* UN JURIDICAL YEARBOOK, at 154–55 (1985) (UN Office of the Legal Adviser stating that anything "directly related" to a "mission or project" as part of "official" UN business). Plaintiffs also allege that social media is not UN business, but almost every UN organ and mission maintains such accounts.[9] The official UN business of any UN mission is to *communicate*.[10]

As explained by the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"), the Palestine Mission is expected to "participate[] in the work of both the Committee and the Bureau" as part of its observer status.[11] The CEIRPP "focuses its activities on diplomatic efforts and initiatives to support … an end to the Israeli occupation that began in 1967 and of the two-State solution" and to "continue to mobilize the international community to stay steadfast in its support for the inalienable rights of the Palestinian people."[12] "Through its activities," the CEIRPP "*raise[s] international awareness* of the political, human rights and humanitarian developments" and "seek[s] to mobilize ***the broadest possible international support***." *Id.* (emphasis added). The CEIRPP and other UN bodies use Facebook,

---

[9] For example, the Twitter account of Palestine's UN Mission is followed by the US Mission (@USUN), and the Missions of the most other countries, from Brazil and Canada to Libya and Zambia, as well as many UN entities, including the General Assembly (@UN), the President of the General Assembly (@UN_PGA), and many others.

[10] The United States' UN Mission often discusses the Israeli-Palestinian dispute in various fora. *See, e.g.*, Remarks by Ambassador Linda Thomas-Greenfield at the J Street National Conference (April 19, 2021), available at: https://usun.usmission.gov/remarks-by-ambassador-linda-thomas-greenfield-at-the-j-street-national-conference/.

[11] Report, CEIRPP, UN Doc. A/75/35, at: https://www.un.org/ga/search/view_doc.asp?symbol=A/75/35, ¶ 31.

[12] Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020), available at: https://www.un.org/unispal/document/palestinian-rights-committee-programme-of-work-for-2020-a-ac-183-2020-1/.

Twitter, and websites to echo Palestine's UN Mission.[13]   The online activities of Palestine's UN Mission fall squarely within official UN business as exemplified by the CEIRPP mandate.[14]

3.   *Ancillary activities.*  The PSJVTA additionally precludes jurisdiction based on "any *personal* or *official* activities conducted ancillary" to official activities.   Ancillary means "supplementary," Black's Law Dictionary (11th ed. 2019), "incidental or peripheral," The Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012), or "subservient, subordinate," Oxford English Dictionary (Online ed., 2020).   As Senator Leahy explained, the PSJVTA allows Defendants to "meet with advocates regarding relevant issues, make public statements, and otherwise engage in public advocacy and civil society activities that are ancillary to the conduct of official business without consenting to personal jurisdiction."   166 Cong. Rec. S627 (daily ed. Jan. 28, 2020) (statement of Sen. Patrick Leahy).   Indeed, Senator Leahy led the "negotiation that resulted in" the "ancillary" language with "Senators of both parties [that] understand that it is in our national interest to permit certain activities related to the official representation of the PA and PLO."   *Id.*  Having voted for the bill *and* having negotiated that specific language, his views deserve "special weight."   *Reynolds-Naughton v. Norwegian Cruise Line*, 386 F.3d 1, 5 (1st Cir. 2004) ("the sponsors of the *language* [at issue] ... would ordinarily get special weight").

## <u>Conclusion</u>

This Court should dismiss this case for lack of personal jurisdiction.

---

[13] *See, e.g.,* CEIRPP Twitter post, *Special Rapporteurs Warn of Rising Levels of Israeli Settler Violence in a Climate of Impunity*, at: https://twitter.com/UNISPAL/status/1382718800144048132; UN Humanitarian Affairs Office - Occupied Palestinian Territory, *Another 52 Palestinians were injured by Israeli forces across the West Bank*, at https://www.ochaopt.org/poc/30-march-12-april-2021.

[14] *See, e.g.*, General Assembly Resolution A/RES/ES-10/2, *Illegal Israeli actions in occupied East Jerusalem and the rest of the Occupied Palestinian Territory,* and UN Security Council, Agenda Item S/2020/10-23, *The Situation in the Middle East, including the Palestinian question.*  The press conference in New York City alleged by Plaintiffs (¶ 77) was the official announcement of the Mission's participation in that morning's Security Council meeting.

Respectfully Submitted,

June 7, 2021

**SQUIRE PATTON BOGGS (US) LLP**

/s/ *Gassan A. Baloul*
Gassan A. Baloul (DC Bar 1034245)
gassan.baloul@squirepb.com
Mitchell R. Berger (DC Bar 385467)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2021, a true and correct copy of the foregoing was served through the Court's CM/ECF System on all counsel of record in this action.


/s/ *Gassan A. Baloul*
Gassan A. Baloul