# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ | ) | |
| MIRIAM FULD, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-cv-3374 (JMF) |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| THE PALESTINE LIBERATION | ) | |
| ORGANIZATION and | ) | |
| THE PALESTINIAN AUTHORITY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

I hereby certify that I am one of the attorneys of record for Defendants in this action and that on June 8, 2021, I caused the attached Defendants' Supplemental Brief on the PSJVTA, together with accompanying exhibits, to be served via certified mail, tracking number 7018 0040 0000 4788 4096, on the U.S. Attorney General at the following address:

U.S. Department of Justice
Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

/s/ *Gassan A. Baloul*
Gassan A. Baloul

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                             )

MIRIAM FULD, *et al.*,           )

                         )

             Plaintiffs,   )        Case No. 20-cv-3374 (JMF)

                         )

        v.                  )

                         )

THE PALESTINE LIBERATION    )
ORGANIZATION and            )
THE PALESTINIAN AUTHORITY,   )

                         )

             Defendants.   )
_____  )

## DEFENDANTS' SUPPLEMENTAL BRIEF ON THE PSJVTA

                                 **SQUIRE PATTON BOGGS (US) LLP**

Mitchell R. Berger (MB-4112)        Gassan A. Baloul (GB-4473)
mitchell.berger@squirepb.com      gassan.baloul@squirepb.com
2550 M Street, N.W.              Joseph S. Alonzo (JA-1378)
Washington, D.C. 20037         joseph.alonzo@squirepb.com
Telephone: (202) 457-6000       1211 Avenue of the Americas
Facsimile:  (202) 457-6315        26th Floor
                                 New York, NY 10036
                                 Telephone: (212) 872-9800
                                 Facsimile: (212) 872-9815

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

Legal Standard ................................................................................................................. 3

Argument .......................................................................................................................... 3

I.     Exercising Personal Jurisdiction over Defendants Would Violate Due Process ................................................................................................................ 3

      A.    Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction under the Due Process Clause ................................................................................ 3

      B.    Defendants Have Not "Consented" to Personal Jurisdiction ................... 5

            1.    Consent to Jurisdiction Must Be Free and Voluntary ................... 5

            2.    Implied Consent Statutes Must Offer A Benefit That The Defendant May Accept to Demonstrate Consent To Jurisdiction ................................................................................ 8

            3.    Defendants Have Not Impliedly Agreed to Personal Jurisdiction ....................................................................... 11

      C.    Applying the PSJVTA's "Deemed Consent" Provision to Defendants in this Case Would Be Unconstitutional ........................... 14

            1.    The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause .................................. 14

            2.    Allowing Congress to Dictate that Defendants Shall Be "Deemed" to Have Consented to Personal Jurisdiction in this Case Would Violate Separation of Powers .......................... 19

II.    This Court Does Not Need to Consider the PSJVTA's U.S.-Conduct Prong, Which Has Not Been Met in Any Case ................................................... 21

      A.    Palestine's UN Mission Is Not "In the United States" and Is Specifically Exempted under the PSJVTA .............................................. 21

      B.    The Alleged Activities Do Not Create Jurisdiction under the PSJVTA ............................................................................................... 22

Conclusion ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dairy Queen Corp. v. W.B. Mason Co.*,
No. 18-cv-693, 2019 U.S. Dist. LEXIS 3314 (D. Minn. Jan. 8, 2019)....................................7

*Armstrong v. Pomerance*,
423 A.2d 174 (Del. 1980) ..............................................................................................9

*Bank Markazi v. Peterson*,
136 S. Ct. 1310 (2016)..................................................................................................20

*Brown v. Lockheed Martin Corp.*,
814 F.3d 619 (2d Cir. 2016)..........................................................1, 5, 9, 14, 20

*Carnival Cruise Lines v. Shute*,
499 U.S. 585 (1991) ....................................................................................................18

*Chen v. Dunkin' Brands, Inc.*,
954 F.3d 492 (2d Cir. 2020)..................................................................................9, 14

*City of Boerne v. Flores*,
521 U.S. 507 (1997)......................................................................................................20

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986)......................................................................................................21

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)..............................................................................................4, 10, 17

*Dickerson v. United States*,
530 U.S. 428 (2000)................................................................................................19, 20

*Estate of Klieman v. Palestinian Auth.*,
923 F.3d 1115 (D.C. Cir. 2019) ..................................................3, 4, 5, 10, 11, 13, 20

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. __, 141 S. Ct. 1017 (2021)..........................................................................4, 11

*Frost & Frost Trucking Co. v. R.R. Comm'n*,
271 U.S. 583 (1926)......................................................................................................16

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*,
636 F.2d 1300 (D.C. Cir. 1980) ..................................................................................16

*Genuine Parts Co. v. Cepec*,
    137 A.3d 123 (Del. 2016) ........................................................................................ 10

*Gilson v. Republic of Ir.*,
    682 F.2d 1022 (D.C. Cir. 1982) ............................................................................... 18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ........................................................................................... 10, 18

*Hess v. Pawloski*,
    274 U.S. 352 (1927) ...................................................................................... 7, 8, 10

*In re Mid-Atl. Toyota Antitrust Litig.*,
    525 F. Supp. 1265 (D. Md. 1981) .......................................................................... 7, 9

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) ............................................................................................. 6, 18

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ................................................................................................ 16

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) ........................................................................... 5, 13, 21

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ................................................................................................ 14

*Laker Airways Ltd. v. Sabena*,
    731 F.2d 909 (D.C. Cir. 1984) ............................................................................... 15

*Lanham v. BNSF Ry. Co.*,
    939 N.W.2d 363 (Neb. 2020) ................................................................................ 10

*Leonard v. USA Petroleum Corp.*,
    829 F. Supp. 882 (S.D. Tex. 1993) ...................................................................... 7, 14

*Litecubes, LLC v. N. Light Prods.*,
    523 F.3d 1353 (Fed. Cir. 2008) .............................................................................. 15

*Livnat v. Palestinian Auth.*,
    851 F.3d 45 (D.C. Cir. 2017) ...................................................................... 4, 18, 20

*Lugones v. Pete & Gerry's Organic*,
    440 F. Supp. 3d 226 (S.D.N.Y. 2020) ..................................................................... 3

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ........................................................................... 19, 20

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988)..................................................................13

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) .........................................................................18

*R.S.W.W., Inc. v. City of Keego Harbor*,
   397 F.3d 427 (6th Cir. 2005) .........................................................................14

*Reynolds-Naughton v. Norwegian Cruise Line*,
   386 F.3d 1 (1st Cir. 2004) .............................................................................25

*Roell v. Withrow*,
   538 U.S. 580 (2003)........................................................................................6

*Seetransport Wiking Trader Schiffarhtsgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993)...........................................................................19

*Shaffer v. Heitner*,
   433 U.S. 186 (1977).......................................................................................17

*Shatsky v. PLO*,
   955 F.3d 1016 (D.C. Cir. 2020) ...............................................................3, 4, 5

*Siemer v. Learjet Acquisition Corp.*,
   966 F.2d 179 (5th Cir. 1992) .........................................................................19

*Sullivan v. A.W. Chesterton, Inc.*,
   384 F. Supp. 3d 532 (E.D. Pa. 2019) .......................................................10, 14

*United States v. PLO*,
   695 F. Supp. 1456 (S.D.N.Y. 1988)......................................................12, 13, 22

*Walden v. Fiore*,
   571 U.S. 277 (2014).........................................................................................4

*Waldman v. PLO*,
   835 F.3d 317 (2d Cir. 2016).......................................3, 4, 5, 14, 15, 18, 20

*Waldman v. PLO*,
   925 F.3d 570 (2d Cir. 2018)......................................................................11, 13

*Wellness Int'l Network, Ltd. v. Sharif*,
   135 S. Ct. 1932 (2015).............................................................................5, 21

*WorldCare Ltd. Corp. v. World Ins. Co.*,
   767 F. Supp. 2d 341 (D. Conn. 2011) ............................................................19

*Wuchter v. Pizzutti*,
276 U.S. 13 (1928).................................................................................................8

**Statutes, Treaties, and Legislative History**

166 Cong. Rec. S627 (daily ed. Jan. 28, 2020) (statement of Sen. Patrick Leahy).......................25

22 U.S.C. § 5201(b) ...........................................................................................13

22 U.S.C. § 5202 ...............................................................................................12

22 U.S.C. § 5203 ...............................................................................................12

Anti-Terrorism Clarification Act of 2018, 18 U.S.C. §§ 2334(e)...........................................3, 10

Promoting Security and Justice for Victims of Terrorism Act, 18 U.S.C. § 2334
(2019).................................................................................................... passim

Taylor Force Act, 22 U.S.C. § 2378c-1 ......................................................................12

**UN Documents and Statements**

CEIRRP Report, CEIRPP, UN Doc. A/75/35, at:
https://www.un.org/ga/search/view_doc.asp?symbol=A/75/35 .............................................24

General Assembly Resolution A/RES/ES-10/2, *Illegal Israeli actions in occupied
East Jerusalem and the rest of the Occupied Palestinian Territory,*.......................................25

Letters from the Permanent Observer of the State of Palestine to the United
Nations, available at: https://digitallibrary.un.org/record/3854048?ln=en. .............................23

*Programme of Work for 2020*, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7,
2020), at: https://www.un.org/unispal/document/palestinian-rights-committee-
programme-of-work-for-2020-a-ac-183-2020-1/. ..........................................................24

Remarks by Ambassador Linda Thomas-Greenfield at the J Street National
Conference (April 19, 2021), at: https://usun.usmission.gov/remarks-by-
ambassador-linda-thomas-greenfield-at-the-j-street-national-conference/.................................24

UN Committee on the Exercise of the Inalienable Rights of the Palestinian People
("CEIRPP") Report, CEIRPP, UN Doc. A/75/35.............................................................24

UN Documentation, How to Find UN Documents, United Nations Dag
Hammarskjöld Library, at: https://research.un.org/en/docs/find/letters (last
visited Jan 4, 2021). ......................................................................................23

UN Humanitarian Affairs Office – Occupied Palestinian Territory, *Another 52
Palestinians were injured by Israeli forces across the West Bank*, at
https://www.ochaopt.org/poc/30-march-12-april-2021. .................................................25

UN JURIDICAL YEARBOOK (1985) ........................................................................24

UN JURIDICAL YEARBOOK (2000) .......................................................................22

UN Security Council, Agenda Item S/2020/10-23, *The Situation in the Middle East, including the Palestinian question* ....................................................25

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................................25

Richard A. Epstein, "Consent, Not Power, as the Basis of Jurisdiction," *Univ. of Chicago Legal Forum*: Vol. 2001: Issue 1, Art. 2, at 3. ..............................8

U. S. Brief, *Klieman v. Palestinian Auth.*,
No. 15-7034 (D.C. Cir. Mar. 13, 2019) ..............................................10, 11, 22

Oxford English Dictionary (Online ed., 2020) .............................................25

Depositions, *Shatsky v. PLO*,
955 F.3d 1016 (D.C. Cir. 2020) .................................................3, 4, 5, 12

State Dept., Notarial and Authentication Services, at:
https://travel.state.gov/content/travel/en/records-and-authentications/authenticate-your-document/Notarial-Authentication-Services-Consular.html .....................................................................................23

Twitter:  CEIRPP Twitter post, *Special Rapporteurs Warn of Rising Levels of Israeli Settler Violence in a Climate of Impunity*, at:
https://twitter.com/UNISPAL/status/1382718800144048132 ..............................25

WAFA New Agency Website, avalable at: https://english.wafa.ps/ ...........................23

Pls.' Brief, *Waldman v. PLO*,
No. 15-3135 (2d Cir. Dec. 11, 2015) .......................................................15

Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012) ......................................25

Defendants the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") previously moved to dismiss Plaintiffs' Amended Complaint (ECF 21) for lack of personal jurisdiction and for failure to state a claim, under Fed. R. Civ. P. 12(b)(2) and (6). (ECF 25.) Plaintiffs filed a response (ECF 29) and Defendants replied (ECF 31). The Court then ordered supplemental briefing on "the application and constitutionality of" the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), codified at 18 U.S.C. § 2334(e). (ECF 34.) For the following reasons, this Court should dismiss Plaintiffs' Amended Complaint because the PSJVTA does not confer personal jurisdiction over the Defendants.

## Introduction

Time and again, courts evaluating the same conduct asserted by Plaintiffs in this case have held that personal jurisdiction cannot be exercised over Defendants without violating the Due Process Clause. That judicial application of constitutional principles has been subject to repeated legislative attack, of which the PSJVTA is just the latest example. But Congress cannot legislate around the Due Process Clause, nor can it supplant Defendants' due process rights by "deem[ing]" that they "consent" to jurisdiction (18 U.S.C. § 2334(e)(1)) when it is clear that they do not.

"Consent" jurisdiction is a very narrow doctrine, and Due Process requires that any such "consent" be "free and voluntary." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640–41 (2d Cir. 2016). As explained by the U.S. government in defending the PSJVTA's predecessor statute, "deemed" consent to jurisdiction cannot be squared with Due Process unless there is reciprocity—that is, an express or implied exchange by which a defendant impliedly agrees to jurisdiction in return for a benefit conferred by the forum. The PSJVTA provides no such reciprocity, but instead purports to base jurisdiction on Defendants' continuation of conduct—making payments in Palestine, and maintaining facilities, or conducting activity, that is not "official" United Nations business or "any personal or official activities conducted ancillary" thereto. 18 U.S.C. § 2334(e).

While Congress may legislate liability or restrictions for a broad range of activity, it cannot constitutionally remove Defendants' due process protections against personal jurisdiction as a direct or "deemed" consequence of engaging in such activity. That is because Fifth Amendment due process imposes supervening requirements for exercising personal jurisdiction over any defendant that engages in legislatively proscribed activities. Due process requires that the defendant's proscribed activities either must have "minimum contacts" with the forum and give rise to Plaintiffs' claims, or reflect the receipt of a benefit from the forum that creates the "reciprocal obligation" of consent to jurisdiction.

The PSJVTA fails both due process tests. The activities identified in the statute already have been held not to establish "minimum contacts." Those activities likewise do not depend on any benefit or authorization from the forum (the United States). Pre-existing U.S. law already prohibits, or purports to impose liability or other restrictions for, each type of activity on which PSJVTA "deemed" jurisdiction is based, and the PSJVTA does not offer to waive such prohibitions or liability. In the absence of a benefit offered to Defendants in the PSJVTA, there is nothing for them to have accepted or rejected through their conduct, and thus no implied agreement to consent to jurisdiction.

Accordingly, the PSJVTA does not fit within the narrow window of "consent" jurisdiction, but instead improperly attempts to bypass constitutional due-process requirements that prohibit the exercise of personal jurisdiction over Defendants in precisely the circumstances presented in this case. The courts have already determined that Defendants' alleged activities are constitutionally inadequate to give rise to personal jurisdiction in the United States. Allowing Congress to transform those same activities into "consent" would undermine the Supreme Court's modern personal-jurisdiction jurisprudence. This Court should therefore conclude that Plaintiffs have not

established valid "consent" by Defendants to personal jurisdiction and should reaffirm that exercising personal jurisdiction over Defendants would violate due process.

## Legal Standard

Even when a plaintiff invokes "a statutory basis for personal jurisdiction" like the PSJVTA, "the exercise of personal jurisdiction [still] must comport with constitutional due process principles." *Lugones v. Pete & Gerry's Organic, LLC,* 440 F. Supp. 3d 226, 234 (S.D.N.Y. 2020) (quoting *Waldman v. PLO*, 835 F.3d 317, 327 (2d Cir. 2016)). The PSJVTA purports to create "deemed consent" jurisdiction if Defendants make payments, after April 18, 2020, to persons who were "fairly tried" or "ple[d] guilty" and were imprisoned for (or to families of those who died committing) "any act of terrorism" that injured or killed a U.S. national. 18 U.S.C. § 2334(e)(1)(B). The PSJVTA also "deems" "consent" to jurisdiction if, after January 4, 2020, Defendants maintain "any office" or other facility "in the United States," or engage in "any activity while physically present in the United States," not expressly exempted. *Id.* § 2334(e)(1)(B), (e)(3).

## Argument

**I.    Exercising Personal Jurisdiction over Defendants Would Violate Due Process.**

**A.    Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction under the Due Process Clause.**

Both this Circuit and the D.C. Circuit have repeatedly held that exercising personal jurisdiction over the PA and the PLO for their alleged involvement in terrorist attacks in Israel would violate the Fifth Amendment's Due Process Clause. *See Waldman*, 835 F.3d at 344 (holding personal jurisdiction over Defendants would exceed "the limits prescribed by the due process clause"); *Shatsky v. PLO*, 955 F.3d 1016, 1036–38 (D.C. Cir. 2020) (holding the PA and the PLO "are not now and were not at the time they were served subject to the district court's personal jurisdiction"); *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1118 (D.C. Cir. 2019)

3

(holding Fifth Amendment "barred U.S. courts from exercising jurisdiction" over "the PA/PLO"); *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–58 (D.C. Cir. 2017) (same).

As those courts consistently recognize, Defendants are not subject to <u>general</u> jurisdiction in the United States because they are not "fairly regarded as 'at home'" here. *Shatsky*, 955 F.3d at 1036; *see also Waldman*, 835 F.3d at 332 (holding Defendants are fairly regarded as "'at home' in Palestine, where they govern"); *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (describing the due process limitations on general jurisdiction). Defendants also are not subject to <u>specific</u> jurisdiction in the United States because their "suit-related conduct"—namely, their alleged involvement in terrorist attacks overseas (which Defendants dispute)—is "not sufficiently connected to the United States." *Waldman*, 835 F.3d at 335–44; *see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. __, 141 S. Ct. 1017 (2021) (describing the necessary "connection" between plaintiffs' claims and defendant's forum activity); *Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("defendant's suit-related conduct must create a substantial connection" with the forum).

Plaintiffs do not challenge these holdings. Nor do Plaintiffs allege that Defendants' contacts with the United States satisfy the requirements for general or specific jurisdiction under the Due Process Clause. In this case, Defendants engage in only limited UN-related activities in the United States, and those activities are unrelated to the alleged conduct that gave rise to Plaintiffs' claims—which occurred in the West Bank and did not target the United States.

Instead, Plaintiffs assert that this Court may exercise personal jurisdiction over Defendants under the "deemed consent" provisions of the PSJVTA. *See* ECF 21, Am. Compl., ¶ 3 (alleging personal jurisdiction solely under the PSJVTA). Despite Defendants' lack of any substantial contacts with the United States (and their express objection), Plaintiffs allege that Defendants should be "deemed to have consented to personal jurisdiction" in the United States because they:

(1) made certain payments to individuals in Palestine; (2) maintained an office—Palestine's Mission to the UN—in New York; and (3) engaged in certain activities (press statements, social media posts, and alleged "consular services") in the United States.  *See id.* ¶¶ 3, 31–95.

The courts already have ruled that the same or similar activities cannot support personal jurisdiction over Defendants consistent with the Due Process minimum contacts test.  *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (holding Palestine's UN Mission cannot "properly be considered as a basis of jurisdiction"); *Shatsky*, 955 F.3d at 1022–23, 1037 (holding allegations that Defendants "provid[ed] what the Families call 'martyr payments'" and conducted "a public relations campaign designed to influence the United States' policy toward Israel" were insufficient for personal jurisdiction); *Waldman*, 835 F.3d at 335–44 (same with respect to alleged "lobbying activities"); *Klieman*, 923 F.3d at 1123–26 (same with respect to allegations that Defendants "supported acts of terrorism … in part with the goal of advancing their 'campaign in the United States to influence or affect United States foreign policy'").

The question before this Court is whether Plaintiffs can rely upon those same, constitutionally-inadequate activities to force "consent" to jurisdiction under the PSJVTA.  As explained below, the answer to that question is plainly "no."  The constitutional protections afforded to litigants by the Due Process Clause are not so easily evaded.

### B.   Defendants Have Not "Consented" to Personal Jurisdiction.

#### 1.   Consent to Jurisdiction Must Be Free and Voluntary.

Where the legislature attempts to force consent, due process requires courts to analyze whether consent is "free and voluntary."  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016); *see Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932, 1948 (2015) ("It bears emphasizing … consent—whether express or implied—must still be knowing and voluntary.").

Absent express consent, the defendant's consent may be "inferred from [its] conduct." *Roell v. Withrow*, 538 U.S. 580, 582, 589 (2003) (explaining a party may "signal[] consent … through actions rather than words"). For implied consent, the nature of the defendant's activity must evince the defendant's agreement to the forum's exercise of jurisdiction. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee* ("*Bauxites*"), 456 U.S. 694, 705–09 (1982) (holding that "due process is violated … if behavior of the defendant will not support" the application of a legal presumption to the issue of personal jurisdiction).

In some cases, determining whether a defendant knowingly and voluntarily consented to personal jurisdiction is straightforward. A party may expressly agree—through a forum-selection clause, for example—to submit to the jurisdiction of a particular forum. *Id.* at 703–04. Courts may also infer jurisdiction based on actions a party takes within the litigation itself demonstrating it has agreed to submit to the court's jurisdiction. *Id.* (explaining that a party may consent to jurisdiction by invoking certain state judicial procedures, stipulating to jurisdiction, or appearing in court without objecting to jurisdiction). But these canonical forms of consent are not at issue, because Plaintiffs do not claim that Defendants have expressly consented or taken any action in the litigation itself to submit to the jurisdiction of the court. To the contrary, Defendants have twice moved to dismiss Plaintiffs' claims for lack of personal jurisdiction. *See* ECF 17, Mot. to Dismiss, at 4–8; ECF 25, Mot. to Dismiss, at 4–10.

When the legislature attempts to "deem" consent by statute, as here, the due process requirement of reciprocity protects defendants from unilateral, legislatively imposed jurisdiction. As discussed below, courts have recognized a narrow category of "implied consent" statutes under which a party freely and voluntarily agrees to personal jurisdiction by accepting a benefit conferred by the forum. *See Hess v. Pawloski*, 274 U.S. 352, 354–57 (1927) (holding that "acceptance by a

non-resident of the rights and privileges [to drive on public roads]" constituted "signification of his agreement" to consent to jurisdiction under non-resident motorist statute); *Am. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-cv-693, 2019 U.S. Dist. LEXIS 3314, *7 (D. Minn. Jan. 8, 2019) ("Consent to personal jurisdiction may be established in a number of ways, including as a condition of performing some activity in the state.").  When the defendant chooses to take advantage of a forum's offerings (e.g., driving on public roadways, doing business in the state), courts properly assume that the defendant has freely and voluntarily accepted the conditions (including consent to personal jurisdiction) that the state places on such activity.  By accepting the benefit of engaging in the regulated activity, the defendant enters a "'bargain' with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct that the state could otherwise prohibit.  *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993); *see also In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (explaining "consent is part of a bargain").  Put another way, reciprocity or exchange of benefits is the test for true, voluntary *agreement* to personal jurisdiction, as distinguished from unilateral imposition of jurisdiction by the forum.

This implied consent framework improperly becomes a disguised form of imposed jurisdiction if the statute does not offer the defendant any corresponding benefit to "accept" in exchange for its consent.  When the defendant does not avail itself of some benefit offered by the forum, "there is no bargain—no social compact."  *Leonard*, 829 F. Supp. at 889 ("Without a received benefit, there is no bargain, and without a bargain, there is no due process."); *see also In re Mid-Atl.*, 525 F. Supp. at 1278 (holding, in business-registration context, that "[i]f the corporation conducts no business in the forum, it has not availed itself of 'benefits and protections of the laws' of the forum and there is no bargain between the corporation and the forum state").  "The term

consent is inextricably linked to the idea of agreement and is, thus, implicated by the proposition that persons who consent to certain obligations are bound because they agreed to be bound … Parties who consent regard themselves as better off on net because they believe what they receive is worth more to them than what they surrender."  Richard A. Epstein, "Consent, Not Power, as the Basis of Jurisdiction," *Univ. of Chicago Legal Forum*: Vol. 2001: Issue 1, Art. 2, at 3.

Thus, when the purported "consent" is <u>not</u> accompanied by a corresponding benefit—offered by the forum and accepted by the defendant—a defendant's conduct does *not* evince an agreement to consent to personal jurisdiction.  If the activity purportedly giving rise to "consent" to jurisdiction did <u>not</u> require authorization from the state, the defendant's choice to engage in the activity does not reflect any agreement to jurisdiction because it gained nothing by way of exchange; the defendant's ability to engage in the activity did not depend on any "benefit" conferred by the forum in the first instance.

### 2. Implied Consent Statutes Must Offer A Benefit That The Defendant May Accept to Demonstrate Consent To Jurisdiction.

This reciprocal exchange underpins other deemed-consent statutes, such as when States deem consent to jurisdiction in return for a specific benefit.  Many states, for example, have enacted statutes conditioning the benefit of driving on public roads on consent to personal jurisdiction in the state for suits arising from their use of the roads.   Because the state has authority "to regulate the use of its highways" and to "exclude" non-residents, the Supreme Court has held the state could require non-resident drivers to consent to personal jurisdiction.  *Hess*, 274 U.S. at 356–57.  By accepting the privilege of driving on public roads, a non-resident motorist in turn demonstrates his implicit agreement to personal jurisdiction. *Id.*; *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a non-resident in using the highways … may properly be declared to be an agreement to accept service of summons in a suit growing out of the use of the highway ….").

8

Many courts have similarly held that a foreign defendant may impliedly consent to personal jurisdiction by registering to do business in the state.  In exchange for the privilege of doing business, registration statutes require foreign corporations to consent to service of process.  *See Brown*, 814 F.3d at 632–33 (tracing the history of such statutes and describing implied consent as "a promise, fairly extracted, to appear in state court" in exchange for the right to do business in the state); *In re Mid-Atl.*, 525 F. Supp. at 1278 ("When a corporation, as part of its registration to do business in a state, consents to jurisdiction, that consent is part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state."). State corporate director "deemed consent" statutes are subject to a similar analysis.  *See Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (holding that by accepting the "benefits" of a corporate directorship created by state law (such as the opportunity to receive interest-free, unsecured loans), defendants implicitly consented to personal jurisdiction in state court).

Importantly, implied jurisdictional consent cannot pass constitutional muster merely by providing advance notice of jurisdictional consequences absent this type of proffered exchange. Rather, due process requires that the defendant's consent to jurisdiction be "free and voluntary." *Brown*, 814 F.3d at 640.  Free and voluntary consent cannot be established, for example, even when a statute provides advance notice of jurisdictional consequences if deemed consent clashes with due process limits on jurisdiction.  *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 499 (2d Cir. 2020) (holding that New York's business registration statute, historically construed as conditioning registration to do business on consent to general jurisdiction, could no longer be read to imply consent consistent with U.S. Constitution under *Daimler*).[1]

---

[1] As the Second Circuit's decision in *Brown* illustrates, the continued vitality of business registration statutes as a valid grounds for consent to personal jurisdiction is very much in question following *Daimler*.  *See Brown*, 814 F.3d at 637–40.  Post-*Daimler*, several courts have concluded that mere registration to do business is not a sufficient basis to warrant the exercise of personal jurisdiction.  *See, e.g.*, *Sullivan v. A.W. Chesterton, Inc.*, 384 F. Supp. 3d 532, 540–

When courts uphold such implied "consent" jurisdiction, it is because the foreign defendant's decision to accept a benefit conferred by the forum signals its implicit agreement to consent to the state court's jurisdiction. The defendant could not engage in the specified activity (e.g., driving on public highways or doing business in the state) without accepting the conditions placed on the activity by the government. The defendant's decision to accept the benefit of engaging in such activity thus demonstrates its implicit agreement to consent to personal jurisdiction. *See, e.g.*, *Hess*, 274 U.S. at 356–57 (defendant's acceptance of privilege of driving on public roadways serves as "equivalent" of agreeing to consent to jurisdiction).

The United States emphasized that reciprocity was central to the constitutionality of the PSJVTA's predecessor, the Anti-Terrorism Clarification Act of 2018 ("ATCA"), 18 U.S.C. §§ 2334(e)(1)(A), (B) (2018) (superseded by the PSJVTA). In *Klieman*, the Justice Department focused on the two benefits at issue under the ATCA: U.S. financial aid or a Presidential waiver of the 1987 ATA's prohibition on any non-UN PLO office in the United States. The ATCA provided for "deemed consent" jurisdiction over Defendants if they accepted either benefit. *Id*. The Government argued that because "[t]he political branches have long imposed **conditions on these benefits**," it was therefore "reasonable and consistent with the Fifth Amendment for Congress and the Executive to determine that the [PLO's] maintenance of an office in this country … or the Palestinian Authority's continued receipt of certain foreign assistance, should be 'deemed' consent to personal jurisdiction in civil cases under the ATA of 1992." U.S. Brief, *Klieman v. Palestinian*

---

41 (E.D. Pa. 2019) (holding that "a mandatory statutory regime purporting to confer consent to general jurisdiction in exchange for the ability to legally do business in a state is contrary to the rule in *Daimler* and, therefore, can no longer stand"); *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 126, 145 (Del. 2016) (holding that "after *Daimler*, it is not tenable to read Delaware's registration statutes" as conferring personal jurisdiction based on implied consent; *Lanham v. BNSF Ry. Co.*, 939 N.W.2d 363, 371 (Neb. 2020) ("Since *Daimler AG* was decided, the vast majority of state and federal courts have rejected consent by registration as being irreconcilable with [*Goodyear*] and [*Daimler*]."). As these cases hold, a legislative end-run around the constitutional standards announced in *Daimler* violates due process. Applying the PSJVTA to Defendants would violate due process for the same reasons.

*Auth.*, No. 15-7034, at 12-13 (D.C. Cir. Mar. 13, 2019) (emphasis added).

Both the Second and D.C. Circuits thereafter held that the ATCA did not supply jurisdiction over Defendants because they had not accepted either type of U.S. government benefit. *Klieman*, 923 F.3d at 1128–31 (holding plaintiffs failed to establish factual predicates for consent under the ATCA because Defendants "unambiguously ma[de] the choice not to accept such assistance" from the U.S. government); *Waldman v. PLO* ("*Waldman II*"), 925 F.3d 570, 574–75 (2d Cir. 2018) (holding that neither "factual predicate of [the ATCA] has been satisfied" because "neither the PLO nor the PA accept United States assistance," and "plaintiffs have not established that the defendants benefit from an express waiver or suspension [of the ATA]").

The Supreme Court in *Ford* also recently explained that this type of exchange of "reciprocal obligations" between the defendant and the forum make the exercise of personal jurisdiction fair. *Ford Motor Co.*, 141 S. Ct. at 1030. Because Ford enjoyed "the benefits and protections" of the forum's laws by doing business in the forum, the Court held that "allowing jurisdiction in these cases treats Ford fairly." *Id.* By the same token, when there is no exchange between the defendant and the forum, it is unfair to infer free and voluntary consent by the defendant to submit to jurisdiction.

### 3.      Defendants Have Not Impliedly Agreed to Personal Jurisdiction.

Unlike the implied consent statutes described above, the PSJVTA does not confer any benefit on Defendants, or offer to waive pre-existing laws penalizing or prohibiting the activities listed in the statute. Instead, the PSJVTA declares that Defendants shall be "deemed" to have consented to jurisdiction if they continue to engage in precisely the same activities—payments in Palestine and activities by Palestine's UN Mission personnel—they conducted before enactment of the PSJVTA. Accordingly, Defendants' decision to continue engaging in such conduct does

not reflect an acceptance of any benefit conferred by the United States, and therefore does not reflect any implied agreement to jurisdiction in U.S. courts.

The first type of conduct identified by the PSJVTA—payments in Palestine to prisoners or families—occurs entirely outside the United States. While Congress has legislated that such payments potentially may support Anti-Terrorism Act *liability*, the courts have already held that such legislation standing alone cannot provide *jurisdiction* over Defendants because such payments are not connected to the United States or the plaintiffs' claims. *See Shatsky*, 955 F.3d at 1022–23, 1037 (holding alleged "martyr payments" did not confer specific jurisdiction over Defendants). Congress also has legislated that Defendants' continuation of such payments will foreclose any U.S. aid to Palestine. *See, e.g.*, Taylor Force Act, 22 U.S.C. § 2378c-1. But Defendants' payments in Palestine do not depend on U.S. government authorization, and Defendants thus do not avail themselves of any U.S. government benefit when they make such payments. Absent such a benefit, there is no exchange that might signal free and voluntary consent to jurisdiction.

The same is also true of the second type of conduct relied upon by Plaintiffs: the operation of Palestine's UN Mission, and activities such as social-media posts in furtherance of the Mission's work. Since long before the PSJVTA, the Anti-Terrorism Act of 1987 has expressly denied Defendants the "benefit" of engaging in any activity in the United States. *See* 22 U.S.C. § 5202; *United States v. PLO*, 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988).[2] As the courts have recognized, the 1987 Act is a "wide gauged restriction of PLO activity within the United States," *id.*, that

---

[2] The ATA of 1987 prohibits the PLO from operating in the United States by making it unlawful to (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO. *See* 22 U.S.C. § 5202. The Attorney General is authorized to enforce these provisions by proceedings in district court. 22 U.S.C. § 5203.

Congress enacted for the express purpose of "deny[ing] the PLO the benefits of operating in the United States." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) (emphasis added) ("The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefit of operating in the [United States]"); *see* 22 U.S.C. § 5201(b) (declaring Congress's intent to deny the PLO the "benefit" of operating in the United States).

Long before the PSJVTA, judicial interpretation of the UN Headquarters Agreement ("UNHQA") already confined the reach of the 1987 ATA so that the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission to the United States." *PLO*, 695 F. Supp. at 1471. Pursuant to the UNHQA, Defendants may maintain the "continuity" of operations at their UN Mission, and are guaranteed "entry, access, and residence" to the UN. *Id.* at 1465–68; *see also Klinghoffer*, 937 F.2d at 51 (holding UNHQA entitles Defendants to operate their UN Mission by "effectively remov[ing] control over the UN Headquarters and related areas from [U.S.] jurisdiction"); *see also infra* at 21–25 (describing scope of Palestine Mission's protected UN activities). The PSJVTA does not offer to waive any restriction imposed by the 1987 ATA, and no such waiver could be implied because the courts have held that any such waiver must be express. *Waldman II*, 925 F.3d at 574-75; *Klieman*, 923 F.3d at 1130-31. The PSJVTA therefore offers Defendants no protection from the 1987 ATA, or any other benefit whose acceptance might signal free and voluntary consent to jurisdiction in the United States.

The PSJVTA thus stands in stark contrast to its predecessor statute, the ATCA. Under the ATCA, a defendant was deemed to "consent" to jurisdiction if it accepted U.S. financial aid or the "benefit" of a formal "waiver or suspension" of the prohibitions on defendants' activities under the 1987 Act. *See* 18 U.S.C. §§ 2334(e)(1)(A), (B) (2018) (superseded by PSJVTA). In other words, the ATCA permitted Defendants to exchange submission to U.S. jurisdiction in return for

foreign aid or an express waiver of the 1987 ATA.[3]

The PSJVTA, by contrast, does not confer any benefit on Defendants in exchange for their purported "consent."  The PSJVTA does not authorize Defendants to engage in activities in the United States prohibited by the ATA, nor does it extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction.  Accordingly, "there is no bargain—no social compact" between the parties that could evince Defendants' implied agreement to submit to jurisdiction in the United States.  *Leonard*, 829 F. Supp. at 889.

## C. Applying the PSJVTA's "Deemed Consent" Provision to Defendants in this Case Would Be Unconstitutional.

### 1. The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause.

The Second Circuit recognized in *Brown* and *Chen* that due process serves as a supervening check on legislatively imposed "consent" to jurisdiction.  The Second Circuit reiterated its "constitutional concerns" that, if legislative notice of "consent" jurisdiction were alone enough to satisfy due process, "'*Daimler*'s ruling would be robbed of meaning by a back-door thief.'"  *Chen*, 954 F.3d at 499 (quoting *Brown*, 814 F.3d at 640).  *Waldman I* reinforces this point, with its rejection of Plaintiffs' argument that "the defendants consented to personal jurisdiction under the ATA" by appointing an agent and accepting service of process.  835 F.3d at 337.  Plaintiffs argued that Defendants were "on notice" that acceptance of service conferred personal jurisdiction as a

---

[3] This is not to say that the ATCA itself, or an implied consent statute structured like the ATCA, would be free of constitutional defects.  *See supra* n.1.  Under the unconstitutional-conditions doctrine, the government cannot condition the receipt of a government benefit on the surrender of constitutional rights.  *See Koontz v. St. Johns Riv. Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005).  Courts have applied this principle in the business-registration context to invalidate statutes conditioning the right to do business in the state (a government benefit) on the forfeiture of constitutional defenses to personal jurisdiction.  *See, e.g.*, *Sullivan*, 384 F. Supp. 3d at 540–42.  To the extent Plaintiffs assert the PSJVTA confers some "benefit" on Defendants, the same rule would apply: the government cannot condition the receipt of any such government benefit on Defendants' "consent" to forego jurisdictional defenses under the Due Process Clause.  The Court need not reach that issue, however, because the PSJVTA does not confer any benefit on Defendants.

"condition" of entry.  Pls.' Br., *Waldman v. PLO*, No. 15-3135 (2d Cir. Dec. 11, 2015).  Although it was clear that the "ATA permitted service of process on the representative of PLO and PA in Washington," the Second Circuit held that "the statute does not answer the constitutional question of whether due process is satisfied."  835 F.3d at 343 (citing 18 U.S.C. § 2334(a)).

If due process did not require more than fair notice of legislatively-imposed jurisdictional consequences, then nothing could stop Congress from decreeing that henceforth a foreign defendant shall be "deemed" to have "consented" to personal jurisdiction by engaging in *any* activity *anywhere* in the world, even absent "minimum contacts" or "free and voluntary" consent.  But, as the *Waldman I* rejection of Plaintiffs' "consent" argument contemplates, while Congress can prohibit conduct "beyond the territorial boundaries of the United States," that legislative jurisdiction *cannot provide personal jurisdiction* over foreign defendants unless the constitutional requirements are satisfied. *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008).

The personal jurisdiction requirement serves as "an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is <u>independent of the extraterritorial reach of a federal statute</u>."  *Id.* (emphasis added).  As such, Congress's "prescriptive jurisdiction"—its authority to make federal law applicable to parties and their activities—"is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'" *Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984).  This distinction between "prescriptive" and "adjudicative" jurisdiction ensures that foreign defendants cannot be dragged into federal court based solely on Congressional fiat.

Where there is no free and voluntary consent as demonstrated by a reciprocal exchange, Congress cannot simply attach the penalty of personal jurisdiction to a defendant's conduct and call it "deemed consent."  It is undisputed that Congress has broad authority to outlaw extraterritorial

conduct that harms its citizens, including acts of terrorism.  But whether U.S. courts have jurisdiction over the person is subject to a different analysis governed by the Due Process Clause, which as discussed below, precludes Congress from simply imposing jurisdiction.  *See FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1318–19 (D.C. Cir. 1980) (distinguishing adjudicatory from prescriptive jurisdiction and explaining that "a court may not exercise its adjudicatory authority over an individual unless it has power to reach him, as circumscribed by the due process clause of the Constitution").  Congress cannot evade these constitutional restrictions by masking imposed jurisdiction as deemed consent.  *See Frost & Frost Trucking Co. v. R.R. Comm'n*, 271 U.S. 583, 593 (1926) ("[C]onstitutional guarantees, so carefully safeguarded against direct assault, [should not be] open to destruction by the indirect but no less effective process of requiring a surrender which, though in form voluntary, in fact lacks none of the elements of compulsion.").

In the absence of free and voluntary consent to personal jurisdiction by Defendants, the PSJVTA's "deemed consent" provision is no different than the "fictions" of "implied consent" and "presence" discarded in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  As the Supreme Court explained, prior decisions asserting personal jurisdiction over foreign defendants had often "resort[ed] to the legal fiction that [the defendant] has given its consent to service and suit, consent being implied from its presence in the state through the acts of its authorized agents."  *Id.* at 318.  "But more realistically it may be said that those authorized acts were of such a nature as to justify the fiction," meaning that the "nature and quality" of the defendant's activities in the forum were "sufficient to render [the defendant] liable to suit."  *Id.*  "Implied consent," in other words, was an obscure (and unhelpful) way of saying that the defendant's forum contacts were sufficient to warrant jurisdiction under the Due Process Clause.  *See Shaffer v. Heitner*, 433 U.S. 186, 202–03

(1977) (explaining that courts analyzing "implied consent" "were in fact attempting to ascertain 'what dealings make it just to subject a foreign corporation to local suit'").

Plaintiffs' reliance on "deemed consent" is no different.  Stripped of the "legal fiction" of "consent," Plaintiffs assert this Court can exercise jurisdiction over Defendants based on payments made outside the United States and the activities of Palestine's UN Mission.  (*See* ECF 21, Am. Compl., ¶¶31–95.)  Yet federal courts have uniformly held that the nature and quality of those same activities are insufficient to warrant the imposition of personal jurisdiction under the Due Process Clause.  *See supra* at 3–5.  Merely calling the same conduct grounds for "deemed consent" to jurisdiction does not alter that conclusion.

Accepting Plaintiffs' assertion that incanting the words "deemed consent" allows Congress to transform constitutionally-inadequate imposed jurisdiction into "consent" jurisdiction would swallow the "minimum contacts" test.  In *Daimler*, for example, the Supreme Court held that the Due Process Clause prohibited a California court from exercising general jurisdiction over a car manufacturer and its US subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere.  *See* 571 U.S. at 139.  Despite achieving "sizable" sales in the state, the Court held that defendants' activities were insufficient for general jurisdiction because they were not "essentially at home" in the forum.  *Id.*

Under Plaintiffs' novel interpretation of due process, California could circumvent that holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state. If constitutionally-inadequate activities in a forum can serve as a valid basis for consent to personal jurisdiction divorced from any accompanying benefit provided by the forum, there is no end to the types of activities that could serve as the basis for "deemed consent" to jurisdiction.

17

Courts, however, have consistently rejected attempts to extend legislatively-imposed jurisdiction beyond constitutional limits. *See, e.g.*, *Gilson v. Republic of Ir.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982) ("a statute cannot grant personal jurisdiction where the Constitution forbids it"); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (same). As the D.C. Circuit recognized in *Livnat*, "due-process protections" must be applied "to limit personal jurisdiction in Antiterrorism Act cases" even when doing so might "thwart Congress's intent to provide redress," because "Congress cannot wish away a constitutional provision." 851 F.3d at 53. The Due Process Clause "sets the outer boundaries of [a court's] authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 923 (2011). Exercising personal jurisdiction over Defendants on the fiction that they "consent" to jurisdiction simply by continuing activity that fails the minimum contacts test, when the forum offers no benefit in exchange, would transgress those constitutional boundaries. *See Livnat*, 851 F.3d at 56 ("[A]lthough congressional interests may be relevant to whether personal jurisdiction comports with due-process standards, they cannot change the standards themselves.").

Whatever the source of personal jurisdiction, the Court has also emphasized that the exercise of jurisdiction must "not offend 'traditional notions of fair play and substantial justice.'" *Bauxites*, 456 U.S. at 702–03; *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991) (holding forum-selection clauses are still "subject to judicial scrutiny for fundamental fairness"); *Waldman*, 835 F.3d at 343 (holding "due process analysis—considerations of minimum contacts and reasonableness—applies even when federal service-of-process statutes are satisfied").

Exercising jurisdiction over Defendants in this case would violate traditional notions of fair play and substantial justice, given Defendants' "paltry" contacts with the forum, the lack of any suit-related conduct in (or targeting) the United States, and the prior holdings of both the

18

Second and D.C. Circuits that Defendants lack sufficient contacts to support jurisdiction.  *See Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183–84 (5th Cir. 1992) (holding defendant can only impliedly "consent" to jurisdiction "where such jurisdiction is constitutionally permissible"); *WorldCare Ltd. Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 361, 364 (D. Conn. 2011) (holding foreign defendant's "paltry" forum contacts failed the "reasonableness test").  "Expansive, non-explicit consent to being haled into court on any claim whatsoever in a [forum] in which one lacks minimum contacts goes against the longstanding notion that personal jurisdiction is primarily concerned with fairness."  *Id.* at 355.  "Deeming" consent to jurisdiction would be doubly unfair in this case, since any such ruling would retroactively undo the courts' prior uniform rulings based on conduct that took place long after the conduct giving rise to suit.

> **2.     Allowing Congress to Dictate that Defendants Shall Be "Deemed" to Have Consented to Personal Jurisdiction in this Case Would Violate Separation of Powers.**

Allowing Congress through the PSJVTA to override the courts' application of constitutional due process requirements would also violate separation of powers.  It is well-settled that "Congress may not legislatively supersede" the decisions of the federal courts "interpreting and applying the Constitution."  *Dickerson v. United States*, 530 U.S. 428, 437 (2000); *Seetransport Wiking Trader Schiffarhtsgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) (a statute "cannot create personal jurisdiction where the Constitution forbids it") (citation omitted).  Placing legislative acts "on a level with" the Constitution would require the courts to "close their eyes on the constitution," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and make the Constitution, "like other acts, … alterable when the legislature shall please to alter it."  *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997).  The result would give Congress "practical and real omnipotence," *Marbury*, 5 U.S. at 178, and would permit "[s]hifting legislative

majorities [to] change the Constitution and effectively circumvent the difficult and detailed amendment process contained in Article V." *Boerne*, 521 U.S. at 529.

The Supreme Court consistently enforces these separation-of-powers principles by invalidating Congressional efforts to make "substantive change[s] in constitutional protections" by legislation. *Id.* at 532 (invaliding federal statute passed to change constitutional protections); *see Dickerson*, 530 U.S. at 437 (invaliding statute designed to overrule constitutional rule in *Miranda v. Arizona* by altering considerations for determining the voluntariness of a confession). In *Boerne*, the Court held that the judiciary must adhere to its prior constitutional rulings in the face of "contrary expectations" from the "political branches" when they "act against the background of a judicial interpretation of the Constitution already issued." 521 U.S. at 536. In such circumstances, "it is this Court's precedent, not [the statute], which must control." *Id.*

The PSJVTA violates separation of powers as applied here by legislatively redefining the constitutional boundaries of personal jurisdiction to undermine the rulings of the Judicial Branch in *Shatsky I*, *Waldman*, *Livnat*, and *Klieman*, all of which held that Defendants' activities are insufficient to create jurisdiction under the Due Process Clause. Congress cannot change these courts' interpretation and application of constitutional rules, *Bank Markazi v. Peterson,* 136 S. Ct. 1310, 1315 (2016) ("Article III of the Constitution establishes an independent Judiciary with the 'province and duty ... to say what the law is' in particular cases and controversies."), nor can Congress "exercise its authority, including its power to regulate federal jurisdiction, in a way that requires a federal court to act unconstitutionally," *id.* at 1324 n.19 (cleaned up). Applying the PSJVTA to Defendants in this case would dictate personal jurisdiction in direct opposition to the Judicial Branch and is therefore impermissible. *See Brown*, 814 F.3d at 640 (noting that *Daimler's* constitutional holding cannot be robbed of meaning by a legislative "back-door thief").

Finally, a party cannot waive or consent to a separation-of-powers violation.  "To the extent that [a] structural principle is implicated in a given case . . . the parties cannot by consent cure the constitutional difficulty." *Wellness Int'l*, 135 S. Ct. at 1943 (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986)).  "When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect."  *Schor*, 478 U.S. at 850–51.  Artificially-manufactured "consent" cannot be used to usurp the judicial role.

## II.     This Court Does Not Need to Consider the PSJVTA's U.S.-Conduct Prong, Which Has Not Been Met in Any Case.

Because personal jurisdiction based on *either* PSJVTA prong would violate due process, there is no need for the Court to determine whether Plaintiffs can satisfy the disjunctive "U.S. conduct" PSJVTA prong, 18 U.S.C. § 2334(e)(1)(B), in addition to the "payment" prong, 18 U.S.C. § 2334(e)(1)(A).  Nonetheless, while it would not change the outcome of the due process analysis, Plaintiffs' allegations do not meet the U.S. conduct prong, which Plaintiffs allege is triggered by the physical office of Palestine's UN Mission (ECF 21, ¶¶ 91–95), and by certain activities, including "consular services," a Palestinian news website, and posts by the UN Mission's website (palestineun.org), Twitter account (@Palestine_UN), and Facebook page (@Palestine.at.UN) (*see id.* ¶¶ 69–90).  None of these acts supports jurisdiction under the PSJVTA.

### A.     Palestine's UN Mission Is Not "In the United States" and Is Specifically Exempted under the PSJVTA.

Plaintiffs allege that the presence of Palestine's UN Mission in New York is enough to create jurisdiction as an office "in the United States" under 18 U.S.C. § 2334(e)(1)(B)(i).  (ECF 21, Am. Compl., ¶¶ 91–95.)  But under longstanding judicial interpretation, the UN Mission is not "in the United States" under the UNHQA, which "effectively removes control over the UN

21

Headquarters and related areas from the jurisdiction of the United States." *Klinghoffer*, 937 F.2d at 51 ("the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control"). The United States agrees that Palestine's UN Mission is not "in the jurisdiction of the United States" under the UNHQA. U.S. Brief, *Klieman v. Palestinian Auth.*, No. 15-7034, at 6 (D.C. Cir. March 13, 2019). Any interference with the Mission's "ability to discharge its official functions" would "contravene" the UN Charter, the UNHQA, and "various General Assembly resolutions." UN JURIDICAL YEARBOOK, Ch. V, § A(13) (2000); *see also PLO*, 695 F. Supp. at 1471 ("The PLO Mission to the United Nations is an invitee of the United Nations under the Headquarters Agreement and its status is protected by that agreement."). Indeed, the PSJVTA incorporates this law into its provisions, specifically exempting Palestine's UN Mission as an office used "exclusively for the purpose of conducting official business of the United Nations." 18 U.S.C. § 2334(e)(3)(A).

**B.      The Alleged Activities Do Not Create Jurisdiction under the PSJVTA.**

None of the activities alleged by Plaintiff satisfies §2334(e)(1)(B)(iii):

1.      *Consular services*. Third-party depositions in another case show that the "consular services" alleged by Plaintiffs (ECF 21, Am. Compl., ¶¶ 69–74) were nothing more than U.S. notaries (who happen to be Palestinian) acting for private clients. The notaries denied any authority to act on Defendants' behalf, did not take any actions on behalf of or receive any remuneration from Defendants, and denied any professional contacts with Palestine's UN Mission.[4] The depositions showed that the U.S. notaries sent notarized documents on behalf of their private clients to the PLO's Canadian or Mexican consulates for authentication, and that the

---

[4] *See* Awni Abu Hba Depo. (attached as Ex. A) at 92-93, 119, 149, 155; Fuad Ateyeh Depo. (attached as Ex. B) at 22-24, 43, 69. These depositions were taken in *Shatsky v. PLO*, No. 18-12355 (S.D.N.Y.).

Palestinian Land Department answers emails about real estate in Palestine.[5]  The notaries are not Defendants' agents, and Defendants' responses to their inquiries (from consulates or the Land Department) did not take place "while physically present" in the United States.  These activities thus do not constitute grounds for "deemed consent" under the PSJVTA "while physically present" in the United States.  *See* 18 U.S.C. § 2334(e)(1)(B)(iii).

2.      *Internet activities*.  Even though the PSVJTA applies only to those "physically present" in the United States, Plaintiffs rely heavily on internet and social-media posts.  Plaintiffs first cite the news website of the state-supported Palestinian news organization, WAFA, https://english.wafa.ps/.[6]  (ECF 21, Am. Compl., ¶¶ 86a–86m.)  It is unclear why Plaintiffs believe a Palestinian website triggers the PSVJTA, except perhaps that the content was originally created by Palestine's UN Mission.  Everything Plaintiffs quote from WAFA is either an official UN communication *archived on the UN's website* (*id.* ¶¶ 86a–86m) or a speech "given by Palestinian representatives at the United Nations" (*id.* ¶¶ 87n-87r).  For example, ¶ 86a and ¶ 86b quote letters from Palestine's Mission to various UN bodies that were archived as relevant to four UN agenda items, including "Illegal Israeli actions" and "Palestine Question."[7]  Such letters "formally inform the UN community of events and the outcome of non-UN meetings."[8]  Plaintiffs also quote the Mission's official Twitter and Facebook pages (*id.* ¶¶ 89s–89ss), discussing the same subjects.

---

[5] *See* Hbda Depo. at 91-102; Ateyeh Depo. at 46-56, 68.  Authenticating documents in Canada and Mexico does not somehow make the U.S. notaries "agents" of the PLO.  Indeed, the State Department encourages citizens to send "a document notarized by a local foreign notary" to a U.S. consulate for authentication. *See, e.g.*, State Dept., Notarial and Authentication Servs., available at:  https://travel.state.gov/content/travel/en/records-and-authentications/authenticate-your-document/Notarial-Authentication-Services-Consular.html.

[6] *See* About Us, WAFA, at https://english.wafa.ps/Home/AboutUs (WAFA is an "independent body" supported by the PLO to "serve as an independent platform to report events from the official Palestinian perspective").

[7] The letters and UN agenda information are available at: https://digitallibrary.un.org/record/3847785?ln=en; https://digitallibrary.un.org/record/3854048?ln=en.

[8] *UN Documentation, How to Find UN Documents*, United Nations Dag Hammarskjöld Library, available at: https://research.un.org/en/docs/find/letters (last visited Jan. 4, 2021).

Plaintiffs claim that any advocacy by Palestine's UN Mission's for the two-state solution, the end of annexation and demolitions, and the end of the occupation triggers the PSJVTA.  But not only is Palestine's UN Mission not "in the United States," all the communications alleged in the complaint are official UN business under § 2334(e)(3).  *See* UN JURIDICAL YEARBOOK, at 154–55 (1985) (UN Office of the Legal Adviser stating that anything "directly related" to a "mission or project" as part of "official" UN business).  Plaintiffs also allege that social media is not UN business, but almost every UN organ and mission maintains such accounts.[9]  The official UN business of any UN mission is to *communicate*.[10]

As explained by the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"), the Palestine Mission is expected to "participate[] in the work of both the Committee and the Bureau" as part of its observer status.[11]  The CEIRPP "focuses its activities on diplomatic efforts and initiatives to support … an end to the Israeli occupation that began in 1967 and of the two-State solution" and to "continue to mobilize the international community to stay steadfast in its support for the inalienable rights of the Palestinian people."[12]  "Through its activities," the CEIRPP "*raise[s] international awareness* of the political, human rights and humanitarian developments" and "seek[s] to mobilize *the broadest possible international support*."  *Id.* (emphasis added).  The CEIRPP and other UN bodies use Facebook,

---

[9] For example, the Twitter account of Palestine's UN Mission is followed by the US Mission (@USUN), and the Missions of the most other countries, from Brazil and Canada to Libya and Zambia, as well as many UN entities, including the General Assembly (@UN), the President of the General Assembly (@UN_PGA), and many others.

[10] The United States' UN Mission often discusses the Israeli-Palestinian dispute in various fora.  *See, e.g.*, Remarks by Ambassador Linda Thomas-Greenfield at the J Street National Conference (April 19, 2021), available at: https://usun.usmission.gov/remarks-by-ambassador-linda-thomas-greenfield-at-the-j-street-national-conference/.

[11] Report, CEIRPP, UN Doc. A/75/35, at: https://www.un.org/ga/search/view_doc.asp?symbol=A/75/35, ¶ 31.

[12] Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020), available at: https://www.un.org/unispal/document/palestinian-rights-committee-programme-of-work-for-2020-a-ac-183-2020-1/.

Twitter, and websites to echo Palestine's UN Mission.[13]  The online activities of Palestine's UN Mission fall squarely within official UN business as exemplified by the CEIRPP mandate.[14]

      3.   *Ancillary activities*.  The PSJVTA additionally precludes jurisdiction based on "any *personal* or *official* activities conducted ancillary" to official activities.  Ancillary means "supplementary," Black's Law Dictionary (11th ed. 2019), "incidental or peripheral," The Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012), or "subservient, subordinate," Oxford English Dictionary (Online ed., 2020).  As Senator Leahy explained, the PSJVTA allows Defendants to "meet with advocates regarding relevant issues, make public statements, and otherwise engage in public advocacy and civil society activities that are ancillary to the conduct of official business without consenting to personal jurisdiction."  166 Cong. Rec. S627 (daily ed. Jan. 28, 2020) (statement of Sen. Patrick Leahy).  Indeed, Senator Leahy led the "negotiation that resulted in" the "ancillary" language with "Senators of both parties [that] understand that it is in our national interest to permit certain activities related to the official representation of the PA and PLO."  *Id*. Having voted for the bill *and* having negotiated that specific language, his views deserve "special weight."  *Reynolds-Naughton v. Norwegian Cruise Line*, 386 F.3d 1, 5 (1st Cir. 2004) ("the sponsors of the *language* [at issue] ... would ordinarily get special weight").

## Conclusion

      This Court should dismiss this case for lack of personal jurisdiction.

---

[13] *See, e.g.,* CEIRPP Twitter post, *Special Rapporteurs Warn of Rising Levels of Israeli Settler Violence in a Climate of Impunity*, at:  https://twitter.com/UNISPAL/status/1382718800144048132; UN Humanitarian Affairs Office - Occupied Palestinian Territory, *Another 52 Palestinians were injured by Israeli forces across the West Bank*, at https://www.ochaopt.org/poc/30-march-12-april-2021.

[14] *See, e.g.*, General Assembly Resolution A/RES/ES-10/2, *Illegal Israeli actions in occupied East Jerusalem and the rest of the Occupied Palestinian Territory,* and UN Security Council, Agenda Item S/2020/10-23, *The Situation in the Middle East, including the Palestinian question*.  The press conference in New York City alleged by Plaintiffs (¶ 77) was the official announcement of the Mission's participation in that morning's Security Council meeting.

Respectfully Submitted,

June 7, 2021

**SQUIRE PATTON BOGGS (US) LLP**

<u>/s/ *Gassan A. Baloul*</u>
Gassan A. Baloul (DC Bar 1034245)
gassan.baloul@squirepb.com
Mitchell R. Berger (DC Bar 385467)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2021, a true and correct copy of the foregoing was served through the Court's CM/ECF System on all counsel of record in this action.



/s/ *Gassan A. Baloul*
Gassan A. Baloul

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -x
SHABTAI SCOTT SHATSKY, ET AL.,

                              Plaintiffs,

                          Civil No.:
                          8 CIV. 12355 (MKV)


                -against-


THE PALESTINE LIBERATION ORGANIZATION, ET AL.,


                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - -x

                    DEPOSITION OF

                    AWNI ABU HBA

              Taken on April 7, 2021

- - - - - - - - - - - - - - - -- - - - - - - - - -x

Page 2

1
2                          I N D E X
3   WITNESS            EXAMINATION BY            PAGE
4   AWNI ABU HBDA      MR. SINAIKO                 10
5   AWNI ABU HBDA      MR. BERGER                 154
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2   ****************************************************
3   VIDEO-RECORDED REALTIME DEPOSITION of AWNI ABU HBDA,
4   held on April 7, 2021, at 9:38 a.m., was sworn
5   before AMBRIA IANAZZI, a Registered Professional
6   Reporter, Certified Realtime Reporter, and Notary
7   Public.
8   ****************************************************
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2                        (CONT'D)
3                       I N D E X
4                MARKED FOR IDENTIFICATION
5   EXHIBIT           DESCRIPTION              PAGE
6   Exhibit 1         Subpoena                   18
7   Exhibit 2         Tab 1                      28
8   Exhibit 3         Tab 8                      32
9   Exhibit 4         Tab 2                      52
10  Exhibit 5         Declaration of C. Russell  70
11  Exhibit 6         Subpoena to Produce       120
12  Exhibit 7         Tab 13                    124
13  Exhibit 8         Tab 15                    127
14  Exhibit 9         Tab 11                    136
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2   A P P E A R A N C E S:
3
4   COHEN & GRESSER LLP
            Counsel for Plaintiffs
5       800 Third Avenue
        New York, New York 10022
6
7   BY:  STEPHEN M. SINAIKO, ESQ.
            ssinaiko@cohengresser.com
         ERICA LAI, ESQ.
8           elai@cohengresser.com
         ANDREW PECORARO, ESQ.
9           apecoraro@cohengresser.com
10
11  SQUIRE PATTON BOGGS
            Attorneys for Defendants
12       1211 6th Avenue, 26th Floor
        New York, New York 10036
13
14  BY:  MITCHELL BERGER, ESQ.
            mitchell.berger@@squirepb.com
15       GASSAN A. BALOUL, ESQ.
            gassan.baloul@squirepb.com
16       JOSEPH ALONZO, ESQ.
            joseph.alonzo@squirepb.com
17       SALIM KADDOURA, ESQ.
            salim.kaddoura@squirepb.com
18
19  KROPF MOSELEY PLLC
            Counsel for the Witness
20       1100 H Street NW, Suite 1220
        Washington, D.C. 20005
21
22  BY:  SARAH KROPF, ESQ.
23
24
25

**Page 6**

(CONT'D)

A P P E A R A N C E S:

ALSO PRESENT:

COSETTE VINCENT, Cohen & Gresser
ELIZABETH BEZVERKHA, Cohen & Gresser
HADEER AL AMIRI, Interpreter
NAWEL MESSAOUDI, Interpreter
COREY WAINAINA, Videographer

**Page 7**

- o 0 o -

A W N I   A B U   H B D A, the WITNESS
herein, after having been first duly sworn by
a Notary Public, was examined and testified
                through an
            interpreter as follows:

- o 0 o -

**Page 8**

THE VIDEOGRAPHER:  Good morning.  We are
now on the record.  The participants should be
aware that this proceeding is being recorded, and,
as such, all conversations held will be recorded,
unless there is a request and agreement to go off
the record.  This is the remote video-recorded
deposition of Awni Abu Hbda.  Today is Wednesday,
April 7th, 2021.  The time is now 13:39 UTC.

We are here in the matter of Shatsky
versus PLO.  My name is Corey Wainaina.  I am the
remote video technician on behalf of U.S. Legal
Video Support, located at 90 Broad Street, New
York, New York.  I'm not related to any of the
Parties in the Action, nor am I financially
interested in the outcome of the case.

At this time, will the court reporter,
Ambria Ianazzi, on behalf of U.S. Legal Support,
please enter the statement for remote proceeding
into the record.

MR. SINAIKO:  Before we get started with
Mr. Abu Hbda, I would just like to go around to
counsel on the call and confirm that we all
stipulate under the Rule 29 of the Federal Rules
of Civil Procedure that Ms. Ianazzi, although

**Page 9**

she's in New York, is an appropriate officer
before whom to take this deposition; does
everybody so stipulate?

MR. BERGER:  For Defendants, yes.  This is
Mitchell Berger from Squire, Patton, Boggs.

MR. SINAIKO:  And Counsel for the Witness?

MS. KROPF:  We're fine with that.  Thank
you.

MR. SINAIKO:  Okay.

Page 10

```
1                   A. ABU HBDA
2    EXAMINATION BY
3    MR. SINAIKO:
4        Q.   And Mr. Abu Hbda, let me introduce myself.
5    My name is Steve Sinaiko.  I'm a partner in the law
6    firm Cohen & Gresser LLP.  We represent the
7    Plaintiffs in this litigation and we appreciate you
8    being here today.  Have you ever had your deposition
9    taken before, Mr. Abu Hbda?
10       A.   No.
11       Q.   Okay.  Have you ever testified in court,
12   in the United States, prior to today?
13       A.   No.
14       Q.   Okay.  I'm just going to take a couple of
15   minutes to go over some ground rules for our
16   deposition today.  First of all, you are here on the
17   record.  There is a court reporter and a
18   videographer recording everything that we say today.
19            In order to ensure that we have an
20   accurate record, and especially because this
21   deposition is being taken by videoconference,
22   instead of in person, due to the COVID-19 Pandemic,
23   it's important that we not speak over one another,
24   and more than one person speaks at a time.
25            So, I would be grateful if you wait until
```

Page 11

```
1                   A. ABU HBDA
2    I finish my questions before you start answering
3    them, and, of course, I'll try to wait until you
4    finish your answers before I ask my next question;
5    is that okay?
6        A.   Yes.
7        Q.   Okay.
8            MS. KROPF:  And sorry to interrupt, I
9        think we'll have the translator translate your
10       questions going forward; is that okay?
11           MR. SINAIKO:  For the record, all my
12       questions are being translated by the translator.
13       Mr. Abu Hbda is being translated, answering the
14       questions in English, and the questions are not
15       being translated at this time.
16       Q.   Okay.  As we work through our questions
17   today, it's important that you respond to questions
18   verbally because the court reporter and the record
19   can't capture nods of the head, or gestures of the
20   hand, so it's important to give verbal answers to my
21   questions; is that okay?
22           THE INTERPRETER:  Yeah.  I'm supposed to
23       swear first.  I'm sorry.
24           MR. SINAIKO:  Oh, we need to swear in the
25       translator.
```

Page 12

```
1                   A. ABU HBDA
2                    - o 0 o -
3
4          N A W E L   M E S S A O U D I,
5            Called as the interpreter in this
6    matter, was duly sworn by a Notary Public to
7    accurately and faithfully translate the
8    questions propounded to the AWNI ABU HBDA
9    from English into Arabic, and the answers
10   given by the AWNIA ABU HBDA from Arabic into
11              English.
12
13                   - o 0 o -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 13

```
1                   A. ABU HBDA
2            THE INTERPRETER:  I'm sorry, I'm not
3        supposed to do before the oath.
4        Q.   Okay.  Mr. Abu Hbda, let's just -- let's
5    just go back and translate, for Mr. Abu Hbda, my
6    last question.
7            THE INTERPRETER:  Can you please repeat
8        it?
9            MR. SINAIKO:  Oh, certainly.
10       Q.   As we go through our questions today,
11   Mr. Abu Hbda, it's important that you give verbal
12   answers, because the court reporter will not be able
13   to capture, and the record will not be able capture,
14   head nods and hand gestures.
15            So, do you understand that you will need
16   to give verbal answers to the questions that I ask
17   you today?
18       A.   Yes.
19       Q.   Okay.
20       A.   Thank you.
21       Q.   So, Mr. Abu Hbda, I'm going to be asking
22   you a series of questions today.  If at any time,
23   there's a question you don't understand, please let
24   me know, and I'll try to rephrase the question for
25   you, or make it more clear.  But understand that if
```

Page 14

A. ABU HBDA

1 you do answer a question, I will assume, and the
2 Court will assume, and everyone in this room will
3 assume, that you understood each question that you
4 respond to; do you understand?
5     A.   Yes.
6     Q.   Okay.  It is possible that during the
7 course of our deposition today, your counsel or one
8 of the other lawyers in the room may object to one
9 of my questions.  Unless your counsel instructs you
10 not to answer a question that I've asked you, and
11 your counsel is the only person who's permitted to
12 so instruct you, you should answer my questions
13 without regard to any objections that may be raised
14 by any of the lawyers in the room; do you
15 understand?
16     A.   Yes.  Okay.
17          MR. SINAIKO:  Just for the record, I
18 think -- I think, going forward, the translator
19 has been translating Mr. Abu Hbda's answers, and I
20 think it's just going to go more smoothly if we
21 have all of the answers translated, just for the
22 record.  I know that the answers have all been
23 translated.
24          And, you know, Sara, unless you object to

Page 15

A. ABU HBDA

1 it, I think we should have all the answers
2 translated; it's going to go more smoothly.
3          MS. KROPF:  That's fine.  So, Awni, you
4 can have the answers translated to English and,
5 then you can answer in Arabic; okay?
6     A.   I prefer speaking in Arabic.
7     Q.   Okay.
8          MR. BERGER:  Excuse me, I have a question.
9 This is Mitchell Berger.  Is the translator
10 translating from a realtime transcript, because we
11 don't have that, or is she translating from notes
12 that she is taking, or from what Steve is saying?
13          MR. SINAIKO:  Mitch, are you asking to
14 have the realtime because I think we can arrange
15 that, if --
16          MR. BERGER:  We ordered the realtime.  It
17 hasn't been provided to us.
18          MR. SINAIKO:  Do we have a support person
19 from U.S. Legal today, because I'm sure we do.
20          MR. BERGER:  My question is, is Mess
21 translating from the realtime?
22          MR. SINAIKO:  Okay.  But my question is,
23 if you didn't get the realtime, and we have the
24 realtime, we would like you to have it.

Page 16

A. ABU HBDA

1          MR. BERGER:  Yeah.  If the translator is
2 translating it from the realtime, we would like to
3 have it.
4          MR. SINAIKO:  Okay.  Great.  So, we could
5 reach out to the support people from U.S. Legal,
6 so you could have the realtime.
7          THE VIDEOGRAPHER:  You guys want to go off
8 the record?
9          MR. MR. SINAIKO:  Let's go off the record.
10          THE VIDEOGRAPHER:  The time is 13:55.
11     (Whereupon, a short recess was taken.)
12          THE VIDEOGRAPHER:  We are now back on the
13 record.  The time is 14:15 UTC Time.
14     Q.   Mr. Abu Hbda, just before we took this
15 short break, I was about to tell you that in the
16 event that, you know, I will be taking periodic
17 breaks during the deposition, and I understand that
18 you will need breaks, and I understand from your
19 counsel that you will need periodic breaks, just let
20 me know, or let Ms. Kropf know, and we will do that.
21 I just ask that if there's a pending question, that
22 you will not take a break before you answer the
23 question; is that okay?
24     A.   Okay.

Page 17

A. ABU HBDA

1     Q.   Okay.  Mr. Abu Hbda, are you currently
2 under the influence of any medication or other
3 substance that might inhibit your ability to
4 understand and respond to questions?
5     A.   Not drugs, but I'm taking medication, yes.
6     Q.   Okay.  And does the medication that you're
7 taking, Mr. Abu Hbda, interfere with your ability to
8 recall or understand questions?
9     A.   I don't think so.
10     Q.   Okay.  And the medication that you're
11 taking, Mr. Abu Hbda, does it interfere with your
12 memory in any way?
13     A.   I'm not a doctor.  I don't know.
14     Q.   Is it your sense, Mr. Abu Hbda, that
15 there's any reason, as you sit here today, that
16 you're unable to give your best testimony?
17     A.   I think I can do my best today.
18     Q.   Thank you very much.  Okay.
19          MR. SINAIKO:  Cosette, could we put up Tab
20 14, please?
21          MS. VINCENT:  Yeah.
22          MR. SINAIKO:  I would like to mark as our
23 next exhibit, or our first exhibit, Exhibit 1, a
24 three-page document titled, "Subpoena to Testify

Page 18

A. ABU HBDA

1    at a Deposition in a Civil Action".
2        (Whereupon, Subpoena was marked as Exhibit 1
3    for identification, as of April 7th, 2021.)
4        Q.   Mr. Abu Hbda, do you have Exhibit 1?  Are
5    you able to see Exhibit 1?
6        A.   Yes.
7        Q.   Okay.  And Mr. Abu Hbda, have you seen
8    this document before?
9        A.   Yes.
10       Q.   And Mr. Abu Hbda, do you recognize this
11   document to be a subpoena calling on you to testify
12   in this deposition today?
13       A.   Yes.
14       Q.   Okay.  And Mr. Abu Hbda, you're here today
15   testifying pursuant to the Subpoena that we've
16   marked as Exhibit 1, correct?
17       A.   Yes.
18       Q.   Okay.  Now, in advance of your deposition
19   here today, did you do anything to prepare for the
20   deposition?
21       A.   Yes.
22       Q.   Can you tell us, Mr. Abu Hbda, what you
23   did to prepare for your deposition today.
24       A.   I saw all the document I have in my -- in

Page 19

A. ABU HBDA

1    the office -- in my office.
2        Q.   Can you tell us what documents you looked
3    at?  To be more precise -- well, let me withdraw
4    that.
5        Can you tell us what the documents were
6    that you looked at more specifically?
7        A.   Okay.  The paper I do for the -- for
8    the -- for my -- for my client, I sent to the --
9        THE INTERPRETER:  I'm sorry.  I will ask
10   him to repeat, because I didn't really understand.
11       A.   I checked -- I checked -- I checked the
12   paper I used to -- I sent to the -- to my client, I
13   used to send to the Embassy.
14       Q.   And were those papers for your notary
15   public business, sir?
16       A.   Yes.
17       Q.   Okay.  In anticipation of your deposition
18   today, Mr. Abu Hbda, did you meet with anybody?
19       A.   No.
20       Q.   Okay.  So, did you meet with Ms. Kropf,
21   your lawyer, in anticipation of the deposition
22   today?
23       A.   I talked to her over the phone.
24       Q.   Okay.  And how many times did you speak

Page 20

A. ABU HBDA

1    with Ms. Kropf over the telephone in anticipation of
2    your deposition?
3        A.   More than -- more than once, but I don't
4    recall how many times.
5        Q.   Do you think it was more than five times?
6        A.   No; less.
7        Q.   Do you remember when the first time was
8    that you spoke with Ms. Kropf, in anticipation of
9    your deposition?
10       MS. KROPF:  I object.  I mean, I think
11   we're -- you asked if I talked to me.  You asked
12   what he did to prepare.  When he first talked to
13   me is not a relevant or a proper question here.
14       MR. SINAIKO:  You may answer.
15       MS. KROPF:  No.
16       Mr. Abu Hbda, I instruct you not to
17   answer.
18       MR. SINAIKO:  What's the basis for
19   instructing him not answer when he spoke to you?
20       MS. KROPF:  Because it gets into
21   attorney-client privilege communications, when he
22   spoke to --
23       MR. SINAIKO:  I'm probing his answer.  I'm
24   entitled to ask how he spoke to you for the

Page 21

A. ABU HBDA

1    deposition today.
2        MS. KROPF:  And he answered.  He spoke to
3    me by phone and looked at the records.  Any other
4    questions is attorney-client privilege.
5        MR. SINAIKO:  That's an improper
6    instruction.  We'll have to go about that --
7        MS. KROPF:  Don't answer that question.
8        Q.   Aside from talking to Ms. Kropf, did you
9    speak to anybody else in anticipation of your
10   deposition?
11       A.   No.
12       Q.   By the way, when you spoke to Ms. Kropf in
13   anticipation of your deposition, did those
14   conversations take place in English?
15       A.   Yes.
16       Q.   Okay.  At any time before your deposition
17   today, have you spoken to Mitchell Berger, who is
18   attorney for the Defendants, and is on our
19   videoconference today?
20       A.   No.
21       Q.   At any time before your deposition today,
22   have you spoken with Mr. Gassan Baloul, who is also
23   an attorney for the Defendants, and who is also on
24   our videoconference today?

Page 22

A. ABU HBDA

1          A. ABU HBDA
2     A.   No.
3     Q.   Okay.  In advance of your deposition
4  today, have you spoken with any lawyer associated
5  with the law firm Squire, Patton, Boggs, who are
6  Counsel for the Defendants in this action?
7     A.   No.
8     Q.   Okay.  And your lawyer, Ms. Kropf, how did
9  you --
10         Before you received the Subpoena that
11 we've marked as Exhibit 1, have you ever met or
12 spoken to Ms. Kropf?
13         MS. KROPF:  Objection.
14         And Mr. Abu Hbda, you do not need to
15 answer that question.
16         MR. SINAIKO:  That is not a proper
17 objection.  Come on.  I'm entitled to know when he
18 spoke to you.  I'm not asking for the substance of
19 the communications.  I'm just asking whether there
20 were any, because --
21         MS. KROPF:  No, because it would have
22 nothing to do with before he received the
23 Subpoena, nothing to do with this case, in
24 connection with this matter, and that's an
25 improper question.  You could take it up with the

Page 23

1          A. ABU HBDA
2  Judge.
3         MR. SINAIKO:  I don't want this to be a
4  contentious deposition.  The question is not a
5  privilege question.  Relevance objections are not
6  an appropriate basis to instruct a witness not to
7  answer.  The Witness should answer the question.
8         MS. KROPF:  You're asking --
9         MR. SINAIKO:  Are you instructing him not
10 to answer based on relevance?
11         MS. KROPF:  Are you asking him whether or
12 not he has spoken to me, an attorney, before he
13 received the Subpoena?
14         MR. SINAIKO:  That's exactly what I'm
15 asking.  Did he have any contact with you, in
16 advance of receiving the Subpoena; that's what I'm
17 asking.
18         MS. KROPF:  As long as you limit your
19 answer to that.
20         I think we're getting into dangerous
21 territory, whether or not he worked with me
22 before, or whether or not he'd spoken to me before
23 is really not relevant.
24         MR. SINAIKO:  I'm feeling pretty safe, so
25 the Witness can answer the question.

Page 24

1          A. ABU HBDA
2         MS. KROPF:  Why don't you answer the
3  question?
4         MR. SINAIKO:  Can the reporter please
5  repeat the question?
6         (Whereupon, the requested portion was read
7  back by the reporter.)
8     A.   Yes.  Ms. Kropf.  No.
9     Q.   Okay.  And how did you come to be
10 introduced to Ms. Kropf?
11    A.   Through the --
12         THE INTERPRETER:  I'm sorry.
13    A.   Through the Internet.
14    Q.   Mr. Abu Hbda, is it the case that you
15 located Ms. Kropf and hired her as your lawyer on
16 your own?
17    A.   Yes.
18    Q.   Okay.  And are you paying Ms. Kropf out of
19 your own funds, sir?
20         MS. KROPF:  Objection.
21    Q.   You may answer.
22         MS. KROPF:  No, he's not going to answer
23 that, Steve.  It's not relevant.  It gets into the
24 attorney-client.
25         MR. SINAIKO:  Relevance is not a basis for

Page 25

1          A. ABU HBDA
2  an instruction not to answer, and the questions as
3  to issuance and payments of bills is absolutely
4  not privileged.  I'm not asking for any
5  communications between you and he.  I asked for
6  the arrangement between you and he, with respect
7  to payment of bills, and whether he's paying them;
8  that is not a privilege question.
9         MS. KROPF:  Your arrangement --
10         MR. SINAIKO:  If you're going to instruct
11 him on things like that, we're going to have to go
12 to the Judge, which I'd rather not do.
13         MS. KROPF:  The arrangement we have is in
14 writing.  It's a communication between us.
15         I instruct you not to answer.
16         If you want to call the Judge, I invite
17 you to do so.  It goes to the attorney-client
18 privilege written engagement letter, and I'm
19 instructing him not to answer.
20         MR. SINAIKO:  The relationship of his with
21 you is not privileged.  The communications with
22 you is privileged.  Let me see if I could put --
23 slightly ask the question.  I don't want to have
24 to go to the Judge, and this is going to take
25 longer.

Page 26

A. ABU HBDA

1
2      Q.   Mr. Abu Hbda, are you personally paying
3   the bills that Ms. Kropf issues for her services in
4   connection with this matter?
5           MS. KROPF:  And I object, and I am
6      instructing him not to answer.  If you want to
7      call the Court, Steve, then let's go ahead and
8      stop, and why don't we go ahead and take care of
9      it.
10          MR. SINAIKO:  I mean, really, this is
11     improper.  We're going to put a pin in it, and
12     we're going to come back to it, if we have to.
13     This is not a proper objection.  If we have to go
14     to the Judge, or go to Mr. Abu Hbda, you know,
15     because of this kind of thing, I would hate to do
16     it, but we will have to, if we will.  Okay.
17     Q.   Okay.  You mentioned before, Mr. Abu Hbda,
18   you reviewed certain documents in anticipation of
19   your deposition.  Do you remember more specifically
20   what those documents were?
21     A.   Okay.  Power of Attorney for my client.
22     Q.   And what is the nature of these Powers of
23   Attorney that you mentioned?
24     A.   Services for -- for the people from my --
25   from my back home, from my community.

Page 27

A. ABU HBDA

1
2      Q.   You mean your community here in the United
3   States?
4      A.   Yes.
5      Q.   And are these Powers of Attorney with
6   respect to business dealings outside the United
7   States?
8           THE INTERPRETER:  Excuse me, could you
9      please repeat?
10          MR. SINAIKO:  Sure.  Let me put the
11     question a second time.
12     Q.   Are these Powers of Attorney you
13   mentioned, Mr. Abu Hbda, with respect to matters
14   outside the United States?
15     A.   They were special -- they were cases
16   special for my client.
17     Q.   Okay.
18          MR. SINAIKO:  Okay.  Cosette, could we
19     bring up Tab 1, please?
20          MS. VINCENT:  Yeah.
21          MR. SINAIKO:  Let's mark Tab 1, the
22     document, you know -- let's mark that as our next
23     exhibit, Exhibit 2, a six-page document that we
24     printed from a Website titled,
25     "Palestiniandocs.com"; let's mark that as Exhibit

Page 28

A. ABU HBDA

1
2   2.
3           (Whereupon, Tab 1 was marked as Exhibit 2 for
4   identification, as of April 7th, 2021.)
5           THE INTERPRETER:  Excuse me, can we go off
6   record?  Can I ask you if we could go off record?
7   It's now --
8           MR. SINAIKO:  Sure.  If we need to go off
9   the record for a moment, we could do that.
10          THE INTERPRETER:  Yeah.  Can I talk to
11  you?
12          THE VIDEOGRAPHER:  Okay.  Does everyone
13  agree to go off the record?
14          MS. KROPF:  Yup.
15          THE VIDEOGRAPHER:  Okay.  We are now off
16  the record.  The time is 14:40 UTC Time.
17          (Whereupon, a short recess was taken.)
18          THE VIDEOGRAPHER:  We are now back on the
19  record.  The time is 14:45 UTC Time.
20     Q.   Mr. Abu Hbda, can you see Exhibit 2?
21     A.   Yes.
22     Q.   Okay.  And do you recognize this document?
23   And by the way, if you want to page through it, we
24   can page through it.
25     A.   Yes.

Page 29

A. ABU HBDA

1
2      Q.   And just to be clear, Mr. Abu Hbda, you
3   recognize the document; is that correct?
4      A.   Yes.
5      Q.   And what do you recognize this document to
6   be, Exhibit 2?
7      A.   It's from the Website, from my computer --
8   from the computer.
9      Q.   And this Website is a website that is --
10   well, let me withdraw that.
11          Is this Website something that you
12   created, or that was created under your direction,
13   sir?
14     A.   Yes, for me.
15     Q.   And what is the purpose of the Website
16   from which we drew Exhibit 2?
17     A.   Advertising.  Advertisement.
18     Q.   And let's turn to -- actually, hang on one
19   second.  I want to page through the document.
20          MR. SINAIKO:  Cosette, could you turn us
21     to the last page of the document, please?
22     A.   Okay.  I'm looking.  Do you see the last
23   box on the page of the document of Exhibit 2?
24     A.   Now, I can see it.
25     Q.   Okay.  And you see that it says, "Awni Abu

Page 30

```
1              A. ABU HEDA
2  Hbda Documentation Services"; do you see that?
3      A.  Yes.  Yes.
4      Q.  And is that the name of your business,
5  sir?
6      A.  It's part of my business, yes.
7      Q.  Okay.  And is Awni Abu Hbda Documentation
8  Services organized as a corporation, or some other
9  sort of legal entity?
10     A.  It's a -- only my own.  It's for my --
11 yeah, mine person.
12     Q.  Okay.  So, is it organized as a
13 corporation, or a limited liability company, or
14 anything like that?
15     A.  No.  No.
16     Q.  Okay.  And so would it be fair to say that
17 Awni Abu Hbda Documentation Services is a business
18 name that you use yourself, sir?
19     A.  Yes.
20     Q.  Okay.  When did you start Awni Abu Hbda
21 Documentation Services?
22     A.  I don't recall; maybe a year, or a year
23 and a half.
24     Q.  So, you think, sir, that the business was
25 funded in 2019 or 2020; is that correct?
```

Page 31

```
1              A. ABU HEDA
2      A.  The Website maybe, yes.
3      Q.  Okay.  But not the Website, the business
4  itself.  The business that is Awni Abu Hbda
5  Documentation Services, when did you start that
6  business?
7      A.  It wasn't the business.
8      THE INTERPRETER:  Okay.  Okay.
9      A.  It -- before, it wasn't really a business.
10 Before, I was not having paper.  Before, I didn't
11 have -- I haven't have a Website.  I only had the
12 Website maybe a year, or a year and a half ago.
13         Before, I was doing only, like once week,
14 or couple of like -- or couple of times a week.  It
15 wasn't really a business.
16     Q.  Okay.  What was the nature of the
17 activities that you were engaged in, Mr. Abu Hbda,
18 that, you know, that you were doing once or twice a
19 week, and that, apparently now is Awni Abu Hbda
20 Documentation Services?
21     A.  I -- I am.
22     THE INTERPRETER:  Hold on.  Okay.
23     A.  I am -- I am a notary public, and
24 accountant since 1980, and I was doing insurance
25 since 1980.
```

Page 32

```
1              A. ABU HEDA
2      Q.  Okay.  Let's step back just half a step
3  here, Mr. Abu Hbda.
4          Could you please tell me your educational
5  history, since you graduated high school?
6      A.  Paterson.  So --
7      THE INTERPRETER:  Sorry.
8      A.  So, I took courses in community college in
9  Paterson, but I didn't finish, and so I took some --
10     THE INTERPRETER:  Hold on, sorry --
11     A.  Yes, and I took some lecture on insurance,
12 and I had my license.  I had my license.
13     MR. SINAIKO:  Okay.  Let's take just a
14 half a step backwards.
15         Actually, Cosette, could you bring up Tab
16 8, please, and let's mark it as Exhibit 3.
17         Okay.  And so we're marking Exhibit 3, a
18 four-page excerpt, which we printed from the same
19 Website from which we extracted Exhibit 2.
20     (Whereupon, Tab 8 was marked as Exhibit 3 for
21 identification, as of April 7th, 2021.)
22     MR. SINAIKO:  I'll just ask Mr. Abu Hbda
23 quickly --
24     Q.  Do you recognize this to be a page from
25 the Website for your business?
```

Page 33

```
1              A. ABU HEDA
2      A.  Yes.
3      Q.  And this is part of the Website that
4  either you created, or which was created under your
5  direction; is that correct?
6      A.  Yes.
7      Q.  Okay.  Let's turn to the second page.  So,
8  you see the second and third pages had some text
9  that's titled, "Palestinian Traditions and American
10 Freedoms Blend Perfectly in Paterson"; do you see
11 that?
12     A.  Yes.
13     Q.  Is that text that you wrote, sir?
14     A.  No.
15     Q.  Okay.  Is that text --
16         That's text that you got from another
17 source; is that right?
18     THE INTERPRETER:  Okay.
19     A.  It's another magazine.  New Jersey
20 magazine write it -- wrote it, not me.
21     Q.  Do you believe the information presented
22 in this text is accurate?
23     A.  I don't know.  They wrote it, not me.
24     Q.  Okay.  But you posted it on your Website,
25 correct?
```

Page 34

A. ABU HBDA

2      A.   True.

3      Q.   Okay.  Let's look at the first sentence.
4  It says here, "Awni Abu Hbda came to the United
5  States to improve his English skills"; do you see
6  that?  We could enlarge it, if that would be
7  helpful.

8           MR. SINAIKO:  Cosette, could you zoom in
9   for us?

10          THE INTERPRETER:  Thank you.

11     A.   Yes, I do.

12     Q.   Okay.  And so that statement is accurate,
13  correct?

14     A.   Maybe it was -- it's 50 years ago.

15     Q.   Actually, that's -- that takes to the next
16  sentence.  It's -- looking at the next sentence --
17  and I recognize this may have been written sometime
18  ago -- it says, "Following in the footstep of an
19  older brother, Awni Abu Hbda, now 68, arrived in
20  America in 1971"; do you see that?

21     A.   Yes.

22     Q.   And that's, in fact, when you arrived in
23  America, sir; is that correct?

24     A.   I think; yes.

25     Q.   Okay.  And the sentence goes on to say

Page 35

A. ABU HBDA

2  that you graduated from Birzeit University; is that
3  correct?

4      A.   Well, I -- I went to that school, but I
5  never graduated.

6      Q.   Okay.  And so you never received a degree
7  from Birzeit University; is that correct?

8      A.   No.

9      Q.   Have you ever received any degree from any
10  university?

11     A.   No.  No.

12     Q.   Do you have a high school degree, sir?

13     A.   Yes.

14     Q.   Okay.  And you mentioned that you
15  attended -- in the United States, you attended some
16  classes at a community college at Paterson, New
17  Jersey; do you recall that?

18     A.   Yes.

19     Q.   Okay.  Apart from the community college in
20  Paterson, New Jersey, have you ever taken classes at
21  any other educational institution in the United
22  States?

23     A.   Okay.  Institute of Insurance for houses,
24  car, and life.

25     Q.   And what sorts of classes did you take at

Page 36

A. ABU HBDA

2  the Institute of Insurance?

3      A.   Cars, and real estate property, and
4  casualty.

5      Q.   Were the purposes of these courses to help
6  you learn about selling property and casualty
7  insurance?

8      A.   I was learning how to sell insurance.

9      Q.   Okay.  And did you receive any sort of
10  degree or certificate from the Institute of
11  Insurance?

12     A.   I have New Jersey license.

13     Q.   Okay.  We'll come back to that in just a
14  moment.

15          Apart from the Institute of Insurance and
16  College in Paterson, have you taken any course at
17  any institution in the United States?

18     A.   No.

19     Q.   Okay.  Now, you mentioned a moment ago
20  that you are a notary public; do you recall that?

21     A.   Yes.

22     Q.   And in what state are you commissioned a
23  notary public?

24     A.   New Jersey State.

25     Q.   Okay.  And you mentioned that you have

Page 37

A. ABU HBDA

2  some sort of an insurance license; do you recall
3  that?

4      A.   I used --

5           THE INTERPRETER:  Okay.

6      A.   I used to have; not now.

7      Q.   Okay.  And when did you get the insurance
8  license?

9      A.   I don't recall, but I think 1980.

10     Q.   And you don't currently have the license,
11  correct?

12     A.   No.

13     Q.   When did the license expire?

14     A.   I don't recall; maybe 1995, '96.  I don't
15  recall.

16     Q.   Apart from the insurance license, and the
17  Notary Public Commission that you hold from the
18  State of New Jersey, do you hold any other licenses
19  or certificates from any government authority, you
20  know, other than the State of New Jersey, anywhere
21  in the world?

22     A.   No.

23          MR. SINAIKO:  Okay.  Let's -- if we could,
24  Cosette, could you take us back to the first page
25  of Exhibit 3, and let's zoom in at the top of the

Page 38

A. ABU HBDA

1       A. ABU HBDA
2    page.  I don't think we have the top of the page.
3    We're missing the top of the page.  Could you zoom
4    in?  There you go.  Could we zoom in on the
5    Internet address?
6        Q.  Mr. Abu Hbda, do you see that the Internet
7    address for the Website that you use for your
8    business is, "Palestiniandocs.com"?
9        A.  Yes.
10       THE INTERPRETER:  Sorry.
11       Q.  And is that an Internet name that you
12   selected?
13       A.  Yes.
14       Q.  How did you come to select that name for
15   your business?
16       A.  It's a business name; nothing else.
17       Q.  All right.  I'm just asking why you chose
18   that name.
19       A.  It's a business name, that's all.
20       Q.  Was there any particular reason that you
21   chose that name, as opposed to some other name?
22       A.  There is no reason.
23       Q.  Do you specialize, or does your business
24   have a specialty in dealing with Palestinian
25   documents?

Page 39

A. ABU HBDA

1       A. ABU HBDA
2        A.  No.
3        Q.  In your business, do you frequently deal
4    with documents that are either being submitted to,
5    or being issued by the Palestinian government --
6    actually, I withdraw the question.  Let me ask the
7    question again.
8        Do you specialize, or does your business
9    have a specialty, in dealing with documents issued
10   by the Palestinian Authority?
11       A.  No.
12       Q.  In your business, do you frequently deal
13   with documents that are being submitted to or were
14   issued by the Palestinian Authority?
15       THE INTERPRETER:  Okay.
16       A.  I -- I -- I witness -- I witness notary
17   public to everybody.
18       THE INTERPRETER:  I'm sorry.
19       A.  Everyone, from everywhere -- from --
20   from -- I witness notary public for everybody from
21   everywhere around the world.
22       Q.  Okay.  Do you deal --
23       In your business, sir, do you deal with
24   documents that are being submitted to the
25   Palestinian Authority?

Page 40

A. ABU HBDA

1       A. ABU HBDA
2        THE INTERPRETER:  Okay.  Okay.
3        A.  I'm a notary public who is witness to
4    either Palestinian, or somebody else who -- who --
5    who witness and sign the paper for everybody, and
6    send paper to either the Palestinian Embassy, or
7    other embassies.
8        Q.  Okay.  So, one of the -- sir --
9        Is it fair to say, sir, that one of the
10   services that you offer through your business is the
11   submission of documents on behalf of your clients,
12   to the Palestinian Authority?
13       THE INTERPRETER:  Okay.  Okay.
14       A.  No, I only send it to the Embassy if --
15       THE INTERPRETER:  Okay.
16       A.  I don't send -- usually, I -- I don't --
17   usually, I don't send the paper to the Embassy.  I
18   only send the paper if -- if the person ask me.  I
19   don't know how to send to the Embassy.  Usually, I
20   don't do it.
21       Q.  Okay.  So, one of the --
22       Is it fair to say, sir, that one of the
23   services --
24       MR. BERGER:  Excuse me, I'm going to
25   object to the translation.  We all heard the

Page 41

A. ABU HBDA

1       A. ABU HBDA
2    answer in English.  The translation has generally
3    been terrible.  We heard the answer in English.
4    It's on the videotape.  The word, "usual," was
5    never used.
6        MR. SINAIKO:  I'm going to say, Mr. Abu
7    Hbda requested a translator today.  I assume he
8    took the position that his English is not able to
9    testify today.  Mr. Abu Hbda's English is pretty
10   good.  He seems to understand my questions well.
11   He often starts to answer them before the
12   translator has finished translating, and my
13   question is, why did we go -- I mean, if Abu Hbda
14   is able to answer questions in English, why do we
15   have a translator here today?  That's a question
16   for Ms. Kropf.
17       MS. KROPF:  If you recall, Steve, we
18   started the deposition by saying why doesn't he
19   answer the questions in English, and he translated
20   the answer, and we started with that process, and
21   you said it was smoother to have him answer, and
22   have her translate in English.
23       My suggestion is, why don't I talk to
24   Mr. Abu Hbda, and see how it's going, and see this
25   process before, and see how it's working.

Page 42

A. ABU HBDA

1    I take your point.  It's your deposition.
2  We suggested the translator in case there were any
3  issues, but my suggestion was that he answered in
4  English.  I thought you said it was smoother if he
5  answered in Arabic.
6        MR. SINAIKO:  Actually, I -- the court
7  reporter explained, and I agree, there has to be a
8  consistent way that we're doing this.  It's not
9  possible for us to rely on translations of the
10  questions and answers in English.  Like, either
11  it's a translated deposition, or it's not a
12  translated deposition.
13        And if we're going to have him testify in
14  English, which I, actually, having now watched
15  this unfold for a while now, because I'm sort of
16  learning a little bit myself about Mr. Abu Hbda's
17  English skills, it seems to me that he understands
18  pretty well, and, you know, given his background,
19  he's been in the United States for 50 years, it's
20  not surprising that he understands pretty well.
21        If you want to take a break, that's fine,
22  and if you want to make sure it makes sense to
23  continue with the translator, or whether we ought
24  to -- ought to excuse the translator and continue

Page 43

A. ABU HBDA

1  the deposition after the break in English only.
2        MS. KROPF:  I would like to talk to my
3  client about that because there's a comfort point
4  here, you know -- because you're going to ask
5  questions that are probably technical.  The words
6  are very much going to matter, and I don't know
7  how he feels about the translation.  So, why don't
8  we take a 15-minute break, and I'll talk to him,
9  and if you want to, you know, the counsel can talk
10  offline as well.
11        MR. SINAIKO:  Sure.  So, it's 11:21 now,
12  according to my clock.  Why don't we plan to
13  resume ourselves at -- you want to resume at
14  11:45?
15        MS. KROPF:  I don't know if we need that
16  long.
17        MR. SINAIKO:  We don't need that much
18  time.
19        MS. KROPF:  I think 15 minutes is 11:35.
20        MR. SINAIKO:  That's perfect.  Why don't
21  we go off the record and resume at 11:35.
22        THE VIDEOGRAPHER:  We're off the record --
23        THE INTERPRETER:  I want to say something
24  in English, and this is --

Page 44

A. ABU HBDA

1    He's saying something in Arabic, and he
2  was saying something in English, and I have to say
3  both, so that's why I was translating both; that's
4  what I did.
5        MR. SINAIKO:  Understood.  That's actually
6  one of the things that we have to work out here,
7  whether it makes sense to have the translated
8  deposition, whether Mr. Abu Hbda's skills -- it's
9  more sensible, and more efficient to just proceed
10  in English.  So, why don't we go off the record.
11  We'll resume at 11:35, and we'll figure out how to
12  handle this.
13        THE VIDEOGRAPHER:  Okay.  We're now off
14  the record.  The time is 15:22 UTC Time.
15        (Whereupon, a short recess was taken.)
16        THE VIDEOGRAPHER:  We are now back on the
17  record.  The time is 15:39 UTC Time.
18        MR. SINAIKO:  So, before we resume the
19  examination of Mr. Abu Hbda, I just want to
20  summarize the conversation that Ms. Kropf and I
21  had off the record, which is that, although
22  Mr. Abu Hbda's English skills are pretty good,
23  Ms. Kropf informed me that Mr. Abu Hbda is more
24  comfortable having a translator on the call for

Page 45

A. ABU HBDA

1  which reason, we're going to, at least for the
2  time being, continue using the translator, and we
3  could continue to reevaluate that as we move
4  forward; is that fair, Ms. Kropf?
5        MS. KROPF:  That's correct.  Thanks,
6  Steve.
7        MR. SINAIKO:  Okay.
8     Q.  I think we were looking at --
9        MR. SINAIKO:  Okay.  Let's go back to
10  Exhibit 3.
11        And Cosette, could we go to Page 2,
12  please?  And could we zoom in on the one, two --
13  third paragraph.
14     Q.  All right.  Mr. Abu Hbda, can you see the
15  third paragraph of that text that's, you know, part
16  of the Exhibit 3?
17     A.  Yes.
18     Q.  Okay.  And I'm looking at the second --
19  the second sentence of Paragraph 3.  It says that
20  you studied business and political science at
21  Passaic County Community College, and William
22  Paterson Community College; is that correct?
23     A.  It's just some --
24        MR. SINAIKO:  I'm just going to note for

Page 46

```
 1                  A. ABU HBDA
 2   the record that, you know, in response to my
 3   question, Mr. Abu Hbda immediately began answering
 4   in English, and his answer was perfectly
 5   intelligible to me, but we should continue with
 6   the translation.
 7       A.   Yeah.
 8       Q.   Sir, is it accurate that you took business
 9   and political science classes at Passaic County
10   Community College?
11       A.   Yes.
12       Q.   And is that the community college in
13   Paterson, New Jersey that you mentioned earlier in
14   your testimony today, sir?
15       A.   Yes.
16       Q.   Okay.  And William Paterson University,
17   that's not the college that you mentioned earlier;
18   is that right?
19       A.   No.
20       Q.   Okay.  But you did take classes at William
21   Paterson University, in addition to the college in
22   Paterson, New Jersey, and in addition to the
23   Institution of Insurance, correct?
24       A.   In William Paterson, and I -- I took --
25   it's -- I took a couple of lecture with -- for
```

Page 47

```
 1                  A. ABU HBDA
 2   insurance, not credits.
 3       Q.   Okay.  Now that we've clarified that you
 4   took classes at William Paterson University, in
 5   addition to the Institute of Insurance, and the
 6   College at William Paterson, does that refresh your
 7   recollection of any other institution in the United
 8   States where you studied?
 9            THE INTERPRETER:  Can you repeat that?
10            MR. SINAIKO:  Can the court reporter read
11   back the question, please?
12            (Whereupon, the requested portion was read
13   back by the reporter.)
14       A.   I don't recall.
15       Q.   Okay.
16            THE VIDEOGRAPHER:  Can I just ask Mr. Abu
17   Hbda to keep his face in the screen?  Your mouth
18   is cut off.  Thank you.  Thank you.
19            MR. SINAIKO:  Let's go to the next page of
20   Exhibit 3.  And can we zero in on the second
21   paragraph at the top?  There's the one-liner, and
22   then there's the second paragraph.
23       Q.   All right.  Mr. Abu Hbda, do you see that
24   in the second paragraph, the Article says, "Awni Abu
25   Hbda made a run for the City Counsel in 1984 but
```

Page 48

```
 1                  A. ABU HBDA
 2   lost"; do you see that?
 3            THE INTERPRETER:  Counselor, I don't see
 4   it.
 5            MR. SINAIKO:  Sure.  We're in the second
 6   paragraph on the page.  There's a one-line
 7   paragraph, and a second paragraph, and we're
 8   looking at the second sentence, which says, "Awni
 9   Abu Hbda made a run for the City Council in 1984
10   but lost."
11            THE INTERPRETER:  Yes.  Okay.
12       A.   Yes.
13       Q.   Okay.  And is that statement accurate?
14       A.   Yes.
15       Q.   Okay.  And let me just go to -- let me go
16   to the fourth paragraph down, the one that starts,
17   "Today political candidates," and the first line of
18   the paragraph, second sentence says, "In addition to
19   servicing as Paterson's Deputy Mayor"; do you see
20   that.
21            MR. SINAIKO:  The first sentence says, "In
22   addition to," -- the second sentence says, "In
23   addition to servicing as Paterson Deputy Mayor."
24            THE INTERPRETER:  Thank you.
25            MR. SINAIKO:  We're actually focusing on
```

Page 49

```
 1                  A. ABU HBDA
 2   the next sentence, actually --
 3       Q.   Actually, let me withdraw the question.
 4            Now that the translating is focusing on
 5   what I'm focusing on, let me just put the question
 6   again.
 7       A.   Yes.
 8       Q.   Mr. Abu Hbda, on the second page of
 9   Exhibit 3, in the fourth paragraph, do you see that
10   it says, "In addition to servicing as Paterson's
11   Deputy Mayor an additional" --
12       A.   Yes.
13       Q.   Okay.  Is it, in fact, the case you served
14   as Paterson's Deputy Mayor?
15       A.   Yes.
16       Q.   And when did you serve as Paterson's
17   Deputy Mayor?
18       A.   2002 to 2010.
19       Q.   Okay.  And have you ever held any title,
20   or -- well, let me withdraw that.
21            Have you ever held any title under any
22   other -- under any other government, apart from
23   Paterson, New Jersey?
24       A.   New Jersey -- in Paterson Commissioner,
25   but not in New Jersey.
```

Page 50

```
1                 A. ABU HEDA
2      Q.   I'm sorry, can you --
3      A.   In Paterson, Commissioner comments --
4  Commissioner Institutes of Paterson.  Commissioner
5  Institutes of Paterson.
6      Q.   Okay.  Mr. Abu Hbda, was your answer a
7  moment ago that you also served as some sort of a
8  Commissioner in Paterson, New Jersey?
9      A.   Yes.
10     Q.   We should wait for the translator to
11 answer for you, and then would you answer --
12          By the way, let's get through this
13 question and we'll come back.
14     MR. SINAIKO:  Could the court reporter
15   read back the question, please?
16     (Whereupon, the requested portion was read
17 back by the reporter.)
18     A.   I used to be Commissioner of the institute
19 of Paterson.
20     Q.   Sir, is it accurate that you were a --
21 that you held the title of Commissioner of the City
22 of Paterson, New Jersey -- you were one of the --
23 withdrawn.
24          Is it accurate, sir, that you held the
25 title Commissioner in the City of Paterson, and that
```

Page 51

```
1                 A. ABU HEDA
2  you were one of a number of Commissioners in that
3  city?
4      A.   I used to be the Commissioner, the
5  Institute of Paterson, and the Library Boards.
6      Q.   Were those appointed commissions, or --
7  withdrawn.
8          Were those appointed positions or elected
9  positions?
10     A.   It's appointed.
11     Q.   Okay.  And apart from your positions in
12 the City of Paterson as Deputy Mayor, and
13 Commissioner, and the Library Board, have you ever
14 held any other title with any government body?
15     THE INTERPRETER:  Okay.
16     A.   With the government, no.
17     Q.   Okay.  Have you ever held a title given to
18 you by the Palestinian Authority?
19     A.   No.
20     Q.   Have you ever been an employee of the
21 Palestinian Authority?
22     A.   No.
23     Q.   Have you ever held a title given to you by
24 the Palestine Liberation Organization?
25     A.   No.
```

Page 52

```
1                 A. ABU HEDA
2      Q.   Okay.
3      MR. SINAIKO:  Cosette, let's bring up Tab
4  2, please.  And I would like to mark this as our
5  next exhibit; I think it's going to be Exhibit 4.
6      (Whereupon, Tab 2 was marked as Exhibit 4 for
7  identification, as of April 7th, 2021.)
8      MR. SINAIKO:  Cosette?
9      MS. VINCENT:  Yes.  Bringing it up.
10     MR. SINAIKO:  Please.  Okay.  Thank you.
11 So, I would like to mark for identification as
12 Exhibit 4 a three-page excerpt from Mr. Abu Hbda's
13 Website, and --
14     Q.   And I would ask you, Mr. Abu Hbda, can you
15 see the document?
16     A.   Yes.
17     Q.   And do you recognize this to be an excerpt
18 for the Website that you obtained for your business?
19     A.   Yes.
20     Q.   And this page of your Website was prepared
21 by you or under your direction, correct?
22     A.   Yes, I -- I -- yes, I took it, but it
23 wasn't me who prepared.
24     Q.   So, it wasn't you who prepared -- oh, I'm
25 sorry.  Let me withdraw that.
```

Page 53

```
1                 A. ABU HEDA
2          Just to be clear, Mr. Abu Hbda, your
3  testimony is that you didn't prepare the document,
4  or you didn't prepare this document, but you checked
5  its content and you agreed with its content,
6  correct?
7      A.   Yes, I checked it and I agree on it.  I
8  agreed on it.
9      MR. SINAIKO:  Okay.  Let's turn to Page 2
10   of the document.
11     Q.   At the top of the page, Mr. Abu Hbda, do
12 you see that it says, "Legalize You Documents"?
13     THE INTERPRETER:  I don't see it.
14     MR. SINAIKO:  At the top of the page, in
15   the center, "Legalize You Documents"?
16     THE INTERPRETER:  Oh, yeah.  Okay.
17     A.   Yes.
18     Q.   Okay.  And can you explain to us -- well,
19 withdrawn.
20          Is Legal -- is, "Legalize You Documents,"
21 is that a service that you provide through Abu Hbda
22 Documentation Services?
23     A.   Yes.
24     Q.   And can you describe to us what that
25 service is exactly?  When you say that one of the
```

Page 54

1                    A. ABU HBDA
2    services you offer is, "Legalize You Documents,"
3    what do you mean by that?
4         A.    I witness -- I witness -- I witness,
5    and -- and notary -- about the paper of my client
6    for the embassy, for the embassies.
7         Q.    Okay.  And that -- and which embassies are
8    those, sir?
9         A.    Any embassies in the world.
10        Q.    Does that include, in any way, any
11   embassies with the Palestinian Authority?
12             THE INTERPRETER:  Could you please repeat,
13   sorry?  Excuse me.
14             MR. SINAIKO:  Could the reporter please
15   read back the question?
16             (Whereupon, the requested portion was read
17   back by the reporter.)
18        Q.    When you mentioned, Mr. Abu Hbda, any
19   embassies in the world, does that include any
20   embassies that are in any way associated with the
21   Palestinian Authority?
22        A.    For the Palestinian Embassy will ask
23   people to send their paper to the Embassy.
24        Q.    Okay.  So, to go back to the question, the
25   answer is, I think what you were saying, sir, is

Page 55

1                    A. ABU HBDA
2    that the answer to the question is, yes, that the
3    documents in question are prepared for use, you
4    know, or submission to embassies affiliated in some
5    way with the Palestinian Authority; is that correct?
6             MR. BERGER:  Objection, that
7    mischaracterizes his testimony.
8         Q.    Okay.  You may answer, Mr. Abu Hbda.
9    Actually, I apologize.  Let me withdraw the
10   question.
11             You testified a moment ago, Mr. Abu Hbda,
12   that you witness documents for the embassies, and I
13   asked you whether that -- the embassies included any
14   embassies that included in any way any embassies
15   associated with the Palestinian Authority?
16             MR. BERGER:  Objection; that's not what he
17   said.
18             MR. SINAIKO:  I'm reading from the
19   realtime.
20             MR. BERGER:  You're using the word, "for,"
21   in a way that the translator didn't mean.  I could
22   tell you that because we have a check translator
23   here.
24             MR. SINAIKO:  I see.  I can't say what the
25   translator knows or doesn't know.  My Arabic

Page 56

1                    A. ABU HBDA
2    skills are obviously less, you know -- less sharp
3    than those of your check translator.  In any
4    event, let me just try to put this question again.
5         Q.    When you say, Mr. -- when you say,
6    Mr. Abu Hbda that -- let me -- let me withdraw that
7    question.
8             Going back to the top of the center of
9    Page 2 of Exhibit 4 where it says, "Legalize You
10   Documents," is it correct, sir, that the service of,
11   "Legalize You Documents," involves witnessing and
12   notarizing new signatures on documents?
13             THE INTERPRETER:  Okay.
14        A.    Most of the time, yes.  Sometimes there is
15   no signature.
16        Q.    Okay.  And when there is no signature,
17   what does the process of Legalize You Document
18   involve?
19             THE INTERPRETER:  Okay.
20        A.    So, when there is --
21             THE INTERPRETER:  Hold on.  One.
22        A.    When there is a certificate, a course
23   certificate, or a Ph.D., or a death certificate, or
24   a school certificate, or a divorce, or university
25   certificate, we -- we -- we don't sign, we -- we

Page 57

1                    A. ABU HBDA
2    don't sign it.  We sign it --
3             THE INTERPRETER:  Okay.
4         A.    We sign it, and we send it to --
5             THE INTERPRETER:  Okay.
6         A.    Okay.  Either people they will send it to
7    the Embassy, or we send it to the Embassy.
8         Q.    Okay.  So, that -- the service, "Legalize
9    You Documents," as noted at the top of the second
10   page of Exhibit 4, can involve you notarizing a
11   signature, correct?
12             THE INTERPRETER:  Okay.
13        A.    So, when it's most -- yeah; when it's a
14   paper coming from the Court, or from a -- when it's
15   a legal paper, or it's a degree.  So, we -- we
16   consider it as a -- it's something legal.  So, we
17   consider it as something legal.
18        Q.    Okay.  Let me go back to the question,
19   Mr. Abu Hbda.  The question is, does the service of
20   Legalize You Documents noted at the top of the
21   center of Page 2, Exhibit 4 include, in some
22   instances, notarizing a signature?  That's a simple
23   question.
24             THE INTERPRETER:  Hold on.  I'm sorry.
25   I'm assume to go step by step because I cannot say

Page 58

A. ABU HBDA

1     like that my translation has to be accurate.
2        A.   Okay.  Some legal paper doesn't need to
3     be -- doesn't need to be legalized.
4        Q.   Understood, understood.  Let me step back
5     for a moment, because we're getting a little off
6     track here.
7             In some instances, "Legalize You
8     Documents," involves notarizing a signature; is that
9     correct, sir?  This is the service that's noted at
10    the top of the page, correct, sir?
11       A.   If someone has a paper and we have to sign
12    on it, yes.
13       Q.   Okay.
14       A.   The person has to sign the front of us,
15    yes.
16            MR. SINAIKO:  I would just note again that
17    Mr. Abu Hbda answered that question in English
18    over the translator and, you know, in a perfectly
19    coherent way.  We're going to continue with the
20    translator now, but I am concerned that this is an
21    incredible waste of time, that the translator is
22    acting ineffective here, and it's slowing down the
23    deposition, but we could then --
24       Q.   New question.  Is it correct that service

Page 59

A. ABU HBDA

1     of Legalize You Documents sometimes performs you
2     witnessing the signature?
3        A.   Sometimes, yes, sometimes, no.
4        Q.   Okay.  At times, it does, correct?
5             THE INTERPRETER:  Excuse me.
6        Q.   At times, it does, correct?
7        A.   Yes.
8        Q.   Okay.  And at times, "Legalize You
9     Documents," involves documents that are not signed
10    by your clients; is that correct, sir?
11            THE INTERPRETER:  I'm sorry, I'm just
12    reading the question again.
13            Okay.
14       A.   If it's a legal paper, no.  If it's like a
15    court, or a divorce, or a deaf -- death.
16       Q.   Okay.  And in that -- in that instance --
17            When we're talking about a document that
18    is not signed by your client, is it correct, sir,
19    that your service involved submitting that document
20    to an authority for authentication or certification?
21       A.   I would send the paper, and they are free
22    to sign it or not, either sign it or nothing.
23       Q.   Okay.  When you're talking about, for
24    example, authentication, or legalization of a birth

Page 60

A. ABU HBDA

1     certificate, or a death certificate, in that
2     instance, you send the -- if the client asks you to
3     you send the certificate to an Embassy -- I think
4     you mentioned an Embassy -- and they put a stamp on
5     it from a foreign government; is that correct?
6             THE INTERPRETER:  Could you say it step by
7     step.
8             MR. SINAIKO:  Okay.
9             THE INTERPRETER:  Or I will read it from
10    the transcript.
11       Q.   Let me try to ask the question in pieces
12    slowly.
13            When you are dealing -- instances when
14    legalizing a document involves legalizing a death
15    certificate; is that correct, Mr. Abu Hbda?
16       A.   Yes.  Yes, and they will be free, if they
17    want to sign it -- if they will sign it or not.
18       Q.   Okay.  But whether or not the -- whether
19    or not the client signs the document,
20    legalization -- that -- what does legalization of a
21    document like that entail?
22       A.   The person will go back to the -- to the
23    --
24            MR. SINAIKO:  Once again, I'll note that

Page 61

A. ABU HBDA

1     Mr. Abu Hbda is assisting the translator, and
2     translating, and speaking perfect English.
3        A.   The person will -- will go back to the --
4     to the place where -- the person will -- will go
5     back to the place, like whether they will sign it or
6     not, the person will go back to the --
7             THE INTERPRETER:  Okay.  Excuse me, I will
8     translate it.
9        A.   The person will take the paper -- the
10    person will take the paper.
11            THE INTERPRETER:  Okay.
12       A.   He will send it back to his home, back
13    home.
14            THE INTERPRETER:  Okay.
15       A.   And the -- the -- his back home is free to
16    accept it, whether accept it or not.
17       Q.   And sometimes, Mr. Abu Hbda, you send the
18    document, correct, rather than your client?
19       A.   If they ask me to do it, yes.
20       Q.   Okay.  And when you send the document,
21    what is the purpose of sending the document; what
22    are you trying to get?
23       A.   To be -- to be signed by the -- by the
24    embassy, or -- by the embassy or the -- by the

Page 62

A. ABU HBDA

1    embassy or the consulate.
2        Q.    To be signed by an official of a foreign
3    government, correct, or stamp -- let me withdraw
4    that.
5            To be signed, or stamped, or -- let me
6    withdraw that.  I'm going to try one more time.
7            When you send the documents to a foreign
8    embassy, the purpose of that is to have them sign
9    and/or stamp, or certified by an official of a
10   foreign government; is that correct?
11       A.    They will.
12       THE INTERPRETER:  Okay.
13       A.    They will -- they will sign on the top of
14   my signature.  They're not responsible of the main
15   contain of the paper.
16       Q.    Right.  But the purpose of submitting the
17   document to the foreign embassy is to obtain a
18   signature or a stamp on the document from an
19   official of the government whose embassy that is; is
20   that correct?
21       A.    Yes; correct.
22       Q.    Okay.  And one of the places to which you
23   submit documents of this nature to get a signature,
24   or a certification, or a stamp is the Palestinian
25

Page 63

A. ABU HBDA

1    Authority; is that correct?
2        A.    No.
3        Q.    So, the answer is no, that's not correct?
4        A.    I don't send to them -- I don't send to
5    the -- the Palestinian Authority.  I send to people
6    who represent the Palestinian Authority.
7        MR. SINAIKO:  Okay.  Once again, I'm going
8    to note that Mr. Abu Hbda was assisting the
9    translator, and translating his answer into
10   English, and I'm going to go on to my next
11   question, which is --
12       Q.    To the embassy which you send these papers
13   in Canada, you understand that to be an embassy
14   operated by the Palestinian Authority, correct?
15       THE INTERPRETER:  Can you please repeat
16   the question.
17       MR. SINAIKO:  Can the court reporter read
18   the question back, please.
19       (Whereupon, the requested portion was read
20   back by the reporter.)
21       A.    Yeah, you -- it was -- it was writing
22   that -- it was -- it was writing -- no, the title
23   was Palestinian delegation.
24       Q.    Okay.  You understand that embassy to be
25

Page 64

A. ABU HBDA

1    affiliated with the Palestinian Authority, correct,
2    sir?
3        A.    I only know that it represent -- it
4    represent Palestinian, Palestinian people.
5        Q.    Okay.  Staying on Page 2 of Exhibit 4, do
6    you see, sir, that it says, "Passport Services"; do
7    you see that, sir?
8        A.    Yes.
9        Q.    Okay.  And would it be fair to say, sir,
10   that, "Passport Services," involves the submission
11   of applications to obtain or renew a passport?
12       A.    No.
13       Q.    No? Can you describe -- oh, sorry.  Can
14   you describe what, "Passport Services," means,
15   please?
16       A.    Someone will come with that --
17       THE INTERPRETER:  Hold on.
18       A.    Someone will come --
19       THE INTERPRETER:  Hold on.
20       A.    Someone will come --
21       THE INTERPRETER:  Okay.
22       A.    Someone will come with his passport.  We
23   will do Power of Attorney from him to someone else.
24   He will sign it in front of me.
25

Page 65

A. ABU HBDA

1        After that, I will sign it notary, and I
2    will give -- I will give it to him, and he will send
3    it to -- he will send it with whatever he wants.
4        Q.    Okay.  So, your service, when you say,
5    "Passport Services" -- pardon me.
6            When you say, "Passport Services," on your
7    Website here, Mr. Abu Hbda, the service you provide
8    is notarizing a signature on a passport application;
9    is that correct?
10       THE INTERPRETER:  Okay.
11       A.    I notarize -- I notarize his signature
12   only.  I notarize his signature only.
13       Q.    Okay.  So, just to be clear, and to close
14   this off, "Passport Services," involves the
15   notarization of passport applicants on passport
16   applications, correct?
17       A.    So, on the Passport Services, there is no
18   application; there is only Power of Attorney.
19       MR. SINAIKO:  Okay.  I'm going to suggest
20   it's 12:30 now.  I'm going to suggest that we take
21   our lunch break, and we resume at 1:30, if that's
22   okay with everybody.
23       MS. KROPF:  Okay.  That's fine.  I don't
24   know if we want to have a conversation about the
25

Page 66

A. ABU HBDA

1  translation on the record or off the record.
2      MR. SINAIKO:  I guess we could have a
3  conversation about translation off the record, but
4  after we have the conversation about translation
5  off the record, we need to have the conversation
6  on the record.
7      MS. KROPF:  That's fine.
8      MR. SINAIKO:  Why don't Mr. Abu Hbda be
9  excused, so he could have his lunch, And Counsel
10  can have the conversation about translation, and
11  we'll plan to resume at 1:34.  Actually, you know
12  what, I take it back.  Let's plan to resume at
13  1:34.
14      THE VIDEOGRAPHER:  Okay.  We're now off
15  the record.  The time is 16:34 UTC Time.
16      (Whereupon, a short recess was taken.)
17      THE VIDEOGRAPHER:  We are now back on the
18  record.  The time is 17:39 UTC Time.
19      MR. SINAIKO:  I will just point out to
20  everyone on the call, before we resume the
21  examination of Mr. Abu Hbda, that we have a new
22  translator now.  The translator, maybe the new
23  translator could identify himself by name and be
24  sworn by the court reporter.

Page 67

A. ABU HBDA

1      THE INTERPRETER:  Sure.  My name is
2  Sadeer; S-A-D-E-E-R; this is the first name.  Al,
3  A-L, space, Amiri, A-M-I-R-I, and it's written on
4  the screen.
5                    - o O o -
6
7      H A D E E R  A L A M I R I,
8      Called as the interpreter in this
9  matter, was duly sworn by a Notary Public to
10  accurately and faithfully translate the
11  questions propounded to the AWNI ABU HBDA
12  from English into Arabic, and the answers
13  given by the AWNI ABU HBDA from Arabic into
14                    English.
15
16                    - o O o -
17
18
19
20
21
22
23
24

Page 68

A. ABU HBDA

1  BY MR. SINAIKO:
2      Q.  Mr. Abu Hbda, I hope you had a terrific
3  lunch.  Are you ready to resume?
4      A.  Yes.
5      Q.  Do we wait, the translate -- I don't --
6  maybe you don't need the translator, but if the
7  translator's here, we should use the translator.
8      A.  I'm ready.
9      MR. SINAIKO:  Okay.  Cosette, could we
10  bring up -- could we bring up Tab 4, again,
11  please?
12      MS. VINCENT:  Yes.
13      MR. SINAIKO:  I'm sorry, I meant Tab 2,
14  Exhibit 4.
15      MS. VINCENT:  I got you.
16      MR. SINAIKO:  Done, and done.
17      Q.  Okay.  We're going to stay on Page 2, and
18  we're going to resume -- we're going to try to run
19  back over some material we did before where we were
20  having trouble with the translation; is that okay,
21  Mr. Abu Hbda?  Please, if we don't need the
22  translator, we could excuse him, but if we need the
23  translator --
24      A.  Yes, sir.

Page 69

A. ABU HBDA

1      Q.  Okay.  Returning to the top of the page.
2  Do you see in the center of the page says, "Legalize
3  You Documents"; do you see that, sir?
4      A.  Yes, I see it.
5      Q.  And, "Legalize You Documents," is one of
6  the services that Awni Abu Hbda Documentation
7  Services provides; is that correct?
8      A.  Yes.
9      Q.  Okay.  And can you describe the nature of
10  the service, "Legalize You Documents"?
11      A.  It's like a notarization, when somebody
12  comes to sign a document, and you witness this
13  signature, and you sign it.  It's like a notary
14  public service.
15      Q.  Okay.  And apart from witnessing or
16  notarizing a signature, does, "Legalize You
17  Documents," entail any other type of service?
18      A.  If someone wants to notarization, if he
19  wants to send the papers to the embassy to be
20  signed, we take the papers and send them to that
21  embassy.
22      Q.  Okay.  And the embassies to which you
23  sign -- to which you send these papers -- let me
24  withdraw that and start again.

Page 70

```
1                    A. ABU HBDA
2         The embassies to which you send these
3    papers, those includes embassies associated with the
4    Palestinian Authority, or the Palestinian
5    association; is that correct, sir?
6         A.   It's representative of the Palestinian
7    population in Canada.
8         Q.   And do you understand that this
9    representative of the Palestinian people in Canada
10   is in some fashion associated with the Palestinian
11   Liberation Organization or the Palestinian
12   Authority?
13        A.   I don't know the relationship or the rules
14   in that country.  All I know is that it's a
15   representative of the Palestinian application in
16   Canada and it documents or certify documents.
17        Q.   Thank you, Mr. Abu Hbda.
18        MR. SINAIKO:  Let's mark as our next
19   Exhibit a 55-page document that is titled on the
20   front page, "Declaration of C. Russell."
21        This is Tab 10C.  Cosette, could you bring
22   it up, please?
23        MS. VINCENT:  It will be up shortly.
24        (Whereupon, Declaration of C. Russell was
25   marked as Exhibit 5 for identification, as of
```

Page 71

```
1                    A. ABU HBDA
2    April 7th, 2021.)
3         A.   Yes, sir.
4         Q.   And, specifically, we're going to turn to
5    Page 52 of the document.
6         MR. SINAIKO:  Page --
7         MS. VINCENT:  Yeah, I'm going to have to
8    exit out of there as quick as possible.  I'll
9    share my screen in a moment.
10        MR. SINAIKO:  Can we rotate that around,
11   so Mr. Abu Hbda could see that more clearly?
12        MS. VINCENT:  I'll rotate it.  One moment.
13        Q.   Can you see the page that we're focusing
14   on from Exhibit 5, Mr. Abu Hbda?
15        A.   Yes, I do.
16        Q.   Okay.  And do you recognize that this is a
17   document that you've seen before, sir?
18        A.   Yes, I do.
19        Q.   Okay.  And do you see that there's a stamp
20   in black ink in the upper left-hand corner, and a
21   raised seal, and the stamp in black ink says, "Abu
22   Hbda"; do you see that, sir?
23        A.   Yes, I do.
24        Q.   And the stamp in black ink, that's your
25   notarial stamp; is that correct, sir?
```

Page 72

```
1                    A. ABU HBDA
2         A.   Yes, sir.
3         Q.   And you were saying the signature there,
4    that's your signature; is that correct, sir?
5         A.   Yes.
6         Q.   Do you see the raised seal immediately to
7    the left of your black ink seal?
8         A.   Yes.
9         Q.   Is that a notarial seal?
10        A.   Yes, sir.
11        Q.   Whose notarial seal was that?
12        A.   For me.
13        Q.   Okay.  And do you see that there are a
14   number of other stamps on this document?  There's a
15   stamp -- let me withdraw that.
16        Do you see there's a stamp in blue ink,
17   and there's a stamp in red ink on this document?
18        A.   Exactly, yes.
19        Q.   And, sir, is this an example of a document
20   that Awni Abu Hbda Documentation Services legalized?
21        A.   It maybe like -- certificates, graduation
22   certificates, death certificates, authorization.
23   Yes, this is one of them; yes, maybe.
24        Q.   Okay.  And are you able to read the blue
25   ink stamp?
```

Page 73

```
1                    A. ABU HBDA
2         MR. SINAIKO:  Cosette, could you zoom in
3    on the blue ink stamp, please.
4         Q.   Is that okay, Mr. Hbda.  Can you see it?
5         A.   It says, "General Palestinian Delegation
6    Canada."
7         Q.   Okay.  And is that the office in Canada to
8    which you emailed documents when you want them
9    legalized?
10        A.   Yes, sir.
11        Q.   And now, let's look at the red ink stamp.
12   Can you read the red ink stamp, sir?
13        A.   Not all of it.
14        Q.   Okay.  Are you familiar with that stamp,
15   sir?
16        A.   Yes, I've seen stamps like this.
17        Q.   So, although you're unable to read the
18   stamp in its entirety, can you read the portions of
19   it that you are able to read?
20        MR. SINAIKO:  Let the record reflect that
21   Mr. Abu Hbda translated the red ink stamp to the
22   best he was able to --
23        A.   It says the Palestinian delegation
24   legalized this document, but it doesn't confirm the
25   contents or the information inside this document.
```

Page 74

A. ABU HBDA

1   It's not responsible for the content inside this
2   document.
3       Q.   And you can see inside, Mr. Abu Hbda, do
4   you see that there is a blue ink signature inside
5   the red ink stamp?
6       A.   Yes.
7       Q.   And are you able to tell us whose
8   signature that is?
9       A.   To be honest, I don't know whose signature
10  is that.
11      Q.   Okay.  And this stamp, is this a stamp
12  that's typically -- let me withdraw the question and
13  try again.
14          Is this red ink stamp a stamp that
15  typically appears on documents that you have
16  legalized for your clients?
17      A.   Not all the documents, no.
18      Q.   Do you have any understanding as to which
19  types of documents this red ink stamp would appear
20  on and which not?
21      A.   I'm not sure, but I think maybe it's the
22  certificates that has this red ink stamp, while
23  other documents, they don't have this stamp.
24      Q.   Okay.  And do you have any understanding

Page 75

A. ABU HBDA

1   as to who placed the red ink stamp on this document?
2       A.   The council, or the delegation of both the
3   council.
4       Q.   And that's a person in this office in
5   Canada that you mentioned earlier, this delegation
6   office to which you mail papers, which you would
7   like papers legalized for your clients, correct?
8       A.   This is what this supposed to be.
9       Q.   Okay.  But just to clarify, my question
10  was the office where that stamp was applied was the
11  office -- as you understand it, the office where
12  that stamp was applied was the office in Canada to
13  which you send documents when your clients asked you
14  to have them legalized; is that correct?
15      A.   Yes.
16      Q.   Okie doke.
17          MR. SINAIKO:  Now, let's go back for a
18  moment to Exhibit 4.  Okay.  Now, Cosette, we're
19  getting Exhibit 4 back up.
20          MS. VINCENT:  Yes, we are.
21          MR. SINAIKO:  Okay.  And let's turn to
22  Page 2 for Mr. Abu Hbda.
23          MS. VINCENT:  Is this the page you want?
24          MR. SINAIKO:  I'm sorry, I think we're

Page 76

A. ABU HBDA

1   looking at the wrong document.  I want to look at
2   Tab 2, which is also Exhibit 4.
3           MS. VINCENT:  Sorry.
4           MR. SINAIKO:  It's okay.  Take your time.
5           Bear with us for just a moment, Mr. Abu
6   Hbda.
7           There we go.  Back to Page 2.
8       Q.   Okay.  Now, underneath, "Legalize You
9   Documents," you see that there are a number of
10  different types of -- there are a number of
11  different entities on that page?
12      A.   Yes.
13      Q.   Okay.  The first one is, "Awni Abu Hbda
14  Service Registration Form"; do you see that?
15      A.   Yes.
16      Q.   Can you tell us what that is.
17      A.   This is registering a client.  If someone
18  comes to my office, I register his office or enter
19  his name in a book.
20      Q.   Ah.  Is that a book where you record your
21  notarial act, sir?
22      A.   It's a regular page.  I don't see -- of
23  this pages it changes day by day.
24      Q.   Got it.  But, this service registration

Page 77

A. ABU HBDA

1   form, this is not a document you would legalize?
2   This is a piece of paper you have your clients
3   complete, so you could provide services to them; is
4   that correct?
5       A.   Correct.
6       Q.   Okay.  Going back up to Legalize You
7   Documents for one moment.  What do you typically
8   charge clients to Legalize You Documents for them?
9       A.   If it's only notary public, I charge from
10  five to 15 to 20; this is only if it's notary
11  public.
12      Q.   Right.  And if they're -- in the instances
13  where you're asked to legalize a document by
14  transmitting it to this office in Canada, what do
15  you charge clients to do that?
16      A.   So, the service includes the postage that
17  we use to send it, the fees that they charge us, and
18  the preventative to cancel it, and our fees.  So, it
19  ranges from 250 to 300.  Again, this includes the
20  postage, and includes the money postage.  We -- the
21  money order to pay for the fees that we -- council
22  charges, or that office charges, plus our fees to
23  legalize the document.  The total is between $250
24  and $300 in total.

Page 78

A. ABU HBDA

1          Q.   And Mr. Abu Hbda, what does your business
2     charge -- let me withdraw that question and ask it
3     more crisply.
4               Mr. Hbda -- I'm going to try one more time
5     here.
6               Mr. Abu Hbda, what is your fee, putting
7     aside the fees for postage, and fees charged by the
8     council, whatever you charge, what is your fee that
9     you charge for the document?
10         A.   Between $50 to $100.
11         Q.   And how frequently would you say -- well,
12    let's just -- let me withdraw that question and try
13    again.
14              How frequently would you say that you send
15    documents to this office in Canada that we've been
16    talking about, this delegation of the Palestinian
17    people that you mentioned; how frequently would you
18    say that you send documents to that office that --
19    to be legalized?
20         A.   It may be once a week or maybe every day;
21    it's variable.  It depends on the people.
22         Q.   So, would it be fair to say that over the
23    last year, you've done that at least 50 times?
24         A.   I don't have the number.  I cannot tell.

Page 79

A. ABU HBDA

1          Q.   Okay.  So, ballpark, you're not prepared
2     to say you did it at least 50 times over the last
3     year?
4          A.   I don't know.  To be honest, I'm not sure.
5          Q.   But you'd say --
6               Well, just to go back to what you said
7     before.  You'd say that you do it several times a
8     month; is that correct, sir?
9          A.   Maybe more.  I don't know.
10         Q.   Okay.  Let's go down to a few stops on the
11    document.  Do you see that it says, "Passport
12    Services"?
13         A.   This is in total.
14              THE INTERPRETER:  I will repeat the
15         question.  It seems he did not hear it.
16              MR. SINAIKO:  Okay.  Go ahead.
17         A.   Yes, sir.
18         Q.   And can you tell me, does, "Passport
19    Services," include -- well, withdrawn.
20              The Passport Services that your company
21    provides, does that include the transmission of
22    documents to the office in Canada that we've been
23    talking about, the delegation of the Palestinian
24    people, as you describe it?

Page 80

A. ABU HBDA

1          A.   Yes, sir.  No.
2          Q.   Okay.  Do the Passport Services that your
3     company provide, or -- withdrawn.
4               Do the Passport Services that your
5     business provides relate in any way to passports
6     issued by the Palestinian Authority, or the
7     Palestinian Liberation Authority, to the extent such
8     exist?
9          A.   We write an authorization between two
10    persons; one person here and one person in
11    Palestinian.  This has no relation to the PLO, or
12    the organization; it's two persons.
13         Q.   What is the nature of this authorization
14    that you're talking about?
15         A.   It gives authorization to this person to
16    renew the passport for that other person.  We just
17    notarized this document.
18         Q.   I see.  Is this a document that's issued
19    by the Palestinian Authority, and that you assist
20    one of your customers in executing?
21         A.   No, most of the time we write it.  It's a
22    handwritten.  This person authorizes that person to
23    do the renew; that's it.
24         Q.   And is there a prescribed form of words

Page 81

A. ABU HBDA

1     that that document needs to include in order to be
2     legally valued?
3          A.   No, to accept another person to renew the
4     passport, they accept any notarize document, only in
5     America, not only for me, but in the whole state in
6     America.
7          Q.   Right.  And are these documents that are
8     used to apply for or renew passports issued by the
9     Palestinian Authority or the Palestinian Liberation
10    Organization?
11         A.   No, these are the Palestinian passports.
12         Q.   Right.  So, is it -- how -- well, let me
13    withdraw that.
14              How do you understand --
15              After you prepare and understand and
16    notarize one of these documents, how do you
17    understand that your clients utilize these
18    documents; in other words, what do they do with
19    them?
20         A.   He sends these documents by FedEx to the
21    other person, and after this leaves my office, I
22    don't know what happens to him.  I don't know
23    anything about him after he leaves.
24         Q.   Okay.  And this passport service that you

Page 82

A. ABU HEDA

1
2      perform in connection with passports by the
3      Palestinian Authority, how long have you been
4      performing that service?
5          A.   I don't know to be honest.  I've been
6      notarizing papers for customers for long time, but I
7      don't have an idea of how long exactly.
8          Q.   Would you say it's been at least five
9      years?
10         A.   Maybe.  It may be five, it may be seven,
11     it may be more.  I don't know.
12         Q.   Okay.  The preparation of these documents
13     is important in order for a person in the United
14     States to be able to obtain or renew a passport
15     issued by the Palestinian Authority; is that
16     correct?
17         A.   Correct.
18         Q.   And did there come a time when you learned
19     how to prepare these documents, so that they would
20     be legally effective when presented to these
21     authorities, you know, were presented to the
22     Palestinian Authority?
23         A.   Sometimes --
24              THE INTERPRETER:  I'm sorry.
25         A.   Sometimes customers bring all of the form

Page 83

A. ABU HEDA

1
2      papers written and sent to them from my home
3      country, and they wanted to be notarized.
4          Q.   Right, but you mentioned -- thank you very
5      much.
6               You mentioned before, Mr. Abu Hbda, that
7      sometimes you prepared the document, right?
8      Sometimes you prepared the document that has to be
9      notarized and then returned to the Palestinian
10     Authority, correct?
11         A.   Correct.
12         Q.   Okay.  How did you learn the proper
13     wording to put in these documents, so that when
14     presented to the Palestinian Authority, the
15     documents would have the desired effect?
16         A.   We made copies from the papers that were
17     brought to us and then we started using them.
18         Q.   Okay.  Have you ever familiarized yourself
19     for the legal requirements for the issuance or
20     renewal of a passport by the Palestinian Authority?
21         A.   I know that from the people who come,
22     these people have spoken with the people who they
23     want to authorize, and they gave -- they give them
24     the information.
25         Q.   Has any representative of the Palestinian

Page 84

A. ABU HEDA

1
2      Authority ever explained to you any aspect of the
3      process of the issuance or renewal of a passport by
4      the Palestinian Authority?
5          A.   No.
6          Q.   Okay.  And these Passport Services that
7      you provide that are referenced on Page 2 of Exhibit
8      4, have you ever performed those Passport Services
9      in connection with the issuance or renewal of a
10     passport, other than by the Palestinian Authority?
11         A.   Yes, there is.  I performed services for
12     passports to travel to Jordan, and, also, for the
13     Egyptian government.  So, anyone who come requesting
14     this service, I file the form for him or for her.
15         Q.   Okay.  Let's move down to, "Family
16     Matters"; do you see that, Mr. Abu Hbda?
17         A.   Yes, sir.
18         Q.   Can you describe that service to us,
19     please.
20         A.   So, if two people fight at home, like a
21     husband and a wife, I try to solve the issue between
22     them, and if there's another issue, like a daughter
23     with her father, or a family member with another
24     family member for the Palestinian population, I come
25     and try to solve the issue for them.

Page 85

A. ABU HEDA

1
2          Q.   Got it.  And so is that a service that
3      falls within the category of legalization of
4      documents?
5          A.   Yeah, sometimes -- thank you.  Sometimes
6      they have written documents, or have filed claims
7      against each other, and through each of them, and
8      then they come, and the issue solve them; they try
9      to discharge the claim, dissolve the claim, and they
10     write the paper, and I notarize this paper.
11         Q.   And that's a service that you provide as a
12     Notary Public of the State of New Jersey; is that
13     correct?
14         A.   It is a service that I provide for the
15     population, the Palestinian population, to solve the
16     issues or the altercations between the persons.
17         Q.   And you know to whom these documents you
18     note relating to Family Matters are submitted by
19     your customers?
20         A.   I give it to the person responsible, and
21     he submits it to the Court to discharge or resolve
22     the claim after they drop the case, and all these
23     services are free, just to clarify.  I don't get any
24     payment for these services; I provide it for free.
25         Q.   Excellent.  And these services are with

Page 86

A. ABU HBDA

1  respect to legal proceedings in the United States;
2  is that correct?
3      A.  If there is a claim, yes, but if there
4  isn't a claim, we just try to solve the issue
5  between them, and they come in peace between them.
6      Q.  Excellent.  Let's move down to the next
7  one here.  It says, "Driver License Certification";
8  do you see that one, sir?
9      A.  Yes, sir.
10     Q.  Okay.  And can you tell us what Driver
11 License Certification -- withdrawn.
12         Can you tell us what service Driver
13 License Certification involves, or can you describe
14 the service?
15     A.  Okay.  So, they stopped at this entity
16 before a while ago.  We used to do a translation, if
17 someone comes from an Arabic country, or the
18 driver's license from that country, we try to
19 translate and validate this driver's license, and
20 notarize it, and he takes it to the DMV, but now it
21 stopped.  It's not longer available.
22     Q.  And when did that service cease to be
23 available?
24     A.  It stopped at a point now, but they

Page 87

A. ABU HBDA

1  specified certain authorized people to do this
2  service.
3      Q.  Okay.  So, when you say they -- when you
4  say, "they specified certain authorized people," who
5  is, "they"?
6      A.  The DMV in New Jersey.
7      Q.  Okay.  Got it.  Is that a service that you
8  ever performed, so that a driver's license could be
9  certified to any entity outside the United States?
10     A.  No.
11     Q.  Okay.  Let's move down to, "Life
12 Certificate."  Can you tell us what service
13 involves, "Life Certificate"?
14     A.  So, this service is a service where, from
15 all over the Arabic countries, people are retired,
16 and they have to prove that their still alive to
17 receive their retirement.  So, they come to my
18 office with the proper documents that they have
19 that -- the ID and the passport, and we write a form
20 and they sign it.  I notarize it to prove that this
21 person is still alive, and then the person takes it
22 and sends it to his government, and to be able to
23 receive the retirement.
24     Q.  Right.  And do you know whether any of

Page 88

A. ABU HBDA

1  these Life Certificate documents have, you know,
2  well -- withdrawn.
3         Do you know whether any of the Life
4  Certificate documents you've certified have been
5  used for the purposes of collecting a pension, or
6  money, or from the Palestinian Authority, or the
7  Palestinian Liberation Organization?
8      A.  I don't know that.
9      Q.  So, it's possible that the answer is yes;
10 is that correct, sir?
11         MR. BERGER:  Objection to the form of the
12 question; calls for speculation.
13     Q.  Mr. Abu Hbda, you may answer.
14         MR. SINAIKO:  Can we have the question
15 repeated for Mr. Abu Hbda, please?
16     (Whereupon, the requested portion was read
17 back by the reporter.)
18     A.  I don't know.  I can't tell you.  No, I
19 don't know.
20     Q.  Okay.  So, my question to you, sir, is, is
21 it possible that the answer to the question is yes?
22         MR. BERGER:  I object to the form of the
23 question; calls for speculation, and it's been
24 asked and answered.

Page 89

A. ABU HBDA

1      MR. SINAIKO:  Mr. Berger, let me ask the
2  question.
3      Q.  Is it possible that one or more of the
4  Life Certificate documents that you assisted in
5  preparing have been submitted to the -- a -- or the
6  Palestinian Liberation Authority, or Palestinian
7  Liberation Organization, for purposes of collecting
8  a pension or money from one of those entities?
9      MR. BERGER:  And I object to the question,
10 even though it was re-worded, because it calls for
11 speculation.
12         MR. SINAIKO:  Okay.  The objection has
13 been noted, and the Witness should answer.
14     A.  I don't know.  Not even a single one.  I
15 don't know anything about these documents.
16     Q.  These documents that you assist in
17 preparing, right?
18     A.  Maybe.  I haven't done, not even a single
19 one.  I don't remember whether I've done it, or
20 maybe I haven't done any of them.
21     Q.  So, you have no recollection, one way or
22 the other, whether any of these documents were for
23 the purpose of collecting a pension, or money from
24 the Palestinian Liberation Organization, or the

Page 90

A. ABU HBDA

1          A. ABU HBDA
2   Palestinian Liberation Authority; is that correct?
3       A.   I don't know.  I don't know.
4       Q.   Okay.  Okay.  Let's move down to the next
5   item on this page.  It says, "Trade Certification."
6   can you tell us -- can you tell us what service that
7   involves?
8       A.   I haven't done any of this; none.
9       Q.   Okay.  Can you describe the nature of this
10  service, whether or not you've actually performed
11  it?
12      A.   Maybe it involves registering a company in
13  New Jersey.
14      Q.   Okay.  Does it involve registering any
15  companies or businesses outside of the United
16  States?
17      A.   No, I haven't done none -- neither inside,
18  nor outside the States.  I didn't do any of them.
19      Q.   Okay.  Let's go down to the next one,
20  "Academic Record Certification"; can you describe
21  that service for me, please?
22      A.   This is a service where if a doctor
23  graduates from a university, or a hospital, or a
24  program, we certify this degree for this person to
25  be able to work in other countries back in Jordan,

Page 91

A. ABU HBDA

1          A. ABU HBDA
2   Palestinian, Lebanon.  So, he brings this documents,
3   and we certify this document, so that he can work in
4   these other countries.
5       Q.   And when you say you certify the document,
6   what do you mean by that?
7       A.   We send it to the embassy of the country
8   that he's entering into.
9       Q.   Okay.  So, this would be -- and just to,
10  you know, go back to the document, if we need to,
11  and let me know if you'd like to go back to the
12  document, but I'm thinking, is this a service
13  similar to the service that you performed with
14  respect to, you know, the document that had the red
15  and blue stamps that we were looking at before?
16      A.   Approximately, yes.  It's similar.  It's
17  the same thing.
18      Q.   Okay.  And that's the service that you
19  could perform just to get records certified by the
20  Palestinian Authority or the Palestinian Liberation
21  Authority, correct; Palestinian Liberation
22  Organization?
23      A.   No, it's not -- neither from the
24  Palestinian government, no.  The Liberation, the
25  Liberation, it's from the office in Washington,

Page 92

A. ABU HBDA

1          A. ABU HBDA
2   maybe.  In Canada.
3       Q.   Is Canada the same office that we were
4   talking about before, correct, sir?
5           MR. SINAIKO:  Let the record reflect that
6       Mr. Abu Hbda answered the question in English,
7       before the translation came.
8       Q.   Sir, have you ever had personal authority
9   to provide certification of a document on behalf of
10  the Palestinian Authority?
11      A.   No.
12      Q.   Have you ever personally had the authority
13  to certify any document on behalf of the Palestine
14  Liberation Organization?
15      A.   No.
16      Q.   Okay.  In connection with the documents
17  that you submit to an office in Canada that we've
18  been talking about, I believe you mentioned that the
19  office in Canada charges some sort of a fee; is
20  that -- do you recall that?
21      A.   Yes.
22      Q.   Okay.  And you, you know --
23           Again, do you remember that you told us
24  before that you also -- you also collect a fee from
25  the customer yourself?

Page 93

A. ABU HBDA

1          A. ABU HBDA
2       A.   Correct.
3       Q.   Has there ever been a circumstance in
4   which the office in Canada, to which you sent
5   documents, has shared a portion of its fee with you?
6       A.   No.
7       Q.   Have you ever asked -- let me withdraw
8   that question.  It's an inartful question.
9           Have you ever asked that the office in
10  Canada, to which you've been submitting documents,
11  as we've been discussing, to share its fee with you?
12      A.   No.
13      Q.   Is the office in Canada to which you
14  submit documents aware that you charge a fee to your
15  customers for making these submissions on their
16  behalf?
17           MR. BERGER:  Objection, calls for
18      speculation.
19      Q.   To your knowledge?
20      A.   I'm sorry, could you repeat the question.
21      Q.   Let me rephrase the question.  To your
22  knowledge, is the -- are the -- is the office in
23  Canada that we've been talking about aware that when
24  you submit documents to them for certification, you
25  are collecting a fee for your customers?

Page 94

A. ABU HEDA

1
2    A.   For my fee -- for my fees.  Why are they
3    concerned with my fees?
4    Q.   Okay.  Let's get the question read back.
5        MR. SINAIKO:  I would like to just have
6    the question read back because I think the
7    question was pretty clear, and we should just get
8    an answer to it.  I think -- could we just ask the
9    question of Mr. Abu Hbda again.
10       THE INTERPRETER:  Sure.
11       (Whereupon, the requested portion was read
12   back by the reporter.)
13   A.   They are not concerned because why are
14   they concerned with my fees?  They -- the customers
15   bring a money order for the fees that the office
16   charges from, and then I will speak with the
17   customer, and they pay me my fees.  So, this --
18   these are two separate things.  Why are they
19   involved with my fees?  These fees go to a money
20   order.
21   Q.   I'm going to try the question again.
22       To your knowledge, is the office in Canada
23   to which you submit documents --
24       This office in Canada we've been
25   discussing; is the office in Canada aware that you

Page 95

A. ABU HEDA

1
2    charge a fee to your clients in connection with the
3    performance of that service; are you aware?
4    A.   They never asked me.  I never asked them.
5    Q.   So, the answer is, you don't know whether
6    they're aware or not; is that correct, sir?
7    A.   I don't know.  I don't interfere with
8    those things.  I don't even speak with them.  I
9    don't know.
10   Q.   Actually, that's -- that raises one
11   question I had, and we could just address it now.
12       Have you ever communicated orally with any
13   representative of this office in Canada that we are
14   discussing there?
15   A.   Is -- there is certain situation where you
16   call, basically to just inquire whether your
17   documents have been finished or not.
18   Q.   Okay.  Apart from communications of that
19   nature, have you ever communicated orally with
20   anybody at the office in Canada that we've been
21   talking about?  That's the question.  Let me
22   rephrase the question.
23       Apart from communications of that nature,
24   have you ever communicated orally with anybody in
25   this office in Canada that we've been discussing to

Page 96

A. ABU HEDA

1
2    which you send documents to be certified or
3    legalized?
4    A.   No, like in situations where the papers
5    takes a long time, you call and leave a message.
6    You don't speak with anybody personally and they
7    don't pick up the phone.
8    Q.   Okay.  Putting aside oral communications,
9    have you ever communicated in writing with anybody
10   in this office in Canada that we've been discussing?
11   A.   No.
12   Q.   Okay.  Let's go down two stops -- we're
13   still on Page 2 of Exhibit 4.  Let's go down two
14   stops to, "Power of Attorney"; do you see that?
15   A.   Yes.
16   Q.   Can you describe that service for us?
17   A.   So, this document special for Palestinians
18   who want to give Powers of Attorney, or authorize
19   people; example either registering a land, either
20   divorce in the court of the legal court, or doing
21   something where they cannot go to the home country,
22   they authorize or give the Powers of Attorney to
23   another person over there to do that.
24   Q.   And these are Powers of Attorney that are
25   used in areas under control of the Palestinian

Page 97

A. ABU HEDA

1
2    Authority, to your understanding; is that correct?
3    A.   Yes.
4    Q.   And do you prepare these documents, or are
5    they prepared by somebody else, and you just
6    notarize the signatures?
7    A.   Most of the people bring this completed
8    document for attorneys in my home country, and we
9    just notarize them.  They sign these papers in front
10   of us.  We sign and notarize it.
11   Q.   And do you ever submit these Powers of
12   Attorney to, you know, to the office in Canada, or
13   to any other office that you might understand to be
14   affiliated with the Palestinian Authority, or the
15   Palestinian Liberation Organization?
16   A.   Sure.  So, after this person signs it, I
17   sign it and notarize it.  We give it to that person,
18   and give them the address and contact information
19   for the counsel, or the litigant in Canada, and tell
20   him that you have to have a money order, and you
21   have to send it there, and most people do it.
22       Some people tell us that they don't know
23   how to do it, and they need us to do it for them.
24   So, again, we do this by having the money order, and
25   sending it by FedEx to the office in Canada.  So,

Page 98

A. ABU HBDA

1
2    it's either or.
3        Q.   Okay.  Let's jump down one more stop here,
4    and do you see Mr. Abu Hbda that it says, "Land and
5    Property Transaction"?
6        A.   Yes, sir.
7        Q.   Can you describe this service that's
8    reflected there?
9        A.   So, this is similar to the authorization I
10   spoke about, like if someone wants to sell a land,
11   or construe the land in my home country, they bring
12   the papers and they sign it in front of us, and we
13   notarize it, and we send it to Canada, but before
14   that, we have to send them email to the office of
15   Land and Corporate in Ramallah, and we get a
16   response, and then the communication will directly
17   between Canada, the office in Canada and this office
18   in Ramallah.
19       Q.   Okay.  Terrific.
20           MR. SINAIKO:  We've been going for an hour
21   and ten minutes.  Would it be all right if we took
22   a short break?
23           THE INTERPRETER:  I want to continue
24   because I don't have time.
25           MR. SINAIKO:  Well, with apologies, I

Page 99

A. ABU HBDA

1
2    actually need to take a break for three minutes.
3    We could stay on the record, if you want.  I just
4    need to get up for three minutes and I'll be right
5    back.
6            THE INTERPRETER:  Let's make it five
7    minutes.
8            MR. SINAIKO:  Take five.  Let's go off the
9    record for five minutes.  We'll come back at 2:52.
10           THE INTERPRETER:  Thank you, sir.
11           THE VIDEOGRAPHER:  Okay.  We are now off
12   the record at 18:47 UTC Time.
13           (Whereupon, a short recess was taken.)
14           THE VIDEOGRAPHER:  We are now back on the
15   record.  The time is 18:53 UTC time.
16       Q.   Mr. Abu Hbda, you mentioned a moment ago,
17   in connection with land and property transactions on
18   this page, Page 2 of Exhibit 4, that there are times
19   where you need to communicate by email with an
20   office in Ramallah; do you recall mentioning that?
21       A.   I just send the email.  I don't speak with
22   anyone.
23       Q.   Understood, but what is the purpose of
24   these emails?
25       A.   Just to inspect that the land is really

Page 100

A. ABU HBDA

1
2    registered in that person's name who wants to sell
3    it to make sure that he owns it.
4        Q.   Okay.  And is that a procedure that's
5    required by the -- by laws or regulations of the
6    Palestinian Authority?
7        A.   No, it's something that to make sure that
8    the person who's buying the land is protected, and
9    really the land is in the name of the seller.  It's
10   not required by the government.
11       Q.   Ah, and how did you learn of the existence
12   of this office where you send the emails?
13       A.   I think the office in Canada sent us an
14   email saying you have to email the office in
15   Ramallah, and the office in Ramallah will get in
16   contact with them.
17       Q.   And how did you come to receive that email
18   from the office in Canada?
19       A.   Honestly, I don't remember if it came as
20   an email or a message.  I don't remember.
21       Q.   Whether it was an email, or a message, my
22   question is, do you recall how you came to receive
23   that communication from the office in Canada,
24   whether it was either in written or oral form?
25       A.   I don't remember exactly the incident.  I

Page 101

A. ABU HBDA

1
2    don't remember.
3        Q.   Let's look at one more thing on Page 2
4    here.  It says -- you see it says, "All Arab Nations
5    Documents Certification"?
6        A.   It's the same, doing certifications,
7    certificate, or -- sorry, authorization --
8            THE INTERPRETER:  Delete that --
9        A.   -- doing authorization.  Doing same thing
10   we were doing, like if someone comes from Jordan, we
11   do notarization from Jordan.  If someone comes to do
12   notarization from the Gulf countries, or Egypt, or
13   Yemen, or Israel.  So, it's the same.  It's just
14   doing notarizations for other countries.
15       Q.   Authorizations of what sort?
16       A.   Notarization.
17       Q.   Notarization.  Got it.  I'm so sorry.
18   Maybe I misheard.  Okay.
19           So, just to be clear, I want to make sure
20   it's notarization, by you as a Notary Public of the
21   State of New Jersey, of a documentation to a foreign
22   government?
23       A.   Correct.
24       Q.   A foreign government, or the Palestinian
25   Authority, or the Palestinian Liberation

Page 102

```
 1              A. ABU HBDA
 2  Organization, right?
 3       A.   No, I didn't say that.  I said other
 4  foreign governments.  I didn't say Palestinian
 5  government.  I didn't say the Palestinian Liberation
 6  Organization.  Yes, other government; this is what I
 7  said.
 8       Q.   Okay.  So, all Arab nations document
 9  certification does not -- that service that your
10  company performs does not in any way involve the
11  Palestinian Authority, or the Palestinian Liberation
12  Organization, correct?
13       A.   I'm a New Jersey Notary.  I notarize
14  papers to people, and they send it wherever they
15  want to.  This doesn't change anything for me.
16       Q.   Understood.  So, they -- I mean, they
17  could be documents used for any purpose?  It's a
18  documentation for notarization purposes; is that
19  right?
20       A.   Yes, I -- I'm just a New Jersey Notary,
21  and that's all.  I just notarize the documents in
22  New Jersey; that's all.
23       Q.   Very good.  Okay.  I want to go back to a
24  topic that we discussed briefly earlier.  I'm going
25  to try to come back to it.  Subsequent to
```

Page 103

```
 1              A. ABU HBDA
 2  receiving -- well, let me withdraw that.
 3          Do you remember, Mr. Abu Hbda, that
 4  earlier today, we looked at one of the Subpoenas
 5  that you were served with; do you recall that?
 6       A.   Yes.
 7       Q.   Okay.  To your recollection -- and by the
 8  way, let's just --
 9          I mean, we could confirm it, but the
10  Subpoena was served on you.  Hang on one second --
11  the Subpoena was served on you around March 11th;
12  does that sound right, sir?
13       A.   Correct.
14       Q.   Since you received the Subpoena, have you
15  communicated orally with any person you understood
16  to be an officer, agent, or employee, or in any way
17  related to the Palestinian Authority?
18       A.   No.
19       Q.   And since you received the Subpoena, have
20  you communicated orally with any person you
21  understood to be an officer, or agent, or employee,
22  or in any way related to the Palestinian Liberation
23  Organization?
24       A.   No.
25       Q.   And since you received the Subpoena, have
```

Page 104

```
 1              A. ABU HBDA
 2  you communicated orally with any person you
 3  understood to be an officer, or an agent, or
 4  employee, or in any way affiliated with this office
 5  in Canada that -- that we've been discussing, the
 6  office to which you submit documents when you would
 7  like them to be legalized by the Palestinian
 8  Authority?
 9       A.   No.
10       Q.   And since you received the Subpoena, have
11  you communicated in writing, including by email,
12  with any person you understand to be an officer, or
13  an agent, or an employee, or in any way affiliate
14  with the Palestinian Authority?
15       A.   No.
16       Q.   And since you received the Subpoena, have
17  you communicated in writing, including via email,
18  with any person you understood to be about officer,
19  or an agent, or an employee or in any way affiliated
20  with the Palestinian Liberation Organization?
21       A.   No.
22       Q.   Okay.  And since you received the
23  Subpoena, have you communicated in writing with any
24  person of your understanding to be an officer, or an
25  agent, or an employee, or any way affiliated with
```

Page 105

```
 1              A. ABU HBDA
 2  this office in Canada, which we've been discussing,
 3  to which you authorized notarization of
 4  documentation you submit to the Palestinian
 5  Authority?
 6       A.   No.
 7       Q.   Okay.  To your knowledge -- well, let me
 8  withdraw that.  Start again.
 9          The question I'm about to ask you is based
10  on your personal knowledge.  To your personal
11  knowledge and, you know, in advance of today, was
12  any person who you understand to be an agent, or an
13  employee, or an officer, or somehow affiliated with
14  the Palestinian Liberation Organization, aware of
15  you were being served with a subpoena?
16       A.   I haven't told anybody about that, no.
17       Q.   Okay.  But to your --
18          Putting aside whether you told anybody or
19  not, to your knowledge, are any such people aware
20  of?
21       A.   How would I know?  I haven't spoken with
22  anybody.
23       Q.   So --
24       A.   But I don't know.  How would I know if
25  anybody knows?
```

Page 106

A. ABU HBDA

1                        A. ABU HBDA
2        Q.   To your knowledge, you're not aware of
3   that?  That's all I'm asking.
4        A.   I don't know.  I don't know anything.
5        Q.   Okay.  And to your knowledge, again, just
6   your personal knowledge, and in advance of today,
7   was any person who you understand to be an agent, or
8   an employee, or an officer, or otherwise affiliated
9   with the Palestinian Authority aware of the Subpoena
10  that was served on you in connection with today's
11  deposition?
12       A.   No, I don't know.  I don't know.
13       Q.   So, the answer is -- I mean, I just want
14  to confirm that I understood correctly.
15            To your knowledge, you are not aware of
16  any such person being knowledgeable about the fact
17  that you were served with the Subpoena?
18       A.   For me, I didn't tell anybody.
19       Q.   Right.  But that, again, I just want to be
20  clear; you're not aware of any such person knowing
21  whether you told them or not?
22       A.   God only knows.  Am I God?  I don't know.
23  How would I know.
24       Q.   Okay.  And one last question in this line.
25  To your knowledge, in advance of today, was any

Page 107

A. ABU HBDA

1                        A. ABU HBDA
2   person who is an employee, or agent, or officer, or
3   otherwise affiliated with this office in Canada that
4   we've been talking about, where you submit documents
5   for, you know, certification or authentication of
6   documents by the Palestinian Liberation Authority,
7   were any of those people, to your knowledge, aware
8   that you were served with the Subpoena?
9        A.   I don't know.
10       Q.   Okay.  Not -- so, to your knowledge, the
11  answer is no; is that correct?
12       A.   I don't know.  I don't know anything.  I
13  don't know.
14       Q.   Okay.  By the way, your business -- let's
15  go to the last page of Exhibit -- I guess this is
16  Exhibit 4.
17            MR. SINAIKO:  Cosette, can we zoom in on
18       the thumbtack, please?  There we go.  Let's zoom
19       in on that.
20       Q.   Mr. Abu Hbda, do you see the thumbtack
21  that we zoomed in on here on Exhibit 4?
22       A.   Yes, sir.
23       Q.   Okay.  And you see there's an address
24  there, 964 Main Street, in Paterson, New Jersey?
25       A.   Yes.

Page 108

A. ABU HBDA

1                        A. ABU HBDA
2        Q.   And what is that address?
3        A.   This is my address.
4        Q.   Your address.  Is that a home address?
5        A.   No.
6        Q.   Okay.  What kind of an address is that?
7   Is that the address where your business is located?
8        A.   Yes, this is the office; yes.
9        Q.   Okay.  How long has the office of your
10  business been at that location?
11       A.   I don't remember exactly, maybe two years.
12  I don't remember exactly.
13       Q.   All right.
14            MR. SINAIKO:  Cosette, can we get Exhibit
15       5 again, please?  I think that was Tab 10.
16            MS. VINCENT:  Tab 10.
17            MR. SINAIKO:  But, I think we marked it as
18       Exhibit 5.
19            MS. VINCENT:  So, which page?
20            MR. SINAIKO:  So, we're going to go to
21       Page 36 of the PDF.  Actually, it has a number in
22       the lower right-hand; 296.
23            MS. VINCENT:  Maybe it should be up.
24            MR. SINAIKO:  Yeah, that looks right.  Can
25  we zoom?

Page 109

A. ABU HBDA

1                        A. ABU HBDA
2            Actually, let me ask Mr. Abu Hbda.
3        Q.   Have you seen this page before?  Do you
4   recognize it?  Anything you want to see, let us
5   know, and we could move the pages around for you.
6   Whatever you'd like us to do, we'll do.
7        A.   No, I haven't seen it.
8        Q.   Okay.
9            MR. SINAIKO:  Cosette, can you zoom in the
10       upper left-hand logo in the corner.
11       Q.   Do you see the logo, Mr. Abu Hbda?
12       A.   Yeah.
13       Q.   Okay.  Do you see it says, "PLO General
14  Delegations to the United States"?
15            MR. SINAIKO:  Can we make it any larger?
16       I know it's -- I'm having a hard time seeing it
17       to.  There we go.  Might be better.
18       Q.   Does that make it easier?  Can you see the
19  logo, Mr. Abu Hbda?
20       A.   Why.
21       Q.   Do you see that it says, "General
22  Delegation to the United States"?
23       A.   Yes.
24       Q.   Do you have an understanding of what the
25  PLO General Delegation to the United States is or

Page 110

A. ABU HBDA

1    was?

2         A.   Yes.

3         Q.   And what do you understand that the PLO

4    General Delegations of the United States is or was?

5         A.   It is a representative of Palestinian

6    Authority.

7         Q.   Okay.  And is that an analogue, or a

8    former analogue in the United States to the office

9    in Canada that we've been talking about?

10        A.   I don't know because I've never seen this

11   page.  This is the first time I've seen it.

12        Q.   Okay.  But putting aside the web page, and

13   whether you've seen it or not, do you have -- were

14   you aware of what the general PLO delegation to the

15   United States was?

16        A.   It used to have the Palestinian Authority

17   for the documents and papers.

18        Q.   Right.

19        A.   Something --

20        Q.   And in that respect, did this office

21   perform a bunch in -- similar to the one that is

22   performed by this office in Canada that you deal

23   with on behalf of your clients, who are looking to

24   have documents legalized or certified by the

Page 111

A. ABU HBDA

1    Palestinian Authority?

2         A.   Yes, they were authenticating the papers,

3    notarizing the paper; yes.

4         Q.   And while that office was in existence,

5    was it part of your business at Awni Abu Hbda

6    Documentation Services for certifications or

7    legalization of this office PLO General Delegation

8    to the United States?

9         A.   Most of the people from New Jersey, and

10   New Jersey when we used to notarize the papers, they

11   go by themselves; they go in person to that office.

12        Q.   I'm not sure I understand that exactly.

13   Do you mean they would go to the office, PLO General

14   Delegation to the United States?

15        A.   Yes, sir; yes.

16        Q.   Okay.

17             MR. SINAIKO:  Cosette, let's zoom out.

18   Okay.

19        Q.   Do you see this page is titled, "Conular

20   Affairs"?

21        A.   Yes.

22        Q.   When you see underneath that on the

23   upper -- there are one, two, three and four, five,

24   six boxes there; do you see that?

Page 112

A. ABU HBDA

1         A.   Yes, sir.

2         Q.   Okay.  And you see that the box in the

3    upper left-hand corner says, "General Powers of

4    Attorneys"; do you see that?

5         A.   Yes.

6         Q.   That's a service that is also provided by

7    Awni Abu Hbda Documentation Services, correct?

8         A.   I notarize it as a -- as a notary; yes.

9         Q.   Okay.  And you see in the -- in the center

10   on the top there, it says, "Durable Land Power of

11   Attorney"; do you see that?

12        A.   Yes.

13        Q.   And that's also a service that Awni Abu

14   Hbda Documentation Services provides in connection

15   with the Palestinian Authority, correct?

16        A.   I do it -- I notarize it as a notary

17   public; yes.

18        Q.   Okay.

19             MR. SINAIKO:  Cosette, let's go to Page --

20   I guess it's Page 42 of the PDF.

21             MS. VINCENT:  Sure; sure thing.

22        Q.   Mr. Abu Hbda, this -- just to be clear,

23   this is another page of the Exhibit that we have

24   been looking at.

Page 113

A. ABU HBDA

1         A.   I see that was Page 42, correct?

2             MR. SINAIKO:  It's Page 42 of the PDF; 42

3    out of 55; correct, Cosette?

4             MS. VINCENT:  It should be shared.

5             MR. SINAIKO:  That's it.

6         Q.   Okay.  Mr. Abu Hbda, do you see that page

7    that's got, "A302," in the lower right-hand corner?

8         A.   Yes.

9         Q.   And you see it says, "Notary Publics"?

10        A.   Yes.

11        Q.   Okay.  And do you see that -- I guess it

12   says, "Notary Publics," in the upper left-hand logo?

13        A.   Yes.

14        Q.   Okay.  And then it says, "Notary Publics,"

15   again in the middle of the page.  I guess -- there's

16   a paragraph, and then to the right, it says, "Notary

17   Publics," again; can you see that?

18             MR. SINAIKO:  Sorry.  Can we enlarge that

19   for Mr. Abu Hbda?

20        Q.   Does that help?  Okay.  And do you see

21   that there are a number of cities listed there?

22             Okay.  And do you see that one of them is

23   Paterson?

24        A.   Yes, I see it.

Page 114

A. ABU HBDA

1                        A. ABU HBDA
2        Q.   Okay.
3        MR. SINAIKO:  Let's move to Page 8038.
4    It's a few more pages in.  And let's zoom in
5    again, so that Mr. Abu Hbda can see better, so
6    that I can see better; my eyes are terrible, also.
7        Q.   Do you see that that's your name there,
8    sir?
9        A.   Yes.
10       MR. SINAIKO:  He understands the
11   questions, which is terrific.
12       Q.   And do you see there's some letters there
13   in a foreign letter, which I unfortunately don't
14   understand, but do you see next to your name,
15   there's some foreign letters there?
16       A.   Yes.
17       Q.   And can you tell us what that is?
18       A.   It's my name, "Abu Hbda."
19       Q.   That's your name in Arabic?
20       A.   Yes.
21       Q.   Okay.  And underneath that, it says "388."
22   By the way, do you understand that that's a
23   reference to you?
24       A.   Yes.
25       Q.   Okay.  And do you see underneath it, it

Page 115

A. ABU HBDA

1                        A. ABU HBDA
2    says, "388 Lake View Avenue, Clifton, New Jersey"?
3        A.   Yes.
4        Q.   And what is that address?
5        A.   This is my office address.  I had an
6    office at that place in the past.
7        Q.   Understood.  And do you still have an
8    office there?
9        A.   No.
10       Q.   Okay.  Underneath that, there's a
11   telephone number.  Do you see the telephone number?
12   I think it's a telephone number.
13       A.   Yes.
14       Q.   And is that a telephone number that you
15   used for your business?
16       A.   This is my personal cell phone.
17       Q.   Personal cell phone.  Got it.  So, let me
18   ask a question; do you have an understanding as to
19   how your name came to be placed on a Website of the
20   PLO Delegation to the United States, General
21   Delegation to the United States?
22       A.   Yes, I know.
23       Q.   And can you explain for the Court how that
24   happened?
25       A.   So, I used to notarize papers that goes to

Page 116

A. ABU HBDA

1                        A. ABU HBDA
2    the embassy, and they know, they saw my name coming
3    on these papers, and they called me, and they asked
4    me, and I said I agree.
5        Q.   And who was it that called you, if you
6    remember?
7        A.   I don't remember exactly, but I think
8    someone was working there.  His name is Hakim.
9        Q.   Okay.  Do you know what Hakim's role was
10   in that office?
11       THE INTERPRETER:  I'm sorry, can you
12   repeat the question, sir?
13       MR. SINAIKO:  Sure.
14       Q.   Do you know what Hakim's role was in the
15   office?  And by that I mean, the General Delegation
16   of the United States?
17       A.   No, I know that he was working there;
18   that's it.
19       Q.   Okay.  Apart from --
20       Do you remember what Hakim told you in
21   this conversation that you had with him and what you
22   said to him?
23       A.   He asked me if they could put my name on
24   the Website to notarize the papers that they
25   authenticated.

Page 117

A. ABU HBDA

1                        A. ABU HBDA
2        Q.   And do you remember anything that you said
3    to Hakim during the call?
4        A.   Yes, I told him, "yes, I agree."
5        Q.   And do you remember anything else about
6    this telephone call that you had with Hakim?
7        A.   No.
8        Q.   And do you remember any other
9    communications that you had with Hakim, apart from
10   this telephone call that you described?
11       A.   So, if papers are delayed, or if we have a
12   question, we used to call him to inquire about
13   the -- just the question.
14       Q.   So, he was a contact of yours at the PLO
15   General Delegations of the United States when that
16   office was open, correct?
17       A.   This is the person that I knew -- all -- I
18   knew his name there.
19       Q.   Did you ever meet him in person?
20       MR. SINAIKO:  Just let the record reflect
21   that Mr. -- 
22       A.   I've never met Hakim in my life.  I only
23   saw Hakim on TV.
24       MR. SINAIKO:  Let the record reflect that
25   before Mr. -- you know, before the translator

Page 118

```
1                    A. ABU HBDA
2     translated that answer, Mr. Abu Hbda had provided
3     the answer to the question.
4          Q.   Okay.  Apart from Hakim, did you ever
5     communicate with any other person who worked at the
6     office of the PLO General Delegations of the United
7     States?
8          A.   There was another person, his name was
9     Dr. Omar.  He was the, you know, legal
10    representative there, and we used to ask him
11    questions; the same thing we were doing with Hakim.
12         Q.   Okay.  Apart from Hakim and Dr. Omar, did
13    you ever communicate with anybody else who worked at
14    the PLO General Delegation to the United States?
15         A.   I don't remember speaking with anyone
16    else; no.
17         Q.   How many times would you say you've
18    communicated with Dr. Omar?
19         A.   I don't remember; maybe once, twice.  I
20    don't know.  I don't remember.
21         Q.   When was the last time you spoke with
22    Hakim, the individual we mentioned a few minutes
23    ago?
24         A.   After they closed the -- cancel it.  I
25    don't know anything about what happened after.
```

Page 119

```
1                    A. ABU HBDA
2          Q.   And what about Dr. Omar?  When was the
3     last time you remember communicating with Dr. Omar?
4          A.   I don't know; maybe before they closed.  I
5     don't remember.  I spoke with them either once or
6     twice.  I don't know.
7          Q.   Oh, you think --
8               Just to be clear about that, you think you
9     spoke to Dr. Omar only once or twice; is that
10    correct?
11         A.   Correct.
12         Q.   Okie doke.  Did you ever receive
13    compensation of any type from the PLO General
14    Delegation to the United States?
15         A.   No.
16         Q.   Did you ever hold a title of any kind with
17    the PLO General Delegation to the United States?
18         A.   No.
19         Q.   Not even an honorary title, like Deputy
20    Mayor of Paterson, right?
21         A.   What is Paterson has to do with the -- it
22    doesn't have any relation.
23         Q.   I'm just asking about honorary titles?
24         A.   No.
25         Q.   I know you were the Deputy Honorary Mayor
```

Page 120

```
1                    A. ABU HBDA
2     of Paterson, and I know we looked, that that's a
3     large honorary role, and I want to know if you had
4     any honorary delegations that might have been given
5     to you at the PLO General Delegation of the United
6     States?
7          A.   No, there isn't.
8          MR. SINAIKO:  Cosette, can we bring up
9     Exhibit 12, please, and we're going to mark this
10    as Exhibit 6.
11         (Whereupon, Subpoena to Produce was marked as
12    Exhibit 6 for identification, as of April 7th,
13    2021.)
14         MR. SINAIKO:  I'll ask the court reporter
15    to mark it, Subpoena to Produce Documents,
16    Information, or Objects, or to Permit Inspections
17    of Premises in Civil Action.
18         Q.   My question to you, Mr. Abu Hbda, feel
19    free to take a look at the document, if you want to
20    page through it.  Cosette can help you with that.
21    Just tell her what you'd like her to do.
22              My question to you is, after you looked at
23    the document, is whether you recognize it?
24         A.   Yes, I've seen it.
25         Q.   And what do you recognize this document to
```

Page 121

```
1                    A. ABU HBDA
2     be?
3          A.   This is the Subpoena that was sent to me.
4          Q.   Okay.  Do you recognize this to be the
5     Subpoena by which the Plaintiffs in this case asked
6     you to produce documents?
7          A.   Yes.
8          Q.   Okay.  Now, I know we mentioned this
9     before, but I want to spend just a little bit more
10    time on it because I think we'll be able to do that
11    a little bit more effectively now than we could
12    before.  Can you tell me what steps you took to
13    search for documents that might be responsive to the
14    Subpoena?
15         A.   So, I searched in my emails, and I
16    searched in the files, if I have documents about
17    anything, but, usually, we don't keep files.
18         Q.   Okay.  And are these your personal files,
19    sir?
20         THE INTERPRETER:  I'm sorry, this is the
21    interpreter.  The client is -- he is massaging his
22    eyes.
23         MR. SINAIKO:  Is everybody okay?  Do we
24    need to take a short break.
25         THE INTERPRETER:  Okay.
```

Page 122

A. ABU HBDA

2      MR. SINAIKO:  Because, like I said at the
3  beginning, we could take a break any time you need
4  to, sir.
5      THE INTERPRETER:  No, you can continue,
6  sir.
7      MR. SINAIKO:  Thank you very much.
8   Q.  I'm going to try to wind this up as
9  quickly as I can.  I think we're actually getting
10 close to the end.  The files that you searched for
11 documents that might be responsive to the Subpoenas,
12 were those your personal files?
13  A.  The files I have in my office.
14  Q.  Those are the files at the offices of Awni
15 Abu Hbda Documentation Services in Paterson?
16  A.  Yes.
17  Q.  Okay.  Do you have personal files at home
18 that might possibly contain documents responsive to
19 the Subpoena?
20  A.  No.
21  Q.  Okay.  And the emails that you searched,
22 where were those -- in what account were those
23 emails?
24  A.  My email.
25  Q.  Your personal email, sir?

Page 123

A. ABU HBDA

2  A.  I have only one email.
3  Q.  And that's an email account that you use
4  for both personal and -- personal and business?
5  A.  Correct.
6  Q.  Okay.  And just to be clear, and I'm just
7  getting this off of one of the Exhibits that I
8  mentioned, and I could show you the Exhibit if you
9  like, but just to confirm, the email is
10 redm@gmail.com; is that correct?
11  A.  Good.
12  Q.  And that email account, is that the only
13 email account that's used for the business of Awni
14 Abu Hbda Documentation Services?
15  A.  Yes, sir.
16  Q.  By the way, sir, apart from -- apart from
17 you, personally, does any other person work for Awni
18 Abu Hbda Documentation Services; do you have any
19 other employees?
20  A.  I work by myself.
21  Q.  Okay.  And, again, just to close off an
22 open spot, you had mentioned before that you perform
23 accounting services of some type; do you recall
24 that?
25  A.  This was in the past, yes.

Page 124

A. ABU HBDA

2  Q.  Okay.  And when did you stop providing
3  those services?
4  A.  I don't remember.  In the 90's.  I don't
5  know.
6  Q.  And, generally, what was the nature of
7  those services?
8  A.  Paying taxes; something like that.
9  Q.  All right.
10     MR. SINAIKO:  Cosette, let's bring up --
11     Okay.  Let's go to Tab 13, please, and
12 let's mark this as our next exhibit.  Is this
13 Exhibit 7?
14     (Whereupon, Tab 13 was marked as Exhibit 7
15 for identification, as of April 7th, 2021.)
16     MS. VINCENT:  It should be Exhibit 11.
17     MR. SINAIKO:  So, in a letter dated
18 April 5, 2021, from Sara Kropf to myself, and my
19 partner, Ron Wick.
20  Q.  I'll ask you, Mr. Abu Hbda, after you've
21 had a chance to look at the document, have you seen
22 it before?
23  A.  I think.  Ask me to look into my records.
24 I'm not sure whether I've seen this document or not.
25  Q.  Okay.  But you see that the second

Page 125

A. ABU HBDA

2  sentence of the first paragraph of the letter says,
3  "Mr. Abu Hbda has searched his records for documents
4  in response to your Subpoena"; do you see that?
5  A.  Yes, sir.
6  Q.  And you see that at the top of the page it
7  says, "April 5, 2021"; do you see that?
8  A.  Yes.
9  Q.  Okay.  And so I think you had mentioned
10 before that you conducted a search of emails and
11 files; did you do that work, prior to April 5, 2021?
12  A.  Yes.
13  Q.  Okay.  And did you conduct any searches
14 for documents after April 5, 2021?
15  A.  I don't know.  Maybe yesterday I saw
16 something.  I don't remember, to be honest.
17  Q.  Okay.  Let's look at the third sentence of
18 the first paragraph of this letter.  In this
19 sentence, Ms. Kropf tells my partner Mr. Wick and me
20 that you did not have any documents responsive to
21 the Subpoena; do you see that, sir?
22  A.  Exactly.
23  Q.  Right.  And, in fact, ultimately, you did
24 locate some documents that were responsive to the
25 Subpoena; is that correct, sir?

Page 126

A. ABU HEDA

1        A. ABU HEDA
2        A.   I don't know what you mean by that.  I
3    don't know.
4        Q.   There came a time, sir, did there not,
5    where you provided some documents that were produced
6    to the Plaintiffs, pursuant to the Subpoena in this
7    case; isn't that right?
8        A.   One paper, maybe.
9        Q.   Okay.  And do you recall how you came to
10   locate that document?
11       A.   I continued searching in the papers I
12   have, so I found this paper.
13       Q.   Okay.  Is there any other searching that
14   you feel you could do to locate additional documents
15   responsive to the Plaintiff's Subpoena?
16       A.   If I find something, I will tell my
17   attorney immediately about it, but I don't have
18   anything else.
19       Q.   Right.  And how did you -- well, let me
20   ask you this.
21            Before Ms. Kropf sent this letter to my
22   partner, Mr. Wick and me, do you believe that you
23   thoroughly searched your records for documents that
24   might be responsive to the Subpoena?
25       A.   Yes.

Page 127

A. ABU HEDA

2        Q.   And how did you conclude that there might
3    be additional documents you still needed to look
4    for, if you did conclude that?
5        A.   To be honest, I don't know.  I just
6    looked, and I searched in the papers, and I saw
7    these papers among the -- among the papers.
8        Q.   I see.  And what did you do after you saw
9    that piece of paper?
10       A.   I sent -- I sent it to my attorney.
11       Q.   And when did you do that, if you remember?
12       A.   Yesterday.  Maybe yesterday.  I don't
13   know.  I think yesterday.
14       Q.   All right.
15            MR. SINAIKO:  Cosette, if we could bring
16   up Tab 15.
17            MS. VINCENT:  Okay.
18            MR. SINAIKO:  And let's mark this as our
19   next Exhibit.  Let's -- this is going to be
20   Exhibit 8.
21            (Whereupon, Tab 15 was marked as Exhibit 8
22   for identification, as of April 7th, 2021.)
23            MR. SINAIKO:  It's a document that has
24   a -- the logo at the top and heading that says,
25   "General Delegation PLO United States," and is

Page 128

A. ABU HEDA

2    entitled, "Contract for Notary Public Services."
3    This will be Exhibit 8.
4        Q.   Mr. Abu Hbda, do you have Exhibit 8 in
5    front of you?
6        A.   Yes.  Yes.
7        Q.   Okay.  All right.  And you see that --
8            This is a document -- obviously, you've
9    seen before because you supplied it to your attorney
10   who, in turn, supplied it to us recently; is that
11   correct?
12       A.   Yeah.
13       Q.   And where was this document physically
14   located when you found it?
15       A.   One of the drawers.
16       Q.   Okay.  Was that a drawer in your office in
17   Paterson, or was that a drawer at home, or where was
18   the drawer located?
19       A.   In Paterson.
20       Q.   Okay.  And can you tell us what this
21   document is.
22       A.   This is the contract of the Palestinian
23   Mission.  They sent it to me, but I never signed it.
24   I never sent it back to them.
25       Q.   I see.  So, this is -- you don't --

Page 129

A. ABU HEDA

2            This is a contract that you never actually
3    entered into?
4        A.   No, no.  I -- I refused it.  I refused.
5        Q.   Well, maybe you could tell me --
6    withdrawn.
7            How did you come to receive this piece of
8    paper?
9        A.   I don't know.  Maybe it's with one of the
10   notarized papers we sent them, they sent with them
11   back to us.  I don't remember at all.  I don't
12   remember at all how I got it.
13       Q.   Do you recall when you received this piece
14   of paper?
15       A.   Maybe in 2014, around that time.
16       Q.   Okay.  And you see there's some
17   handwriting filled into the document in the middle
18   of the first page?
19       A.   Yes.
20       Q.   Whose handwriting is that?
21       A.   This is my handwriting.
22       Q.   Okay.  And that's your name, and your
23   business address that -- that is written in your
24   handwriting on the first page of Exhibit 8, correct?
25       A.   Correct.

Page 130

A. ABU HBDA

2      Q.   Okay.  And this is a piece of paper that
3   was -- strike that.
4           Do you recall ever requesting that this
5   document be sent to you?
6      A.   No.
7      Q.   So, as far as you know, this document was
8   gratuitously sent to you by the General Delegation
9   of the PLO to the United States, correct?
10     A.   Yes.
11     Q.   And I'm going to turn you to Page 3 of the
12  document.
13          MR. SINAIKO:  Cosette, if we could just
14      move over there.  Can we zoom in on the name
15      that's in the middle of the page?  Do you see what
16      I'm talking about there?  Perfect.  It's a little
17      hard to read because the quality of the copy is
18      not very high.
19     Q.   This is what we got from your counsel.  Do
20  you see there's a name there Maen Areikat; M-A-E-N;
21  A-R-E-I-K-A-T?
22     A.   Yes.
23     Q.   And do you know who that is?
24     A.   He's the Ambassador of the Commission.
25     Q.   Have you ever communicated in, orally or

Page 131

A. ABU HBDA

2   in writing, with that person?
3      A.   I saw him once, and I had a meeting, and I
4   went, and he wasn't -- I -- it was a session, and he
5   was there, but I've never spoken with him.  I've
6   never wrote him anything.
7      Q.   Is that a session of the UN that you
8   personally attended?
9      A.   It's the session of the United Nations.
10  All representative comes.  It happens always.
11     Q.   So, are you talking about a General
12  Assembly of the UN meeting, sir?
13     A.   Yeah.  Yes.
14     Q.   Was that something that you watched in
15  person or were you present?
16     A.   I went to the one follow-up visit and it
17  was present there.
18     Q.   I see.  So, did you actually interact with
19  Maen Areikat, or was it just somebody who you saw?
20     A.   I never spoke or interacted with him.
21     Q.   Okay.  So, it was just somebody who you
22  saw at the United Nations during a visit there?
23     A.   Yes, I've only seen him; yes.
24     Q.   And why were you present at the United
25  Nations at that time?

Page 132

A. ABU HBDA

2      A.   All people go to see these sessions, or
3   the meetings.  It's -- I did it the same as any
4   member of the public.
5      Q.   So, you were present just as a member of
6   the public, correct?
7      A.   Yes.
8      Q.   Apart from the visit to the United Nations
9   where you saw Maen Areikat, have you ever been a
10  member of the United Nations at that time?
11     A.   I take my children and grandchildren
12  often, every two or three years, to show them from
13  the outside the United Nations.  So, I take them, my
14  grandchildren, just to show them.
15     Q.   Okay.
16          MR. SINAIKO:  Looking at -- let's --
17      let's's zoom out again, please, Cosette.
18     Q.   Looking at Exhibit 8, can you point me to
19  any trade secret that's reflected in that document?
20          THE INTERPRETER:  Sorry.  Could you repeat
21      the question again?  This is the interpreter.
22          MR. SINAIKO:  Certainly.
23     Q.   Looking at Exhibit 8, Mr. Abu Hbda, can
24  you point me to any trade secret in that document?
25     A.   What is it that you're referring to

Page 133

A. ABU HBDA

2   exactly?
3      Q.   Well, let me put it a little differently.
4   Mr. Abu Hbda, do you see any information in this
5   document that you regard as reflecting a secret that
6   you use in your business, secret information that
7   you use in your business?
8      A.   I never signed this document.  So, what is
9   the content?  What is inside?  It doesn't belong to
10  me.  It's -- it doesn't belong to me.  I didn't sign
11  it.
12     Q.   So, would you agree then that this
13  document does not reflect any secret or confidential
14  information concerning your business?
15     A.   This document is not related to me.  I
16  don't have any relation whatsoever to this document.
17     Q.   Right.  So, my question is, would you
18  agree that this document does not reflect any secret
19  or confidential information concerning your
20  business?
21     A.   I don't understand your question, and I
22  cannot answer this question because it's not related
23  to me.
24     Q.   Okay.  So, can we agree that this -- that
25  this document does not reflect any information at

Page 134

```
 1              A. ABU HBDA
 2   all about the business that you run, that is Awni
 3   Abu Hbda Documentation Services?
 4        A.   I don't understand your question, or what
 5   you are referring to.
 6        Q.   Okay.  What I'm trying to understand,
 7   Mr. Abu Hbda, is whether this document contains any
 8   information about your business, Awni Abu Hbda
 9   Documentation Services?
10        A.   Again, this is concerning -- this document
11   is regarding documentation services, but I haven't
12   signed it.  I didn't sign it, or do anything with
13   it.
14        Q.   When you received this document from --
15   from the PLO General Delegation to the United
16   States, did anybody ask you to keep the document
17   confidential?
18        A.   No.  Nobody asked me about that.
19        Q.   And does this document reflect any
20   financial information about you or about Awni Abu
21   Hbda Documentation Services?
22        A.   No.
23        Q.   Okay.  And do you regard this document as
24   containing information of a personal nature about
25   anyone else or you?
```

Page 135

```
 1              A. ABU HBDA
 2        A.   It has my name and my address; that's all.
 3        Q.   Right.  And do you regard that
 4   information -- well, withdrawn.
 5             Do you regard that name and business
 6   address as personal or intimate information about
 7   you?
 8        A.   It's a business information.
 9        Q.   Okay.  But publicly available business
10   information, correct?
11        A.   Maybe.
12        Q.   Well, it's on your Website; isn't it, sir?
13        A.   Yes, that's possible.
14        Q.   With your name and telephone --
15             It's possible.  Should we go back and look
16   at the Website again?  Would you like me to look at
17   the Website again, sir?
18        A.   I told you.  This is a business
19   information that is available on the Website.
20        Q.   Okay.  Perfect.  And this document -- I'm
21   going to just come back to one or two other things.
22   This document that we've marked as, I think it's
23   Exhibit 8.
24             MR. SINAIKO:  Is it 8?  Are we on Exhibit
25   8, Cosette?  I think it is Exhibit 8.
```

Page 136

```
 1              A. ABU HBDA
 2             MS. VINCENT:  Yeah, it's Exhibit 8.
 3        Q.   This document that we marked, Exhibit 8,
 4   do you regard this document as containing personal
 5   or intimate information about any person?
 6        A.   No.
 7        Q.   And do you regard this document as
 8   containing personal or intimate information about
 9   any person?
10        A.   What do you mean by, "personal"?  Are you
11   referring to me or any person?
12        Q.   Any person.  We already established that
13   the document pertaining to you is the information
14   you make available on your Website.  What I'm asking
15   you is, do you regard this document as containing
16   information of a personal or intimate nature of you
17   or any person?
18        A.   I don't know anything about this document,
19   and I cannot answer anything regarding it.
20             MR. SINAIKO:  Okay.  Let's go to Tab 11,
21   and we'll mark this as Exhibit 9.
22             (Whereupon, Tab 11 was marked as Exhibit 9
23   for identification, as of April 7th, 2021.)
24             MR. SINAIKO:  Can we zoom in just a little
25   bit, Cosette?  Just to make it a little more
```

Page 137

```
 1              A. ABU HBDA
 2   legible.  So, this is a document that we obtained
 3   from the Internet, from the Website of the
 4   permanent observer Palestine to the United Nations
 5   of New York.  It's an excerpt from the Website,
 6   and I would ask the court reporter to mark it as
 7   Deposition Exhibit 9.
 8        Q.   Okay.  I just have a few questions about
 9   this one.  Mr. Abu Hbda, do you see that there's a
10   list of names in the middle of the page here?  Let's
11   zoom in a little bit.  It's testing everybody's eyes
12   here.  It's hard to see.  Can you see that better?
13        A.   Yes.
14        Q.   Okay.  Can you see that the first name is
15   Riyad Mansour?
16        A.   Yes.
17        Q.   And do you know that person?
18        A.   You know.
19        Q.   How do you know that person?
20        A.   I see him in the UN.  He comes sometimes
21   for meetings.  He participates with people's
22   concerns.  If someone dies, if there is a, like some
23   incidents, or if there's a celebration, he comes to
24   celebrate with us involved in the community.
25        Q.   How many times would you say you've met
```

Page 138

A. ABU HBDA

1
2  Mr. Mansour?

3      A.   I've never had a special meeting with him

4  in my life.  I never sat with him.  I see him.  I

5  shake hands with him, like other people do.

6      Q.   Okay.  Apart from seeing him, and shaking

7  hands with him, have you ever had a substantive

8  communication with him, beyond pleasantries?

9      A.   Maybe we speak when there is a

10 celebration, there is a funeral, there is a wedding,

11 there is a dinner.  So, just in general speaking, we

12 don't discuss politics; that's general speaking.

13 He's a public figure.  Everybody knows him.

14     Q.   Okay.  But your interactions with him,

15 Mr. Abu Hbda -- let me withdraw that.

16          Mr. Abu Hbda, do you have interactions, or

17 have you ever had interactions with Mr. Mansour,

18 other than, you know, of a social nature?

19     A.   No.

20     Q.   Okay.  Let's go to the next person Feda

21 Abdelhady-Nasser; do you see that person's name?

22     A.   I don't know.

23     Q.   My question -- let me just get a clear

24 question and answer.  Do you know Feda

25 Abdelhady-Nasser personally?

Page 139

A. ABU HBDA

1
2      A.   No.

3      Q.   Have you ever met Feda Abdelhady-Nasser?

4      A.   No.

5      Q.   To your knowledge, have you ever

6  communicated with Feda Abdelhady-Nasser?

7      A.   No.

8      Q.   Okay.  The next person down on the list

9  Nadya Rasheed; have you ever seen that, Mr. Abu

10 Hbda?

11     A.   Yes, I see her.

12     Q.   And have you ever met Nadya Rasheed?

13     A.   No.

14     Q.   And have you ever communicated with Nadya

15 Rasheed?

16     A.   No.

17     Q.   Okay.  Let's go to the next name on the

18 list Majed Bamya; do you see that name?

19     A.   Yes.

20     Q.   And have you ever Majed Bamya?

21     A.   No.

22     Q.   And to your knowledge, have you ever

23 communicated with Majed Bamya?

24     A.   No.

25     Q.   Let's go to the next name, Abdallah

Page 140

A. ABU HBDA

1
2  Abushawesh; do you see that name, sir?

3      A.   Yes.

4      Q.   And have you ever met Abdallah Abushawesh?

5      A.   Yes.

6      Q.   You have, right?  And who do you

7  understand Abdallah Abushawesh to be?

8      A.   I don't know.  He works in the UN, in the

9  Mission.  I don't know.

10     Q.   Would you say that you know Abdallah

11 Abushawesh personally?

12     A.   No.

13     Q.   Have you ever communicated with Abdallah

14 Abushawesh?

15     A.   I think I saw him once only in the UN, and

16 I spoke with him once; that's it.

17     Q.   And what was the nature of the

18 conversation, if you remember?

19     A.   "How are you?  How is your family?  How is

20 your children?"

21     Q.   And were those questions that he was

22 asking of you, or were those questions you were

23 asking of him?

24     A.   We both asked the same questions.

25     Q.   I see.  And where did this meeting happen?

Page 141

A. ABU HBDA

1
2      A.   In the -- it's in the UN.

3      Q.   And what was the context for you meeting

4  Abdallah Abushawesh at the UN?

5          THE INTERPRETER:  I'm sorry.  Interpreter.

6  Could you repeat the question?

7          MR. SINAIKO:  Sure.

8      Q.   What was the context for you meeting

9  Abdallah Abushawesh at the UN?

10     A.   There was no specific.  He was there, and

11 there was some people there, and I saw him.

12     Q.   Okay.  And apart from this one

13 communication that you recall, can you recall any

14 other communications with Mr. Abdallah Abushawesh?

15     A.   No.

16     Q.   Okay.  Let's go to the next name, Nada

17 Tarbush; do you see that name there, sir?

18     A.   Yes, I do.

19     Q.   Have you ever met Ms. Nada Tarbush?

20     A.   No.

21     Q.   Have you ever communicated with Nada

22 Tarbush?

23     A.   No.

24     Q.   Okay.  And let's go to the next name on

25 the list.  Can you see Ms. Sahar Abushawesh?

Page 142

A. ABU HBDA

1                    A. ABU HBDA
2        A.   Yes.
3        Q.   Okay.  And have you ever met Ms. Sahar
4    Abushawesh?
5        A.   No.
6        Q.   Have you ever communicated with Sahar
7    Abushawesh?
8        A.   No.
9        Q.   Okay.  Let's go down to the next one;
10   Ms. Sahar Salam; do you see that name Sahar Salam?
11       A.   Yes, I saw the name, yes.
12       Q.   Okay.  Have you ever met Sahar Salam?
13       A.   No.
14       Q.   Okay.  And have you ever communicated with
15   Ms. Sahar Salam?
16       A.   No.
17       Q.   Okay.  And the last name on the list
18   Ms.Nadia Ghannam; do you see that name?
19       A.   I see it, yes.
20       Q.   Okay.  And have you ever met Ms. Nadia
21   Ghannam?
22       A.   Her name is not strange to me, but I've
23   never met her in person.
24       Q.   Right.  And have you ever communicated
25   with Nadia Ghannam?

Page 143

A. ABU HBDA

1                    A. ABU HBDA
2        A.   No.
3            MR. SINAIKO:  Let's move back up to to top
4    of this page.  Page -- Exhibit 9.
5        Q.   Have you -- I guess I'll try to limit the
6    question to at any time during 2020 or 2021, and we
7    could put aside the conversations with Mr. Mansour
8    that you've already told us about, and the other
9    conversations that you've already told us about, you
10   know, in the last couple of minutes.
11           Putting aside those conversations, do you
12   recall, at any time in 2020 or 2021, having any
13   communication with anybody that you understood to be
14   an employee of, or an agent of, or affiliated with
15   the permanent member of the State of Palestinian
16   Mission in New York?
17       A.   No.
18           MR. SINAIKO:  Alrighty.  If we could -- I
19   think I'm actually close to finished.  If we could
20   go off the record.  I probably want 15 minutes to
21   gather my notes, and I think we're very close to
22   done.  Would it be all right if we took a break?
23           MS. KROPF:  If we could do a little
24   shorter than 15 minutes.
25           (Whereupon, a short recess was taken.)

Page 144

A. ABU HBDA

1                    A. ABU HBDA
2            THE VIDEOGRAPHER:  We are now back on the
3    record.  The time is 20:30 UTC Time.
4        Q.   Okay.  Mr. Abu Hbda, I just have a few
5    more questions for you today.  Do you recall, sir,
6    that we were looking at a list of notaries public
7    that was maintained by the PLO General Delegation to
8    the United States, a list that you were on?
9        A.   Yes.
10       Q.   Okay.  And are you aware of any other
11   lists of that nature, that is lists of notary
12   publics in the United States that are -- that is
13   currently maintained by the Palestinian Authority?
14       A.   I don't have any lists.
15       Q.   No, but were you aware of the existence of
16   any such list?
17       A.   You can ask the Mission in Canada, the
18   Embassy for me.  I don't know.
19       Q.   Ah.  So, just to come back to the
20   question.  Were you aware of the --
21           Were you aware that that Palestinian
22   Authority maintains any list of notaries in the
23   United States, similar to the one we looked at from
24   the former PLO General Delegation to the United
25   States?

Page 145

A. ABU HBDA

1                    A. ABU HBDA
2        A.   You have to ask them themselves about
3    this.  For me, I don't know.
4        Q.   You don't know?  I'm just trying to
5    know --
6            I'm just trying to confirm if you're aware
7    of such a thing or not.
8        A.   I don't know.  Maybe there is.  I don't
9    know about this.
10       Q.   So, you're unaware of any such list, just
11   to be clear?
12       A.   I don't have a list or know, but maybe
13   there is a list with names on it.  I don't know.
14       Q.   Okay.  And do you know whether any such
15   list is maintained by the Palestinian Liberation
16   Organization?
17       A.   Why don't you go and ask the PLO?  Why --
18   how would I know about that?
19       Q.   I'm just asking you, sir, if you could let
20   us know if you're aware of any such ID, I'd be
21   grateful.
22       A.   I don't know.  I don't have a list.  I
23   know there's people who sign, but I don't have a
24   list.  I don't know.
25       Q.   Okay.  And the office that you mentioned

Page 146

A. ABU HBDA

1       A. ABU HBDA
2    in Canada to which you send documents when you would
3    like them legalized or certified by the Palestinian
4    Authority, do you know where that office in Canada
5    maintains such a list, just to your knowledge?  I'm
6    not asking whether they do or not.  I'm asking if
7    you know whether they do or not.
8           MR. BERGER:  I'm going to object to the
9       form as misstating his prior testimony.
10          But, you could answer.
11      Q.   Let me put the question again in a way
12   that will hopefully not draw an objection.  The
13   office in Canada that we've been speaking about
14   today; you know what I'm talking about, correct,
15   sir?
16      A.   I know, but I don't know what the Mission,
17   or the office in Canada knows, or keeps, or what
18   they don't know.  You could call them and ask them
19   about that.
20      Q.   You're getting ahead of me a little bit.
21   I'm first trying to make a clear record here.  The
22   office in Canada, remember we looked at the document
23   that had the red stamp and the blue stamp on it?
24      A.   Yes.
25      Q.   Okay.  And you remember that was the

Page 147

A. ABU HBDA

1       A. ABU HBDA
2    document that you sent to an office in Canada,
3    correct?
4       A.   Correct.
5       Q.   Okay.  And that office in Canada, were you
6    aware of whether that office in Canada maintains a
7    list of notary publics in the United States who can
8    perform notarial services, and a list that we looked
9    at before to the PLO General Delegation to the
10   United States?
11      A.   I don't know.  I know they had my name,
12   but for other names, I don't know.
13      Q.   You know they have your name?
14      A.   They signed my paper, so they know my
15   name.
16      Q.   Got it.  Okay.  And one further question,
17   are you aware whether the permanent observer to the
18   United Nations maintains a list of notaries public,
19   in the United States similar to the one maintained
20   by the General Delegations PLO to the United States?
21      A.   I don't know anything about the Mission of
22   the UN; I don't know anything about it.
23      Q.   Okay.  Were you aware that any time after
24   January 4, 2020, that's January 4 of last year, the
25   Palestinian Authority has referred any customer to

Page 148

A. ABU HBDA

1       A. ABU HBDA
2    your business Awni Abu Hbda Documentation Services?
3       A.   No.  The Authority or the government, they
4    don't send anything to us.  They haven't sent
5    anything to us.
6       Q.   Okay.  Were you aware whether at any time
7    January 4, 2020, the Palestinian Liberation
8    Organization has referred any customers or clients
9    to your business Awni Abu Hbda Documentation
10   Services?
11      A.   No, they haven't sent anything.
12      Q.   Okay.  Are you aware whether this office
13   in Canada that we've been talking about, the one
14   which you sent the document with the red and blue
15   stamp on it, were you aware whether that office,
16   since January 2020, has referred any customers or
17   clients to your business Awni Abu Hbda Documentation
18   Services?
19          Just looking at the realtime record, I
20   want to be sure that my record reflects my question
21   pertains to any referrals of customers or clients on
22   or after January 4, 2020.
23      A.   No.
24      Q.   Okay.  And are you aware whether the
25   Permanent Observer Mission to the United Nations

Page 149

A. ABU HBDA

1       A. ABU HBDA
2    Mission in New York has referred any customers or
3    clients to Awni Abu Hbda Documentation Services on
4    or after January 4, 2020?
5       A.   No, they didn't.
6       Q.   And on or after January 4, 2020, have you
7    been paid any money or given anything of value by
8    the Palestinian Liberation Organization?
9       A.   No.
10      Q.   And on or after January 4, 2020, have you
11   been paid any money, or given anything of value by
12   the Palestinian Liberation Organization?
13      A.   No.
14      Q.   And on or after January 4th, 2020, have
15   you been given any -- have you been paid any money
16   or given anything of value by the, you know, by the
17   office in Canada that we referred to before, the one
18   to which you sent the document with the red and the
19   blue stamp?
20      A.   No.
21      Q.   And on or after January 4, 2020, have you
22   been paid any money, or given anything of value by
23   the Permanent Observer Mission to the United Nations
24   in New York City, the one we've been talking about?
25      A.   No.

Page 150

A. ABU HBDA

2    Q.   On or after January 4, 2020, have you
3 entered into any agreements with the Palestinian
4 Authority?
5    A.   No.
6    Q.   On or after January 4, 2020, have you
7 entered into any agreements with the Palestinian
8 Liberation Organization?
9    A.   No.
10    Q.   And on or after January 4, 2020, have you
11 entered into any agreements with the office in
12 Canada that we've been talking about to which you
13 sent the document, the red and the blue stamp?
14    A.   No.
15    Q.   And on or after January 4, 2020, have you
16 entered into any agreements with the Permanent
17 Observer Mission to the United Nations Mission in
18 New York?
19    A.   No.
20    Q.   By the way, just to clarify, you
21 understand that my questions about the Permanent
22 Observer Mission, you know, the Permanent Observer
23 Mission to the United Nations in New York, that's a
24 reference to the -- hang on one second, the -- the
25 entity whose Website, you know, we looked at as

Page 151

A. ABU HBDA

2 Exhibit 9; you understand that, correct?
3    A.   Yes, sir.
4    Q.   And apart from seeing Mr. Mansour at the
5 United Nations, or seeing Mr. Mansour at social --
6 on social occasions of the sort that you described,
7 that is to say family events, I suppose it was
8 funerals you mentioned -- let me withdraw that.
9        You mentioned before that you've seen
10 Mr. Mansour at certain types of events outside of
11 the United Nations; do you remember that?
12    A.   Maybe; yes.
13    Q.   Can you just give us a description of the
14 sort of events those were?  I know we're going back
15 a little bit, but I just want to try to refresh your
16 recollection.
17    A.   It's from gathering, maybe a wedding, a
18 funeral; it's something -- it's not related, and
19 even if it's in New York, it's not in the same area.
20    Q.   Okay.  Apart from these social gatherings,
21 are you aware of any other activities that
22 Mr. Mansour engages in here in the United States?
23    A.   How would I know?
24    Q.   Well, have you ever attended, for example,
25 a speech that Mr. Mansour delivered?

Page 152

A. ABU HBDA

2    A.   On TV.
3    Q.   And do you know from where Mr. Mansour
4 delivered the speech that you delivered on TV?
5 Sorry, let me withdraw that.
6        Do you know where Mr. Mansour delivered
7 the speeches that you saw him deliver on television?
8    A.   How would I know, but most of them are in
9 the UN.
10    Q.   Do you know the locations of any are --
11 that are not in the UN?
12    A.   No, I don't know.
13    Q.   Have you ever seen Mr. -- apart from
14 social gatherings, have you ever seen Mr. Mansour in
15 person, other than at the United Nations
16 headquarters?
17    A.   No.
18    Q.   Okay.  And turning back to just
19 momentarily -- and we could put the list up if we
20 need to -- turning back to the list of personnel
21 from Exhibit 9, the list of personnel from the
22 Permanent Observer Mission in New York, have you
23 ever seen -- and apart from the social occasions
24 that you mentioned with respect to Mr. Mansour, have
25 you ever seen any of those individuals, other than

Page 153

A. ABU HBDA

2 the individuals from the UN headquarters in New
3 York?
4    A.   No.  No.
5    Q.   Okay.  Let me go on mute for 30 seconds.
6 I think I'm done.  I just want to confirm.  Hang on
7 one sec.
8        MR. SINAIKO:  Okay.  Mr. Abu Hbda, I have
9 no further questions for you at this time, and I'm
10 prepared to hand the Witness over to Mr. Berger,
11 if he'd like to examine.
12        MR. BERGER:  Yes.  Thank you.  And thank
13 you for your patience.

Page 154

A. ABU HBDA

1
2    EXAMINATION BY
3    MR. BERGER:
4        Q.    Mr. Abu Hbda, I won't take very much of
5    your time.  My name is Mitchell Berger.  I'm one of
6    the lawyers for the Palestinian Liberation
7    Organization, and for the record, have we ever met
8    before.
9        A.    No.
10       Q.    Thank you.  I want to take you back to a
11   question that Mr. Sinaiko asked you, and an answers
12   you gave earlier this afternoon.  It was at Page 74,
13   starting at Line 1 of the --
14           MR. SINAIKO:  Would you mind if I just --
15   back there?  I just need a moment.
16           MR. BERGER:  Go ahead.  Let me know when
17   you're -- you're at Page 74 line --
18           MR. SINAIKO:  Go ahead.  Okie Doke.  I'm
19   there.
20       Q.    Okay.  So, Mr. Abu Hbda, you were asked
21   this question and you gave this answer.  Question,
22   "Sir, have you ever had personal authority to
23   provide certification of a document on behalf of the
24   Palestinian Authority?"
25           And you gave the answer, "no."

Page 155

A. ABU HBDA

1
2           Do you recall being asked that question
3    and being given that answer?
4        A.    Yes.
5        Q.    Okay.  I would like to use Mr. Sinaiko's
6    phrasing of, "on behalf of," and ask you two
7    questions, if I may.  Is that all right with you?
8        A.    Yes.
9        Q.    Okay.  Since January 4, 2020, have you
10   provided any services on behalf of the Palestinian
11   Authority?
12           MR. SINAIKO:  Objection.
13       A.    No.
14       Q.    Since January 4, 2020, have you provided
15   any services on behalf of the Palestinian Liberation
16   Organization?
17           MR. SINAIKO:  Objection.
18       A.    No.
19           MR. BERGER:  That's all I have.  Thank
20   you.
21           MR. SINAIKO:  Mr. Abu Hbda, we really
22   appreciate your time today and your patience.
23           THE VIDEOGRAPHER:  We are now --
24           MR. SINAIKO:  Before we go off the record,
25   I had one question to ask of Sara.

Page 156

A. ABU HBDA

1
2           MS. KROPF:  Yeah.
3           MR. SINAIKO:  So, while we're on the
4    record, in light of Mr. Abu Hbda's testimony
5    today, can we withdraw the Confidential
6    designation on the document that was produced to
7    us?  Can you withdraw that designation?
8           MS. KROPF:  You know, let me just double
9    check my client candidly -- I put that on because
10   my client -- let me talk to him about that and get
11   back to you.
12           MR. SINAIKO:  It seems pretty clear from
13   the testimony that there's no basis for the
14   confidential designation or run around getting
15   confidential designations withdrawn.  I figured I
16   would just ask.
17           MS. KROPF:  Can you send me whatever
18   Protective Order's in place, so I could look at
19   the language?
20           MR. SINAIKO:  Erica, could you take a look
21   at that?
22           MS. LAI:  We could go off the record.
23           (Continued on next page to accommodate
24   jurat.)
25

Page 157

1
2           THE VIDEOGRAPHER:  Okay.  If everyone's
3    ready.  We are now off the record.  The time is
4    20:54 UTC Time, and this concludes today's
5    testimony given by Awni Abu Hbda Documentation
6    Services.  Thank you, everyone.  Thank you,
7    Mr. Abu Hbda.
8                        -o0o-
9           (Whereupon, the examination of AWNI ABU HBDA
10   was concluded at 4:54 p.m.)
11
12
13           _____
14                AWNI ABU HBDA
15
16
17
18
19
20
21
22
23
24
25

Page 158

1

2                    C E R T I F I C A T E

3

4         I, AMBRIA IANAZZI, do hereby Certify:

5         THAT AWNI ABU HBDA was sworn under penalty of

6    perjury by a Notary Public.

7

8         THAT the deposition transcript herein is a

9    verbatim record of the testimony given by AWNI ABU

10   HBDA, stenographically record by a Registered

11   Professional Reporter, and Certified Realtime

12   Reporter.

13

14        THAT I am not related to any of the Parties

15   to this Action by blood or marriage; and I have no

16   interest, financial or otherwise, in the outcome of

17   the case.

18

19

20        CERTIFICATION DATE:  April 12th, 2021.

21

22

23

24        _Ambria Ianazzi_____

25        AMBRIA IANAZZI, RPR, CRR, RCR, CSR

Page 159

1    Errata Sheet

2

3    NAME OF CASE: SHABTAI SCOTT SHATSKY -against- PALESTINE LIBERATION ORGANIZATION

4    DATE OF DEPOSITION: 04/07/2021

5    NAME OF WITNESS: Awni Abu Hba

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25        _____

---

### Exhibits

**EX 0001 Awni Abu Hba 04072 1**
  3:6 17:24 18:3,5,6,17 22:11

**EX 0002 Awni Abu Hba 04072 1**
  3:7 27:23 28:3,20 29:6,16,23 32:19

**EX 0003 Awni Abu Hba 04072 1**
  3:8 32:16, 17,20 37:25 45:11,17 47:20 49:9

**EX 0004 Awni Abu Hba 04072 1**
  3:9 52:5,6, 12 56:9 57:10,21 64:6 68:15 75:19,20 76:3 84:7,8 96:13 99:18 107:16,21

**EX 0005 Awni Abu Hba 04072 1**
  3:10 70:25 71:14 108:14,15,18

**EX 0006 Awni Abu Hba 04072 1**
  3:11 120:10, 12

**EX 0007 Awni Abu Hba 04072 1**
  3:12 124:13, 14

**EX 0008 Awni Abu Hba 04072 1**
  3:13 127:20, 21 128:3,4 129:24 132:18,23 135:23,24,25 136:2,3

**EX 0009 Awni Abu Hba 04072 1**
  3:14 136:21, 22 137:7 143:4 151:2 152:21

---

### $

**$100**
  78:11
**$250**
  77:24
**$300**
  77:25
**$50**
  78:11

---

### -

**-o0o-**
  157:8

---

### 0

**0**
  7:2,10 12:2, 13 67:6,17

---

### 1

**1**
  17:24 18:3, 5,6,17 22:11 27:19,21 28:3 154:13
**10**
  108:15,16
**10C**
  70:21
**11**
  124:16 136:20,22
**11:21**
  43:12
**11:35**
  43:20,22 44:12
**11:45**
  43:15
**11th**
  103:11
**12**
  120:9
**12:30**
  65:21
**13**
  124:11,14
**13:39**
  8:9
**13:55**
  16:11
**14**
  17:21
**14:15**
  16:14
**14:40**
  28:16
**14:45**
  28:19
**15**
  43:20 77:11 127:16,21 143:20,24

**15-minute**
  43:9
**15:22**
  44:15
**15:39**
  44:18
**16:34**
  66:16
**17:39**
  66:19
**18:47**
  99:12
**18:53**
  99:15
**1971**
  34:20
**1980**
  31:24,25 37:9
**1984**
  47:25 48:9
**1995**
  37:14
**1:30**
  65:22
**1:34**
  66:12,14

---

### 2

**2**
  27:23 28:2, 3,20 29:6, 16,23 32:19 45:12 52:4,6 53:9 56:9 57:21 64:6 68:14,18 75:23 76:3,8 84:7 96:13 99:18 101:3
**20**
  77:11
**2002**
  49:18
**2010**
  49:18

**2014**
129:15
**2019**
30:25
**2020**
30:25 143:6,
12 147:24
148:7,16,22
149:4,6,10,
14,21 150:2,
6,10,15
155:9,14
**2021**
8:9 18:4
28:4 32:21
52:7 71:2
120:13
124:15,18
125:7,11,14
127:22
136:23
143:6,12
**20:30**
144:3
**20:54**
157:4
**250**
77:20
**29**
8:24
**296**
108:22
**2:52**
99:9

---

**3**

**3**
32:16,17,20
37:25 45:11,
17,20 47:20
49:9 130:11
**30**
153:5
**300**
77:20

**36**
108:21
**388**
114:21 115:2

---

**4**

**4**
52:5,6,12
56:9 57:10,
21 64:6
68:11,15
75:19,20
76:3 84:8
96:13 99:18
107:16,21
147:24
148:7,22
149:4,6,10,
21 150:2,6,
10,15 155:9,
14
**42**
112:21
113:2,3
**4:54**
157:10
**4th**
149:14

---

**5**

**5**
70:25 71:14
108:15,18
124:18
125:7,11,14
**50**
34:14 42:20
78:24 79:3
**52**
71:5
**55**
113:4
**55-page**
70:19

---

**6**

**6**
120:10,12
**68**
34:19

---

**7**

**7**
124:13,14
**74**
154:12,17
**7th**
8:9 18:4
28:4 32:21
52:7 71:2
120:12
124:15
127:22
136:23

---

**8**

**8**
32:16,20
127:20,21
128:3,4
129:24
132:18,23
135:23,24,25
136:2,3
**8038**
114:3

---

**9**

**9**
136:21,22
137:7 143:4
151:2 152:21
**90**
8:13
**90's**
124:4

**96**
37:14
**964**
107:24

---

**A**

**A-L**
67:4
**A-M-I-R-I**
67:4
**A-R-E-I-K-A-T**
130:21
**A302**
113:8
**Abdallah**
139:25
140:4,7,10,
13 141:4,9,
14
**Abdelhady-
nasser**
138:21,25
139:3,6
**ability**
17:4,8
**able**
13:12,13
18:6 41:8,14
72:24 73:19,
22 74:8
82:14 87:23
90:25 121:10
**absolutely**
25:3
**Abu**
8:8,22 10:1,
4,9 11:1,13
12:1,8,10
13:1,4,5,11,
21 14:1,20
15:1 16:1,15
17:1,2,8,12,
15 18:1,5,8,
11,15,23
19:1,19
20:1,17 21:1

22:1,14 23:1
24:1,14 25:1
26:1,2,14,17
27:1,13
28:1,20
29:1,2,25
30:1,7,17,20
31:1,4,17,19
32:1,3,22
33:1 34:1,4,
19 35:1 36:1
37:1 38:1,6
39:1 40:1
41:1,6,9,13,
24 42:1,17
43:1 44:1,9,
20,23,24
45:1,15
46:1,3 47:1,
16,23,24
48:1,9 49:1,
8 50:1,6
51:1 52:1,
12,14 53:1,
2,11,21
54:1,18
55:1,8,11
56:1,6 57:1,
19 58:1,18
59:1 60:1,16
61:1,2,18
62:1 63:1,9
64:1 65:1,8
66:1,9,22
67:1,12,14
68:1,3,22
69:1,7 70:1,
17 71:1,11,
14,21 72:1,
20 73:1,21
74:1,4 75:1,
23 76:1,6,14
77:1 78:1,2,
7 79:1 80:1
81:1 82:1
83:1,6 84:1,
16 85:1 86:1
87:1 88:1,
14,16 89:1

90:1 91:1
92:1,6 93:1
94:1,9 95:1
96:1 97:1
98:1,4 99:1,
16 100:1
101:1 102:1
103:1,3
104:1 105:1
106:1 107:1,
20 108:1
109:1,2,11,
19 110:1
111:1,6
112:1,8,14,
23 113:1,7,
20 114:1,5,
18 115:1
116:1 117:1
118:1,2
119:1 120:1,
18 121:1
122:1,15
123:1,14,18
124:1,20
125:1,3
126:1 127:1
128:1,4
129:1 130:1
131:1 132:1,
23 133:1,4
134:1,3,7,8,
20 135:1
136:1 137:1,
9 138:1,15,
16 139:1,9
140:1 141:1
142:1 143:1
144:1,4
145:1 146:1
147:1 148:1,
2,9,17
149:1,3
150:1 151:1
152:1 153:1,
8 154:1,4,20
155:1,21
156:1,4
157:5,7,9,14

Abushawesh
140:2,4,7,
11,14 141:4,
9,14,25
142:4,7
Academic
90:20
accept
61:17 81:4,5
accommodate
156:23
account
122:22
123:3,12,13
accountant
31:24
accounting
123:23
accurate
10:20 33:22
34:12 46:8
48:13 50:20,
24 58:2
accurately
12:7 67:11
act
76:22
acting
58:23
action
8:15 18:2
22:6 120:17
activities
31:17 151:21
addition
46:21,22
47:5 48:18,
22,23 49:10
additional
49:11 126:14
127:3
address
38:5,7 95:11
97:18 107:23
108:2,3,4,6,
7 115:4,5
129:23

135:2,6
advance
18:19 22:3
23:16 105:11
106:6,25
Advertisement
29:17
Advertising
29:17
Affairs
111:21
affiliate
104:13
affiliated
55:4 64:2
97:14 104:4,
19,25 105:13
106:8 107:3
143:14
afternoon
154:12
agent
103:16,21
104:3,13,19,
25 105:12
106:7 107:2
143:14
ago
31:12 34:14,
18 36:19
50:7 55:11
86:17 99:16
118:23
agree
28:13 42:8
53:7 116:4
117:4
133:12,18,24
agreed
53:5,8
agreement
8:6
agreements
150:3,7,11,
16
ahead
26:7,8 79:17

146:20
154:16,18
**alive**
87:17,22
**Alrighty**
143:18
**altercations**
85:16
**Ambassador**
130:24
**Ambria**
8:18
**America**
34:20,23
81:6,7
**American**
33:9
**Amiri**
67:4
**analogue**
110:8,9
**and/or**
62:10
**answer**
14:2,11,13
15:6 16:23
20:15,18,20,
24 21:8
22:15 23:7,
10,19,25
24:2,21,22
25:2,15,19
26:6 41:2,3,
11,14,19,20,
21 46:4
50:6,11
54:25 55:2,8
63:4,10
88:10,14,22
89:14 94:8
95:5 106:13
107:11
118:2,3
133:22
136:19
138:24
146:10

154:21,25
155:3
**answered**
21:3 42:4,6
58:18 88:25
92:6
**answering**
11:2,13 46:3
**answers**
11:4,20 12:9
13:12,16
14:20,22,23
15:2,5 42:11
67:13 154:11
**anticipation**
19:18,22
20:2,9
21:10,14
26:18
**anybody**
19:19 21:10
95:20,24
96:6,9
105:16,18,
22,25 106:18
118:13
134:16
143:13
**anyone**
84:13 99:22
118:15
134:25
**apart**
35:19 36:15
37:16 49:22
51:11 69:16
95:18,23
116:19 117:9
118:4,12
123:16 132:8
138:6 141:12
151:4,20
152:13,23
**apologies**
98:25
**apologize**
55:9

**apparently**
31:19
**appears**
74:16
**applicants**
65:16
**application**
65:9,19
70:15
**applications**
64:12 65:17
**applied**
75:11,13
**apply**
81:9
**appointed**
51:6,8,10
**appreciate**
10:7 155:22
**appropriate**
9:2 23:6
**Approximately**
91:16
**April**
8:9 18:4
28:4 32:21
52:7 71:2
120:12
124:15,18
125:7,11,14
127:22
136:23
**Arab**
101:4 102:8
**Arabic**
12:9,10
15:6,7 42:6
44:2 55:25
67:13,14
86:18 87:16
114:19
**area**
151:19
**areas**
96:25
**Areikat**
130:20

131:19 132:9
**around**
8:22 39:21
71:10 103:11
109:5 129:15
156:14
**arrange**
15:15
**arrangement**
25:6,9,13
**arrived**
34:19,22
**Article**
47:24
**asked**
14:11 20:12
25:5 55:13
75:14 77:14
88:25 93:7,9
95:4 116:3,
23 121:5
134:18
140:24
154:11,20
155:2
**asking**
13:21 15:14
22:18,19
23:8,11,15,
17 25:4
38:17 106:3
119:23
136:14
140:22,23
145:19 146:6
**asks**
60:3
**aspect**
84:2
**Assembly**
131:12
**assist**
80:20 89:17
**assisted**
89:5
**assisting**
61:2 63:9

associated
  22:4 54:20
  55:15 70:3,
  10
association
  70:5
assume
  14:2,3,4
  41:7 57:25
attended
  35:15 131:8
  151:24
attorney
  21:19,24
  23:12 26:21,
  23 27:5,12
  64:24 65:19
  96:14,18,22,
  24 97:12
  112:12
  126:17
  127:10 128:9
attorney-
client
  20:22 21:5
  24:24 25:17
attorneys
  97:8 112:5
authenticated
  116:25
authenticatin
g
  111:3
authenticatio
n
  59:21,25
  107:5
authorities
  82:21
authority
  37:19 39:10,
  14,25 40:12
  51:18,21
  54:11,21
  55:5,15
  59:21 63:2,
  6,7,15 64:2

70:4,12
80:7,8,20
81:10 82:3,
15,22 83:10,
14,20 84:2,
4,10 88:7
89:7 90:2
91:20,21
92:8,10,12
97:2,14
100:6 101:25
102:11
103:17
104:8,14
105:5 106:9
107:6 110:7,
17 111:2
112:16
144:13,22
146:4 147:25
148:3 150:4
154:22,24
155:11
authorization
  72:22 80:10,
  14,16 98:9
  101:7,9
Authorization
s
  101:15
authorize
  83:23 96:18,
  22
authorized
  87:2,5 105:3
authorizes
  80:23
available
  86:22,24
  135:9,19
  136:14
Avenue
  115:2
aware
  8:4 93:14,23
  94:25 95:3,6
  105:14,19
  106:2,9,15,

20 107:7
110:15
144:10,15,
20,21 145:6,
20 147:6,17,
23 148:6,12,
15,24 151:21
Awni
  8:8 12:8
  15:4 29:25
  30:7,17,20
  31:4,19
  34:4,19
  47:24 48:8
  67:12,14
  69:7 72:20
  76:14 111:6
  112:8,14
  122:14
  123:13,17
  134:2,8,20
  148:2,9,17
  149:3 157:5,
  9,14
AWNIA
  12:10

_____

          B
_____

back
  13:5 16:13
  24:7 26:12,
  25 28:18
  32:2 36:13
  37:24 44:17
  45:10 47:11,
  13 50:13,15,
  17 54:15,17,
  24 56:8
  57:18 58:5
  60:23 61:4,
  6,7,13,16
  63:19,21
  66:13,18
  68:20 75:18,
  20 76:8 77:7
  79:7 88:18
  90:25 91:10,

11 94:4,6,12
99:5,9,14
102:23,25
128:24
129:11
135:15,21
143:3 144:2,
19 151:14
152:18,20
154:10,15
156:11
background
  42:19
backwards
  32:14
ballpark
  79:2
Baloul
  21:23
Bamya
  139:18,20,23
based
  23:10 105:9
basically
  95:16
basis
  20:19 23:6
  24:25 156:13
Bear
  76:6
began
  46:3
beginning
  122:3
behalf
  8:12,18
  40:11 92:9,
  13 93:16
  110:24
  154:23
  155:6,10,15
believe
  33:21 92:18
  126:22
belong
  133:9,10

Awni Abu Hba
April 07, 2021                                    6

**Berger**
9:5,6 15:9,
10,17,21
16:2 21:18
40:24 55:6,
16,20 88:12,
23 89:2,10
93:17 146:8
153:10,12
154:3,5,16
155:19
**best**
17:17,18
73:22
**better**
109:17
114:5,6
137:12
**bills**
25:3,7 26:3
**birth**
59:25
**Birzeit**
35:2,7
**bit**
42:17 121:9,
11 136:25
137:11
146:20
151:15
**black**
71:20,21,24
72:7
**Blend**
33:10
**blue**
72:16,24
73:3 74:5
91:15 146:23
148:14
149:19
150:13
**Board**
51:13
**Boards**
51:5

**body**
51:14
**Boggs**
9:6 22:5
**book**
76:20,21
**box**
29:23 112:3
**boxes**
111:25
**break**
16:16,23
42:22 43:2,9
65:22 98:22
99:2 121:24
122:3 143:22
**breaks**
16:18,19,20
**briefly**
102:24
**bring**
27:19 32:15
52:3 68:11
70:21 82:25
94:15 97:7
98:11 120:8
124:10
127:15
**Bringing**
52:9
**brings**
91:2
**Broad**
8:13
**brother**
34:19
**brought**
83:17
**bunch**
110:22
**business**
19:16 27:6
30:4,6,17,24
31:3,4,6,7,
9,15 32:25
38:8,15,16,
19,23 39:3,

8,12,23
40:10 45:21
46:8 52:18
78:2 80:6
107:14
108:7,10
111:6 115:15
123:4,13
129:23
133:6,7,14,
20 134:2,8
135:5,8,9,18
148:2,9,17
**businesses**
90:15
**buying**
100:8

—————————

C

—————————

**call**
8:23 25:16
26:7 44:25
66:21 95:16
96:5 117:3,
6,10,12
146:18
**called**
12:5 67:9
116:3,5
**calling**
18:12
**calls**
88:13,24
89:11 93:17
**Canada**
63:14 70:7,
9,16 73:6,7
75:6,13
77:15 78:16
79:23 92:2,
3,17,19
93:4,10,13,
23 94:22,24,
25 95:13,20,
25 96:10
97:12,19,25
98:13,17

100:13,18,23
104:5 105:2
107:3
110:10,23
144:17
146:2,4,13,
17,22 147:2,
5,6 148:13
149:17
150:12
**cancel**
77:19 118:24
**candidates**
48:17
**candidly**
156:9
**capture**
11:19 13:13
**car**
35:24
**care**
26:8
**Cars**
36:3
**case**
8:16 22:23
24:14 42:3
49:13 85:22
121:5 126:7
**cases**
27:15
**casualty**
36:4,6
**category**
85:3
**cease**
86:23
**celebrate**
137:24
**celebration**
137:23
138:10
**cell**
115:16,17
**center**
53:15 56:8
57:21 69:3

Awni Abu Hba
April 07, 2021

112:10

**certain**
26:18 87:2,5
95:15 151:10

**certainly**
13:9 132:22

**certificate**
36:10 56:22,
23,24,25
60:2,4,16
87:13,14
88:2,5 89:5
101:7

**certificates**
37:19 72:21,
22 74:23

**certification**
59:21 62:25
86:8,12,14
90:5,20 92:9
93:24 101:5
102:9 107:5
154:23

**certifications**
101:6 111:7

**certified**
62:10 87:10
88:5 91:19
96:2 110:25
146:3

**certify**
70:16 90:24
91:3,5 92:13

**chance**
124:21

**change**
102:15

**changes**
76:24

**charge**
77:9,10,16,
18 78:3,9,10
93:14 95:2

**charged**
78:8

**charges**
77:23 92:19
94:16

**check**
55:22 56:3
156:9

**checked**
19:12 53:4,7

**children**
132:11
140:20

**chose**
38:17,21

**circumstance**
93:3

**cities**
113:22

**city**
47:25 48:9
50:21,25
51:3,12
149:24

**Civil**
8:25 18:2
120:17

**claim**
85:9,22
86:4,5

**claims**
85:6

**clarified**
47:3

**clarify**
75:10 85:23
150:20

**classes**
35:16,20,25
46:9,20 47:4

**clear**
13:25 29:2
53:2 65:14
94:7 101:19
106:20
112:23 119:8
123:6 138:23
145:11
146:21

156:12

**clearly**
71:11

**client**
19:9,13
26:21 27:16
43:4 54:5
59:19 60:3,
20 61:19
76:18 121:21
156:9,10

**clients**
40:11 59:11
74:17 75:8,
14 77:3,9,16
81:18 95:2
110:24
148:8,17,21
149:3

**Clifton**
115:2

**clock**
43:13

**close**
65:14 122:10
123:21
143:19,21

**closed**
118:24 119:4

**Cohen**
10:6

**coherent**
58:20

**collect**
92:24

**collecting**
88:6 89:8,24
93:25

**college**
32:8 35:16,
19 36:16
45:22,23
46:10,12,17,
21 47:6

**come**
22:17 24:9
26:12 36:13

38:14 50:13
64:17,19,21,
23 82:18
83:21 84:13,
24 85:8 86:6
87:18 99:9
100:17
102:25 129:7
135:21
144:19

**comes**
69:13 76:19
86:18
101:10,11
131:10
137:20,23

**comfort**
43:4

**comfortable**
44:25

**comments**
50:3

**Commission**
37:17 130:24

**commissioned**
36:22

**Commissioner**
49:24 50:3,
4,8,18,21,25
51:4,13

**Commissioners**
51:2

**commissions**
51:6

**communicate**
99:19 118:5,
13

**communicated**
95:12,19,24
96:9 103:15,
20 104:2,11,
17,23 118:18
130:25
139:6,14,23
140:13
141:21
142:6,14,24

communicating
119:3
communication
25:14 98:16
100:23 138:8
141:13
143:13
communication
s
20:22 22:19
25:5,21
95:18,23
96:8 117:9
141:14
community
26:25 27:2
32:8 35:16,
19 45:22,23
46:10,12
137:24
companies
90:15
company
30:13 79:21
80:4 90:12
102:10
compensation
119:13
complete
77:4
completed
97:7
computer
29:7,8
concerned
58:21 94:3,
13,14
concerns
137:22
conclude
127:2,4
concluded
157:10
concludes
157:4
conduct
125:13

conducted
125:10
confidential
133:13,19
134:17
156:5,14,15
confirm
8:23 73:24
103:9 106:14
123:9 145:6
153:6
connection
22:24 26:4
82:2 84:9
92:16 95:2
99:17 106:10
112:15
consider
57:16,17
consistent
42:9
construe
98:11
consulate
62:2
contact
23:15 97:18
100:16
117:14
contains
134:7
content
53:5 74:2
133:9
contentious
23:4
contents
73:25
context
141:3,8
continue
42:24,25
45:3,4 46:5
58:20 98:23
122:5
continued
126:11

156:23
contract
128:2,22
129:2
control
96:25
Conular
111:20
conversation
44:21 65:25
66:4,5,6,11
116:21
140:18
conversations
8:5 21:15
143:7,9,11
copies
83:16
copy
130:17
Corey
8:11
corner
71:20 109:10
112:4 113:8
Corporate
98:15
corporation
30:8,13
correct
18:17 29:3
30:25 33:5,
25 34:13,23
35:3,7 37:11
45:6,23
46:23 52:21
53:6 55:5
56:10 57:11
58:10,11,25
59:5,7,11,19
60:6,16
61:19 62:4,
11,21,22
63:2,4,15
64:2 65:10,
17 69:8 70:5
71:25 72:4

75:8,15
77:5,6 79:9
82:16,17
83:10,11
85:13 86:3
88:11 90:2
91:21 92:4
93:2 95:6
97:2 101:23
102:12
103:13
107:11
112:8,16
113:2,4
117:16
119:10,11
123:5,10
125:25
128:11
129:24,25
130:9 132:6
135:10
146:14
147:3,4
151:2
correctly
106:14
Cosette
17:20 27:18
29:20 32:15
34:8 37:24
45:12 52:3,8
68:10 70:21
73:2 75:19
107:17
108:14 109:9
111:18
112:20 113:4
120:8,20
124:10
127:15
130:13
132:17
135:25
136:25
council
48:9 75:3,4
77:22 78:9

counsel
  8:23 9:7
  14:8,10,12
  16:20 22:6
  43:10 47:25
  66:10 97:19
  130:19
Counselor
  48:3
countries
  87:16 90:25
  91:4 101:12,
  14
country
  70:14 83:3
  86:18,19
  91:7 96:21
  97:8 98:11
County
  45:22 46:9
couple
  10:14 31:14
  46:25 143:10
course
  11:3 14:8
  36:16 56:22
courses
  32:8 36:5
court
  8:17 10:11,
  17 11:18
  13:12 14:3
  26:7 42:7
  47:10 50:14
  57:14 59:16
  63:18 66:25
  85:21 96:20
  115:23
  120:14 137:6
COVID-19
  10:22
created
  29:12 33:4
credits
  47:2
crisply
  78:4

customer
  92:25 94:17
  147:25
customers
  80:21 82:6,
  25 85:19
  93:15,25
  94:14 148:8,
  16,21 149:2
cut
  47:18

─────────────

              D

─────────────

dangerous
  23:20
dated
  124:17
daughter
  84:22
day
  76:24 78:21
deaf
  59:16
deal
  39:3,12,22,
  23 110:23
dealing
  38:24 39:9
  60:14
dealings
  27:6
death
  56:23 59:16
  60:2,15
  72:22
Declaration
  70:20,24
Defendants
  9:5 21:19,24
  22:6
degree
  35:6,9,12
  36:10 57:15
  90:24
delayed
  117:11

delegation
  63:24 73:5,
  23 75:3,6
  78:17 79:24
  109:22,25
  110:15
  111:8,15
  115:20,21
  116:15
  118:14
  119:14,17
  120:5 127:25
  130:8 134:15
  144:7,24
  147:9
delegations
  109:14 110:5
  117:15 118:6
  120:4 147:20
Delete
  101:8
deliver
  152:7
delivered
  151:25
  152:4,6
depends
  78:22
deposition
  8:8 9:3
  10:8,16,21
  14:8 16:18
  18:2,13,19,
  21,24 19:18,
  22 20:3,10
  21:2,11,14,
  17,22 22:3
  23:4 26:19
  41:18 42:2,
  12,13 43:2
  44:9 58:24
  106:11 137:7
Deputy
  48:19,23
  49:11,14,17
  51:12
  119:19,25

describe
  53:24 64:14,
  15 69:10
  79:25 84:18
  86:14 90:9,
  20 96:16
  98:7
described
  117:10 151:6
description
  151:13
designation
  156:6,7,14
designations
  156:15
desired
  83:15
dies
  137:22
different
  76:11,12
differently
  133:3
dinner
  138:11
direction
  29:12 33:5
  52:21
directly
  98:16
discharge
  85:9,21
discuss
  138:12
discussed
  102:24
discussing
  93:11 94:25
  95:14,25
  96:10 104:5
  105:2
dissolve
  85:9
divorce
  56:24 59:16
  96:20

DMV
  86:21 87:7
doctor
  17:14 90:22
document
  17:25 18:9,
  12,25 27:22,
  23 28:22
  29:3,5,19,
  21,23 52:15
  53:3,4,10
  56:17 59:18,
  20 60:15,20,
  22 61:19,21,
  22 62:18,19
  69:13 70:19
  71:5,17
  72:14,17,19
  73:24,25
  74:3 75:2
  76:2 77:2,
  14,24 78:10
  79:12 80:18,
  19 81:2,5
  83:7,8 91:3,
  5,10,12,14
  92:9,13
  96:17 97:8
  102:8
  120:19,23,25
  124:21,24
  126:10
  127:23
  128:8,13,21
  129:17
  130:5,7,12
  132:19,24
  133:5,8,13,
  15,16,18,25
  134:7,10,14,
  16,19,23
  135:20,22
  136:3,4,7,
  13,15,18
  137:2 146:22
  147:2 148:14
  149:18
  150:13

documentation
  30:2,7,17,21
  31:5,20
  53:22 69:7
  72:20 101:21
  102:18 105:4
  111:7 112:8,
  15 122:15
  123:14,18
  134:3,9,11,
  21 148:2,9,
  17 149:3
  157:5
documents
  19:3,6
  26:18,20
  38:25 39:4,
  9,13,24
  40:11 53:12,
  15,20 54:2
  55:3,12
  56:10,11,12
  57:9,20 58:9
  59:2,10
  62:8,24
  69:4,6,11,18
  70:16 73:8
  74:16,18,20,
  24 75:14
  76:10 77:8,9
  78:16,19
  79:23 81:8,
  17,19,21
  82:12,19
  83:13,15
  85:4,6,17
  87:19 88:2,5
  89:5,16,17,
  23 91:2
  92:16 93:5,
  10,14,24
  94:23 95:17
  96:2 97:4
  101:5
  102:17,21
  104:6 107:4,
  6 110:18,25

120:15
  121:6,13,16
  122:11,18
  125:3,14,20,
  24 126:5,14,
  23 127:3
  146:2
doing
  31:13,18,24
  42:9 96:20
  101:6,9,10,
  14 118:11
doke
  75:17 119:12
  154:18
double
  156:8
draw
  146:12
drawer
  128:16,17,18
drawers
  128:15
drew
  29:16
Driver
  86:8,11,13
driver's
  86:19,20
  87:9
drop
  85:22
drugs
  17:6
due
  10:22
duly
  7:5 12:6
  67:10
Durable
  112:11

———————————

          E

———————————

earlier
  46:13,17
  75:6 102:24

103:4 154:12
easier
  109:18
educational
  32:4 35:21
effect
  83:15
effective
  82:20
effectively
  121:11
efficient
  44:10
Egypt
  101:12
Egyptian
  84:13
either
  33:4 39:4
  40:4,6 42:11
  57:6 59:23
  96:19 98:2
  100:24 119:5
elected
  51:8
email
  98:14 99:19,
  21 100:14,
  17,20,21
  104:11,17
  122:24,25
  123:2,3,9,
  12,13
emailed
  73:8
emails
  99:24 100:12
  121:15
  122:21,23
  125:10
embassies
  40:7 54:6,7,
  9,11,19,20
  55:4,12,13,
  14 69:23
  70:2,3

**embassy**
  19:14 40:6,
  14,17,19
  54:6,22,23
  57:7 60:4,5
  61:25 62:2,
  9,18,20
  63:13,14,25
  69:20,22
  91:7 116:2
  144:18
**employee**
  51:20
  103:16,21
  104:4,13,19,
  25 105:13
  106:8 107:2
  143:14
**employees**
  123:19
**end**
  122:10
**engaged**
  31:17
**engagement**
  25:18
**engages**
  151:22
**English**
  11:14 12:9,
  11 15:5
  21:15 34:5
  41:2,3,8,9,
  14,19,22
  42:5,11,15,
  18 43:2,25
  44:3,11,23
  46:4 58:18
  61:3 63:11
  67:13,15
  92:6
**enlarge**
  34:6 113:19
**ensure**
  10:19
**entail**
  60:22 69:18

**enter**
  8:19 76:19
**entered**
  129:3 150:3,
  7,11,16
**entering**
  91:8
**entirety**
  73:18
**entities**
  76:12 89:9
**entitled**
  20:25 22:17
  128:2
**entity**
  30:9 86:16
  87:10 150:25
**Erica**
  156:20
**established**
  136:12
**estate**
  36:3
**event**
  16:17 56:4
**events**
  151:7,10,14
**everybody**
  9:4 39:17,20
  40:5 65:23
  121:23
  138:13
**everybody's**
  137:11
**everyone**
  14:3 28:12
  39:19 66:21
  157:6
**everyone's**
  157:2
**exactly**
  23:14 53:25
  72:18 82:7
  100:25
  108:11,12
  111:13 116:7
  125:22 133:2

**examination**
  10:2 44:20
  66:22 154:2
  157:9
**examine**
  153:11
**examined**
  7:6
**Excellent**
  85:25 86:7
**excerpt**
  32:18 52:12,
  17 137:5
**excuse**
  15:9 27:8
  28:5 40:24
  42:25 54:13
  59:6 61:8
  68:23
**excused**
  66:10
**executing**
  80:21
**exhibit**
  17:24 18:3,
  5,6,17 22:11
  27:23,25
  28:3,20
  29:6,16,23
  32:16,17,19,
  20 37:25
  45:11,17
  47:20 49:9
  52:5,6,12
  56:9 57:10,
  21 64:6
  68:15 70:19,
  25 71:14
  75:19,20
  76:3 84:7
  96:13 99:18
  107:15,16,21
  108:14,18
  112:24
  120:9,10,12
  123:8
  124:12,13,
  14,16

**127:19,20,21
  128:3,4
  129:24
  132:18,23
  135:23,24,25
  136:2,3,21,
  22 137:7
  143:4 151:2
  152:21**
**Exhibits**
  123:7
**exist**
  80:9
**existence**
  100:11 111:5
  144:15
**exit**
  71:8
**expire**
  37:13
**explain**
  53:18 115:23
**explained**
  42:8 84:2
**extent**
  80:8
**extracted**
  32:19
**eyes**
  114:6 121:22
  137:11

---

**F**

---

**face**
  47:17
**fact**
  34:22 49:13
  106:16
  125:23
**fair**
  30:16 40:9,
  22 45:5
  64:10 78:23
**faithfully**
  12:7 67:11

falls
  85:3
familiar
  73:14
familiarized
  83:18
family
  84:15,23,24
  85:18 140:19
  151:7
far
  130:7
fashion
  70:10
father
  84:23
Feda
  138:20,24
  139:3,6
Federal
  8:24
Fedex
  81:21 97:25
fee
  78:7,9
  92:19,24
  93:5,11,14,
  25 94:2 95:2
feel
  120:18
  126:14
feeling
  23:24
feels
  43:8
fees
  77:18,19,22,
  23 78:8
  94:2,3,14,
  15,17,19
fight
  84:20
figure
  44:12 138:13
figured
  156:15

file
  84:14
filed
  85:6
files
  121:16,17,18
  122:10,12,
  13,14,17
  125:11
filled
  129:17
financial
  134:20
financially
  8:15
find
  126:16
fine
  9:8 15:4
  42:22 65:24
  66:8
finish
  11:2,4 32:9
finished
  41:12 95:17
  143:19
firm
  10:6 22:5
first
  7:5 10:16
  11:23 17:24
  20:8,13 34:3
  37:24 48:17,
  21 67:3
  76:14 110:12
  125:2,18
  129:18,24
  137:14
  146:21
five
  20:6 77:11
  82:8,10
  99:6,8,9
  111:24
focusing
  48:25 49:4,5
  71:13

follow-up
  131:16
Following
  34:18
follows
  7:8
footstep
  34:18
foreign
  60:6 62:3,8,
  11,18
  101:21,24
  102:4
  114:13,15
form
  76:15 77:2
  80:25 82:25
  84:14 87:20
  88:12,23
  100:24 146:9
forward
  11:10 14:19
  45:5
found
  126:12
  128:14
four
  111:24
four-page
  32:18
fourth
  48:16 49:9
free
  59:22 60:17
  61:16 85:23,
  24 120:19
Freedoms
  33:10
frequently
  39:3,12
  78:12,15,18
front
  58:15 64:25
  70:20 97:9
  98:12 128:5
funded
  30:25

funds
  24:19
funeral
  138:10
  151:18
funerals
  151:8

---

G

Gassan
  21:23
gather
  143:21
gathering
  151:17
gatherings
  151:20
  152:14
gave
  83:23
  154:12,21,25
general
  73:5 109:13,
  21,25 110:5,
  15 111:8,14
  112:4 115:20
  116:15
  117:15
  118:6,14
  119:13,17
  120:5 127:25
  130:8 131:11
  134:15
  138:11,12
  144:7,24
  147:9,20
generally
  41:2 124:6
gestures
  11:19 13:14
getting
  23:20 58:6
  75:20 122:9
  123:7 146:20
  156:14

Ghannam
  142:18,21,25
give
  11:20 13:11,
  16 17:17
  65:3 83:23
  85:20 96:18,
  22 97:17,18
  151:13
given
  12:10 42:19
  51:17,23
  67:14 120:4
  149:7,11,15,
  16,22 155:3
  157:5
God
  106:22
goes
  25:17 34:25
  115:25
going
  10:14 11:10
  13:21 14:19,
  21 15:3
  24:22 25:10,
  11,24 26:11,
  12 40:24
  41:6,24
  42:14 43:5,7
  45:2,25 52:5
  56:8 58:20
  62:7 63:8,11
  65:20,21
  68:18,19
  71:4,7 77:7
  78:5 94:21
  98:20 102:24
  108:20 120:9
  122:8 127:19
  130:11
  135:21 146:8
  151:14
good
  8:2 41:10
  44:23 102:23
  123:11

government
  37:19 39:5
  49:22 51:14,
  16 60:6
  62:4,11,20
  84:13 87:23
  91:24 100:10
  101:22,24
  102:5,6
  148:3
governments
  102:4
graduated
  32:5 35:2,5
graduates
  90:23
graduation
  72:21
grandchildren
  132:11,14
grateful
  10:25 145:21
gratuitously
  130:8
Great
  16:5
Gresser
  10:6
ground
  10:15
guess
  66:3 107:15
  112:21
  113:12,16
  143:5
Gulf
  101:12
guys
  16:8

————————————

              H

————————————

Hakim
  116:8,20
  117:3,6,9,
  22,23 118:4,
  11,12,22

Hakim's
  116:9,14
half
  30:23 31:12
  32:2,14
hand
  11:20 13:14
  153:10
handle
  44:13
hands
  138:5,7
handwriting
  129:17,20,
  21,24
handwritten
  80:23
hang
  29:18 103:10
  150:24 153:6
happen
  140:25
happened
  115:24
  118:25
hard
  109:16
  130:17
  137:12
hate
  26:15
Hbda
  8:8,22 10:1,
  4,9 11:1,13
  12:1,8,10
  13:1,4,5,11,
  21 14:1 15:1
  16:1,15
  17:1,2,8,12,
  15 18:1,5,8,
  11,15,23
  19:1,19
  20:1,17 21:1
  22:1,14 23:1
  24:1,14 25:1
  26:1,2,14,17
  27:1,13

28:1,20
29:1,2 30:1,
2,7,17,20
31:1,4,17,19
32:1,3,22
33:1 34:1,4,
19 35:1 36:1
37:1 38:1,6
39:1 40:1
41:1,7,13,24
42:1 43:1
44:1,20,24
45:1,15
46:1,3 47:1,
17,23,25
48:1,9 49:1,
8 50:1,6
51:1 52:1,14
53:1,2,11,21
54:1,18
55:1,8,11
56:1,6 57:1,
19 58:1,18
59:1 60:1,16
61:1,2,18
62:1 63:1,9
64:1 65:1,8
66:1,9,22
67:1,12,14
68:1,3,22
69:1,7 70:1,
17 71:1,11,
14,22 72:1,
20 73:1,4,21
74:1,4 75:1,
23 76:1,7,14
77:1 78:1,2,
5,7 79:1
80:1 81:1
82:1 83:1,6
84:1,16 85:1
86:1 87:1
88:1,14,16
89:1 90:1
91:1 92:1,6
93:1 94:1,9
95:1 96:1
97:1 98:1,4
99:1,16

100:1 101:1
102:1 103:1,
3 104:1
105:1 106:1
107:1,20
108:1 109:1,
2,11,19
110:1 111:1,
6 112:1,8,
15,23 113:1,
7,20 114:1,
5,18 115:1
116:1 117:1
118:1,2
119:1 120:1,
18 121:1
122:1,15
123:1,14,18
124:1,20
125:1,3
126:1 127:1
128:1,4
129:1 130:1
131:1 132:1,
23 133:1,4
134:1,3,7,8,
21 135:1
136:1 137:1,
9 138:1,15,
16 139:1,10
140:1 141:1
142:1 143:1
144:1,4
145:1 146:1
147:1 148:1,
2,9,17
149:1,3
150:1 151:1
152:1 153:1,
8 154:1,4,20
155:1,21
156:1 157:5,
7,9,14
**Hbda's**
14:20 41:9
42:17 44:9,
23 52:12
156:4

**head**
11:19 13:14
**heading**
127:24
**headquarters**
152:16 153:2
**hear**
79:16
**heard**
40:25 41:3
**held**
8:5 49:19,21
50:21,24
51:14,17,23
**help**
36:5 113:21
120:20
**helpful**
34:7
**high**
32:5 35:12
130:18
**hired**
24:15
**history**
32:5
**hold**
31:22 32:10
37:17,18
56:21 57:24
64:18,20
119:16
**home**
26:25 61:13,
14,16 83:2
84:20 96:21
97:8 98:11
108:4 122:17
128:17
**honest**
74:10 79:5
82:5 125:16
127:5
**Honestly**
100:19
**honorary**
119:19,23,25

120:3,4
**hope**
68:3
**hospital**
90:23
**hour**
98:20
**houses**
35:23
**husband**
84:21

---

### I

**Ianazzi**
8:18,25
**ID**
87:20 145:20
**idea**
82:7
**identification**
18:4 28:4
32:21 52:7,
11 70:25
120:12
124:15
127:22
136:23
**identify**
66:24
**immediately**
46:3 72:6
126:17
**important**
10:23 11:17,
20 13:11
82:13
**improper**
21:6 22:25
26:11
**improve**
34:5
**inartful**
93:8
**incident**
100:25

**incidents**
137:23
**include**
54:10,19
57:21 79:20,
22 81:2
**included**
55:13,14
**includes**
70:3 77:17,
20,21
**including**
104:11,17
**incredible**
58:22
**individual**
118:22
**individuals**
152:25 153:2
**ineffective**
58:23
**influence**
17:3
**information**
33:21 73:25
83:24 97:18
120:16
133:4,6,14,
19,25 134:8,
20,24 135:4,
6,8,10,19
136:5,8,13,
16
**informed**
44:24
**inhibit**
17:4
**ink**
71:20,21,24
72:7,16,17,
25 73:3,11,
12,21 74:5,
6,15,20,23
75:2
**inquire**
95:16 117:12

inside
  73:25 74:2,
  4,5 90:17
  133:9
inspect
  99:25
Inspections
  120:16
instance
  59:17 60:3
instances
  57:22 58:8
  60:14 77:13
institute
  35:23 36:2,
  10,15 47:5
  50:18 51:5
Institutes
  50:4,5
institution
  35:21 36:17
  46:23 47:7
instruct
  14:13 20:17
  23:6 25:10,
  15
instructing
  20:20 23:9
  25:19 26:6
instruction
  21:7 25:2
instructs
  14:10
insurance
  31:24 32:11
  35:23 36:2,
  7,8,11,15
  37:2,7,16
  46:23 47:2,5
intelligible
  46:5
interact
  131:18
interacted
  131:20
interactions
  138:14,16,17

interested
  8:16
interfere
  17:8,12 95:7
Internet
  24:13 38:5,
  6,11 137:3
interpreter
  7:8 11:22
  12:5 13:2,7
  19:10 24:12
  27:8 28:5,10
  31:8,22
  32:7,10
  33:18 34:10
  37:5 38:10
  39:15,18
  40:2,13,15
  43:24 47:9
  48:3,11,24
  51:15 53:13,
  16 54:12
  56:13,19,21
  57:3,5,12,24
  59:6,12
  60:7,10
  61:8,12,15
  62:13 63:16
  64:18,20,22
  65:11 67:2,9
  79:15 82:24
  94:10 98:23
  99:6,10
  101:8 116:11
  121:20,21,25
  122:5
  132:20,21
  141:5
interrupt
  11:8
intimate
  135:6 136:5,
  8,16
introduce
  10:4
introduced
  24:10

invite
  25:16
involve
  56:18 57:10
  90:14 102:10
involved
  59:20 94:19
  137:24
involves
  56:11 58:9
  59:10 60:15
  64:11 65:15
  86:14 87:14
  90:7,12
Israel
  101:13
issuance
  25:3 83:19
  84:3,9
issue
  84:21,22,25
  85:8 86:5
issued
  39:5,9,14
  80:7,19 81:9
  82:15
issues
  26:3 42:4
  85:16
item
  90:5

J

January
  147:24
  148:7,16,22
  149:4,6,10,
  14,21 150:2,
  6,10,15
  155:9,14
Jersey
  33:19 35:17,
  20 36:12,24
  37:18,20
  46:13,22
  49:23,24,25

  50:8,22
  85:12 87:7
  90:13 101:21
  102:13,20,22
  107:24
  111:10,11
  115:2
Jordan
  84:12 90:25
  101:10,11
Judge
  23:2 25:12,
  16,24 26:14
jump
  98:3
jurat
  156:24

K

keep
  47:17 121:17
  134:16
kind
  26:15 108:6
  119:16
knew
  117:17,18
know
  13:24 14:23,
  25 16:17,21
  17:14 22:17
  26:14 27:22
  31:18 33:23
  37:20 40:19
  42:19 43:5,
  7,10,16
  45:16 46:2
  55:4,25 56:2
  58:19 64:4
  65:25 66:12
  70:13,14
  74:10 79:5,
  10 81:23
  82:5,11,21
  83:21 85:17
  87:25 88:2,

4,9,19,20
89:15,16
90:3 91:10,
11,14 92:22
95:5,7,9
97:12,22
105:11,21,24
106:4,12,22,
23 107:5,9,
12,13 109:5,
16 110:11
115:22
116:2,9,14,
17 117:25
118:9,20,25
119:4,6,25
120:2,3
121:8 124:5
125:15
126:2,3
127:5,13
129:9 130:7,
23 136:18
137:17,18,19
138:18,22,24
140:8,9,10
143:10
144:18
145:3,4,5,8,
9,12,13,14,
18,20,22,23,
24 146:4,7,
14,16,18
147:11,12,
13,14,21,22
149:16
150:22,25
151:14,23
152:3,6,8,
10,12 154:16
156:8

**knowing**
106:20

**knowledge**
93:19,22
94:22 105:7,
10,11,19
106:2,5,6,

15,25 107:7,
10 139:5,22
146:5

**knowledgeable**
106:16

**Kropf**
9:8 11:8
15:4 16:21
19:21 20:2,
9,11,16,21
21:3,8,9,13
22:8,12,13,
21 23:8,11,
18 24:2,8,
10,15,18,20,
22 25:9,13
26:3,5 28:14
41:16,17
43:3,16,20
44:21,24
45:5,6 65:24
66:8 124:18
125:19
126:21
143:23
156:2,8,17

---

**L**

**LAI**
156:22

**Lake**
115:2

**land**
96:19 98:4,
10,11,15
99:17,25
100:8,9
112:11

**language**
156:19

**large**
120:3

**larger**
109:15

**law**
10:5 22:5

**laws**
100:5

**lawyer**
19:22 22:4,8
24:15

**lawyers**
14:9,15
154:6

**learn**
36:6 83:12
100:11

**learned**
82:18

**learning**
36:8 42:17

**leave**
96:5

**leaves**
81:22,24

**Lebanon**
91:2

**lecture**
32:11 46:25

**left**
72:7

**left-hand**
71:20 109:10
112:4 113:13

**legal**
8:12,18
15:20 16:6
30:9 53:20
57:15,16,17
58:3 59:15
83:19 86:2
96:20 118:9

**legalization**
59:25 60:21
85:3 111:8

**legalize**
53:12,15,20
54:2 56:9,
11,17 57:8,
20 58:8
59:2,9 69:3,
6,11,17 76:9
77:2,7,9,14,

24

**legalized**
58:4 72:20
73:9,24
74:17 75:8,
15 78:20
96:3 104:7
110:25 146:3

**legalizing**
60:15

**legally**
81:3 82:20

**legible**
137:2

**let's's**
132:17

**letter**
25:18 114:13
124:17
125:2,18
126:21

**letters**
114:12,15

**liability**
30:13

**Liberation**
51:24 70:11
80:8 81:10
88:8 89:7,8,
25 90:2
91:20,21,24,
25 92:14
97:15 101:25
102:5,11
103:22
104:20
105:14 107:6
145:15 148:7
149:8,12
150:8 154:6
155:15

**Library**
51:5,13

**license**
32:12 36:12
37:2,8,10,
13,16 86:8,

12,14,19,20
87:9
**licenses**
37:18
**life**
35:24 87:12,
14 88:2,4
89:5 117:22
138:4
**light**
156:4
**limit**
23:18 143:5
**limited**
30:13
**line**
48:17 106:24
154:13,17
**list**
137:10
139:8,18
141:25
142:17
144:6,8,16,
22 145:10,
12,13,15,22,
24 146:5
147:7,8,18
152:19,20,21
**listed**
113:22
**lists**
144:11,14
**litigant**
97:19
**litigation**
10:7
**little**
42:17 58:6
121:9,11
130:16 133:3
136:24,25
137:11
143:23
146:20
151:15

**LLP**
10:6
**locate**
125:24
126:10,14
**located**
8:13 24:15
108:7
128:14,18
**location**
108:10
**locations**
152:10
**logo**
109:10,11,19
113:13
127:24
**long**
23:18 43:17
82:3,6,7
96:5 108:9
**longer**
25:25 86:22
**look**
34:4 73:11
76:2 101:3
120:19
124:21,23
125:17 127:3
135:15,16
156:18,20
**looked**
19:3,7 21:4
103:4 120:2,
22 127:6
144:23
146:22 147:8
150:25
**looking**
29:22 34:16
45:9,19 48:8
76:2 91:15
110:24
112:25
132:16,18,23
144:6 148:19
**looks**

108:24
**lost**
48:2,10
**lower**
108:22 113:8
**lunch**
65:22 66:10
68:4

___

## M

**M-A-E-N**
130:20
**made**
47:25 48:9
83:16
**Maen**
130:20
131:19 132:9
**magazine**
33:19,20
**mail**
75:7
**main**
62:15 107:24
**maintained**
144:7,13
145:15
147:19
**maintains**
144:22 146:5
147:6,18
**Majed**
139:18,20,23
**make**
13:25 42:23
99:6 100:3,7
101:19
109:15,18
136:14,25
146:21
**makes**
42:23 44:8
**making**
93:15
**Mansour**
137:15

138:2,17
143:7 151:4,
5,10,22,25
152:3,6,14,
24
**March**
103:11
**mark**
17:23 27:21,
22,25 32:16
52:4,11
70:18 120:9,
15 124:12
127:18
136:21 137:6
**marked**
18:3,17
22:11 28:3
32:20 52:6
70:25 108:17
120:11
124:14
127:21
135:22
136:3,22
**marking**
32:17
**massaging**
121:21
**material**
68:20
**matter**
8:10 12:6
22:24 26:4
43:7 67:10
**matters**
27:13 84:16
85:18
**Mayor**
48:19,23
49:11,14,17
51:12
119:20,25
**mean**
20:11 26:10
27:2 41:13
54:3 55:21
91:6 102:16

Awni Abu Hba
April 07, 2021                                                    18

103:9 106:13
111:14
116:15 126:2
136:10
**means**
  64:15
**meant**
  68:14
**medication**
  17:3,6,7,11
**meet**
  19:19,21
  117:19
**meeting**
  131:3,12
  138:3 140:25
  141:3,8
**meetings**
  132:3 137:21
**member**
  84:23,24
  132:4,5,10
  143:15
**memory**
  17:13
**mentioned**
  26:17,23
  27:13 35:14
  36:19,25
  46:13,17
  54:18 60:5
  75:6 78:18
  83:4,6 92:18
  99:16 118:22
  121:8 123:8,
  22 125:9
  145:25
  151:8,9
  152:24
**mentioning**
  99:20
**Mess**
  15:21
**message**
  96:5 100:20,
  21

**met**
  22:11 117:22
  137:25
  139:3,12
  140:4 141:19
  142:3,12,20,
  23 154:7
**middle**
  113:16
  129:17
  130:15
  137:10
**mind**
  154:14
**mine**
  30:11
**minutes**
  10:15 43:20
  98:21 99:2,
  4,7,9 118:22
  143:10,20,24
**mischaracteri
zes**
  55:7
**misheard**
  101:18
**missing**
  38:3
**Mission**
  128:23 140:9
  143:16
  144:17
  146:16
  147:21
  148:25
  149:2,23
  150:17,22,23
  152:22
**misstating**
  146:9
**Mitch**
  15:14
**Mitchell**
  9:6 15:10
  21:18 154:5
**moment**
  28:9 36:14,

19 50:7
55:11 58:6
71:9,12
75:19 76:6
77:8 99:16
154:15
**momentarily**
  152:19
**money**
  77:21,22
  88:7 89:9,24
  94:15,19
  97:20,24
  149:7,11,15,
  22
**month**
  79:9
**morning**
  8:2
**mouth**
  47:17
**move**
  45:4 84:15
  86:7 87:12
  90:4 109:5
  114:3 130:14
  143:3
**Ms.nadia**
  142:18
**mute**
  153:5

---

**N**

---

**Nada**
  141:16,19,21
**Nadia**
  142:20,25
**Nadya**
  139:9,12,14
**name**
  8:11 10:5
  30:4,18
  38:11,14,16,
  18,19,21
  66:24 67:2,3
  76:20 100:2,

9 114:7,14,
18,19 115:19
116:2,8,23
117:18 118:8
129:22
130:14,20
135:2,5,14
137:14
138:21
139:17,18,25
140:2
141:16,17,24
142:10,11,
17,18,22
147:11,13,15
154:5
**names**
  137:10
  145:13
  147:12
**nations**
  101:4 102:8
  131:9,22,25
  132:8,10,13
  137:4 147:18
  148:25
  149:23
  150:17,23
  151:5,11
  152:15
**nature**
  26:22 31:16
  62:24 69:10
  80:14 90:9
  95:19,23
  124:6 134:24
  136:16
  138:18
  140:17
  144:11
**need**
  11:24 13:15
  16:19,20
  22:14 28:8
  43:16,18
  58:3,4 66:6
  68:7,22,23
  91:10 97:23

99:2,4,19
121:24 122:3
152:20
154:15
**needed**
127:3
**needs**
81:2
**never**
35:5,6 41:5
95:4 110:11
117:22
128:23,24
129:2 131:5,
6,20 133:8
138:3,4
142:23
**nods**
11:19 13:14
**notarial**
71:25 72:9,
11 76:22
147:8
**notaries**
144:6,22
147:18
**notarization**
65:16 69:12,
19 101:11,
12,16,17,20
102:18 105:3
**notarizations**
101:14
**notarize**
65:12,13
81:5,17
85:10 86:21
87:21 97:6,
9,10,17
98:13
102:13,21
111:11
112:9,17
115:25
116:24
**notarized**
80:18 83:3,9
129:10

**notarizing**
56:12 57:10,
22 58:9 65:9
69:17 82:6
111:4
**notary**
7:6 12:6
19:15 31:23
36:20,23
37:17 39:16,
20 40:3 54:5
65:2 67:10
69:14 77:10,
11 85:12
101:20
102:13,20
112:9,17
113:10,13,
15,17 128:2
144:11 147:7
**note**
45:25 58:17
60:25 63:9
85:18
**noted**
57:9,20
58:10 89:14
**notes**
15:12 143:21
**number**
51:2 72:14
76:10,11
78:25 108:21
113:22
115:11,12,14

——————————

——————————

**O**

——————————

**oath**
13:3
**object**
14:9,25
20:11 26:5
40:25 88:23
89:10 146:8
**objection**
22:13,17

24:20 26:13
55:6,16
88:12 89:13
93:17 146:12
155:12,17
**objections**
14:14 23:5
**Objects**
120:16
**observer**
137:4 147:17
148:25
149:23
150:17,22
152:22
**obtain**
62:18 64:12
82:14
**obtained**
52:18 137:2
**obviously**
56:2 128:8
**occasions**
151:6 152:23
**offer**
40:10 54:2
**office**
19:2 73:7
75:5,7,11,
12,13 76:19
77:15,23
78:16,19
79:23 81:22
87:19 91:25
92:3,17,19
93:4,9,13,22
94:15,22,24,
25 95:13,20,
25 96:10
97:12,13,25
98:14,17
99:20
100:12,13,
14,15,18,23
104:4,6
105:2 107:3
108:8,9
110:9,21,23

111:5,8,12,
14 115:5,6,8
116:10,15
117:16 118:6
122:13
128:16
145:25
146:4,13,17,
22 147:2,5,6
148:12,15
149:17
150:11
**officer**
9:2 103:16,
21 104:3,12,
18,24 105:13
106:8 107:2
**offices**
122:14
**official**
62:3,10,20
**offline**
43:11
**okay**
9:10 10:11,
14 11:5,7,
10,16,21
13:4,19
14:7,17
15:6,8,23
16:5,24,25
17:2,7,11,19
18:8,15,19
19:8,18,21,
25 21:17
22:3,8 24:9,
18 26:16,17,
21 27:17,18
28:12,15,22
29:22,25
30:7,12,16,
20 31:3,8,
16,22 32:2,
13,17 33:7,
15,18,24
34:3,12,25
35:6,14,19,
23 36:9,13,

19,25 37:5,
7,23 39:15,
22 40:2,8,
13,15,21
44:14 45:8,
10,19 46:16,
20 47:3,15
48:11,13,15
49:13,19
50:6 51:11,
15,17 52:2,
10 53:9,16,
18 54:7,24
55:8 56:13,
16,19 57:3,
5,6,8,12,18
58:3,14
59:5,9,14,
17,24 60:9,
19 61:8,12,
15,21 62:13,
23 63:8,25
64:6,10,22
65:5,11,14,
20,23,24
66:15 68:10,
18,21 69:2,
10,16,23
71:16,19
72:13,24
73:4,7,14
74:12,25
75:10,19,22
76:5,9,14
77:7 79:2,
11,17 80:3
81:25 82:12
83:12,18
84:6,15
86:11,16
87:4,8,12
88:21 89:13
90:4,9,14,19
91:9,18
92:16,22
94:4 95:18
96:8,12
98:3,19
99:11 100:4

101:18
102:8,23
103:7 104:22
105:7,17
106:5,24
107:10,14,23
108:6,9
109:8,13
110:8,13
111:17,19
112:3,10,19
113:7,12,15,
21,23 114:2,
21,25 115:10
116:9,19
118:4,12
121:4,8,18,
23,25
122:17,21
123:6,21
124:2,11,25
125:9,13,17
126:9,13
127:17
128:7,16,20
129:16,22
130:2 131:21
132:15
133:24
134:6,23
135:9,20
136:20
137:8,14
138:6,14,20
139:8,17
141:12,16,24
142:3,9,12,
14,17,20
144:4,10
145:14,25
146:25
147:5,16,23
148:6,12,24
151:20
152:18
153:5,8
154:20
155:5,9
157:2

**Okie**
75:17 119:12
154:18
**older**
34:19
**Omar**
118:9,12,18
119:2,3,9
**once**
20:4 31:13,
18 60:25
63:8 78:21
118:19
119:5,9
131:3
140:15,16
**one**
10:23,24
14:8,9 29:18
40:8,9,21,22
44:7 45:13
48:16 50:22
51:2 53:25
56:21 62:7,
23 69:6
71:12 72:23
76:14 77:8
78:5 80:11,
21 81:17
86:8,9 89:4,
9,15,20,22
90:19 95:10
98:3 101:3
103:4,10
106:24
110:22
111:24
113:23
123:2,7
126:8 128:15
129:9 131:16
135:21 137:9
141:12 142:9
144:23
147:16,19
148:13
149:17,24
150:24 153:7

154:5 155:25
**one-line**
48:6
**one-liner**
47:21
**open**
117:16
123:22
**operated**
63:15
**opposed**
38:21
**oral**
96:8 100:24
**orally**
95:12,19,24
103:15,20
104:2 130:25
**order**
10:19 77:22
81:2 82:13
94:15,20
97:20,24
**Order's**
156:18
**ordered**
15:17
**organization**
51:24 70:11
80:13 81:11
88:8 89:8,25
91:22 92:14
97:15 102:2,
6,12 103:23
104:20
105:14
145:16 148:8
149:8,12
150:8 154:7
155:16
**organized**
30:8,12
**outcome**
8:16
**outside**
27:6,14
87:10 90:15,

18 132:13
151:10

**owns**
100:3

---

**P**

---

**p.m.**
157:10

**page**
28:23,24
29:19,21,23
32:24 33:7
37:24 38:2,3
45:12 47:19
48:6 49:8
52:20 53:9,
11,14 56:9
57:10,21
58:11 64:6
68:18 69:2,3
70:20 71:5,
6,13 75:23,
24 76:8,12,
23 84:7 90:5
96:13 99:18
101:3 107:15
108:19,21
109:3
110:12,13
111:20
112:20,21,24
113:2,3,7,16
114:3 120:20
125:6
129:18,24
130:11,15
137:10 143:4
154:12,17
156:23

**pages**
33:8 76:24
109:5 114:4

**paid**
149:7,11,15,
22

**Palestine**
51:24 92:13

137:4

**Palestinian**
33:9 38:24
39:5,10,14,
25 40:4,6,12
51:18,21
54:11,21,22
55:5,15
62:25 63:6,
7,15,24
64:2,5 70:4,
6,9,10,11,15
73:5,23
78:17 79:24
80:7,8,12,20
81:10,12
82:3,15,22
83:9,14,20,
25 84:4,10,
24 85:15
88:7,8 89:7,
25 90:2
91:2,20,21,
24 92:10
96:25 97:14,
15 100:6
101:24,25
102:4,5,11
103:17,22
104:7,14,20
105:4,14
106:9 107:6
110:6,17
111:2 112:16
128:22
143:15
144:13,21
145:15 146:3
147:25 148:7
149:8,12
150:3,7
154:6,24
155:10,15

**Palestiniando
cs.com**
27:25 38:8

**Palestinians**
96:17

**Pandemic**
10:22

**paper**
19:8,13
31:10 40:5,
6,17,18
54:5,23
57:14,15
58:3,12
59:15,22
61:10,11
62:16 77:3
85:10 111:4
126:8,12
127:9 129:8,
14 130:2
147:14

**papers**
19:15 63:13
69:20,21,24
70:3 75:7,8
82:6 83:2,16
96:4 97:9
98:12 102:14
110:18
111:3,11
115:25
116:3,24
117:11
126:11
127:6,7
129:10

**paragraph**
45:14,16,20
47:21,22,24
48:6,7,16,18
49:9 113:17
125:2,18

**pardon**
65:6

**part**
30:6 33:3
45:16 111:6

**participants**
8:3

**participates**
137:21

**particular**
38:20

**Parties**
8:15

**partner**
10:5 124:19
125:19
126:22

**Passaic**
45:22 46:9

**passport**
64:7,11,12,
15,23 65:6,
7,9,15,16,18
79:12,19,21
80:3,5,17
81:5,25
82:14 83:20
84:3,6,8,10
87:20

**passports**
80:6 81:9,12
82:2 84:12

**past**
115:6 123:25

**Paterson**
32:6,9 33:10
35:16,20
36:16 45:23
46:13,16,21,
22,24 47:4,6
48:23 49:23,
24 50:3,4,5,
8,19,22,25
51:5,12
107:24
113:24
119:20,21
120:2 122:15
128:17,19

**Paterson's**
48:19 49:10,
14,16

**patience**
153:13
155:22

**Patton**
9:6 22:5

pay
77:22 94:17
paying
24:18 25:7
26:2 124:8
payment
25:7 85:24
payments
25:3
PDF
108:21
112:21 113:3
peace
86:6
pending
16:22
pension
88:6 89:9,24
people
16:6 26:24
54:23 57:6
63:6 64:5
70:9 78:18,
22 79:25
83:21,22
84:20 87:2,
5,16 96:19
97:7,21,22
102:14
105:19 107:7
111:10 132:2
138:5 141:11
145:23
people's
137:21
perfect
43:21 61:3
130:16
135:20
perfectly
33:10 46:4
58:19
perform
82:2 91:19
110:22
123:22 147:8

performance
95:3
performed
84:8,11 87:9
90:10 91:13
110:23
performing
82:4
performs
59:2 102:10
periodic
16:17,20
permanent
137:4 143:15
147:17
148:25
149:23
150:16,21,22
152:22
Permit
120:16
permitted
14:12
person
10:22,24
14:12 15:19
30:11 40:18
58:15 60:23
61:4,5,7,10,
11 75:5
80:11,16,17,
23 81:4,22
82:13 85:20
87:22 90:24
96:23 97:16,
17 100:8
103:15,20
104:2,12,18,
24 105:12
106:7,16,20
107:2 111:12
117:17,19
118:5,8
123:17
131:2,15
136:5,9,11,
12,17
137:17,19

138:20 139:8
142:23
152:15
person's
100:2 138:21
personal
92:8 105:10
106:6
115:16,17
121:18
122:12,17,25
123:4 134:24
135:6 136:4,
8,10,16
154:22
personally
26:2 92:12
96:6 123:17
131:8 138:25
140:11
personnel
152:20,21
persons
80:11,13
85:16
pertaining
136:13
pertains
148:21
Ph.d.
56:23
phone
19:24 21:4
96:7 115:16,
17
phrasing
155:6
physically
128:13
pick
96:7
piece
77:3 127:9
129:7,13
130:2
pieces
60:12

pin
26:11
place
21:15 61:5,6
115:6 156:18
places
62:23
Plaintiff's
126:15
Plaintiffs
10:7 121:5
126:6
plan
43:13 66:12,
13
pleasantries
138:8
please
8:19 13:7,23
17:21 24:4
27:9,19
29:21 32:4,
16 45:13
47:11 50:15
52:4,10
54:12,14
63:16,19
64:16 68:12,
22 70:22
73:3 84:19
88:16 90:21
107:18
108:15 120:9
124:11
132:17
PLO
8:11 80:12
109:13,25
110:4,15
111:8,14
115:20
117:14
118:6,14
119:13,17
120:5 127:25
130:9 134:15
144:7,24
145:17

147:9,20

point
  42:2 43:4
  66:20 86:25
  132:18,24
political
  45:21 46:9
  48:17
politics
  138:12
population
  70:7 84:24
  85:15
portion
  24:6 47:12
  50:16 54:16
  63:20 88:17
  93:5 94:11
portions
  73:18
position
  41:8
positions
  51:8,9,11
possible
  14:7 42:10
  71:8 88:10,
  22 89:4
  135:13,15
possibly
  122:18
postage
  77:17,21
  78:8
posted
  33:24
Power
  26:21 64:24
  65:19 96:14
  112:11
Powers
  26:22 27:5,
  12 96:18,22,
  24 97:11
  112:4
precise
  19:4

prefer
  15:7
Premises
  120:17
preparation
  82:12
prepare
  18:20,24
  20:13 53:3,4
  81:16 82:19
  97:4
prepared
  52:20,23,24
  55:3 79:2
  83:7,8 97:5
  153:10
preparing
  89:6,18
prescribed
  80:25
present
  131:15,17,24
  132:5
presented
  33:21 82:20,
  21 83:14
pretty
  23:24 41:9
  42:19,21
  44:23 94:7
  156:12
preventative
  77:19
printed
  27:24 32:18
prior
  10:12 125:11
  146:9
privilege
  20:22 21:5
  23:5 25:8,18
privileged
  25:4,21,22
probably
  43:6 143:20
probing
  20:24

procedure
  8:25 100:4
proceed
  44:10
proceeding
  8:4,19
proceedings
  86:2
process
  41:20,25
  56:17 84:3
produce
  120:11,15
  121:6
produced
  126:5 156:6
program
  90:24
proper
  20:14 22:16
  26:13 83:12
  87:19
property
  36:3,6 98:5
  99:17
propounded
  12:8 67:12
protected
  100:8
Protective
  156:18
prove
  87:17,21
provide
  53:21 65:8
  77:4 80:4
  84:7 85:11,
  14,24 92:9
  154:23
provided
  15:18 112:7
  118:2 126:5
  155:10,14
provides
  69:8 79:22
  80:6 112:15

providing
  124:2
public
  7:6 12:6
  19:16 31:23
  36:20,23
  37:17 39:17,
  20 40:3
  67:10 69:15
  77:10,12
  85:12 101:20
  112:18 128:2
  132:4,6
  138:13 144:6
  147:18
publicly
  135:9
publics
  113:10,13,
  15,18 144:12
  147:7
purpose
  29:15 61:22
  62:9,17
  89:24 99:23
  102:17
purposes
  36:5 88:6
  89:8 102:18
pursuant
  18:16 126:6
put
  17:20 25:22
  26:11 27:10
  49:5 56:4
  60:5 83:13
  116:23 133:3
  143:7 146:11
  152:19 156:9
putting
  78:7 96:8
  105:18
  110:13
  143:11

## Q

**quality**
130:17
**question**
11:4 13:6,
23,24 14:2,
4,11 15:9,
21,23 16:22,
24 20:14
21:8 22:15,
25 23:4,5,7,
25 24:3,5
25:8,23
27:11 39:6,7
41:13,15
46:3 47:11
49:3,5
50:13,15
54:15,24
55:2,3,10
56:4,7
57:18,19,23
58:18,25
59:13 60:12
63:12,17,19
74:13 75:10
78:3,13
79:16 88:13,
15,21,22,24
89:3,10 92:6
93:8,20,21
94:4,6,7,9,
21 95:11,21,
22 100:22
105:9 106:24
115:18
116:12
117:12,13
118:3
120:18,22
132:21
133:17,21,22
134:4
138:23,24
141:6 143:6
144:20

146:11
147:16
148:20
154:11,21
155:2,25
**questions**
11:2,10,12,
14,16,17,21
12:8 13:10,
16,22 14:10,
13 17:5,9
21:5 25:2
41:10,14,19
42:11 43:6
67:12 114:11
118:11 137:8
140:21,22,24
144:5 150:21
153:9 155:7
**quick**
71:8
**quickly**
32:23 122:9

## R

**raised**
14:14 71:21
72:6
**raises**
95:10
**Ramallah**
98:15,18
99:20 100:15
**ranges**
77:20
**Rasheed**
139:9,12,15
**re-worded**
89:11
**reach**
16:6
**read**
24:6 47:10,
12 50:15,16
54:15,16
60:10 63:18,

20 72:24
73:12,17,18,
19 88:17
94:4,6,11
130:17
**reading**
55:18 59:13
**ready**
68:4,9 157:3
**real**
36:3
**realtime**
15:11,15,17,
22,24,25
16:3,7 55:19
148:19
**reason**
17:16 38:20,
22 45:2
**recall**
17:9 20:5
30:22 35:17
36:20 37:2,
9,14,15
41:17 47:14
92:20 99:20
100:22 103:5
123:23 126:9
129:13 130:4
141:13
143:12 144:5
155:2
**receive**
36:9 87:18,
24 100:17,22
119:12 129:7
**received**
22:10,22
23:13 35:6,9
103:14,19,25
104:10,16,22
129:13
134:14
**receiving**
23:16 103:2
**recently**
128:10

**recess**
16:12 28:17
44:16 66:17
99:13 143:25
**recognize**
18:11 28:22
29:3,5 32:24
34:17 52:17
71:16 109:4
120:23,25
121:4
**recollection**
47:7 89:22
103:7 151:16
**record**
8:3,7,20
10:17,20
11:11,18
13:13 14:18,
23 16:9,10,
14 28:6,9,
13,16,19
43:22,23
44:11,15,18,
22 46:2
66:2,4,6,7,
16,19 73:20
76:21 90:20
92:5 99:3,9,
12,15
117:20,24
143:20 144:3
146:21
148:19,20
154:7 155:24
156:4,22
157:3
**recorded**
8:4,5
**recording**
10:18
**records**
21:4 91:19
124:23 125:3
126:23
**red**
72:17 73:11,
12,21 74:6,

15,20,23
75:2 91:14
146:23
148:14
149:18
150:13
**redm@gmail.**
**com**
123:10
**reevaluate**
45:4
**reference**
114:23
150:24
**referenced**
84:7
**referrals**
148:21
**referred**
147:25
148:8,16
149:2,17
**referring**
132:25 134:5
136:11
**reflect**
73:20 92:5
117:20,24
133:13,18,25
134:19
**reflected**
98:8 132:19
**reflecting**
133:5
**reflects**
148:20
**refresh**
47:6 151:15
**refused**
129:4
**regard**
14:14 133:5
134:23
135:3,5
136:4,7,15
**regarding**
134:11

136:19
**register**
76:19
**registered**
100:2
**registering**
76:18 90:12,
14 96:19
**registration**
76:15,25
**regular**
76:23
**regulations**
100:5
**relate**
80:6
**related**
8:14 103:17,
22 133:15,22
151:18
**relating**
85:18
**relation**
80:12 119:22
133:16
**relationship**
25:20 70:13
**relevance**
23:5,10
24:25
**relevant**
20:14 23:23
24:23
**rely**
42:10
**remember**
20:8 26:19
89:20 92:23
100:19,20,25
101:2 103:3
108:11,12
116:6,7,20
117:2,5,8
118:15,19,20
119:3,5
124:4 125:16
127:11

129:11,12
140:18
146:22,25
151:11
**remote**
8:7,12,19
**renew**
64:12 80:17,
24 81:4,9
82:14
**renewal**
83:20 84:3,9
**repeat**
13:7 19:11
24:5 27:9
47:9 54:12
63:16 79:15
93:20 116:12
132:20 141:6
**repeated**
88:16
**rephrase**
13:24 93:21
95:22
**reporter**
8:17 10:17
11:18 13:12
24:4,7 42:8
47:10,13
50:14,17
54:14,17
63:18,21
66:25 88:18
94:12 120:14
137:6
**represent**
10:6 63:7
64:4,5
**representativ**
**e**
70:6,9,15
83:25 95:13
110:6 118:10
131:10
**request**
8:6
**requested**

24:6 41:7
47:12 50:16
54:16 63:20
88:17 94:11
**requesting**
84:13 130:4
**required**
100:5,10
**requirements**
83:19
**resolve**
85:21
**respect**
25:6 27:6,13
86:2 91:14
110:21
152:24
**respond**
11:17 14:5
17:5
**response**
46:2 98:16
125:4
**responsible**
62:15 74:2
85:20
**responsive**
121:13
122:11,18
125:20,24
126:15,24
**resume**
43:14,22
44:12,19
65:22 66:12,
13,21 68:4,
19
**retired**
87:16
**retirement**
87:18,24
**returned**
83:9
**Returning**
69:2
**reviewed**
26:18

right
33:17 38:17
45:15 46:18
47:23 62:17
77:13 81:8,
13 83:4,7
87:25 89:18
98:21 99:4
102:2,19
103:12
106:19
108:13,24
110:19
113:17
119:20 124:9
125:23
126:7,19
127:14 128:7
133:17 135:3
140:6 142:24
143:22 155:7
right-hand
108:22 113:8
Riyad
137:15
role
116:9,14
120:3
Ron
124:19
room
14:3,9,15
rotate
71:10,12
Rule
8:24
rules
8:24 10:15
70:13
run
47:25 48:9
68:19 134:2
156:14
Russell
70:20,24

——————

S

——————

S-A-D-E-E-R
67:3
Sadeer
67:3
safe
23:24
Sahar
141:25
142:3,6,10,
12,15
Salam
142:10,12,15
Sara
14:25 124:18
155:25
sat
138:4
saying
15:13 41:18
44:2,3 54:25
72:3 100:14
says
29:25 34:4,
18 45:20
47:24 48:8,
18,21,22
49:10 53:12
56:9 64:7
69:3 71:21
73:5,23
79:12 86:8
90:5 98:4
101:4
109:13,21
112:4,11
113:10,13,
15,17 114:21
115:2 125:2,
7 127:24
school
32:5 35:4,12
56:24
science
45:21 46:9

screen
47:17 67:5
71:9
seal
71:21 72:6,
7,9,11
search
121:13
125:10
searched
121:15,16
122:10,21
125:3 126:23
127:6
searches
125:13
searching
126:11,13
sec
153:7
second
27:11 29:19
33:7,8
45:19,20
47:20,22,24
48:5,7,8,18,
22 49:8 57:9
103:10
124:25
150:24
seconds
153:5
secret
132:19,24
133:5,6,13,
18
see
18:6 25:22
28:20 29:22,
24,25 30:2
33:8,10
34:5,20 38:6
41:24,25
45:15 47:23
48:2,3,19
49:9 52:15
53:12,13
55:24 64:7,8

69:3,4,5
71:11,13,19,
22 72:6,13,
16 73:4
74:4,5
76:10,15,23
79:12 80:19
84:16 86:9
96:14 98:4
101:4
107:20,23
109:4,11,13,
18,21
111:20,23,25
112:3,5,10,
12 113:2,7,
10,12,18,21,
23,25 114:5,
6,7,12,14,25
115:11
124:25
125:4,6,7,21
127:8 128:7,
25 129:16
130:15,20
131:18 132:2
133:4 137:9,
12,14,20
138:4,21
139:11,18
140:2,25
141:17,25
142:10,18,19
seeing
109:16 138:6
151:4,5
select
38:14
selected
38:12
sell
36:8 98:10
100:2
seller
100:9
selling
36:6

**send**
19:14 40:6,
14,16,17,18,
19 54:23
57:4,6,7
59:22 60:3,4
61:13,18,21
62:8 63:5,6,
13 65:3,4
69:20,21,24
70:2 75:14
77:18 78:15,
19 91:7 96:2
97:21 98:13,
14 99:21
100:12
102:14 146:2
148:4 156:17

**sending**
61:22 97:25

**sends**
81:21 87:23

**sense**
17:15 42:23
44:8

**sensible**
44:10

**sentence**
34:3,16,25
45:20 48:8,
18,21,22
49:2 125:2,
17,19

**separate**
94:18

**series**
13:22

**serve**
49:16

**served**
49:13 50:7
103:5,10,11
105:15
106:10,17
107:8

**service**
53:21,25
56:10 57:8,

19 58:10,25
59:20 65:5,8
69:11,15,18
76:15,25
77:17 81:25
82:4 84:14,
18 85:2,11,
14 86:13,15,
23 87:3,8,
13,15 90:6,
10,21,22
91:12,13,18
95:3 96:16
98:7 102:9
112:7,14

**services**
26:3,24
30:2,8,17,21
31:5,20
40:10,23
53:22 54:2
64:7,11,15
65:6,7,15,18
69:7,8 72:20
77:4 79:13,
20,21 80:3,5
84:6,8,11
85:23,24,25
111:7 112:8,
15 122:15
123:14,18,23
124:3,7
128:2 134:3,
9,11,21
147:8 148:2,
10,18 149:3
155:10,15
157:6

**servicing**
48:19,23
49:10

**session**
131:4,7,9

**sessions**
132:2

**seven**
82:10

**several**
79:8

**shake**
138:5

**shaking**
138:6

**share**
71:9 93:11

**shared**
93:5 113:5

**sharp**
56:2

**Shatsky**
8:10

**short**
16:12,16
28:17 44:16
66:17 98:22
99:13 121:24
143:25

**shorter**
143:24

**shortly**
70:23

**show**
123:8
132:12,14

**sign**
40:5 56:25
57:2,4
58:12,15
59:23 60:18
61:6 62:9,14
64:25 65:2
69:13,14,24
87:21 97:9,
10,17 98:12
133:10
134:12
145:23

**signature**
56:15,16
57:11,22
58:9 59:3
62:15,19,24
65:9,12,13
69:14,17

72:3,4 74:5,
9,10

**signatures**
56:12 97:6

**signed**
59:10,19
61:24 62:3,6
69:21 128:23
133:8 134:12
147:14

**signs**
60:20 97:16

**similar**
91:13,16
98:9 110:22
144:23
147:19

**simple**
57:22

**Sinaiko**
8:21 9:7,10
10:3,5
11:11,24
13:9 14:18
15:14,19,23
16:5,10
17:20,23
20:15,19,24
21:6 22:16
23:3,9,14,24
24:4,25
25:10,20
26:10 27:10,
18,21 28:8
29:20 32:13,
22 34:8
37:23 41:6
42:7 43:12,
18,21 44:6,
19 45:8,10,
25 47:10,19
48:5,21,25
50:14 52:3,
8,10 53:9,14
54:14 55:18,
24 58:17
60:9,25
63:8,18

Awni Abu Hba
April 07, 2021

28

65:20 66:3,
9,20 68:2,
10,14,17
70:18 71:6,
10 73:2,20
75:18,22,25
76:5 79:17
88:15 89:2,
13 92:5 94:5
98:20,25
99:8 107:17
108:14,17,
20,24 109:9,
15 111:18
112:20
113:3,6,19
114:3,10
116:13
117:20,24
120:8,14
121:23
122:2,7
124:10,17
127:15,18,23
130:13
132:16,22
135:24
136:20,24
141:7 143:3,
18 153:8
154:11,14,18
155:12,17,
21,24 156:3,
12,20

**Sinaiko's**
155:5

**single**
89:15,19

**sir**
19:16 24:19
29:13 30:5,
18,24 33:13
34:23 35:12
39:23 40:8,
9,22 46:8,14
50:20,24
54:8,25
56:10 58:10,

11 59:11,19
64:3,7,8,10
68:25 69:4
70:5 71:3,
17,22,25
72:2,4,10,19
73:10,12,15
76:22 79:9,
18 80:2
84:17 86:9,
10 88:11,21
92:4,8 95:6
98:6 99:10
103:12
107:22
111:16 112:2
114:8 116:12
121:19
122:4,6,25
123:15,16
125:5,21,25
126:4 131:12
135:12,17
140:2 141:17
144:5 145:19
146:15 151:3
154:22

**sit**
17:16

**situation**
95:15

**situations**
96:4

**six-page**
27:23

**skills**
34:5 42:18
44:9,23 56:2

**slightly**
25:23

**slowing**
58:23

**slowly**
60:13

**smoother**
41:21 42:5

**smoothly**
14:21 15:3

**social**
138:18
151:5,6,20
152:14,23

**solve**
84:21,25
85:8,15 86:5

**sort**
30:9 36:9
37:2 42:16
50:7 92:19
101:15
151:6,14

**sorts**
35:25

**sound**
103:12

**source**
33:17

**space**
67:4

**speak**
10:23 19:25
21:10 94:16
95:8 96:6
99:21 138:9

**speaking**
15:7 61:3
118:15
138:11,12
146:13

**speaks**
10:24

**special**
27:15,16
96:17 138:3

**specialize**
38:23 39:8

**specialty**
38:24 39:9

**specific**
141:10

**specifically**
19:7 26:19
71:4

**specified**
87:2,5

**speculation**
88:13,24
89:12 93:18

**speech**
151:25 152:4

**speeches**
152:7

**spend**
121:9

**spoke**
20:9,20,23,
25 21:3,13
22:18 98:10
118:21
119:5,9
131:20
140:16

**spoken**
21:18,23
22:4,12
23:12,22
83:22 105:21
131:5

**spot**
123:22

**Squire**
9:6 22:5

**stamp**
60:5 62:4,
10,19,25
71:19,21,24,
25 72:15,16,
17,25 73:3,
11,12,14,18,
21 74:6,12,
15,20,23,24
75:2,11,13
146:23
148:15
149:19
150:13

**stamped**
62:6

**stamps**
72:14 73:16
91:15

**start**

11:2 30:20
31:5 69:25
105:8
**started**
8:21 41:18,
20 83:17
**starting**
154:13
**starts**
41:11 48:16
**state**
36:22,24
37:18,20
81:6 85:12
101:21
143:15
**statement**
8:19 34:12
48:13
**States**
10:12 27:3,
7,14 34:5
35:15,22
36:17 42:20
47:8 82:14
86:2 87:10
90:16,18
109:14,22,25
110:5,9,16
111:9,15
115:20,21
116:16
117:15
118:7,14
119:14,17
120:6 127:25
130:9 134:16
144:8,12,23,
25 147:7,10,
19,20 151:22
**stay**
68:18 99:3
**Staying**
64:6
**step**
32:2,14
57:25 58:5
60:7,8

**steps**
121:12
**Steve**
10:5 15:13
24:23 26:7
41:17 45:7
**stipulate**
8:24 9:4
**stop**
26:8 98:3
124:2
**stopped**
86:16,22,25
**stops**
79:11 96:12,
14
**strange**
142:22
**Street**
8:13 107:24
**strike**
130:3
**studied**
45:21 47:8
**submission**
40:11 55:4
64:11
**submissions**
93:15
**submit**
62:24 92:17
93:14,24
94:23 97:11
104:6 105:4
107:4
**submits**
85:21
**submitted**
39:4,13,24
85:18 89:6
**submitting**
59:20 62:17
93:10
**subpoena**
17:25 18:3,
12,16 22:10,
23 23:13,16

103:10,11,
14,19,25
104:10,16,23
105:15
106:9,17
107:8
120:11,15
121:3,5,14
122:19
125:4,21,25
126:6,15,24
**Subpoenas**
103:4 122:11
**Subsequent**
102:25
**substance**
17:4 22:18
**substantive**
138:7
**suggest**
65:20,21
**suggested**
42:3
**suggestion**
41:23 42:4
**summarize**
44:21
**supplied**
128:9,10
**support**
8:13,18
15:19 16:6
**suppose**
151:7
**supposed**
11:22 13:3
75:9
**sure**
15:20 27:10
28:8 42:23
43:12 48:5
67:2 74:22
79:5 94:10
97:16 100:3,
7 101:19
111:13
112:22

116:13
124:24 141:7
148:20
**surprising**
42:21
**swear**
11:23,24
**sworn**
7:5 12:6
66:25 67:10

---

**T**

---

**Tab**
17:20 27:19,
21 28:3
32:15,20
52:3,6
68:11,14
70:21 76:3
108:15,16
124:11,14
127:16,21
136:20,22
**take**
9:3 10:14
16:23 21:15
22:25 25:24
26:8 32:13
35:25 37:24
42:2,22 43:9
46:20 61:10,
11 65:21
66:13 69:21
76:5 99:2,8
120:19
121:24 122:3
132:11,13
154:4,10
156:20
**taken**
10:9,21
16:12 28:17
35:20 36:16
44:16 66:17
99:13 143:25
**takes**
34:15 86:21

87:22 96:5

**taking**
  15:13 16:17
  17:6,8,12

**talk**
  28:10 41:23
  43:3,9,10
  156:10

**talked**
  19:24 20:12,
  13

**talking**
  21:9 59:18,
  24 78:17
  79:24 80:15
  92:4,18
  93:23 95:21
  107:4 110:10
  130:16
  131:11
  146:14
  148:13
  149:24
  150:12

**Tarbush**
  141:17,19,22

**taxes**
  124:8

**technical**
  43:6

**technician**
  8:12

**telephone**
  20:2 115:11,
  12,14 117:6,
  10 135:14

**television**
  152:7

**tell**
  16:16 18:23
  19:3,6 32:4
  55:22 74:8
  76:17 78:25
  79:19 86:11,
  13 87:13
  88:19 90:6
  97:19,22

106:18
114:17
120:21
121:12
126:16
128:20 129:5

**tells**
  125:19

**ten**
  98:21

**terrible**
  41:3 114:6

**terrific**
  68:3 98:19
  114:11

**territory**
  23:21

**testified**
  7:6 10:11
  55:11

**testify**
  17:25 18:12
  41:9 42:14

**testifying**
  18:16

**testimony**
  17:17 46:14
  53:3 55:7
  146:9 156:4,
  13 157:5

**testing**
  137:11

**text**
  33:8,13,15,
  16,22 45:16

**thank**
  9:8 13:20
  17:19 34:10
  47:18 48:24
  52:10 70:17
  83:4 85:5
  99:10 122:7
  153:12
  154:10
  155:19 157:6

**Thanks**
  45:6

**thing**
  26:15 91:17
  101:3,9
  112:22
  118:11 145:7

**things**
  25:11 44:7
  94:18 95:8
  135:21

**think**
  11:9 14:19,
  21 15:2,15
  17:10,18
  20:6,11
  23:20 30:24
  34:24 37:9
  38:2 43:20
  45:9 52:5
  54:25 60:4
  74:22 75:25
  94:6,8
  100:13
  108:15,17
  115:12 116:7
  119:7,8
  121:10 122:9
  124:23 125:9
  127:13
  135:22,25
  140:15
  143:19,21
  153:6

**thinking**
  91:12

**third**
  33:8 45:14,
  16 125:17

**thoroughly**
  126:23

**thought**
  42:5

**three**
  99:2,4
  111:24
  132:12

**three-page**
  17:25 52:12

**thumbtack**
  107:18,20

**time**
  8:9,17 10:24
  11:15 13:22
  16:11,14
  20:8 21:17,
  22 27:11
  28:16,19
  43:19 44:15,
  18 45:3
  56:14 58:22
  62:7 66:16,
  19 76:5 78:5
  80:22 82:6,
  18 96:5
  98:24 99:12,
  15 109:16
  110:12
  118:21 119:3
  121:10 122:3
  126:4 129:15
  131:25
  132:10
  143:6,12
  144:3 147:23
  148:6 153:9
  154:5 155:22
  157:3,4

**times**
  19:25 20:5,6
  31:14 59:5,
  7,9 78:24
  79:3,8 99:18
  118:17
  137:25

**title**
  49:19,21
  50:21,25
  51:14,17,23
  63:23
  119:16,19

**titled**
  17:25 27:24
  33:9 70:19
  111:20

**titles**
  119:23

today
8:8 10:8,12,
16,18 11:17
13:10,17,22
14:8 15:20
17:16,18
18:13,15,20,
24 19:19,23
21:2,18,20,
22,25 22:4
41:7,9,15
46:14 48:17
103:4 105:11
106:6,25
144:5 146:14
155:22 156:5

today's
106:10 157:4

told
92:23
105:16,18
106:21
116:20 117:4
135:18
143:8,9

top
37:25 38:2,3
47:21 53:11,
14 56:8
57:9,20
58:11 62:14
69:2 112:11
125:6 127:24
143:3

topic
102:24

total
77:24,25
79:14

track
58:7

trade
90:5 132:19,
24

Traditions
33:9

Transaction
98:5

transactions
99:17

transcript
15:11 60:11

translate
11:9 12:7
13:5 41:22
61:9 67:11
68:6 86:20

translated
11:12,13,15
14:22,24
15:3,5 41:19
42:12,13
44:8 73:21
118:2

translating
14:20 15:11,
12,22 16:3
41:12 44:4
49:4 61:3
63:10

translation
40:25 41:2
43:8 46:6
58:2 66:2,4,
5,11 68:21
86:17 92:7

translations
42:10

translator
11:9,12,25
14:19 15:10
16:2 41:7,
12,15 42:3,
24,25 44:25
45:3 50:10
55:21,22,25
56:3 58:19,
21,22 61:2
63:10 66:23,
24 68:7,8,
23,24 117:25

translator's
68:8

transmission
79:22

transmitting
77:15

travel
84:12

trouble
68:21

True
34:2

try
11:3 13:24
56:4 60:12
62:7 68:19
74:14 78:5,
13 84:21,25
85:8 86:5,19
94:21 102:25
122:8 143:5
151:15

trying
61:23 134:6
145:4,6
146:21

turn
29:18,20
33:7 53:9
71:4 75:22
128:10
130:11

turning
152:18,20

TV
117:23
152:2,4

twice
31:18 118:19
119:6,9

two
45:13 80:10,
13 84:20
94:18 96:12,
13 108:11
111:24
132:12
135:21 155:6

type
69:18 119:13
123:23

types
74:20 76:11
151:10

typically
74:13,16
77:8

---

U

U.S.
8:12,18
15:20 16:6

ultimately
125:23

UN
131:7,12
137:20
140:8,15
141:2,4,9
147:22
152:9,11
153:2

unable
17:17 73:17

unaware
145:10

underneath
76:9 111:23
114:21,25
115:10

understand
13:15,23,25
14:5,16
16:18,19
17:5,9 19:11
41:10 63:14,
25 70:8
75:12 81:15,
16,18 97:13
104:12
105:12 106:7
110:4 111:13
114:14,22
133:21
134:4,6
140:7 150:21
151:2

understanding
74:19,25
97:2 104:24
109:24
115:18
understands
42:18,21
114:10
understood
14:4 44:6
58:5 99:23
102:16
103:15,21
104:3,18
106:14 115:7
143:13
unfold
42:16
United
10:12 27:2,
6,14 34:4
35:15,21
36:17 42:20
47:7 82:13
86:2 87:10
90:15
109:14,22,25
110:5,9,16
111:9,15
115:20,21
116:16
117:15
118:6,14
119:14,17
120:5 127:25
130:9 131:9,
22,24 132:8,
10,13 134:15
137:4 144:8,
12,23,24
147:7,10,18,
19,20 148:25
149:23
150:17,23
151:5,11,22
152:15
university
35:2,7,10

46:16,21
47:14 56:24
90:23
upper
71:20 109:10
111:24 112:4
113:13
usual
41:4
UTC
8:9 16:14
28:16,19
44:15,18
66:16,19
99:12,15
144:3 157:4
utilize
81:18

_____

_____

V

validate
86:20
value
149:7,11,16,
22
valued
81:3
variable
78:22
verbal
11:20 13:11,
16
verbally
11:18
versus
8:11
video
8:12,13
video-
recorded
8:7
videoconferen
ce
10:21 21:20,
25

videographer
8:2 10:18
16:8,11,13
28:12,15,18
43:23 44:14,
17 47:16
66:15,18
99:11,14
144:2 155:23
157:2
videotape
41:4
View
115:2
VINCENT
17:22 27:20
52:9 68:13,
16 70:23
71:7,12
75:21,24
76:4 108:16,
19,23 112:22
113:5 124:16
127:17 136:2
visit
131:16,22
132:8

_____

W

Wainaina
8:11
wait
10:25 11:3
50:10 68:6
want
16:8 23:3
25:16,23
26:6 28:23
29:19 42:22,
23 43:10,14,
24 44:20
60:18 65:25
73:8 75:24
76:2 83:23
96:18 98:23
99:3 101:19
102:15,23

106:13,19
109:4 120:3,
19 121:9
143:20
148:20
151:15 153:6
154:10
wanted
83:3
Washington
91:25
waste
58:22
watched
42:15 131:14
way
17:13 21:13
28:23 42:9
50:12 54:10,
20 55:5,14,
21 58:20
80:6 89:22
102:10
103:8,16,22
104:4,13,19,
25 107:14
114:22
123:16
146:11
150:20
web
110:13
website
27:24 29:7,
9,11,15
31:2,3,11,12
32:19,25
33:3,24 38:7
52:13,18,20
65:8 115:19
116:24
135:12,16,
17,19 136:14
137:3,5
150:25
wedding
138:10
151:17

Wednesday
  8:8
week
  31:13,14,19
  78:21
went
  35:4 131:4,
  16
whatsoever
  133:16
Wick
  124:19
  125:19
  126:22
wife
  84:21
William
  45:22 46:16,
  20,24 47:4,6
wind
  122:8
withdraw
  19:4 29:10
  39:6 49:3,20
  52:25 55:9
  56:6 62:4,7
  69:25 72:15
  74:13 78:3,
  13 81:14
  93:7 103:2
  105:8 138:15
  151:8 152:5
  156:5,7
withdrawn
  50:23 51:7
  53:19 79:20
  80:4 86:12
  88:3 129:6
  135:4 156:15
witness
  7:4 9:7
  23:6,7,25
  39:16,20
  40:3,5 54:4
  55:12 69:13
  89:14 153:10
witnessing

56:11 59:3
69:16
word
  41:4 55:20
wording
  83:13
words
  43:6 80:25
  81:19
work
  11:16 44:7
  90:25 91:3
  123:17,20
  125:11
worked
  23:21 118:5,
  13
working
  41:25 116:8,
  17
works
  140:8
world
  37:21 39:21
  54:9,19
write
  33:20 80:10,
  22 85:10
  87:20
writing
  25:14 63:22,
  23 96:9
  104:11,17,23
  131:2
written
  25:18 34:17
  67:4 83:2
  85:6 100:24
  129:23
wrong
  76:2
wrote
  33:13,20,23
  131:6

                Y

yeah
  11:22 16:2
  17:22 27:20
  28:10 30:11
  46:7 53:16
  57:13 63:22
  71:7 85:5
  108:24
  109:12
  128:12
  131:13 136:2
  156:2
year
  30:22 31:12
  78:24 79:4
  147:24
years
  34:14 42:20
  82:9 108:11
  132:12
Yemen
  101:13
yesterday
  125:15
  127:12,13
York
  8:14 9:2
  137:5 143:16
  149:2,24
  150:18,23
  151:19
  152:22 153:3
Yup
  28:14

                Z

zero
  47:20
zoom
  34:8 37:25
  38:3,4 45:13
  73:2 107:17,
  18 108:25

109:9 111:18
114:4 130:14
132:17
136:24
137:11
zoomed
  107:21

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -x
SHABTAI SCOTT SHATSKY, ET AL.,

                    Plaintiffs,

                    Civil No.:
                    8 CIV. 12355 (MKV)


             -against-


THE PALESTINE LIBERATION ORGANIZATION, ET AL.,


                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - -x

               DEPOSITION OF

               FUAD ATEYEH

           Taken on April 8, 2021

- - - - - - - - - - - - - - - - - - - - - - - - -x

Fuad Ateyeh
April 08, 2021

Page 2

1
2                I N D E X
3    WITNESS        EXAMINATION BY        PAGE
4    FUAD ATEYEH    MR. WICK                10
5    FUAD ATEYEH    MR. BERGER              68
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2                      (CONT'D)
3                 I N D E X
4           MARKED FOR IDENTIFICATION
5    EXHIBIT         DESCRIPTION         PAGE
6    Exhibit 1       Tab 3                13
7    Exhibit 2       Tab 4                39
8    Exhibit 3       Tab 9                45
9    Exhibit 4       Tab 10               48
10   Exhibit 5       Tab 8                52
11   Exhibit 6       Tab 1                58
12   Exhibit 7       Tab 5                63
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2    ****************************************************
3    VIDEO-RECORDED REALTIME DEPOSITION of FUAD ATEYEH,
4    held on April 8, 2021, at 12:32 p.m., was sworn
5    before AMBRIA IANAZZI, a Registered Professional
6    Reporter, Certified Realtime Reporter, and Notary
7    Public.
8    ****************************************************
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2    A P P E A R A N C E S:
3
4    COHEN & GRESSER LLP
              Counsel for Plaintiffs
5             800 Third Avenue
              New York, New York 10022
6
7    BY:   RONALD F. WICK, ESQ.
              rwick@cohengresser.com
8             ERICA LAI, ESQ.
              elai@cohengresser.com
9             ANDREW PECORARO, ESQ.
              apecoraro@cohengresser.com
10
11   SQUIRE PATTON BOGGS
              Attorneys for Defendants
12            1211 6th Avenue, 26th Floor
              New York, New York 10036
13
14   BY:   MITCHELL BERGER, ESQ.
              mitchell.berger@@squirepb.com
15            GASSAN BALOUL, ESQ.
              gassan.baloul@squirepb.com
16            JOSEPH ALONZO, ESQ.
              joseph.alonzo@squirepb.com
17            SALIM KADOURA, ESQ.
              salim.kadoura@squirepb.com
18
19   ROGERS JOSEPH O'DONNELL, PC
              Counsel for the Witness
20            875 15th Street, Northwest #725
              Washington, D.C. 20005
21
22   BY:   DEAN PAIK, ESQ.
23
24
25

Fuad Ateyeh
April 08, 2021

Page 6

```
1
2                   (CONT'D)
3          A P P E A R A N C E S:
4
5    ALSO PRESENT:
6
7    COSETTE VINCENT, Cohen & Gresser
8    ELIZABETH BEZVERKHA, Cohen & Gresser
9    HADEER AL AMIRI, Interpreter
10   COREY WAINAINA, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1
2                    - o 0 o -
3
4        H A D E E R   A L   A M I R I,
5        Called as the interpreter in this
6    matter, was duly sworn by a Notary Public to
7     accurately and faithfully translate the
8    questions propounded to the AWNI ABU HBDA
9     from English into Arabic, and the answers
10   given by the AWNI ABU HBDA from Arabic into
11                    English.
12
13                   - o 0 o -
14
15        F U A D   A T E Y E H,
16       The WITNESS herein, after having been
17    first duly sworn by a Notary Public, was
18       examined and testified through an
19        interpreter, in Arabic, as follows:
20
21                   - o 0 o -
22
23
24
25
```

Page 8

```
1
2        THE VIDEOGRAPHER:  Good afternoon.  We are
3    now on the record.  The Participants should be
4    aware that this proceeding is being recorded, and
5    as such, all conversations held will be recorded,
6    unless there is a request or agreement to go off
7    the record.  This is the remote video-recorded
8    deposition of Fuad Ateyeh.  Today is Thursday,
9    April 8th, 2021.  The time is now 16:33 UTC Time.
10       We are here in the matter of Shatsky
11   versus PLO.  My name is Corey Wainaina.  I am the
12   Remote video technician on behalf of U.S. Legal
13   Support located at 90 Broad Street, New York, New
14   York.  I'm not related to any Party in this
15   Action, nor am I financially interested in the
16   outcome.
17       At this time, will the reporter Ambria
18   Ianazzi on behalf of U.S. Legal Support please
19   enter the statement for remote proceedings into
20   the record.
21       MR. WICK:  Before we begin, just one
22   housekeeping measure, I would ask, as we are here
23   remotely during the COVID-19 Pandemic, that
24   Counsel confirm that we're stipulating, pursuant
25   to Rule 29 to the Federal Rules of Civil Procedure
```

Page 9

```
1
2    that today's deposition may be taken by
3    videoconference, as we're proceeding, and that it
4    may be taken before Ms. Ianazzi, who I understand
5    is in New York, and the rest of us are scattered
6    in different locations; do Counsel agree?
7        MR. BERGER:  For the Defendants, yes.
8        MR. PAIK:  For the deponent, yes.
9        MR. WICK:  Thank you.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 10

```
1                    F. ATEYEH
2    EXAMINATION BY
3    MR. WICK:
4        Q.   Good morning, Mr. Ateyeh.  Thank you for
5    coming today.
6        A.   Good morning, sir.
7        Q.   My name is Ron Wick.  I'm with the law
8    firm of Cohen & Gresser, and I will be asking you
9    some questions today.  Let me begin by asking you,
10   have you ever had your deposition taken before?
11       A.   Yes.
12       Q.   On how many occasions?
13       A.   Twice.
14       Q.   Great.  We may come back to that, but let
15   me just go over the process with you.  As a
16   reminder, the court reporter will be transcribing
17   everything we say today.  To make sure that the
18   record is accurate, and especially since we're
19   proceeding by videoconference, it is important that
20   you and I, and the other counsel, and our
21   interpreter, not speak over each other, so that only
22   one person speaks at a time, and I would wait --
23   excuse me.
24            So, I would ask that you wait until I
25   finish my questions before you start to answer, and
```

Page 11

```
1                    F. ATEYEH
2    I will, in turn, try to wait until you finish before
3    I ask another question.
4            And it is also important, given that we do
5    have a court reporter taking down everything that we
6    say, for you to respond to questions verbally.  For
7    example, nodding your head is something that can't
8    be transcribed.
9            And if you don't understand one of my
10   questions, please let me know, and I will try and
11   rephrase it for you.  If you do answer a question, I
12   will assume that you understood it; okay?
13           Your counsel and other counsel here may
14   object to my questions.  Unless your counsel
15   instructs you not to answer a question, you should
16   go ahead and answer my question, even though there
17   was an objection; is that understood?
18           And lastly, I hope we won't be going for
19   too long today, but we may take periodic breaks
20   during the deposition.  If you need a break at any
21   time, please let your attorney know, or let me know,
22   and we'll do our best to accommodate your request.
23           My one request is that if I've asked you a
24   question, I would ask that you answer the question
25   before we take the break; is that all right?
```

Page 12

```
1                    F. ATEYEH
2        A.   Okay.
3        Q.   Mr. Ateyeh, are you aware of any reason
4    why you cannot answer my questions today fully and
5    accurately?
6        A.   No.
7        Q.   All right.  I note that you asked for an
8    interpreter today.  Mr. Ateyeh, are you fluent in
9    Arabic?
10       A.   Yes.
11       Q.   And are you also fluent in English?  How
12   long have you lived in the United States?
13       A.   So --
14           THE INTERPRETER:  This is interpreter.  I
15   want to instruct him in Arabic, also, for his
16   answers to be in Arabic, also, instead of English.
17       A.   Fifty-two years.
18       Q.   All right.  And when you conduct business,
19   typically, which language do you use?
20       A.   English.
21       Q.   I'm going to be showing you some documents
22   during the deposition.  We'll be putting them on the
23   screen, and we will show you as much of the document
24   as you need to see.  If there's something else in
25   the document you would like to see, you and your
```

Page 13

```
1                    F. ATEYEH
2    counsel could just let us know, and we'll be happy
3    to move the document around and show you whatever it
4    is.  And I'm going to do that now.
5            MR. WICK:  And could we put up Tab 3,
6    please.
7            MS. VINCENT:  Yes.
8            (Whereupon, Tab 3 was marked as Exhibit 1 for
9    identification, as of April 8th, 2021.)
10       Q.   Can you see that, Mr. Ateyeh?  What we're
11   showing you right now is a copy of a Subpoena from a
12   Court that's commanding you to appear at a
13   deposition today.  Go ahead.
14           Have you received a copy of the Subpoena?
15           Mr. Ateyeh, because you've requested an
16   interpreter, and he's translating my questions in
17   Arabic, you need to answer in Arabic, and have him
18   translated back to me.
19       Q.   And to be clear, do you understand,
20   Mr. Ateyeh?
21       A.   Yes.
22       Q.   Okay.
23           THE INTERPRETER:  This is interpreter.  I
24   asked him if he received a copy of the Subpoena
25   and the answer was yes.
```

Fuad Ateyeh
April 08, 2021

Page 14

1                    F. ATEYEH
2        Q.    All right.  And is it your understanding
3    that you are testifying today pursuant to the
4    Subpoena?
5        A.    Yes.
6        Q.    Did you do anything to prepare for your
7    deposition today?
8        A.    Yes.
9        Q.    What did you do?
10       MR. PAIK:  So, we're not talking about
11   meeting with the lawyer, or anything that
12   Mr. Ateyeh and I spoke about.
13       Q.    Other than speaking with your lawyer,
14   Mr. Ateyeh, what did you do to prepare for your
15   deposition today?
16       A.    I was asked to search or look for some
17   papers, and I was trying to locate them and give
18   them to my attorney.
19       Q.    Okay.  Did you meet with anybody, or
20   discuss your deposition, or your testimony today
21   with anybody other than your attorney?
22       A.    Yes.
23       Q.    Who else did you meet with?
24       A.    With my wife.
25       Q.    Anyone other than your wife?

Page 15

1                    F. ATEYEH
2        A.    No.
3        Q.    And prior to your deposition today, have
4    you ever had any communications with the counsel for
5    the Defendants, who is here today, Mr. Mitch Berger?
6        A.    No.
7        Q.    And have you ever had any communications
8    with Mr. Berger's colleague Gassan Baloul?
9        A.    No.
10       Q.    And have you ever had any communications
11   with anybody else at the Defendant's law firm of
12   Squire, Patton, Boggs?
13       A.    No.
14       Q.    And your attorney, Mr. Paik, did you know
15   Mr. Paik before you received the Subpoena?
16       A.    No.
17       Q.    And how did you get in contact with
18   Mr. Paik?
19       MR. PAIK:  I'm sorry, can you answer in
20   Arabic, please?
21       A.    A family friend recommended him.
22       Q.    And is anyone, other than you, paying his
23   legal bills for this matter?
24       MR. PAIK:  Objection.
25       Can I object first, or do you want to

Page 16

1                    F. ATEYEH
2    interpret it first?
3        THE INTERPRETER:  I will interpret it.
4        MR. PAIK:  Okay.  I'm going to object, and
5    on attorney-client privilege grounds, and instruct
6    the Witness not to answer.
7        MR. WICK:  On attorney-client privilege
8    grounds?
9        MR. PAIK:  Yes.
10       MR. WICK:  Who paying his bills?
11       MR. PAIK:  I mean, you could do whatever
12   you feel is appropriate.  That's the objection,
13   and that's the instruction.  I would also add that
14   it's not relevant.  I don't see how he's paying
15   his fees is relevant to, or makes the -- somehow
16   objects -- the Palestinian Authority to -- in the
17   United States.
18       MR. WICK:  Well, I appreciate that.  Of
19   course, relevance is not a basis to object.  I'll
20   ask a different question.
21       Q.    Is the Palestinian Authority paying your
22   legal bills in connection with this matter?
23       MR. PAIK:  Go ahead.  I'm sorry.  Okay.
24   Same objection, same instruction.
25       Q.    And are you going to follow your

Page 17

1                    F. ATEYEH
2    attorney's instruction, Mr. Ateyeh?
3        A.    Yes.
4        Q.    And is anyone from the Palestinian
5    Liberation Authority -- correction.
6        Is the Palestinian Liberation Organization
7    paying your legal bills in connection with this
8    matter?
9        MR. PAIK:  Okay.  Objection -- same
10   objection, same instruction.
11       Q.    And Mr. Ateyeh, are you going to follow
12   your attorney's instruction not to answer my
13   question?
14       A.    Yes.
15       Q.    Mr. Ateyeh, you, I believe, testified a
16   moment ago that you have had your deposition taken
17   on two previous occasions; is that correct?
18       A.    Yes, sir.
19       Q.    Let's start with the most recent one.
20   When was that?
21       A.    2012, I think.
22       Q.    And what type of case was that in
23   connection with?
24       MR. PAIK:  Use the interpreter, please.
25       A.    One of the tenants who was renting claimed

Fuad Ateyeh
April 08, 2021

Page 18

F. ATEYEH

2 that -- there was a fire, and she claimed that she
3 was affected by that fire, and she filed a claim
4 against me for personal injury.
5     Q.   She was a residential tenant of yours?
6     A.   Yes, sir.
7     Q.   And what about the other occasion in which
8 you were deposed; when was that?
9     A.   Maybe 2005.
10     Q.   And what type of case was that?
11     A.   One person lended money for me, asked me
12 for money.  I lent him money.  He never gave it back
13 to me, so I sued him.
14     Q.   You were recovering on a personal loan?
15          MR. PAIK:  Excuse me, I'm going to object
16     as to outside the basis of reasonable scope for
17     the jurisdiction of discovery.  You've got your
18     answer for the basis of the deposition; would you
19     move on?
20     Q.   You could answer, Mr. Ateyeh.
21     A.   Was the question; did I get my money or
22 not?
23     Q.   No.  I just wanted to clarify that the
24 nature of the case was you were seeking to recover
25 on a personal loan?

Page 19

F. ATEYEH

2     A.   Yes.
3     Q.   And have you ever testified in court?
4     A.   Yes.  Yes.
5     Q.   On how many occasions?
6     A.   I think once.
7     Q.   And was it in either of the two cases that
8 you just discussed?
9          THE INTERPRETER:  This is interpreter.
10     He's asking me to repeat the question.  I will.
11     A.   Are you referring to the case where I lent
12 someone money, and I filed a claim against him?
13     Q.   All right.  So, that was the same case
14 where you had your deposition taken, and -- in,
15 approximately, 2005?
16     A.   Yes.
17     Q.   Great.
18          MR. WICK:  And to make it easier,
19     Elizabeth, I think we could take that document
20     down.  Thank you.
21     Q.   Mr. Ateyeh, are you a licensed notary
22 public?
23     A.   Yes.
24     Q.   Where are you licensed?
25     A.   In the State of California.

Page 20

F. ATEYEH

2     Q.   Are you licensed in any other
3 jurisdictions?
4     A.   No.
5     Q.   And do you offer your notary public
6 services individually or through one of your
7 businesses?
8          MR. PAIK:  Objection, it assumes he has
9     businesses.
10     Q.   You can answer, if you understand the
11 question.
12     A.   I don't know what is the difference.  I
13 have a business, and I do the notarization.  I don't
14 know what is the connection.
15     Q.   Is your business -- strike that.
16          What's the name of your business?
17     A.   Fred's Liquor.
18     Q.   I'm sorry, Fred's Liquor?
19     A.   Liquor.
20     Q.   And that business sells liquor?
21     A.   Yes.
22     Q.   And Fred's Liquor also offers notary
23 public services?
24     A.   No.
25     Q.   Okay.  Do you have a business that offers

Page 21

F. ATEYEH

2 notary public services?
3     A.   No.
4     Q.   But you offer notary public services
5 yourself?
6     A.   Yes.
7     Q.   Do you have any other notary publics that
8 work for you?
9     A.   No.
10     Q.   And for what types of clients do you
11 particularly -- that's not a good question.  Let me
12 try to rephrase that.
13          Are your notary services primarily used by
14 individuals, as opposed to companies, or
15 organizations?
16     A.   Whomever calls me, I notarize it for him.
17     Q.   Are there particular types of documents
18 that you hold yourself out as a specialty of yours
19 in notarizing?
20     A.   No.
21     Q.   Are there particular types of clients that
22 you advertise your services to?
23          MR. PAIK:  Objection, assumes he
24     advertises.
25     Q.   You may answer.

Page 22

```
 1                      F. ATEYEH
 2       A.   I do not advertise.  I'm sorry for that.
 3       Q.   Approximately, how many documents do you
 4  notarize per year?
 5       A.   I cannot tell you the exact number, but
 6  maybe 30, 20; I don't know exactly.
 7       Q.   Is it fair to say that your notary
 8  services are not a significant portion of your
 9  income?
10       A.   I want to explain to you that this
11  service, I do it as a favor for the community, other
12  than to gain money for it.
13       Q.   Do you charge for your notary services?
14       A.   Yes.
15       Q.   And, approximately, what percent of your
16  notary clients would you say are Palestinian
17  American?
18       A.   A high percentage, most of them.
19       Q.   All right.  And do you have notary clients
20  outside of the United States?
21       A.   No.
22            MR. PAIK:  Objection, ambiguous.
23            MR. WICK:  I'll rephrase it.
24       Q.   Do you have notary clients who reside
25  outside of the United States?
```

Page 23

```
 1                      F. ATEYEH
 2       A.   No.
 3       Q.   Is the Palestinian Authority a client of
 4  yours?
 5       A.   No.
 6       Q.   Is the Palestinian Liberation Organization
 7  a client of yours?
 8       A.   No.
 9       Q.   And just for shorthand, during the
10  deposition, I will use the acronym, "PLO," to refer
11  to the Palestinian Liberation Organization; is that
12  okay?
13       A.   Yes.
14       Q.   To the best of your knowledge, does
15  anybody who works for the Palestinian Authority --
16  excuse me.
17            To the best of your knowledge, is anyone
18  who works for the Palestinian Authority a client of
19  yours?
20       A.   No.
21       Q.   And to the best of your knowledge, is
22  anybody who works for the PLO a client of yours?
23       A.   No.
24       Q.   And to the best of your knowledge, is
25  anybody who works at the Palestinian United Nations
```

Page 24

```
 1                      F. ATEYEH
 2  Mission a client of yours?
 3       A.   No.
 4       Q.   Have you ever provided any notary services
 5  for the Palestinian Authority?
 6       A.   No.
 7       Q.   Have you ever provided any notary services
 8  for the PLO?
 9       A.   No.
10       Q.   And have you ever provided any notary
11  services for anyone that you knew to be an official
12  or an employee of either the Palestinian Authority
13  or the PLO?
14       A.   No.
15       Q.   Have you ever provided any consular
16  services for the Palestinian Authority or the PLO?
17            MR. PAIK:  Object to the form of the
18  question.  It's ambiguous.  I don't know what you
19  mean by, "consular services."
20            MR. BERGER:  I join in that objection.
21            MR. WICK:  Please go ahead and interpret
22  the question, and I would like an answer.
23       A.   No.
24       Q.   In providing your notary services, do you
25  have occasion to notarize or certify any official
```

Page 25

```
 1                      F. ATEYEH
 2  documents of either the Palestinian Authority or the
 3  PLO?
 4       A.   No.
 5       Q.   Do you have occasion to notarize or
 6  certify documents for use in Palestinian legal
 7  proceedings?
 8            MR. PAIK:  Objection.  Sorry.  Go ahead.
 9            MR. BERGER:  Objection, compound question.
10       Q.   You may answer.
11       A.   I don't understand exactly what you are
12  referring to.
13       Q.   Have you ever had occasion to -- let me
14  strike that.
15            Are you occasionally asked to notarize a
16  document that is intended to be used in a -- in a
17  legal proceeding in Palestinian?
18       A.   No.
19       Q.   Give me just a moment, please.
20            Do you have any agreement with the
21  Palestinian Authority who provide any services in
22  the United States?
23            MR. PAIK:  Objection; indifferent as to
24  time.
25            MR. WICK:  To be clear, I'll rephrase the
```

Fuad Ateyeh
April 08, 2021

Page 26

1           F. ATEYEH
2    question.
3        Q.  Do you currently have any agreement with
4    the Palestinian Authority to be able to provide
5    services in the United States?
6        A.  No.
7        Q.  Have you ever had such an agreement?
8        A.  What agreement exactly are you referring
9    to?
10       Q.  Have you ever had any agreement of any
11   kind with the Palestinian Authority to provide
12   services to individuals in the United States?
13       MR. PAIK:  Objection.  Services of any
14   kind?
15       MR. WICK:  Correct.
16       A.  No, I don't have any agreement.
17       Q.  Have you ever had any agreement with the
18   Palestinian Authority to provide services in the
19   United States?
20       A.  No, but I didn't even understand; what do
21   you mean by, "the agreement"?
22       Q.  Do you understand what an agreement is?
23       A.  Yes.
24       Q.  Okay.  I'm asking about whether you've
25   ever had an agreement of any kind with the

Page 27

1           F. ATEYEH
2    Palestinian Authority that have to do with you
3    providing services in the United States?
4        A.  No.
5        Q.  Same question for the PLO.  Have you ever
6    had an agreement with the PLO to provide any kind of
7    services in the United States?
8        A.  No.
9        Q.  And do you hold any licenses that have
10   been granted by the Palestinian Authority?
11       A.  No.
12       Q.  Do you hold any licenses that have been
13   granted by the PLO?
14       A.  No.
15       Q.  Are you aware that the PLO used to have an
16   office in Washington, D.C.?
17       A.  Yes.
18       Q.  And do you know what happened to that
19   office?
20       A.  Yes.
21       Q.  What's your understanding of what happened
22   to that office?
23       MR. PAIK:  In Arabic, please.
24       A.  I understand it's closed now.  The office
25   is closed now.

Page 28

1           F. ATEYEH
2        Q.  And do you have an understanding that the
3    Washington, D.C. office of the PLO used to provide
4    services that could be characterized as consular
5    services?
6        MR. PAIK:  Objection, lacks foundation.
7    If the Witness even understands what consular
8    services are.
9        MR. WICK:  Let me stop real quick for a
10   second because I realized I forgot to do something
11   very important, which is plug my laptop in, and
12   it's about to die.
13       THE VIDEOGRAPHER:  Do you want to go off
14   the record?
15       MR. WICK:  Okay.  Yes.  Could we go off
16   the record for a minute, please.
17       THE VIDEOGRAPHER:  Okay.  We are now off
18   the record.  The time is 17:14 UTC Time.
19       (Whereupon, a short recess was taken.)
20       THE VIDEOGRAPHER:  We are now back on the
21   record.  The time is 17:16 UTC Time.
22       MR. WICK:  Thank you.
23       Q.  And before I was interrupted, Mr. Ateyeh,
24   there was an objection to my question, so I'm going
25   to ask you a different one.  Were you aware of any

Page 29

1           F. ATEYEH
2    services that the PLO D.C. offices provided, before
3    it closed?
4        A.  I don't know.
5        Q.  All right.  Do you know what the D.C.
6    office did?
7        A.  I don't know.
8        Q.  Do you have any understanding as to
9    whether the D.C. office certified documents for use
10   in certain legal proceedings?
11       MR. PAIK:  Objection, asked and answered.
12       Q.  Please answer the question.
13       A.  Let me answer.  Maybe it's not straight
14   answer, but I don't know what they do exactly in
15   that office.  The only thing I know is that I send
16   them the authorization, and they sign it, and send
17   it back; this is what I know.
18       Q.  What authorization would you send them?
19       A.  I send them -- because they sign it.  I
20   don't know what they do it with, but they sign it.
21       Q.  Why would you have occasion to send papers
22   to the PLO's D.C. office?
23       THE INTERPRETER:  I'm sorry.
24       MR. PAIK:  Objection.  Can he have a
25   time-period?

Fuad Ateyeh
April 08, 2021

Page 30

F. ATEYEH

1              F. ATEYEH
2          MR. WICK:  I'm working off the Witness's
3      answer, but if you'd like to clarify, certainly.
4      Let's step back.
5          Q.   On occasion, you would send papers to the
6      D.C. -- to the PLO's D.C. office, correct?
7          A.   Yes.  To be specific, the authorization I
8      do; yes.
9          Q.   And over what --
10         MR. BERGER:  Excuse me, we have an
11     objection to the translation.  Our translator says
12     the word he is using is, "Power of Attorney," not
13     authorization.
14         MR. WICK:  Okay.
15         Q.   The papers that you're describing, without
16     characterizing them, over what time-period would you
17     send papers to the PLO's Washington, D.C. office?
18         A.   I didn't understand the question to answer
19     it correctly.  So, when you say, "timeframe," do you
20     mean how long for these documents to take, or what
21     do you mean by, "timeframe," exactly?
22         Q.   I mean the dates on which you would have
23     occasion to interact with the PLO's D.C. office;
24     from what year to what year, approximately?
25         A.   From 2012 up until they closed.

Page 31

F. ATEYEH

1              F. ATEYEH
2          Q.   I'm sorry, from 2012 until?
3          A.   Until the office was closed.
4          Q.   Okay.  Thank you.  And since we seem to
5      have a disagreement about what these papers were
6      called, can you describe them for me, please?
7          A.   So, the Power -- the papers that I service
8      are Power of Attorneys that we sign and send to the
9      attorneys, and there's two types of Power of
10     Attorneys; there's the general Power of Attorney,
11     and the specific one for selling property, or
12     selling a land.
13         Q.   And why would you send Powers of Attorney
14     to the -- to the PLO's Washington, D.C. office?
15         A.   They either come to me to sign the deal or
16     go directly.  They are to sign it, so I help the --
17     the community to sign it.
18         Q.   So, this is a -- are these documents that
19     you would notarize for one of your clients?
20         A.   Yes.
21         Q.   Okay.  And why would you -- after you've
22     notarized a Power of -- strike that.
23              So, you would notarize a Power of Attorney
24     for one of your clients, correct?
25         A.   Yes.

Page 32

F. ATEYEH

1              F. ATEYEH
2          Q.   And why would the PLO's Washington, D.C.
3      office need that document, after you had notarized
4      it?
5          MR. PAIK:  Objection, calls for
6      speculation.  And, also, objection, assumes facts
7      not in evidence.
8          Q.   You may answer.  Please answer in Arabic.
9          A.   So, first of all, the question is not
10     clear.  Secondly, I'm just a notary public.  I have
11     already notarized -- I notarize the papers, the
12     Power of Attorneys, but I don't have any authority
13     to sign on their behalf.
14         Q.   I understand.  There's a process here that
15     I'm not understanding, and I'm hoping you can save a
16     little bit of time.  If you could explain it, what
17     the connection is between your client and you, and
18     the PLO's Washington, D.C. office.  So, if I
19     understand it --
20         THE INTERPRETER:  Sorry.  Continue.
21         Q.   And so my question is, why did you send
22     documents that you had notarized to the PLO, rather
23     than just giving them back to your client?
24         A.   Now, your question is slightly more -- to
25     answer it.  So, the customer comes, and they sign,

Page 33

F. ATEYEH

1      and I notarize the document, and either I take their
2      document, or Power of Attorney, and take it
3      themselves to the office in Washington, D.C., or I
4      take it myself, and send it, and get it back.
5              About 50 percent of the Power of Attorney,
6      the individuals take it themselves, and I never see
7      them again, and the other part, I send it to the
8      office, and they send it back to me.  I hope that
9      this answers your question.
10         Q.   I'm starting to understand.  So, why
11     would --
12              You said that for about 50 percent you
13     would send the document to the PLO, and they would
14     send it back to you.  Would the PLO do something
15     with that document before sending it back?
16         MR. BERGER:  Objection, this is
17     Mr. Berger.  I'm identifying myself because the
18     record has me down as Mr. Paik.  I object to the
19     ambiguity of the question.  You should be -- PLO,
20     it should be clear on the record, the PLO Mission
21     of the United States, not the PLO delegation.
22         MR. WICK:  I am referring to the PLO's
23     Washington, D.C. office, which I understood to be
24     an office of the PLO, but if that creates an

1                    F. ATEYEH
2    ambiguity, I'm happy to refer to it as the
3    Washington, D.C. office.  The Witness may answer.
4              THE INTERPRETER:  Could you please read
5    the question again, if you don't mind.
6              MR. WICK:  I'll re-ask the question.
7         Q.   You referred a moment ago to sending
8    documents to the PLO's Washington, D.C. office, and
9    then sending the document back to you.
10             My question is, what would the PLO's
11   Washington, D.C. office do with that document,
12   before sending it back to you?
13        A.   Yes, I know they stamp it with the
14   Embassy's stamp, and they send it back to me, and I
15   give it back to the client.
16        Q.   Okay.  And does that stamp convey some
17   sort of authorization or approval from the PLO?
18             MR. PAIK:  Objection, calls for
19   speculation.
20             MR. WICK:  The Witness may answer.
21             MR. PAIK:  Objection.  This is Paik.  I
22   think that also calls for a legal conclusion, what
23   the Witness --
24        Q.   Mr. Ateyeh, you may answer.
25        A.   When they sign it and send it back to us,

1                    F. ATEYEH
2    it becomes a valid document for us.
3         Q.   Okay.  And when you say, "a valid
4    document," is it your understanding that it's a
5    valid document under Palestinian law?
6              MR. BERGER:  Objection, calls for a legal
7    conclusion.  This is -- calls for a legal
8    conclusion.
9              Objection, this is also Berger.  It's
10   leading, and this is a non-party witness.
11        Q.   You may answer.
12        A.   I don't know what happens to this document
13   after I receive it.  I give it to them, and I don't
14   know what happens to it.
15        Q.   I understand.  What did you mean when you
16   said, "it becomes a valid document after it's
17   stamped"?
18        A.   My clients send it to the authorize person
19   in Palestinian to use it.
20        Q.   Okay.  So, the documents that you would
21   send to be stamped by the PLO's Washington, D.C.
22   office were typically documents that your clients
23   intended to send to Palestine for use there?
24        A.   Yes.
25        Q.   Okay.  And based on the practice that

1                    F. ATEYEH
2    you've just described, is it your understanding that
3    stamping documents, or attesting to documents for
4    use in Palestine was a service that was provided by
5    the PLO's Washington, D.C. office?
6         A.   Yes.
7         Q.   Okay.  Are you aware of any other services
8    that the PLO's Washington, D.C. office offered?
9         A.   No.
10        Q.   Do you have any awareness of whether the
11   PLO's Washington, D.C. office offered notary
12   services?
13        A.   Yes.
14        Q.   And to be clear, is it your understanding
15   that the PLO's Washington, D.C. office offered
16   notary services?
17        A.   Yes.
18        Q.   Okay.  And to your knowledge, did the
19   PLO's Washington, D.C. office enter into contracts
20   with individual notaries to offer notary services?
21        A.   I don't know.
22        Q.   To your knowledge, did the PLO's
23   Washington, D.C. office ever refer individuals to
24   you, or recommend that they get documents certified
25   by you?

1                    F. ATEYEH
2         A.   I don't know who sends the clients.  I
3    don't know.
4         Q.   So, to be clear, you're not aware of the
5    PLO's Washington, D.C. office ever recommending or
6    referring a client to you?
7              MR. PAIK:  Objection, asked and answered.
8    You may answer.
9         A.   Let me clear the picture more.  When a
10   client comes to me, I want -- I don't ask the
11   client, "who sent you?  Where did you come from?"
12        Q.   I understand that you don't ask the
13   client.  My question is a little bit different, but
14   it's a direct question.
15             Do you have any knowledge or awareness
16   that the Washington, D.C. of the PLO ever
17   recommended or referred a client to you?
18             MR. PAIK:  Objection, asked and answered.
19        A.   Again, I will answer you again.  Really, I
20   don't know.
21        Q.   Okay.  And do you have any awareness or
22   knowledge that the Palestinian Authority ever
23   recommended or referred a client to you?
24        A.   No.
25        Q.   Okay.

Fuad Ateyeh
April 08, 2021

Page 38

                    F. ATEYEH
1
2          MR. WICK:  Elizabeth, could we go to Tab
3    D, please, or Tab 4.  Excuse me.
4          MS. BEZVERKHA:  Sorry.  Just a moment.
5          MR. PAIK:  Sorry.  Do you mind if we take
6    a break while -- I think we've been going for more
7    than an hour.
8          MR. WICK:  That's fine with me.
9          THE VIDEOGRAPHER:  Okay.  We are now off
10   the record.  The time is 17:39 UTC Time.
11         (Whereupon, a short recess was taken.)
12         THE VIDEOGRAPHER:  We are now back on the
13   record.  The time is 17:51 UTC.
14         MR. WICK:  Thank you.
15         Q.  Mr. Ateyeh, I was about to show you a
16   document, but before I do so, maybe I'll just -- to
17   avoid it, are you aware of having been -- ever
18   having your name or contact information on a website
19   affiliated with the PLO regarding your notary
20   services?
21         A.  Yes, from the clients.
22         Q.  I don't understand your answer.  What do
23   you mean by, "from the clients"?
24         A.  Yes, when a client comes to me, he tells
25   me that he got my name and contact from the Website.

Page 39

                    F. ATEYEH
1
2          Q.  Okay.  And do you understand that Website
3    to be a Website of the PLO?
4          A.  It's not the PLO.
5          Q.  Okay.  Let's look at Tab 4.
6          A.  Okay.
7          Q.  We're going to show you a document.
8    Mr. Ateyeh, this is a printout from a Website.
9    You'll see at the -- at the top of the Website, it
10   says, "PLO General Delegation to the United States."
11         (Whereupon, Tab 4 was marked as Exhibit 2 for
12   identification, as of April 8th, 2021.)
13         MR. WICK:  Can you zoom in a little bit on
14   that, so we could see the heading, and can we zoom
15   in on that?
16         Q.  There we go.  You see the heading, "PLO
17   General Delegation to the United States"?
18         A.  Yes.
19         Q.  Okay.  And to -- to not mislead, this is
20   not a current web page.
21         MR. WICK:  Elizabeth, can you scroll down
22   to the bottom of the page.  A little more.  All
23   the way to the bottom.  There we go.
24         Q.  You'll see the date at the very bottom,
25   it's timestamped March 18th, 2019; do you see that?

Page 40

                    F. ATEYEH
1
2    Yes; do you see that?
3          A.  Yes.
4          Q.  All right.  If we go back up to the first
5    page, you'll see that there's a section in the
6    middle of the page called, "notary publics"; do you
7    see that?
8          A.  Yes, sir.
9          Q.  Okay.
10         MR. WICK:  And Elizabeth, could you scroll
11   down?  It's going to be about seven or eight pages
12   to that section.  It's going to be several pages
13   down.
14         And while she is scrolling, I'm going to
15   ask you, Mr. Ateyeh, are you familiar with that
16   Website?
17         A.  No.
18         Q.  Okay.  All right.  So, this page is from
19   the Notary Public section of that Website, and you
20   will see that there is a list of tabs associated
21   with various cities; do you see that?
22         A.  It's not clear.
23         Q.  You mean the document isn't clear?  You
24   can't read it clearly?
25         A.  I can't see it even.  I don't know.  Now I

Page 41

                    F. ATEYEH
1
2    can see it.
3          Q.  Okay.  Do you see your name listed on the
4    page?
5          A.  Yes.
6          Q.  All right.  Do you know how you came --
7    how your name came to be listed on this page?
8          A.  First of all, I haven't seen this page my
9    whole life.  Second thing, I am a well-known and
10   trusted person in the community.
11         MR. PAIK:  This is Paik.  Can I move to
12   strike everything after, "second"?
13         MR. WICK:  I'm sorry?
14         MR. PAIK:  Move to strike everything
15   after, "second," as nonresponsive.
16         MR. WICK:  You're certainly free to state
17   your motion for the record.
18         MR. PAIK:  What?  Sorry, I didn't catch
19   that.  The second part of the answer wasn't
20   responsive to the question, so I just move to
21   strike it.
22         MR. WICK:  And your motion is noted.
23         Q.  So, I'm going to ask the question again.
24   Mr. Ateyeh, do you know how your name came to be
25   listed on this page?

Page 42

F. ATEYEH

1
2     A.   I have been doing the Notary Public
3     through the State of California for ten years, and I
4     expect for it to be popular among people.
5     Q.   Do you know who put your name on the page?
6     A.   No, and I've never seen this page.
7     Q.   Did anyone at the PLO or the Palestinian
8     Authority ever ask you for permission to list you as
9     a Notary Public on their Website?
10    A.   No.
11    Q.   And I want to be clear on this, although
12    I've asked you similar questions before; have you
13    ever had any financial or business arrangement with
14    the Washington, D.C. office of the PLO?
15         Since the Washington, D.C. office closed,
16    do you know whether the Palestinian Authority, or
17    PLO has established a list of recommended Notary
18    Publics in the United States?
19    A.   I know there is a list of names available
20    and my name is one of them.
21    Q.   Do you know where a person could find that
22    list?
23    A.   You know, I've never seen this myself.
24    Q.   How do you know that your name is on it?
25    A.   The people tell me that.

Page 43

F. ATEYEH

1
2     Q.   Which people?
3     A.   The clients who comes to sign their
4     papers.
5     Q.   To your knowledge, do some of these
6     clients find out about you and your services from
7     that list?
8     A.   Very few of them, but most of them, most
9     of the clients knows that I'm a Notary Public in San
10    Francisco.
11    Q.   Have you ever had a conversation with
12    anybody at the Palestinian Authority or the PLO
13    about having your name on that list?
14    A.   No.
15    Q.   And have you ever received any
16    compensation from the Palestinian Authority or for
17    the PLO for being on that list?
18    A.   No.
19    Q.   And have you ever received any
20    compensation from the Palestinian Authority or the
21    PLO for any notary services that you have performed
22    pursuant to your being on that list?
23    A.   No.
24    Q.   Has anyone ever contacted you to ask that
25    you notarize a document on behalf of the Palestinian

Page 44

F. ATEYEH

1     Authority or the PLO?
2
3     A.   No.
4     Q.   You described a little while ago a process
5     by which you notarize documents for use in
6     Palestine.  Do you also notarize documents for other
7     purposes, or have all of the documents you've
8     notarized been for use in Palestine?
9         MR. PAIK:  Object to the portion of the
10    question, to the extent it attempts to summarize
11    parts of the answer.
12        MR. WICK:  You may answer.
13    A.   So, I'm a Notary Public in the State of
14    California, and my office is open to any person who
15    comes to notarize their document.  Yes, high
16    percentages from Palestine, but not all of my
17    customers or clients are Palestinians.
18    Q.   I'm going to ask you to estimate, during
19    the last 12 months, approximately, what percentage
20    of the documents that you have notarized were
21    documents that were notarized for use in Palestine?
22    A.   Most of them.
23    Q.   More than 75 percent?
24    A.   Yes.
25    Q.   More than 90 percent?

Page 45

F. ATEYEH

1
2     A.   I don't know -- I cannot -- I don't know.
3         MR. WICK:  Elizabeth, could we take this
4     down and put up Tab 9, please.
5         (Whereupon, Tab 9 was marked as Exhibit 3 for
6     identification, as of April 8th, 2021.)
7         MR. WICK:  Great.
8     Q.   Mr. Ateyeh, I am showing you a document
9     that you produced to us, as well as a Certified
10    English translation of that document that we've had
11    done.  This is -- the first page is labeled FA001-T,
12    which is the first page of the English translation,
13    but lets just scroll through the pages very quick.
14        MR. WICK:  Elizabeth.  So, that everybody
15    could see the full document, slow down.  Go back
16    to the -- that's FA002-T, which is the second page
17    of the English translation, and then after that,
18    we have the translator Certification, keep going,
19    and then below that, we have the original document
20    that you produced to us, Bates stamped FA001 and
21    the last page, I believe, is FA002.
22    Q.   Mr. Ateyeh, at least with respect to the
23    last two pages of this documents, do you recognize
24    the document as a document that you produced to us?
25    A.   Yes.

Fuad Ateyeh
April 08, 2021

Page 46

F. ATEYEH

1                    F. ATEYEH
2        Q.   And could you please describe what this
3   document is.
4        A.   So, this is a Power of Attorney specific
5   that cannot be changed, meaning that this Power of
6   Attorney can only be used specifically to sell a
7   land.
8             MR. WICK:  Okay.  And I actually stop, and
9   ask a process question now, because I realize we
10  have not talked about marking these exhibits, and
11  I ask Ms. Ianazzi, what's your procedure for that?
12  Do we send these?  Okay.  Thank you.
13       Q.   And this is a document, Mr. Ateyeh, that
14  you notarized, correct?
15       A.   Yes.
16       Q.   In fact, that is your seal in the bottom
17  right-hand corner of the page numbered FA002,
18  correct?
19       A.   Yes.
20       Q.   And can you describe the seals in the
21  lower left-hand corner; what are those?
22       A.   There are three seals.  Which one are you
23  referring to?
24       Q.   Well, I see two seals.  Let me step back
25  here.  Let's start with the -- the large rectangle,

Page 47

F. ATEYEH

1                    F. ATEYEH
2   which is the top of the seals, right next to the
3   redacted box; do you see that?
4        A.   Yes.
5        Q.   All right.  And can you describe what seal
6   that is?
7        A.   Can you enlarge it more, so that I will be
8   able to view it better?
9             MR. WICK:  Can you do that, Elizabeth?
10       A.   I can see it now better.
11       Q.   Great.  Can you explain what that seal is?
12       A.   It said that the Special Palestinian
13  Mission in Mexico are not responsible for the
14  content of this document, but we organize, and we
15  did the seal, and the stamp of the Notary Public,
16  Mr. Fuad Ateyeh.
17       Q.   And I see the name of, "Riyad Alhalabi,"
18  on the page; do you see that?
19       A.   Yes.
20       Q.   And do you know who that is?
21       A.   Over the phone.
22       Q.   I'm sorry?
23       A.   I know him over the phone.
24       Q.   Okay.  Who is he?
25       A.   He is the person who is responsible for

Page 48

F. ATEYEH

1                    F. ATEYEH
2   signing the Power of Attorney.
3        Q.   And was he affiliated with the Palestinian
4   Authority or the PLO?
5        A.   I know that he works in the Embassy.  What
6   is his rank, what is his duty, I don't know.
7        Q.   And by the Embassy, are you referring to
8   the Palestinian Embassy in Mexico?
9        A.   Yes, sir.
10       Q.   And so did you send this document to him
11  after you notarized it?
12       A.   Yes, sir.
13       Q.   And he then returned it to you with a
14  stamp?
15       A.   Yes, sir.
16       Q.   It'll be just a moment, please.  I'm
17  trying to make this go as quickly as I can.  Okay.
18            MR. WICK:  Could we go to Tab 10, please.
19       (Whereupon, Tab 10 was marked as Exhibit 4
20  for identification, as of April 8th, 2021.)
21       Q.   And, again, we'll just look through this
22  quickly.  This is similar to what we just looked at
23  add at in the -- an English translation of the
24  document, similar to the document produced.  It's --
25  if we'll just walk through it quickly.  If we could

Page 49

F. ATEYEH

1                    F. ATEYEH
2   go to the first page, please.
3        Again, English translation that we
4   numbered FA0013-T.  The next page, the translator
5   Certification coversheet, and then the Certification
6   follows that, and then the page after that has a
7   coversheet titled, "Original," then we have a
8   document Bates numbered FA0013 that came from your
9   production, Mr. Ateyeh, and I would ask again, do
10  you recognize this page, FA0013, as a copy of a
11  document you produced to us?
12       A.   Yes.
13       Q.   And is this another example of a Power of
14  Attorney that you notarized for a client?
15       A.   Yes.
16       Q.   Okay.  Let's see.  And can you tell from
17  the document when you notarized the document?
18            MR. WICK:  Can you scroll up, please,
19  Elizabeth, or scroll down, actually, to the bottom
20  of the page.
21       Actually, the date appears to be cut off
22  of the page.  Do any of the other Seals on the
23  page give you an indication of when this occurred,
24  of when you notarized the document?
25       A.   Yes.

Page 50

```
1                    F. ATEYEH
2        Q.   And what do the other Seals tell you about
3   when this occurred?
4        A.   I think it's August 18, 2020.
5        Q.   Okay.  And that's the date of Mr.
6   Alhalabi's seal, correct?
7        A.   No, it was sealed or stamped after two
8   weeks, on August 31st.
9        Q.   Okay.  And so you would have notarized it
10  about two weeks before that?
11       A.   Correct.
12       Q.   And is this another example of a document
13  that you notarized and sent to the Palestinian
14  Embassy in Mexico?
15       A.   Yes.
16       Q.   And were you in the United States when you
17  notarized this document?
18       A.   Yes.
19       Q.   Approximately, how many documents in the
20  last year have you notarized and sent to Palestinian
21  embassies outside the United States?
22            MR. PAIK:  Object to the form of the
23       question; assumes facts not in evidence to the use
24       of the word plural.
25       A.   It's very hard to estimate.  I don't know
```

Page 51

```
1                    F. ATEYEH
2   exactly how many.
3        Q.   Do you think it's more than ten?
4        A.   Definitely; yes.
5        Q.   Do you think it's more than 20?
6        A.   I don't think so.
7        Q.   Okay.  And have you notarized and sent any
8   documents in the last year to Palestinian embassies
9   in countries -- in Mexico?
10       A.   From which date to which date?
11       Q.   What is today?  April 8th, 2020, to
12  April 8th, 2021?
13       A.   Yes.
14       Q.   Which other countries have you sent --
15  excuse.
16            Me.  Which other Palestinian embassies
17  have you sent such documents to?
18       A.   Canada.
19       Q.   In any other embassies, besides Canada and
20  Mexico, during that timeframe?
21       A.   No.
22       Q.   And if I take that time-period back a
23  little bit further to January 4th of 2020, would
24  your answer change?
25       A.   I don't -- I really don't know.
```

Page 52

```
1                    F. ATEYEH
2        Q.   Okay.  Since January 4th of 2020, have you
3   notarized any documents, and sent them to the
4   Palestinian United Nations Mission in the United
5   States?
6        A.   No.
7        Q.   Have you notarized any documents and sent
8   them to any office of the Palestinian Authority or
9   the PLO in the United States?
10       A.   No.
11            MR. WICK:  Can we go to Tab 8, please.
12       (Whereupon, Tab 8 was marked as Exhibit 5 for
13  identification, as of April 8th, 2021.)
14       Q.   So, Tab 8, Mr. Ateyeh is three pages from
15  your production to us that we just received, I
16  believe the day before yesterday.
17            MR. WICK:  And, again, if we could,
18       Elizabeth, if you could scroll through, I believe
19       the first three pages are translated pages labeled
20       FA0131 -- excuse me.  Slow down.  Go back to the
21       first Page 3, FA0130-T.  The second is an English
22       translation, FA0131-T.  Next page.  Next one is
23       a -- is a translation page labeled FA0132-T.  Next
24       page, then the next page.
25            We have our translation Certification and
```

Page 53

```
1                    F. ATEYEH
2   the next page, we -- one more page down.  We have
3   from your production a page labeled FA -- excuse
4   me, 0131, then the next page FA0131, and the page
5   after that, FA0132.
6            So, if we could scroll up to two pages up
7   to FA0130.
8        Q.   And I would ask you, Mr. Ateyeh, if you
9   recognize this document?
10       A.   Yes.
11       Q.   What is it?
12            MR. WICK:  I need you to answer in Arabic,
13       please.
14       A.   So, when we send the Power of Attorney to
15  the Embassy of the lands, or the -- of lands, I put
16  their email on it, and my email, and a copy of the
17  Power of Attorney, and I send it to them.
18       Q.   Let me ask it this way.  This is an email
19  sent by you, correct?
20       A.   Yes.
21       Q.   And, I'm sorry, and you sent it to an
22  email address, "palus@mfae.gov.ps," correct?
23       A.   Yes.
24       Q.   Whose email is that?
25       A.   It's either Department of Land, or it's
```

Page 54

```
1              F. ATEYEH
2    the division where they notarize the Power of
3    Attorneys.
4              MR. PAIK:  Well, don't guess.  If you
5    know, but don't guess.
6    Q.   Is it your understanding that the email
7    address belongs to some office of the Palestinian
8    Authority or the PLO?
9    A.   What I know is it belongs to one of the
10   Palestinian departments.
11   Q.   And did you send this email to this
12   address because one of your notary clients asked you
13   to do so?
14   A.   Yes.
15   Q.   And this email is dated February 3rd,
16   2021, correct?
17   A.   Yes.
18   Q.   And this email had an attachment to it,
19   correct?
20   A.   Yes.
21   Q.   Do you know what the attachment was?
22   A.   It's a Power of Attorney, specific Power
23   of Attorney that cannot be used for our purposes.
24   Q.   And was that attachment produced to us as
25   part of your earlier production?
```

Page 55

```
1              F. ATEYEH
2              THE INTERPRETER:  I'm sorry, I'll ask him
3    to --
4    A.   Of course.  I have sent it to you.
5    Q.   Okay.  And there is a portion of the
6    subject line of the email that has been redacted or
7    blacked out; why was that done?
8              MR. PAIK:  Well, can I answer that, or --
9    I mean, we are the ones that did the
10   redaction.  It's just redacted personal
11   information, identified first as I stated in the
12   letter I sent to you.
13             MR. WICK:  Okay.
14   Q.   Let's go to the next page.  The next page
15   is FA0131, and it appears to be an email from you to
16   the email address, "palus@mofa.pna.ps," dated
17   September 11th, 2020, correct?
18   A.   Yes, sir.
19   Q.   And who did you send this document to?
20   A.   It's the same email, but I usually send
21   documents to it.  The email for the Department of
22   Lands.
23   Q.   And is this another situation where you
24   notarized a Power of Attorney for a client and sent
25   it to the Department of Lands in Palestine?
```

Page 56

```
1              F. ATEYEH
2    A.   Yes, sir.
3    Q.   And you sent that document at the request
4    of your client?
5    A.   Yes, sir.
6    Q.   Okay.  And was the attachment of this
7    document produced as part of your earlier
8    production?
9    A.   Yes.
10   Q.   Okay.
11             MR. WICK:  And can we scroll down to one
12   more page, please, to the document labeled at the
13   bottom, "FA0132."
14   Q.   This document is an email from you dated
15   August 24th, 2020, correct?
16   A.   Yes, sir.
17   Q.   And is there another email to the
18   Palestinian Department of Lands?
19   A.   Yes, sir.
20   Q.   And is this another example of a Power of
21   Attorney that you sent to the Department of Lands at
22   the request of your client after notarizing it?
23   A.   Yes, sir.
24   Q.   And I note that only part of the subject
25   line here is redacted --
```

Page 57

```
1              F. ATEYEH
2              MR. WICK:  And, Elizabeth, if you could
3    please scroll up to the translation of this page,
4    FA132-T.  The portion before the redacted is
5    translated as, "Agency," in the subject line, and
6    the portion of the redaction after the translation
7    is, "I will send it to Mexico."
8    Q.   And my question for you is, is the
9    redacted portion the name of the agency?
10   A.   When I send it, I send it to Mexico, so
11   that it doesn't get mixed up between Mexico and
12   Canada.
13   Q.   My question -- before I ask the question
14   again --
15             MR. WICK:  Elizabeth, would you please
16   scroll down to the original version, the last
17   page.
18   Q.   My question is, is the redacted portion of
19   this document in the subject line the name of a
20   client or is it the name of an agency?
21   A.   The client's name.
22   Q.   Thank you.
23             MR. PAIK:  Let me put on the record my
24   objection.  Your translation is inaccurate.
25   "Agency," is not the word.  It's, "Power of
```

Fuad Ateyeh
April 08, 2021

Page 58

F. ATEYEH

1       F. ATEYEH
2   Attorney."
3       THE INTERPRETER:  I'm sorry, this is the
4   interpreter.  Your question is asking about, is it
5   the entity, not the -- is it sent to the office
6   there, right?  I meant by agency is the office,
7   not the document itself.
8       MR. PAIK:  I'm not quibbling with your
9   translation.  I'm talking about the documents, the
10  way that the document translator translated the
11  Arabic language led to the mistaken language
12  premised on the notion that this is some agency of
13  government as opposed to the word being Power of
14  Attorney.
15      THE INTERPRETER:  Thank you, sir.
16      MR. WICK:  Could we go to Tab 1, please.
17      (Whereupon, Tab 1 was marked as Exhibit 6 for
18  identification, as of April 8th, 2021.)
19      Q.   Mr. Ateyeh, what we're showing you now is
20  the other Subpoena that we had received on you,
21  which is a Subpoena committing you to produce
22  documents.  You've seen this Subpoena before,
23  correct?
24      A.   Yes.
25      Q.   I know that you produced some documents in

Page 59

F. ATEYEH

1       F. ATEYEH
2   response to this the Subpoena, and I would just like
3   to ask you what you did to search for the documents
4   that were responsive to our Subpoena?
5       A.   I tried to fulfill all of your requests.
6   I searched everything I have, and whatever I was
7   able to find, I did send it to you.
8       Q.   Where specifically did you look?
9       A.   I searched in my office, if I have any
10  documents, and I searched my phone, if there was any
11  documents, and that's -- this is where I keep my
12  documents.
13      MR. WICK:  Elizabeth, would you scroll
14  down to the next page, and the next page, and the
15  page after that, and one more page, one more, keep
16  going.  Let's get -- I want to get to the
17  Substantive Request.  Keep going.  There we go.
18      Q.   So, I just want to go through this very
19  quickly with you, Mr. Ateyeh.
20      The first Request asks for all
21  communications between you and an employee, agent,
22  representative, or other person acting on behalf of,
23  or for the benefit of a Defendant, that being the
24  Palestinian Authority, or the PLO, on or after
25  October 1st, 2019, and to be clear, did you find any

Page 60

F. ATEYEH

1       F. ATEYEH
2   such communications?
3       A.   Yes, I did.
4       Q.   And these would include the documents that
5   you -- that you produced regarding communications
6   with various offices and agents to whom you sent
7   notarized documents, correct?
8       MR. PAIK:  Objection, this question is
9   misleading, given the legal conclusion request
10  stated in Request 1.
11      Q.   You may answer.
12      A.   Yes.
13      Q.   All right.  Have you ever had any
14  communications with any employee, agent,
15  representative, or anybody else acting on behalf of
16  the Palestinian Authority, or the PLO, since
17  October 1st, 2019, other than sending and receiving
18  documents on behalf of your notary clients?
19      MR. PAIK:  Objection, the question is
20  misleading and ambiguous.  On whose behalf is
21  acting in your question?
22      Q.   You may answer.
23      A.   No.
24      Q.   Okay.  Give me just a moment, please.
25      MR. WICK:  We can take the document down,

Page 61

F. ATEYEH

1       F. ATEYEH
2   Elizabeth.
3       Q.   Mr. Ateyeh, are you familiar with an
4   entity called the Palestinian National Council?
5       A.   Yes.
6       Q.   And what is the Palestinian National
7   Council?
8       A.   It's like a Parliament -- I'm sorry.  It's
9   like the Palestinian Parliament; yes.
10      Q.   Okay.  It's like the Palestinian
11  Parliament.  Okay.  Have you ever been a member of
12  the Palestinian National Council?
13      A.   Yes.
14      Q.   During what time-period?
15      A.   In the beginning of the -- 2000, but I
16  cannot give you a specific date.
17      Q.   Are you currently a member of the
18  Palestinian National Council?
19      A.   No.
20      Q.   When did you stop being a member of the
21  Palestinian National Council?
22      A.   Five years, six years.
23      Q.   Five or six years ago?
24      A.   Yes, sir.
25      Q.   Have you done any work relating to the

Page 62

F. ATEYEH

2  Palestinian National Council since January 4th of
3  2020?
4        A.   No.
5        Q.   Since January 4th, 2020, have you done any
6  other work, or been a part of any other
7  organizations affiliated with the Palestinian
8  National Counsel, or the PLO?
9        A.   No.
10       MR. PAIK:  Can I ask, we're -- it's
11  actually three hours behind.  So, it's getting
12  almost to lunchtime.  Are you almost done because
13  if you are, we could just plow through and get
14  through it.
15       MR. WICK:  Yes, I have about another ten
16  to 15 minutes to make sure I got everything, and
17  then I'll wrap up.
18       MR. PAIK:  Great.
19       MR. BERGER:  And I'll have a few questions
20  as well, of course.
21       MR. WICK:  Okay.
22       Q.   Have you ever had any interactions, since
23  January 4th of 2020, with anybody affiliated with
24  the Palestinian Authority, or the PLO in the United
25  States?

Page 63

F. ATEYEH

2        A.   No.
3        Q.   And during that same time-period, since
4  January 4th of 2020, have you attended any events
5  held or sponsored by the Palestinian Authority or
6  the PLO in the United States?
7        A.   No.
8        Q.   Have you ever been to the -- to the UN
9  Mission of the PLO in New York?
10       A.   No.
11       MR. WICK:  Can we put up Tab 5, please,
12  and can we scroll in on a little bit more closely,
13  zoom in a little more closely on that, so we can
14  read some of the names.
15       (Whereupon, Tab 5 was marked as Exhibit 7 for
16  identification, as of April 8th, 2021.)
17       THE INTERPRETER:  I can't read that.
18       MR. WICK:  We're trying to read that.
19       Q.   Mr. Ateyeh, this is a page taken from the
20  Permanent Observer Mission from the Palestinian to
21  the United Nations, and there's a list of
22  individuals on that page described as the Mission
23  Team; do you see that?
24       A.   Yes.
25       Q.   And I would like you to take a look at

Page 64

F. ATEYEH

2  that list of individuals, and I'm going to ask you,
3  do you know any of them?
4        Okay.  Any others?
5        A.   Nadya Rasheed, I recognize her name.
6        Q.   Any others?
7        A.   No, that's it.
8        Q.   Okay.  Let's start with --
9        To be clear, so it was two names, correct,
10  Mr. Mansour and Ms. Rasheed?
11       A.   Yes.
12       Q.   Okay.  How do you know Mr. Mansour?
13       A.   He's the Ambassador of Palestinian to the
14  United Nations, and he's always on TV.  He's a
15  permanent figure that everybody knows.
16       Q.   But do you know him personally?
17       A.   Yes.
18       Q.   And for how long have you known him?
19       A.   So, I knew him since his brother died
20  about five or six years ago.  His brother died in
21  San Francisco, and he attended the funeral ceremony,
22  and we went to the Palestinian services.
23       Q.   When was the last time that you spoke with
24  him?
25       A.   I don't know if we have ever spoken.

Page 65

F. ATEYEH

2        Q.   Okay.  Have you emailed with him in the
3  last year?
4        A.   No.
5        Q.   All right.  So, you don't have any
6  personal friendship or relationship with him,
7  correct?
8        A.   No.
9        Q.   Okay.  I'm sorry, I need to be clear on
10  the answer because I said, "correct?"
11       Do you have a personal friendship or
12  relationship with Mr. Mansour?
13       A.   No.
14       Q.   Okay.  And what about Ms. Rasheed; do you
15  know her personally?
16       A.   Yes.
17       Q.   And how do you know her?
18       MR. WICK:  In Arabic, please.
19       A.   Her father is one of her -- my close
20  friends, and we live together in San Francisco area.
21       Q.   When was the last time you spoke with her?
22       A.   I've never have spoken with her.
23       Q.   So, when you said you're close friends,
24  you're referring to her father, not to Ms. Rasheed
25  herself?

Page 66

```
                        F. ATEYEH
 1
 2       A.   Correct.
 3       Q.   Okay.  And are you aware of --
 4            Other than the UN Mission in New York, are
 5  you aware of any other offices or facilities owned
 6  or occupied by the PLO or the Palestinian Authority
 7  in the United States?
 8       A.   No.
 9       Q.   Are you aware of anybody who works for the
10  PLO or the Palestinian Authority in the United
11  States, other than through the UN Mission?
12       A.   No.
13       Q.   And are you aware of anybody who receives
14  payment for the Palestinian Authority -- excuse me.
15            Are you aware of anybody who receives
16  payment from the Palestinian Authority or the PLO
17  for performing notary services in the United States?
18       A.   No.
19            MR. WICK:  If I can take a five-minute
20       break, I think I'm probably done, but can we go
21       off the record for a moment?
22            THE VIDEOGRAPHER:  Okay.  We're now off
23       the record.  The time is 19:00 UTC Time.
24            (Whereupon, a short recess was taken.)
25            THE VIDEOGRAPHER:  We are now back on the
```

Page 67

```
                        F. ATEYEH
 1
 2  record.  The time is 19:10 UTC Time.
 3       Q.   Mr. Ateyeh, I just have one more question
 4  for you.  Earlier in the deposition, you spoke about
 5  a practice, when the PLO's Washington, D.C. office
 6  was open, of periodically sending notarized
 7  documents to that office and receiving them back; do
 8  you recall that?
 9       A.   Yes.
10       Q.   Since the Washington, D.C. office closed,
11  is there -- is there another office of the, either
12  the Palestinian Authority, or the PLO, that is --
13  performed a similar function in the United States,
14  than what the Washington, D.C. performed?
15            MR. PAIK:  Object to the form of the
16       question; it's misleading and contains a legal
17       conclusion.
18       A.   No.
19            MR. WICK:  Okay.  I thank you very much
20       for your time and your patience today, and I don't
21       have any further questions for you, but I believe
22       my friend Mr. Berger does.
23            MR. BERGER:  Thank you.
24
25
```

Page 68

```
                        F. ATEYEH
 1
 2  EXAMINATION BY
 3  MR. BERGER:
 4       Q.   Good afternoon, how are you?  My name is
 5  Mitchell Berger.  I am one of the lawyers for the
 6  Defendants, Palestinian Authority and Palestinian
 7  Liberation Organization; have we ever met before?
 8       A.   No.
 9       Q.   We looked at two documents, Exhibits 3 and
10  Exhibit 4.  We looked at those documents; do you
11  recall those documents?
12       A.   I don't know what's Exhibit 3 and what's
13  Exhibit 4, but all the documents you have presented,
14  they came from me.
15       Q.   Right.  Thank you.  When you notarize
16  documents, did you do so as a service to your notary
17  client?
18       A.   Yes.
19       Q.   Did you do so as a service to the
20  Palestinian Authority?
21       A.   No.
22       Q.   Did you do so as a service to the
23  Palestinian Liberation Organization?
24       A.   No.
25       Q.   We looked at some emails that you sent to
```

Page 69

```
                        F. ATEYEH
 1
 2  the Ministry of Lands in Ramallah; do you recall
 3  that?
 4       A.   If you don't mind repeating the questions.
 5       Q.   Sure.  Do you recall, we looked at some
 6  emails that Mr. Wick asked you about?
 7       A.   Yes.
 8       Q.   When you sent those emails, did you send
 9  them as a service for your notary client?
10       A.   Yes.
11       Q.   Did you send those emails as a service on
12  behalf of the Palestinian Authority?
13       A.   No.
14       Q.   Did you send those as a service on behalf
15  of the Palestinian Liberation Organization?
16       A.   No.
17       Q.   Since January 4 of 2020, have you provided
18  any services on behalf of the Palestinian Authority?
19       A.   No.
20       Q.   Since January 4, 2020, have you provided
21  any services on behalf of the Palestinian Liberation
22  Organization?
23       A.   No.
24            MR. BERGER:  Thank you, Mr. Ateyeh.  Those
25       are all the questions that I have.
```

Fuad Ateyeh
April 08, 2021

Page 70

1
2          THE WITNESS:  Thank you.
3      MR. WICK:  Thank you very much.
4          THE VIDEOGRAPHER:  Everyone agree to go
5   off the record?  Okay.
6      MR. PAIK:  Yes.
7          THE VIDEOGRAPHER:  The time is now 19:17
8   UTC.  We are off the record, and this concludes
9   today's testimony by Fuad Ateyeh.  Thank you,
10  everyone.  Have a great day.
11             -o0o-
12      (Whereupon, the examination of FUAD ATEYEH
13  was concluded at 5:17 p.m.)
14
15
16          _____
17          FUAD ATEYEH
18
19
20
21
22
23
24
25

Page 71

1
2          C E R T I F I C A T E
3
4      I, AMBRIA IANAZZI, do hereby Certify:
5      THAT FUAD ATEYEH, the WITNESS herein, was
6   sworn under penalty of perjury by a Notary Public.
7
8      THAT the deposition transcript herein is a
9   verbatim record of the testimony given by FUAD
10  ATEYEH, stenographically record by a Registered
11  Professional Reporter, and Certified Realtime
12  Reporter.
13
14      THAT I am not related to any of the Parties
15  to this Action by blood or marriage; and I have no
16  interest, financial or otherwise, in the outcome of
17  the case.
18
19
20      CERTIFICATION DATE:  April 13th, 2021.
21
22          _Ambria Ianazzi_
23  _____
24      AMBRIA IANAZZI, RPR, CRR, RCR, CSR
25

Page 72

1  Errata Sheet
2
3  NAME OF CASE: SHABTAI SCOTT SHATSKY -against- PALESTINE LIBERATION ORGANIZATION
4  DATE OF DEPOSITION: 04/08/2021
5  NAME OF WITNESS: Fuad Ateyeh
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25          _____

Fuad Ateyeh
April 08, 2021

## Exhibits

**EX 0001 Fuad Ateyeh 040821**
3:6 13:8
**EX 0002 Fuad Ateyeh 040821**
3:7 39:11
**EX 0003 Fuad Ateyeh 040821**
3:8 45:5 68:12
**EX 0004 Fuad Ateyeh 040821**
3:9 48:19 68:10,13
**EX 0005 Fuad Ateyeh 040821**
3:10 52:12
**EX 0006 Fuad Ateyeh 040821**
3:11 58:17
**EX 0007 Fuad Ateyeh 040821**
3:12 63:15

---

## 0

**0**
7:2,13,21
**0131**
53:4

---

## 1

**1**
13:8 58:16, 17 60:10
**10**
48:18,19
**11th**
55:17
**12**
44:19

**15**
62:16
**16:33**
8:9
**17:14**
28:18
**17:16**
28:21
**17:39**
38:10
**17:51**
38:13
**18**
50:4
**18th**
39:25
**19:00**
66:23
**1st**
59:25 60:17

---

## 2

**2**
39:11
**20**
22:6 51:5
**2000**
61:15
**2005**
18:9 19:15
**2012**
17:21 30:25 31:2
**2019**
39:25 59:25 60:17
**2020**
50:4 51:11, 23 52:2 55:17 56:15 62:3,5,23 63:4
**2021**
8:9 13:9 39:12 45:6 48:20 51:12

52:13 54:16 58:18 63:16
**24th**
56:15
**29**
8:25

---

## 3

**3**
13:5,8 45:5 52:21
**30**
22:6
**31st**
50:8
**3rd**
54:15

---

## 4

**4**
38:3 39:5,11 48:19
**4th**
51:23 52:2 62:2,5,23 63:4

---

## 5

**5**
52:12 63:11, 15
**50**
33:6,13

---

## 6

**6**
58:17

---

## 7

**7**
63:15

**75**
44:23

---

## 8

**8**
52:11,12,14
**8th**
8:9 13:9 39:12 45:6 48:20 51:11, 12 52:13 58:18 63:16

---

## 9

**9**
45:4,5
**90**
8:13 44:25

---

## A

**able**
26:4 47:8 59:7
**ABU**
7:8,10
**accommodate**
11:22
**accurate**
10:18
**accurately**
7:7 12:5
**acronym**
23:10
**acting**
59:22 60:15, 21
**Action**
8:15
**add**
16:13 48:23
**address**
53:22 54:7, 12 55:16

advertise
  21:22 22:2
advertises
  21:24
affected
  18:3
affiliated
  38:19 48:3
  62:7,23
afternoon
  8:2
agency
  57:5,9,20,25
  58:6,12
agent
  59:21 60:14
agents
  60:6
ago
  17:16 34:7
  44:4 61:23
  64:20
agree
  9:6
agreement
  8:6 25:20
  26:3,7,8,10,
  16,17,21,22,
  25 27:6
ahead
  11:16 13:13
  16:23 24:21
  25:8
Alhalabi
  47:17
Alhalabi's
  50:6
Ambassador
  64:13
ambiguity
  33:20 34:2
ambiguous
  22:22 24:18
  60:20
Ambria
  8:17

American
  22:17
answer
  10:25 11:11,
  15,16,24
  12:4 13:17,
  25 15:19
  16:6 17:12
  18:18,20
  20:10 21:25
  24:22 25:10
  29:12,13,14
  30:3,18
  32:8,25
  34:3,20,24
  35:11 37:8,
  19 38:22
  41:19 44:11,
  12 51:24
  53:12 55:8
  60:11,22
  65:10
answered
  29:11 37:7,
  18
answers
  7:9 12:16
  33:10
anybody
  14:19,21
  15:11 23:15,
  22,25 43:12
  60:15 62:23
  66:9,13,15
anyone
  14:25 15:22
  17:4 23:17
  24:11 42:7
  43:24
appears
  49:21 55:15
appreciate
  16:18
appropriate
  16:12
approval
  34:17

approximately
  19:15 22:3,
  15 30:24
  44:19 50:19
April
  8:9 13:9
  39:12 45:6
  48:20 51:11,
  12 52:13
  58:18 63:16
Arabic
  7:9,10,19
  12:9,15,16
  13:17 15:20
  27:23 32:8
  53:12 58:11
  65:18
area
  65:20
around
  13:3
arrangement
  42:13
asked
  11:23 12:7
  13:24 14:16
  18:11 25:15
  29:11 37:7,
  18 42:12
  54:12
asking
  10:8,9 19:10
  26:24 58:4
asks
  59:20
associated
  40:20
assume
  11:12
assumes
  20:8 21:23
  32:6 50:23
Ateyeh
  8:8 10:1,4
  11:1 12:1,3,
  8 13:1,10,
  15,20 14:1,

12,14 15:1
  16:1 17:1,2,
  11,15 18:1,
  20 19:1,21
  20:1 21:1
  22:1 23:1
  24:1 25:1
  26:1 27:1
  28:1,23 29:1
  30:1 31:1
  32:1 33:1
  34:1,24 35:1
  36:1 37:1
  38:1,15
  39:1,8 40:1,
  15 41:1,24
  42:1 43:1
  44:1 45:1,8,
  22 46:1,13
  47:1,16 48:1
  49:1,9 50:1
  51:1 52:1,14
  53:1,8 54:1
  55:1 56:1
  57:1 58:1,19
  59:1,19 60:1
  61:1,3 62:1
  63:1,19 64:1
  65:1 66:1
attachment
  54:18,21,24
  56:6
attempts
  44:10
attended
  63:4 64:21
attesting
  36:3
attorney
  11:21 14:18,
  21 15:14
  30:12 31:10,
  13,23 33:3,6
  46:4,6 48:2
  49:14 53:14,
  17 54:22,23
  55:24 56:21
  58:2,14

attorney's
  17:2,12
attorney-
client
  16:5,7
attorneys
  31:8,9,10
  32:12 54:3
August
  50:4,8 56:15
authority
  16:16,21
  17:5 23:3,
  15,18 24:5,
  12,16 25:2,
  21 26:4,11,
  18 27:2,10
  32:12 37:22
  42:8,16
  43:12,16,20
  44:2 48:4
  52:8 54:8
  59:24 60:16
  62:24 63:5
  66:6,10,14,
  16
authorization
  29:16,18
  30:7,13
  34:17
authorize
  35:18
available
  42:19
avoid
  38:17
aware
  8:4 12:3
  27:15 28:25
  36:7 37:4
  38:17 66:3,
  5,9,13,15
awareness
  36:10 37:15,
  21
AWNI
  7:8,10

**B**

back
  10:14 13:18
  18:12 28:20
  29:17 30:4
  32:23 33:5,
  9,15,16
  34:9,12,14,
  15,25 38:12
  40:4 45:15
  46:24 51:22
  52:20 66:25
Baloul
  15:8
based
  35:25
basis
  16:19 18:16,
  18
Bates
  45:20 49:8
begin
  8:21 10:9
beginning
  61:15
behalf
  8:12,18
  32:13 43:25
  59:22 60:15,
  18,20
behind
  62:11
believe
  17:15 45:21
  52:16,18
belongs
  54:7,9
below
  45:19
benefit
  59:23
Berger
  9:7 15:5
  24:20 25:9
  30:10 33:17,

  18 35:6,9
  62:19
Berger's
  15:8
besides
  51:19
best
  11:22 23:14,
  17,21,24
better
  47:8,10
BEZVERKHA
  38:4
bills
  15:23 16:10,
  22 17:7
bit
  32:16 37:13
  39:13 51:23
  63:12
blacked
  55:7
Boggs
  15:12
bottom
  39:22,23,24
  46:16 49:19
  56:13
box
  47:3
break
  11:20,25
  38:6 66:20
breaks
  11:19
Broad
  8:13
brother
  64:19,20
business
  12:18 20:13,
  15,16,20,25
  42:13
businesses
  20:7,9

**C**

California
  19:25 42:3
  44:14
called
  7:5 31:6
  40:6 61:4
calls
  21:16 32:5
  34:18,22
  35:6,7
Canada
  51:18,19
  57:12
case
  17:22 18:10,
  24 19:11,13
cases
  19:7
catch
  41:18
ceremony
  64:21
certain
  29:10
certainly
  30:3 41:16
Certification
  45:18 49:5
  52:25
certified
  29:9 36:24
  45:9
certify
  24:25 25:6
change
  51:24
changed
  46:5
characterized
  28:4
characterizing
  30:16

charge
  22:13
cities
  40:21
Civil
  8:25
claim
  18:3 19:12
claimed
  17:25 18:2
clarify
  18:23 30:3
clear
  13:19 25:25
  32:10 33:21
  36:14 37:4,9
  40:22,23
  42:11 59:25
  64:9 65:9
clearly
  40:24
client
  23:3,7,18,22
  24:2 32:17,
  23 34:15
  37:6,10,11,
  13,17,23
  38:24 49:14
  55:24 56:4,
  22 57:20
client's
  57:21
clients
  21:10,21
  22:16,19,24
  31:19,24
  35:18,22
  37:2 38:21,
  23 43:3,6,9
  44:17 54:12
  60:18
close
  65:19,23
closed
  27:24,25
  29:3 30:25
  31:3 42:15

closely
  63:12,13
Cohen
  10:8
colleague
  15:8
come
  10:14 31:15
  37:11
comes
  32:25 37:10
  38:24 43:3
  44:15
commanding
  13:12
committing
  58:21
communication
s
  15:4,7,10
  59:21 60:2,
  5,14
community
  22:11 31:17
  41:10
companies
  21:14
compensation
  43:16,20
compound
  25:9
conclusion
  34:22 35:7,8
  60:9
conduct
  12:18
confirm
  8:24
connection
  16:22 17:7,
  23 20:14
  32:17
consular
  24:15,19
  28:4,7
contact
  15:17 38:18,

25
contacted
  43:24
content
  47:14
Continue
  32:20
contracts
  36:19
conversation
  43:11
conversations
  8:5
convey
  34:16
copy
  13:11,14,24
  49:10 53:16
Corey
  8:11
corner
  46:17,21
correct
  17:17 26:15
  30:6 31:24
  46:14,18
  50:6,11
  53:19,22
  54:16,19
  55:17 56:15
  58:23 60:7
  64:9 65:7,10
  66:2
correction
  17:5
correctly
  30:19
Council
  61:4,7,12,
  18,21 62:2
counsel
  8:24 9:6
  10:20 11:13,
  14 13:2 15:4
  62:8
countries
  51:9,14

course
  16:19 55:4
  62:20
court
  10:16 11:5
  13:12 19:3
coversheet
  49:5,7
COVID-19
  8:23
creates
  33:25
current
  39:20
customer
  32:25
customers
  44:17
cut
  49:21

---

D

D.C.
  27:16 28:3
  29:2,5,9,22
  30:6,17,23
  31:14 32:2,
  18 33:4,24
  34:3,8,11
  35:21 36:5,
  8,11,15,19,
  23 37:5,16
  42:14,15
date
  39:24 49:21
  50:5 51:10
  61:16
dated
  54:15 55:16
  56:14
dates
  30:22
day
  52:16
deal
  31:15

Defendant
59:23
Defendant's
15:11
Defendants
9:7 15:5
Definitely
51:4
Delegation
39:10,17
Department
53:25 55:21,
25 56:18,21
departments
54:10
deponent
9:8
deposed
18:8
deposition
8:8 9:2
10:10 11:20
12:22 13:13
14:7,15,20
15:3 17:16
18:18 19:14
23:10
describe
31:6 46:2,20
47:5
described
36:2 44:4
63:22
describing
30:15
die
28:12
died
64:19,20
difference
20:12
different
9:6 16:20
28:25 37:13
direct
37:14

directly
31:16
disagreement
31:5
discovery
18:17
discuss
14:20
discussed
19:8
division
54:2
document
12:23,25
13:3 19:19
25:16 32:3
33:2,3,14,16
34:9,11
35:2,4,5,12,
16 38:16
39:7 40:23
43:25 44:15
45:8,10,15,
19,24 46:3,
13 47:14
48:10,24
49:8,11,17,
24 50:12,17
53:9 55:19
56:3,7,12,14
57:19 58:7,
10 60:25
documents
12:21 21:17
22:3 25:2,6
29:9 30:20
31:18 32:22
34:8 35:20,
22 36:3,24
44:5,6,7,20,
21 45:23
50:19 51:8,
17 52:3,7
55:21 58:9,
22,25 59:3,
10,11,12
60:4,7,18

doing
42:2
duly
7:6,17
duty
48:6

_____

E

earlier
54:25 56:7
easier
19:18
eight
40:11
either
19:7 24:12
25:2 31:15
33:2 53:25
Elizabeth
19:19 38:2
39:21 40:10
45:3,14 47:9
49:19 52:18
57:2,15
59:13 61:2
email
53:16,18,22,
24 54:6,11,
15,18 55:6,
15,16,20,21
56:14,17
emailed
65:2
embassies
50:21 51:8,
16,19
Embassy
48:5,7,8
50:14 53:15
Embassy's
34:14
employee
24:12 59:21
60:14
English
7:9,11

12:11,16,20
45:10,12,17
48:23 49:3
52:21
enlarge
47:7
enter
8:19 36:19
entity
58:5 61:4
established
42:17
estimate
44:18 50:25
events
63:4
everybody
45:14 64:15
evidence
32:7 50:23
exact
22:5
exactly
22:6 25:11
26:8 29:14
30:21 51:2
EXAMINATION
10:2
examined
7:18
excuse
10:23 18:15
23:16 30:10
38:3 51:15
52:20 53:3
66:14
Exhibit
13:8 39:11
45:5 48:19
52:12 58:17
63:15
exhibits
46:10
expect
42:4
explain
22:10 32:16

47:11

**extent**
44:10

---

**F**

**FA**
53:3
**FA001**
45:20
**FA001-T**
45:11
**FA0013**
49:8,10
**FA0013-T**
49:4
**FA002**
45:21 46:17
**FA002-T**
45:16
**FA0130**
53:7
**FA0130-T**
52:21
**FA0131**
52:20 53:4
55:15
**FA0131-T**
52:22
**FA0132**
53:5 56:13
**FA0132-T**
52:23
**FA132-T**
57:4
**facilities**
66:5
**fact**
46:16
**facts**
32:6 50:23
**fair**
22:7
**faithfully**
7:7

**familiar**
40:15 61:3
**family**
15:21
**father**
65:19,24
**favor**
22:11
**February**
54:15
**Federal**
8:25
**feel**
16:12
**fees**
16:15
**Fifty-two**
12:17
**figure**
64:15
**filed**
18:3 19:12
**financial**
42:13
**financially**
8:15
**find**
42:21 43:6
59:7,25
**fine**
38:8
**finish**
10:25 11:2
**fire**
18:2,3
**firm**
10:8 15:11
**first**
7:17 15:25
16:2 32:9
40:4 41:8
45:11,12
49:2 52:19,
21 55:11
59:20
**five**
61:22,23

**64:20**
**five-minute**
66:19
**fluent**
12:8,11
**follow**
16:25 17:11
**follows**
7:19 49:6
**forgot**
28:10
**form**
24:17 50:22
**foundation**
28:6
**Francisco**
43:10 64:21
65:20
**Fred's**
20:17,18,22
**free**
41:16
**friend**
15:21
**friends**
65:20,23
**friendship**
65:6,11
**Fuad**
8:8 47:16
**fulfill**
59:5
**full**
45:15
**fully**
12:4
**funeral**
64:21

---

**G**

**gain**
22:12
**Gassan**
15:8

**gave**
18:12
**general**
31:10 39:10,
17
**getting**
62:11
**give**
14:17 25:19
34:15 35:13
49:23 60:24
61:16
**given**
7:10 11:4
60:9
**giving**
32:23
**going**
11:18 12:21
13:4 16:4,25
17:11 18:15
28:24 38:6
39:7 40:11,
12,14 41:23
44:18 45:18
59:16,17
64:2
**good**
8:2 10:4,6
21:11
**government**
58:13
**granted**
27:10,13
**Great**
10:14 19:17
45:7 47:11
62:18
**Gresser**
10:8
**grounds**
16:5,8
**guess**
54:4,5

## H

**happened**
27:18,21
**happy**
13:2 34:2
**hard**
50:25
**HBDA**
7:8,10
**head**
11:7
**heading**
39:14,16
**held**
8:5 63:5
**help**
31:16
**high**
22:18 44:15
**hold**
21:18 27:9,
12
**hope**
11:18 33:9
**hoping**
32:15
**hour**
38:7
**hours**
62:11
**housekeeping**
8:22

## I

**Ianazzi**
8:18 9:4
46:11
**identificatio
n**
13:9 39:12
45:6 48:20
52:13 58:18
63:16

**identified**
55:11
**identifying**
33:18
**important**
10:19 11:4
28:11
**inaccurate**
57:24
**include**
60:4
**income**
22:9
**indication**
49:23
**indifferent**
25:23
**individual**
36:20
**individually**
20:6
**individuals**
21:14 26:12
33:7 36:23
63:22 64:2
**information**
38:18 55:11
**injury**
18:4
**instruct**
12:15 16:5
**instruction**
16:13,24
17:2,10,12
**instructs**
11:15
**intended**
25:16 35:23
**interact**
30:23
**interactions**
62:22
**interested**
8:15
**interpret**
16:2,3 24:21

**interpreter**
7:5,19 10:21
12:8,14
13:16,23
16:3 17:24
19:9 29:23
32:20 34:4
55:2 58:3,4,
15 63:17
**interrupted**
28:23

## J

**January**
51:23 52:2
62:2,5,23
63:4
**join**
24:20
**jurisdiction**
18:17
**jurisdictions**
20:3

## K

**keep**
45:18 59:11,
15,17
**kind**
26:11,14,25
27:6
**knew**
24:11 64:19
**know**
11:10,21
13:2 15:14
20:12,14
22:6 24:18
27:18 29:4,
5,7,14,15,
17,20 34:13
35:12,14
36:21 37:2,
3,20 40:25
41:6,24

42:5,16,19,
21,23,24
45:2 47:20,
23 48:5,6
50:25 51:25
54:5,9,21
58:25 64:3,
12,16,25
65:15,17
**knowledge**
23:14,17,21,
24 36:18,22
37:15,22
43:5
**known**
64:18

## L

**labeled**
45:11 52:19,
23 53:3
56:12
**lacks**
28:6
**land**
31:12 46:7
53:25
**lands**
53:15 55:22,
25 56:18,21
**language**
12:19 58:11
**laptop**
28:11
**large**
46:25
**lastly**
11:18
**law**
10:7 15:11
35:5
**lawyer**
14:11,13
**leading**
35:10

Fuad Ateyeh
April 08, 2021

led
  58:11
left-hand
  46:21
legal
  8:12,18
  15:23 16:22
  17:7 25:6,17
  29:10 34:22
  35:6,7 60:9
lended
  18:11
lent
  18:12 19:11
lets
  45:13
letter
  55:12
Liberation
  17:5,6 23:6,
  11
licensed
  19:21,24
  20:2
licenses
  27:9,12
life
  41:9
line
  55:6 56:25
  57:5,19
liquor
  20:17,18,19,
  20,22
list
  40:20 42:8,
  17,19,22
  43:7,13,17,
  22 63:21
  64:2
listed
  41:3,7,25
little
  32:16 37:13
  39:13,22
  44:4 51:23
  63:12,13

live
  65:20
lived
  12:12
loan
  18:14,25
locate
  14:17
located
  8:13
locations
  9:6
long
  11:19 12:12
  30:20 64:18
look
  14:16 39:5
  48:21 59:8
  63:25
looked
  48:22
lower
  46:21
lunchtime
  62:12

———————————

M

make
  10:17 19:18
  48:17 62:16
makes
  16:15
Mansour
  64:10,12
  65:12
March
  39:25
marked
  13:8 39:11
  45:5 48:19
  52:12 58:17
  63:15
marking
  46:10
matter
  7:6 8:10

15:23 16:22
  17:8
mean
  16:11 24:19
  26:21 30:20,
  21,22 35:15
  38:23 40:23
  55:9
meaning
  46:5
meant
  58:6
measure
  8:22
meet
  14:19,23
meeting
  14:11
member
  61:11,17,20
Mexico
  47:13 48:8
  50:14 51:9,
  20 57:7,10,
  11
middle
  40:6
mind
  34:5 38:5
minute
  28:16
minutes
  62:16
mislead
  39:19
misleading
  60:9,20
Mission
  24:2 33:21
  47:13 52:4
  63:9,20,22
  66:4,11
mistaken
  58:11
Mitch
  15:5

mixed
  57:11
moment
  17:16 25:19
  34:7 38:4
  48:16 60:24
  66:21
money
  18:11,12,21
  19:12 22:12
months
  44:19
morning
  10:4,6
motion
  41:17,22
move
  13:3 18:19
  41:11,14,20

———————————

N

Nadya
  64:5
name
  8:11 10:7
  20:16 38:18,
  25 41:3,7,24
  42:5,20,24
  43:13 47:17
  57:9,19,20,
  21 64:5
names
  42:19 63:14
  64:9
National
  61:4,6,12,
  18,21 62:2,8
Nations
  23:25 52:4
  63:21 64:14
nature
  18:24
need
  11:20 12:24
  13:17 32:3
  53:12 65:9

**never**
18:12 33:7
42:6,23
65:22
**nodding**
11:7
**non-party**
35:10
**nonresponsive**
41:15
**notaries**
36:20
**notarization**
20:13
**notarize**
21:16 22:4
24:25 25:5,
15 31:19,23
32:11 33:2
43:25 44:5,
6,15 54:2
**notarized**
31:22 32:3,
11,22 44:8,
20,21 46:14
48:11 49:14,
17,24 50:9,
13,17,20
51:7 52:3,7
55:24 60:7
**notarizing**
21:19 56:22
**notary**
7:6,17 19:21
20:5,22
21:2,4,7,13
22:7,13,16,
19,24 24:4,
7,10,24
32:10 36:11,
16,20 38:19
40:6,19
42:2,9,17
43:9,21
44:13 47:15
54:12 60:18
66:17

**note**
12:7 56:24
**noted**
41:22
**notion**
58:12
**number**
22:5
**numbered**
46:17 49:4,8

---

**O**

**object**
11:14 15:25
16:4,19
18:15 24:17
33:19 44:9
50:22
**objection**
11:17 15:24
16:12,24
17:9,10 20:8
21:23 22:22
24:20 25:8,
9,23 26:13
28:6,24
29:11,24
30:11 32:5,6
33:17 34:18,
21 35:6,9
37:7,18
57:24 60:8,
19
**objects**
16:16
**Observer**
63:20
**occasion**
18:7 24:25
25:5,13
29:21 30:5,
23
**occasionally**
25:15
**occasions**
10:12 17:17

19:5
**occupied**
66:6
**occurred**
49:23 50:3
**October**
59:25 60:17
**offer**
20:5 21:4
36:20
**offered**
36:8,11,15
**offers**
20:22,25
**office**
27:16,19,22,
24 28:3
29:6,9,15,22
30:6,17,23
31:3,14
32:3,18
33:4,9,24,25
34:3,8,11
35:22 36:5,
8,11,15,19,
23 37:5
42:14,15
44:14 52:8
54:7 58:5,6
59:9
**offices**
29:2 60:6
66:5
**official**
24:11,25
**okay**
11:12 12:2
13:22 14:19
16:4,23 17:9
20:25 23:12
26:24 28:15,
17 30:14
31:4,21
34:16 35:3,
20,25 36:7,
18 37:21,25
38:9 39:2,5,
6,19 40:9,18

41:3 46:8,12
47:24 48:17
49:16 50:5,9
51:7 52:2
55:5,13
56:6,10
60:24 61:10,
11 62:21
64:4,8,12
65:2,9,14
66:3,22
**once**
19:6
**one**
8:21 10:22
11:9,23
17:19,25
18:11 20:6
28:25 31:11,
19,24 42:20
46:22 52:22
53:2 54:9,12
56:11 59:15
65:19
**ones**
55:9
**open**
44:14
**opposed**
21:14 58:13
**Organization**
17:6 23:6,11
**organizations**
21:15 62:7
**organize**
47:14
**original**
45:19 49:7
57:16
**outcome**
8:16
**outside**
18:16 22:20,
25 50:21
**owned**
66:5

**P**

**page**
39:20,22
40:5,6,18
41:4,7,8,25
42:5,6
45:11,12,16,
21 46:17
47:18 49:2,
4,6,10,20,
22,23 52:21,
22,23,24
53:2,3,4
55:14 56:12
57:3,17
59:14,15
63:19,22

**pages**
40:11,12
45:13,23
52:14,19
53:6

**Paik**
9:8 14:10
15:14,15,18,
19,24 16:4,
9,11,23
17:9,24
18:15 20:8
21:23 22:22
24:17 25:8,
23 26:13
27:23 28:6
29:11,24
32:5 33:19
34:18,21
37:7,18 38:5
41:11,14,18
44:9 50:22
54:4 55:8
57:23 58:8
60:8,19
62:10,18

**Palestine**
35:23 36:4
44:6,8,16,21

55:25
**Palestinian**
16:16,21
17:4,6 22:16
23:3,6,11,
15,18,25
24:5,12,16
25:2,6,17,21
26:4,11,18
27:2,10
35:5,19
37:22 42:7,
16 43:12,16,
20,25 47:12
48:3,8
50:13,20
51:8,16
52:4,8 54:7,
10 56:18
59:24 60:16
61:4,6,9,10,
12,18,21
62:2,7,24
63:5,20
64:13,22
66:6,10,14,
16

**Palestinians**
44:17

**palus@mfae.
gov.ps**
53:22

**palus@mofa.
pna.ps**
55:16

**Pandemic**
8:23

**papers**
14:17 29:21
30:5,15,17
31:5,7 32:11
43:4

**Parliament**
61:8,9,11

**part**
33:8 41:19
54:25 56:7,
24 62:6

**Participants**
8:3

**particular**
21:17,21

**parts**
44:11

**Party**
8:14

**Patton**
15:12

**paying**
15:22 16:10,
14,21 17:7

**payment**
66:14,16

**people**
42:4,25 43:2

**percent**
22:15 33:6,
13 44:23,25

**percentage**
22:18 44:19

**percentages**
44:16

**performed**
43:21

**performing**
66:17

**periodic**
11:19

**permanent**
63:20 64:15

**permission**
42:8

**person**
10:22 18:11
35:18 41:10
42:21 44:14
47:25 59:22

**personal**
18:4,14,25
55:10 65:6,
11

**personally**
64:16 65:15

**phone**
47:21,23

59:10
**picture**
37:9

**please**
8:18 11:10,
21 13:6
15:20 17:24
24:21 25:19
27:23 28:16
29:12 31:6
32:8 34:4
38:3 45:4
46:2 48:16,
18 49:2,18
52:11 53:13
56:12 57:3,
15 58:16
60:24 63:11
65:18

**PLO**
8:11 23:10,
22 24:8,13,
16 25:3
27:5,6,13,15
28:3 29:2
32:22 33:14,
15,20,21,22,
25 34:17
37:16 38:19
39:3,4,10,16
42:7,14,17
43:12,17,21
44:2 48:4
52:9 54:8
59:24 60:16
62:8,24
63:6,9 66:6,
10,16

**PLO's**
29:22 30:6,
17,23 31:14
32:2,18
33:23 34:8,
10 35:21
36:5,8,11,
15,19,22
37:5

plow
  62:13
plug
  28:11
plural
  50:24
popular
  42:4
portion
  22:8 44:9
  55:5 57:4,6,
  9,18
Power
  30:12 31:7,
  8,9,10,22,23
  32:12 33:3,6
  46:4,5 48:2
  49:13 53:14,
  17 54:2,22
  55:24 56:20
  57:25 58:13
Powers
  31:13
practice
  35:25
premised
  58:12
prepare
  14:6,14
previous
  17:17
primarily
  21:13
printout
  39:8
prior
  15:3
privilege
  16:5,7
probably
  66:20
procedure
  8:25 46:11
proceeding
  8:4 9:3
  10:19 25:17

proceedings
  8:19 25:7
  29:10
process
  10:15 32:14
  44:4 46:9
produce
  58:21
produced
  45:9,20,24
  48:24 49:11
  54:24 56:7
  58:25 60:5
production
  49:9 52:15
  53:3 54:25
  56:8
property
  31:11
propounded
  7:8
provide
  25:21 26:4,
  11,18 27:6
  28:3
provided
  24:4,7,10,15
  29:2 36:4
providing
  24:24 27:3
public
  7:6,17 19:22
  20:5,23
  21:2,4 32:10
  40:19 42:2,9
  43:9 44:13
  47:15
publics
  21:7 40:6
  42:18
purposes
  44:7 54:23
pursuant
  8:24 14:3
  43:22
put
  13:5 42:5

45:4 53:15
57:23 63:11
putting
  12:22

_____

Q

question
  11:3,11,15,
  16,24 16:20
  17:13 18:21
  19:10 20:11
  21:11 24:18,
  22 25:9 26:2
  27:5 28:24
  29:12 30:18
  32:9,21,24
  33:10,20
  34:5,6,10
  37:13,14
  41:20,23
  44:10 46:9
  50:23 57:8,
  13,18 58:4
  60:8,19,21
questions
  7:8 10:9,25
  11:6,10,14
  12:4 13:16
  42:12 62:19
quibbling
  58:8
quick
  28:9 45:13
quickly
  48:17,22,25
  59:19

_____

R

rank
  48:6
Rasheed
  64:5,10
  65:14,24
re-ask
  34:6

read
  34:4 40:24
  63:14,17,18
real
  28:9
realize
  46:9
realized
  28:10
reason
  12:3
reasonable
  18:16
receive
  35:13
received
  13:14,24
  15:15 43:15,
  19 52:15
  58:20
receives
  66:13,15
receiving
  60:17
recent
  17:19
recess
  28:19 38:11
  66:24
recognize
  45:23 49:10
  53:9 64:5
recommend
  36:24
recommended
  15:21 37:17,
  23 42:17
recommending
  37:5
record
  8:3,7,20
  10:18 28:14,
  16,18,21
  33:19,21
  38:10,13
  41:17 57:23
  66:21,23

**recorded**
8:4,5
**recover**
18:24
**recovering**
18:14
**rectangle**
46:25
**redacted**
47:3 55:6,10
56:25 57:4,
9,18
**redaction**
55:10 57:6
**refer**
23:10 34:2
36:23
**referred**
34:7 37:17,
23
**referring**
19:11 25:12
26:8 33:23
37:6 46:23
48:7 65:24
**regarding**
38:19 60:5
**related**
8:14
**relating**
61:25
**relationship**
65:6,12
**relevance**
16:19
**relevant**
16:14,15
**reminder**
10:16
**remote**
8:7,12,19
**remotely**
8:23
**renting**
17:25
**repeat**
19:10

**rephrase**
11:11 21:12
22:23 25:25
**reporter**
8:17 10:16
11:5
**representativ
e**
59:22 60:15
**request**
8:6 11:22,23
56:3,22
59:17,20
60:9,10
**requested**
13:15
**requests**
59:5
**reside**
22:24
**residential**
18:5
**respect**
45:22
**respond**
11:6
**response**
59:2
**responsible**
47:13,25
**responsive**
41:20 59:4
**rest**
9:5
**returned**
48:13
**right**
11:25 12:7,
18 13:11
14:2 19:13
22:19 29:5
40:4,18 41:6
47:2,5 58:6
60:13 65:5
**right-hand**
46:17

**Riyad**
47:17
**Ron**
10:7
**Rule**
8:25
**Rules**
8:25

---

**S**

**San**
43:9 64:21
65:20
**save**
32:15
**says**
30:11 39:10
**scattered**
9:5
**scope**
18:16
**screen**
12:23
**scroll**
39:21 40:10
45:13 49:18,
19 52:18
53:6 56:11
57:3,16
59:13 63:12
**scrolling**
40:14
**seal**
46:16 47:5,
11,15 50:6
**sealed**
50:7
**seals**
46:20,22,24
47:2 49:22
50:2
**search**
14:16 59:3
**searched**
59:6,9,10

**second**
28:10 41:9,
12,15,19
45:16 52:21
**section**
40:5,12,19
**see**
12:24,25
13:10 16:14
33:7 39:9,
14,16,24,25
40:2,5,7,20,
21,25 41:2,3
45:15 46:24
47:3,10,17,
18 49:16
63:23
**seeking**
18:24
**sell**
46:6
**selling**
31:11,12
**sells**
20:20
**send**
29:15,16,18,
19,21 30:5,
17 31:8,13
32:21 33:5,
8,9,14,15
34:14,25
35:18,21,23
46:12 48:10
53:14,17
54:11 55:19,
20 57:7,10
59:7
**sending**
33:16 34:7,
9,12 60:17
**sends**
37:2
**September**
55:17
**service**
22:11 31:7

Fuad Ateyeh
April 08, 2021

36:4

**services**
20:6,23
21:2,4,13,22
22:8,13
24:4,7,11,
16,19,24
25:21 26:5,
12,13,18
27:3,7 28:4,
5,8 29:2
36:7,12,16,
20 38:20
43:6,21
64:22 66:17

**seven**
40:11

**several**
40:12

**Shatsky**
8:10

**short**
28:19 38:11
66:24

**shorthand**
23:9

**show**
12:23 13:3
38:15 39:7

**showing**
12:21 13:11
45:8 58:19

**sign**
29:16,19,20
31:8,15,16,
17 32:13,25
34:25 43:3

**significant**
22:8

**signing**
48:2

**similar**
42:12 48:22,
24

**sir**
10:6 17:18
18:6 40:8

**start**
10:25 17:19
46:25 64:8

**starting**
33:11

**state**
19:25 41:16
42:3 44:13

**stated**
55:11 60:10

**statement**
8:19

**States**
12:12 16:17
22:20,25
25:22 26:5,
12,19 27:3,7
33:22 39:10,
17 42:18
50:16,21
52:5,9 62:25
63:6 66:7,
11,17

**step**
30:4 46:24

**stipulating**
8:24

**stop**
28:9 46:8
61:20

**straight**
29:13

**Street**
8:13

**strike**
20:15 25:14
31:22 41:12,
14,21

**subject**
55:6 56:24
57:5,19

**Subpoena**
13:11,14,24
14:4 15:15
58:20,21,22
59:2,4

**Substantive**
59:17

**sued**
18:13

**summarize**
44:10

**Support**
8:13,18

**sure**
10:17 62:16

**sworn**
7:6,17

---

**T**

**Tab**
13:5,8 38:2,
3 39:5,11
45:4,5
48:18,19
52:11,12,14
58:16,17
63:11,15

**tabs**
40:20

**take**
11:19,25
19:19 30:20
33:2,3,5,7
38:5 45:3
51:22 60:25
63:25 66:19

**taken**
9:2,4 10:10
17:16 19:14
28:19 38:11
63:19 66:24

**taking**
11:5

**talked**
46:10

**talking**
14:10 58:9

**Team**
63:23

**technician**
8:12

**start**
48:9,12,15
55:18 56:2,
5,16,19,23
58:15 61:24

**situation**
55:23

**slightly**
32:24

**slow**
45:15 52:20

**sort**
34:17

**speak**
10:21

**speaking**
14:13

**speaks**
10:22

**Special**
47:12

**specialty**
21:18

**specific**
30:7 31:11
46:4 54:22
61:16

**specifically**
46:6 59:8

**speculation**
32:6 34:19

**spoke**
14:12 64:23
65:21

**spoken**
64:25 65:22

**sponsored**
63:5

**Squire**
15:12

**stamp**
34:13,14,16
47:15 48:14

**stamped**
35:17,21
45:20 50:7

**stamping**
36:3

Fuad Ateyeh
April 08, 2021

tell
  22:5 42:25
  49:16 50:2
tells
  38:24
ten
  42:3 51:3
  62:15
tenant
  18:5
tenants
  17:25
testified
  7:18 17:15
  19:3
testifying
  14:3
testimony
  14:20
Thank
  9:9 10:4
  19:20 28:22
  31:4 38:14
  46:12 57:22
  58:15
thing
  29:15 41:9
think
  17:21 19:6,
  19 34:22
  38:6 50:4
  51:3,5,6
  66:20
three
  46:22 52:14,
  19 62:11
Thursday
  8:8
time
  8:9,17 10:22
  11:21 25:24
  28:18,21
  32:16 38:10,
  13 64:23
  65:21 66:23
time-period
  29:25 30:16

  51:22 61:14
  63:3
timeframe
  30:19,21
  51:20
timestamped
  39:25
titled
  49:7
today
  8:8 10:5,9,
  17 11:19
  12:4,8 13:13
  14:3,7,15,20
  15:3,5 51:11
today's
  9:2
top
  39:9 47:2
transcribed
  11:8
transcribing
  10:16
translate
  7:7
translated
  13:18 52:19
  57:5 58:10
translating
  13:16
translation
  30:11 45:10,
  12,17 48:23
  49:3 52:22,
  23,25 57:3,
  6,24 58:9
translator
  30:11 45:18
  49:4 58:10
trusted
  41:10
try
  11:2,10
  21:12
trying
  14:17 48:17
  63:18

turn
  11:2
TV
  64:14
Twice
  10:13
two
  17:17 19:7
  31:9 45:23
  46:24 50:7,
  10 53:6 64:9
type
  17:22 18:10
types
  21:10,17,21
  31:9
typically
  12:19 35:22

────────────

U

U.S.
  8:12,18
UN
  63:8 66:4,11
understand
  9:4 11:9
  13:19 20:10
  25:11 26:20,
  22 27:24
  30:18 32:14,
  19 33:11
  35:15 37:12
  38:22 39:2
understanding
  14:2 27:21
  28:2 29:8
  32:15 35:4
  36:2,14 54:6
understands
  28:7
understood
  11:12,17
  33:24
United
  12:12 16:17
  22:20,25

  23:25 25:22
  26:5,12,19
  27:3,7 33:22
  39:10,17
  42:18 50:16,
  21 52:4,9
  62:24 63:6,
  21 64:14
  66:7,10,17
UTC
  8:9 28:18,21
  38:10,13
  66:23

────────────

V

valid
  35:2,3,5,16
various
  40:21 60:6
verbally
  11:6
version
  57:16
versus
  8:11
video
  8:12
video-
recorded
  8:7
videoconferen
ce
  9:3 10:19
VIDEOGRAPHER
  8:2 28:13,
  17,20 38:9,
  12 66:22,25
view
  47:8
VINCENT
  13:7

────────────

W

Wainaina
  8:11

Fuad Ateyeh
April 08, 2021

**wait**
  10:22,24
  11:2
**walk**
  48:25
**want**
  12:15 15:25
  22:10 28:13
  37:10 42:11
  59:16,18
**wanted**
  18:23
**Washington**
  27:16 28:3
  30:17 31:14
  32:2,18
  33:4,24
  34:3,8,11
  35:21 36:5,
  8,11,15,19,
  23 37:5,16
  42:14,15
**way**
  39:23 53:18
  58:10
**web**
  39:20
**website**
  38:18,25
  39:2,3,8,9
  40:16,19
  42:9
**weeks**
  50:8,10
**well-known**
  41:9
**went**
  64:22
**Whomever**
  21:16
**Wick**
  8:21 9:9
  10:3,7 13:5
  16:7,10,18
  19:18 22:23
  24:21 25:25
  26:15 28:9,

15,22 30:2,
14 33:23
34:6,20
38:2,8,14
39:13,21
40:10 41:13,
16,22 44:12
45:3,7,14
46:8 47:9
48:18 49:18
52:11,17
53:12 55:13
56:11 57:2,
15 58:16
59:13 60:25
62:15,21
63:11,18
65:18 66:19
**wife**
  14:24,25
**witness**
  7:16 16:6
  28:7 34:3,
  20,23 35:10
**Witness's**
  30:2
**word**
  30:12 50:24
  57:25 58:13
**work**
  21:8 61:25
  62:6
**working**
  30:2
**works**
  23:15,18,22,
  25 48:5 66:9
**wrap**
  62:17

---

**Y**

---

**year**
  22:4 30:24
  50:20 51:8
  65:3

**years**
  12:17 42:3
  61:22,23
  64:20
**yesterday**
  52:16
**York**
  8:13,14 9:5
  63:9 66:4

---

**Z**

---

**zoom**
  39:13,14
  63:13