UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MIRIAM FULD, et al.,

                    *Plaintiffs*,

     v.

PALESTINE LIBERATION ORGANIZATION,
et al.,

                    *Defendants*.

Case No. 20 Civ. 3374 (JMF)

---

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW
IN OPPOSITION TO MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

THE LAW OFFICE OF JEFFREY
FLEISCHMANN, P.C.
Jeffrey Fleischmann, Esq.
150 Broadway, Suite 900
New York, NY 10038
Tel: 646-657-9623
Email: jf@lawjf.com

THE SILVERMAN LAW FIRM
Samuel Silverman, Esq.
16 Squadron Blvd.
New City, NY 10956
Tel: 845-517-0351
Email: silvermans@silvermanlaw.net

*Counsel for Plaintiffs*

THE LAW OFFICE OF ALLEN SCHWARTZ, ESQ.
Allen Schwartz, Esq.
2635 Nostrand Ave.
Brooklyn, NY 11210
Tel: 347-460-5379
Email: allen@allenschwartzlaw.com

*Of-Counsel to The Law Office of Jeffrey Fleischmann, P.C*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      The Allegations Satisfy the PSJVTA......................................................................... 3

      A.      Subparagraph (1)(A) ....................................................................................... 3

      B.      Subparagraph (1)(B) ....................................................................................... 4

II.     The PSJVTA Does Not Violate the Due Process Clause .............................................. 13

      A.      The PSJVTA Gave Defendants Fair Warning ...................................................... 14

      B.      The PSJVTA Reasonably Advances Legitimate Government Interests.............. 14

      C.      Defendants' "Reciprocity" Argument is Meritless ................................................ 17

      D.      Defendants' Fallback Arguments Are Meritless.................................................... 20

III.    The PSJVTA Does Not Invade the Judicial Power ....................................................... 25

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (2d ed. 1990) ................................. 17

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755 (Fed. Cir. 2016) ......................... 19

*Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016) ...................................................... 24

*Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172 (D.D.C. 2004) .................... 25

*Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020) .......................................... 11

*BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790 (7th Cir. 2014) ..................................... 19

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773 (2017) ............................. 22

*Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) .................................. 19

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ........................................... 13, 19

*Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78 (2d Cir. 2016) ..................................... 10

*Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492 (2d Cir. 2020) ........................................ 19

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...................................................... 25

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................................ 13

*Daimler A.G. v. Bauman*, 571 U.S. 117 (2014) ...................................................... 20

*Dep't of Navy v. Egan,* 484 U.S. 518 (1988). ...................................................... 15

*Dickerson v. United States*, 530 U.S. 428 (2000) .................................................. 25

*DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81 (2d Cir. 2001) ...................................... 3

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ...................................................... 22

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161 (2d Cir. 2015) .................................... 2

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ................................................. 11

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017 (2021) ............................ 22

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.* (U.S. Mar. 6, 2020) ................................ 16

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ......................................................................... 16

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211 (4th Cir. 2019) .................................... 19

*Heller v. Doe*, 509 U.S. 312 (1993) ............................................................................................. 15

*Hoellen v. Annunzio*, 468 F.2d 522 (7th Cir. 1972) ...................................................................... 8

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................................... 15

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) ............. 14

*J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011) .......................................................... 22

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) ..................................................................... 15

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) .................................................................. 15

*Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Feb. 15, 2019) ........................................ 14

*Klieman v. Palestinian Auth.*, No. 15–7034 (D.C. Cir. March 13, 2019) .................................... 16

*Klieman v. Palestinian Authority*, 923 F.3d 1115 (D.C. Cir. 2019) ............................................. 7

*Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44 (2d Cir. 1991) .................................................... 7

*Knox v. Palestine Liberation Org.*, 229 F.R.D. 65 (S.D.N.Y. 2005) ............................................ 17

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ............................................ 22

*Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882 (S.D. Tex. 1993) ........................................ 18

Lucinda A. Low, *et al.*, *Int'l Lawyer's Deskbook* 298 (2d ed. 2002) ........................................... 4

*MacDermid, Inc. v. Deiter*, 702 F.3d 725 (2d Cir. 2012) ............................................................. 3

*Machleder v. Diaz*, 801 F.2d 46 (2d Cir. 1986) ........................................................................... 18

*Madden v. Cowen & Co.*, 576 F.3d 957 (9th Cir. 2009) ................................................................ 6

*Meese v. Keene*, 481 U.S. 465 (1987) ............................................................................................ 7

*Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265 (D. Md. 1981) ............................................ 18

*Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311 (1964) ................................ 14

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) ...................... 20

*Patchak v. Zinke*, 138 S. Ct. 897 (2018) ........................................................ 15

*Rine v. Imagitas, Inc.*, 590 F.3d 1215 (11th Cir. 2009) ....................................... 6

*Rising v. Brown*, 313 F. Supp. 824 (C.D. Cal. 1970) ........................................... 8

*Roell v. Withrow*, 538 U.S. 580 (2003) ......................................................... 14

*Sanchez-Ramirez v. Consulate Gen. of Mexico*, No. C 12-3485 PJH, 2013 WL 4013947 (N.D. Cal. Aug. 5, 2013) .......................................................................... 6

*Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191 (2d Cir. 2015) ............... 18

*Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), D.E. 935-1 (Aug. 10, 2015) .... 16

*Stone v. INS*, 514 U.S. 386 (1995) .............................................................. 12

*Sullivan v. Finkelstein*, 496 U.S. 617 (1990) ................................................. 11

*Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367 (S.D.N.Y. 2001) ............................. 17

*Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659 (2d Cir. 2013) ............................. 3

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*, F.3d 296 (D.C. Cir. 2005) .................. 23

*Trainmen v. Toledo, P. & W.R. Co.,* 321 U.S. 50 (1944) ....................................... 15

*Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76 (D.R.I. 2001) ................................ 25

*United States v. Aguilar*, 515 U.S. 593 (1995) ................................................ 11

*United States v. Ali,* 718 F.3d 929 (D.C. Cir. 2013) ......................................... 23

*United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017) .......................................... 18

*United States v. Palestine Liberation Org.*, 695 F. Supp. 1456 (S.D.N.Y. 1988) .............. 12

*United States v. Smith,* 499 U.S. 160 (1991) ................................................. 13

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ......................................... 23

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) ...................................... 23

*W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648 (1981) ............... 23

*Waite v. All Acquisition Corp.*, 901 F.3d 1307 (11th Cir. 2018) ................................ 19

*Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) ........................................... 1

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) ............................................ 12

*Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932 (2015)..................................................... 14, 24

*Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214 (1992) ................ 9

## Constitutional Provisions

U.S. Const. art. III, § 2 ......................................................................................................35

## Statutes

15 U.S.C. § 381 .............................................................................................................. 9

18 U.S.C. § 2333 .................................................................................................. 1, 6, 8, 11

18 U.S.C. § 2334(e)(1) ................................................................................................ 1, 3

18 U.S.C. § 2334(e)(1)(A) ............................................................................................... 3

18 U.S.C. § 2334(e)(1)(B) ............................................................................................... 4

18 U.S.C. § 2334(e)(3).................................................................................................... 4

18 U.S.C. § 2334(e)(3)(B)............................................................................................... 7

18 U.S.C. § 2334(e)(3)(F) ............................................................................................... 9

18 U.S.C. § 2334(e)(4)............................................................................................... 12, 13

22 U.S.C. § 5201(b) ..................................................................................................... 20

22 U.S.C. § 5202 .......................................................................................................... 20

## INTRODUCTION

At issue is remedial legislation that Congress enacted and then amended in response to *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016), *on motion to recall mandate*, 925 F.3d 570 (2d Cir. 2019), *vacated*, 140 S. Ct. 2714 (2020), and similar cases in the D.C. Circuit. Lead sponsors of the legislation explained why Congress acted: Senate Judiciary Committee Chairman Grassley, the original sponsor of the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, said that the decisions "nullified the fundamental purpose of the ATA, to protect Americans wherever in the world they may be," and "disrespected Congress's power to protect U.S. citizens and U.S. interests." 165 Cong. Rec. S7182 (Dec. 19, 2019). House Judiciary Committee Chairman Nadler said that the courts had "wrongly" concluded "that the district court lacked personal jurisdiction" and that the remedial legislation would "secure a measure of justice for terrorism victims." 164 Cong. Rec. H6617–18 (July 23, 2018).

The legislation gave the PLO and PA a clear choice: they would subject themselves to personal jurisdiction in civil ATA cases if, following the law's effective date, they: (A) continued paying the designees of terrorists who murdered or injured U.S. citizens; or (B) failed to limit their U.S. presence and activities to official business of the United Nations. *See* 18 U.S.C. § 2334(e)(1). And Congress instructed that the law be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." Promoting Security and Justice for Victims of Terrorism Act, Pub. L. No. 116-94, § 903(d)(1)(A) (18 U.S.C. § 2333 note) (PSJVTA).

Defendants admit that their conduct meets the pay-for-slay provision. They deny that their conduct meets the U.S. presence and activities provision, but their arguments—that their Upper East Side townhouse is not "in the United States," and that appearing at university seminars and notarizing birth certificates is "official business of the United Nations"—cannot be taken seriously.

Defendants focus on trying to have the statute declared unconstitutional, claiming that Congress may not specify conditions under which a defendant consents to the exercise of personal jurisdiction unless that defendant "enters a '"bargain" with the state' whereby it consents to personal jurisdiction in exchange for permission to engage in conduct that the state could otherwise prohibit." Br. 7. But that is not the law. Consent does not require "reciprocity," and due process is met when the defendant has fair warning of the conduct that will be deemed consent to jurisdiction and a reasonable relationship exists between the statute in question and a legitimate governmental objective. The PSJVTA easily meets those requirements.

The nature of defendants' position here is extraordinary. Congress, exercising its constitutional duty to make laws concerning foreign affairs and national security, enacted a statute focused on the conduct of a foreign government in order to promote U.S. national security and U.S. foreign policy. Now, that same foreign government—having flaunted the U.S. national security and foreign policy goals of ending institutionalized payments rewarding terrorists and compensating terror victims—asks this Court to hold that the political branches exceeded their constitutional powers. Defendants cite no case holding a federal statute unconstitutional at the behest of a foreign government, and we have been unable to find one. Defendants would have this Court be the first to do so, providing them with immunity for their involvement in terror attacks that left a U.S. citizen dead by crafting a new constitutional rule that departs from well-established standards. The Court should decline the invitation.

## LEGAL STANDARD

At the pleading stage, in order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff "must make a prima facie showing that jurisdiction exists." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015). Courts may rely on materials outside the

pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

## ARGUMENT

## I.    The Allegations Satisfy the PSJVTA

The PSJVTA contains two operative provisions, codified at 18 U.S.C. § 2334(e)(1). To consent to jurisdiction, a defendant need engage in an activity after the law's effective date that satisfies either one of the two provisions. Defendants satisfy both.

### A.    Subparagraph (1)(A)

A defendant (as defined) "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after April 18, 2020, it "makes any payment, directly or indirectly—"

> (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or
>
> (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual … .

18 U.S.C. § 2334(e)(1)(A). Defendants do not contest the allegations that they have engaged in conduct that meets these elements. Am. Compl. ¶¶ 31-67. Defendants have a longstanding practice pursuant to which they provide monthly payments and other benefits to designees of Palestinians imprisoned for murdering or injuring civilians in terror attacks and to the families of suicide terrorists. *Id.* ¶¶ 32-44. They have elected to give up hundreds of millions of dollars in U.S. foreign

assistance in order to continue that practice. *Id.* ¶¶ 45-53. Notwithstanding this substantial financial cost, defendants have confirmed numerous times that the payments have continued past the April 18, 2020 trigger date. *Id.* ¶ 54. These payments have gone to at least 200 prisoners, and to the families of at least 60 suicide terrorists, who murdered or maimed U.S. nationals. *Id.* ¶¶ 55-67.

### B.    Subparagraph (1)(B)

Subparagraph (1)(B) separately provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after January 4, 2020, the defendant

> (i) continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States; * * * or,

> (iii) conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority.

18 U.S.C. § 2334(e)(1)(B). Subparagraph (B) is subject to several exceptions, including:

> (A) any office, headquarters, premises, or other facility or establishment used exclusively for the purpose of conducting official business of the United Nations;

> (B) any activity undertaken exclusively for the purpose of conducting official business of the United Nations; * * * or,

> (F) any personal or official activities conducted ancillary to activities listed under this paragraph.

18 U.S.C. § 2334(e)(3). Three categories of post-enactment conduct meet these statutory terms.

**1. "Consular" Activities.**—For many years, defendants' Washington, D.C. office provided what defendants called "consular services"—that is, they legalized documents for use in territories administered by the PA. Am. Compl. ¶ 69. As part of this offering, defendants authorized a network of notaries across the United States to carry out such legalizations, and publicized their names. *Id.*; *see generally* Lucinda A. Low, *et al.*, *Int'l Lawyer's Deskbook* 298 (2d ed. 2002) ("[t]raditional [l]egalization" of documents for use abroad involves a series of "certification[s],"

the first of which is execution "before a notary").[1] In support of their motion to dismiss, defendants filed deposition transcripts of two of these authorized notaries, which they contend demonstrate that there were no "consular" activities on their behalf in the United States after the PSJVTA. Br. 22-23. That is incorrect. Resolving all potential factual disputes in plaintiffs' favor, *see In re Terrorist Attacks*, 714 F.3d at 673, the facts are as follows:

1. Before 2018, defendants' Washington, D.C. office "assist[ed] Palestinians in the US with Consular Service, such as Power of Attorney documents, Birth and Death certificates and other forms." Gen'l Delegation of the PLO, FARA Supp. Statement, p. 4 (Oct. 9, 2018) (Fleischmann Decl. Ex. D). As Fuad Ateyeh testified, "attesting to documents for use in Palestine was a service that was provided by the PLO's Washington, D.C. office." Ateyeh Dep. 36 (*Id.* Ex. N).

2. Defendants' pre-2018 website listed eight notaries as part of their so-called consular-service offerings, including Fuad Ateyeh (San Francisco) and Awni Abu Hdba (Patterson, New Jersey). *Id.* Ex. C. These individuals notarized documents "in connection with the Palestinian Authority" and submitted them to defendants' Washington, D.C. office which "legalized" or "certified" them. Abu Hbda Dep. 110-12 (*Id.* Ex. M).

3. Pre-2018 documents reflected defendants' state of mind that persons involved in the certification process were acting for the benefit of defendants. For example, one of defendant's employees described his certification activities as being "rendered to" the PLO. Hakam Takash, FARA Registration Statement (May 21, 2012)) (*Id.* Ex. B). Similarly, defendants sent a preprinted "Contract for Notary Services" to at least one of the eight approved notaries, Abu Hbda Dep. 128 (*Id.* Ex. M), stating that the notary was "to provide notary services for use by the [PLO Delegation to the U.S.]." *Id.* Ex. M.

4. In 2018, after the State Department ordered defendants to close their Washington, D.C. office, their official spokesman, Saeb Erekat, announced that defendants "would find alternate ways of continuing to provide consular services, and guarantee the continued provision of services to its citizens." *Id.* Ex. F.

5. After January 4, 2020, a list of notaries acceptable to defendants continued to exist. Ateyeh Dep. 42 (*Id.* Ex. N). Notaries on the list received documents in the United States; notarized them; sent them to Palestinian officials in Mexico or Canada for certification; and then sent the certified documents to PA officials for use in territories

---

[1] *Compare* 22 C.F.R. § 92.4 (U.S. consular agents perform "notarial acts" for documents "required for use" in the United States). Because defendants are not a foreign state, their D.C. office never enjoyed any form of immunity or diplomatic status. *See* Letter from Eric J. Boswell to Abdel Rahman (June 22, 1994) (Fleischmann Dec. Ex. A); *accord* KPFA Radio Interview of Hakam Takash (Oct. 11, 2018) (*Id.* Ex. E) ("We had all the responsibilities of a consulate but we were never allowed the…privileges of a consulate").

administered by the PA. Ateyeh Dep. 45-56 (*Id.* Ex. N); Abu Hbda Dep. 57-62, 69-70, 78-79, 97-98 (*Id.* Ex. M). According to Ateyeh, more than 75% of the documents he notarized "were notarized for use in Palestine." Ateyeh Dep. 44 (*Id.* Ex. N).

6.   The notaries' activities occurred in the United States. Abu Hbda Dep. 102 (*Id.* Ex. M).

In sum, defendants authorized U.S. notaries to perform notarial acts "in connection with" the defendants' certification and legalization of documents required for use in PA governmental agencies. Defendants' own documents reflect their understanding that these activities were for *defendants' own* benefit. And the notaries were integral to the certification process. After their Washington, D.C. office was closed, defendants stated that they "would find alternative ways of continuing to provide consular services" in order to "guarantee the continued provision of services" to Palestinians in the U.S. *Id.* Ex. F. They did so by continuing to use the same notaries.

The notarial services were performed "on behalf of" the PLO and PA within the meaning of § 2334(e)(1)(B), which must be construed "liberally" in order "to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note). The phrase *on behalf of* means "in the interest of," "as a representative of," or "for the benefit of." *Madden v. Cowen & Co.*, 576 F.3d 957, 973 (9th Cir. 2009) (quoting *Webster's Third New Int'l Dictionary* 198 (2002)). A private person may act "on behalf of" a government entity. *See Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1225 (11th Cir. 2009). The case of *Sanchez-Ramirez v. Consulate Gen. of Mexico*, No. C 12-3485 PJH, 2013 WL 4013947, at *9 (N.D. Cal. Aug. 5, 2013), *aff'd*, 603 F. App'x 631 (9th Cir. 2015), is instructive. There the court held that an individual who provided "notarial services" to Mexican nationals was "assist[ing] in official governmental functions such as the provision of notarial services" and that his employment was "'intertwined' with government activity." *Id.* Here, too, the notaries assisted in defendants' official governmental functions. Even defendants' *own* preprinted contract—stating that the notaries were providing a "service for use by" the PLO (Fleischmann Decl. Ex. O)—reflected defendants' understanding that the

6

notaries were acting for the benefit of (*i.e.*, on behalf of) the PLO and PA.

    **2. Propaganda.**—After the PSJVTA's effective date, Defendants made public appearances and maintained and regularly updated a website and social media accounts in English to influence the U.S. public and U.S. policymakers. Am. Compl. ¶¶ 77-90. These activities, which were conducted in the United States, Am. Compl. ¶¶ 83-85, included press conferences in the United States by their Chairman, Mahmoud Abbas; and appearances by their top official in the United States, Riyad Mansour, at an undergraduate seminar hosted by Seton Hall University, and a "webinar" hosted by a U.S. not-for-profit group. Am. Compl. ¶ 77; Fleischmann Decl. Exs. I-L. Defendants criticized U.S. policies, aired grievances against the Government of Israel, and engaged in self-promotion. *See* Am. Compl. ¶ 89; Fleischmann Decl. Ex. Q (describing a film about "Surfing in Gaza"). These activities constituted propaganda, *i.e.*, "political material intended to influence the foreign policies of the United States." *Meese v. Keene*, 481 U.S. 465, 470 (1987). As such, they do not come within either of the statutory exceptions that defendants invoke.

    *First*, the propaganda activities were not "undertaken exclusively for the purpose of conducting official business of the United Nations." 18 U.S.C. § 2334(e)(3)(B). To the contrary, they are exactly the type of conduct by defendants' UN representatives that the Second Circuit and this Court have held to be non-UN-related, and therefore cognizable for jurisdictional purposes. *Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) ("speak[ing] in public and to the media in New York in support of the PLO's cause"), *on remand*, 795 F. Supp. 112, 114 (S.D.N.Y. 1992) ("speeches," "interviews," "media appearances," and distribution of "informational pamphlets" were "sufficiently separate from [PLO's] UN activities that they may be considered in determining" to exercise personal jurisdiction). In *Klieman v. Palestinian Authority*, 923 F.3d 1115, 1130 (D.C. Cir. 2019), the D.C. Circuit observed that defendants' Twitter and Facebook social media

posts—which have continued since January 4, 2020—were "rather similar promotional activities" to those supporting jurisdiction in *Klinghoffer.*

Defendants argue that because a certain UN committee wants to "raise international awareness" of the "inalienable rights of the Palestinian people," and defendants' promotional activities further that "cause," the promotional activities have now transformed into "official business of the United Nations" within the meaning of § 2334(e)(1)(B). Br. 24-25. By defendants' logic, *anything* done in furtherance of the UN's expansive aspirations qualifies as "official business." The UN's Economic and Financial Committee, for instance, aims to promote the "eradication of poverty." *See The GA Handbook: A practical guide to the United Nations General Assembly* at 71, https://www.eda.admin.ch/dam/mission-new-york/en/documents/UN_GA_Final.pdf.   Thus, any activity by defendants purporting to further this "cause" would qualify as "official business of the United Nations" under § 2334(e)(1)(B) under defendants' theory. The Court should decline defendants' invitation to disregard *Klinghoffer* on the theory that the UN has so expanded the scope of official business that the decision has become obsolete. Accepting that invitation would mean that the PSJVTA's UN-activities exception entirely swallows the rule—exactly the opposite of Congress's instruction that the statute be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." § 903(d)(1)(A) (18 U.S.C. § 2333 note).

In reality, self-promotion is well understood to differ from the official business of a deliberative body. In an analogous context, courts have held that a deliberative body's "official business" simply does not include self-promoting public relations activities by its members. *See Hoellen v. Annunzio*, 468 F.2d 522, 526 (7th Cir. 1972); *Rising v. Brown*, 313 F. Supp. 824, 826–27 (C.D. Cal. 1970). Contrary to defendants' suggestion, the UN's Office of Legal Affairs has never opined that self-promotion by a non-member observer is "official business of the United

Nations," which that office has defined as the "performance of official duties on behalf of the United Nations," attending to "the business of the Organization," or "an official act. "*See* 1968 U.N. Jurid. Y.B. 194–95; 1985 U.N. Jurid. Y.B. 148. Self-promotion is none of those.

*Second*, press conferences and social media releases do not come within the catch-all exception for "personal or official activities conducted *ancillary* to activities listed under this paragraph," 18 U.S.C. § 2334(e)(3)(F), because they are not "ancillary" to official UN business. Ancillary means "providing necessary support to the essential operations of a central organization."

*Fowler's Dictionary of Modern English Usage* at 48 (4th ed. 2015). It is defined as:

> 1. Subservient, subordinate, ministering (to)
>
> 2. *lit.* (after Latin.) Of or pertaining to maid-servants. …
>
> 3. Designating activities and services that provide essential support to the functioning of a central service or industry; also, of staff employed in these supporting roles. Now used esp. of non-medical staff and services in hospitals. …

*Oxford English Dictionary* (online ed.), https://www.oed.com/view/Entry/7258; *see Webster's Third New International Dictionary* at 80 (2002) ("subordinate or auxiliary to a primary or principal legal document, proceeding, office, or officer").

The Supreme Court's decision in *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214 (1992), illustrates the correct usage of the word "ancillary." That case concerned the reach of the term "solicitation of orders" in 15 U.S.C. § 381, which the Court read as covering not only "actual requests for purchases," but also "activities that are *entirely ancillary* to requests for purchases." 505 U.S. at 226, 228 (emphasis by the Court). The Court explained that an activity is "ancillary" to the main activity if "the only reason to do it is to facilitate" the main activity—which is to say, only if it "serve[s] no purpose apart from [its] role in facilitating" the main activity. *Id.* at 229, 234. Thus, "ancillary" activities were those serving "no independent business function apart from their connection to the soliciting of orders." *Id.* at 228–29. In contrast,

"activities that the company would have reason to engage in anyway" were *not* "ancillary." *Id.* at 229. The Court then applied its holding to the activity of sales representatives replacing stale chewing gum at stores. The Court acknowledged that replacing the stale gum facilitated the solicitation of orders by encouraging consumers to buy gum; but the activity was not "ancillary" because it *also* resulted in sales, "thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting consumers." *Id.* at 233–34.

Here, as in *Wrigley*, Defendants' activities are "ancillary" to official UN business *only* if they serve "no independent purpose" other than to facilitate UN business. For example, taking a cab to the UN Headquarters in order to deliver a speech is not "official business of the United Nations," *see* 1977 U.N. Jurid. Y.B. at 247, but it serves no independent purpose but to facilitate the speech's delivery and therefore is "ancillary" to the conduct of official UN business. In contrast, tweeting out accusations that Israel engages in racism, ethnic cleansing, terror, and gratuitous cruelty, Am. Compl. ¶ 89(y), (cc), (nn), and retweeting statements from U.S. politicians about defendants' relationship with Israel, *id.* ¶ 89(gg), have an obvious independent purpose: to influence U.S. policymakers and the U.S. public on issues of interest to defendants. Such activities are thus *not* "ancillary" to official UN business.

Canons of construction also support a narrow reading of Exception (F). Courts read statutory exceptions "narrowly in order to preserve the primary operation of the [main] provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). "When a statute sets forth a general principle, coupled with an exception to it, it is logical to assume, in the face of ambiguity in the exception, that the legislature did not intend the exception to be so broad as to leave nothing of the general principle." *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 91 (2d Cir. 2016). Courts typically "place metes and bounds on [even] very broad language of [a] catchall provision," *United States v. Aguilar*, 515

U.S. 593, 599 (1995), rather than "allow a catchall term" to "dictate the particulars" of the statutory scheme, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1617 (2018). Indeed, the statute itself instructs that it be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note). Reading the catch-all broadly would violate these canons and contravene Congress's instruction.

Finally, the PSJVTA's legislative history also supports applying the main modern meaning of "ancillary," as explained by the bill's lead sponsor: "the exception in the language for 'ancillary' activities is intended to permit only essential support or services that are absolutely necessary to facilitate the conduct of diplomatic activities expressly exempted in the bill." 165 Cong. Rec. S7182 (daily ed. Dec. 19, 2019) (statement of Sen. Lankford). Defendants rely on a post-enactment "clarification" by Senator Leahy that "ancillary activities are those which may *not* be essential for the minimal functioning of the mission but which support the mission's primary operations." 166 Cong. Rec. S627 (Jan. 28, 2020). Some of defendants' activities, such as a lecture at Seton Hall, do not meet even this expansive reading of the catch-all. But Senator Leahy's statement is unreliable because it was made five weeks *after* the PSJVTA became law. Arguments based on "subsequent legislative history" "should not be taken seriously." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring)).[2] Senator Leahy's post-enactment statement is also contrary to his expressed views *before* the vote, when he said he would support the bill on the floor and "get recourse for victims" if changes to the bill were made to protect the opportunity for "quiet discussions" at the UN.[3]

---

[2] Senator Leahy's after-the-fact "clarification" came following repeated lobbying of his staff by Defendants' counsel. *See* Squire Patton Boggs, FARA Supplemental Statement attachment D-3 (July 31, 2020) (Fleischmann Decl. Ex. J).

[3] "I want to be able to … try to get recourse for victims. I don't want to do something that may

Senator Leahy said nothing at that time suggesting a desire to immunize grievance-laced tweets.

**3. Defendants' Office.**—Defendants maintain an office in a townhouse at 115 East 65th Street in Manhattan. Am. Compl. ¶ 92. They use it to conduct promotional activities. *Id.* ¶ 95.

Defendants claim that their townhouse is not "in the United States." Br. 21. They base that remarkable assertion on the Second Circuit's holding that the pre-PSJVTA version of § 2334(e)(1), referring to locations "within *the jurisdiction of* the United States," was inapplicable to the PLO's Observer Mission in New York. *Waldman*, 925 F.3d at 575. But Congress superseded that holding in the PSJVTA by *deleting* the phrase "within the jurisdiction of" from § 2334(e)(1)(B) and adding paragraph (e)(4), which provides

> (4) Rule of construction.—Notwithstanding any other law (including any treaty), any office, headquarters, premises, or other facility or establishment within the territory of the United States that is not specifically exempted by paragraph (3)(A) shall be considered to be in the United States for purposes of paragraph (1)(B).

18 U.S.C. § 2334(e)(4). Defendants ignore these statutory changes, which reflect a clear and unequivocal intent to supersede prior law, including the treaty on which defendants rely. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53 (2d Cir. 2010) ("notwithstanding" clause "abrogate[d]" inconsistent treaty); *see also United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1468–69 (S.D.N.Y. 1988).

Defendants assert that their office is used "exclusively for the purpose of conducting official business of the United Nations," (Br. 22) but they do not deny the allegation that they use the office to conduct promotional activities (Am. Compl. ¶ 95), which are not official UN business for

---

selectively close doors to the UN, where, as you know as well as I, many times it's the quiet discussions held between the United States and others at the UN that solve a lot of problems." Executive Business Meeting, Comm. on the Judiciary, at 1:02:37–1:03:07 (Oct. 17, 2019), https://www.judiciary.senate.gov/meetings/10/17/2019/executive-business-meeting.

the reasons explained above. Defendants do not and cannot invoke Exception (F) for their office either, because under paragraph (4), "any office … premises, or other facility or establishment within the territory of the United States that is not *specifically exempted by paragraph (3)(A)* shall be considered to be in the United States for purposes of paragraph (1)(B)." 18 U.S.C. § 2334(e)(4) (emphasis added). Had Congress intended the catch-all in paragraph (3)(F) to apply to Defendants' office, paragraph (4) would have said so. *See United States v. Smith,* 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions … additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

## II.   The PSJVTA Does Not Violate the Due Process Clause

Federal legislation concerning consent to personal jurisdiction must meet two relevant due process standards.[4] *First*, fair notice requires that any consent-to-jurisdiction arrangement provide persons with "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (alterations and quotation marks omitted). *Second*, the Due Process Clause also protects against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The PSJVTA satisfies both standards. It gave Defendants fair warning that their conduct would subject them to personal jurisdiction in ATA cases if they engaged in specified post-enactment activity. And the exercise of personal jurisdiction in such cases reasonably advances the federal government's legitimate interests in combatting international terrorism, protecting U.S. citizens abroad, and compensating victims of terrorism.

---

[4] In *Waldman*, the Second Circuit held that defendants "have due process rights." 835 F.3d at 329. This holding was contrary to the position of the United States that the PLO and similar entities "do not have constitutional rights." Constitutionality of Closing the Palestine Information Office, 11 Op. OLC 104, 120 & n.7 (1987). We respectfully preserve this issue for appellate consideration.

A.      **The PSJVTA Gave Defendants Fair Warning**

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). A defendant may consent to personal jurisdiction by, for example, entering a contract and "agree[ing] in advance to submit to the jurisdiction of a given court," *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964), or through "the voluntary use of certain state procedures," *Bauxites*, 456 U.S. at 704. So long as a defendant's conduct is "knowing and voluntary," the court's exercise of jurisdiction is consistent with due process. *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1948 (2015); *see Roell v. Withrow*, 538 U.S. 580, 590 (2003); *Burger King Corp.*, 471 U.S. at 472 n.14. The PSJVTA meets this "fair warning" standard. It describes with precision what actions would cause the PLO and PA to be deemed to have consented to personal jurisdiction in civil cases under the ATA if those actions are taken after specified dates.

Upon enactment of the relevant provisions, the PLO and PA had fair warning and the opportunity to choose whether or not to continue such actions and thereby consent to jurisdiction. Defendants were thus free to structure their affairs to avoid jurisdiction—as they did in December 2018, when they acknowledged that "the terms of ATCA envision that the Government of Palestine will make a choice whether or not to accept U.S. 'assistance, however provided' after January 31st, 2019, under the referenced Foreign Assistance programs" and informed the United States that "[t]he Government of Palestine unambiguously makes the choice not to accept such assistance." Letter from Hon. Rami Hamdallah to Hon. Michael R. Pompeo (Dec. 26, 2018) (U.S. Resp. to Feb. 6, 2019, Order, Ex. 1, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Feb. 15, 2019)). Defendants made a different choice in response to the PSJVTA.

B.      **The PSJVTA Reasonably Advances Legitimate Government Interests**

The Due Process Clause requires the United States to govern reasonably, in the service of

a legitimate governmental objective, avoiding the arbitrary or irrational exercise of power. *See Lewis*, 523 U.S. at 846. The PSJVTA easily meets the reasonableness standard.

Congress enacted, and the President signed, the PSJVTA pursuant to the political branches' authority over foreign affairs and national security, as well as Congress's plenary "'control over the jurisdiction of the federal courts.'" *Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) (quoting *Trainmen v. Toledo, P. & W.R. Co.,* 321 U.S. 50, 63–64 (1944)). The decision whether to enlist the judiciary in the enforcement of foreign policy and national security interests of the United States "belongs to those answerable to the people and assigned by the Constitution to defend this nation." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1419 (2018) (Gorsuch, J., concurring). All acts of Congress are "accorded a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319 (1993), but the presumption of constitutionality carries extra force when Congress exercises its "broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). "[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in ... national security affairs," *Dep't of Navy v. Egan,* 484 U.S. 518, 530 (1988).

The political branches determined that the PSJVTA advances "critical U.S. interests by seeking to enable U.S. victims of terrorism to vindicate their rights in U.S. courts while simultaneously protecting our own national security interests and those of our close ally, Israel." Letter from Sec. Michael R. Pompeo to Sen. Charles E. Grassley (June 19, 2019) (Fleishman Decl. Ex. H). The PSJVTA advances the United States' interest in combating terrorism, which is "an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 4 (2010). By enabling the imposition of civil liability on the PLO and PA in cases when they or their employees or agents engage in or provide material support for terrorism harming U.S. nationals, the ATA

creates a financial incentive for these entities to modify their conduct in order to protect U.S. nationals and their families. The PSJVTA also reasonably advances the United States' responsibility to protect U.S. citizens wherever in the world they travel. The murder of a U.S. national abroad is an "act of violence against … a person under the particular protection of [U.S.] laws," and Congress may reasonably determine that "special protection for U.S. nationals serves key national interests." *Gamble v. United States*, 139 S. Ct. 1960, 1967 (2019). By deterring and disrupting terrorism, the United States' interest in protecting American citizens is advanced. And the PSJVTA advances the United States' interest in supporting "fair compensation for American victims of terrorism from those responsible for their losses." Statement of Interest of the United States, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), D.E. 935-1 ¶ 12 (Aug. 10, 2015).

As the United States has explained with regard to the PSJVTA's predecessor, this statute "arises in a unique foreign affairs context," involving "a limited set of anti-terrorism cases against *sui generis* foreign non-sovereign entities that have no right to operate in the United States." U.S. Br. at 15, *Klieman v. Palestinian Auth.*, No. 15–7034 (D.C. Cir. March 13, 2019). "In this foreign affairs context, in contrast to the limited and mutually exclusive sovereignty of the several states, Congress may deem certain actions of defendants like the Palestinian Authority and the Palestine Liberation Organization to be consent to personal jurisdiction in the United States, even if a State cannot enact similar legislation." *Id.*; *accord* U.S. Br. at 32, *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, No. 19–368 (U.S. Mar. 6, 2020) ("the United States' constitutional powers and special competence in matters of foreign affairs and international commerce, in contrast to the limited and geographically cabined sovereignty of each of the several States, would permit the exercise of federal judicial power in ways that have no analogue at the state level").

16

**C.       Defendants' "Reciprocity" Argument is Meritless**

Defendants have effectively abandoned the due-process argument they made in *Sokolow* to the Supreme Court, the Second Circuit, and on remand in the brief they lodged with this Court; instead, they now assert that "'deemed' consent to jurisdiction cannot be squared with Due Process unless there is reciprocity—that is, an express or implied exchange by which a defendant impliedly agrees to jurisdiction in return for a benefit conferred by the forum." Br. 1.

**1.** Defendants' new "reciprocity" theory is wrong as legal matter. "'[I]mplied consent' [is] a traditional basis for personal jurisdiction" in which "voluntary consent to jurisdiction need not be supported by consideration" at all. *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 380 (S.D.N.Y. 2001) (Lynch, J.) (quoting 4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (2d ed. 1990)). A defendant may impliedly consent to jurisdiction by engaging in disfavored conduct that satisfies a rational standard, clearly established in advance. The most obvious examples are cases in which a defendant is deemed to have consented to the exercise of personal jurisdiction by failing to engage in jurisdictional discovery. *See, e.g.*, *Bauxites*, 456 U.S. at 704-05. These defendants have previously engaged in that form of deemed consent. *See Knox v. Palestine Liberation Org.*, 229 F.R.D. 65, 70 (S.D.N.Y. 2005). Such cases involve no bargain with the state and no reciprocity; the defendants simply failed to comply with judicial discovery orders.

In *Bauxites*, the Supreme Court held that such conduct was one category in which "actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." 465 U.S. at 704-05. A defendant's failure to raise a timely objection to the exercise of personal jurisdiction is another such category, similarly triggering deemed consent to personal jurisdiction, as the Court explained in *Bauxites*. *Id*. These defendants have previously engaged in that form of deemed consent, as well. *See Gilmore v. Palestinian Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016). Again, such cases involve no bargain with the state and no reciprocity. They reflect a

17

determination that certain conduct by a defendant, which crossed clearly established lines, has amounted to "a legal submission to the jurisdiction of the court." *Bauxites*, 465 U.S. at 704-05. In none of those cases did the defendant have an implicit "reciprocal bargain" with the United States.

More generally, consent requires no "bargain" with anyone to be effective, even when constitutional rights are at stake. Persons may consent without reciprocity to law-enforcement searches, *United States v. Gomez*, 877 F.3d 76, 98 (2d Cir. 2017), to the adjudication of rights by a non-Article III court, *Wellness Int'l*, 575 U.S. at 678, to the presence of individuals on private property, *Machleder v. Diaz*, 801 F.2d 46, 59 (2d Cir. 1986), or even to the publication of libelous statements, *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015).

Defendants rely (Fuld Br. 7-8) on snippets from two district court cases. Those cases contained dicta about a "bargain with the state" as a way of explaining their holdings that a state registration-to-do-business statute "necessarily incorporates the Due Process 'minimum contacts' requirement." *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981); *see Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993). But those two anomalous holdings have not gained traction in the decades since the cases were decided.[5] Today, it is black-letter law that even without minimum contacts, "personal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum." 4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (4th ed. 2008).[6] Thus, the Second Circuit has acknowledged the continuing vitality

---

[5] Defendants also rely on a statement in a law-review article analyzing the law of personal jurisdiction through the lens of libertarian free-market theory. *See* Richard A. Epstein, *Consent, Not Power, as the Basis of Jurisdiction*, 2001 Univ. of Chicago Legal Forum art. 2. But in that article, Professor Epstein asserted that in cases of international torts, the best jurisdictional rule is one "holding that aggressors … have to take a back seat to their victims" because victims "should be allowed to pursue the action in their home forum" in such cases. *Id.* pp. 30-32.

[6] *See The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 112–9, at 1999 (2012 & Supp. 2017) ("Consent has always been sufficient to create [personal]

of cases holding that "a defendant may consent to personal jurisdiction without regard to what a due process analysis of its contacts would yield." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016). Instead, *Brown* evaluated a state consent-by-registration statute under the due-process standards of fair warning and rationality.[7] (Notably, the word "reciprocity" does not appear in *Brown*.)

Defendants also attempt to support their reciprocity theory by misrepresenting the position of the United States in the *Klieman* case, asserting that the United States argued that "reciprocity was central to the constitutionality of the PSJVTA's predecessor." Br. 10. The word "reciprocity" does not appear in the government's brief in that case. The government instead argued—consistent with plaintiffs' position here—that the constitutional standards are fair warning and a reasonable relationship between the statute and a legitimate government interest. Thus, the government asserted: (1) the statute "operates similarly to other legal arrangements through which a defendant may validly consent to personal jurisdiction" by giving the defendants "fair warning that particular conduct will subject them to personal jurisdiction" (U.S. *Klieman* Br. at 10-11, citing *Bauxites*, 456 U.S. at 703, and *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); and (2) the statute

---

jurisdiction, even in the absence of any other connection between the litigation and the forum."); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) ("unless the party consents to jurisdiction, there must be … minimum contacts") (citation omitted); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents."); *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 769 (Fed. Cir. 2016) (O'Malley, J., concurring) ("consent to jurisdiction is an alternative to the minimum contacts analysis"); *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, 793 (7th Cir. 2014) ("Idento asserts that it would violate the Due Process Clause of the Fifth Amendment to base personal jurisdiction on consent. That is nonsense.").

[7] Defendants also cite *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492 (2d Cir. 2020), which followed *Brown* by similarly construing the New York registration-to-do-business statute so that registration "does not constitute consent" to general jurisdiction, in order to avoid a constitutional question about an ambiguous statute. *Id.* at 499.

reflected the exercise of foreign policy powers in furtherance of the government's interest to "halt, deter, and disrupt international terrorism" in a "reasonable" manner "consistent with this legislative purpose" (U.S. *Klieman* Br. at 11-13 (quoting H.R. Rep. No. 115-858 at 7-8)).

**2.** With regard to their U.S. activities, defendants' theory suffers from an additional flaw— they *did* receive a "benefit" by engaging with the society and economy of the United States. Defendants incorrectly contend that "the Anti-Terrorism Act of 1987 expressly denied [them] the 'benefit' of engaging in any activity in the United States." Br. 12. That is not accurate. It is true that, as foreign governmental political entities, defendants are subject to expulsion at the Executive's discretion and have no right to distribute propaganda. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 934 (D.C. Cir. 1988). It is also true that the 1987 law had a broad legislative purpose—that defendants "should not benefit from operating in the United States." 22 U.S.C. § 5201(b). But the operative provisions of the 1987 law were limited—defendants were forbidden only from "expend[ing] funds" or "maintain[ing] an office" within the jurisdiction of the United States, 22 U.S.C. § 5202. In addition, Executive Branch practice has reflected a "'failure to prosecute' allegedly excessive propaganda activities." *Klieman*, 923 F.3d at 1131. Thus, the 1987 law's operative provisions and the U.S. government's prosecutorial choices left defendants with the opportunity to engage in *some* activities in the United States—a "benefit" even under their theory.

### D.   Defendants' Fallback Arguments Are Meritless

In addition to their reciprocity argument, defendants offer a hodgepodge of meritless fallback arguments. They need not detain the Court long.

**1.** Defendants contend that *Daimler A.G. v. Bauman*, 571 U.S. 117 (2014), would be "'robbed of meaning by a back-door thief' if legislative notice of consent jurisdiction were alone enough to satisfy due process." Br. 14 (quoting *Brown*, 814 F.3d at 640) (cleaned up). This

argument fails because (as plaintiffs *agree*) fair warning alone is not enough: due process also requires a reasonable relationship between the statute and a legitimate government objective.

The *Brown* case offers defendants no support, because the court focused on fair warning and state interests. To be sure, *Brown* said that a state's consent-to-general-jurisdiction-by-registration statute would present a "difficult constitutional question about the validity of such consent after *Daimler*," given "*Daimler*'s strong admonition against the expansive exercise of general jurisdiction." 814 F.3d at 640; *see id.* at 638 (identifying "potential" and "unresolved constitutional issues"). But in light the Supreme Court's *Bauxites* decision and other cases upholding consent jurisdiction, it said that "a carefully drawn state statute that expressly required consent to general jurisdiction as a condition on a foreign corporation's doing business in the state, at least in cases brought by state residents, might well be constitutional." *Id.* at 641 (quotation marks omitted).

The Second Circuit's reasoning in *Brown*, moreover, demonstrates just how different the PSJVTA is. With regard to fair warning, *Brown* observed that the statute at issue contained no "express language alerting the potential registrant that by complying with the statute and appointing an agent it would be agreeing to submit to the general jurisdiction of the state courts," *id.* at 636, and expressed concern about construing the statute to create jurisdiction based "on a slender inference of consent pulled from routine bureaucratic measures that were largely designed for another purpose entirely," *id.* at 639. where the defendant had provided only "perhaps unwitting" consent, *id.* at 637. The PSJVTA is very different. Its warning about jurisdiction-creating conduct could not be more explicit, and its scope is limited to cases focused on harm to U.S. nationals under a single anti-terrorism statute.

With regard to arbitrary government action, *Brown* expressed concern about permitting "the exercise of general jurisdiction over a corporation in a state in which the corporation had

done *no business at all*," which would no doubt reach "circumstances where the state's interests seem limited." *Id.* at 637. *Brown* thus focused on Connecticut's seeming lack of a legitimate state interest in adjudicating the claims of out-of-state residents. *Compare Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1030 (2021) (States have "significant interests" in adjudicating their own citizens' claims), *with Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017) (a State "may have little legitimate interest in the claims" of non-residents). Here, the jurisdiction-creating conduct is closely related to the claims at issue and of intense interest to the United States, which has a strong, direct interest in this dispute, to protect its own citizens from terrorism and to provide its own citizens and their families a forum for redress.

Striking the PSJVTA down on the basis of decisions regarding state-court jurisdiction would make no sense in light of the very different federal interests at stake, because "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis," *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality), and because the structural limits on the power of individual States by our system of federalism "may be decisive," *Bristol-Myers Squibb*, 137 S. Ct. at 1780. As the United States explained in *Daimler* itself, when it comes to federal statutes, "the political Branches are well positioned to determine when the exercise of personal jurisdiction will, on balance, further the United States' interests," and the courts should give "proper regard" to "Congress's judgment concerning relevant contacts with a forum for jurisdictional purposes." U.S. Br. at 3, *Daimler*, No. 11–965 (U.S. July 6, 2013).[8]

---

[8] Defendants invoke the unconstitutional conditions doctrine in a footnote. Br. 14 n.3. But that doctrine requires only a reasonable relationship between the government's interests and the condition imposed. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605–06 (2013) (requiring "a 'nexus' and 'rough proportionality'" between the condition and the "social costs" imposed by private conduct); *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) (restraining

**2.** Defendants argue that *legislative* jurisdiction (which they call jurisdiction to prescribe) is more expansive than *adjudicatory* jurisdiction (which they call jurisdiction to adjudicate). Br. 15-16. Yet defendants concede that Congress has ample constitutional authority to forbid or regulate the conduct that triggers jurisdiction under the PSJVTA—including the extraterritorial conduct at issue here. *Id*. And they identify no decision in which Congress's authority to regulate extraterritorial conduct was upheld, while its authority to provide jurisdiction to enforce such regulation in domestic courts was invalidated. Nor does it make sense that Congress would have power to enact extraterritorial legislation that can never be enforced.

In addition, "jurisdiction to adjudicate" is a concept of customary international law, *see Restatement of Foreign Relations Law (Fourth)* § 401 (2018), and "[n]ever does customary international law prevail over a contrary federal statute." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 302–03 (D.C. Cir. 2005); *see United States v. Yousef*, 327 F.3d 56, 91 (2d Cir. 2003) ("United States law is not subordinate to customary international law"); *United States v. Ali,* 718 F.3d 929, 945 (D.C. Cir. 2013) ("Ali mistakes the due process inquiry for the customary international law of jurisdiction."); *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law."). In any event, as the reporters of the *Restatement* have explained, "customary international law does not limit personal jurisdiction." William S. Dodge, *et al.*, Jurisdiction to Adjudicate Under Customary International Law, *OpinioJuris* (2018), http://opiniojuris.org/2018/09/11/33646/.

---

government action only if the condition "has little or no relationship" to the government's interest); *W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 668 (1981) (conditions sustained if they serve a "legitimate purpose" and it is "reasonable" to conclude that the conditions "would promote that purpose."). The PSJVTA satisfies this reasonableness standard.

**3.** Defendants next assert that implied consent is merely a "legal fiction" that has been "discarded." Br. 16-17. But implied consent that flows from fair warning and reasonably furthers a legitimate governmental interest is constitutional. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. at 1948 (adopting an "implied consent" rule for submission to jurisdiction of bankruptcy court, so long as the implied consent was "knowing and voluntary"); *Bauxites*, 456 U.S. at 703 ("A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court."); *see also Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185– 86 (2016) (Fourth Amendment does not bar statutes providing that motorists are "deemed to have consented" to blood and breath alcohol tests, since the statutes are "reasonable" and have a "nexus" to the privilege of driving, explaining "this standard does not differ in substance from the standard" under "Fifth Amendment jurisprudence").

**4.** Finally, defendants contend that it would be fundamentally unfair for the United States to exercise jurisdiction given their "'paltry' contacts with the forum, the lack of any suit-related conduct in (or targeting) the United States," and their recent litigation successes. Br. 18-19. That assertion is stunning. Defendants had no settled expectations of immunity with regard to their liability-creating conduct when it occurred in the years 2002 to 2004—many years after it was criminalized under U.S. law, Pub. L. 99–399, § 1202 (Aug. 27, 1986); many years after Congress created a private right of action for U.S. citizens, Pub. L. 102–572, title X, § 1003 (Oct. 29, 1992); and even after international conventions outlawed it around the globe, Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2179 U.N.T.S. 197; Convention for Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 258. Simply put, there is no safe haven for terrorists and their supporters. Nearly 200 nations agree that a State may exercise civil, criminal or administrative jurisdiction over a perpetrator of a terror attack "against a national of

that State." Convention for the Suppression of the Financing of Terrorism, Art. 7(2)(a). Moreover, at the time of Defendants' conduct in this case, they had been uniformly held subject to personal jurisdiction in U.S. courts for committing acts of terror outside the United States, so they had no expectation of immunity from U.S. jurisdiction. *See Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 179 (D.D.C. 2004); *Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Klinghoffer*, 795 F. Supp. at 114. The Second Circuit's 2016 jurisdictional ruling in *Waldman* came as an eleventh-hour reprieve, due to a sea change in the law of general jurisdiction.[9] In the PSJVTA, Congress *vindicated* the parties' expectations circa 2002–2004 by providing a U.S. forum for U.S. terror victims, if defendants elected to engage in conduct specified in the PSJVTA—which they did.

## III.   The PSJVTA Does Not Invade the Judicial Power

Contrary to defendants' assertion, Congress did not "legislatively supersede" a constitutional rule. Def. Br.19 (quoting *Dickerson v. United States*, 530 U.S. 428, 437 (2000)). The PSJVTA does not purport to redefine any constitutional standard at all, let alone one authoritatively established by the Supreme Court. It simply provides a new basis on which specified, post-enactment conduct will be deemed to manifest consent to personal jurisdiction for a specific class of cases. Nothing in the statute purports to change the due-process standards that apply. The cases defendants cite (at 19-20) illustrate this point. In both *City of Boerne v. Flores*, 521 U.S. 507 (1997), and *Dickerson*, 530 U.S. at 438, the Supreme Court held that Congress could not replace constitutional standards articulated by the Supreme Court with conflicting standards devised by the legislature. The PSJVTA does not purport to do that.

---

[9] *Waldman* also held that the Fifth Amendment bars federal courts from exercising civil jurisdiction authorized by Congress over a defendant whose criminal conduct harms a U.S. citizen outside the United States. 835 F.3d at 338. There is a division of authority in the Circuits on this issue, and plaintiffs respectfully preserve this issue for appellate consideration.

**CONCLUSION**

For the foregoing reasons, the Court should deny the motion to dismiss the complaint for

lack of personal jurisdiction.

Dated: July 6, 2021
        New York, New York

                                        Respectfully submitted,

                                        THE LAW OFFICE OF JEFFREY FLEISCH-
                                        MANN, P.C.

                                        By: ___/s/_____
                                              Jeffrey Fleischmann, Esq.
                                        150 Broadway, Suite 900 New York, NY 10038
                                        Tel: 646-657-9623
                                        Fax: 646-351-0694
                                        Email: jf@lawjf.com –

                                        - and –

                                        THE SILVERMAN LAW FIRM
                                        Samuel Silverman, Esq.
                                        16 Squadron Blvd.
                                        New City, NY 10956
                                        Tel: 845-517-0351
                                        Email: silvermans@silvermanlaw.net

                                        *Counsel for Plaintiffs*

THE LAW OFFICE OF ALLEN SCHWARTZ, ESQ.
Allen Schwartz, Esq.
2635 Nostrand Ave Brooklyn, NY 11210
Tel: 347-460-5379
Email: allen@allenschwartzlaw.com
*Of-Counsel to The Law Office of Jeffrey Fleischmann, P.C*

26