1:20-cv-03374-JMF

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 17 2024

22-76-cv (L)
Fuld v. Palestine Liberation Organization

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

_____

August Term 2022
Argued: May 3, 2023
Decided: September 8, 2023

Docket Nos. 22-76-cv (L), 22-496-cv (Con)

_____

MIRIAM FULD, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR
OF THE ESTATE OF ARI YOEL FULD, DECEASED, AND AS NATURAL GUARDIAN OF
PLAINTIFF NATAN SHAI FULD, NATAN SHAI FULD, MINOR, BY HIS NEXT FRIEND AND
GUARDIAN MIRIAM FULD, NAOMI FULD, TAMAR GILA FULD, AND ELIEZER YAKIR
FULD,

*Plaintiffs – Appellants*,

UNITED STATES OF AMERICA,

*Intervenor – Appellant*,

—v.—

THE PALESTINE LIBERATION ORGANIZATION AND THE PALESTINIAN AUTHORITY
(A/K/A "THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY," AND/OR "THE
PALESTINIAN COUNCIL," AND/OR "THE PALESTINIAN NATIONAL AUTHORITY"),

*Defendants – Appellees.**

_____

_____

* The Clerk of Court is directed to amend the official caption as set forth above.

Before: LEVAL AND BIANCO, *Circuit Judges*, AND KOELTL, *District Judge*.**

The plaintiffs, several family members of a United States citizen killed in an overseas terrorist attack, appeal from a judgment of the United States District Court for the Southern District of New York (Furman, J.) dismissing their claims against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") for lack of personal jurisdiction. The Government, as intervenor in accordance with 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), also appeals from that judgment. On appeal, both the plaintiffs and the Government argue that the district court erred in finding unconstitutional the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, the statute on which the plaintiffs relied to allege personal jurisdiction over the defendants. The PSJVTA specifically provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil action pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2333, irrespective of "the date of the occurrence of the act of international terrorism" at issue, upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. Id. § 2334(e). We conclude that the PSJVTA's "deemed consent" provision is inconsistent with the dictates of the Fifth Amendment's Due Process Clause. Accordingly, we **AFFIRM** the judgment of the district court.

_____

                              ALLON KEDEM, Arnold & Porter Kaye Scholer LLP, Washington, D.C. (Kent A. Yalowitz, Avishai D. Don, David C. Russell, Arnold & Porter Kaye Scholer LLP, New York, NY, Dirk C. Phillips, Stephen K. Wirth, Arnold & Porter Kaye Scholer LLP, Washington, D.C., Jeffrey Fleischmann, The Law Office of Jeffrey Fleischmann, P.C., New York, NY, Samuel Silverman,

---

** Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

The Silverman Law Firm PLLC, New City, NY, *on the brief*), *for Plaintiffs-Appellants.*

Mitchell R. Berger, Squire Patton Boggs (US) LLP, Washington, D.C. (Gassan A. Baloul, Squire Patton Boggs (US) LLP, Washington, D.C., *on the brief*), *for Defendants-Appellees.*

Benjamin H. Torrance, Assistant United States Attorney, Of Counsel *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY (Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, D.C., *on the brief*), *for Intervenor-Appellant United States of America.*

Tejinder Singh, Sparacino PLLC, Washington, D.C., *for Amici Curiae Abraham D. Sofaer and Louis J. Freeh in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

J. Carl Cecere, Cecere PC, Dallas, TX, *for Amici Curiae Sen. Charles E. Grassley, Sen. Richard Blumenthal, Rep. Jerrold Nadler, Rep. Claudia Tenney, Rep. Bradley E. Schneider, Sen. James Lankford, Sen. Marco Rubio, Rep. Kathleen Rice, Rep. Lee Zeldin, Rep. Theodore Deutch, and Rep. Grace Meng in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

Joshua E. Abraham, Abraham Esq. PLLC, New York, NY, *for Amici Curiae Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell in Support of Plaintiffs-Appellants.*

3

KOELTL, *District Judge*:

The plaintiffs, several family members of a United States citizen killed in an overseas terrorist attack, appeal from a judgment of the United States District Court for the Southern District of New York (Furman, <u>J.</u>) dismissing their claims against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"). The district court dismissed those claims for lack of personal jurisdiction over the defendants. The Government, as intervenor in accordance with 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), also appeals from the judgment.

At issue in this appeal is the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, the federal statute on which the plaintiffs relied to allege personal jurisdiction over the defendants. The PSJVTA was enacted for the precise purpose of preventing dismissals based on lack of personal jurisdiction in cases just like this one — civil actions against the PLO and the PA pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, which provides a damages remedy for United States nationals injured "by reason of an act of international terrorism," <u>id.</u> § 2333(a).

4

Congress crafted the PSJVTA in response to a series of judicial decisions, all arising out of civil ATA cases related to terrorist activity abroad, which held that federal courts had no general or specific personal jurisdiction over the PLO and the PA. The resulting statute reflects a legislative effort to create personal jurisdiction over those entities based on alleged consent, which, when validly given, may constitute an independent constitutional basis for subjecting a nonresident defendant to litigation in a particular forum. The PSJVTA specifically provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction in [any] civil [ATA] action," irrespective of "the date of the occurrence of the act of international terrorism" at issue, upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. Id. § 2334(e).

The district court determined that this "deemed consent" provision was an unconstitutional attempt to create personal jurisdiction over the defendants where none existed, and it accordingly dismissed the plaintiffs' civil ATA action for lack

of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2).

Both the plaintiffs and the Government (together, "appellants") challenge that

conclusion on appeal, arguing principally that the exercise of this "deemed

consent" jurisdiction under the PSJVTA satisfies the Fifth Amendment's Due

Process Clause.

We conclude that the PSJVTA's provision for "deemed consent" to personal

jurisdiction is inconsistent with the requirements of constitutional due process.

Accordingly, we **AFFIRM** the district court's judgment dismissing this case.

## I. BACKGROUND

The plaintiffs are the widowed spouse and children of Ari Yoel Fuld, a

United States citizen who was fatally stabbed during a September 2018 terrorist

attack outside a shopping mall in the West Bank. In the aftermath of Fuld's death,

the plaintiffs commenced this action against the PLO and the PA, alleging that

these defendants had "encouraged, incentivized, and assisted" the nonparty who

committed the attack on Fuld. Am. Compl. ¶ 4. The PA, established in 1993

pursuant to the Oslo Accords, is the non-sovereign and interim governing body of

parts of the Gaza Strip and the West Bank (collectively referred to here as

"Palestine"). The PLO, an entity founded in 1964, conducts Palestine's foreign

affairs and serves as a Permanent Observer to the United Nations ("UN") on behalf of the Palestinian people. The plaintiffs seek monetary relief from both defendants pursuant to the ATA, 18 U.S.C. § 2333, which, as relevant here, provides United States nationals "injured . . . by reason of an act of international terrorism" with a civil damages remedy against "any person who aids and abets, by knowingly providing substantial assistance [to]," the perpetrator of the attack. Id. § 2333(a), (d)(2).

Several years before these plaintiffs initiated their case, and prior to the passage of the PSJVTA, this Court decided Waldman v. Palestine Liberation Organization, 835 F.3d 317 (2d Cir. 2016) ("Waldman I"), cert denied sub nom. Sokolow v. Palestine Liberation Organization, 138 S. Ct. 1438 (2018) (mem.), which arose out of litigation involving civil ATA claims similar in key respects to those asserted here.[1] The Waldman plaintiffs, a group of United States citizens injured or killed during terror attacks in Israel and the estates or survivors of such citizens, sued the PLO and the PA for money damages pursuant to the ATA, alleging that the defendants had provided material support to the nonparties who carried out

---

[1] The procedural history of the Waldman litigation (captioned Sokolow v. Palestine Liberation Organization, No. 04-cv-397 (S.D.N.Y.) in the district court) is set forth in greater detail in Waldman v. Palestine Liberation Organization, ___ F.4th ___, No. 15-3135 (2d Cir. Sept. 8, 2023) ("Waldman III") (per curiam), which we also decide today.

the attacks. After more than a decade of litigation and a substantial jury verdict in favor of the plaintiffs, the defendants filed their appeal in this Court, where they reasserted their longstanding objection that the claims against them should be dismissed for lack of personal jurisdiction.

This Court ultimately agreed with the defendants, concluding that dismissal was required because, notwithstanding the "unquestionably horrific" nature of the attacks underlying the plaintiffs' claims, "[t]he district court could not constitutionally exercise either general or specific personal jurisdiction over the defendants." Waldman I, 835 F.3d at 344. We explained, as a threshold matter, that while sovereign governments lack due process rights, "neither the PLO nor the PA is recognized by the United States as a sovereign state," and accordingly, both defendants are entitled to due process protections. Id. at 329. Moreover, we noted that our precedents established that the "due process analysis" in the personal jurisdiction context "is basically the same under both the Fifth and Fourteenth Amendments," except that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." Id. at 330 (quoting Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998)).

With these background principles in mind, we concluded that the district court lacked general personal jurisdiction over the defendants "pursuant to the Supreme Court's recent decision" in <u>Daimler AG v. Bauman</u>, 571 U.S. 117 (2014), because neither defendant's contacts with the forum were "so constant and pervasive as to render [it] essentially at home" in the United States. <u>Waldman I</u>, 835 F.3d at 331, 335 (quoting <u>Daimler</u>, 571 U.S. at 122). We rejected the notion that the defendants could be considered "essentially at home" in this country based on their activities in Washington, D.C., which were "limited to maintaining an office [there], promoting the Palestinian cause in speeches and media appearances, and retaining a lobbying firm." <u>Id.</u> at 333. Rather, both the PLO and the PA "are 'at home' in Palestine, where these entities are headquartered and from where they are directed." <u>Id.</u> at 334 (citing <u>Daimler</u>, 571 U.S. at 139 n.20).

This Court likewise held that the district court could not properly exercise specific personal jurisdiction over the PLO and the PA, in view of the absence of any "substantial connection" between "the defendants' suit-related conduct — their role in the six terror attacks at issue — [and] . . . the forum." <u>Id.</u> at 335 (citing <u>Walden v. Fiore</u>, 571 U.S. 277, 284 (2014)). We explained that the terrorist attacks themselves took place outside the United States, that "the defendants' [related]

activities in violation of the ATA occurred outside the United States," and that

none of these acts were "specifically targeted" or "expressly aimed" at the United

States. Id. at 335, 337–38. Indeed, the attacks in question were "random," such that

they "affected United States citizens only because [those citizens] were victims of

indiscriminate violence . . . abroad." Id. at 337. Thus, the actions for which the

defendants had been sued "were not sufficiently connected to the United States to

provide specific personal jurisdiction," and the "limits prescribed by

[constitutional] due process" required that the case be dismissed. Id. at 337, 344.

In a series of comparable cases, the United States Court of Appeals for the District

of Columbia Circuit reached the same conclusions. See Livnat v. Palestinian Auth.,

851 F.3d 45, 54–58 (D.C. Cir. 2017) (concluding, in a civil ATA case arising out of

overseas terror attacks, that exercising general or specific jurisdiction over the PA

would not "meet the requirements of the Fifth Amendment's Due Process

Clause"), cert. denied, 139 U.S. 373 (2018) (mem.); see also Shatsky v. Palestine

Liberation Org., 955 F.3d 1016, 1036–37 (D.C. Cir. 2020) (same as to both the PLO

and the PA); Est. of Klieman v. Palestinian Auth., 923 F.3d 1115, 1123–26 (D.C. Cir.

2019) ("Klieman") (same), judgment vacated on other grounds, 140 S. Ct. 2713

(2020) (mem.), opinion reinstated in part, 820 F. App'x 11 (D.C. Cir. 2020) (mem.).

10

Congress responded to <u>Waldman I</u> and similar decisions with federal legislation known as the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183, which modified an existing ATA provision, 18 U.S.C. § 2334, to include a new subsection (e) concerning the "[c]onsent of certain parties to personal jurisdiction." <u>See</u> ATCA § 4, 132 Stat. at 3184. This new subsection provided that "regardless of the date of the occurrence of the act of international terrorism upon which [a] civil action [pursuant to the ATA] was filed," a defendant would "be deemed to have consented to personal jurisdiction in such civil action if," after more than 120 days following the ATCA's enactment, the defendant (1) "accept[ed]" certain "form[s] of assistance" from the United States, or (2) "maintain[ed]" an office "within the jurisdiction of the United States" while "benefiting from a waiver or suspension" of 22 U.S.C. § 5202, a statutory provision expressly barring the PLO from operating any such office. ATCA § 4, 132 Stat. at 3184.

Before the expiration of the 120-day period, both the PLO and the PA formally terminated their acceptance of any relevant assistance from the United States, and the PLO shuttered its diplomatic mission in Washington, D.C. — its

only office operating in the United States pursuant to a waiver of 22 U.S.C. § 2502.[2]

See Klieman, 923 F.3d at 1128–30.

This Court subsequently denied a motion to recall the mandate in Waldman I based on the ATCA, because neither of the statute's "factual predicates" for personal jurisdiction could be satisfied. Waldman v. Palestine Liberation Org., 925 F.3d 570, 574–75 (2d Cir. 2019) ("Waldman II") (per curiam), cert. granted, judgment vacated sub nom. Sokolow v. Palestine Liberation Org., 140 S. Ct. 2714 (2020) (mem.). Around the same time, the D.C. Circuit Court of Appeals made a similar finding. See Klieman, 923 F.3d at 1128 (dismissing ATA

---

[2] The PLO had previously maintained this Washington, D.C. office pursuant to an express waiver of 22 U.S.C. § 5202, which expired around the time of the office's closure. At that point, no waivers or suspensions of this provision remained in effect. See Klieman, 923 F.3d at 1130. The PLO has continued to operate its UN Permanent Observer Mission in New York, but it does so without any need for a waiver or suspension of 22 U.S.C. § 5202, which forbids the PLO from "maintain[ing] an office . . . within the jurisdiction of the United States." 22 U.S.C. § 5202(3); see Klieman, 923 F.3d at 1129–30. That statutory prohibition "does not apply . . . to the PLO's Mission in New York," because the PLO's UN office falls beyond the jurisdiction of the United States in light of the UN Headquarters Agreement. Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 46, 51 (2d Cir. 1991) ("[T]he PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control."); see also United States v. Palestine Liberation Org., 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988) ("The PLO Mission to the United Nations is an invitee of the United Nations under the Headquarters Agreement and its status is protected by that agreement.").

claims against the PLO and the PA for lack of personal jurisdiction and explaining, in relevant part, that the ATCA's "factual predicates" had not been "triggered").

While petitions for writs of certiorari from <u>Waldman II</u> and <u>Klieman</u> were pending, Congress stepped in again, this time enacting the PSJVTA on December 20, 2019. <u>See</u> Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082 (2019). Section 903(c) of the PSJVTA superseded the relevant portions of the ATCA, resulting in various amendments to the personal jurisdiction provisions of 18 U.S.C. § 2334(e).[3] 133 Stat. at 3083–85. Those amendments included a narrowed definition of the term "defendant," which now refers exclusively to the PLO, the PA, and any "successor[s]" or "affiliate[s]" thereof. 18 U.S.C. § 2334(e)(5). In drafting the PSJVTA, Congress also specified new post-enactment conduct that would be "deemed" to constitute "consent" to personal jurisdiction in "any civil action" under the ATA, "regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed." <u>Id.</u> § 2334(e)(1).

---

[3] The PSJVTA also includes a number of additional provisions, but only the jurisdictional amendments of § 903(c) are at issue in this case. We do not pass on the constitutionality of any portion of the PSJVTA other than § 903(c). However, for purposes of clarity, this opinion refers to § 903(c) as the PSJVTA, which is consistent with the nomenclature used in the district court's decision and the parties' briefs on appeal.

As amended pursuant to the PSJVTA, 18 U.S.C. § 2334(e)(1) includes two subparagraphs that list the circumstances under which "a defendant shall be deemed to have consented to personal jurisdiction" in a civil ATA case. Subparagraph (A) provides, first, that a defendant "shall be deemed to have consented" to such jurisdiction if, "after . . . 120 days" following the enactment of the PSJVTA (that is, after April 18, 2020), the defendant "makes any payment, directly or indirectly":

> (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or

> (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual.

Id. § 2334(e)(1)(A). This subparagraph refers, in the words of other federal legislation on the subject, to a "practice of paying salaries to terrorists serving in Israeli prisons[] [and] to the families of deceased terrorists," Taylor Force Act, Pub. L. No. 115-141, § 1002, 132 Stat. 348, 1143 (2018), which Congress has previously condemned as "an incentive to commit acts of terror." Id.

14

Subparagraph (B) of the PSJVTA provides that "a defendant shall be deemed to have consented to personal jurisdiction" in a civil ATA action if, "after 15 days" following the PSJVTA's enactment (that is, after January 4, 2020), the defendant "continues to maintain," "establishes," or "procures any office, headquarters, premises, or other facilities or establishments in the United States," or otherwise "conducts any activity while physically present in the United States on behalf of the [PLO] or the [PA]." 18 U.S.C. § 2334(e)(1)(B). The PSJVTA exempts "certain activities and locations" from the reach of subparagraph (B), including facilities and activities devoted "exclusively [to] the purpose of conducting official business of the United Nations," id. § 2334(e)(3)(A)–(B), specified activities related to engagements with United States officials or legal representation, id. § 2334(e)(3)(C)–(E), and any "personal or official activities conducted ancillary to activities listed" in these exceptions, id. § 2334(e)(3)(F).

The PSJVTA includes a "rule[] of construction," which provides that the legislation's terms "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA § 903(d)(1)(A), 133 Stat. at 3085. Congress also specified that the PSJVTA "shall apply to any case

pending on or after August 30, 2016," id. § 903(d)(2), 133 Stat. at 3085, referring to the date just one day before this Court's decision in Waldman I.

On April 27, 2020, several months after the PSJVTA's enactment, the Supreme Court granted certiorari in Waldman II and Klieman, vacated both judgments, and remanded the cases "for further consideration in light of the [PSJVTA]." Sokolow, 140 S. Ct. at 2714; see Klieman, 140 S. Ct. at 2713. Three days later, on April 30, 2020, the plaintiffs commenced this action. The plaintiffs invoked the PSJVTA as the sole basis for personal jurisdiction, and their amended complaint alleged that both prongs of the statute's "deemed consent" provision had been satisfied. With respect to the first prong, the plaintiffs alleged that, after April 18, 2020, the defendants continued an existing practice of making payments to (1) the designees of incarcerated terrorists who were fairly convicted of attacks that killed or injured United States nationals, and (2) the families of deceased terrorists who died while committing attacks that killed or injured United States nationals. See 18 U.S.C. § 2334(e)(1)(A). For the second prong, the plaintiffs alleged that, after January 4, 2020, the defendants (1) used an office maintained in the United States, namely their UN Permanent Observer Mission in New York City, for purposes other than official UN business, and (2) engaged in various activities

on their own behalf while in the United States, including providing consular services, holding press conferences, and publishing various online and print materials designed to influence American foreign policy. See id. § 2334(e)(1)(B).

The PLO and the PA moved to dismiss the plaintiffs' amended complaint for lack of personal jurisdiction and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), respectively. In connection with their Rule 12(b)(2) motion, the defendants challenged the constitutionality of the PSJVTA, arguing that the statute's provision for "deemed consent" to personal jurisdiction violated due process requirements. The district court certified this constitutional challenge to the United States Attorney General, and the Government intervened in the action to defend the PSJVTA. See 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1.

In a January 6, 2022 decision, the district court granted the defendants' Rule 12(b)(2) motion to dismiss on the ground that it could not validly exercise personal jurisdiction under the PSJVTA's "deemed consent" provision. See Fuld v. Palestine Liberation Org., 578 F. Supp. 3d 577, 580, 596 (S.D.N.Y. 2022). The court noted at the outset that "a defendant's knowing and voluntary consent, whether express or implied," can serve as an "independent" basis for personal jurisdiction, separate

17

and apart from "general jurisdiction[] . . . [and] specific jurisdiction." Id. at 579.

Moreover, the court observed that the PLO and the PA did "not dispute" the

plaintiffs' allegation that they had made payments triggering the PSJVTA's first

"deemed consent" prong.[4] Id. at 583. Nevertheless, the district court concluded

that "deemed consent" under the PSJVTA could not "constitutionally provide for

personal jurisdiction over [the] [d]efendants." Id. at 587. The court reasoned that

the predicate activities under the PSJVTA do not "even remotely signal[] approval

or acceptance of," or an "inten[t] to submit to," jurisdiction in the United States,

id. (internal quotation marks omitted), that the statute "push[es] the concept of

consent well beyond its breaking point," id. at 595, and that "legislature[s] [cannot]

simply create [personal] jurisdiction out of whole cloth by deeming any conduct

[whatsoever] to be 'consent,'" id. at 580. In short, the district court concluded that

"deemed consent jurisdiction" under the PSJVTA is not "consistent with the

---

[4] The defendants did, however, "contest [the] [p]laintiffs' allegations that the PSJVTA's second 'deemed consent' prong ha[d] been met." Fuld, 578 F. Supp. 3d at 583 n.3. The defendants argued that to the extent they had conducted activities within the United States after the relevant post-enactment date, all of those activities fell within the exceptions for UN-related undertakings and "ancillary" conduct. 18 U.S.C. § 2334(e)(3). In light of its finding that "the PSJVTA's first prong ha[d] been met," the district court declined to consider "whether [the] [d]efendants' conduct also implicate[d] the second prong." Fuld, 578 F. Supp. 3d at 583 n.3. It is also unnecessary to address that question on this appeal.

requirements of due process," and accordingly, the action had to be dismissed for lack of personal jurisdiction. Id. (internal quotation marks omitted).

The district court entered final judgment on January 7, 2022. Both the plaintiffs and the Government timely appealed.

## II. DISCUSSION

We review the dismissal of a complaint for lack of personal jurisdiction de novo, construing the pleadings in the light most favorable to the plaintiffs and resolving all doubts in the plaintiffs' favor. V&A Collection, LLC v. Guzzini Props. Ltd., 46 F.4th 127, 131 (2d Cir. 2022). Likewise, we review de novo questions of law, including challenges to the constitutionality of a statute. United States v. Wasylyshyn, 979 F.3d 165, 172 (2d Cir. 2020).

"Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) 'the plaintiff's service of process upon the defendant must have been procedurally proper'; (2) 'there must be a statutory basis for personal jurisdiction that renders such service of process effective'; and (3) 'the exercise of personal jurisdiction must comport with constitutional due process principles.'" Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC, 22 F.4th 103, 121 (2d Cir. 2021) (quoting Waldman I, 835 F.3d at 327–28). In this case, the parties do not dispute that the first and second requirements were waived and

19

satisfied, respectively.[5] See Fuld, 578 F. Supp. 3d at 583. We therefore consider only the third requirement — "whether jurisdiction over the defendants may be exercised consistent with the Constitution." Waldman I, 835 F.3d at 328.

The principle that a court must have personal jurisdiction over a defendant "recognizes and protects an individual liberty interest" flowing from the Constitution's guarantees of due process. Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982). As we explained in Waldman I, that principle extends to both the PLO and the PA, each of whom enjoys a due process right "to be subject only to [a court's] lawful power." 835 F.3d at 328–29 (citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011) (plurality opinion)). In particular, constitutional due process ensures that a court will exercise personal jurisdiction over a defendant only if "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The Supreme Court's precedents discussing that requirement, including its canonical opinion in International Shoe, have arisen under the Due Process

---

[5] Specifically, the defendants "waived any defenses regarding proper service of process," and with respect to the second requirement, the defendants do not dispute that they "made payments" sufficient to satisfy the PSJVTA's first statutory prong for "deemed consent." Fuld, 578 F. Supp. 3d at 583.

Clause of the Fourteenth Amendment — a constraint on the power of state tribunals. <u>See</u> U.S. CONST. amend. XIV, § 1; <u>see also</u> <u>Int'l Shoe</u>, 326 U.S. at 311. But we have previously explained that the personal jurisdiction analysis is "basically the same" under the Fifth Amendment's Due Process Clause, which limits the power of the federal courts and governs the inquiry here.[6] <u>Waldman I</u>, 835 F.3d at 330 (internal quotation marks omitted); <u>see</u> U.S. CONST. amend. V.

The Supreme Court has recognized three distinct bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process: general jurisdiction, specific jurisdiction, and consent. <u>See, e.g.</u>, <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472–73 & 472 n.14 (1985); <u>J. McIntyre Mach.</u>, 564 U.S. at 880–81 (plurality opinion). The first two bases, "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction," "giv[e] content" to the holding of <u>International Shoe</u>, which established that a court may hear claims against a defendant who has not submitted to its authority only where the defendant has certain "contacts"

---

[6] As noted above, the "principal difference" between these due process standards arises in the context of a minimum-contacts inquiry: the analysis under the Fourteenth Amendment is limited to the defendant's contacts with the forum state, while the Fifth Amendment permits consideration of the defendant's contacts with the United States as a whole. <u>Waldman I</u>, 835 F.3d at 330 (citing <u>Chew</u>, 143 F.3d at 28 n.4).

with the forum. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021); see Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923–24 (2011); Int'l Shoe, 326 U.S. at 316. General jurisdiction, as its name suggests, allows a court to hear "any and all claims" against a defendant — but, for businesses and organizations, only when that defendant is "essentially at home" in the forum. Ford, 141 S. Ct. at 1024 (quoting Goodyear, 564 U.S. at 919); see Daimler, 571 U.S. at 127. Specific jurisdiction, in contrast, covers a "narrower class of claims," Ford, 141 S. Ct. at 1024, and depends "on the relationship among the defendant, the forum, and the litigation," Walden, 571 U.S. at 284 (internal quotation marks omitted). In particular, a court may exercise specific jurisdiction if the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum," Hanson v. Denckla, 357 U.S. 235, 253 (1958), or if the defendant has intentionally directed wrongdoing at the forum, Calder v. Jones, 465 U.S. 783, 790 (1984). Even then, the court's authority is limited solely to claims that "arise out of or relate to" the defendant's forum contacts. Ford, 141 S. Ct. at 1025 (quoting Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255, 262 (2017)); see Burger King, 471 U.S. at 472–73.

Neither of those two bases for personal jurisdiction is at issue here. In the proceedings before the district court, the plaintiffs never argued for general or specific jurisdiction over the PLO and the PA. Nor do they contest the district court's conclusion that "[a]ny such argument would be foreclosed by . . . Waldman I." Fuld, 578 F. Supp. 3d at 584. Instead, the plaintiffs rely exclusively on consent, the third independent basis for exercising personal jurisdiction over an out-of-forum defendant. See Ins. Corp. of Ireland, 456 U.S. at 703; Burger King, 471 U.S. at 472 & n.14. The plaintiffs contend that the PLO and the PA are deemed to have consented to personal jurisdiction in this civil ATA action pursuant to the PSJVTA, because engaging in the statute's predicate conduct amounts to "implied" or "constructive" consent. See, e.g., Pls.' Br. at 13. Both the plaintiffs and the Government argue that the PSJVTA establishes consent-based jurisdiction in accordance with due process principles, and that the district court erred in holding otherwise.

We disagree. For the reasons set forth below, we conclude that the PSJVTA's "deemed consent" provision is inconsistent with the Due Process Clause of the Fifth Amendment. Because the statute does not establish a federal court's authority over the PLO and the PA consistent with the Fifth Amendment's

requirement of due process, this case against those defendants was properly dismissed for lack of personal jurisdiction.

## A.

Consent to personal jurisdiction is a voluntary agreement on the part of a defendant to proceed in a particular forum. See Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 316 (1964) (a defendant "may agree . . . to submit to the jurisdiction of a given court"); J. McIntyre Mach., 564 U.S. at 880–81 (plurality opinion) ("explicit consent" is among the "circumstances, or . . . course[s] of conduct, from which it is proper to infer . . . an intention to submit to the laws of the forum"); Knowlton v. Allied Van Lines, Inc., 900 F.2d 1196, 1199 (8th Cir. 1990) ("A defendant may voluntarily consent or submit to the jurisdiction of a court which otherwise would not have jurisdiction over it."). In several of its decisions, including, most recently, Mallory v. Norfolk Southern Railway Co., 143 S. Ct. 2028 (2023), the Supreme Court has explained why such consent suffices to establish personal jurisdiction: "Because the [due process] requirement of personal jurisdiction [is] first of all an individual right, it can, like other such rights, be waived." Ins. Corp. of Ireland, 456 U.S. at 703; see Burger King, 471 U.S. at 472 n.14 ("[T]he personal jurisdiction requirement is a waivable right[.]"); Mallory, 143 S.

Ct. at 2043 (plurality opinion) ("[P]ersonal jurisdiction is a <u>personal</u> defense that may be waived or forfeited." (emphasis in original)); <u>id.</u> at 2051 (Alito, J., concurring in part and concurring in the judgment) ("If a person voluntarily waives th[e] [personal jurisdiction] right, that choice should be honored."). Thus, when a defendant has validly consented to personal jurisdiction, a court may exercise authority over that defendant in conformity with the Due Process Clause, even in the absence of general or specific jurisdiction. <u>See, e.g.</u>, <u>Mallory</u>, 143 S. Ct. at 2039 (plurality opinion) (explaining that "consent can . . . ground personal jurisdiction" apart from a defendant's forum contacts (internal quotation marks omitted)); <u>see also</u> <u>Knowlton</u>, 900 F.2d at 1199.

The Supreme Court has recognized a "variety of legal arrangements [that] have been taken to represent express or implied consent" to personal jurisdiction consistent with due process. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703; <u>see</u> <u>Mallory</u>, 143 S. Ct. at 2038 n.5 (majority opinion). For example, a defendant's consent to personal jurisdiction may be implied based on litigation-related conduct, or where a defendant accepts a benefit from the forum in exchange for its amenability to suit in the forum's courts. <u>See, e.g.</u>, <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703–05; <u>Mallory</u>, 143 S. Ct. at 2033 (majority opinion); <u>id.</u> at 2041 n.8 (plurality opinion). In such

cases, it is often fair and reasonable to infer the defendant's voluntary agreement to submit itself to a court's authority. But consent cannot be found based solely on a government decree pronouncing that activities unrelated to being sued in the forum will be "deemed" to be "consent" to jurisdiction there. 18 U.S.C. § 2334(e)(1); cf. Ins. Corp. of Ireland, 456 U.S. at 705 (distinguishing between litigation-related conduct that establishes personal jurisdiction and "mere assertions of . . . power" over a defendant (quoting Chicago Life Ins. Co. v. Cherry, 244 U.S. 25, 29 (1917))). A prospective defendant's activities do not signify consent to personal jurisdiction simply because Congress has labeled them as such.

Thus, while "[a] variety of legal arrangements . . . [may] represent . . . consent to . . . personal jurisdiction," id. at 703, the PSJVTA is not among them. The PSJVTA's provision for consent-based jurisdiction over the PLO and the PA, in which Congress has "deemed" the continuation of certain conduct to constitute "consent," falls outside any reasonable construction of valid consent to proceed in a particular forum's courts.

### 1.

We begin with some of the "various ways" in which "consent may be manifested," either "by word or [by] deed." Mallory, 143 S. Ct. at 2039 (plurality

opinion). It is well-established that a defendant may expressly consent to personal jurisdiction in a particular court by contract, usually through an agreed-upon forum-selection clause. See Ins. Corp. of Ireland, 456 U.S. at 703–04; see also Szukhent, 375 U.S. at 316 ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court."). So long as such "forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement [against a defendant] does not offend due process." Burger King, 471 U.S. at 472 n.14 (quoting Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)); see also Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991) ("[F]orum selection clauses . . . are subject to judicial scrutiny for fundamental fairness."). Likewise, a court may exercise authority over a defendant on the basis of express consent provided in a stipulation. See Ins. Corp. of Ireland, 456 U.S. at 704; Petrowski v. Hawkeye-Sec. Co., 350 U.S. 495, 496 (1956) (per curiam) ("[The] respondent, by its stipulation, waived any right to assert a lack of personal jurisdiction over it.").

The Supreme Court has acknowledged that a defendant may, in certain circumstances, impliedly consent to personal jurisdiction through litigation-related conduct. See, e.g., Ins. Corp. of Ireland, 456 U.S. at 703–05. Such conduct

includes a defendant's voluntary in-court appearance, see id. at 703, unless the

defendant has appeared for the limited purpose of contesting personal jurisdiction

(in which case, the defendant typically preserves the defense), see Mallory, 143 S.

Ct. at 2044 (plurality opinion). Moreover, in keeping with the principle that "[t]he

expression of legal rights is often subject to certain procedural rules," a

defendant's "failure to follow [such] rules" with regard to personal jurisdiction

may "result in a curtailment of [its] right[]" to enforce that requirement. Ins. Corp.

of Ireland, 456 U.S. at 705. "Thus, the failure to enter a timely objection to personal

jurisdiction constitutes, under Rule 12(h)(1), a waiver of the objection." Id.

Similarly, a defendant's failure to comply with certain pretrial orders concerning

jurisdictional discovery may justify a "sanction under Rule 37(b)(2)(A) consisting

of a finding of personal jurisdiction." Id. The Supreme Court has found that other

litigation activities can subject a litigant to personal jurisdiction as well. See, e.g.,

id. at 704; Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 451 (1932).[7]

---

[7] Among these other examples, the only instances in which findings of "implied consent" have been premised on a defendant's omission are those where the defendant "fail[ed] to follow" litigation rules and orders related to personal jurisdiction, Ins. Corp. of Ireland, 456 U.S. at 703, 705, and thereby "forfeited" — rather than waived — the defense. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133–34, 135 (2d Cir. 2011) ("Personal jurisdiction . . . can . . . be purposely waived or inadvertently forfeited. . . . [A] defendant forfeits its jurisdictional defense if it appears before a district court to press that defense but then willfully withdraws from the litigation and defaults[.]");

The Supreme Court has also recognized that a prospective defendant may be subject to personal jurisdiction if it has accepted a government benefit from the forum, in return for which the defendant is required to submit itself to suit in the forum. See Mallory, 143 S. Ct. at 2044 (plurality opinion) (explaining that personal jurisdiction may exist where the defendant has "accept[ed] an in-state benefit with jurisdictional strings attached"). The Supreme Court's recent decision in Mallory highlighted such an arrangement: Mallory approved the exercise of consent-based jurisdiction pursuant to a state business registration statute that "require[d] an out-of-state firm to answer any suits against it in exchange for status as a registered

---

Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61–62 (2d Cir. 1999) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right. . . . [The defendant] participated in pretrial proceedings but never moved to dismiss for lack of personal jurisdiction despite several clear opportunities to do so during the four-year interval after filing its answer. These circumstances establish a forfeiture." (internal quotation marks and citations omitted)). It can be said that in failing to follow such rules or orders, a defendant effectively concedes the issue. See Ins. Corp. of Ireland, 456 U.S. at 705, 709 (where noncompliance with litigation rules and orders supports a "presumption of fact" as to the "want of merit in the asserted [personal jurisdiction] defense," "[t]he preservation of due process [is] secured" (quoting Hammond Packing Co. v. Arkansas, 212 U.S. 322, 350–51 (1909))). While forfeiture of a personal jurisdiction defense may be the product of mistake or inadvertence, rather than affirmative conduct evincing agreement, the Supreme Court has counted such forfeitures among the "legal arrangements [that] have been taken to represent . . . implied consent to . . . personal jurisdiction." Id. at 703. But beyond these forfeitures in the context of litigation, the existing precedent suggests that the conduct necessary to support an inference of implied consent, whether related to the litigation or not, must be some "intentional[]" act that can reasonably be construed as a waiver of the personal jurisdiction requirement. Id. at 704.

foreign corporation and the benefits that entails." Id. at 2033 (majority opinion). A plurality of the Justices noted that this sort of "exchange" between the defendant and the forum — in other words, "consent to suit in exchange for access to a State's markets" — "can signal consent to jurisdiction" in at least some cases. Id. at 2041 n.8 (plurality opinion) (alterations adopted).

The litigation-related activities or reciprocal bargains described above, just like "explicit consent," can supply a basis "from which it is proper to infer . . . an intention to submit" to the forum, J. McIntyre Mach., 564 U.S. at 880–81 (plurality opinion), or are otherwise "of such a nature as to justify the fiction" of consent to a court's authority, Int'l Shoe, 326 U.S. at 318; see also Ins. Corp. of Ireland, 456 U.S. at 705 (explaining, with regard to litigation conduct, that "due process [is] secured" where the conduct supports a "presumption of fact" as to the existence of personal jurisdiction). Under such circumstances, the assertion of consent-based personal jurisdiction does "not offend traditional notions of fair play and substantial justice," and is therefore consistent with constitutional due process. Ins. Corp. of Ireland, 456 U.S. at 702–03 (quoting Int'l Shoe, 326 U.S. at 316).

30

**2.**

The appellants argue that the PSJVTA's "deemed consent" provision subjects the PLO and the PA to personal jurisdiction in a manner consistent with due process limits. But the statute's terms are insufficient to establish the defendants' valid consent, either express or implied, to waive their constitutional right not to be sued in a court that lacks personal jurisdiction over them.

It is undisputed that this case does not involve a defendant's express consent in any form — and for that reason, the plaintiffs' argument that a finding of consent "follows a fortiori from" Carnival Cruise is misplaced. See Pls.' Br. at 12–13, 28–29. In that case, the Supreme Court held that a specific forum-selection clause in a cruise ticket was enforceable against the parties who had assented to the agreement at issue. See Carnival Cruise, 499 U.S. at 587–89. The decision in Carnival Cruise did not "infer[] consent" at all, see Pls.' Br. at 27–29, but instead enforced the express jurisdiction-conferring language of a contract after accounting for considerations of notice and fundamental fairness.[8] See Carnival Cruise, 499 U.S. at 593–95.

---

[8] The plaintiffs also rely on Szukhent, 375 U.S. 311. But Szukhent concerned the validity under the Federal Rules of Civil Procedure of a contract provision that expressly appointed an agent for service of process. Id. at 315. As in Carnival Cruise, Szukhent enforced the express terms of a contract. No express contract is at issue here.

The appellants characterize the PSJVTA as establishing implied consent, but the statute provides no basis for a finding that the defendants have agreed to submit to the jurisdiction of the United States courts. The PSJVTA does not purport to determine that any litigation-related conduct on the part of the PLO or the PA constitutes implied consent to jurisdiction. Nor does the PSJVTA require submission to the federal courts' jurisdiction in exchange for, or as a condition of, receiving some in-forum benefit or privilege. Instead, Congress selected certain non-litigation activities in which the PLO and the PA had already engaged (or were alleged to have engaged) and decreed that those activities, if continued or resumed after a certain date, "shall be deemed" to constitute "consent[] to personal jurisdiction." 18 U.S.C. § 2334(e)(1); see, e.g., Klieman, 923 F.3d at 1123–24, 1127, 1129–30 (describing allegations of PLO and PA activity in the United States); Taylor Force Act § 1002, 132 Stat. at 1143 (discussing the relevant payments). The defendants' support for terrorism not targeted at the United States and their limited activities within the United States have already been found to be insufficient to establish general or specific jurisdiction over the PLO and the PA in similar ATA cases, see, e.g., Waldman I, 835 F.3d at 339–42, and those same activities cannot reasonably be interpreted as signaling the defendants' "intention

to submit" to the authority of the United States courts, see J. McIntyre Mach., 564 U.S. at 881 (plurality opinion). Rather, such activities allegedly constitute "consent" under the PSJVTA only because Congress has labeled them that way. Thus, under the statute, the defendants incur a jurisdictional penalty for the continuation of conduct that they were known to partake in before the PSJVTA's enactment — conduct which, on its own, cannot support a fair and reasonable inference of the defendants' voluntary agreement to proceed in a federal forum. This declaration of purported consent, predicated on conduct lacking any of the indicia of valid consent previously recognized in the case law, fails to satisfy constitutional due process.

Pursuant to the PSJVTA's first prong, the PLO and the PA "shall be deemed to have consented to personal jurisdiction" for "mak[ing] any payment" to the designees of incarcerated terrorists, or to the families of deceased terrorists, whose acts of terror "injured or killed a national of the United States." 18 U.S.C. § 2334(e)(1)(A). This specific non-litigation conduct cannot reasonably be understood as signaling the defendants' agreement to submit to the United States courts. Accordingly, the effect of the first prong is to subject the defendants to a jurisdictional sanction — "deemed consent" to the federal courts' authority — for

continuing to make the payments at issue. Illustrating the point, the appellants themselves repeatedly emphasize that the PSJVTA's first prong serves to deter a congressionally disfavored activity. See, e.g., Pls.' Br. at 11 (the first prong "incentivizes [the] [d]efendants to halt the universally condemned practice of making [the] payments" at issue); Intervenor Br. at 25–26 (the first prong "discourage[s]" payments that Congress has linked to terrorist activity). But Congress has a variety of other tools at its disposal for discouraging the payments in question. See, e.g., 22 U.S.C. § 2378c-1(a)(1)(B) (barring certain U.S. foreign aid that "directly benefits" the PA until both the PLO and the PA have "terminated" the relevant payments). Imposing consent to personal jurisdiction as a consequence for those payments, and thereby divesting the defendants of their Fifth Amendment liberty interest, is not among them.

The second prong of the PSJVTA similarly specifies predicate conduct that does not evince the defendants' agreement to subject themselves to the jurisdiction of the United States courts. This prong provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" for "maintain[ing] any office" or "conduct[ing] any activity while physically present in the United States," with a limited set of exceptions. 18 U.S.C. § 2334(e)(1)(B). The appellants repeatedly

34

suggest that this prong is consistent with relevant precedents because it "[c]ondition[s] permission" for the defendants to engage in such activities, and to receive the attendant benefits of doing so, "on their consent to personal jurisdiction in ATA actions." Intervenor Br. at 24; see Pls.' Br. at 48 (the defendants' "receipt of [certain] benefits" is "condition[ed] . . . on their consent"). But this characterization is inaccurate, given that the statute does not provide the PLO or the PA with any such benefit or permission. With the exception of UN-related conduct and offices, which are protected pursuant to international treaty (and which, as set forth in 18 U.S.C. § 2334(e)(3), are exempt from the PSJVTA's second prong), federal law has long prohibited the defendants from engaging in any activities or maintaining any offices in the United States, absent specific executive or statutory waivers.[9] See,

---

[9] For example, the Anti-Terrorism Act of 1987 imposes a "wide gauged restriction of PLO activity within the United States [that], depending on the nature of its enforcement, could effectively curtail any PLO activities in the United States, aside from the Mission to the United Nations." Palestine Liberation Org., 695 F. Supp. at 1471; accord Klinghoffer, 937 F.2d at 51 ("[W]ere the PLO not a permanent observer at the UN, it would not be entitled to enter New York at all."); see Anti-Terrorism Act of 1987, Pub. L. 100-204, tit. X, §§ 1002–1005, 101 Stat. 1331, 1406–1407 (codified at 22 U.S.C. §§ 5201–5203) (stating Congress's "determin[ation] that the PLO and its affiliates are a terrorist organization . . . and should not benefit from operating in the United States," 22 U.S.C. § 5201(b), and prohibiting various activities related to the PLO, including "expend[ing] [PLO] funds," id. § 5202). Similar restrictions apply to the PA. See, e.g., Palestinian Anti-Terrorism Act of 2006 ("PATA"), Pub. L. No. 109-446, § 7(a), 120 Stat. 3318, 3324 (codified at 22 U.S.C. § 2378b note) (barring the PA from "establish[ing] or maintain[ing] an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States" absent a specified certification). The Government acknowledges that these restrictions

e.g., Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 46, 51 (2d Cir. 1991) (explaining that "the PLO is prohibited from engaging in any activities in this country other than the maintenance of a mission to the UN"). The PSJVTA does not purport to relax or override these prohibitions, and the appellants have not identified any other change in existing law (for example, a statutory or executive waiver) that would otherwise authorize the restricted conduct. Thus, the statute's second prong cannot reasonably be construed as requiring a defendant's consent to jurisdiction in exchange for permission to engage in the predicate activities, because the defendants have not been granted permission to engage in those activities at all.[10] Instead, the second prong exacts "deemed" consent as a price to

---

can be lifted or relaxed only through the execution of formal waivers or suspensions under statutorily required procedures. See Intervenor Br. at 24–25 (citing relevant waiver provisions); see also Klieman, 923 F.3d at 1129–31 (describing the "formal . . . waiver procedure" applicable to 22 U.S.C. § 5202).

[10] The appellants do not dispute that the defendants are statutorily barred from conducting activities in the United States. Rather, the plaintiffs suggest that the Government has historically permitted certain activities as "a matter of grace," thereby allowing the Government to require consent in return. Pls.' Reply Br. at 25. But the Government retains the authority to enforce the relevant prohibitions and could exercise it at any time. See 22 U.S.C. § 5203 (authorizing the Attorney General to take any "necessary steps," including "legal action," to enforce the restrictions as to the PLO); PATA § 7(b), 120 Stat. at 3324 (same as to the PA). Turning a blind eye to prohibited conduct that remains subject to sanction or curtailment is not the same as authorizing such conduct. Cf. Klieman, 923 F.3d at 1131 (rejecting an attempt to "equate [a]

be paid upon "conduct[ing] [such] activit[ies]," 18 U.S.C. § 2334(e)(1)(B), without conferring any rights or benefits on the defendants in return.

The appellants argue that the PSJVTA is constitutionally sound because it gives the defendants "fair warning" of the relevant jurisdiction-triggering conduct and "reasonably advances legitimate government interests in the context of our federal system." Pls.' Br. at 11. They derive this standard from a variety of cases describing basic principles of due process, including the Supreme Court's decisions on specific jurisdiction in Ford Motor Co., 141 S. Ct. 1017, and Burger King, 471 U.S. 462. However, the concepts of "fair warning" and "legitimate government interests" establish only minimum due process requirements. These generalizations about due process do not resolve the precise issue in this case, which is whether the defendants have consented to suit in the absence of general or specific jurisdiction. None of the cases on which the appellants rely to support their broad due process test purported to answer that question.[11]

---

government 'failure to prosecute'" certain activities under 22 U.S.C. § 5202 with the "waiver or suspension" of the restrictions of those activities, for purposes of an analysis under the ATCA).

[11] The plaintiffs also argue that the district court's analysis was flawed because it referred to the right at issue here, the due process right not to be haled into a forum lacking personal jurisdiction, as a "fundamental constitutional right." See Fuld, 578 F. Supp. 3d at 580, 591. The Supreme Court has recognized that "certain fundamental rights" trigger "heightened" scrutiny, Washington v. Glucksberg, 521 U.S. 702, 720 (1997), and

Tellingly, the appellants have cited no case implying consent to personal jurisdiction under circumstances similar to those in this action. Instead, all of the appellants' authorities concerning such implied consent involved a defendant's litigation-related conduct, or a defendant's acceptance of some in-forum benefit conditioned on amenability to suit in the forum's courts. Those cases premised consent on activities from which it was reasonable to infer a defendant's submission to personal jurisdiction, but that is not the situation here.

For example, in Insurance Corporation of Ireland, a decision that the appellants have relied on extensively, a defendant appeared before the district court to assert a personal jurisdiction defense, but then repeatedly failed to comply with discovery orders "directed at establishing jurisdictional facts" related to its contacts with the forum. 456 U.S. at 695; see id. at 698–99. The district court accordingly imposed a discovery sanction pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), which provides that certain facts may "be taken as established" when a party "fails to obey a[] [discovery] order" concerning those

---

accordingly, the plaintiffs suggest that the district court must have applied an unduly strict standard in this case. These arguments are without merit. The district court was plainly using the phrase "fundamental" in a colloquial sense, not as a formal classification or a term of art, and we see no indication that the district court applied an inappropriately rigorous standard of scrutiny.

facts. Fed. R. Civ. P. 37(b)(2)(A). Consistent with that Rule, the district court treated the nonresident defendant's forum contacts as having been proven, which in turn established personal jurisdiction. See Ins. Corp. of Ireland, 456 U.S. at 695, 699.

The Supreme Court rejected the defendant's argument that this discovery sanction violated due process. Id. at 696. Relying on its previous decision in Hammond Packing Co. v. Arkansas, 212 U.S. 322 (1909), the Supreme Court explained that the "preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." Ins. Corp. of Ireland, 456 U.S. at 705 (quoting Hammond Packing, 212 U.S. at 350–51). In other words, the defendant's "failure to supply the requested information as to its contacts with [the forum]," after "[h]aving put the issue in question," could fairly be construed as a tacit acknowledgment that the sought-after facts would establish personal jurisdiction. Id. at 709.

The current case bears no resemblance to Insurance Corporation of Ireland. In contrast to the "actions of the defendant" at issue there, id. at 704, the relevant conduct under the PSJVTA takes place entirely outside of the litigation. Moreover, the Supreme Court made clear that the application of the Hammond Packing

39

presumption in <u>Insurance Corporation of Ireland</u>, along with the exercise of personal jurisdiction that followed from it, was appropriate only because the defendant's litigation conduct related to whether personal jurisdiction existed. To underscore the point, the Supreme Court distinguished <u>Hovey v. Elliott</u>, 167 U.S. 409 (1897), which held that due process was violated where a court rendered judgment against a defendant "as 'punishment' for failure" to pay a certain fee — conduct plainly unrelated to any "asserted defense" in that case. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 705–06. The effect of the PSJVTA is similar: the statute subjects the defendants to the authority of the federal courts for engaging in conduct with no connection to the establishment of personal jurisdiction, and indeed with no connection to litigation in the United States at all.

With respect to non-litigation conduct, the appellants rely heavily on cases finding consent to jurisdiction based on business registration statutes, which the plaintiffs described at oral argument as "no different" from the PSJVTA. However, the Supreme Court's recent decision in <u>Mallory</u> makes plain why those statutes are readily distinguishable. <u>Mallory</u> arose out of a Virginia resident's lawsuit in Pennsylvania state court against his former employer, a Virginia railroad corporation, for damages sustained as a result of work in Virginia and Ohio. <u>See</u>

143 S. Ct. at 2032–33. The plaintiff argued that the defendant had consented to personal jurisdiction in Pennsylvania when it registered as a foreign corporation under Pennsylvania law, which "requires out-of-state companies that register to do business in the [state] to agree to appear in its courts on 'any cause of action' against them." Id. at 2033 (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b) (2019)); see also id. at 2037 (noting that the Pennsylvania statute "explicit[ly]" provides for general jurisdiction over registered foreign corporations). The defendant did not dispute that it had registered under the Pennsylvania statute, but it "resisted [the plaintiff's] suit on constitutional grounds," raising the question of "whether the Due Process Clause of the Fourteenth Amendment prohibits a State from requiring an out-of-state corporation to consent to personal jurisdiction to do business there." Id. at 2033.

The Supreme Court rejected this due process challenge and held that the defendant was subject to jurisdiction in Pennsylvania based on the state's business registration statute. See id. at 2032, 2037–38. The majority reasoned that the case fell "squarely within [the] rule" of Pennsylvania Fire Insurance Co. v. Gold Issue Mining & Milling Co., 243 U.S. 93 (1917), see Mallory, 143 S. Ct. at 2038, which, in the words of the plurality, established that the type of business registration statute

41

at issue "comport[s] with the Due Process Clause," id. at 2033 (plurality opinion). Pennsylvania Fire specifically upheld the exercise of personal jurisdiction pursuant to a Missouri state law "requir[ing] any out-of-state insurance company desiring to transact any business in the State to . . . accept service on [a particular state] official as valid in any suit." Id. at 2036 (plurality opinion) (internal quotation marks omitted). In that case, "there was 'no doubt' [the out-of-state insurance company] could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract," because the corporation "had agreed to accept service of process in Missouri on any suit as a condition of doing business there." Id. (plurality opinion) (quoting Pennsylvania Fire, 243 U.S. at 95).

That language — "as a condition of doing business there" — explains why the statutes at issue in both Pennsylvania Fire and Mallory could support a finding of implied consent to personal jurisdiction. Consent may be fairly inferred when a prospective defendant "voluntarily invoke[s] certain [in-forum] benefits . . . conditioned on submitting to the [forum's] jurisdiction," because the acceptance of the benefit implicitly signals the defendant's agreement to appear in the forum's courts. Id. at 2045 (Jackson, J., concurring). Put differently, a defendant may give its consent as part of a bargain: the defendant seeks and obtains a benefit that the

forum has to offer, and the defendant agrees to be sued in that jurisdiction in exchange. Thus, the statute at issue in <u>Mallory</u> supported a finding of consent to jurisdiction because it "gave the [defendant] the right to do business in-state in return for agreeing to answer any suit against it." 143 S. Ct. at 2041 (plurality opinion). Indeed, in discussing why such statutes count among the "legal arrangements [that] may represent . . . implied consent . . . consistent with due process," both the majority and the plurality referred repeatedly to this sort of "exchange."[12] <u>Id.</u> at 2044 n.10 (plurality opinion) (internal quotation marks omitted and alterations adopted); <u>see also</u> <u>id.</u> at 2044 (plurality opinion) ("[A]ccepting an in-state benefit with jurisdictional strings attached . . . can carry with [it] profound consequences for personal jurisdiction."). The plurality also stressed the fundamental fairness of <u>Mallory</u>'s outcome, given the scale of the

---

[12] <u>See, e.g.,</u> <u>Mallory</u>, 143 S. Ct. at 2041 n.8 (plurality opinion) ("[T]hese arrangements <u>can</u> include state laws requiring consent to suit in exchange for access to a State's markets." (internal quotation marks omitted and alterations adopted)); <u>see also</u> <u>id.</u> at 2033 (majority opinion) ("Pennsylvania law . . . requires an out-of-state firm to answer any suits against it in exchange for status as a registered foreign corporation and the benefits that entails."); <u>id.</u> at 2037 (majority opinion) (explaining that the registered defendant obtained "both the benefits and burdens shared by domestic corporations — including amenability to suit in state court on any claim," and that the defendant "has agreed to be found in Pennsylvania and answer any suit there"); <u>id.</u> at 2035 (plurality opinion) (describing a long history of state statutes "requiring out-of-state corporations to consent to in-state suits in exchange for the rights to exploit the local market and to receive the full range of benefits enjoyed by in-state corporations").

defendant's operations in the state. See id. at 2041–43. Because the defendant "had taken full advantage of its opportunity to do business" in the forum, the plurality found no due process concern in enforcing its consent to jurisdiction against it. Id. at 2041.

Mallory therefore underscores the lack of merit in the appellants' asserted analogy between the PSJVTA and business registration statutes. The PSJVTA does not require that the PLO and the PA consent to jurisdiction as a condition of securing a legal right to do business in the United States, which remains prohibited under current law, or to conduct any other presently unauthorized activity. Indeed, the statute does not offer any in-forum benefit, right, or privilege that the PLO and the PA could "voluntarily invoke" in exchange for their submission to the federal courts. Mallory, 143 S. Ct. at 2045 (Jackson, J., concurring). The defendants in this case cannot be said to have accepted some in-forum benefit in return for an agreement to be amenable to suit in the United States.[13]

_____

[13] The plaintiffs contend that we would "break new ground" if we endorsed the "unprecedented" proposition that an in-forum benefit is required to establish a defendant's consent to jurisdiction based on non-litigation conduct. Pls.' July 26, 2023 Supp. Br. at 5, 6. But this argument misses the point. The receipt of a benefit from the forum is not a necessary prerequisite to a finding that a defendant has consented to personal jurisdiction there. Rather, as in Mallory, this sort of "arrangement[]" — that is, a defendant's voluntary acceptance of an in-forum benefit conditioned on amenability to suit — can suffice under the circumstances to "signal consent to jurisdiction." 143 S. Ct.

The appellants' other examples of consent statutes are distinguishable on the same grounds. For example, the plaintiffs point to the state law at issue in <u>Hess v. Pawloski</u>, 274 U.S. 352 (1927), which provided that a nonresident motorist's use of the public roads "shall be deemed equivalent" to appointing an agent for service of process in actions "growing out of any accident or collision in which said nonresident may be involved." <u>Id.</u> at 354 (internal quotation marks omitted). Such a statute conditions "the use of the highway," an in-state benefit from which states may "exclude" nonresidents, on the nonresident's "consent" to personal jurisdiction. <u>Id.</u> at 356–57. Indeed, the statute itself was phrased in those terms: it stated that "[t]he acceptance by a nonresident of the rights and privileges" associated with "operating a motor vehicle . . . on a public way in the [state]" would be a "signification of his agreement" to service. <u>Id.</u> at 354 (internal quotation marks omitted). The same logic applies to state statutes providing that state courts, in certain classes of cases, can exercise consent-based jurisdiction over nonresident officers and directors of a business incorporated under that state's laws. <u>See</u> Pls.'

---

at 2041 n.8 (plurality opinion) (internal quotation marks omitted). In other words, such an exchange can serve as a proxy for consent, from which it may be reasonable and fair to infer an agreement to submit to the forum. There are other means of demonstrating consent, such as certain litigation-related conduct. <u>See, e.g.</u>, <u>Ins. Corp. of Ireland</u>, 456 U.S. 703–05. But "deemed consent," absent some exchange of benefits, has never been recognized as a means of valid consent to personal jurisdiction.

Br. at 29 (citing Hazout v. Tsang Mun Ting, 134 A.3d 274, 289 (Del. 2016)). In "accepting and holding" the position of officer or director, Hazout, 134 A.3d at 277, a "privilege" that carries with it "significant [state-law] benefits and protections," id. at 292 n.66 (quoting Armstrong v. Pomerance, 423 A.2d 174, 176 (Del. 1980)), a nonresident can be said to have signaled an agreement to the jurisdictional consequences.[14]

---

[14] Relying on other cases outside of the personal jurisdiction context, the plaintiffs compare the PSJVTA to "implied consent laws that require motorists . . . to consent to BAC [(blood alcohol content)] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." Missouri v. McNeely, 569 U.S. 141, 161 (2013) (plurality opinion); see, e.g., South Dakota v. Neville, 459 U.S. 553, 559 (1983) (describing one such statute as "declar[ing] that any person operating a vehicle in [the state] is deemed to have consented to a chemical test of the alcoholic content of his blood if arrested for driving while intoxicated"). But these statutes, which implicate the Fourth Amendment's protections against unreasonable searches, see McNeely, 569 U.S. at 148–51, are distinguishable for a variety of reasons, including those set forth above with regard to Mallory and Hess. Like the service-of-process statute considered in Hess, the "implied consent laws" for suspected drunk drivers require a motorist's consent to a particular obligation (specifically, "cooperation with BAC testing") as "a condition of the privilege of driving on state roads." Birchfield v. North Dakota, 579 U.S. 438, 447–48 (2016); see McNeely, 569 U.S. at 161 (plurality opinion) (noting that "all 50 states" have adopted laws requiring drivers to consent to BAC testing "as a condition of operating a motor vehicle within the State"). That is very different from the statute at issue here, which does not condition the defendants' consent on any in-forum privilege at all.

Further, the Supreme Court has never actually upheld these so-called implied consent laws under a consent theory. Rather, the Court has assessed the constitutionality of these laws on a case-by-case basis, relying on the exigency exception to the probable cause and warrant requirements of the Fourth Amendment. See Mitchell v. Wisconsin, 139 S. Ct. 2525, 2532–33 (2019) ("But our decisions have not rested on the idea that these laws . . . create actual consent to all the searches they authorize."); see also id. at 2551 (Gorsuch, J., dissenting) (underscoring that the Supreme Court did not address whether

In short, when a potential defendant accepts a government benefit conditioned on submitting to suit in the forum, such conduct may fairly be understood as consent to jurisdiction there. The same is often true when a defendant engages in litigation conduct related to the existence of personal jurisdiction. But in the PSJVTA, Congress has simply declared that specific activities of the PLO and the PA — namely, certain payments made outside of the United States, and certain operations within the United States (which remain unlawful) — constitute "consent" to jurisdiction. No aspect of these allegedly jurisdiction-triggering activities can reasonably be interpreted as evincing the defendants' "intention to submit" to the United States courts. J. McIntyre, 564 U.S. at 881 (plurality opinion). Congress cannot, by legislative fiat, simply "deem" activities to be "consent" when the activities themselves cannot plausibly be construed as such. Cf. McDonald v. Mabee, 243 U.S. 90, 91 (1917) (noting that, in "exten[ding] . . . the means of acquiring [personal] jurisdiction," "great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact").

---

implied consent was sufficient to authorize the search). These cases, therefore, shed little light on when a constitutional right may be waived by implied consent.

Like the district court, we need not decide whether, "under different circumstances, Congress or a state legislature could constitutionally 'deem' certain conduct to be consent to personal jurisdiction." <u>Fuld</u>, 578 F. Supp. 3d at 587. But for such a statute to pass muster, "the predicate conduct would have to be a much closer proxy for actual consent than the predicate conduct at issue" here. <u>Id.</u> Because the PSJVTA's predicate activities cannot reasonably be understood as signifying the defendants' consent, the statute does not effect a valid waiver of the defendants' due process protection against the "coercive power" of a foreign forum's courts. <u>Goodyear</u>, 564 U.S. at 918; <u>see</u> <u>Waldman I</u>, 835 F.3d at 328, 329.

### B.

Our conclusion also follows from <u>College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board</u>, 527 U.S. 666 (1999). That decision concerned a federal statute, the Trademark Remedy Clarification Act ("TRCA"), which provided that states would forgo their Eleventh Amendment immunity from federal Lanham Act litigation if they committed "any violation" of the Lanham Act's prohibitions on false and misleading advertising. <u>Id.</u> at 670 (quoting 15 U.S.C. § 1122(b)). As relevant here, the petitioner argued that a state could be said to have "'impliedly' or 'constructively' waived its immunity" upon engaging

48

in the relevant predicate conduct — namely, "the activities regulated by the Lanham Act" — after "being put on notice by the clear language of the TRCA that it would be subject to [suit] for doing so." Id. at 669, 676, 680.

The Supreme Court rejected that proposition. It concluded that even with "unambiguous[]" advance notice from Congress, a state's "voluntarily elect[ing] to engage in the federally regulated conduct" at issue would not suffice to render the state suable. Id. at 679–81. Such conduct, the Supreme Court explained, supplied no basis "to assume actual consent" to suit in federal court. Id. at 680. To hold otherwise would ignore the "fundamental difference between a State's expressing unequivocally that it waives its immunity" (in which case, one can "be certain that the State in fact consents to suit") and "Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity." Id. at 680–81. The decision explained:

> In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that the State made an altogether voluntary decision to waive its immunity.

Id. at 681 (emphasis in original) (internal quotation marks omitted). The Supreme Court also saw no merit in the notion that a state could be "deemed to have constructively waived its sovereign immunity" simply because "the asserted basis

49

for [the] waiver [was] conduct that the State realistically could choose to abandon."
<u>Id.</u> at 679, 684. This fact, the decision noted, "ha[d] no bearing upon the
voluntariness of the waiver." <u>Id.</u> at 684.

This reasoning underscores the unconstitutionality of the PSJVTA's
"deemed consent" provision. The statute purports to extract consent to personal
jurisdiction using the very same template that <u>College Savings Bank</u> condemned
in the sovereign immunity context: it identifies activities that, in Congress's
judgment, the PLO and the PA "realistically could choose to abandon," and it
"express[es] unequivocally [Congress's] intention that if [either defendant] takes
[those] action[s] it shall be deemed to have" consented to a federal court's
authority. <u>Id.</u> at 681, 684. The appellants repeatedly contend that this statutory
framework gives rise to constructive consent because the predicate conduct is itself
"voluntary," and the defendants "knowing[ly]" continued such conduct with
"notice" of the statute's terms. Pls.' Br. at 19–20; <u>see</u> Intervenor Br. at 2–3. But
<u>College Savings Bank</u> rejected that precise theory of constructive consent, making
clear that the ability to "abandon" the relevant predicate conduct "ha[s] no bearing
upon the voluntariness of the [asserted] waiver." 527 U.S. at 684. Instead, as
<u>College Savings Bank</u> explained with regard to the state respondent, "the most

50

that can be said" about the defendants here "is that [each] has been put on notice

that Congress intends to subject it to [certain] suits" in federal court. Id. at 681.

That is a "very far" cry from an "altogether voluntary decision" on the part of

either defendant to submit to a court's jurisdiction. See id.

  The appellants argue that the logic of College Savings Bank is inapplicable

here because the decision concerned the "special context" of state sovereign

immunity, where the standard for waiver is "particularly strict." Pls.' Br. at 30–31

(internal quotation marks omitted); see Coll. Sav. Bank, 527 U.S. at 675 (describing

the "test for determining whether a State has waived its immunity" as a "stringent

one" (internal quotation marks omitted)). But the relevant aspects of the Supreme

Court's reasoning were not so cabined. To the contrary, the decision emphasized

that "constructive consent is not a doctrine commonly associated with the

surrender of constitutional rights," and it noted that constructive waivers like the

one considered there — a close match for the sort of "deemed consent" at issue

here — "are simply unheard of in the context of . . . constitutionally protected

privileges." 527 U.S. at 681 (internal quotation marks omitted and alteration

adopted). The Supreme Court illustrated this point with an analogy to an entirely

different constitutional context:

> [I]magine if Congress amended the securities laws to provide with
> unmistakable clarity that anyone committing fraud in connection
> with the buying or selling of securities in interstate commerce would
> not be entitled to a jury in any federal criminal prosecution of such
> fraud. Would persons engaging in securities fraud after the adoption
> of such an amendment be deemed to have "constructively waived"
> their constitutionally protected rights to trial by jury in criminal
> cases? After all, the trading of securities is not so vital an activity that
> any one person's decision to trade cannot be regarded as a voluntary
> choice. The answer, of course, is no. The classic description of an
> effective waiver of a constitutional right is the intentional
> relinquishment or abandonment of a known right or privilege.

Id. at 681–82 (internal quotation marks and citations omitted, alterations adopted).

This example was pertinent, the Supreme Court explained, because the Eleventh Amendment privilege of "[s]tate sovereign immunity, no less than the [Sixth Amendment] right to trial by jury in criminal cases, is constitutionally protected." Id. at 682. The same is true with regard to the "due process right not to be subjected to judgment in [a foreign forum's] courts," J. McIntyre Mach., 564 U.S. at 881 (plurality opinion), which, like the Sixth Amendment jury trial right, is a "legal right protecting the individual," Ins. Corp. of Ireland, 456 U.S. at 704. The plaintiffs nevertheless suggest that we should ignore the lessons of College Savings Bank because its general statements regarding waivers of constitutional rights are nonbinding "dicta." Pls.' Br. at 13, 30, 32. But "it does not at all follow that we can cavalierly disregard" those statements. United States v. Bell, 524 F.2d

202, 206 (2d Cir. 1975). Even if Supreme Court dicta do not constitute established law, we nonetheless accord deference to such dicta where, as here, no change has occurred in the legal landscape. United States v. Harris, 838 F.3d 98, 107 (2d Cir. 2016) (citing Newdow v. Peterson, 753 F.3d 105, 108 n.3 (2d Cir. 2014)); Bell, 524 F.2d at 206 (noting that Supreme Court dicta "must be given considerable weight"). That deference is especially warranted in this case, given the close parallels between the PSJVTA and the statutory framework that College Savings Bank rejected.

Indeed, the voluminous briefing in this case makes clear that the PSJVTA's approach to deemed consent is "simply unheard of," Coll. Sav. Bank, 527 U.S. at 681, because those papers, while extensive, fail to identify a single case approving a similar constructive waiver of the personal jurisdiction requirement. The briefs instead rely entirely on personal jurisdiction cases that are inapposite or distinguishable, for all of the reasons discussed above.

The appellants also cite various cases involving waivers of other constitutional rights, but those cases do not support the constitutionality of the "deemed consent" imposed in the PSJVTA. For example, in arguing that waiving a constitutional right does not require any exchange of benefits, the appellants

53

point to <u>United States v. O'Brien</u>, 926 F.3d 57 (2d Cir. 2019). In <u>O'Brien</u>, however, the defendant had expressly consented to the warrantless searches of his properties, in writing, rendering that case a plainly inapt comparison on the question of constructive consent.[15] <u>Id.</u> at 77. The appellants' authorities concerning valid waivers of the Fifth Amendment privilege against self-incrimination are similarly far afield. <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412 (1986); <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985). The criminal suspects' actions in those cases, taken upon receiving clear and comprehensive warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), left "no doubt" (in <u>Moran</u>) or "no question" (in <u>Elstad</u>) that each had knowingly and voluntarily waived his Fifth Amendment protections. <u>See</u> <u>Moran</u>, 475 U.S. at 417–18, 421–22 (respondent executed "written form[s] acknowledging that he understood his [<u>Miranda</u>] right[s]," and then gave a free and uncoerced confession); <u>Elstad</u>, 470 U.S. at 314–15, 315 n.4 (respondent gave affirmative verbal responses confirming that he understood his <u>Miranda</u> rights, then provided a free and uncoerced description of his offense).

---

[15] The Supreme Court's decision in <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973), a case that the plaintiffs cited at oral argument, is likewise distinguishable because it focused on an instance of express consent — in particular, to the warrantless search of a vehicle. <u>See</u> <u>id.</u> at 220.

The PSJVTA also finds no support in the plaintiffs' cases concerning implied waivers of a litigant's right to proceed before an Article III court. See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665 (2015); Roell v. Withrow, 538 U.S. 580 (2003). In these decisions, the Supreme Court explained that such waivers could be fairly inferred based on specific litigation conduct, namely, "voluntarily appear[ing] to try [a] case before [a] non-Article III adjudicator" after "[being] made aware of the need for consent and the right to refuse it." Wellness Int'l Network, 575 U.S. at 685 (internal quotation marks omitted) (discussing implied consent to a bankruptcy judge's resolution of certain claims); Roell, 538 U.S. at 586 n.3, 591 (discussing implied consent to a magistrate judge's disposition of an action). Those authorities are unlike this case, where the defendants have not engaged in any conduct (litigation-related or otherwise) evincing an "intention of . . . submitting to the court's jurisdiction." Roell, 538 U.S. at 586 n.3 (internal quotation marks omitted).

In sum, Congress cannot take conduct otherwise insufficient to support an inference of consent, brand it as "consent," and then decree that a defendant, after some time has passed, is "deemed to have consented" to the loss of a due process right for engaging in that conduct. This unprecedented framework for consent-based jurisdiction, predicated on conduct that is not "of such a nature as to justify

55

the fiction" of consent, cannot be reconciled with "traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316, 318 (internal quotation marks omitted). Thus, the PSJVTA's "deemed consent" provision is incompatible with the Fifth Amendment's Due Process Clause.

### C.

The appellants and their amici make various other arguments in support of the constitutionality of the PSJVTA and the exercise of personal jurisdiction in this case, none of which is persuasive.

The Government defends the constitutionality of the PSJVTA on the grounds that the predicate conduct at issue is "closely linked to the only claim for which personal jurisdiction is permitted, a civil ATA action concerning attacks on Americans." Intervenor Br. at 30. But the relevant question here is not whether the predicate conduct identified in the statute bears some relation to the activities proscribed under the ATA, or to Congress's interest in remediating the harms that flow from those activities. Rather, the question is whether such conduct demonstrates the defendants' valid consent to the authority of a United States court. No basis exists to conclude that it does.

Also unpersuasive is the Government's contention that Congress, in furtherance of an important legislative purpose, narrowly tailored the PSJVTA to establish jurisdiction over only the PLO, the PA, and their "successors or affiliates." Intervenor Br. at 24. Such singling out does not cure a constitutional deficiency. Where, as here, a statute impinges on constitutional rights, it cannot be salvaged on the basis that it violates the rights of only a handful of subjects.

Relatedly, the Government contends that this Court must defer to Congress's choices in crafting the PSJVTA because the statute is "centrally concerned with matters of foreign affairs," a realm in which the political branches enjoy "broad authority." Intervenor Br. at 27. Invalidating the statute, the Government argues, would frustrate legislative and executive efforts to give full effect to the ATA's civil liability provisions, which comprise part of the nation's "comprehensive legal response to international terrorism." Id. at 22–23 (internal quotation marks omitted). It is true, of course, that when "sensitive interests in national security and foreign affairs [are] at stake," the policy judgments of both Congress and the Executive are "entitled to significant weight." Holder v. Humanitarian Law Project, 561 U.S. 1, 36 (2010). But it is equally true that the Government's broad "foreign affairs power . . . , 'like every other governmental

power, must be exercised in subordination to the applicable provisions of the Constitution.'" <u>Am. Ins. Ass'n v. Garamendi</u>, 539 U.S. 396, 416 n.9 (2003) (quoting <u>United States v. Curtiss-Wright Exp. Corp.</u>, 299 U.S. 304, 320 (1936)). Indeed, "[o]ur deference in matters of policy cannot . . . become abdication in matters of law," and "[o]ur respect for Congress's policy judgments . . . can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 567 U.S. 519, 538 (2012).

Thus, a statute "cannot create personal jurisdiction where the Constitution forbids it." <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 538 F.3d 71, 80 (2d Cir. 2008) (internal quotation marks omitted), <u>abrogated on other grounds by</u> <u>Samantar v. Yousuf</u>, 560 U.S. 305 (2010); <u>accord</u> <u>Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.</u>, 284 F.3d 1114, 1121 (9th Cir. 2002); <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82, 95 (D.C. Cir. 2002). Because the PSJVTA purports to provide consent-based jurisdiction in a manner at odds with constitutional due process, the statute cannot stand, notwithstanding the policy concerns that motivated its enactment. <u>See</u> <u>Nat'l Fed'n of Indep. Bus.</u>, 567 U.S. at 538 ("[T]here can be no question that it is the responsibility of th[e] Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits.").

The appellants also urge us to depart from our prior holding that the due process analyses under the Fifth and Fourteenth Amendments parallel one another in civil cases, see Waldman I, 835 F.3d at 330, and to embrace instead the view that the Fifth Amendment imposes comparatively looser requirements for the exercise of personal jurisdiction. For its part, the Government argues that Congress, as compared to state legislatures subject to the Fourteenth Amendment, should be permitted under the Fifth Amendment to authorize "a greater scope of personal jurisdiction" where it wishes to facilitate federal adjudication of certain "legal claims." Intervenor Br. at 39–40. As the basis for this position, the Government contends that the Supreme Court "has tied the limitations of its Fourteenth Amendment personal jurisdiction jurisprudence" to interstate federalism concerns, which do not similarly constrain the exercise of Congress's legislative power. Id. at 37–38. Under the Government's theory, the Fifth Amendment subjects Congress to a more lenient due process standard, allowing it to enact the sort of "deemed consent" provision featured in the PSJVTA — "[e]ven if," due to their limited sovereignty, "state[s] could not enact similar legislation consistent with the Fourteenth Amendment." Id. at 40.

The short answer to this argument is that the panel's opinion in Waldman I is the law of the Circuit and cannot be changed unless it is overruled by the Supreme Court or by this Court in an en banc or "mini-en banc" decision. See United States v. Peguero, 34 F.4th 143, 158 & n.9 (2d Cir. 2022). In any event, federalism is not the only constraint on the exercise of personal jurisdiction. See Douglass v. Nippon Yusen Kabushiki Kaisha, 46 F.4th 226, 235 (5th Cir. 2022) (en banc), cert. denied sub nom. Douglass v. Kaisha, 143 S. Ct. 1021 (2023) (mem.); Livnat, 851 F.3d at 55 ("[P]ersonal jurisdiction is not just about federalism."). Fundamentally, the Constitution's personal jurisdiction requirements represent a "restrict[ion] [on] judicial power" — and, as a corollary, a restriction on the legislative ability to expand that power — "not as a matter of sovereignty, but as a matter of individual liberty." J. McIntyre Mach., 564 U.S. at 884 (plurality opinion) (quoting Ins. Corp. of Ireland, 456 U.S. at 702). Thus, to the extent that the need for personal jurisdiction operates as a limit on a state's sovereign authority, that effect "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause." Ins. Corp. of Ireland, 456 U.S. at 702 n.10. Relatedly, the Supreme Court's precedents make clear that one of the "vital purpose[s] of personal-jurisdiction standards," whether applied in state or federal

court, "is to ensure fairness to the defendant." Livnat, 851 F.3d at 55 (internal quotation marks omitted and alteration adopted).

For these very reasons, several courts of appeals, including ours, have rejected the notion that federalism's irrelevance in the Fifth Amendment context justifies a "more lenient" standard for personal jurisdiction. Waldman I, 835 F.3d at 329–30; see, e.g., Livnat, 851 F.3d at 54–55; see also Douglass, 46 F.4th at 236–38 ("Because the Due Process Clauses use the same language and guarantee individual liberty in the same way, it makes sense that the standards developed in the Fourteenth Amendment context must govern under the Fifth Amendment."). No basis exists to conclude that the same argument, rooted in the absence of federalism-related restrictions on national power, would warrant relaxing due process constraints on Congress's ability to "deem[] certain actions . . . to be consent to personal jurisdiction." Intervenor Br. at 40. Whether premised on contacts or consent, subjecting a nonresident defendant to the power of a particular forum implicates compelling concerns for fairness and individual liberty, and those "strong justifications for personal-jurisdiction limits apply equally in Fifth Amendment cases." Livnat, 851 F.3d at 55.[16]

---

[16] Moreover, "[j]urisdictional rules should be 'simple,' 'easily ascertainable,' and 'predictable.'" Livnat, 851 F.3d at 56 (alterations adopted) (quoting Daimler, 571 U.S. at

The plaintiffs take a somewhat different approach to this Fifth Amendment issue: they ask us to invoke our "'mini en banc' process," overrule Waldman I entirely, and embrace the broader Fifth Amendment standard used for personal jurisdiction in criminal cases, so that the district court may assert "specific jurisdiction" over the defendants irrespective of whether the PSJVTA gives rise to valid consent. Pls.' Br. at 16, 49. Together with their amici, the plaintiffs raise a host of historical, structural, and practical considerations, including many of the same federalism-related arguments already rejected above, in an attempt to secure a more permissive interpretation of the Fifth Amendment's due process limits.

These arguments, however, provide no persuasive basis for disturbing a binding decision of this Court, especially where that decision accords with existing Circuit case law and the overwhelming weight of authority from the other federal courts of appeals.[17] See Douglass, 46 F.4th at 235, 239 & n.24 (collecting cases from

_____

137). The Government's proposal meets none of those criteria. While the Government assures us that not every conceivable "deemed consent" provision would pass muster under a relaxed Fifth Amendment standard, it fails to identify any workable limitation on the "greater scope" of jurisdiction that would be permitted. Intervenor Br. at 39.

[17] See, e.g., Douglass, 46 F.4th at 235 ("We . . . hold that the Fifth Amendment due process test for personal jurisdiction requires the same 'minimum contacts' with the United States as the Fourteenth Amendment requires with a state. Both Due Process Clauses use the same language and serve the same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction."); Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd., 43 F.4th 1303, 1308 (11th Cir. 2022) ("[C]ourts should analyze personal jurisdiction under the Fifth Amendment using the same basic standards and

the Second, Sixth, Seventh, Eleventh, Federal, and D.C. Circuits); <u>see also</u> <u>Livnat</u>,

851 F.3d at 54–55 & 55 n.5 (similar). Moreover, <u>Waldman I</u> was not the first

---

tests that apply under the Fourteenth Amendment."); <u>Abelesz v. OTP Bank</u>, 692 F.3d 638, 660 (7th Cir. 2012) (finding "no merit" in the contention that the Fifth Amendment "relaxes the minimum-contacts inquiry"); <u>Carrier Corp. v. Outokumpu Oyj</u>, 673 F.3d 430, 449 (6th Cir. 2012) (holding that the Fifth Amendment due process test "parallels" the Fourteenth Amendment analysis); <u>Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.</u>, 297 F.3d 1343, 1350 (Fed. Cir. 2002) (concluding that the Fourteenth Amendment "minimum contacts" standard "articulated in <u>International Shoe</u> . . . and its progeny" applies in "Fifth Amendment due process cases"). In contending that several federal courts of appeals have held otherwise, <u>see</u> Pls.' Br. at 59–60, the plaintiffs rely on outdated authorities, chief among them a vacated decision of the United States Court of Appeals for the Fifth Circuit, <u>see</u> <u>Douglass v. Nippon Yusen Kabushiki Kaisha</u>, 996 F.3d 289 (5th Cir.) (per curiam), <u>opinion vacated and reh'g en banc granted</u>, 2 F.4th 525 (5th Cir. 2021) (mem.), which subsequently concluded that the Due Process Clauses of the Fifth and Fourteenth Amendments require the same personal jurisdiction analysis, <u>see</u> 46 F.4th 226 (5th Cir. 2022) (en banc). The plaintiffs also misstate the holdings of other cases, which nowhere suggested that the personal jurisdiction requirements of the Fifth Amendment are less stringent than those applicable under the Fourteenth Amendment. <u>See, e.g.</u>, <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 370–71 & 370 n.2 (3d Cir. 2002) (invoking Fourteenth Amendment due process "minimum contacts" standards where the Fifth Amendment applied); <u>see also</u> <u>Peay v. BellSouth Med. Assistance Plan</u>, 205 F.3d 1206, 1211–12 (10th Cir. 2000) (similarly borrowing Fourteenth Amendment standards to conduct a Fifth Amendment inquiry).

The Supreme Court has never "expressly analyzed whether the Fifth and Fourteenth Amendment standards differ," instead reserving decision on the issue. <u>Livnat</u>, 851 F.3d at 54; <u>see, e.g.</u>, <u>Bristol-Meyers</u>, 582 U.S. at 268–69 ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."). Other courts of appeals have observed that on at least one occasion, the Supreme Court appears to have "instinctively relied on its Fourteenth Amendment personal jurisdiction jurisprudence" in the Fifth Amendment context. <u>Douglass</u>, 46 F.4th at 239 (citing <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 620 (1992), in turn quoting <u>Burger King</u>, 471 U.S. at 475); <u>accord</u> <u>Livnat</u>, 851 F.3d at 54.

decision of this Court to apply Fourteenth Amendment due process principles in a Fifth Amendment context; the analysis there followed from prior Circuit precedents that "clearly establish[ed] the congruence of [the] due process analysis under both the Fourteenth and Fifth Amendments." 835 F.3d at 330 (citing, among other authorities, Chew, 143 F.3d at 28 n.4, and In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673–74 (2d Cir. 2013)); see also Porina v. Marward Shipping Co., 521 F.3d 122, 127–29 (2d Cir. 2008). Therefore, we decline the invitation to abandon our prior ruling and upend settled law on the due process standards under the Fifth Amendment.

To the extent the plaintiffs ask us to revisit any other aspect of our decision in Waldman I, we decline that invitation as well. After explaining that the Fifth and Fourteenth Amendment due process analyses parallel one another in civil actions, Waldman I faithfully applied the Supreme Court's binding due process precedents, including its then-recent decision in Daimler, to conclude that the PLO and the PA could not be subjected to general or specific jurisdiction under the circumstances presented. In three separate cases involving similar ATA claims, the D.C. Circuit Court of Appeals agreed. See Shatsky, 955 F.3d at 1036–37; Klieman,

923 F.3d at 1123–26; <u>Livnat</u>, 851 F.3d at 56–57. No aspect of the present dispute affects our decision in <u>Waldman I</u> as to what constitutional due process requires.

*   *   *

We reiterate the district court's closing observation that just "[a]s in <u>Waldman I</u>, the killing of Ari Fuld was 'unquestionably horrific' and [the] [p]laintiffs' efforts to seek justice on his and their own behalf are morally compelling." <u>Fuld</u>, 578 F. Supp. 3d at 595 (quoting <u>Waldman I</u>, 835 F.3d at 344). But "the federal courts cannot exercise jurisdiction in a civil case beyond the limits" of the Due Process Clause, "no matter how horrendous the underlying attacks or morally compelling the plaintiffs' claims." <u>Id.</u> at 595–96 (quoting <u>Waldman I</u>, 835 F.3d at 344). The PSJVTA provides for personal jurisdiction over the PLO and the PA in a manner that exceeds those constitutional limits. Because the statute violates due process, the defendants cannot be "deemed to have consented" to personal jurisdiction in this case. 18 U.S.C. § 2334(e)(1).

**CONCLUSION**

We have considered all of the arguments of the parties and their <u>amici</u>. To the extent not specifically addressed above, those arguments are either moot or without merit. For the foregoing reasons, we conclude that the PSJVTA's provision

regarding "deemed" consent to personal jurisdiction is inconsistent with constitutional due process. Accordingly, the plaintiffs' complaint against the PLO and the PA was properly dismissed for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The judgment of the district court is **AFFIRMED.**